# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; ANGELA GILMORE; AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA; and EQUALITY NORTH CAROLINA, <br><br> *Plaintiffs*, <br><br> v. <br><br> PATRICK MCCRORY, in his official capacity as Governor of North Carolina; ROY COOPER III, in his official capacity as Attorney General of North Carolina; UNIVERSITY OF NORTH CAROLINA; BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; and W. LOUIS BISSETTE, JR., in his official capacity as Chairman of the Board of Governors of the University of North Carolina, <br><br> *Defendants*. | No. 1:16-cv-236 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This lawsuit challenges a sweeping North Carolina law, House Bill 2 ("H.B. 2"), which bans transgender people from accessing restrooms and other facilities consistent with their gender identity and blocks local governments from protecting lesbian, gay, bisexual, and transgender ("LGBT") people against discrimination in a wide variety of settings.  By singling out LGBT people for disfavored treatment and explicitly

1

writing discrimination against transgender people into state law, H.B. 2 violates the most basic guarantees of equal treatment and the U.S. Constitution.

2.     In February 2016, the City of Charlotte enacted an ordinance (the "Ordinance") that extended existing municipal anti-discrimination protections to LGBT people.  In light of the pervasive discrimination faced by LGBT people—and particularly transgender people—advocates had long pressed the Charlotte City Council for these protections.  Because North Carolina state law does not expressly prohibit discrimination based on sexual orientation or gender identity, many LGBT residents of Charlotte—as well as LGBT residents throughout the state—are exposed to invidious discrimination in their day-to-day lives simply for being themselves.  After two hours-long hearings, in which there was extensive public comment on both sides of the issue, the Charlotte City Council voted to adopt the Ordinance.

3.     Before the Ordinance could take effect, the North Carolina General Assembly rushed to convene a special session with the express purpose of passing a statewide law that would preempt Charlotte's "radical" move to protect its residents from discrimination.  In a process rife with procedural irregularities, the legislature introduced and passed H.B. 2 in a matter of hours, and the governor signed the bill into law that same day.  Lawmakers made no attempt to cloak their actions in a veneer of neutrality, instead openly and virulently attacking transgender people, who were falsely portrayed as predatory and dangerous to others.  While the discriminatory, stated focus of the legislature in passing H.B. 2—the use of restrooms by transgender people—is on its own

2

illegal and unconstitutional, H.B. 2 in facts wreaks far greater damage by also prohibiting local governments in North Carolina from enacting express anti-discrimination protections based on sexual orientation and gender identity.

4.      Plaintiffs are individuals and nonprofit organizations whose members and constituents will be directly impacted by H.B. 2. Like the two transgender plaintiffs in the case, transgender people around the state of North Carolina immediately suffered harm under H.B. 2 in that they are not able to access public restrooms and other single-sex facilities that accord with their gender identity. LGBT people are also harmed by H.B. 2 in that it strips them of or bars them from anti-discrimination protections under local law. Plaintiffs seek a declaratory judgment that H.B. 2 violates their or their members' constitutional and statutory rights to equal protection, liberty, dignity, autonomy and privacy, as well an injunction preliminarily and permanently enjoining enforcement by of H.B. 2 by Defendants.

## PARTIES

### A.      Plaintiffs.

5.      Plaintiff Joaquín Carcaño ("Mr. Carcaño") is a 27-year-old man who resides in Carrboro, North Carolina. Mr. Carcaño is employed by the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"). He is transgender.

6.      Plaintiff Payton Grey McGarry ("Mr. McGarry") is a 20-year-old man who resides in Greensboro, North Carolina. Mr. McGarry is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro"). He is transgender.

3

7.     Plaintiff Angela Gilmore ("Ms. Gilmore") is a 52-year-old woman who resides in Durham, North Carolina and is an Associate Dean and Professor at North Carolina Central University School of Law.  Ms. Gilmore is a lesbian.

8.     Plaintiff American Civil Liberties Union of North Carolina ("ACLU of NC") is a private, non-profit membership organization with its principal office in Raleigh, North Carolina.  It has approximately 8,500 members in the State of North Carolina, including LGBT members.  The mission of the ACLU of NC is to defend and advance the individual freedoms embodied in the United States Constitution, including the rights of LGBT people, to be free from invidious discrimination and infringements on their liberty interests.  The ACLU of NC sues on behalf of its members, some of whom are transgender individuals who are barred by H.B. 2 from using restrooms and other facilities in accordance with their gender identity in schools and government buildings, and some of whom are lesbian, gay, bisexual, or transgender individuals who have been stripped of or barred from local non-discrimination protections based on their sexual orientation and sex, including gender identity.

9.     Plaintiff Equality NC ("Equality NC") is North Carolina's largest non-profit organization advocating for the rights of lesbian, gay, bisexual, and transgender individuals, with over 100,000 constituents and supporters.  Originally founded in 1979 as the North Carolina Human Rights Fund, Equality NC is dedicated to securing equal rights and justice for lesbian, gay, bisexual, and transgender North Carolinians.  Equality NC conducts comprehensive campaigns to build public support for equal rights,

4

advocates with policy-making bodies for the enactment of anti-discrimination protections for LGBT people, and provides educational programming on LGBT issues. Equality NC represents the interests of constituents who would otherwise have standing to participate in this case and have indicia of membership. Because Equality NC's primary function is to protect the rights of LGBT people, its challenge to H.B. 2 is germane to the organization's purpose.

**B.    Defendants.**

10.    Defendant Patrick McCrory ("Defendant McCrory" or "Governor McCrory" or "the Governor") is sued in his official capacity as the Governor of North Carolina. Pursuant to Article III, Section 1 of the State Constitution, "the executive power of the State" is vested in Defendant McCrory in his capacity as Governor. Article III, Section 5(4) also provides that it is the duty of Defendant McCrory in his capacity as Governor to "take care that the laws be faithfully executed." Governor McCrory is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

11.    Defendant Roy Cooper III ("Defendant Cooper" or "Mr. Cooper") is sued in his official capacity as the Attorney General of North Carolina. Pursuant to N.C. Gen. Stat. § 114-2, it is Defendant Cooper's duty in his capacity as Attorney General of North Carolina to appear on behalf of the state in any court or tribunal in any cause or matter, civil or criminal, in which the state may be a party or interested. It is also the duty of Defendant Cooper to defend and enforce the laws of North Carolina. Mr. Cooper is a

5

person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

12. Defendant University of North Carolina is an education program or activity receiving federal financial assistance. Defendant University of North Carolina includes its constituent institutions, the University of North Carolina at Chapel Hill, and the University of North Carolina at Greensboro.

