| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; H.S., by her next friend and mother, KATHRYN SCHAFER; ANGELA GILMORE; KELLY TRENT; BEVERLY NEWELL; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, <br><br> *Plaintiffs*, <br><br> v. <br><br> PATRICK MCCRORY, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; and W. LOUIS BISSETTE, JR., in his official capacity as Chairman of the Board of Governors of the University of North Carolina, <br><br> *Defendants*. | No. 1:16-cv-00236-TDS-JEP |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      This lawsuit challenges a sweeping North Carolina law, House Bill 2 ("H.B. 2"), which bans transgender people from accessing restrooms and other facilities consistent with their gender identity and blocks local governments from protecting lesbian, gay, bisexual, and transgender ("LGBT") people against discrimination in a wide

1

variety of settings. By singling out LGBT people for disfavored treatment and explicitly writing discrimination against transgender people into state law, H.B. 2 violates the most basic guarantees of equal treatment and the U.S. Constitution.

2.     In February 2016, the City of Charlotte enacted an ordinance (the "Ordinance") that extended existing municipal anti-discrimination protections to LGBT people. In light of the pervasive discrimination faced by LGBT people—and particularly transgender people—advocates had long pressed the Charlotte City Council for these protections. Because North Carolina state law does not expressly prohibit discrimination based on sexual orientation or gender identity, many LGBT residents of Charlotte—as well as LGBT residents throughout the state—are exposed to invidious discrimination in their day-to-day lives simply for being themselves. After two hours-long hearings, in which there was extensive public comment on both sides of the issue, the Charlotte City Council voted to adopt the Ordinance.

3.     Before the Ordinance could take effect, the North Carolina General Assembly rushed to convene a special session with the express purpose of passing a statewide law that would preempt Charlotte's "radical" move to protect its residents from discrimination. In a process rife with procedural irregularities, the legislature introduced and passed H.B. 2 in a matter of hours, and the Governor signed the bill into law that same day. Lawmakers made no attempt to cloak their actions in a veneer of neutrality, instead openly and virulently attacking transgender people, who were falsely portrayed as predatory and dangerous to others. While the discriminatory, stated focus of the

2

legislature in passing H.B. 2—the use of restrooms by transgender people—is on its own illegal and unconstitutional, H.B. 2 in fact wreaks far greater damage by also prohibiting local governments in North Carolina from enacting express anti-discrimination protections based on sexual orientation and gender identity.

4.     Plaintiffs are individuals and a nonprofit organization whose members and constituents will be directly impacted by H.B. 2. Like the three transgender plaintiffs in the case, transgender people around the state of North Carolina immediately suffered harm under H.B. 2 in that they are not able to access public restrooms and other single-sex facilities that accord with their gender identity. Additionally, all LGBT people are harmed by H.B. 2 in that it strips them of, or bars them from, anti-discrimination protections under local law. Plaintiffs seek a declaratory judgment that H.B. 2 violates their or their members' constitutional and statutory rights to equal protection, liberty, dignity, autonomy, and privacy, as well as an injunction preliminarily and permanently enjoining enforcement by of H.B. 2 by Defendants.

## PARTIES

### A.     Plaintiffs.

5.     Plaintiff Joaquín Carcaño ("Mr. Carcaño") is a 27-year-old man who resides in Carrboro, North Carolina. Mr. Carcaño is employed by the University of North Carolina, and he works at the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"). He is transgender.

3

6.     Plaintiff Payton Grey McGarry ("Mr. McGarry") is a 20-year-old man who resides in Greensboro, North Carolina.  Mr. McGarry is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro").  He is transgender.

7.     Plaintiff H.S. is a 17-year-old young woman from Raleigh, North Carolina who attends school and resides in Winston-Salem, North Carolina.  Plaintiff H.S. is a student at the University of North Carolina School of the Arts High School ("UNCSA-HS").  She is transgender.

8.     Plaintiff Angela Gilmore ("Ms. Gilmore") is a 52-year-old woman who resides in Durham, North Carolina and is an Associate Dean and Professor at North Carolina Central University School of Law.  Ms. Gilmore is a lesbian.

9.     Plaintiffs Kelly Trent ("Ms. Trent") and Beverly Newell ("Ms. Newell") are a lesbian couple who reside in Charlotte, North Carolina.  Ms. Trent is a 39-year-old registered nurse, and Ms. Newell is a 46-year-old realtor.

10.     Plaintiff American Civil Liberties Union of North Carolina ("ACLU of NC") is a private, non-profit membership organization with its principal office in Raleigh, North Carolina.  It has approximately 8,500 members in the State of North Carolina, including LGBT members.  The mission of the ACLU of NC is to defend and advance the individual freedoms embodied in the United States Constitution, including the rights of LGBT people to be free from invidious discrimination and infringements on their liberty interests.  The ACLU of NC sues on behalf of its members, some of whom are transgender individuals who are barred by H.B. 2 from using restrooms and other

4

facilities in accordance with their gender identity in schools (including those subject to N.C. Gen. Stat. § 115C-521.2) and government buildings, and some of whom are lesbian, gay, bisexual, or transgender individuals who have been stripped of or barred from local non-discrimination protections based on their sexual orientation and sex, including gender identity.

**B. Defendants.**

11. Defendant Patrick McCrory ("Defendant McCrory" or "Governor McCrory" or "the Governor") is sued in his official capacity as the Governor of North Carolina. Pursuant to Article III, Section 1 of the State Constitution, "the executive power of the State" is vested in Defendant McCrory in his capacity as Governor. Article III, Section 5(4) also provides that it is the duty of Defendant McCrory in his capacity as Governor to "take care that the laws be faithfully executed." Governor McCrory is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

12. Defendant University of North Carolina is an education program or activity receiving federal financial assistance. Defendant University of North Carolina includes its constituent institutions, the University of North Carolina at Chapel Hill, the University of North Carolina at Greensboro, and the University of North Carolina School of the Arts High School.

13. Defendant Board of Governors of the University of North Carolina ("the Board") is a corporate body charged with the general control, supervision, and

5

governance of the University of North Carolina's constituent institutions. The Board is capable of being sued in "all courts whatsoever" pursuant to N.C. Gen. Stat. § 116-3.

14.     Defendant W. Louis Bissette, Jr. ("Defendant Bissette" or "Mr. Bissette") is sued in his official capacity as the Chairman of the Board of Governors of the University of North Carolina and has the power to ensure the Board's compliance with any injunctive relief.

15.     Defendants, through their respective duties and obligations, are responsible for enforcing H.B. 2. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aide and/or abet in some manner the acts alleged in this complaint, has or will proximately cause the harm alleged herein, and has or will continue to injure Plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

16.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution and under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").

17.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States and the United States Constitution.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant University of North Carolina resides within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to the Plaintiffs' claims took place within the District.

19.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

20.     This Court has personal jurisdiction over Defendants because they are domiciled in North Carolina.

## FACTUAL ALLEGATIONS

### A.     Plaintiffs.

21.     **Plaintiff Joaquín Carcaño** works for the University of North Carolina at Chapel Hill ("UNC-Chapel Hill") Institute for Global Health and Infectious Disease as a Project Coordinator.  The project that he coordinates provides medical education and services such as HIV testing to the Latino/a population.

22.     Mr. Carcaño is a man.

23.     Until the passage of H.B. 2, Mr. Carcaño was recognized and treated like all other men at his job at UNC-Chapel Hill.

24.     Mr. Carcaño is transgender.  What that means is that his sex assigned at birth was female, as his birth certificate reflects, but that designation does not accurately reflect his gender identity, which is male.

7

25.     A person's gender identity refers to the person's internal sense of belonging to a particular gender.  There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

26.     The gender marker on a birth certificate is designated at the time of birth generally based upon the appearance of external genitalia.  However, determinations of sex can involve multiple factors, such as chromosomes, hormone levels, internal and external reproductive organs, and gender identity.

27.     Gender identity is the primary determinant of sex.

28.     Mr. Carcaño was diagnosed with gender dysphoria, the medical diagnosis for the clinically significant distress that individuals whose gender identity differs from the sex they were assigned at birth can experience.

