# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; H.S., by her next friend and mother, KATHRYN SCHAFER; ANGELA GILMORE; KELLY TRENT; BEVERLY NEWELL; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, | No. 1:16-cv-00236-TDS-JEP |
| *Plaintiffs*, | |
| v. | |
| PATRICK MCCRORY, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; and W. LOUIS BISSETTE, JR., in his official capacity as Chairman of the Board of Governors of the University of North Carolina, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65(a) and Local Civil Rule 65.1(b),

Plaintiffs Joaquín Carcaño; Payton Grey McGarry; H.S., by her next friend and mother,

Kathryn Schafer; and American Civil Liberties Union of North Carolina (collectively,

"Plaintiffs"), respectfully submit the following memorandum of law in support of their

motion for a preliminary injunction enjoining Part I of North Carolina House Bill 2

("H.B. 2") (Ex. A[1]), which targets transgender people for differential treatment in single-sex facilities such as restrooms, until this Court renders a final judgment on the merits.

## NATURE OF THE MATTER

This is a case about whether transgender individuals in North Carolina can participate in public life.  In violation of numerous provisions of the U.S. Constitution and Title IX of the Education Amendments of 1972, H.B. 2 deprives transgender people, including Plaintiffs, of respect, dignity, and equal access to public facilities.

## STATEMENT OF FACTS

**I.      Charlotte's Non-Discrimination Ordinance and the Enactment of H.B. 2.**

On February 22, 2016, the Charlotte City Council amended the City's existing non-discrimination ordinance to include, among other characteristics, "sexual orientation, gender identity, and gender expression" as generally prohibited forms of discrimination and added "sex" to the categories protected from discrimination in public accommodations.  Ex. B; *see* Ex. C at 3.  The City Council's 7-4 vote (Ex. D at 43) followed public discussion and testimony, during which more than 140 people spoke. Ex. D at 13-43; *see also* Ex. E.  Among them were transgender residents affirming the importance of the proposed ordinance to their safety and well-being.

State lawmakers expressed outrage over Charlotte's new law even before it was enacted.  Governor McCrory emailed two members of the City Council the day before

---

[1] Except where otherwise specified, exhibit numbers herein (*e.g.*, Ex. _) refer to exhibits to the Declaration of Luke C. Platzer in Support of Plaintiffs' Motion for Preliminary Injunction.

the City's hearing on the proposed ordinance to threaten that an expansion of non-discrimination protection would "most likely cause immediate state legislative intervention." Ex. F at 2. On February 23, 2016, House Speaker Tim Moore inaccurately characterized the measure as "opening all bathrooms and changing rooms to the general public" and said that the City Council "has gone against all common sense and has created a major public safety issue." Ex. G at 1. Senator David Curtis, commenting on the ordinance's protection for Charlotte's transgender residents, said "I think it's just inappropriate. We have rules in our society and that's just one of the rules in our society. This liberal group is trying to redefine everything about our society. Gender and marriage, just the whole liberal agenda." *Id.* The same day, Speaker Moore announced his intent to "join [his] conservative colleagues and Governor McCrory in exploring legislative intervention to correct this radical course." Ex. H at 1.

Within two days, Speaker Moore was publicly exploring a special session of the legislature to overturn Charlotte's ordinance. Addressing concerns that such a session would cost $42,000 per day, the Speaker responded that "we cannot put a price tag on the safety of women and children." Ex. I at 1. Elaborating further, he explained that "we all learned in kindergarten that guys go to the men's room, and gals go to the women's room. You know, and so why folks think they have to upend that to be politically correct makes no sense." Ex. J at 1.

Before, during, and after the March 23, 2016 special session, legislators were outspoken about their motivation for seeking to overturn Charlotte's ordinance, fixating

on transgender individuals using the restroom.  On March 17, 2016, Speaker Moore said

about supporters of Charlotte's ordinance:

> They want to protect adults who feel compelled to dress up like the
> opposite sex.  I, on the other hand, oppose the ordinance to protect children,
> who from the time they've been potty trained, know to go into the
> bathroom of their god-given appropriate gender.  Honestly, it's ridiculous
> we are even having this discussion.  I look forward to invalidating this
> ordinance as soon as possible.

Ex. K at 2.  Representative John Blust stated: "I think it's ridiculous that your anatomy

isn't what governs what restroom you use. . . .  I don't understand why they have to make

way for this .0001 percent of the population."  Ex. L at 2.  Senate President Pro Tem Phil

Berger asked, "How many fathers are now going to be forced to go to the ladies' room to

make sure their little girls aren't molested?"  Ex. M at 3.  Dismissing the cost of the

special session, Senator Andrew Brock said, "You know, $42,000 is not going to cover

the medical expenses when a pervert walks into a bathroom and my little girls are in

there."  Ex. N at 1.

Speaking of Charlotte's ordinance, Representative Mark Brody said that "[t]he

homosexual community just stepped too far and that had to stop and that's my basic

opinion. . . .  This is driven by the homosexual community and they're emboldened by

their victory in the courts on homosexual marriage."  Ex. O at 2.  H.B. 2, Brody

explained, "sends a message to these municipalities who have been taken over by the

liberal, homosexual, pro-homosexual ideology that we are going to stick up for traditional

values and we'll stick up for them constantly if that's what we have to do."  *Id.* at 3.

The special session, called by three-fifths of the House of Representatives rather than by the Governor (Ex. P; *see also* Ex. Q)—the first time that mechanism had been used in 35 years—began the morning of March 23, even though the leadership of the legislature had not yet released a copy of H.B. 2. Ex. R at 2-3. That morning, before H.B. 2 had been filed, Speaker Moore announced that the committee hearing for the bill would begin five minutes after introduction of the bill and adjournment of the morning session. Ex. S at 1. Lawmakers were given a five-minute break to read the bill after it was publicly introduced for the first time, and it was quickly passed by the committee. Ex. T at 2. After only three hours of debate, the bill passed the House and was referred to the Senate, where, at the time of the vote, all Senate Democrats walked out of the chamber, calling the special session an "affront to democracy" (Ex. U at 2), and noting that the Democratic caucus "ch[o]se not to participate in this farce" (Ex. V at 1). The bill passed the Senate unanimously without any Democrats present. *Id.* Governor McCrory signed the legislation fewer than twelve hours after it was introduced, and it became effective immediately. Ex. W at 2.

Several weeks later, after intense public backlash, Governor McCrory issued an Executive Order that claimed to affirm a commitment to nondiscrimination but in fact affirmed the core of H.B. 2. N.C. Exec. Order No. 93 (Apr. 12, 2016) (Ex. X). Although the Governor had previously said that Charlotte's ordinance would "create major public safety issues by putting citizens in possible danger from deviant actions by individuals taking improper advantage of a bad policy" (Ex. G at 1), he subsequently asserted that his

5

support of H.B. 2 was not motivated by fear of molesters posing as transgender persons: "I don't use that term. . . . Mine is not a fear. I'm not doing it, and I don't like the rhetoric that's often used on the right saying what the fear is." Ex. Y at 1. In a recent interview, Governor McCrory further admitted that he was not aware of any people using transgender protections to commit crimes in bathroom. Ex. Z at 12.

## II. Plaintiffs Are Transgender North Carolinians Who Are Singled Out for Differential Treatment and Suffer Mental and Emotional Distress as a Result of H.B. 2.

Plaintiffs Carcaño, McGarry, and H.S. are transgender North Carolinians who are singled out for differential treatment by provisions of H.B. 2 that restrict access to single-sex facilities, such as restrooms and locker rooms, based on the gender marker on one's birth certificate. As set forth below and in the attached declarations, prior to the passage of H.B. 2, these Plaintiffs each used the multi-user restrooms and locker rooms that accord with their gender identity without incident, but since its passage, they have suffered significant mental and emotional distress due to H.B. 2's bar on them using such restrooms in schools and other government buildings. H.B. 2 has disrupted the lives of these Plaintiffs and the many transgender members of the ACLU of North Carolina. *See generally* Preston Decl. (describing impact of H.B. 2 on transgender North Carolinians).