13. Defendant Board of Governors of the University of North Carolina ("the Board") is a corporate body charged with the general control, supervision, and governance of the University of North Carolina's constituent institutions. The Board is capable of being sued in "all courts whatsoever" pursuant to N.C. Gen. Stat. § 116-3.

14. Defendant W. Louis Bissette, Jr. ("Defendant Bissette" or "Mr. Bissette") is sued in his official capacity as the Chairman of the Board of Governors of the University of North Carolina and has the power to ensure the Board's compliance with any injunctive relief.

15. Defendants, through their respective duties and obligations, are responsible for enforcing H.B. 2. Each Defendant, and those subject to their direction, supervision, and control, has or intentionally will perform, participate in, aide and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure Plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant, as well as all

persons under their supervision, direction, or control, including but not limited to their officers, employees, and agents.

## JURISDICTION AND VENUE

16.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").

17.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States and the United States Constitution.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant University of North Carolina resides within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to the Plaintiffs' claims took place within the District.

19.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

20.     This Court has personal jurisdiction over Defendants because they are domiciled in North Carolina.

## FACTUAL ALLEGATIONS

**A.     Plaintiffs.**

21.     **Plaintiff Joaquín Carcaño** works for UNC-Chapel Hill's Institute for

7

Global Health and Infectious Disease as a Project Coordinator. The project that he coordinates provides medical education and services such as HIV testing to the Latino/a population.

22.     Mr. Carcaño is a man.

23.     Until the passage of H.B. 2, Mr. Carcaño was recognized and treated like all other men at his work at UNC-Chapel Hill.

24.     Mr. Carcaño is transgender. What that means is that his sex assigned at birth was female, as his birth certificate reflects, but that designation does not accurately reflect his gender identity, which is male.

25.     A person's gender identity refers to the person's internal sense of belonging to a particular gender. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

26.     The gender marker on a birth certificate is designated at the time of birth generally based upon the appearance of external genitalia. However, determinations of sex can involve multiple factors, such as chromosomes, hormone levels, internal and external reproductive organs, and gender identity.

27.     Gender identity is the primary determinant of sex.

28.     Mr. Carcaño was diagnosed with gender dysphoria, the medical diagnosis for the clinically significant distress that individuals whose gender identity differs from the sex they were assigned at birth can experience.

8

29.     Gender dysphoria is a serious medical condition that if left untreated can lead to clinical distress, debilitating depression, and even suicidal thoughts and acts.

30.     Gender dysphoria is a condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) (DSM-V), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31.     Medical treatment for gender dysphoria must be individualized for the medical needs of each patient.

32.     Treatment for gender dysphoria includes living one's life consistent with one's gender identity, including when accessing single-sex spaces like restrooms and locker rooms.

33.     Forcing a transgender person to use single-sex spaces that do not match the person's gender identity is inconsistent with medical protocols and can cause anxiety and distress to the transgender person and result in harassment of and violence against them.

34.     Mr. Carcaño was born and raised in South Texas.  Since a very young age, around 7 or 8 years old, Mr. Carcaño was aware that he did not feel like a girl, but he did not know how to express how he felt.

35.     Mr. Carcaño ultimately acknowledged his male gender identity to himself later in his adult life.

36.     Mr. Carcaño has been in the continuous care of a licensed mental health clinician since 2013, who diagnosed Mr. Carcaño with gender dysphoria.  Mr. Carcaño initially sought treatment for depression, which was caused in part by his gender dysphoria.

37.     Mental health and medical professionals worldwide recognize and follow the evidence-based standards of care for the treatment of gender dysphoria developed by the World Professional Association for Transgender Health ("WPATH").  After diagnosing Mr. Carcaño with gender dysphoria, his therapist developed a course of treatment consistent with those standards.  The goal of such treatment is to alleviate distress by helping a person live congruently with the person's gender identity, the primary determinant of sex.  Consistent with that treatment and his identity, in January 2015, Mr. Carcaño explained to his family and friends that he was a man.

38.     A critical component of the WPATH Standards of Care is a social transition to living full-time consistently with the individual's gender identity.  For Mr. Carcaño, that includes living in accordance with his gender identity in all respects, including the use of a male name and pronouns and use of the men's restrooms.

39.     For transgender adults, it is critical that social transition include transition in the workplace, including with respect to restrooms.  Excluding a transgender man from the restroom that corresponds to his gender identity, or forcing him to use a separate facility from other men, communicates to the entire workplace that he should not be recognized as a man and undermines the social transition process.

40. Mr. Carcaño also began using Joaquín as his first name in January 2015. His friends, family, and coworkers now recognize him as a man, and they refer to him using his male name and male pronouns.

41. Also consistent with the WPATH Standards of Care, Mr. Carcaño's physician recommended and prescribed hormone treatment, which Mr. Carcaño has received since May 2015. For both hormone therapy and surgical treatment, the WPATH Standards of Care require persistent, well-documented gender dysphoria, which is a criterion that Mr. Carcaño satisfied. Among other therapeutic benefits, the hormone treatment has deepened Mr. Carcaño's voice, increased his growth of facial hair, and given him a more masculine appearance. This treatment helped alleviate the distress Mr. Carcaño experienced due to the discordance between his birth-assigned sex and his identity and helped him to feel more comfortable with who he is.

42. As part of the treatment for his gender dysphoria, Mr. Carcaño also obtained a bilateral mastectomy in January 2016. Consistent with WPATH Standards of Care, Mr. Carcaño satisfied the requirement of having a referral from a qualified mental health professional in order to obtain the surgical treatment.