29.     Gender dysphoria is a serious medical condition that, if left untreated, can lead to clinical distress, debilitating depression, and even suicidal thoughts and acts.

30.     Gender dysphoria is a condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) (DSM-V), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

31.     Medical treatment for gender dysphoria must be individualized for the medical needs of each patient.

8

32.     Treatment for gender dysphoria includes living one's life consistent with one's gender identity, including when accessing single-sex spaces such as restrooms and locker rooms.

33.     Forcing a transgender person to use single-sex spaces that do not match the person's gender identity is inconsistent with medical protocols and can cause anxiety and distress to the transgender person and result in harassment of and violence against them.

34.     Mr. Carcaño was born and raised in South Texas.  Since a very young age, around 7 or 8 years old, Mr. Carcaño was aware that he did not feel like a girl, but he did not know how to express how he felt.

35.     Mr. Carcaño ultimately acknowledged his male gender identity to himself later in his adult life.

36.     Since 2013, Mr. Carcaño has been in the continuous care of a licensed mental health clinician, who diagnosed Mr. Carcaño with gender dysphoria.  Mr. Carcaño initially sought treatment for depression, which was caused in part by his gender dysphoria.

37.     Mental health and medical professionals worldwide recognize and follow the evidence-based standards of care for the treatment of gender dysphoria developed by the World Professional Association for Transgender Health ("WPATH").  After diagnosing Mr. Carcaño with gender dysphoria, his therapist developed a course of treatment consistent with those standards.  The goal of such treatment is to alleviate distress by helping a person live congruently with the person's gender identity, the

9

primary determinant of sex.  Consistent with that treatment and his identity, in January 2015, Mr. Carcaño explained to his family and friends that he is a man.

38.     A critical component of the WPATH Standards of Care is a social transition to living full-time consistently with the individual's gender identity.  For Mr. Carcaño, that includes living in accordance with his gender identity in all respects, including the use of a male name and pronouns and use of the men's restrooms.

39.     For transgender people, it is critical that social transition include transition in the workplace, including with respect to restrooms.  Excluding a transgender man from the restroom that corresponds to his gender identity, or forcing him to use a separate facility from other men, communicates to the entire workplace that he should not be recognized as a man and undermines the social transition process.

40.     Mr. Carcaño also began using Joaquín as his first name in January 2015. His friends, family, and coworkers now recognize him as a man, and they refer to him using his male name and male pronouns.

41.     Also consistent with the WPATH Standards of Care, Mr. Carcaño's physician recommended and prescribed hormone treatment, which Mr. Carcaño has received since May 2015.  For both hormone therapy and surgical treatment, the WPATH Standards of Care require persistent, well-documented gender dysphoria, which is a criterion that Mr. Carcaño satisfied.  Among other therapeutic benefits, the hormone treatment has deepened Mr. Carcaño's voice, increased his growth of facial hair, and given him a more masculine appearance.  This treatment helped alleviate the distress Mr.

Carcaño experienced due to the discordance between his birth-assigned sex and his identity and helped him to feel more comfortable with who he is.

42.     As part of the treatment for his gender dysphoria, Mr. Carcaño also obtained a bilateral mastectomy and nipple reconstruction (also known as "top surgery") in January 2016.  Consistent with WPATH Standards of Care, Mr. Carcaño satisfied the requirement of having a referral from a qualified mental health professional in order to obtain the surgical treatment.

43.     As part of his social transition, Mr. Carcaño began using the men's restroom at work and elsewhere in late 2015, which occurred without incident for the five months or so before H.B. 2's enactment.  Mr. Carcaño's therapist had also specifically recommended that he use only the men's restroom.  She was concerned that using the women's restroom could compromise his mental health, well-being, and safety.  By late 2015, Mr. Carcaño had facial hair facilitated by hormone treatment, and his therapist indicated that others would recognize Mr. Carcaño as a man based on his physical appearance.

44.     Mr. Carcaño is now comfortable with the status of his treatment and, with the exception of the distress now caused by the passage of H.B. 2, his distress has been managed through the clinically recommended treatment he has received.  He plans to continue treatment under the supervision of medical professionals and based on his medical needs.

45. Apart from the building where he works, Mr. Carcaño also used other men's restrooms on the UNC-Chapel Hill campus without incident for approximately five months prior to H.B. 2's passage. In addition, when out in public, such as at restaurants and stores, Mr. Carcaño uses the men's restroom.

46. The only restrooms on the floor where Mr. Carcaño works at UNC-Chapel Hill are designated either for men or for women. H.B. 2 thus excludes him from using the same restrooms that his coworkers typically use. This exclusion is stigmatizing and marks him as different and lesser than other men.

47. Using the women's restroom is not a viable option for Mr. Carcaño, just as it would not be a viable option for non-transgender men to be forced to use the women's restroom. Forcing Mr. Carcaño to use the women's restroom would also cause substantial harm to his mental health and well-being. It would also force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

48. The idea of being forced into the women's restroom causes Mr. Carcaño to experience significant anxiety, as he knows that it would be distressing for him and uncomfortable for others. He fears for his safety because of the passage of H.B. 2.

49. In the initial period after H.B. 2's passage, Mr. Carcaño generally used a single-occupancy restroom not designated either for men or for women in another building on campus, which was approximately a 10-15 minute walk away from his building each way.

12

50.     Mr. Carcaño was subsequently informed by administrative staff in the building where he works that they had learned of a single-occupancy restroom based on building floor plans.  It is accessible using a special service elevator, and the restroom is tucked away in a cubby down a hallway in a part of the building used for housekeeping.

51.     Mr. Carcaño is not only humiliated by being singled out and forced to use a separate restroom from his colleagues and all other men that he works with, but also burdened by having to use a separate restroom on a different floor, which increases the likelihood that he will delay or avoid going to the restroom.

52.     Mr. Carcaño also visits public agencies as defined by N.C. Gen. Stat. § 143-760(4), and intends to and will do so in the future.  For example, as part of his job at UNC-Chapel Hill, Mr. Carcaño has had to visit the offices of the North Carolina Department of Health and Human Services many times in the past, and he will continue to need to do so in the future.  Prior to the passage of H.B. 2, he used the men's restroom while at their office, but he will be banned from doing so in the future under H.B. 2.

53.     Similarly, Mr. Carcaño has visited state courthouses in Chapel Hill as part of a process to obtain a name change from his current legal name, which includes a traditionally feminine first name, to the name he currently uses.  Because that name change process is ongoing, Mr. Carcaño will continue to visit state courthouses in the future, but he will be banned from using the men's restroom there under H.B. 2.

54.     Mr. Carcaño has also visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's

license) and anticipates doing so again in the future, where he will be banned from using the men's restroom under H.B. 2.

55.     Mr. Carcaño also regularly uses the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation.  For example, he uses the restrooms provided by that system when he travels approximately once a month to visit his brother in Atlanta, and when he visits Washington, D.C. periodically.  He will need to continue to use those restrooms in the future, but he will be banned from using the men's restroom under H.B. 2.

56.     There have been no incidents or, to the best of Mr. Carcaño's knowledge, complaints related to his use of the restrooms designated for men.

57.     Mr. Carcaño is currently in the process of pursuing and exhausting administrative remedies before the Equal Employment Opportunity Commission with respect to his rights under Title VII of the Civil Rights Act of 1964.

58.     Mr. Carcaño is a member of the ACLU of NC.

59.     **Plaintiff Payton Grey McGarry** is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro"), where he is double majoring in Business Administration and Accounting.  He is also a skilled musician and has played trumpet in many ensembles at UNC-Greensboro.  He plays the guitar, baritone, clarinet, and saxophone.

14

60.     Mr. McGarry is close to his family and has a younger brother who is also a member of the LGBT community.  Mr. McGarry hopes to use his education to eventually go to law school and work to defend people's civil rights.

61.     Mr. McGarry is a man.

62.     Mr. McGarry is transgender.  As is true for Mr. Carcaño, Mr. McGarry's sex assigned at birth was female, as his birth certificate reflects, but that designation does not conform to his gender identity, which is male.