Plaintiff Joaquín Carcaño is a 27-year-old man who works for the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"). Carcaño Decl. ¶¶ 1-2, 5. Mr. Carcaño is transgender. *Id.* ¶ 6. The sex he was assigned at birth was female, which is reflected on his birth certificate, but his birth certificate does not match his gender

identity or sex, which are male. *Id.* Prior to the passage of H.B. 2, Mr. Carcaño used the men's restroom at work and in other public spaces without incident. *Id.* ¶ 15. Since H.B. 2 went into effect, however, Mr. Carcaño has been forced to use a single-occupancy restroom in a remote part of his workplace or to leave work to go to a single-occupancy restroom in another building. *Id.* ¶¶ 20-21.

Because Mr. Carcaño feels humiliated for being singled out and forced to use a separate restroom from his other male coworkers, he often delays or avoids going to the restroom or limits his fluid intake. *Id.* ¶ 21. In addition to using the restroom at UNC-Chapel Hill, Mr. Carcaño has reason to visit offices of the North Carolina Division of Motor Vehicles and Department of Health and Human Services, as well as state courthouses, public airports, and the North Carolina Rest Area system. *Id.* ¶¶ 25-28. He now cannot use the men's restroom in those locations and using the women's restroom there is not an option for him, just as it is not an option for non-transgender men. *Id.* ¶ 22. Mr. Carcaño will continue to experience significant mental and emotional distress and fear of violence and harassment against him as a result of H.B. 2. *Id.* ¶¶ 22, 24.

Payton Grey McGarry is a 20-year-old man and a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro"). McGarry Decl. ¶¶ 1-2, 6. Mr. McGarry is transgender. *Id.* ¶ 7. The sex he was assigned at birth was female, which is reflected on his birth certificate, but his birth certificate does not match his gender identity or sex, which are male. *Id.* Prior to the passage of H.B. 2, Mr. McGarry

used the men's restroom on campus and in other public spaces without incident, but since H.B. 2 went into effect, he has had to search for single-user restrooms outside of the buildings in which he has classes, which interferes with his education. *Id*. ¶¶ 20, 24. Because of H.B. 2, Mr. McGarry feels singled out and marked as inferior to other men on campus. *Id.* ¶ 25.

In addition to using the restroom at UNC-Greensboro, Mr. McGarry also has occasion to visit offices in the North Carolina Division of Motor Vehicles, public airports, and the public restrooms in the North Carolina Rest Area system. *Id.* ¶¶ 30-31. Like Mr. Carcaño, he now cannot use men's rooms in these places and using the women's restroom is not an option. He will continue to experience significant mental and emotional distress and fear of violence and harassment against him as a result of H.B. 2. *Id.* ¶ 27.

Plaintiff H.S. is a 17-year-old girl, and she is a rising senior at the University of North Carolina School of the Arts High School ("UNCSA-HS"). H.S. Decl. ¶¶ 1-2, 6. H.S. is transgender. *Id*. ¶ 7. The sex she was assigned at birth was male, which is reflected on her birth certificate, but her birth certificate does not match her gender identity or sex, which are female. *Id*. Prior to the passage of H.B. 2, H.S. used the girls' or women's restroom at school and in other public spaces without incident, but since H.B. 2 went into effect, she has limited or delayed use of the restroom for fear of getting into trouble if she uses the women's or girls' restroom or being subjected to harassment

and violence if she were to use the boys' or men's restroom in compliance with this new law.  *Id*. ¶ 32.

In addition to using the restroom at UNCSA-HS, H.S. also visits offices of the North Carolina Division of Motor Vehicles, public airports, and the public restrooms in the North Carolina Rest Area system.  *Id.* ¶¶ 33-34.  Using the restroom designated for men or boys in any of these spaces is not an option for her, just as it is not an option for non-transgender women and girls, and she has experienced and continues to experience significant mental and emotional distress and fear of violence and harassment against her as a result of H.B. 2.  *Id.* ¶¶ 30-31.

## III.    H.B. 2 Inflicts Severe Harms on Transgender People and Undermines Well-Established Medical and Scientific Protocols.

The term "transgender" refers to individuals who have a gender identity that differs from the sex assigned them at birth.  Adkins Decl. ¶ 12; Ettner Decl. ¶ 11. Everyone has a gender identity—a person's core sense of belonging to a particular gender.  This identity is fixed at a young age and cannot be changed.  Adkins Decl. ¶¶ 15-17, 20-21; Ettner Decl. ¶ 10.  For most people, their gender identity matches the sex they were assigned at birth and aligns with other components of their sex.  Transgender people experience a disconnect between the sex assigned to them at birth and their core gender. Adkins Decl. ¶ 19; Ettner Decl. ¶ 11.

The medical diagnosis for the incongruence between a person's core identity and birth-assigned sex and accompanying distress is gender dysphoria (formerly known as gender identity disorder).  Ettner Decl. ¶¶ 12-13.  Treatment for gender dysphoria is

9

governed by the World Professional Association for Transgender Health's internationally accepted Standards of Care ("SOC"). *Id.* ¶ 14. In accordance with the SOC, transgender individuals undergo medically-recommended transition in order to live in alignment with their gender identity, including changes in gender expression and role (also referred to as "social role transition"). *Id.* ¶¶ 16-18. To be effective, social role transition must occur in all aspects of life, including when using single-sex spaces such as restrooms or locker rooms. It disrupts treatment to force a transgender individual to use single-sex spaces that do not align with their gender identity. *Id.* ¶¶ 19, 24-26.

Indeed, gender identity is the only medically-appropriate determinant of sex when assignment as male or female is necessary. Adkins Decl. ¶¶ 23, 32-33, 39. This means that a transgender man has the sex of male and a transgender woman has the sex of female. It would be extremely harmful to, for example, force a man who has gender dysphoria to be classified as female for social and legal purposes simply because he was assigned female at birth. *Id.* ¶¶ 32-34. Medical science is clear that it is inappropriate to use chromosomes, hormones, internal reproductive organs, external genitalia, or secondary sex characteristics to override gender identity for purposes of classifying someone as male or female. *Id.* ¶¶ 33. Gender identity does and should control when there is a need to assign a particular gender to an individual. *Id.* ¶¶ 23, 32-33, 39. The cost of not assigning sex based on gender identity is dire. Attempted suicide rates in the transgender community are over 40%, which is a risk of death that far exceeds most other medical conditions. *Id.* ¶ 34; Ettner Decl. ¶ 12. The only treatment to avoid this serious

harm is to recognize the gender identity of patients with gender dysphoria.  Ettner Decl.

¶¶ 15, 23; Adkins Decl. ¶¶ 27, 32.

## STATEMENT OF THE QUESTION TO BE ANSWERED

Whether Plaintiffs are entitled to an order preliminarily enjoining Defendants from implementing Part I of House Bill 2, which deprives them of equal access to government facilities and educational programs and activities in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment and Title IX of the Education Amendments of 1972.

## ARGUMENT

### I.  Preliminary Injunction Standard.

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits."  *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quotation marks omitted).  Plaintiffs seek to enjoin enforcement of Part I of H.B. 2 and restore the state of the law before it was enacted, which was "the last uncontested status between the parties which preceded the controversy."  *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quotation marks omitted).  Such an injunction must be granted if Plaintiffs demonstrate that: (1) they are likely to succeed on the merits; (2) they will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in their favor; and (4) the injunction is in the public interest.  *League of Women Voters*, 769

F.3d at 236 (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Each of those factors weighs strongly in Plaintiffs' favor.

## II.    Plaintiffs Are Likely to Succeed on Their Title IX Claim.

By complying with H.B. 2 and barring transgender individuals from facilities congruent with their gender identity, Defendant University of North Carolina ("UNC") has violated Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX protects both students and school employees. *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982). To prove a violation, a plaintiff must show that (1) he or she experienced discrimination in an education program or activity on the basis of sex, (2) the educational institution was receiving federal financial assistance at the time the discrimination occurred, and (3) the discrimination caused the plaintiff harm. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, No. 15-2056, -- F.3d --, 2016 WL 1567467, at *4 (4th Cir. Apr. 19, 2016).

The Fourth Circuit's binding decision in *G.G.* compels the conclusion that Plaintiffs are likely to succeed on the merits of their Title IX claim. In *G.G.*, the court held that Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity. *Id.* As a recipient of federal financial assistance,

Defendant UNC is subject to Title IX's strictures.[2] Both H.B. 2 and the school board policy at issue in *G.G.* mandate identical forms of sex-based discrimination: the exclusion of transgender individuals from facilities congruent with their gender identity, solely because they were assigned a different gender at birth. *G.G.* thus is on "all fours" with the present case and properly resolves Plaintiffs' Title IX claim here.