43. As part of his social transition, Mr. Carcaño began using the men's restroom at work and elsewhere in late 2015, which occurred without incident for the five months or so before H.B. 2's enactment. Mr. Carcaño's therapist had also specifically recommended that he use only the men's restroom. She was concerned that using the women's restroom could compromise his mental health, well-being, and safety. By late

11

2015, Mr. Carcaño had facial hair facilitated by hormone treatment, and his therapist indicated that others would recognize Mr. Carcaño as male based on his physical appearance.

44.     Mr. Carcaño is now comfortable with the status of his treatment and, with the exception of the distress now caused by the passage of H.B. 2, his distress has been managed through the clinically recommended treatment he has received.  He plans to continue treatment under the supervision of medical professionals and based on his medical needs.

45.     Apart from the building where he works, Mr. Carcaño also used other men's restrooms on the UNC-Chapel Hill campus without incident for approximately five months prior to H.B. 2's passage.  In addition, when out in public, such as at restaurants and stores, Mr. Carcaño uses the men's restroom.

46.     The only restrooms on the floor where Mr. Carcaño works at UNC-Chapel Hill are designated either for men or for women.  There are no restrooms in the building where Mr. Carcaño works that are not designated either for men or women.  All the restrooms in the building are multiple occupancy.

47.     If Mr. Carcaño could not use the men's restroom at UNC-Chapel Hill, he would have to leave campus and find a local business in order to use the men's restroom; or he would have to locate a restroom not designated for either men or women elsewhere on campus.  Either way, preventing him from using the multiple occupancy restrooms that other men are able to use is stigmatizing and marks him as different and lesser than

12

other men. It also interferes with his ability to perform his job duties by requiring him to leave his building each time he needs to use the restroom throughout the workday.

48. Using the women's restroom is not a viable option for Mr. Carcaño, just as it would not be a viable option for non-transgender men to be forced to use the women's restroom. Forcing Mr. Carcaño to use the women's restroom would also cause substantial harm to his mental health and well-being. It would also force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

49. The idea of being forced into the women's restroom causes Mr. Carcaño to experience significant anxiety as he knows that it would be distressing for him and uncomfortable for others. He fears for his safety because of the passage of H.B. 2.

50. Mr. Carcaño also visits public agencies as defined by N.C. Gen. Stat. § 143-760(4), and intends to and will do so in the future. For example, as part of his job at UNC-Chapel Hill, Mr. Carcaño has had to visit the offices North Carolina Department of Health and Human Services many times in the past, and he will continue to need to do so in the future. Prior to passage of H.B. 2, he used the men's restroom while at their office, but he will be banned from doing so in the future under H.B. 2.

51. Similarly, Mr. Carcaño has visited state courthouses in Chapel Hill as part of a process to obtain a name change from his current legal name, which includes a traditionally female first name, to the name he currently uses. Because that name change

13

process is ongoing, Mr. Carcaño will continue to visit state courthouses in the future, but he will be banned from using the men's restroom there under H.B. 2.

52.     Mr. Carcaño has also visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (e.g., to obtain a driver's license) and anticipates doing so again in the future, where he will be banned from using the men's restroom under H.B. 2.

53.     Mr. Carcaño also regularly uses the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation.  For example, he uses the restrooms provided by that system when he travels approximately once a month to visit his brother in Atlanta, and when he visits Washington, D.C. periodically.  He will need to continue to use those restrooms in the future, but he will be banned from using the men's restroom under H.B.2.

54.     There have been no incidents or, to the best of Mr. Carcaño's knowledge, complaints related to his use of the restrooms designated for men.

55.     Mr. Carcaño is a member of the ACLU of NC.

56.     **Plaintiff Payton Grey McGarry** is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro") where he is double majoring in Business Administration and Accounting.  He is also a skilled musician and has played trumpet in many ensembles at UNC-Greensboro.  He plays the guitar, baritone, clarinet, and saxophone.

14

57.     Mr. McGarry is close to his family and has a younger brother who is also a member of the LGBT community.  Mr. McGarry hopes to use his education to eventually go to law school and work to defend people's civil rights.

58.     Mr. McGarry is a man.

59.     Mr. McGarry is transgender.  As is true for Mr. Carcaño, Mr. McGarry's sex assigned at birth was female, as his birth certificate reflects, but that designation does not conform to his gender identity, which is male.

60.     Mr. McGarry was diagnosed with gender dysphoria.

61.     Mr. McGarry was born and raised in Wilson, North Carolina.  Throughout his childhood, Mr. McGarry felt like a boy and never really thought of himself as a girl. It was not until he started to go through puberty that he began to wrestle with the disconnect between his identity as a boy and his assigned birth sex.

62.     Mr. McGarry realized while he was in high school that he is transgender.

63.     In October of 2013, during his senior year in high school, Mr. McGarry began mental health treatment with a licensed clinical social worker who diagnosed him with gender dysphoria.

64.     After diagnosing Mr. McGarry with gender dysphoria, his therapist developed a course of treatment in accordance with medical standards for treating the condition.

65.     Consistent with that treatment and his identity, in the fall and winter of 2013, Mr. McGarry explained to his friends and family that he is male and began to use male pronouns.

66.     In April of 2014, under the care of an endocrinologist, Mr. McGarry began hormone therapy.  This treatment helped alleviate the distress Mr. McGarry experienced due to the discordance between his birth-assigned sex and his identity and helped him to feel more comfortable with who he is.

67.     By the time he graduated high school in June of 2014, Mr. McGarry used the name Payton and male pronouns in all aspects of his life.  He is known as Payton McGarry to his family, friends, and peers, although he has not yet changed his legal first name to Payton.

68.      In the fall of 2014, Mr. McGarry enrolled as a freshman at UNC-Greensboro as Payton McGarry and as male.

69.     Since arriving at UNC-Greensboro, Mr. McGarry has identified and has been known to others as male for all purposes.

70.     Mr. McGarry is a member of Phi Mu Alpha Sinfonia, a music fraternity, and is the Vice President of the Iota Epsilon Chapter of that fraternity.  His fraternity brothers are aware that he is transgender and have no concerns with his use of men's restrooms and locker rooms.

71.     Though Mr. McGarry currently lives off campus, he is on campus six or seven days per week and always uses the restroom designed for men in on-campus buildings.

72.     Mr. McGarry regularly uses the locker room facilities at UNC-Greensboro and always uses the facilities designed for men.