63.     Mr. McGarry was diagnosed with gender dysphoria.

64.     Mr. McGarry was born and raised in Wilson, North Carolina.  Throughout his childhood, Mr. McGarry felt like a boy and never really thought of himself as a girl. It was not until he started to go through puberty that he began to wrestle with the disconnect between his identity as a boy and his assigned birth sex.

65.     Mr. McGarry realized while he was in high school that he is transgender.

66.     In October 2013, during his senior year in high school, Mr. McGarry began mental health treatment with a licensed clinical social worker who diagnosed him with gender dysphoria.

67.     After diagnosing Mr. McGarry with gender dysphoria, his therapist developed a course of treatment in accordance with medical standards for treating the condition.

68.     Consistent with that treatment and his identity, in the fall and winter of 2013, Mr. McGarry explained to his friends and family that he is male and began to use male pronouns.

69.     In April 2014, under the care of an endocrinologist, Mr. McGarry began hormone therapy.  This treatment helped alleviate the distress that Mr. McGarry experienced due to the discordance between his birth-assigned sex and his identity and helped him to feel more comfortable with who he is.

70.     By the time he graduated high school in June 2014, Mr. McGarry used the name Payton and male pronouns in all aspects of his life.  He is known as Payton McGarry to his family, friends, and peers, although he has not yet changed his legal first name to Payton.

71.     In the fall of 2014, Mr. McGarry enrolled as a freshman at UNC-Greensboro as Payton McGarry and as male.

72.     Since arriving at UNC-Greensboro, Mr. McGarry has identified and has been known to others as male for all purposes.

73.     Mr. McGarry is a member of Phi Mu Alpha Sinfonia, a music fraternity, and is the Vice President of the Iota Epsilon Chapter of that fraternity.  His fraternity brothers are aware that he is transgender and have no concerns with his use of men's restrooms and locker rooms.

74.     Though Mr. McGarry currently lives off campus, he is on campus six or seven days per week and always uses the restroom designed for men in on-campus buildings.

75.     Mr. McGarry regularly uses the locker room facilities at UNC-Greensboro and always uses the facilities designed for men.

76.     For the past year and a half since he enrolled at UNC-Greensboro, Mr. McGarry has used the men's restrooms and locker rooms on-campus without incident. Mr. McGarry is unaware of any instance in which any person has complained about his use of the men's restroom or locker room.

77.     Mr. McGarry works part-time as a visual technician for marching bands at different high schools around the state and regularly uses the bathroom for men when working as a visual technician.  There have been no incidents or, to the best of Mr. McGarry's knowledge, complaints related to his use of the restrooms designated for men.

78.     In addition, when out in public, such as at restaurants and stores, Mr. McGarry always uses the men's restroom.

79.     To Mr. McGarry's knowledge, there are very few single-user restrooms on the UNC-Greensboro campus, and there are no single-user bathrooms in many buildings where he has classes.

80.     If Mr. McGarry could not use the men's restroom at UNC-Greensboro, he would have to search for single-user restrooms outside of the buildings where his classes are held every time he had to use the restroom.  This would disrupt his ability to attend

17

class and would interfere with his educational opportunities. Expelling him from the multiple occupancy restrooms and locker rooms available to all other male students is stigmatizing and marks him as different and lesser than other men.

81.     Since he started testosterone two years ago, Mr. McGarry's voice has deepened and his face and body have become more traditionally masculine in appearance.

82.     Using the women's restroom is not a viable option for Mr. McGarry, just as it would not be a viable option for non-transgender men to be forced to use the women's restroom. Forcing Mr. McGarry to use the women's restroom would also cause substantial harm to his mental health and well-being. It would also force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

83.     The idea of being forced into the women's restroom causes Mr. McGarry to experience significant anxiety, as he knows that it would be distressing for him and uncomfortable for others. He fears for his safety because of the passage of H.B. 2.

84.     Since the passage of H.B. 2, Mr. McGarry has been barred from using the men's restrooms on campus. Given that he cannot use the women's restroom and there are only a few available single-user restrooms, he often avoids going to the restroom all day.

85.     Mr. McGarry has also visited public agencies as defined by N.C. Gen. Stat. § 143-760(4), and intends to and will do so in the future. For example, Mr. McGarry has

18

visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's license) and anticipates doing so again in the future, where he will be banned from using the men's restroom under H.B. 2.

86.     Mr. McGarry also has used and will continue to use the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation. He will need to continue to use those restrooms in the future, but he will be banned from using the men's restroom under H.B. 2.

87.     **Plaintiff H.S.** is a junior at the University of North Carolina School of the Arts High School ("UNCSA-HS"). The oldest of four children, she is close to her family, who love and support her. She is an accomplished artist and studies visual arts at UNCSA-HS.

88.     H.S. is a girl.

89.     Until the passage of H.B. 2, H.S. was recognized as a girl at school and when out in public.

90.     H.S. is transgender. She was assigned the sex of male at birth, as her birth certificate reflects, but that designation does not accurately reflect her gender identity, which is female.

91.     H.S. has been diagnosed with gender dysphoria.

92.     H.S. was born in New Jersey but moved to North Carolina when she was 11 years old.  From as young an age two or three, H.S. gravitated towards clothing and toys generally associated with girls.  Like many other girls, she would always want to wear the pink princess dresses at pre-school and to play with Barbie dolls.

93.     After completing pre-school, H.S. did not feel comfortable expressing her identity as a girl and tried to immerse herself in traditionally masculine spaces and activities.  She tried to do things that she felt she was supposed to do as a boy.  But nothing felt right.

94.     Starting in seventh grade, H.S. again began to gravitate toward clothes and activities that were considered more feminine.

95.     By eighth grade, H.S. again began to express a more stereotypically feminine gender and at times would wear makeup and high-heel shoes at school.

96.     As puberty began to approach in ninth grade, severe gender dysphoria and anxiety began to hit H.S., and she experienced significant distress around her body and identity.  She finally went to her parents, who recognized that she was suffering.

97.     In ninth grade, H.S. began therapy with an expert on treating transgender young people and was diagnosed with gender dysphoria.

98.     In 2013, H.S. started high school at Broughton High School in Raleigh.  In the middle of her freshman year, H.S. began hormone blockers to prevent the onset of male puberty and the development of secondary sex characteristics associated with men. This treatment delayed puberty while H.S. continued to understand her female identity.

Though H.S. continued to experience some distress and dysphoria, the hormone blockers greatly reduced her suffering.

99.     At the end of ninth grade, H.S. felt fully comfortable embracing her identity as a girl at school and had the full support of her parents.  On the last day of school her freshman year, H.S. wore a skirt to school that her mother had purchased for her.  It was an important and symbolic turning point in her comfort with and embrace of her identity as a girl.

100.     By sophomore year, H.S. was perceived as a girl and began to use the girls' bathroom at school and in public.  She was also known by female pronouns—such as she, her, and hers—by this time.

101.     During her sophomore year, H.S. was elected to the Queen's Court at her school, an honor that had, in the seventy-five years of the tradition, been shared only among non-transgender girls.

102.     Under the care of her endocrinologist, during her sophomore year in high school, H.S. continued to assess her medical treatment for gender dysphoria and began to consider hormone replacement therapy.  At the end of her sophomore year, in the spring of 2015, H.S. began estrogen therapy to continue her medical transition.

103.     An accomplished visual artist, H.S. applied to the UNCSA-HS for her junior year and was accepted.

104.     In the fall of 2015, H.S. moved to Winston-Salem to attend UNCSA-HS as a boarding student.  She studies visual arts and aspires to a career in fashion.

21

105.    H.S. lives in the girls' dormitory at UNCSA-HS.

106.    Until the passage of H.B. 2, H.S. exclusively used the girls' restroom at school and could not imagine ever using a restroom designated for boys.  H.S. is unaware of any instance in which any person has complained about her use of the girls' restroom.

107.    In addition, when out in public, such as at restaurants and stores, H.S. uses the restrooms designated for women and girls.