The Fourth Circuit recognized that, unless an exception applied, the school board's exclusion of G.G., a transgender boy, from the boys' restroom would amount to discrimination "on the basis of sex," and thus focused on whether the school board's exclusion of the plaintiff from the boys' restroom fell within an *exception* to liability under Title IX. *See id.* at *4 (noting that "[n]ot all distinctions on the basis of sex are impermissible under Title IX" so long as they fall within statutory or regulatory exceptions); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition.").[3]

---

[2] *See Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (UNC is "an institution receiving federal funds"); *see also* Ex. AA at 2 (letter from UNC president noting that UNC "will continue to comply with the requirements of Title IX"); Ex. AB (statement by UNC president that "more than 138,000 of our students—representing all 100 North Carolina counties and all UNC institutions—receive some type of federal aid").

[3] Indeed, even the dissent in *G.G.* agreed that the school board's exclusion of the plaintiff from the boys' restroom required an exception in order to escape liability under Title IX. *Id.* at *19 ("although Title IX and its regulations provide generally that a school . . . may not discriminate on the basis of sex, they also specify that a school does not violate the Act by providing, on the basis of sex, separate . . . facilities") (Niemeyer, J., dissenting). Thus, even under the view that "sex" is determined by external genitalia, the exclusion of G.G. from the boys' restroom on that basis still required a Title IX exception.

13

The Fourth Circuit held that the exception invoked by the school board to defend its policy—which permits the provision of "separate toilet, locker rooms, and shower facilities on the basis of sex," 34 C.F.R. § 106.33—did not permit the exclusion of transgender students from the restrooms congruent with their gender identity in light of the Department of Education's interpretation of that regulation. 2016 WL 1567467, at *4. The agency unequivocally interprets its own regulation as not permitting discrimination against transgender individuals through such exclusions. Ex. AC at 2; Ex. AD at 3-4. *G.G.* held that the agency's position was reasonable, that it reflected the agency's fair and considered judgment, and that it was entitled to controlling weight. 2016 WL 1567467, at *7. Given this clear holding on the precise legal issue presented here, Plaintiffs are likely to succeed on their Title IX claim.

The Fourth Circuit's controlling decision in *G.G.* applies with equal force to "changing facilities," such as locker rooms, under H.B. 2. Both the majority and the dissent agreed that "'sex' should be construed uniformly throughout Title IX." *Id.* at *8; *accord id.* at *19 (Niemeyer, J., dissenting). Given that it is discrimination "on the basis of sex" to exclude a transgender man like Mr. McGarry from the men's restroom, it is equally discrimination "on the basis of sex" to exclude him from the men's locker room. *See Patel v. Napolitano*, 706 F.3d 370, 376 (4th Cir. 2013) ("[t]he meaning of words in a statute cannot change with the statute's application" (internal quotation marks omitted)). The meaning of "sex" under Title IX does not change when Mr. McGarry walks out of a restroom stall and into the locker room. Further, the agency position to which *G.G.*

deferred treats restrooms and locker rooms identically.  *See* Ex. AC at 2 (providing that, where a school elects to provide sex-separated "restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes," it must treat transgender individuals consistent with their gender identity); *see also* Ex. AD at 3.

And just as in *G.G.*, H.B. 2's widespread harms are not mitigated by the fiction that transgender individuals can simply use the facilities corresponding to their birth-assigned sex.  That option is no option at all.  For example, if Mr. McGarry were to use the women's restroom, he would face harassment and violence from those who correctly perceive that he is a man using facilities designated for women.  McGarry Decl. ¶ 28 (explaining that, during the early stages of his transition, he was screamed at, shoved, slapped, and told to get out when he tried using the female restroom).  Similarly, if Mr. Carcaño were to use the women's restroom, he would be acting in direct contravention of what his medical professionals have concluded is medically necessary treatment for his gender dysphoria.  Carcaño Decl. ¶ 15.

Consigning transgender individuals to separate gender-neutral, single-user restrooms does not mitigate the harm that H.B. 2 inflicts.  Those facilities often are not available to Plaintiffs; and even in situations where they are available, they are not equal to the sex-specific facilities that others use.  *See, e.g.*, H.S. Decl. ¶ 27 (describing the lack of gender-neutral restrooms available to H.S. on-campus); McGarry Decl. ¶ 23 (describing the lack of gender-neutral restrooms in many buildings in which Mr. McGarry has class); Carcaño Decl. ¶¶ 19-21 (describing the need to use a special service

elevator to access the gender-neutral restroom tucked away near building housekeeping). Forcing Plaintiffs to expend additional time simply to find a restroom disrupts their ability to work and learn alongside their colleagues and peers.

More fundamentally, shunting transgender individuals into alternative facilities is stigmatizing and brands them as second-class members of the community, unfit to share communal spaces with others. As a result, transgender individuals may delay or minimize trips to the restroom, which, in turn, leads to increased risk for urinary tract infections, kidney disease, and bladder cancer. *See* Routh Decl. ¶ 16; *cf. G.G.*, 2016 WL 1567467, at *2. Title IX bars this harmful and humiliating exclusion on the basis of sex.

## III.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.

H.B. 2 facially discriminates against transgender individuals in violation of equal protection. Although all people need to use facilities that match their gender identity, only transgender people are barred from doing so under H.B. 2. This distinction is written into the law's definition of "biological sex," which necessarily excludes transgender individuals like Plaintiffs from multi-user restrooms and other facilities congruent with their gender identity. Before an individual can walk into a restroom designated for men, for example, that individual must possess a birth certificate with a male gender marker. That requirement of a matching birth certificate discriminates

against transgender individuals because, by definition, their birth-assigned sex does not match their gender identity.[4]

## A. Heightened Scrutiny Applies to H.B. 2.

H.B. 2's discrimination against transgender individuals triggers heightened scrutiny for three reasons: (1) under *G.G.*, the exclusion of transgender individuals from facilities congruent with their gender identity is "based on sex"; (2) discrimination against transgender individuals necessarily relies upon sex stereotypes, gender identity, and gender transition, each of which is related to sex; and (3) discrimination against transgender individuals bears all the indicia of a suspect classification.

### 1. Under *G.G.*, H.B. 2 Discriminates Against Transgender Individuals on the Basis of Sex as a Matter of Law.

For the same reason that barring a transgender individual from restrooms that accord with the individual's gender identity violates Title IX under *G.G.*, such sex-based discrimination also triggers heightened equal protection scrutiny. Courts rely upon a common body of law in analyzing discrimination claims, regardless of whether the claim at issue arises under the Equal Protection Clause or a particular antidiscrimination statute. *See, e.g.*, *G.G.*, 2016 WL 1567467, at *4 ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX."); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (same); *Glenn v. Brumby*,

---

[4] This intentional targeting of transgender people is reinforced by the political reality that H.B. 2 was a direct response to the express inclusion of transgender people in local non-discrimination protections. Governor McCrory disagreed with the Charlotte ordinance, and "[t]hat's why [he] signed [the] bill to stop it." Ex. AE.

663 F.3d 1312, 1316 (11th Cir. 2011) (applying Title VII case law to decide equal protection claim); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (applying Title VII case law in interpreting analogous federal law). *G.G.* therefore also governs this Court's analysis under the Equal Protection Clause.

*G.G.* held that excluding transgender individuals from restrooms congruent with their gender identity constitutes government action "on the basis of sex." *G.G.*, 2016 WL 1567467 at *4. Because H.B. 2 also excludes transgender individuals from facilities congruent with their gender identity, and because it relies on "biological sex," it is a sex-based classification.[5] And there is no question that "all gender-based classifications today warrant heightened scrutiny." *United States v. Virginia*, 518 U.S. 515, 555 (1996) (internal quotation marks omitted).