73.     For the past year and a half since he enrolled at UNC-Greensboro, Mr. McGarry has used the men's restrooms and locker rooms on-campus without incident. Mr. McGarry is unaware of any instance in which any person has complained about his use of the men's restroom or locker room.

74.     Mr. McGarry works part-time as a visual technician for marching bands at different high schools around the state and regularly uses the bathroom for men when working as a visual technician.  There have been no incidents or, to the best of Mr. McGarry's knowledge, complaints related to his use of the restrooms designated for men.

75.     In addition, when out in public, such as at restaurants and stores, Mr. McGarry always uses the men's restroom.

76.     To Mr. McGarry's knowledge, there are very few single-user restrooms on the UNC-Greensboro campus and in many buildings where he has classes there are no single user bathrooms.

77.     If Mr. McGarry could not use the men's restroom at UNC-Greensboro, he would have to search for single-user restrooms outside of the buildings where his classes are held every time he had to use the restroom.  This would disrupt his ability to attend

17

class and would interfere with his educational opportunities. Expelling him from the multiple occupancy restrooms and locker rooms available to all other male students is stigmatizing and marks him as different and lesser than other men.

78.     Since he started testosterone two years ago, Mr. McGarry's voice has deepened and his face and body have become more traditionally masculine in appearance.

79.     Using the women's restroom is not a viable option for Mr. McGarry, just as it would not be a viable option for non-transgender men to be forced to use the women's restroom. Forcing Mr. McGarry to use the women's restroom would also cause substantial harm to his mental health and well-being. It would also force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

80.     The idea of being forced into the women's restroom causes Mr. McGarry to experience significant anxiety as he knows that it would be distressing for him and uncomfortable for others. He fears for his safety because of the passage of H.B. 2.

81.     Mr. McGarry has also visited public agencies as defined by N.C. Gen. Stat. § 143-760(4), and intends to and will do so in the future. For example, Mr. McGarry has visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (e.g., to obtain a driver's license) and anticipates doing so again in the future, where he will be banned from using the men's restroom under H.B. 2.

82.     Mr. McGarry also has used and will continue to use the North Carolina

Rest Area System, which maintains public restrooms along highways and is operated by

the North Carolina Department of Transportation.  He will need to continue to use those

restrooms in the future, but he will be banned from using the men's restroom under H.B.

2.

83.     **Plaintiff Angela Gilmore** is a resident of Durham, North Carolina.

Ms. Gilmore has lived in North Carolina since 2011, when she moved from Florida to

take a job at North Carolina Central University.  She is currently the Associate Dean for

Academic Affairs and Professor of Law at North Carolina Central University.

84.     Ms. Gilmore is a lesbian, and has been in a relationship with her wife,

Angela Wallace, for almost twenty years.  Ms. Gilmore and Ms. Wallace were married in

Washington, D.C. in 2014.

85.     Ms. Gilmore looked for and accepted a job in North Carolina, after she and

her wife fell in love with the state during a visiting teaching job Ms. Gilmore had at Elon

University School of Law in Greensboro, North Carolina, in 2010.

86.     Both Ms. Gilmore and her wife, African American lesbians, felt that North

Carolina, and Durham in particular, was a place where they could be fully themselves,

comfortable in terms of both their race and sexual orientation.

87.     Ms. Gilmore and her wife love living in Durham—they feel very much part

of the community—and prior to the passage of H.B. 2, they had been looking at small

towns in North Carolina where they might want to retire.

88.     Since moving to North Carolina, Ms. Gilmore has worked towards increasing non-discrimination protections for LGBT people.  Ms. Gilmore is a member of ACLU of NC, and she was on the ACLU of NC board between 2014 and 2015.  During that time, the ACLU of NC actively worked to defeat anti-LGBT bills proposed in the state legislature and to pass local ordinances, like the Ordinance, and to protect LGBT people from discrimination at the local level.  Ms. Gilmore also has spoken on panels at her law school and other law schools regarding non-discrimination protections for LGBT people.

89.     The passage of H.B. 2 has caused Ms. Gilmore and her wife distress, in that it has significantly undone their sense of belonging and value in the state, which is why they moved to North Carolina.  Ms. Gilmore and her wife experience H.B. 2 as sending a clear message to them as lesbians that they are not welcome in North Carolina.

90.     Ms. Gilmore and her wife have visited the city of Charlotte and they plan to do so in the future.  As two women traveling together with the same first name, they are often asked about the nature of their relationship, and they therefore regularly reveal themselves to be a lesbian couple.  Under the Ordinance, Ms. Gilmore and her wife would have been protected from sexual orientation discrimination in public accommodations in the city of Charlotte.  With the passage of H.B. 2, Ms. Gilmore worries that she and her wife will now be exposed to discrimination based on their sexual orientation.

91.     With the passage of H.B. 2, Ms. Gilmore also is limited in her ability to increase and benefit from non-discrimination protections for LGBT people in North Carolina. Were she able to, Ms. Gilmore would continue to advocate for local ordinances that prohibit discrimination based on sexual orientation and gender identity.

92.     As a non-transgender woman who always uses the facilities designated for women in both public and private spaces, the passage of H.B. 2 does not make Ms. Gilmore feel safer in these facilities.

**B.     The City of Charlotte's Enactment of a Non-Discrimination Ordinance.**

93.     Advocates have long worked for the passage of an ordinance that would ensure that LGBT people were expressly protected from discrimination within the City of Charlotte. Prior to the vote on the Ordinance, there had been an earlier round of intensive public engagement in late 2014 to early 2015, when the Charlotte City Council previously considered expanding non-discrimination protections to include sexual orientation and gender identity and expression.

94.     There was again extensive discussion and deliberation leading up to the February 2016 vote on the Ordinance. The Charlotte City Council heard hours of robust public comment in a forum that included hundreds of people—both those who were in support of the Ordinance and those who were in opposition to the Ordinance. The Charlotte City Council also received significant legal analysis from the Office of the City Attorney regarding its authority to enact the Ordinance and the effect of the Ordinance.