108.    Outside of H.S.'s dorm room, there are no single-user restrooms available to her at UNCSA-HS and it would be disruptive to H.S.'s education to have to avoid the use of the restroom or to return to her room or locate a single-user restroom off campus every time she needed to go to the restroom.

109.    Forcing H.S. out of spaces shared with her female peers is stigmatizing and marks her as different and lesser than other girls at school.

110.    Particularly because she never went through puberty as a boy and began estrogen treatment earlier this year, H.S. has a traditionally feminine appearance.  She is recognized as female in all aspects of her life.

111.    Using the boys' or men's restroom is not a viable option for H.S., just as it would not be a viable option for non-transgender women and girls to be forced to use the restrooms designated for men and boys.  Forcing H.S. to use the restroom designated for men and boys would also cause substantial harm to her mental health and well-being and would put her in danger of harassment and violence.  It would also force her to disclose

22

to others the fact that she is transgender, which itself could lead to violence and harassment.

112.    The idea of being forced into the restroom designated for boys and men at school and in public causes H.S. to experience significant anxiety and brings up painful memories and anxiety from her earlier childhood.  She fears for her safety because of the passage of H.B. 2.

113.    Since the passage of H.B. 2, H.S. has limited or delayed use of the bathroom because of fear of reprisals if she uses the restroom designated for women and girls and because she fears for her safety if she uses the restroom designated for men and boys, as the law requires.

114.    H.S. has also visited public agencies as defined by N.C. Gen. Stat. § 143-760(4), and intends to and will do so in the future.  For example, H.S. has visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's license) and anticipates doing so again in the future, where she will be banned from using the women's restroom under H.B. 2.

115.    H.S. has used and will continue to use the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation.  She will need to continue to use those restrooms in the future, but she will be banned from using the women's restroom under H.B. 2.

116.    **Plaintiff Angela Gilmore** is a resident of Durham, North Carolina. Ms. Gilmore has lived in North Carolina since 2011, when she moved from Florida to

23

take a job at North Carolina Central University.  She is currently the Associate Dean for Academic Affairs and Professor of Law at North Carolina Central University.

117.    Ms. Gilmore is a lesbian, and has been in a relationship with her wife, Angela Wallace, for almost twenty years.  Ms. Gilmore and Ms. Wallace were married in Washington, D.C. in 2014.

118.    Ms. Gilmore looked for and accepted a job in North Carolina, after she and her wife fell in love with the state during a visiting teaching job Ms. Gilmore had at Elon University School of Law in Greensboro, North Carolina, in 2010.

119.    Both Ms. Gilmore and her wife, African American lesbians, felt that North Carolina, and Durham in particular, was a place where they could be fully themselves, comfortable in terms of both their race and sexual orientation.

120.    Ms. Gilmore and her wife love living in Durham—they feel very much part of the community—and prior to the passage of H.B. 2, they had been looking at small towns in North Carolina where they might want to retire.

121.    Since moving to North Carolina, Ms. Gilmore has worked towards increasing non-discrimination protections for LGBT people.  Ms. Gilmore is a member of the ACLU of NC, and she was on the ACLU of NC board between 2014 and 2015. During that time, the ACLU of NC actively worked to defeat anti-LGBT bills proposed in the state legislature and to pass local ordinances, like the Ordinance, and to protect LGBT people from discrimination at the local level.  Ms. Gilmore also has spoken on

panels at her law school and other law schools regarding non-discrimination protections for LGBT people.

122. The passage of H.B. 2 has caused Ms. Gilmore and her wife distress, in that it has significantly undone their sense of belonging and value in the state, which is why they moved to North Carolina. Ms. Gilmore and her wife experience H.B. 2 as sending a clear message to them as lesbians that they are not welcome in North Carolina.

123. Ms. Gilmore and her wife have visited the City of Charlotte and they plan to do so in the future. As two women traveling together with the same first name, they are often asked about the nature of their relationship, and they therefore regularly reveal themselves to be a lesbian couple. Under the Ordinance, Ms. Gilmore and her wife would have been protected from sexual orientation discrimination in public accommodations in the City of Charlotte. With the passage of H.B. 2, Ms. Gilmore worries that she and her wife will now be exposed to discrimination based on their sexual orientation.

124. With the passage of H.B. 2, Ms. Gilmore also is limited in her ability to increase and benefit from non-discrimination protections for LGBT people in North Carolina. Were she able to, Ms. Gilmore would continue to advocate for local ordinances that prohibit discrimination based on sexual orientation and gender identity.

125. As a non-transgender woman who always uses the facilities designated for women in both public and private spaces, Ms. Gilmore does not feel safer in these facilities because of the passage of H.B. 2.

126.    **Plaintiffs Kelly Trent and Beverly Newell** are residents of Charlotte, North Carolina.  Ms. Trent and Ms. Newell met in 2013, and they were married in Charlotte in December 2014.

127.    As a lesbian couple and as residents of Charlotte, Ms. Trent and Ms. Newell would have been protected by the Ordinance from discrimination based on their sexual orientation by public accommodations in Charlotte.  With the passage of H.B. 2, public accommodations in Charlotte are now legally permitted to discriminate based on sexual orientation.  Ms. Trent and Ms. Newell fear that they are likely to experience discrimination based on their sexual orientation in Charlotte in the future, based on their recent experience of discrimination on that basis.

128.    In February 2016, Ms. Trent reached out to a fertility clinic, the website for which listed an office in Charlotte, and made an appointment for an initial consult in early April 2016.  Ms. Trent and Ms. Newell are trying to become parents, and they are hoping to have Ms. Trent carry a child.  Because they are a lesbian couple, they plan on using donor sperm.  At the time of her contact with the clinic, Ms. Trent made it clear that she and Ms. Newell are a same-sex couple seeking fertility services and that they plan on using donor sperm.

129.    On April 1, 2016—soon after the passage of H.B. 2—a representative of the clinic called Ms. Trent and cancelled the appointment, claiming that the clinic did not serve "single sex couples" or "same sex couples."  The next week, the clinic's website was changed to state that the clinic now does not provide services "requiring the use of

26

donor sperm," although the clinic does continue to provide services for clients using a "husband's" sperm. The clinic's refusal to serve Ms. Trent and Ms. Newell appears to be based on their sexual orientation.

130.    The passage of H.B. 2 prevented Ms. Trent and Ms. Newell from being able to file a public accommodations discrimination complaint with the City of Charlotte Community Relations Committee regarding the clinic's actions, or from having their complaint investigated or conciliated. Had H.B. 2 not passed and preempted the Ordinance, Ms. Trent and Ms. Newell would have filed such a complaint. If Ms. Trent and Ms. Newell suffer future discrimination based on their sexual orientation in a place of public accommodation in Charlotte, they will similarly be denied the ability to avail themselves of the City of Charlotte's Community Relations Committee procedure for receiving, investigating, or conciliating complaints.

131.    With the passage of H.B. 2, Ms. Trent and Ms. Newell are also limited in their ability to increase and benefit from non-discrimination protections for LGBT people in North Carolina. As residents of Charlotte, Ms. Trent and Ms. Newell supported the Ordinance, and were they able to, they would support other local ordinances that prohibit discrimination based on sexual orientation and gender identity.

132.    As non-transgender women who always use the facilities designated for women in both public and private spaces, Ms. Trent or Ms. Newell do not feel safer in these facilities because of the passage of H.B. 2.

## B. The City of Charlotte's Enactment of a Non-Discrimination Ordinance.

133. Advocates have long worked for the passage of an ordinance that would ensure that LGBT people were expressly protected from discrimination within the City of Charlotte. Prior to the vote on the Ordinance, there had been an earlier round of intensive public engagement in late 2014 to early 2015, when the Charlotte City Council previously considered expanding non-discrimination protections to include sexual orientation and gender identity and expression.

134. There was again extensive discussion and deliberation leading up to the February 2016 vote on the Ordinance. The Charlotte City Council heard hours of robust public comment in a forum that included hundreds of people—both those who were in support of the Ordinance and those who were in opposition to the Ordinance. The Charlotte City Council also received significant legal analysis from the Office of the City Attorney regarding its authority to enact the Ordinance and the effect of the Ordinance.