### 2. Discrimination Against Transgender Individuals Is Inherently Discrimination on the Basis of Sex.

Although *G.G.*'s holding is sufficient to resolve the parallel legal issue here of whether H.B. 2's sex-based classification triggers heightened scrutiny, there are multiple independent bases supporting that holding. Modern precedent overwhelmingly holds that discrimination against transgender individuals is discrimination on the basis of "sex," and

---

[5] To be clear, Plaintiffs do not seek to abolish sex-separated facilities. They merely seek to end the harm caused by H.B. 2's exclusion of transgender individuals like them from existing sex-separated facilities that correspond with those individuals' gender identity. The permissibility of sex-separated facilities under the Equal Protection Clause is not at issue here and could only arise where an individual had suffered injury. *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 666 (7th Cir. 2015) (differential treatment does not by itself create an injury in fact when it does not result in any unconstitutional stigma or tangible harm to the plaintiff); *cf. G.G.*, 2016 WL 1567467, at *4 (holding that a Title IX violation requires harm).

therefore must be tested under heightened scrutiny. *See G.G.*, 2016 WL 1567467, at *12, *14 (Davis, J., concurring) (citing cases from the First, Sixth, Ninth, and Eleventh Circuits and noting the "weight of circuit authority" recognizing that "discrimination based on transgender status is already prohibited by the language of federal civil rights statutes, as interpreted by the Supreme Court"); *see generally* Section III.A.1 (discussing common body of law in analyzing equal protection and statutory antidiscrimination claims). This precedent recognizes discrimination against transgender individuals as sex discrimination in at least three ways: (1) discrimination based on sex stereotypes; (2) discrimination based on gender identity and transgender status; and (3) discrimination based on gender transition.

### a.    Sex Stereotyping

Discrimination against transgender individuals is inherently rooted in sex stereotypes and accordingly triggers heightened scrutiny on that basis. The Supreme Court has "made abundantly clear in past cases that gender classifications that rest on impermissible stereotypes violate the Equal Protection Clause." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 139 n.11 (1994). More than a quarter century ago, the Supreme Court explained in the context of Title VII that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).

The plaintiff in *Price Waterhouse* had been denied partnership because of her perceived nonconformity to stereotypes associated with her sex. Her superiors viewed her as "macho" and advised that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* at 235. Even if the employer had no objection to promoting a woman per se, it nonetheless treated the plaintiff differently because of a "sex-based consideration[]"—her failure to conform to a stereotype of how a woman should express her gender. *Id.* at 241-42. This was discrimination on the basis of "sex." *Id.* at 241.

Sex discrimination thus is not limited to favoring one sex over another sex. Instead, it includes any differential treatment on the basis of a sex-based consideration, such as preferring a gender-conforming woman over a gender-nonconforming woman. Stated differently, discrimination based on sex "is not only discrimination because of maleness and discrimination because of femaleness," but also "discrimination because of the *properties or characteristics* by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Conn.*, No. 3:12-cv-1154, -- F. Supp. 3d --, 2016 WL 1089178, at *12 (D. Conn. Mar. 18, 2016) (emphases in original).

Discrimination because an individual is transgender necessarily relies upon sex stereotypes. By definition, a transgender person's gender "identity [does] not meet social definitions of masculinity [or femininity]" associated with one's birth-assigned sex. *Schwenk*, 204 F.3d at 1201. Thus, "[a] person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes." *Glenn*, 663

20

F.3d at 1316; *accord Latta v. Otter*, 771 F.3d 456, 495 n.12 (9th Cir. 2014)

("discrimination on the basis of transgender status is also gender discrimination")

(Berzon, J., concurring).

Indeed, many courts have recognized an inextricable link between discrimination

against a transgender person as such and discrimination on the basis of gender

nonconformity.  *See, e.g.*, *Glenn*, 663 F.3d at 1316 ("There is . . . a congruence between

discriminating against transgender and transsexual individuals and discrimination on the

basis of gender-based behavioral norms."); *Smith v. City of Salem*, 378 F.3d 566, 575 (6th

Cir. 2004) ("discrimination against a plaintiff who is [transgender] – and therefore fails to

act and/or identify with his or her [assigned] gender – is no different from the

discrimination directed against Ann Hopkins in *Price Waterhouse*"); *Schwenk*, 204 F.3d

at 1201; *Rumble v. Fairview Health Servs.*, No. 14-cv-2037, 2015 WL 1197415, at *2

(D. Minn. Mar. 16, 2015) ("discrimination based on an individual's transgender status

constitutes discrimination based on gender stereotyping"); *Finkle v. Howard Cty.*,

12 F. Supp. 3d 780, 788 (D. Md. 2014) ("any discrimination against transsexuals (as

transsexuals) – individuals who, by definition, do not conform to gender stereotypes – is

proscribed by Title VII's proscription of discrimination on the basis of sex as interpreted

by *Price Waterhouse*"); *cf. Macy v. Holder*, No. 0120120821, 2012 WL 1435995, at *8

(EEOC Apr. 20, 2012) ("[C]onsiderations of gender stereoytpes will inherently be part of

what drives discrimination against a transgender[] individual.").  Ultimately, it does not

matter whether a transgender individual is viewed as "an insufficiently masculine man,

an insufficiently feminine woman, or an inherently gender-nonconforming transsexual," because discrimination on any of these bases is based on sex. *Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008).

H.B. 2 codifies sex stereotypes into law by banishing those whose gender identities do not match their birth-assigned sex from the facilities that others are permitted to use. That exclusion is necessarily based on sex stereotypes. *Lusardi v. McHugh*, No. 0120133395, 2015 WL 1607756, at *9 (EEOC Apr. 1, 2015) (employer's policy banning a transgender woman from the women's facilities was discrimination because of sex).[6] The words of Representative Bishop decrying the efforts of what he called a "small group of far-out progressives" to support "a cross-dresser's liberty to express his gender nonconformity" (Ex. AF at 4) illustrate H.B. 2's grounding in such beliefs about sex.

### b.    Gender Identity and Transgender Status

Laws distinguishing between transgender men or women and non-transgender men or women are sex discrimination for an additional reason: such laws allow people to be treated consistent with their gender identity *only* if that identity is consistent with their sex assigned at birth. A law that discriminates against people because their birth-assigned sex and gender identity do not match necessarily is discriminating based on sex.

---

[6] There is no exception to this rule for laws or policies that purport to regulate genital characteristics, as H.B. 2 appears to do. *See Lusardi*, 2015 WL 1607756, at *8-*9 (finding it unlawful to bar a transgender woman from the restroom based on the belief that she was not "truly female" without genital surgery); *see also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065-66 (9th Cir. 2002) (explaining that any focus on sex-related anatomy, such as genitalia or breasts, "is inescapably 'because of . . . sex'").

It is no answer that the law treats everyone consistently with their birth-assigned sex. In analyzing whether "sex has been taken into account," *Smith v. Virginia Commonw. Univ.*, 84 F.3d 672, 676 (4th Cir. 1996) (quotation marks omitted), "[w]hat matters" is that "the discrimination is related to . . . sex," *Schwenk*, 204 F.3d at 1202. *Accord Fabian*, 2016 WL 1089178, at *13 (recognizing that whether the discrimination is "related to sex" is the dispositive inquiry) (quotation marks omitted). Here, that is beyond serious dispute. If one's dress, hairstyle, and make-up usage constitute "sex-based considerations"—which *Price Waterhouse* confirms as binding law—then the same necessarily holds true for a mismatch between gender identity (which gives rise to such outward expressions of gender) and birth-assigned sex. 490 U.S. at 242; *City of Salem*, 378 F.3d at 575; *Schroer*, 577 F. Supp. 2d at 306.

As even the *G.G.* dissent acknowledges, the Fourth Circuit has confirmed that "the term 'sex' means a person's gender identity." 2016 WL 1567467, at *15 (Niemeyer, J., dissenting).[7] *Accord Schwenk*, 204 F.3d at 1201-02 (holding that conduct motivated by an individual's "gender or sexual identity" is because of "gender," which is interchangeable with "sex"); *Fabian*, 2016 WL 1089178, at *13 ("discrimination on the basis of transgender identity is discrimination on the basis of sex"); *Norsworthy v. Beard*,

---

[7] Even before *G.G.*, district courts within the Fourth Circuit had recognized the viability of discrimination claims premised upon a plaintiff's gender identity differing from the sex others perceived the plaintiff to be. *See Muir v. Applied Integrated Tech., Inc.*, No. 13-0808, 2013 WL 6200178, at *10 (D. Md. Nov. 26, 2013) (denying summary judgment in a Title VII case where it was disputed whether Plaintiff was discriminated against based on her "transgender status"); *Finkle*, 12 F. Supp. 3d at 787 (denying motion to dismiss Title VII claim where Plaintiff alleged discrimination based on her "transgender[]" status" and her "gender identification").