21

95.    The impetus for the Ordinance is the reality that LGBT people often face pervasive discrimination.  Although same-sex couples may now marry throughout the United States as a result of the U.S. Supreme Court's 2015 ruling in *Obergefell*, lesbian, gay, and bisexual people remain vulnerable to discrimination in states like North Carolina, where there is no express protection for sexual orientation in state law, making local anti-discrimination protections even more vital.  Discrimination is especially pervasive for transgender people, as evidenced by a 2011 national study of transgender Americans, *Injustice at Every Turn*, which documented the high levels of harassment, discrimination, and violence that transgender people have faced and continue to face.

96.    In the 2011 national report cited above, 90% of respondents reported being harassed at work or taking actions to avoid harassment while 26% reported being fired because they are transgender.  Forty-seven percent reported some form of employment discrimination because they are transgender, including not being hired, not being promoted, or being fired.  Fifty-three percent reported being verbally harassed or disrespected in a place of public accommodation, and 22% report being denied equal treatment by a government agency or official, because they are transgender.

97.    In 2013, it was estimated that there were more than 250,000 LGBT adults in North Carolina, out of an adult population of approximately eight million people.  In addition, there are an estimated 37,800 transgender people (of any age) in North Carolina, including 15,600 individuals who are 13 to 19 years old.  While transgender individuals

only make up a small minority of the population, they are disproportionately targeted for hate crimes in the United States.

98.    On Monday, February 22, 2016, the Charlotte City Council approved by a 7-to-4 vote the Ordinance, which, *inter alia*, amended its existing public accommodations protections by barring discrimination in public accommodations based on "gender identity, gender expression" and "sexual orientation."

99.    The City Council's vote was met with a firestorm of opposition from vocal opponents of the part of the Ordinance that would have required certain public accommodations to allow transgender people to use single-sex facilities, such as restrooms and locker rooms, in accordance with their gender identity.

100.    Opponents of the Ordinance distorted the truth of what the Ordinance's non-discrimination requirement would accomplish and formed a vocal campaign decrying a purported attempt to permit "men in women's restrooms."

**C.    The Events Leading to H.B. 2, Contemporary Statements by Decisionmakers, and Departures From the Normal Legislative Process Revealed a Series of Official Actions Taken for Invidious Purposes.**

101.    The State of North Carolina has rarely, if ever, exercised authority to preempt local ordinances providing broader protections than under state law.  For example, in 1968 Charlotte adopted an ordinance prohibiting discrimination in public accommodations on the basis of race, color, religion, and national origin.  In 1972, the Council amended the ordinance to prohibit discrimination based on sex, which the Council further modified in 1985.

23

102. Even though all of these protections extended beyond the reach of the State's public accommodations law, which until H.B. 2 prohibited only public accommodations discrimination based on disability, the State allowed Charlotte's ordinance to stand undisturbed for decades. It was only after Charlotte took steps to protect LGBT people that the State rushed to preempt the ordinance.

103. Even before the Charlotte City Council had cast its vote on the Ordinance, Governor McCrory informed Charlotte City Council members that the State would likely take immediate action to put a halt to the Ordinance—even as Governor McCrory conceded that was an exceedingly unusual step. In an email to Charlotte City Council members, Governor McCrory noted that he "made a point as the former 14 year Mayor and current Governor to stay out of specific issues being voted on by the Charlotte City Council." Governor McCrory nonetheless characterized the Ordinance's non-discrimination protections for LGBT people as "changing basic long-established values and norms" surrounding "public restrooms," and ominously warning of "possible danger from deviant actions by individuals taking improper advantage of a bad policy." Governor McCrory said that the Ordinance would "most likely cause immediate State legislative intervention which I would support as governor."

104. On Tuesday, February 23, 2016, the Speaker of the House, Tim Moore, issued a press release announcing that he would work with fellow Republicans to explore a "legislative intervention to correct [Charlotte's] radical course."

105.    In North Carolina, it is the state's Governor who typically calls a special session, but in this case, Governor McCrory refused to call a special session because he was concerned the legislature would go beyond addressing the Charlotte Ordinance.

106.    As a result of the Governor's refusal to call a special session, legislative leaders opted for a rarely used law that allows special sessions when three-fifths of legislators in both chambers support the call.  That provision in the state constitution had not been used since 1981, according to Lt. Governor Dan Forest's chief of staff, Hal Weatherman.  The special session cost approximately $42,000 to convene.

107.    The text of H.B. 2, which was named the "Public Facilities Privacy and Security Act," was not shared with most legislators until they arrived to debate the bill.

108.    North Carolina House of Representatives Minority Leader Larry Hall ("Minority Leader Hall") stated "We don't know what we're discussing here, we don't know what we're voting on.  *What we're doing is a perversion of the process*."

109.    Minority Leader Hall said that Democrats were initially told that the special session would take place Thursday, March 24, 2016, when instead the special session was held on March 23, 2016.  Minority Leader Hall stated that, as a result, a number of legislators were "caught off guard" and were "scrambling to try to come back" for the session.

110.    Comments made by lawmakers both during the debate, in the press, and through their social media used vitriolic language to make clear their aim at undoing Charlotte's protections for LGBT people:

25

a.     Senate President Pro Tempore Phil Berger's descriptions of the legislature's work included:

i.     "Senate unanimously votes to stop radical ordinance allowing men into public bathrooms with women and young girls."

ii.     "Lawmakers were forced to come back to session to address the serious safety concerns created by the dangerous ordinance – which violated existing state criminal trespass law, indecent exposure law and building codes and created a loophole that any man with nefarious motives could use to prey on women and young children . . ."

iii.     "How many fathers are now going to be forced to go to the ladies' room to make sure their little girls aren't molested?"

b.     North Carolina state Senator Buck Newton said, "The Charlotte City Council should have never passed this unlawful and reckless bathroom and locker room ordinance.  Politics have reached a new extreme when a municipality's top priority is allowing men into women's bathrooms and locker rooms.  But tens of thousands of our constituents from across the state have called on us to stand up to the political correctness mob, fight for common sense and put a stop to this nonsense once and for all."

c.     North Carolina state Senator David Curtis ("Senator Curtis") said, "This liberal group is trying to redefine everything about our society.  Gender and marriage — just the whole liberal agenda."  Senator Curtis added that while, "We generally don't get involved in local politics.  We need to do what's right."  Senator

26

Curtis said that H.B. 2 was necessary because, "The gays would go into a business, make some outrageous demand that they know the owner cannot comply with and file a lawsuit against that business owner and put him out of business."

        d.    North Carolina state Senator David Brock said, "You know, $42,000 is not going to cover the medical expenses when a pervert walks into a bathroom and my little girls are in there."