135. The impetus for the Ordinance is the reality that LGBT people often face pervasive discrimination. Although same-sex couples may now marry throughout the United States as a result of the U.S. Supreme Court's 2015 ruling in *Obergefell*, lesbian, gay, and bisexual people remain vulnerable to discrimination in states like North Carolina where there is no express protection for sexual orientation in state law, making local anti-discrimination protections even more vital. Discrimination is especially pervasive for transgender people, as evidenced by a 2011 national study of transgender Americans,

28

*Injustice at Every Turn*, which documented the high levels of harassment, discrimination, and violence that transgender people have faced and continue to face.

136.  In the 2011 national report cited above, 90% of respondents reported being harassed at work or taking actions to avoid harassment, while 26% reported being fired because they are transgender.  Forty-seven percent reported some form of employment discrimination because they are transgender, including not being hired, not being promoted, or being fired.  Fifty-three percent reported being verbally harassed or disrespected in a place of public accommodation, and 22% reported being denied equal treatment by a government agency or official because they are transgender.

137.  In 2013, it was estimated that there were more than 250,000 LGBT adults in North Carolina, out of an adult population of approximately eight million people. Among this population of North Carolinians, there are an estimated 37,800 transgender people (of any age), including 15,600 individuals who are 13 to 19 years old.  While transgender individuals only make up a small minority of the population, they are disproportionately targeted for hate crimes in the United States.

138.  On Monday, February 22, 2016, by a 7-to-4 vote, the Charlotte City Council approved the Ordinance, which, *inter alia*, amended its existing public accommodations protections by barring discrimination in public accommodations based on "gender identity, gender expression" and "sexual orientation."

139.  The City Council's vote was met with a firestorm of opposition from vocal opponents of the part of the Ordinance that would have required certain public

29

accommodations to allow transgender people to use single-sex facilities, such as restrooms and locker rooms, in accordance with their gender identity.

140.   Opponents of the Ordinance distorted the truth of what the Ordinance's non-discrimination requirement would accomplish and formed a vocal campaign decrying a purported attempt to permit "men in women's restrooms."

**C.    The Events Leading to H.B. 2, Contemporary Statements by Decisionmakers, and Departures From the Normal Legislative Process Revealed a Series of Official Actions Taken for Invidious Purposes.**

141.   The State of North Carolina has rarely, if ever, exercised authority to preempt local ordinances providing broader protections than under state law.  For example, in 1968 Charlotte adopted an ordinance prohibiting discrimination in public accommodations on the basis of race, color, religion, and national origin.  In 1972, the Council amended the ordinance to prohibit discrimination based on sex, which the Council further modified in 1985.

142.   Even though all of these protections extended beyond the reach of the State's public accommodations law, which until H.B. 2 prohibited only public accommodations discrimination based on disability, the State allowed Charlotte's ordinance to stand undisturbed for decades.  It was only after Charlotte took steps to protect LGBT people that the State rushed to preempt the ordinance.

143.   Even before the Charlotte City Council had cast its vote on the Ordinance, Governor McCrory informed Charlotte City Council members that the State would likely take immediate action to put a halt to the Ordinance—even as Governor McCrory

30

conceded that was an exceedingly unusual step. In an email to Charlotte City Council members, Governor McCrory noted that he "made a point as the former 14 year Mayor and current Governor to stay out of specific issues being voted on by the Charlotte City Council." Governor McCrory nonetheless characterized the Ordinance's non-discrimination protections for LGBT people as "changing basic long-established values and norms" surrounding "public restrooms," and he ominously warned of "possible danger from deviant actions by individuals taking improper advantage of a bad policy." Governor McCrory said that the Ordinance would "most likely cause immediate State legislative intervention which I would support as governor."

144.    On Tuesday, February 23, 2016, the Speaker of the North Carolina House of Representatives, Tim Moore ("Speaker Moore"), issued a press release announcing that he would work with fellow Republicans to explore a "legislative intervention to correct [Charlotte's] radical course."

145.    In North Carolina, it is the state's Governor who typically calls a special session, but in this case, Governor McCrory refused to call a special session because he was concerned that the legislature would go beyond addressing the Charlotte Ordinance.

146.    As a result of the Governor's refusal to call a special session, legislative leaders opted for a rarely used law that allows special sessions when three-fifths of legislators in both chambers support the call. That provision in the state constitution had not been used since 1981, according to Lt. Governor Dan Forest's chief of staff, Hal Weatherman. The special session cost approximately $42,000 to convene.

147. The text of H.B. 2, which was named the "Public Facilities Privacy and Security Act," was not shared with most legislators until they arrived to debate the bill.

148. North Carolina House of Representatives Minority Leader Larry Hall ("Minority Leader Hall") stated "We don't know what we're discussing here, we don't know what we're voting on. *What we're doing is a perversion of the process*."

149. Minority Leader Hall said that Democrats were initially told that the special session would take place on Thursday, March 24, 2016, when instead the special session was held on March 23, 2016. Minority Leader Hall stated that, as a result, a number of legislators were "caught off guard" and were "scrambling to try to come back" for the session.

150. The special session, which lasted a single day, was substantially shorter than previous special sessions. Before H.B. 2 had been filed, Speaker Moore announced that the committee hearing for the bill would begin five minutes after introduction of the bill and adjournment of the morning session. Shortly thereafter, approximately twelve minutes after the House came to order, H.B. 2 was filed—the first time it was officially made available to the public or the legislators.

151. Approximately three minutes after H.B. 2 was filed, the chairman of the House Judiciary IV Committee—the committee to which H.B. 2 was assigned—stated, in response to a fellow member's question, that it was his "intention" to permit time for public comment on the bill during the committee hearing. Upon information and belief, no prior public notice of the time and place for public comment on H.B. 2 was provided.

152.    Only forty-five minutes were allotted for public comment, which was insufficient to permit those who had signed up to speak on H.B. 2 to be heard.

153.    In response to complaints during the committee hearing that members had not been given an opportunity to read the text of H.B. 2, the chairman permitted a five-minute break to allow members to read the bill.

154.    After a favorable referral from the House Judiciary IV Committee, H.B. 2 received only three hours of debate in the House, after which it was passed and referred to the Senate.

155.    The roll call for H.B. 2 in the Senate was called after all Democratic members of the Senate walked out of the chambers in protest, with North Carolina State Senate Democratic Leader Dan Blue calling the special session an "affront to democracy" and stating that the Democratic caucus in the Senate "choose[s] not to participate in this farce." With every Democratic member absent, the Senate passed H.B. 2 unanimously.

156.    Comments made by lawmakers both during the debate, in the press, and through their social media used vitriolic language to make clear their aim at undoing Charlotte's protections for LGBT people:

  a.    North Carolina State Senate President Pro Tempore Phil Berger's descriptions of the legislature's work included:

    i.    "Senate unanimously votes to stop radical ordinance allowing men into public bathrooms with women and young girls."