23

87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015) (gender includes "an individual's sexual identity") (quotation marks omitted); *Rumble*, 2015 WL 1197415, at *2 ("transgender status is necessarily part of his 'sex' or 'gender' identity"). Both "outward behavior and inward identity" are related to sex. *Schwenk*, 204 F.3d at 1201. The Equal Employment Opportunity Commission and the U.S. Department of Justice likewise agree that discrimination based on gender identity and transgender status is sex discrimination. *See Macy*, 2012 WL 1435995, at *10; Memorandum from U.S. Att'y Gen. to U.S. Attorneys (Dec. 15, 2014) (Ex. AG).

Indeed, gender identity is not merely *related to* sex; from a medical perspective, it is *the* sex-related characteristic that determines sex. Adkins Decl. ¶¶ 23, 32-33, 39. Gender identity is not susceptible to voluntary change, and attempts to change a person's gender identity can lead to extreme harm, including suicide. *Id.* ¶¶ 20-22, 26-34; Ettner Decl. ¶¶ 12. That is why, in situations in which an individual's gender identity is inconsistent with other sex-related characteristics, it is gender identity that must control—not the discordant sex-related characteristics. Adkins Decl. ¶¶ 32-33.

For example, as the Fourth Circuit noted, non-transgender individuals who have lost external genitalia in an accident have not somehow lost their sex. *G.G.*, 2016 WL 1567467, at *6; *accord Sommerville v. Hobby Lobby Stores*, Charge Nos. 2011CN2993/2011CP2994, slip op. at 8, 12 (Ill. Hum. Rts. Comm'n May 15, 2015) (Ex. AH) (observing that the "absence of male genitalia does not make a female, as that could occur by illness or injury" and finding the exclusion of a transgender woman from the

24

women's restroom was unlawful). Instead, gender identity continues to define their sex. So too with transgender individuals: "the individual's sex as male or female is to be generally determined by reference to the [individual]'s gender identity." *G.G.*, 2016 WL 1567467, at *6. In sum, gender identity serves as the core of sex—not genitalia or gonads or any other sex-related characteristic. *Id.*

Precedent makes clear that, when the government draws lines related to whether a person's gender identity aligns with the person's birth-assigned sex, such line-drawing is sex-based and must be tested under heightened scrutiny.

### c. Gender Transition

Discrimination based on gender transition is necessarily based on sex, just as discrimination based on religious conversion is necessarily based on religion. For example, firing an employee because she converts from Christianity to Judaism "would be a clear case of discrimination 'because of religion.'" *Schroer*, 577 F. Supp. 2d at 306. Even if the employer "harbors no bias toward either Christians or Jews but only 'converts[,]' . . . [n]o court would take seriously the notion that 'converts' are not covered" by the statutory ban on religious discrimination. *Id.*; *accord Fabian*, 2016 WL 1089178, at *13; *Macy*, 2012 WL 1435995, at *11. "Because Christianity and Judaism are understood as examples of religions rather than the definition of religion itself, discrimination against converts, or against those who practice either religion the 'wrong' way, is obviously discrimination 'because of religion.'" *Fabian*, 2016 WL 1089178, at *13.

Similarly, the government may treat men and women equally as a general matter but nonetheless discriminate against those who undertake gender transition or who do not "complete" gender transition in the government's view. For example, although H.S. is a girl, lives openly as a girl, and has taken medical steps (including hormone therapy) to affirm her female identity, H.B. 2 reflects a government determination that H.S.'s gender transition is not yet finished and she is not "really" a girl until she obtains surgical treatment and updates her birth certificate. By defining the proper terms of gender transition and therefore writing into law what it means to be a "real" man or "real" woman, H.B. 2 discriminates based on sex.

### 3. Discrimination Based on Transgender Status Is Subject to Heightened Equal Protection Scrutiny.

In addition to triggering heightened scrutiny based on sex, H.B. 2 also separately triggers heightened scrutiny because it discriminates based on transgender status.

In identifying whether a classification triggers heightened scrutiny, the Supreme Court has considered whether: (a) the class has historically been "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987) (quotation marks omitted); (b) the class's defining characteristic "frequently bears [a] relation to ability to perform or contribute to society," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440-41 (1985) (quotation marks omitted); (c) the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602 (quotation marks omitted); and (d) the class is "a minority or politically powerless," *id*. (quotation marks omitted). While not all four factors must be met to warrant

heightened scrutiny, *see Golinski v. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 983

(N.D. Cal. 2012), all four point in favor of heightened scrutiny with respect to laws that

classify on the basis of transgender status.

Transgender people have experienced a long history of discrimination, including

pervasive discrimination in employment, housing, and access to places of public

accommodation or government services.[8] An individual's transgender status also has no

relation to a person's ability to contribute to society. Transgender individuals are a

discrete minority—it is estimated that they make up a small percentage of the population

(Ex. AK at 5-6)—and there can be little dispute that they are relatively powerless

politically. Further, an individual's gender identity is not an attribute that they can or

should be expected to change. *See* Adkins Decl. ¶¶ 20, 26, 30; Ettner Decl. ¶ 10; *see also*

*Hernandez-Montiel, v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (gender identity is "so

fundamental" to identity that individuals "should not be required to abandon" it).

Recent federal decisions accordingly recognize that discrimination against

transgender people must be evaluated under heightened scrutiny. *See Adkins v. City of*

*New York*, No. 14-cv-7519, -- F. Supp. 3d --, 2015 WL 7076956, at *3-4 (S.D.N.Y. Nov.

16, 2015) (finding heightened scrutiny warranted based on four-factor test); *Norsworthy*,

87 F. Supp. 3d at 1119 (same).

---

[8] *See generally* Exs. AI and AJ; *see also Brocksmith v. United States*, 99 A.3d 690, 698
n.8 (D.C. 2014) ("[t]he hostility and discrimination that transgender individuals face in
our society today is well-documented").

**B.** **H.B. 2 Lacks Any Substantial or Even Rational Relationship to an Important Government Interest.**

H.B. 2's class-based targeting of Plaintiffs demands meaningful review, as discrimination based on both sex and transgender status. Under heightened scrutiny, "[t]he burden of justification is demanding and it rests entirely on the State." *Virginia*, 518 U.S. at 533. All sex classifications must be evaluated under heightened scrutiny even when they are based on alleged "biological differences" between men and women. *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 73 (2001). "The State must show at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (internal quotation marks and brackets omitted). Moreover, constitutionality is judged based on the "actual state purposes, not rationalizations for actions in fact differently grounded." *Id.* at 535-36.

H.B. 2 cannot meet this test. Indeed, the rationales offered by lawmakers for H.B. 2 cannot survive even the most deferential review, let alone the heavy burden Defendants must satisfy here.

### 1. H.B. 2 Lacks Any Connection to Promoting Safety.

During the passage of H.B. 2, lawmakers repeatedly disparaged transgender people, falsely suggesting that protections for them would lead to a host of safety risks for others. "[E]ven in the ordinary equal protection case calling for the most deferential of standards, [the Court] insist[s] on knowing the relation between the classification adopted and the object to be attained." *Romer v. Evans*, 517 U.S. 620, 632 (1996). The

justifications offered must have a "footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993). But when it comes to claims about safety, there is no such footing in reality.

Despite repeated suggestions by lawmakers that the law was necessary to protect women and girls, even Defendant McCrory admits that the invocation of these fears had no factual basis. *See* Ex. Z at 12 (admitting that people supposedly "using transgender protections to commit crimes in bathrooms . . . wasn't a problem"; that there have been "[n]o" such cases in the last five years; and that he is not "aware of" any such cases). The Fourth Circuit rejected the same "amorphous" concerns in *G.G.* 2016 WL 1567467, at *8 n.11 (stating that the court was "unconvinced" by the school board's purported "safety concerns").

The supposed safety risks that H.B. 2 was meant to address have no connection to transgender individuals and are already comprehensively addressed through the criminal law.[9] Plaintiffs' expert, Assistant Chief of University Police Aran Mull, confirms that Governor McCrory and *G.G.* are correct: non-discrimination protections for transgender people cause no safety risks to others. Mull Decl. ¶¶ 13-20, 31-34; *see generally* Ex. AL.