111.    Debate in both chambers of the North Carolina General Assembly focused specifically on reversing the Charlotte Ordinance, with lawmakers in both chambers condemning the anti-discrimination protections for LGBT people, including transgender individuals' right to use facilities in accordance with their gender identity.

112.    Less than 10 hours after it was introduced, the bill unanimously passed both houses. Governor McCrory signed the bill that same night, issuing a signing statement making clear once again the targets of H.B. 2. His signing statement said, "This radical breach of trust and security under the false argument of equal access not only impacts the citizens of Charlotte but people who come to Charlotte to work, visit or play. This new government regulation defies common sense and basic community norms by allowing, for example, a man to use a woman's bathroom, shower or locker room." H.B. 2 took effect immediately.

**D.    H.B. 2 Harms Transgender People.**

113.    H.B. 2 amended North Carolina's General Statutes to mandate that school boards *require* students to use restrooms and other single-sex facilities in accordance with

their "biological sex" providing that,

> Local boards of education shall require every multiple occupancy bathroom or changing facility that is designated for student use to be designated for and used only by students based on their biological sex.

114.    H.B. 2 also imposes the same mandate on all executive branch agencies (which are expressly defined to include Defendant University of North Carolina), and all public agencies, providing that they,

> shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex.

115.    Each of those provisions defines "biological sex" as follows,

> Biological sex. – The physical condition of being male or female, which is stated on a person's birth certificate.

116.    Changing the gender marker on one's birth certificate is not a viable option for many transgender people, as every jurisdiction has a different set of often onerous and unnecessary requirements for updating the gender listed on a birth certificate.

117.    For instance, a person born in North Carolina can only update the gender marker listed on a North Carolina-issued birth certificate with proof of certain surgeries that may not be medically necessary, advisable, or affordable for any given person. Even more troubling, a person born in neighboring Tennessee can never change the gender listed on a Tennessee-issued birth certificate.

118.    Medical treatment such as the surgery required to update a person's North Carolina birth certificate does not alter a person's gender (or what H.B. 2 calls "biological sex"), but rather merely brings a person's body into alignment with the

28

gender they have always been. Gender identity is instead the chief determinant of a person's gender.

119. H.B. 2's provisions requiring use of single-sex facilities in accordance with the sex stated on their birth certificate not only disproportionately burdens transgender people, but intentionally targets them for differential treatment. Lawmakers made clear that H.B. 2 was specifically aimed at transgender people. For example, an FAQ released by Governor McCrory after H.B. 2's enactment states, "Why did North Carolina pass this law in the first place? Answer: The bill was passed after the Charlotte City Council voted to impose a regulation requiring businesses to allow a man into a women's restroom, shower, or locker room if they choose," even though it does not do that, but only allows a transgender woman to use a women's restroom or other multiple user facility for women.

120. Prior to the passage of H.B. 2, it was already illegal for a person to enter a restroom or locker room to assault or injure another. Moreover, protecting transgender people from discrimination in public accommodations, as has been done in numerous states and hundreds of localities, has resulted in no increase in public safety incidents in any jurisdiction anywhere in the United States, and including transgender people in public life in no way impacts the safety or well-being of non-transgender people.

121. The painful message of stigma sent by H.B. 2 echoes the dehumanizing rhetoric employed by a number of lawmakers, suggesting that transgender people are somehow predatory or dangerous to others. In fact, it is H.B. 2 that exposes transgender

people to harassment and potential violence. Transgender people are already disproportionately targeted for physical violence and harassment in North Carolina and across the country. When a transgender person is forced to disclose their transgender status to strangers, such disclosure puts them at a high risk for violence. H.B. 2's requirement that transgender people be shunted into single-sex spaces that do not match their gender identity invades their privacy and exposes this vulnerable population to harassment and potential violence by others.

122. Upon information and belief, after the enactment of H.B. 2, some school officials that had been respecting their students' gender identity without any problem called parents to say that their children would be forced out of the single-sex facilities that match their gender identity.

123. H.B. 2's broad sweep means that the same result applies to executive and public agencies, including routine places such as libraries, public health centers, airports, and the Division of Motor Vehicles, as well as places where people may turn in times of crisis, such as state hospitals, police departments, and courthouses. Transgender individuals working in such agencies may not be able to safely use any bathroom any longer, threatening their ability to keep their job.

124. H.B. 2's restroom ban also deters transgender people from participating in the state and local democratic process. It bans them from using the restroom consistent with their gender identity when visiting the North Carolina General Assembly, petitioning their legislator, or entering any building operated by the legislative branch. It

30

also bans them from using the restroom consistent with their gender identity at a city council meeting or at a mayor's office.

125.    H.B. 2's harms extend even farther, creating conflicts between state law and various federal laws.  The conflict with Title IX, for example, puts at risk the more than $4.5 billion in federal education funding that North Carolina is expected to receive in 2016.  Employers subject to Title VII also will violate the U.S. Equal Employment Opportunity Commission's decree that discriminating against transgender people with respect to restroom use is impermissible sex discrimination.  Public hospitals that receive federal funding also will violate Section 1557 of the Affordable Care Act if they comply with H.B. 2.

126.    All of this follows a history of discrimination by the decisionmakers against transgender people, including for example, Governor McCrory's participation in a Fourth Circuit *amicus curiae* brief arguing that a transgender student's request to access restrooms in accordance with his gender identity is "radical."

   E.    **H.B. 2 Harms Lesbian, Gay, and Bisexual Individuals, as well as Transgender Individuals.**

127.    H.B. 2 also disproportionately burdens lesbian, gay, and bisexual individuals, as well as transgender individuals, by stripping them of or barring them from anti-discrimination projections under local law.  H.B. 2 took aim at the Charlotte ordinance in a section providing,

> The General Assembly declares that the regulation of discriminatory practices in employment is properly an issue of general, statewide concern, such that this Article and other applicable provisions of the General Statutes supersede and

31

preempt any ordinance, regulation, resolution, or policy adopted or imposed by a unit of local government or other political subdivision of the State that regulates or imposes any requirement upon an employer pertaining to the regulation of discriminatory practices in employment, except such regulations applicable to personnel employed by that body that are not otherwise in conflict with State law.