33

ii.    "Lawmakers were forced to come back to session to address the serious safety concerns created by the dangerous ordinance—which violated existing state criminal trespass law, indecent exposure law and building codes and created a loophole that any man with nefarious motives could use to prey on women and young children . . ."

iii.    "How many fathers are now going to be forced to go to the ladies' room to make sure their little girls aren't molested?"

b.    North Carolina State Senator Buck Newton said, "The Charlotte City Council should have never passed this unlawful and reckless bathroom and locker room ordinance.  Politics have reached a new extreme when a municipality's top priority is allowing men into women's bathrooms and locker rooms.  But tens of thousands of our constituents from across the state have called on us to stand up to the political correctness mob, fight for common sense and put a stop to this nonsense once and for all."

c.    North Carolina State Senator David Curtis ("Senator Curtis") said, "This liberal group is trying to redefine everything about our society.  Gender and marriage — just the whole liberal agenda."  Senator Curtis added that while, "We generally don't get involved in local politics.  We need to do what's right."  Senator Curtis said that H.B. 2 was necessary because, "The gays would go into a business, make some outrageous demand that they know the owner cannot comply with and file a lawsuit against that business owner and put him out of business."  Senator Curtis suggested that H.B. 2 was broadly drafted specifically for the purpose of defending the bathroom

provision it in court: "[w]e feel like we can successfully defend the law and the fact that we made the law much broader," explaining that "[i]n addition to the bathroom issue we restricted the rights of cities and towns to impose a higher minimum wage. The bill has to do with restricting rights of cities and counties. I suspect we will defend it based on that."

      d.     North Carolina State Senator Andrew Brock said, "You know, $42,000 is not going to cover the medical expenses when a pervert walks into a bathroom and my little girls are in there."

      e.     Speaker Moore said "They want to protect adults who feel compelled to dress up like the opposite sex. I, on the other hand, oppose the ordinance to protect children, who from the time they've been potty trained, know to go into the bathroom of their god given appropriate gender. Honestly, it's ridiculous we are even having this discussion. I look forward to invalidating this ordinance as soon as possible."

      f.     North Carolina State Representative Mark Brody said Charlotte's ordinance "violates my Christian values and it violates decency values," adding that he "had to stop it." Representative Brody further stated that "[t]he homosexual community has just stepped too far and that had to stop and that's my basic opinion," noting that "[t]his is driven by the homosexual community and they're emboldened by their victory in the courts on homosexual marriage." Brody elaborated further that H.B. 2 "sends a message to these municipalities who have been taken over by the liberal, homosexual,

prohomosexual ideology that we are going to stick up for traditional values and we'll

stick up for them constantly if that's what we have to do."

g.      North Carolina State Representative John Blust opined that he

"think[s] it's ridiculous that your anatomy isn't what governs what restroom you use,"

adding that he does not "understand why they have to make way for this .0001 percent of

the population."

157.    Debate in both chambers of the North Carolina General Assembly focused

specifically on reversing the Charlotte Ordinance, with lawmakers in both chambers

condemning the anti-discrimination protections for LGBT people, including transgender

individuals' right to use facilities in accordance with their gender identity.

158.    Fewer than 10 hours after it was introduced, the bill passed both houses.

Governor McCrory signed the bill that same night, issuing a signing statement making

clear once again the targets of H.B. 2.  His signing statement said, "This radical breach of

trust and security under the false argument of equal access not only impacts the citizens

of Charlotte but people who come to Charlotte to work, visit or play.  This new

government regulation defies common sense and basic community norms by allowing,

for example, a man to use a woman's bathroom, shower or locker room."  H.B. 2 took

effect immediately.

**D.      H.B. 2 Harms Transgender People.**

159.    H.B. 2 amended North Carolina's General Statutes to mandate that school

boards *require* students to use restrooms and other single-sex facilities in accordance with

36

their "biological sex" providing that,

> Local boards of education shall require every multiple occupancy bathroom or
> changing facility that is designated for student use to be designated for and used
> only by students based on their biological sex.

160.   H.B. 2 also imposes the same mandate on all executive branch agencies

(which are expressly defined to include Defendant University of North Carolina), and all

public agencies, providing that they

> shall require every multiple occupancy bathroom or changing facility to be
> designated for and only used by persons based on their biological sex.

161.   Each of those provisions defines "biological sex" as follows,

> Biological sex. – The physical condition of being male or female, which is stated
> on a person's birth certificate.

162.   Changing the gender marker on one's birth certificate is not a viable option

for many transgender people, as every jurisdiction has a different set of often onerous and

unnecessary requirements for updating the gender listed on a birth certificate.

163.   For instance, a person born in North Carolina can only update the gender

marker listed on a North Carolina-issued birth certificate with proof of certain surgeries

that may not be medically necessary, advisable, or affordable for any given person.

Meanwhile, a person born in neighboring Tennessee can never change the gender listed

on a Tennessee-issued birth certificate.

164.   Medical treatment such as the surgery required to update a person's North

Carolina birth certificate does not alter a person's gender (or what H.B. 2 calls

"biological sex"), but rather merely brings a person's body into alignment with the

gender they have always been.  Gender identity is instead the chief determinant of a person's gender.

165.    H.B. 2's provisions requiring use of single-sex facilities in accordance with the sex stated on their birth certificate not only disproportionately burdens transgender people, but intentionally targets them for differential treatment.  Lawmakers made clear that H.B. 2 was specifically aimed at transgender people.  For example, an FAQ released by Governor McCrory after H.B. 2's enactment states, "Why did North Carolina pass this law in the first place?  Answer:  The bill was passed after the Charlotte City Council voted to impose a regulation requiring businesses to allow a man into a women's restroom, shower, or locker room if they choose," even though it does not do that, but only allows a transgender woman to use a women's restroom or other multiple user facility for women and a transgender man to use a men's restroom or other multiple user facility for men.

166.    Prior to the passage of H.B. 2, it was already illegal for a person to enter a restroom or locker room to assault or injure another.  Moreover, protecting transgender people from discrimination in public accommodations, as has been done in numerous states and hundreds of localities, has resulted in no increase in public safety incidents in any jurisdiction anywhere in the United States, and including transgender people in public life in no way impacts the safety or well-being of non-transgender people.

167.    The painful message of stigma sent by H.B. 2 echoes the dehumanizing rhetoric employed by a number of lawmakers, suggesting that transgender people are

38

somehow predatory or dangerous to others.  In fact, it is H.B. 2 that exposes transgender people to harassment and potential violence.  Transgender people are already disproportionately targeted for physical violence and harassment in North Carolina and across the country.  When a transgender person is forced to disclose their transgender status to strangers, such disclosure puts them at a high risk for violence.  H.B. 2's requirement that transgender people be shunted into single-sex spaces that do not match their gender identity invades their privacy and exposes this vulnerable population to harassment and potential violence by others.

168.    Upon information and belief, after the enactment of H.B. 2, some school officials that had been respecting their students' gender identity without any problem called parents to say that their children would be forced out of the single-sex facilities that match their gender identity.

169.    H.B. 2's broad sweep means that the same result applies to executive and public agencies, including routine places such as libraries, public health centers, airports, and the Division of Motor Vehicles, as well as places where people may turn in times of crisis, such as state hospitals, police departments, and courthouses.  Transgender individuals working in such agencies may not be able to safely use any bathroom any longer, threatening their ability to keep their job.

170.    Following the enactment of H.B. 2, the City Attorney of the City of Charlotte issued a memorandum dated April 1, 2016 to the Mayor and City Council of the City of Charlotte, regarding the effect of H.B. 2 on the Ordinance and other city laws

or policies.  The memorandum noted that H.B. 2 "invalidates . . . the February 22 amendments to the public accommodations ordinance," and concluded that "[d]ue to the preemption described above, the Community Relations Committee can no longer receive, investigate, and conciliate complaints for violations of the public accommodations ordinance."  The memorandum also expressed uncertainty regarding whether H.B. 2 preempted the city's non-discrimination protections for city employees.

171.    Following the enactment of H.B. 2, the University of North Carolina President issued a memorandum dated April 5, 2016 to chancellors of constituent UNC schools, including UNC-Chapel Hill, UNC-Greensboro, and UNCSA-HS.  The memorandum specifically states that "University institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex."  The memorandum included a copy of H.B. 2, which includes its definition of "biological sex."

172.    Following the enactment of H.B. 2, Governor McCrory issued Executive Order No. 93, dated April 12, 2016.  The order affirmed that "[u]nder current law, every multiple occupancy restroom, locker room, or shower facility located in a cabinet agency must be designated for and only used by persons based on their biological sex," and that "restrooms, locker rooms, and shower facilities in public buildings, including our schools" would be maintained by the State "on the basis of biological sex."  In a press release and video statement accompanying Executive Order No. 93, the governor stated

that the Executive Order "[m]aintains . . . gender-specific restroom and locker room facilities in government buildings and schools."

173. Executive Order No. 93 required that N.C. Gen. Stat. § 143-760 (H.B. 2, Section 1.3) be interpreted consistent with the following guidance: "[w]hen a private entity leases State real property and the property in the lessee's exclusive possession includes multiple occupancy restrooms, locker rooms or other like facilities, the private entity will control the signage and use of these facilities."