---

[9] While several legislators suggested predators may enter bathrooms under the guise of being transgender and pose a safety risk to women and children, North Carolina's criminal laws already protect against that risk. For example, a man doing so in order to expose himself or for sexual gratification would be guilty of Indecent Exposure, N.C. Gen. Stat. § 14-190.9; a man doing so to view, photograph, or record others would be guilty of Secretly Peeping into Room Occupied by Another Person, *id.* § 14-202; and a man doing so to trap women in a bathroom stall would be guilty of Felonious Restraint, *id.* § 14-43.3. North Carolina law also already criminalizes Taking Indecent Liberties with Children, *id.* § 14-202.1, and Rape and Other Sex Offenses, *id.* §§ 14-27.20 to -27.36.

Crimes like sexual assault are already illegal, and protecting transgender people from discrimination changes none of that.  Mull Decl. ¶¶ 20-21.  Moreover, as nearly 300 service providers and advocates for survivors of sexual and domestic violence have confirmed, it is nothing but scapegoating to blame transgender people for crimes relating to sexual assault; such arguments simply "perpetuate falsehoods about transgender people and . . . mak[e] no one safer."  Mull Decl., Ex. D.

To the contrary, when it comes to safety risks, transgender people themselves are the group most vulnerable to harassment and violence in sex-separated spaces such as restrooms.  McGarry Decl. ¶ 28; Mull Decl. ¶¶ 21-22.  While H.B. 2 has *no effect* on the safety of the general, non-transgender population, the law greatly increases the risk of harassment and bodily harm for transgender North Carolinians.  *Id.*  A discriminatory classification that not only fails to serve its purported justification—but, in fact, actively undermines the alleged justification—cannot survive any level of constitutional review.

### 2.    H.B. 2 is Neither Rationally Nor Substantially Related to an Interest in Privacy.

Though lawmakers have sought to justify H.B. 2 on the ground that it is necessary to protect the privacy of non-transgender individuals, for at least four reasons this justification also fails constitutional scrutiny.

First, the defendant school board in *G.G.* vigorously pressed privacy as the centerpiece of its defense.  The Fourth Circuit rejected it.  The court acknowledged that public restrooms, locker rooms, and shower facilities are commonly separated by sex.  2016 WL 1567567, at *8.  It also acknowledged that an individual has an interest against

the involuntary exposure of his or her own nude body in certain circumstances. *Id.* But the court disagreed that "the truth of these propositions undermine[d]" its conclusion. *Id.* Instead, it adopted the position of the Department of Education—which the court had determined to be reasonable—that banning transgender individuals from facilities matching their gender identity could not be justified by either "privacy interests or safety concerns." *Id.*

Second, privacy can be preserved without resorting to discrimination against transgender individuals. As a threshold issue, a purported concern for bodily exposure has no footing in the restroom context, given the divided and enclosed nature of restroom stalls, and the existence and availability of privacy dividers for urinals. As for "changing facilities," under H.B. 2, any individual who does not wish to be undressed in front of others—for whatever reason, including modesty about being undressed in front of anyone—can already take steps to prevent that from happening. For example, rather than use a locker room, an individual can simply use a restroom stall to change. *See* Walker Decl. ¶ 16; *see also* Ex. AM at 7-8. Doing so "carries no stigma whatsoever," whereas banishing a transgender individual from communal facilities imposes a humiliating and continuing "mark of difference." *G.G.*, 2016 WL 1567567, at *13 (Davis, J., concurring); *cf. Cruzan v. Special Sch. Dist. No. 1*, 294 F.3d 981, 984 (8th Cir. 2002) (noting that a non-transgender employee who did not want to use the same restroom as a transgender employee was free to use the unisex restroom instead).

31

For its part, the government can take steps to enhance "general privacy for all"—such as adding or expanding partitions between urinals in men's restrooms, or adding privacy strips to the doors of stalls in all restrooms—just as the school board did in *G.G.* 2016 WL 1567567, at *2; *see* Walker Decl. ¶¶ 11, 14-16; Ex. AM at 8. Those types of measures are also available to North Carolina. *Cf., e.g.*, 10A N.C. Admin. Code 13G.0309 (mandating privacy partitions or curtains for showers and toilets in North Carolina adult care homes). If greater privacy is what Defendants genuinely seek, there are infinite ways to achieve that result—none of which require discriminating against transgender individuals.

Third, H.B. 2 fails to promote privacy, even on its own terms. Though the purpose of the law is supposedly to protect people from viewing certain parts of bodies different from their own, the law does not draw a line based on those characteristics. Rather, H.B. 2 defines "biological sex" as the sex listed on a person's birth certificate, which is an inaccurate proxy for an individual's anatomy. In a number of states, transgender individuals do not need to have had any surgery to obtain a corrected birth certificate with a gender marker matching their gender identity.[10] Conversely, in some states and

---

[10] California: Cal. Health & Safety Code §§ 103426, 103430; Connecticut: Conn. Gen. Stat. §§ 19a-42, 19-42b; District of Columbia: D.C. Code § 7-210.01; Hawai'i: Haw. Rev. Stat. § 338-17.7; Maryland: Md. Code, Health-Gen. § 4-211; Massachusetts: Mass. Gen. Laws ch. 46, § 13; Minnesota: *See* Minn. Dep't of Health, Document Requirements to Amend a Birth Record (Ex. AN); New York: *See* Letter from Guy Warner, Director, N.Y. State Dep't of Health, Bureau of Vital Records (Sept. 28, 2015) (Ex. AO); Oregon: Or. Rev. Stat. § 33.460; Rhode Island: R.I. Admin. Code § 31-1-29:35.0; Vermont: Vt. Stat. Ann. tit. 18, § 5112; Washington: *See* Wash. State Dep't of Health, *Gender Change on a Birth Certificate* (Ex. AP).

most countries, transgender individuals face a categorical bar to obtaining corrected birth certificates.[11]  Thus, two transgender individuals with precisely the same external genital characteristics would be forced into different restrooms under H.B. 2, only because the places of their birth have different laws about changing birth certificates.  That is the epitome of arbitrary line-drawing that is impermissible under even rational basis review.  Even where an ostensibly legitimate purpose is put forth in support of a law, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *Cleburne*, 473 U.S. at 446-47.

Defendants' privacy justification also is belied by the scope of H.B. 2, which applies only to government buildings and—as Governor McCrory has emphasized— does not apply to businesses such as department stores, restaurants, and gyms, even though they have facilities available to the general public.  N.C. Gen. Stat. §§ 115C-521.2(b), 143-760(b); Exec. Order No. 93 (Ex. X) at 1; Ex. Z at 9-10; Ex. AQ at 1, 3.  If allowing transgender people to use facilities in accordance with gender identity poses such a serious threat to the privacy (and safety) of others, surely that would motivate North Carolina to use its power over not only public agencies but also non-government facilities that are open to the general public.  But it did not.  Other women's privacy

---

[11] *See* Lisa Mottet, *Modernizing State Vital Statistics Statutes and Policies to Ensure Accurate Gender Markers on Birth Certificates: A Good Government Approach to Recognizing the Lives of Transgender People*, 19 Mich. J. of Gender & L. 373, 381-82, 396 n.90 (2013) (discussing statutes and/or case law in Idaho, Kansas, Ohio, Puerto Rico, and Tennessee).

interests are not affected differently when H.S. uses the women's restroom at school, versus at a coffee shop or shopping mall—because *neither* poses any threat to privacy.

Fourth, and perhaps most importantly, to the extent that H.B. 2 seeks to validate an objection to seeing transgender people—which is to say, to their mere presence—that is not a legitimate government interest that this Court should dignify. Across history, there have been similar claims of "discomfort" about simply sharing spaces with those perceived as different—but the correct answer has never been to indulge that discomfort. "[A]ssertions of emotional discomfort about sharing facilities with transgender individuals" share a common lineage with "similar claims of discomfort in the presence of a minority group, which formed the basis for decades of racial segregation in housing, education, and access to public facilities like restrooms, locker rooms, swimming pools, eating facilities and drinking fountains." *Dep't of Fair Emp't & Hous. v. Am. Pac. Corp.*, No. 34-2013-00151153, Order at 4 (Cal. Super. Ct. Mar. 13, 2014) (Ex. AR); *see also Lusardi*, 2015 WL 1607756, at *9 ("Some co-workers may be . . . embarrassed or even afraid to share a restroom with a transgender co-worker. But . . . co-worker confusion or anxiety cannot justify discriminatory terms and conditions of employment.").