128.    H.B. 2 stripped lesbian, gay, and bisexual individuals of anti-discrimination protections in Charlotte, because no such sexual orientation anti-discrimination protections exist in state law.  The preemptive effect of this section did not fall equally on all North Carolinians, however.

129.    Recognizing that North Carolina law had no statewide public accommodations protection of any kind except for people with disabilities, H.B. 2 actually enacted a new public accommodations statute—so that the other groups whose protections also would have been preempted under the Charlotte Ordinance were spared that result.  The new public accommodations statute prohibits discrimination based on "race, religion, color, national origin, or biological sex"—omitting the sexual orientation protections that had been included in the Charlotte Ordinance.

130.    The North Carolina legislature has a history of targeted discrimination toward lesbian, gay, and bisexual people.  For example, the legislature approved and referred to voters a constitutional amendment barring access to marriage for same-sex couples.  Legislative leaders also intervened in litigation challenging the constitutionality of the exclusion of same-sex couples from marriage pursuant to a statute authorizing them to act on behalf of the General Assembly.  In 2015, the legislature also passed a bill that allows county magistrates to recuse themselves from performing civil marriages.

32

131.    The preemptive effect of H.B. 2 also harmed transgender people as well. While the Charlotte Ordinance had prohibited discrimination based on sex, gender identity, and gender expression, the new public accommodations statute restricted its protections solely to "biological sex," which is defined in an effort to deliberately exclude transgender people from protection.

## CLAIMS FOR RELIEF

### COUNT I
### Deprivation of Equal Protection
### U.S. Const. Amend. XIV

132.    Plaintiffs incorporate paragraphs 1 through 131 as though fully set forth herein.

133.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge H.B. 2 both facially and as applied to them.

134.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

**A.      Sex Discrimination in Single-Sex Restrooms and Facilities (H.B. 2, Part I)**

135.    Section A of Count I is asserted by Plaintiffs Carcaño, McGarry, Equality NC, and ACLU of NC against Defendants Governor McCrory, Cooper, Board of Governors, and Bissette.

33

136.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

137.    H.B. 2 discriminates against transgender people on the basis of sex.

138.    Discrimination based on sex includes but is not limited to discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

139.    H.B. 2 facially classifies people based on sex, gender identity, and transgender status.

140.    H.B. 2 treats transgender people differently than non-transgender people who are similarly situated.

141.    Under H.B. 2, non-transgender people are able to access restrooms and other single-sex facilities consistent with their gender identity, but transgender people are banned from restrooms and other single-sex facilities consistent with their gender identity.

142.    H.B. 2 discriminates against transgender people based on gender nonconformity.  For example, although Mr. Carcaño and Mr. McGarry are men, are perceived as men in public, and have had medical treatment to bring their body into alignment with their male gender identity, they have birth certificates with female gender markers that do not conform to H.B. 2's expectations for men.  Furthermore, if transgender men such as Mr. Carcaño and Mr. McGarry had been assigned male at birth,

34

they would not be banned by H.B. 2 from the restrooms and other single-sex facilities consistent with their gender identity. No person has any control over the sex that person is assigned at birth.

143. H.B. 2's discrimination against transgender people based on sex is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

144. H.B. 2 endangers the safety, privacy, security, and well-being of transgender individuals. For example, if a transgender woman were to use the men's restroom, she likely would be harassed and might be assaulted by men who believed that she should not be in the men's restroom. Similarly, if a transgender man were to use the women's restroom, he likely would be harassed and might be assaulted by women who believe he should not be in the women's restroom.

145. H.B. 2 does not promote the safety, privacy, security, or well-being of non-transgender people.

146. H.B. 2 deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

147. H.B. 2's discrimination against transgender people based on sex denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**B.  Sex and Sexual Orientation Discrimination in Preemption of Local Non-Discrimination Protections (H.B. 2, Part II, Sections 2.2 & 2.3; H.B. 2, Part III)**

148.  Section B of Count I is asserted by Plaintiffs Carcaño, McGarry, Gilmore, Equality NC, and ACLU of NC against Defendants Governor McCrory and Cooper.

149.  Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex and discrimination based on sexual orientation are presumptively unconstitutional and subject to heightened scrutiny.

150.  H.B. 2 deprives LGBT people of protections against discrimination based on sexual orientation, gender identity, and gender expression.

151.  H.B. 2 was motivated by an intent to treat LGBT people differently, and worse, than other people, including by stripping them of the protections afforded by the City of Charlotte's Ordinance and precluding any local government from taking action to protect LGBT people against discrimination.

152.  H.B. 2 was enacted for the purpose of disadvantaging LGBT people and is based on animus against LGBT people.  H.B. 2 was also enacted because of, and not in spite of, its adverse effects on LGBT people.

153.  The justifications cited in H.B. 2 for its enactment, including a purported governmental interest in consistent statewide obligations, are pretext for discrimination and did not reflect the actual motivations for the bill.  For example, proposals to add sexual orientation and gender identity and expression protections to the statewide public accommodations law were rejected.

154.    By blocking anti-discrimination protections for LGBT people at the local level, H.B. 2 imposes a different and more burdensome political process on LGBT people than on non-LGBT people who have state protection against identity-based discrimination.  H.B. 2 accordingly places a special burden on LGBT people within the governmental process with an intent to injure that minority group.

155.    H.B. 2 deprives LGBT people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

156.    H.B. 2's discrimination against LGBT people based on sex and sexual orientation denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

### C.    Discrimination Based on Transgender Status Warrants Heightened Scrutiny.

157.    Transgender people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

158.    Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

159.    A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

37

160.    Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

161.    Gender identity generally is fixed at an early age and highly resistant to change through intervention.

**D.    Discrimination Based on Sexual Orientation Warrants Heightened Scrutiny.**

162.    Lesbian, gay, and bisexual people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

163.    Lesbian, gay, and bisexual people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Lesbian, gay, and bisexual people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

164.    A person's sexual orientation bears no relation to a person's ability to contribute to society.

165.    Sexual orientation is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

166.    Sexual orientation generally is fixed at an early age and highly resistant to change through intervention.

**COUNT II**
**Violation of Right to Privacy**
**U.S. Const. Amend. XIV**
**Plaintiffs Carcaño, McGarry, Equality NC, and ACLU of NC against Defendants**
**Governor McCrory, Cooper, Board of Governors, and Bissette**

167.    The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

168.    Substantive protections of the Due Process Clause include the right to avoid disclosure of sensitive, personal information.