174. Executive Order No. 93 also sought to clarify the ambiguity regarding the scope of preemption provision noted by the City Attorney of the City of Charlotte, stating that "N.C. Gen. Stat. § 143-422.2(c) permits local governments or other political subdivisions of the State to set their own employment policies applicable to their own personnel," and affirming that "local governments may establish their own non-discrimination employment practices."

175. H.B. 2's restroom ban also deters transgender people from participating in the state and local democratic process. It bans them from using the restroom consistent with their gender identity when visiting the North Carolina General Assembly, petitioning their legislator, or entering any building operated by the legislative branch. It also bans them from using the restroom consistent with their gender identity at a city council meeting or at a mayor's office.

176. H.B. 2's harms extend even farther, creating conflicts between state law and various federal laws. The conflict with Title IX, for example, puts at risk the more

41

than $4.5 billion in federal education funding that North Carolina is expected to receive

in 2016. H.B. 2 also could lead to financial penalties under Executive Order 11246,

which prohibits federal contractors (such as the University of North Carolina) from

barring transgender employees from the restrooms consistent with their gender identity.

In addition, public employers subject to Title VII will violate the U.S. Equal Employment

Opportunity Commission's decree that discriminating against transgender people with

respect to restroom use is impermissible sex discrimination. Public hospitals that receive

federal funding also will violate Section 1557 of the Affordable Care Act if they comply

with H.B. 2.

177. The enactment of H.B. 2 follows a history of discrimination by decision-

makers against transgender people, including, for example, Governor McCrory's

participation in a Fourth Circuit *amicus curiae* brief arguing that a transgender student's

request to access restrooms in accordance with his gender identity is "radical."

E. **H.B. 2 Harms Lesbian, Gay, and Bisexual Individuals, as well as Transgender Individuals.**

178. H.B. 2 also disproportionately burdens lesbian, gay, and bisexual

individuals, as well as transgender individuals, by stripping them of or barring them from

anti-discrimination projections under local law. H.B. 2 took aim at the Charlotte

ordinance in a section providing,

> The General Assembly declares that the regulation of discriminatory practices in employment is properly an issue of general, statewide concern, such that this Article and other applicable provisions of the General Statutes supersede and preempt any ordinance, regulation, resolution, or policy adopted or imposed by a unit of local government or other political subdivision of the State that regulates or

42

imposes any requirement upon an employer pertaining to the regulation of discriminatory practices in employment, except such regulations applicable to personnel employed by that body that are not otherwise in conflict with State law.

179. H.B. 2 stripped lesbian, gay, and bisexual individuals of anti-discrimination protections in Charlotte, because no such sexual orientation anti-discrimination protections exist in state law. The preemptive effect of this section did not fall equally on all North Carolinians, however.

180. Recognizing that North Carolina law had no statewide public accommodations protection of any kind except for people with disabilities, H.B. 2 actually enacted a new public accommodations statute—so that the other groups whose protections also would have been preempted under the Charlotte Ordinance were spared that result. The new public accommodations statute prohibits discrimination based on "race, religion, color, national origin, or biological sex"—omitting the sexual orientation protections that had been included in the Charlotte Ordinance.

181. The North Carolina legislature has a history of targeted discrimination toward lesbian, gay, and bisexual people. For example, the legislature approved and referred to voters a constitutional amendment barring access to marriage for same-sex couples. Legislative leaders also intervened in litigation challenging the constitutionality of the exclusion of same-sex couples from marriage pursuant to a statute authorizing them to act on behalf of the General Assembly. In 2015, the legislature also passed a bill that allows county magistrates to recuse themselves from performing civil marriages.

182.    The preemptive effect of H.B. 2 also harmed transgender people.  While the Charlotte Ordinance had prohibited discrimination based on sex, gender identity, and gender expression, the new public accommodations statute restricted its protections solely to "biological sex," which is defined in an effort to deliberately exclude transgender people from protection.

## CLAIMS FOR RELIEF

## COUNT I

### Deprivation of Equal Protection

### U.S. Const. Amend. XIV

183.    Plaintiffs incorporate paragraphs 1 through 182 as though fully set forth herein.

184.    Plaintiffs state this cause of action against Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge H.B. 2 both facially and as applied to them.

185.    The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

### A.    Discrimination Based on Sex and Transgender Status in Single-Sex Restrooms and Facilities (H.B. 2, Part I)

186.    Section A of Count I is asserted by Plaintiffs Carcaño, McGarry, H.S., and ACLU of NC against Defendants Governor McCrory, Board of Governors, and Bissette.

44

187.     Under the Equal Protection Clause of the Fourteenth Amendment,
discrimination based on sex is presumptively unconstitutional and subject to heightened
scrutiny.

188.     H.B. 2 discriminates against transgender people on the basis of sex.

189.     Discrimination based on sex includes, but is not limited to, discrimination
based on gender nonconformity, gender identity, transgender status, and gender
transition.

190.     H.B. 2 facially classifies people based on sex, gender identity, and
transgender status.

191.     Under the Equal Protection Clause of the Fourteenth Amendment,
discrimination based on transgender status is presumptively unconstitutional and subject
to heightened scrutiny.

192.     H.B. 2 treats transgender people differently than non-transgender people
who are similarly situated.

193.     Under H.B. 2, non-transgender people are able to access restrooms and
other single-sex facilities consistent with their gender identity, but transgender people are
banned from restrooms and other single-sex facilities consistent with their gender
identity.

194.     H.B. 2 discriminates against transgender people based on gender
nonconformity.  For example, although Mr. Carcaño and Mr. McGarry are men, are
perceived as men in public, and have had medical treatment to bring their body into

45

alignment with their male gender identity, they have birth certificates with female gender markers that do not conform to H.B. 2's expectations for men. Furthermore, if transgender men such as Mr. Carcaño and Mr. McGarry had been assigned male at birth, they would not be banned by H.B. 2 from the restrooms and other single-sex facilities consistent with their gender identity. The same is true for H.S., who is a young woman, is perceived as a woman in public, and has had medical treatment to bring her body into alignment with her gender but has a birth certificate that classifies her as male and therefore does not conform to H.B. 2's expectations for women. Had H.S. been assigned female at birth, she would not be banned by H.B. 2 from restrooms and other single-sex facilities designated for women and girls.

195.    No person has any control over the sex that person is assigned at birth. In fact, when a person is born with characteristics associated with both male and female infants, the appropriate course is to assign sex based on likely gender identity and to later re-assign sex based on gender identity once it is known if it conflicts with the original sex assignment.

196.    H.B. 2's discrimination against transgender people based on sex or transgender status is not substantially related to any important government interest. Indeed, it is not even rationally related to any legitimate government interest.

197.    H.B. 2 endangers the safety, privacy, security, and well-being of transgender individuals. For example, if a transgender young woman, like H.S., were to use the restroom designated for men and boys, she likely would be harassed and might be

46

assaulted by men or boys who believed that she should not be in that restroom. Similarly, if a transgender man were to use the women's restroom, he likely would be harassed and might be assaulted by women who believe he should not be in the women's restroom.

198.    H.B. 2 does not promote the safety, privacy, security, or well-being of non-transgender people.

199.    H.B. 2 deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

200.    H.B. 2's discrimination against transgender people based on sex denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**B.      Discrimination Based on Sex, Transgender Status. and Sexual Orientation in Preemption of Local Non-Discrimination Protections (H.B. 2, Part II, Sections 2.2 & 2.3; H.B. 2, Part III)**

201.    Section B of Count I is asserted by Plaintiffs Carcaño, McGarry, H.S., Gilmore, Trent, Newell, and ACLU of NC against Defendant Governor McCrory.

202.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex, discrimination based on sexual orientation, and discrimination based on transgender status are presumptively unconstitutional and subject to heightened scrutiny.

203.    H.B. 2 deprives LGBT people of protections against discrimination based on sexual orientation, gender identity, and gender expression.

47

204.    H.B. 2 was motivated by an intent to treat LGBT people differently, and worse, than other people, including by stripping them of the protections afforded by the City of Charlotte's Ordinance and precluding any local government from taking action to protect LGBT people against discrimination.