Impermissible prejudice "rises not from malice or hostile animus alone," but can instead be caused by "want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves" and who "might at first seem unsettling to us." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374-75 (2001) (Kennedy, J., concurring). Even if such beliefs are

born of a "profound and deep conviction[]," *Lawrence v. Texas*, 539 U.S. 558, 571 (2003), "negative attitudes, or fear" cannot justify singling out one group for unequal treatment, *Cleburne*, 473 U.S. at 448. Discomfort with transgender people, even when wrapped in the cloak of privacy or safety, is simply not a legitimate basis for imposing unequal or stigmatizing treatment. That is particularly true here, where there are myriad ways to protect privacy interests without expelling transgender individuals from communal spaces.

Indeed, when a law is motivated by an improper purpose, as H.B. 2 is, it is invalid and cannot by saved by justifications that the government might offer in its defense. Although H.B. 2 purports to serve a legitimate goal, courts must look beyond that assertion and "determin[e] whether a law is motivated by an improper animus or purpose." *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013). Here, the law's "principal purpose is to impose inequality." *Id.* at 2694. H.B. 2 effectively seeks to define transgender individuals out of existence and shut them out from public life. This is "a denial of equal protection of the laws in the most literal sense." *Romer*, 517 U.S. at 633.

## IV. Plaintiffs Are Likely to Succeed on Their Due Process Claims.

### A. Because the Constitutional Right to Privacy Protects Transgender Individuals Against Forced Disclosure of Their Transgender Identity, Plaintiffs Are Likely to Succeed on the Merits of Their Privacy Claim.

By forcing transgender individuals to use restrooms and other facilities that do not accord with their gender, and that they publicly express in all aspects of their lives,

H.B. 2 forces transgender individuals in North Carolina to disclose their transgender status—a highly personal and intimate detail of their lives—to strangers in and around the public facilities that they use. For example, H.B. 2 forces Mr. Carcaño to use the restroom designated for women, but because he is a man and perceived as such, his transgender status and personal medical information is revealed to those around him if he enters the women's restroom in accordance with H.B. 2. When the government forces such a revelation, it takes away from transgender individuals their right to decide when to "come out" as transgender based on personal preferences and on judgments about which disclosures may result in violence and discrimination against them. This information therefore is constitutionally protected from compelled disclosure, and Plaintiffs are likely to succeed on the merits of their claim that H.B. 2 violates constitutional privacy protections.

The Supreme Court has recognized a constitutionally protected "zone of privacy," arising out of the Fourteenth Amendment's Due Process Clause. *See Whalen v. Roe*, 429 U.S. 589, 598 n.23 (1977) (citing *Roe v. Wade*, 410 U.S. 113, 152-53 (1973)). This zone protects against "disclosure of personal matters." *Id.* at 599-600 & nn. 24-25. H.B. 2 encroaches on this interest by undermining transgender persons' ability to control to whom and under what circumstances they reveal the deeply personal and intimate fact of their transgender identity and medical transition.

The constitutional right to privacy protects "[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality." *Walls v. City of*

*Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990). The "more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Id*. Several circuits have recognized that constitutional privacy protections include a right to keep private deeply personal matters pertaining to sexual orientation and gender identity.[12] In *Powell v. Schriver*, the Second Circuit recognized that those whose gender identity is inconsistent with the sex they were assigned at birth "understandably might desire to conduct their affairs as if . . . a transition [from one gender to another] was never necessary," and have a "particularly compelling" interest "to preserve privacy in the matter," that "is really beyond debate." 175 F.3d 107, 111 (2d Cir. 1999). Furthermore, the court found it "obvious that an individual who reveals that she is a transsexual potentially exposes herself . . . to discrimination and intolerance." *Id*. at 111-12 (alteration in original) (quotation marks omitted); *see also Love v. Johnson*, No. 15-11834, -- F. Supp. 3d --, 2015 WL 7180471, at *5 (E.D. Mich. Nov. 16, 2015) (concluding that "by requiring Plaintiffs to disclose their transgender status, [Michigan's driver's license policy] directly implicates their fundamental right of privacy"); *K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431 CI, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012) ("The Court agrees that one's

---

[12] *See Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) (sexual orientation); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (transsexualism); *Bloch v. Ribar*, 156 F.3d 673, 685-86 (6th Cir. 1998) ("[o]ur sexuality and choices about sex"); *Eastwood v. Dep't of Corrs.*, 846 F.2d 627, 631 (10th Cir. 1988) (same); *Thorne v. City of El Segundo*, 726 F.2d 459, 468 (9th Cir. 1983) (same).

transgender[] status is private, sensitive personal information" and "is entitled to protection.").

These constitutional privacy interests are heightened by the risks of private violence and discrimination to which transgender persons may become subject upon involuntary disclosure that they are transgender. *See, e.g.*, *Love*, 2015 WL 7180471, at *5 (disclosure of transgender identity to anyone requesting plaintiffs' driver's license—which could not be changed absent gender reassignment/realignment surgery—"create[d] a very real threat to Plaintiffs' personal security and bodily integrity"); *see generally Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062-64 (6th Cir. 1998) (release of names and addresses of undercover police officers and their immediate family members to gang members' defense counsel "created a very real threat to the officers' and their family members' personal security and bodily integrity, and possibly their lives").

"When the decision or the information sought is 'fundamental' regulation 'may be justified only by compelling state interests, and must be narrowly drawn to express only those interests.'" *Walls*, 895 F.2d at 192 (quoting *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977)). H.B. 2 fails this due process standard for all the same reasons it cannot withstand the heightened equal protection standard. *See* Section III.B, *supra*.

## B.    Plaintiffs Are Likely to Succeed in Proving that Provisions of H.B. 2 Violate Their Due Process Right to Avoid Forced Surgical Treatment.

H.B. 2 independently violates Plaintiffs' substantive due process rights because it forces them to undergo serious and invasive surgery that for many is unwanted, unnecessary, or unavailable to them (Ettner Decl. ¶ 22) in order to use the restroom or

38

other facility that corresponds with their gender identity. By tying access to sex-separated facilities to the gender marker listed on one's birth certificate, H.B. 2 fundamentally infringes on Plaintiffs' ability to make life-changing decisions about their own medical care, because the majority of states that permit changing one's birth certificate, including North Carolina, require that transgender people undergo some form of surgical treatment in order to bring the gender marker on their birth certificate into alignment with their gender identity. *See, e.g.*, N.C. Gen. Stat. § 130A-118(b)(4) (requiring "sex reassignment surgery").

The liberty interest protected by the Due Process Clause includes an "interest in independence in making certain kinds of important decisions," including the right to refuse the kind of invasive medical treatment at issue here. *Whalen*, 429 U.S. at 599-600 & n.26; *United States v. Charters*, 829 F.2d 479, 491-92 (4th Cir. 1987) ("The right to refuse medical treatment has been specifically recognized as a subject of constitutional protection"). In this case, H.B. 2 forces Plaintiffs to choose between: (1) exercising their constitutional right to decline invasive, painful, and in some cases, risky surgery and (2) their ability to use the restroom that corresponds with their gender identity, which is necessary not only for their psychological well-being but also to avoid the harassment, discrimination, and violence they face if forced to use facilities that are inconsistent with their gender identity. *See, e.g.*, McGarry Decl. ¶ 28. Due process does not permit North Carolina to so burden Plaintiffs' autonomy.

## V. Plaintiffs Satisfy the Other Preliminary Injunction Factors.

### A. An Injunction Is Necessary to Avoid Irreparable Harm.

A preliminary injunction is further warranted by the irreparable nature of the harm that Plaintiffs will endure in the absence of relief from this Court. The constitutional nature of the harms alleged by Plaintiffs—to their fundamental rights to equal protection, privacy, and due process—necessarily renders those harms irreparable. *See Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction."); *see also Senior Execs. Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012) ("[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." (quotation marks omitted)).