169.    There is a fundamental right of privacy in preventing the release of, and in deciding in what circumstances to release: (1) personal information whose release could subject them to bodily harm; and (2) information of a highly personal and intimate nature.

170.    H.B. 2 requires the disclosure of highly personal information regarding transgender people to each person who sees them using a restroom or other facility inconsistent with their gender identity or gender expression.  This disclosure places them at risk of bodily harm.

171.    There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest.  H.B. 2 also is not even rationally related to a legitimate state interest.

172.    In addition, the privacy interests of transgender people that are invaded outweigh any purported interest the government could assert.

**Violation of Liberty and Autonomy in the Right to Refuse Unwanted Medical Treatment**
**U.S. Const. Amend. XIV**
**Plaintiffs Carcaño, McGarry, Equality NC, and ACLU of NC against Defendants Governor McCrory, Cooper, Board of Governors, and Bissette**

173.    The Fourteenth Amendment's Due Process Clause protects individuals' substantive rights to be free to make certain private decisions without unjustified governmental intrusion.

174.    The right to make certain private decisions without unjustified governmental intrusion includes the right to refuse unwanted medical treatment.

175.    H.B. 2 forces transgender people to undergo medical procedures that may not be medically appropriate or available in order to access facilities consistent with their gender identity.

176.    Not all transgender individuals undergo gender confirmation surgery.  For some, the surgery is not medically necessary, while for others it is medically impossible.  For example, because medical treatment for gender dysphoria is individualized, hormone treatment may be sufficient to manage the distress associated with gender dysphoria for some individuals.  Surgery may be medically necessary for others who do not have health insurance coverage for it and cannot afford to pay for the surgery out-of-pocket.

177.    Some states require proof of surgery before they will allow the gender marker on a birth certificate to be changed.  For those born in North Carolina, state law requires proof of "sex reassignment surgery."  N.C. Gen. Stat. § 130A-11B.

40

178.     For example, Mr. McGarry has not been able to amend his North Carolina birth certificate to accurately reflect his gender because surgery is not medically necessary for him.  Accordingly, H.B. 2 bans him from accessing restrooms and other facilities consistent with his gender identity.

179.     There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest.  H.B. 2 is not even rationally related to a legitimate state interest.

**COUNT IV**
**Violation of Title IX**
**20 U.S.C. § 1681, et seq.**
**Plaintiff Carcaño against Defendant University of North Carolina**

180.     Plaintiff incorporates paragraphs 1 through 131 as though fully set forth herein.

181.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

182.     Under Title IX, discrimination "on the basis of sex" includes discrimination on the basis of gender nonconformity, gender identity, transgender status, and gender transition.

183.     Defendant University of North Carolina is an education program receiving federal financial assistance.

41

184.     Defendant University of North Carolina is an executive branch agency as defined by H.B. 2.

185.     Pursuant to H.B. 2, Defendant University of North Carolina "shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex."

186.     By requiring Mr. Carcaño – a transgender man – to use a restroom that is inconsistent with his gender identity, Defendant University of North Carolina excludes Mr. Carcaño from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities at Defendant's constituent campus, UNC-Chapel Hill, "on the basis of sex," which violates Mr. Carcaño's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

**COUNT V**
**Violation of Title IX**
**20 U.S.C. § 1681, et seq.**
**Plaintiff McGarry against Defendant University of North Carolina**

187.     Plaintiff incorporates paragraphs 1 through 131 as though fully set forth herein.

188.     Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

189. Under Title IX, discrimination "on the basis of sex" includes discrimination on the basis of gender nonconformity, gender identity, transgender status, and gender transition.

190. Defendant University of North Carolina is an education program receiving federal financial assistance.

191. Defendant University of North Carolina is an executive branch agency as defined by H.B. 2.

192. Pursuant to H.B. 2, Defendant University of North Carolina "shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex."

193. By requiring Mr. McGarry – a transgender man – to use a restroom that is inconsistent with his gender identity, Defendant University of North Carolina excludes Mr. McGarry from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities at Defendant's constituent campus, UNC-Greensboro, "on the basis of sex," which violates Mr. McGarry's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A. Declaring that the provisions of and enforcement by Defendants of H.B. 2 as discussed above violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution;

43

B.     Declaring that the provisions of and enforcement by Defendants of H.B. 2 as discussed above violate Plaintiffs' rights under Title IX;

C.     Preliminarily and permanently enjoining enforcement by Defendants of H.B. 2 as discussed above;

D.     Requiring Defendants in their official capacities to allow individuals, including transgender people, to use single-sex facilities in accordance with their gender identity in all public schools and universities, executive branch agencies, and public agencies; and requiring Defendants in their official capacities to allow local governments to enact and to continue to enforce anti-discrimination protections for LGBT people;

E.     Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.     Granting such other and further relief as the Court deems just and proper.

G.     The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and

///

///

///

against all persons acting in active concert or participation with any Defendant, or under

any Defendant's supervision, direction, or control.

Dated:  March 28, 2016

Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook
N.C. State Bar No. 33838
AMERICAN CIVIL LIBERTIES UNION FOR
    NORTH CAROLINA LEGAL FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile:  866-511-1344
cbrook@acluofnc.org

Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone: 212-549-2627
Facsimile:  212-549-2650
egill@aclunc.org
cstrangio@aclu.org

Tara L. Borelli*
Peter C. Renn*
Kyle A. Palazzolo*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile:  404-897-1884
tborelli@lambdalegal.org
prenn@lambdalegal.org
kpalazzolo@lambdalegal.org

*Counsel for Plaintiffs*

* Appearing by special appearance pursuant to L.R. 83.1(d).