205.    H.B. 2 was enacted for the purpose of disadvantaging LGBT people and is based on animus against LGBT people.  H.B. 2 was also enacted because of, and not in spite of, its adverse effects on LGBT people.

206.    The justifications cited in H.B. 2 for its enactment, including a purported governmental interest in consistent statewide obligations, are pretext for discrimination and did not reflect the actual motivations for the bill.  For example, proposals to add sexual orientation and gender identity and expression protections to the statewide public accommodations law were rejected.

207.    By blocking anti-discrimination protections for LGBT people at the local level, H.B. 2 imposes a different and more burdensome political process on LGBT people than on non-LGBT people who have state protection against identity-based discrimination.  H.B. 2 accordingly places a special burden on LGBT people within the governmental process with an intent to injure that minority group.

208.    H.B. 2 deprives LGBT people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

209. H.B. 2's discrimination against LGBT people based on sex and sexual orientation denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

## C. Discrimination Based on Transgender Status Warrants Heightened Scrutiny.

210. Transgender people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

211. Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

212. A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

213. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

214. Gender identity generally is fixed at an early age and highly resistant to change through intervention.

**D.     Discrimination Based on Sexual Orientation Warrants Heightened Scrutiny.**

215.    Lesbian, gay, and bisexual people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

216.    Lesbian, gay, and bisexual people are a discrete and insular group and lack the political power to protect their rights through the legislative process.  Lesbian, gay, and bisexual people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

217.    A person's sexual orientation bears no relation to a person's ability to contribute to society.

218.    Sexual orientation is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

219.    Sexual orientation generally is fixed at an early age and highly resistant to change through intervention.

* * *

# COUNT II

## Violation of Right to Privacy

## U.S. Const. Amend. XIV

### Plaintiffs Carcaño, McGarry, H.S., and ACLU of NC
### against Defendants Governor McCrory, Board of Governors, and Bissette

220.     Plaintiffs incorporate paragraphs 1 through 182 as though fully set forth herein.

221.     The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

222.     Substantive protections of the Due Process Clause include the right to avoid disclosure of sensitive, personal information.

223.     There is a fundamental right of privacy in preventing the release of, and in deciding in what circumstances to release: (1) personal information of which the release could subject them to bodily harm; and (2) information of a highly personal and intimate nature.

224.     H.B. 2 requires the disclosure of highly personal information regarding transgender people to each person who sees them using a restroom or other facility inconsistent with their gender identity or gender expression.  This disclosure places them at risk of bodily harm.

225.     There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest. H.B. 2 is not even rationally related to a legitimate state interest.

226.    In addition, the privacy interests of transgender people that are invaded outweigh any purported interest the government could assert.

## COUNT III

### Violation of Liberty and Autonomy in the
### Right to Refuse Unwanted Medical Treatment

### U.S. Const. Amend. XIV

### Plaintiffs Carcaño, McGarry, H.S., and ACLU of NC
### against Defendants Governor McCrory, Board of Governors, and Bissette

227.    Plaintiffs incorporate paragraphs 1 through 182 as though fully set forth herein.

228.    The Fourteenth Amendment's Due Process Clause protects individuals' substantive rights to be free to make certain private decisions without unjustified governmental intrusion.

229.    The right to make certain private decisions without unjustified governmental intrusion includes the right to refuse unwanted medical treatment.

230.    H.B. 2 forces transgender people to undergo medical procedures that may not be medically appropriate or available in order to access facilities consistent with their gender identity.

231.    Not all transgender individuals undergo gender confirmation surgery.  For some, the surgery is not medically necessary, while for others it is medically dangerous or impossible.  For example, because medical treatment for gender dysphoria is individualized, hormone treatment may be sufficient to manage the distress associated

52

with gender dysphoria for some individuals. Surgery may be medically necessary for others who do not have health insurance coverage for it and cannot afford to pay for the surgery out-of-pocket.

232. Some states require proof of surgery before they will allow the gender marker on a birth certificate to be changed. For those born in North Carolina, state law requires proof of "sex reassignment surgery." N.C. Gen. Stat. § 130A-11B.

233. For example, H.S. has not been able to amend her New Jersey birth certificate to accurately reflect her gender because surgery is not medically necessary for her and is generally not available to individuals under 18. Accordingly, H.B. 2 bans her from accessing restrooms and other facilities consistent with her gender identity.

234. There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest. H.B. 2 is not even rationally related to a legitimate state interest.

## COUNT IV

### Violation of Title IX

### 20 U.S.C. § 1681, *et seq*.

**Plaintiffs Carcaño, McGarry, and H.S.
against Defendant University of North Carolina**

235. Plaintiffs incorporate paragraphs 1 through 182 as though fully set forth herein.

236. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

53

discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

237. Under Title IX, discrimination "on the basis of sex" includes discrimination on the basis of gender nonconformity, gender identity, transgender status, and gender transition.

238. Defendant University of North Carolina is an education program receiving federal financial assistance.

239. Defendant University of North Carolina is an executive branch agency as defined by H.B. 2.

240. Pursuant to H.B. 2, Defendant University of North Carolina "shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex." As set forth in the UNC President's memorandum dated April 5, 2016, Defendant University of North Carolina has implemented H.B. 2 by issuing guidance that "[u]niversity institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex."

241. By requiring Mr. Carcaño—a transgender man—to use a restroom that is inconsistent with his gender identity, Defendant University of North Carolina excludes Mr. Carcaño from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities at Defendant's constituent campus,

UNC-Chapel Hill, "on the basis of sex," which violates Mr. Carcaño's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

242.    By requiring Mr. McGarry—a transgender man—to use a restroom that is inconsistent with his gender identity, Defendant University of North Carolina excludes Mr. McGarry from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities at Defendant's constituent campus, UNC-Greensboro, "on the basis of sex," which violates Mr. McGarry's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

243.    By requiring H.S.—a transgender young woman—to use a restroom that is inconsistent with her gender identity, Defendant University of North Carolina excludes H.S. from participation in, denies her the benefits of, and subjects her to discrimination in educational programs and activities at Defendant's constituent campus, UNCSA-HS, "on the basis of sex," which violates H.S.'s rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

\* \* \*

55

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.      Declaring that the unlawful provisions of H.B. 2 discussed above and their enforcement by Defendants violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution;

B.      Declaring that the unlawful provisions of H.B. 2 discussed above and their enforcement by Defendants violate Plaintiffs' rights under Title IX;

C.      Preliminarily and permanently enjoining enforcement by Defendants of the unlawful provisions of H.B. 2 discussed above;

D.      Requiring Defendants in their official capacities to allow individuals, including transgender people, to use single-sex facilities in accordance with their gender identity in all public schools and universities, executive branch agencies, and public agencies; and requiring Defendants in their official capacities to allow local governments to enact and to continue to enforce anti-discrimination protections for LGBT people;

E.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.      Granting such other and further relief as the Court deems just and proper.

G.      The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

Dated: April 21, 2016

Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook
N.C. State Bar No. 33838
AMERICAN CIVIL LIBERTIES UNION FOR
    NORTH CAROLINA LEGAL FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile: 866-511-1344
cbrook@acluofnc.org

Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone: 212-549-2627
Facsimile: 212-549-2650
egill@aclunc.org
cstrangio@aclu.org

Tara L. Borelli*
Peter C. Renn*
Kyle A. Palazzolo*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
tborelli@lambdalegal.org
prenn@lambdalegal.org
kpalazzolo@lambdalegal.org

Paul M. Smith*
Luke C. Platzer*
Mark P. Gaber*
Lorenzo Di Silvio*
Nicholas W. Tarasen*
Thomas D. Garza*
JENNER & BLOCK LLP
1099 New York Avenue, N.W.
Suite 900, Washington, DC 20001
Telephone: 202-639-6000
Facsimile: 202-639-6066
psmith@jenner.com
lplatzer@jenner.com
mgaber@jenner.com
ldisilvio@jenner.com
ntarasen@jenner.com
tgarza@jenner.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).