In addition, deprivation of these rights risks actual and imminent harms to the Plaintiffs, as well as other transgender North Carolinians. By forcing transgender North Carolinians to use public restrooms that do not align with their gender identity and expression, H.B. 2 effectively forces them to choose between three different options, each of which is harmful: (1) endure significant physical discomfort by avoiding public restrooms altogether—an option that is medically risky (Routh Decl. ¶¶ 14-15), will often prove impractical if not impossible, and can cause serious emotional and psychological harm (Ettner Decl. ¶¶ 24-26; Adkins Decl. ¶ 32); (2) avoid use of government buildings and other public facilities—an option that may preclude them from doing their jobs,

access to the courts, or the ability to use highways or airports (Carcaño Decl. ¶¶ 21-26); or (3) disclose their transgender identity to others in and around the bathrooms that they use—which may cause psychological distress and lead to harassment and violence. As to this third option, once this disclosure takes place, the bell cannot be un-rung, and an award of money damages cannot adequately remedy the harm. *See Senior Execs.*, 891 F. Supp. 2d at 755 (granting plaintiffs' motion for a preliminary injunction to prevent disclosure of sensitive information). "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (internal quotation marks omitted), *abrogated on other grounds by Winter*, 555 U.S. at 22. This is especially true with respect to constitutional violations of the right to privacy because "the public disclosure of confidential information is irreparable." *Senior Execs.*, 891 F. Supp. 2d at 755; *see also United States v. Miami Univ.*, 294 F.3d 797, 818 (6th Cir. 2002) ("Once personally identifiable information has been made public, the harm cannot be undone.").

Furthermore, forcing transgender individuals to use the wrong restroom communicates the state's moral disapproval of their identity, which the Constitution and federal law protect. *See Lawrence*, 539 U.S. at 583 ("Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause"); *Windsor*, 133 S. Ct. at 2694. H.B. 2 tells transgender individuals that they are different and less valuable. Dignitary harms are cognizable and irreparable injuries. *See Baskin v.*

*Bogan*, 12 F. Supp. 3d 1137, 1140 (S.D. Ind. 2014) (granting TRO and holding that dignitary harms constitute irreparable injuries); *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2606 (2015) ("Dignitary wounds cannot always be healed with the stroke of a pen.").

The risk to Plaintiffs' personal safety that H.B. 2 causes by forcing them and other transgender North Carolinians to disclose their transgender status to complete strangers in and around public restrooms is yet further grounds of irreparable harm. *See, e.g.*, *Glenside W. Corp. v. Exxon Co., U.S.A.*, 761 F. Supp. 1118, 1133 (D.N.J. 1991) ("Courts have granted injunctive relief where the applicant for such relief shows he or she may be subjected to violence without injunctive relief.").

**B.      The Balance of Hardships Weighs in Favor of an Injunction.**

The balance of hardships weighs strongly in favor of granting a preliminary injunction. Enforcement of H.B. 2 prevents Plaintiffs from safely using the restroom at work, school, and in their communities. H.B. 2 thus subjects Plaintiffs and others to the dilemma of being either deprived of their ability to access important public buildings (or doing so only at the impractical—if not impossible—cost of significant physical discomfort, psychological trauma, and other serious injury, Routh Decl. ¶¶ 14-15; Ettner Decl. ¶¶ 24-26; Adkins Decl. ¶ 32), or being compelling to disclose a highly personal and intimate detail of their lives in a manner that risks exposing them to violence, threats, and intimidation. H.B. 2 further denies Plaintiffs their right to equal protection, both as a

matter of constitutional law and under important statutorily-protected rights to equal educational opportunities under Title IX.

There are not any adequate countervailing interests supporting interim enforcement of H.B. 2 while this Court adjudicates Plaintiffs' claims on the merits. A preliminary injunction would merely maintain the status quo prior to the recent enactment of H.B. 2, before which no statewide prohibition prevented transgender persons from using restroom facilities consistent with their gender identity, and the absence of such a prohibition threatened no significant or irreparable hardship to either the State or to members of the public. Although proponents of H.B. 2 have postulated a public safety rationale underlying the statute, as Governor McCrory has admitted (Ex. Z at 12), no data supports such assertions. To the contrary, hundreds of jurisdictions expressly bar discrimination against transgender people and transgender individuals regularly have used restrooms consistent with their gender identity across the country without any increase in public safety incidents. Mull Decl. ¶¶ 13-17, 31-34; *see* Walker Decl. ¶ 13.

Moreover, a "[S]tate is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (affirming grant of preliminary injunction) (quotation marks omitted); *accord Newsom ex rel. Newsom v. Albemarle Cty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (holding school district was "in no way harmed by issuance of preliminary injunction" preventing it from enforcing regulation).

## C.    An Injunction Is in the Public Interest.

A preliminary injunction would serve the public interest because it is always in the public interest to "uphold[] constitutional rights." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (quotation marks omitted); *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011); *Carandola*, 303 F.3d at 521. Furthermore, enforcing Plaintiffs' "right to be free from discrimination on the basis of sex . . . is plainly in the public interest." *G.G.*, 2016 WL 1567467, at *14 (Davis, J., concurring). The "public interest is certainly served by promoting compliance with Title IX." *Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771, 778 (S.D. W. Va. 2012); *accord Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) ("[T]he overriding public interest [lies] in the firm enforcement of Title IX."). "There is no doubt but that removing the legacy of sexual discrimination . . . from our nation's educational institutions is an important governmental objective." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 104 (4th Cir. 2011) (quoting *Kelley v. Bd. of Trs.*, 35 F.3d 265, 271-73 (7th Cir. 1994)). Indeed, antidiscrimination laws prohibiting sex discrimination serve "compelling state interests of the highest order." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984). A preliminary injunction, therefore, is necessarily in the public interest.

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court enter a preliminary injunction enjoining Defendants, their officers, employees, and agents; all persons acting in active concert or participation with any Defendant, or under any

Defendant's supervision, direction, or control; and all other persons within the scope of

Federal Rule of Civil Procedure 65, from enforcing Part I of H.B. 2.


Dated:  May 16, 2016                                Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook                                Jon W. Davidson*
N.C. State Bar No. 33838                            Tara L. Borelli*
AMERICAN CIVIL LIBERTIES UNION FOR                  Peter C. Renn*
    NORTH CAROLINA LEGAL FOUNDATION                 Kyle A. Palazzolo*
Post Office Box 28004                               LAMBDA LEGAL DEFENSE AND
Raleigh, North Carolina 27611                          EDUCATION FUND, INC.
Telephone: 919-834-3466                             730 Peachtree Street NE, Suite 1070
Facsimile:  866-511-1344                            Atlanta, GA 30308-1210
cbrook@acluofnc.org                                 Telephone: 404-897-1880
                                                    Facsimile:  404-897-1884
Elizabeth O. Gill*                                  jdavidson@lambdalegal.org
Chase B. Strangio*                                  tborelli@lambdalegal.org
AMERICAN CIVIL LIBERTIES UNION                      prenn@lambdalegal.org
    FOUNDATION                                      kpalazzolo@lambdalegal.org
125 Broad St., 18th Fl.
New York, NY 10004                                  Paul M. Smith*
Telephone: 212-549-2627                             Luke C. Platzer*
Facsimile:  212-549-2650                            JENNER & BLOCK LLP
egill@aclunc.org                                    1099 New York Avenue, NW, Suite 900
cstrangio@aclu.org                                  Washington, D.C. 20001-4412
                                                    Telephone: 202-639-6000
                                                    Facsimile: 202-639-6066
                                                    psmith@jenner.com
                                                    lplatzer@jenner.com

*Counsel for Plaintiffs*


* Appearing by special appearance pursuant to L.R. 83.1(d).

45

<u>**CERTIFICATE OF SERVICE**</u>

I, Christopher A. Brook, hereby certify that on May 16, 2016, I electronically filed Plaintiffs' Motion for Preliminary Injunction, as well as the Memorandum of Law, declarations, and exhibits thereto in support, with the Clerk of the Court using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

I also hereby certify that I caused the foregoing to be delivered via first-class and electronic mail to the following non CM/ECF participants:

      Robert C. Stephens
      General Counsel to the Governor
      Office of the General Counsel
      20301 Mail Service Center
      Raleigh, NC 27699
      bob.stephens@nc.gov
      *Counsel for Governor Patrick McCrory*

      Thomas C. Shanahan
      UNC General Administration
      P.O. Box 2688
      Chapel Hill, NC 27515-2688
      tcshanahan@northcarolina.edu
      *Counsel for University of North Carolina; Board of Governors of the University of*
      *North Carolina; and W. Louis Bissette, Jr., Chairman of the Board of Governors*
      *of the University of North Carolina*

                              /s/ Christopher A. Brook        
                              Christopher A. Brook