# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO; PAYTON
GREY MCGARRY; H.S., by her next
friend and mother, KATHRYN
SCHAFER; ANGELA GILMORE;
KELLY TRENT; BEVERLY NEWELL;
and AMERICAN CIVIL LIBERTIES
UNION OF NORTH CAROLINA,

      Plaintiffs,

      v.

PATRICK MCCRORY, in his official
capacity as Governor of North Carolina;
UNIVERSITY OF NORTH CAROLINA;
BOARD OF GOVERNORS OF THE
UNIVERSITY OF NORTH CAROLINA;
and W. LOUIS BISETTE, JR., in his
official capacity as Chairman of the Board
of Governors of the University of North
Carolina

      Defendants.

No. 1:16-cv-00236-TDS-JEP

## PROPOSED ANSWER AND COUNTERCLAIMS IN INTERVENTION

S. KYLE DUNCAN* (DC Bar # 1010452)
  *Lead Counsel*
GENE C. SCHAERR* (DC Bar # 416638)
SCHAERR | DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC 20006
202-714-9492
571-730-4429 (fax)
kduncan@schaerr-duncan.com
gschaerr@schaerr-duncan.com
*Specially Appearing Pursuant to Local
Civil Rule 83.1(d)*

ROBERT D. POTTER, JR. (NC Bar # 17553)
ATTORNEY AT LAW
2820 Selwyn Avenue, #840
Charlotte, NC 28209
704-552-7742
rdpotter@rdpotterlaw.com

*Attorneys for Intervenors*

## INTRODUCTION

1.      When people find themselves in the intimate settings of public bathrooms, locker rooms, or showers, they expect to encounter only other people of the same biological sex.  Until very recently, that simple expectation of bodily privacy and safety would have been taken for granted.  Yet when North Carolina sought to protect that common-sense expectation in law—by enacting the "Public Facilities Privacy and Security Act" (the "Act"), commonly known as HB2—a torrent of vicious criticism was unleashed against the State, its officials, and its citizens.  The same kind of distortion of the Act and its purposes is embodied in the present lawsuit by the American Civil Liberties Union ("ACLU").  Because an adverse judgment in this case would have a dramatically negative impact throughout North Carolina—including threatening what the ACLU concedes are more than four billion dollars in federal education funding—the leaders of both chambers of the North Carolina General Assembly have intervened in this action.

2.      The ACLU's complaint makes clear that, unlike the people of North Carolina, the ACLU believes the only valid approach to the sensitive and emerging issue of gender dysphoria is to allow *anyone* to use *any* communal public locker room or shower (not to mention restrooms) based solely on that person's self-declared "gender identity."  Never mind that the ACLU's legal theory would inevitably lead to women and girls in public changing facilities seeing unclothed individuals who, whatever their gender identity, still have fully functional male genitals.  Apparently, the ACLU believes

2

the obvious social costs of their favored policy are outweighed by the policy's purported psychological benefits to persons of conflicted gender identity.

3. The people of North Carolina came to a different and far more sensible conclusion, one they enacted in the law at issue in this case. Despite being grossly mischaracterized in the media, the Act does not reflect hostility towards those whose gender identity differs from their biological sex. To the contrary, the Act allows a flexible system of single-occupancy facilities for persons who do not wish to use public facilities designated for their biological sex. The Act also leaves in place provisions allowing a person to obtain a sex-change operation, make a corresponding change to their birth certificate, and then use the facilities consistent with their new anatomy. And the Act allows *private* businesses and other entities to determine their own policies—including, if they wish, policies closer to the ACLU's views.

4. But the Act also reflects concern and compassion for the many North Carolina residents—especially girls and women—who do not wish to be in close proximity to persons with genitals characteristic of the opposite sex when using public restrooms, locker rooms, and showers. Those people reasonably believe that a policy allowing people of the opposite biological sex into those spaces would be an assault on *their* dignity, privacy, and safety, and an affront to the legitimate and longstanding privacy expectations of all North Carolinians. That is why, in *publicly* owned facilities, the Act simply requires that everyone—regardless of their "gender identity"—use the facilities that correspond to their current anatomy.

3

5.     In short, the Act is not, as it has been mischaracterized in the press, an "anti-transgender" law. It is, rather, a law that promotes both privacy and safety, while accommodating the legitimate interests of persons with conflicts between their biological sex and gender identities.

6.     Nor does the act remotely violate the Fourteenth Amendment's Equal Protection and Due Process Clauses or Title IX, as claimed by the ACLU.  Indeed, the ACLU's interpretations of all three provisions rest on the implausible premise that a privacy policy expressly designed to *avoid* making distinctions based on gender identity—by relying on anatomy instead—nonetheless "facially" discriminates on the basis of gender identity.  That is nonsensical.

7.     The ACLU's suit, moreover, represents an assault on the whole system of single-sex bathrooms that, precisely because of privacy concerns, has long been an accepted part of our Nation's social compact. As a legal matter, if a biologically male individual can access a women's bathroom based on a claim of "gender identity," then *any* male can gain access on the same kind of claim, regardless of whether they "identify" as male or female: If discrimination based on "gender identity" is unlawful when the person seeking access identifies as a female, as a matter of principle it must be equally unlawful when that person identifies as a male.

8.     Most troubling, the ACLU's suit is a frontal assault on the fundamental legal and social understanding of what distinguishes men from women.  Under North Carolina's view—embedded throughout its law, as it has been in every society since human beings began to consider the matter—whether one is a man or a woman, and

4

entitled to be treated as such, is an objective inquiry, driven by verifiable aspects of anatomy and genetics. But under the ACLU's view, this traditional way of looking at gender and sex is itself a product of rank bigotry. In the ACLU's view, "sex" is the equivalent of "gender identity," and both are merely a passing psychological construct, the product of a multi-factor balancing test with one factor—one's subjective "gender identity"—given determinative weight. It is astonishing that the ACLU believes it can overturn the most basic cornerstone of human reality—the difference between "male" and "female"—based on its own unsupported assertions in a legal pleading. In any event, Intervenors believe the ACLU's avant-garde view is utterly unworkable, and its implementation would wreak havoc on North Carolina law in countless areas, including state employment law, fair housing law, family law and many others.

9.      Finally, the ACLU's claim that the Act violates these civil rights laws also represents an all-out assault, not only on the sovereign right of North Carolinians to determine their own policies regarding basic expectations of bodily privacy and security, but on the right of every other State and local government to do the same. It would call for a stunning and radical act of judicial overreach, and this Court should reject it root and branch.

## INTERESTS OF INTERVENORS

10.      For their part, Intervenors have a broad and comprehensive legal interest in defending the Act. They are the highest leaders of the General Assembly, the Legislative Branch of the North Carolina government. That Branch of government is directly subject to the requirements of the Act, would be directly subject to the ACLU's proposed legal

5

requirements under the Fourteenth Amendment if the ACLU prevailed, and is not subject to the authority of the Governor or the other defendants here.

11.     In addition, the General Assembly has principal responsibility for the organization and financing of North Carolina public schools, N.C. Const. Art. IX, § 2; the organization of public educational districts, *id*. Art IX, § 4; and the maintenance and financing of North Carolina's higher education system, including UNC and "the other public institutions of higher education," *id*. Art. IX, §§ 8, 9; *id*. Art. V, § 12.

12.     Finally, as the sole body in North Carolina with the authority to enact laws, *id*. Art. II, § 1, the General Assembly alone can modify the requirements of state employment and anti-discrimination laws, as well as appropriate funds necessary to safeguard the state budget, *id.* Art. V, § 7.

## ANSWER IN INTERVENTION

13.     All responses herein are to the ACLU's First Amended Complaint for Declaratory and Injunctive Relief (hereafter, "complaint"), unless otherwise indicated.  In response to paragraph 1 of the complaint, Intervenors admit that the Act is a North Carolina law designed to ensure that people—whatever their "gender identity" may currently be—use only those public multiple-occupancy restrooms, locker rooms, and showers designated for their biological sex, if they choose to use multiple-occupancy facilities rather than the single-occupancy gender-neutral facilities that the Act encourages.  Intervenors also admit that the Act restricts the ability of local governments to enact laws—like the Charlotte ordinance described in paragraph 3 of the complaint— that would require that persons be allowed to enter such public and privately-owned

6

facilities according solely to their self-declared "gender identity." Intervenors also admit that the Act requires that certain other types of laws dealing with civil rights be enacted at the state level rather than the local level. Intervenors deny the remainder of paragraph 1.

14. In response to paragraph 2 of the complaint, Intervenors admit only that the City of Charlotte enacted the ordinance discussed in that paragraph. Intervenors lack sufficient information to respond to the rest of the paragraph, and therefore deny the paragraph except as admitted.

15. In response to paragraph 3 of the complaint, Intervenors admit that the Act was passed during a special session for the purpose (among others) of invalidating Charlotte's radical ordinance, and that the Act was passed and signed quickly because of the crisis that ordinance created. Intervenors also admit that the Act requires that certain other types of laws dealing with civil rights be enacted at the state level rather than the local level. Intervenors deny that the process by which the Act was passed was "rife with procedural irregularities." Intervenors further deny that lawmakers "attack[ed] transgender people" or portrayed them "as predatory and dangerous to others." The remainder of the paragraph either states legal conclusions or makes false allegations of fact, and for those reasons is denied.

16. In response to paragraph 4, Intervenors deny that the plaintiff nonprofit organizations are or will be directly affected by the Act. Intervenors admit that under the Act, people of one biological sex are prevented from entering bathrooms, locker rooms and showers that have been designated for people of the opposite biological sex. Intervenors deny that this restriction harms anyone. Intervenors also admit that the Act

7

requires that certain other types of laws dealing with civil rights be enacted at the state level rather than the local level. Intervenors deny that this aspect of the Act harms anyone. Intervenors admit that the description of the Plaintiffs' objective is consistent with their complaint. Intervenors deny the alleged constitutional violations.

17.     Intervenors lack sufficient information to respond to paragraphs 5 through 10, and therefore deny them.

18.     Intervenors admit that, as paragraph 11 alleges, Patrick McCrory is the Governor of North Carolina. The text of the North Carolina Constitution speaks for itself. The remainder of this paragraph states legal conclusions to which Intervenors need not respond.

19.     The first sentence of paragraph 12 states a legal conclusion to which Intervenors need not respond. Intervenors admit the remainder of this paragraph.

20.     As to paragraph 13, Intervenors admit that the Board of Governors of the University of North Carolina is charged with the general control, supervision, and governance of the University of North Carolina. The remainder of paragraph 10 contains legal conclusions, which Intervenors need not respond to and therefore deny except as admitted.

21.     As to paragraphs 14 through 20, Intervenors admit that Louis Bissette, Jr. ("Defendant Bissette" or "Mr. Bissette") is the Chairman of the Board of Governors of the University of North Carolina. The remainder of paragraphs 14 through 20 state legal conclusions to which Intervenors need not respond.

22.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 21-24, and therefore deny those allegations.

23.     Intervenors admit the first sentence of paragraph 25, but deny the remainder of that paragraph.

24.     Intervenors admit the first sentence of paragraph 26, but deny the remainder of that paragraph.

25.     Intervenors deny the allegation in paragraph 27.

26.     Intervenors lack information sufficient to admit or deny the allegations in paragraph 28, and therefore deny those allegations.

27.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 29-32, and therefore deny those allegations.

28.     Intervenors lack information sufficient to admit or deny the allegations in paragraph 33, and therefore deny those allegations.  To the extent this paragraph suggests that the Act "forces" anyone to "use single-sex spaces that do not match the person's gender identity," Intervenors deny that allegation.

29.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 34-38, and therefore deny those allegations.

30.     Intervenors deny the allegations in paragraph 39.

31.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 40-45, and therefore deny those allegations.

32.     Intervenors lack information sufficient to admit or deny the allegations in the first two sentences of paragraph 46, and therefore deny those allegations.   Intervenors deny the last sentence of that paragraph.

33.     Intervenors lack information sufficient to admit or deny the allegations in paragraph 47, and therefore deny those allegations.  To the extent this paragraph suggests that the Act "forces" this plaintiff "to use the women's restroom," Intervenors deny that allegation.

34.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 48 through 51, and therefore deny those allegations.

35.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 52 through 55, and therefore deny those allegations.  To the extent these paragraphs allege that the Act forever "bans" this plaintiff from using these publicly owned men's restrooms, Intervenors deny that allegation.

36.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 56 through 58, and therefore deny those allegations.

37.     Intervenors lack information sufficient to admit or deny the allegations in paragraphs 59 through 79, and therefore deny those allegations.

38.     Intervenors lack information sufficient to admit or deny the allegations in the first two sentences of paragraph 80, and therefore deny those allegations.  Intervenors deny the last sentence of that paragraph.

39.     Intervenors lack information sufficient to admit or deny the allegations in paragraph 81, and therefore deny those allegations.

40. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 82 through 84, and therefore deny those allegations. To the extent these paragraphs suggests that the Act "forces" this plaintiff "to use the women's restroom," Intervenors deny that allegation.

41. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 85 and 86, and therefore deny those allegations. To the extent these paragraphs allege that the Act forever "bans" this plaintiff from using these publicly owned men's restrooms, Intervenors deny that allegation.

42. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 87 through 110, and therefore deny those allegations.

43. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 111 through 113, and therefore deny those allegations. To the extent these paragraphs suggests that the Act "forces" or "requires" this plaintiff "to use the boys' or men's restroom," Intervenors deny that allegation.

44. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 114 and 115, and therefore deny those allegations. To the extent these paragraphs allege that the Act forever "bans" this plaintiff from using these publicly owned women's restrooms, Intervenors deny that allegation.

45. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 116 through 125, and therefore deny those allegations.

46. Intervenors lack information sufficient to admit or deny the allegations in paragraphs 126 through 132, and therefore deny those allegations.

11

47.    Intervenors lack information sufficient to admit or deny the allegations in paragraphs 133 through 140, and therefore deny those allegations.

48.    Intervenors lack information sufficient to admit or deny the allegations in paragraph 141, and therefore deny those allegations.

49.    Intervenors lack information sufficient to admit or deny the allegations in paragraphs 142, and therefore deny those allegations.  To the extent that paragraph suggests that the Act was the result of Charlotte's simply taking "steps to protect LGBT people," Intervenors deny that allegation.

50.    Intervenors admit that Governor McCrory sent the email referenced in paragraph 143, which speaks for itself. Intervenors deny the characterization of that email and deny the remaining allegations in paragraph 143.

51.    Intervenors admit paragraph 144.

52.    Intervenors lack information sufficient to admit or deny the allegations in paragraph 145, and therefore deny those allegations.

53.    With respect to paragraph 146, Intervenors admit only that legislative leaders called a special session. With respect to the remaining allegations of paragraph 146, Intervenors lack information sufficient to admit or deny them.

54.    Intervenors lack information sufficient to admit or deny the allegations in paragraph 147.

55.    Intervenors admit that Minority Leader Hall made the statements referenced in paragraphs 148 and 149.  Intervenors deny that those statements were true.

12

56.     Intervenors lack sufficient information to admit or deny the allegations concerning the special session in paragraphs 150-154. The transcripts of the proceedings of the special session speak for themselves.  The Act was enacted in accordance with lawful process and proper legislative procedure.

57.     As to paragraph 155, Intervenors admit that all Democratic members of the Senate chose to leave the chambers before the vote on the Act, and that the Act then passed unanimously.  With respect to the remaining allegations of paragraph 155, Intervenors lack sufficient information to admit or deny whether Mr. Blue made the quoted statement, and also lack information sufficient to admit or deny why individual members chose to leave the chambers.

58.     Intervenors admit that the statements referenced in paragraph 156 were reported by the media and attributed to the indicated legislators, but they deny the characterizations of those statements in this paragraph.  Intervenors also deny that these statements used "vitriolic language."  Intervenors further deny that those statements show an "aim" to "undo[] Charlotte's protections for LGBT people."  Intervenors have been unable to verify that any of these statements were made during the General Assembly's debate or other official proceedings, and thus deny the implication that they were made during any official proceedings.

59.     As to paragraph 157, Intervenors admit only that debate over the Act addressed the Charlotte ordinance. Intervenors deny the paragraph's characterization of the debate in the General Assembly and so deny the remaining allegations of paragraph 157.

60. With respect to paragraph 158, Intervenors admit only that the Act passed both houses of the General Assembly, was signed by the governor, and took effect immediately. Intervenors deny the remaining allegations in paragraph 158.

61. As to paragraphs 159 and 160, Intervenors deny that the Act "require[s] students to use restrooms and other single-sex facilities in accordance with their 'biological sex.'" In fact, the Act allows people with "gender dysphoria" to use sex-neutral, single-user facilities rather than multiple-user facilities designated for people of their biological sex, and it allows and even encourages public entities to offer such sex-neutral facilities. Otherwise the provisions of the Act cited in these paragraphs speak for themselves.

62. As to paragraph 161, the quoted provision speaks for itself.

63. To the extent that paragraphs 162-164 reference state laws, those laws speak for themselves. To the extent that paragraphs 162-164 state legal conclusions about those state laws, Intervenors need not admit or deny them. Intervenors deny all other allegations in paragraphs 162 through 164.

64. With respect to paragraph 165, Intervenors admit that Governor McCrory released a "frequently asked questions" or FAQ sheet following the Act's passage and that the FAQ contains the quoted statement; however, Intervenors deny the characterization of that statement in the remainder of the paragraph. Intervenors deny the remaining allegations in paragraph 165. The Act did not "target" "transgender" people and was not "aimed" at them. The Act was instead "aimed" at preventing the safety and privacy problems created by the Charlotte Ordinance. Contrary to the suggestion in this

14

paragraph, that Ordinance contained no protection against people entering bathrooms, locker rooms and showers designated for the opposite biological sex based upon a pretextual or false claim of gender identity. And no other state or local law of which Intervenors are aware creates penalties for such pretextual or false claims.

65.     As to paragraph 166, Intervenors admit only that existing criminal laws cover assault, battery, and other illegal contact, but deny the suggestion in the remainder of the paragraph that this fact was sufficient to eliminate the serious risks to privacy and safety posed by the Charlotte Ordinance. Intervenors lack information sufficient to admit or deny the remaining allegations of paragraph 166.

66.     Intervenors deny the allegations in the first and second sentences of paragraph 167. Intervenors lack information sufficient to admit or deny the allegations of the third and fourth sentences of that paragraph, and deny the suggestion in the fourth sentence that the Act "forces" transgender persons "to disclose their transgender status to strangers." Intervenors further deny the allegation in the fifth sentence that the Act "require[s] that transgender people be shunted into single-sex spaces that do not match their gender identity." As previously noted, the Act does not require that such people use *any* "single-sex spaces."

67.     Intervenors lack information sufficient to admit or deny paragraph 168.

68.     Intervenors lack information sufficient to admit or deny the first sentence of paragraph 169. Intervenors deny the allegation in the second sentence that "[t]ransgender individuals working in [public] agencies may not be able to safely use any bathroom any longer …" The Act was carefully designed to ensure that such individuals *will* have safe

15

access to appropriate bathroom facilities, even as it minimizes risks to the privacy and safety of others.

69. Intervenors lack information sufficient to admit or deny paragraphs 170 and 171.

70. Intervenors admit paragraph 172, except for the suggestion in the last sentence that the Act requires that all "restroom and locker room facilities in government buildings and schools" be gender-specific. In fact, the Act makes ample allowance for sex-neutral facilities open to people regardless of their current "gender identity."

71. Intervenors admit paragraph 173.

72. The Executive Order referenced in paragraph 174 speaks for itself. Intervenors lack information sufficient to admit or deny the paragraph's characterization of the purposes of the Executive Order.

73. Intervenors deny paragraph 175.

74. Paragraph 176 states a series of legal conclusions, which Intervenors need not admit or deny.

75. Intervenors deny paragraph 177.

76. The first sentence of paragraph 178 states a legal conclusion, which Intervenors need not admit or deny. Intervenors admit that the Act contains the language quoted in the remainder of this paragraph, but deny that this language "took aim at the Charlotte ordinance."

77. Paragraph 179 states a series of legal conclusions, which Intervenors need not admit or deny.

16

78.     With respect to paragraph 180, Intervenors admit only that the Act introduced statewide prohibitions on discrimination in public accommodations on the basis of "race, religion, color, or biological sex." Intervenors deny the paragraph's characterizations of the Act and the remaining allegations of paragraph 180.

79.     Intervenors deny the first sentence of paragraph 181, and the suggestion in the remaining sentences that the referenced laws constituted "discrimination toward lesbian, gay and bisexual people."

80.     As to paragraph 182, Intervenors deny the allegation in the first sentence that the Act "harmed transgender people." Intervenors also deny the allegation in the second sentence that the Act was designed "in an effort to deliberately exclude transgender people from protection." The remainder of the paragraph states legal conclusions that Intervenors need not admit or deny.

## ANSWER TO COUNT I:  EQUAL PROTECTION CLAIM

81.     Re-alleging all preceding paragraphs above, Intervenors deny the allegations in the ACLU's equal protection claim contained in paragraphs 183 through 219, which fail to state a claim upon which relief can be granted.  Furthermore, for several reasons, the ACLU's argument that the Act violates the Equal Protection Clause of the Fourteenth Amendment, both facially and as applied, is erroneous as a matter of law.  This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

### Single-Sex Restrooms, Locker Rooms and Showers (H.B. 2, Part I)

82.     The ACLU's equal protection challenge to that portion of the Act governing the use of single-sex restroom, locker and shower facilities is meritless as a matter of fact and law.

83.     First, at the threshold, the ACLU's foundational premise that this portion of the Act discriminates against "transgender" persons, either on the basis of sex or otherwise, is patently incorrect.  On the face of the Act, a person's ability to use a particular multi-occupancy bathroom, locker room or shower facility depends *not* on the person's gender identity but on the person's "biological sex"—as determined by the person's birth certificate.  *See* HB2 §§ 1.2, 1.3.  Accordingly, the face of the Act refutes any notion that it discriminates on the basis of gender identity and, hence, against "transgender" persons.

84.     Second, although a "separate but equal" approach is clearly inappropriate with respect to racial classifications, separating persons of the opposite biological sex

18

based on their different physical and anatomical characteristics has always been viewed as consistent with equal protection principles and related non-discrimination statutes – especially in the context of bathrooms, locker rooms and showers. As numerous courts have recognized, separating the sexes based on these differences is firmly grounded in legitimate privacy concerns. For example, the U.S. Court of Appeals for this Circuit has pointedly noted "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation and the differences between the genders demand a facility for each gender that is different." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). And in discussing the challenges of admitting women to Virginia Military Institute, the U.S. Supreme Court noted that such a decision would undoubtedly require alterations necessary to afford members of each sex "privacy from the other sex in living arrangements …." *Virginia v. United States*, 518 U.S. 515, 550 n.19 (1996).

85. Third, the ACLU's argument that the Act discriminates on the basis of sex by treating transgendered individuals differently from others rests upon a radical re-imagining of the fundamental concept of "sex." The ACLU asserts that "gender identity serves as the core of sex—not genitalia or gonads or any other sex-related characteristic." ACLU Memorandum of Law in Support of Preliminary Injunction, at 25. But that view contradicts common sense—to say nothing of medical, legal, and historical definitions of "sex," all of which define that term by reference to objective anatomical and genetic characteristics. For example, Webster's New Twentieth Century Dictionary (2nd ed. 1970) defines "sex" as "either of the two divisions of organisms distinguished as male or

19

female," with "male" defined as "designating or of the sex that fertilizes the ovum and begets offspring" and "female" defined as "designating or of the sex that produces ova and bears offspring: opposed to male." *See In re Estate of Gardiner*, 273 Kan. 191, 212-13 (2002) (relying on dictionary definitions of "sex," "male," and "female," and noting they "are words in common usage and understood by the general population").

86.     By sharpest contrast, the ACLU's concept of "sex" as "gender identity" appears to be a multi-factored, fluid state having more to do with psychology than biology. *See* ACLU Compl. ¶26 (alleging that one's sex can involve multiple factors not apparent at birth); ¶¶98-99 (describing how Plaintiff H.S. chose to delay puberty until Plaintiff "felt fully comfortable embracing her identity as a girl"); ¶189 (differentiating between "gender nonconformity, gender identity, transgender status, and gender transition"). Accommodating the law to such a view would require abolishing all legal differences based on sex—a result clearly not required by the Equal Protection Clause.

87.     Fourth, transgendered individuals do not constitute a suspect class entitled to heightened scrutiny under the Equal Protection Clause. *See* ACLU Compl. ¶191. For example, the Nation has seen a significant history of discrimination against disabled people, yet the Supreme Court has refused to afford heightened scrutiny to classifications on the basis of disability. See *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (U.S. 1985). As the Court put it there, "the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests" should be protected. The Supreme Court has likewise refused to apply

heightened scrutiny to age-related classifications, even while acknowledging that "the treatment of the aged in this Nation has not been wholly free of discrimination …." *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313 (1976).

88.     Plaintiffs cannot seriously maintain that transgendered individuals are politically powerless.   *See* ACLU Memorandum of Law in Support of Preliminary Injunction, at 27. Any such suggestion is debunked by the fact that the National Basketball Association and other sports leagues, numerous businesses, leaders of government in numerous states, noted musicians, celebrities, and even the current Administration have all vehemently criticized the Act—and indeed the Administration has sued to invalidate it.   A group that can persuade a sitting president of the United States to mobilize the United States Justice Department to defend its interests is politically powerful, not powerless.   As the Supreme Court has put it, "Any minority can be said to be powerless to assert direct control over the legislature, but if that were a criterion for higher level scrutiny by the courts, much economic and social legislation would now be suspect." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 445 (U.S. 1985).

89.     Fifth, the Act's provisions dealing with public restrooms, locker rooms and showers are supported by governmental interests that are not only rational, but important and even compelling.   One such interest, described above, is North Carolina's desire to protect settled expectations of privacy in places where people are typically unclothed, either partially or fully, and therefore at their most vulnerable. In such intimate settings, people have a longstanding and legitimate expectation that they will encounter only other

persons of the same biological sex—and the State has a compelling interest in protecting that expectation of bodily privacy through the narrowly tailored measures in the Act.

90.     Another such interest is North Carolina's desire to enable law enforcement officers to protect the physical and emotional safety of vulnerable populations using public restrooms, locker room and showers.  The ACLU's theory would allow no means for police officers or other administrators to determine whether a person was in a particular restroom, locker room or shower for legitimate or nefarious purposes.  For instance, any man would have a legal right to enter a restroom, locker room or shower designated for women, simply by claiming that he "identifies" as a female; the ACLU's theory offers no way to distinguish false claims of female "identification" from true claims.  With over 23,000 registered sex offenders residing in North Carolina, that is not merely a legitimate, but a compelling concern.

91.     Criminal laws governing assault, battery and sexual crimes only partially and inadequately address that concern.  *Cf.* ACLU Compl. ¶166.  The prospect that a sexual predator may one day be punished *after* a sexual assault in a public shower or locker room is cold comfort to the victim.  Accordingly, the purpose of the Act's public facilities provisions is not simply to ensure that those who enter such a facility for the purpose of sexual predation are punished after the fact.  Instead, the Act serves a prophylactic function:  it enables the police and other public officials to ensure that sexual predators do not enter those facilities at all, or, if they do enter, that they can be removed before they attack.  For that and other reasons, therefore, these provisions are

not merely rational; they are narrowly tailored to serve compelling governmental interests.

92. Finally, even if these provisions of the Act could hypothetically violate the Equal Protection Clause (properly construed) in *some* of their possible applications, they cannot possibly be unconstitutional in all of their possible applications, and for that reason cannot be facially unlawful. For example, even under the ACLU's interpretation of the Equal Protection Clause, the Act would presumably be lawful when applied to prevent a *known* male sexual predator from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone. Surely the ACLU's interpretation of the Equal Protection Clause would not require that people making claims of gender identity known to authorities to be false be allowed to enter a bathroom or shower designated for people of the opposite sex. Because the Act prevents entry into facilities designated for people of the opposite sex by those known to be making false claims of gender identity, the Act clearly is not unlawful in *all* of its applications, even under the ACLU's legal theory, and therefore cannot be unlawful on its face.

**Pre-emption of local anti-discrimination laws (H.B. 2, Parts II and III)**

93. The ACLU's equal protection challenge to that portion of the Act pre-empting local anti-discrimination laws is also meritless. To the extent that claim, set forth in paragraphs 201 through 219 of the ACLU's complaint, makes new allegations of fact, those allegations are denied. That claim is meritless as a matter of fact and law for several reasons, including but not limited to the following:

23

94. First, there is nothing unusual or sinister about the State deciding to address anti-discrimination regulation at the state level rather than at the local level. To the contrary, the North Carolina Constitution expressly requires the General Assembly to legislate on numerous subjects—including anti-discrimination provisions like those at issue here—"as a single united commonwealth rather than as a conglomeration of innumerable discordant communities." *Williams v. Blue Cross Blue Shield*, 357 N.C. 170, 186 (2003) (citing N.C. Const. Art. II, § 24). Indeed, Article XIV of the North Carolina Constitution (1) specifically states that "no special or local act shall be enacted" whenever the General Assembly "is authorized by the Constitution to enact general laws" on a particular subject, and (2) expressly authorizes the General Assembly to "at any time repeal any special [or] local … act" to secure uniformity state-wide. N.C. Const. Art. XIV, § 3. Other states take a similar approach to various subjects. *See, e.g.,* Fla. Stat. § 386.209 ("expressly preempt[ing] regulation of smoking to the state and supersed[ing] any municipal or county ordinance on the subject"); Utah Code § 34A-5-102.5 ("supersed[ing] and preempt[ing]" employment discrimination measures taken by "a local government entity, a state entity, or the governing body of a political subdivision"); Va. Code Ann. § 36-55.52 ("controlling" any inconsistent "general, special, or local" law related to low-income housing regulation). Moreover, unlike the Colorado law at issue in *Romer v. Evans*—which could be overturned only by "enlisting the citizenry of Colorado to amend the State Constitution"—the Act here could be modified or repealed by a simple majority of the General Assembly and the support of the governor, just as any other law could. *Cf. Romer v. Evans,* 517 U.S. 620, 631 (1996).

24

95.     Second, unlike the provision at issue in *Romer,* the pre-emption provisions of the Act do not discriminate on the basis of sex, transgender status or sexual orientation.  Rather, those provisions preempt local anti-discrimination laws directed at *any* minorities or other interest groups—including the disabled, the aged, the poor, the unmarried, etc.— not just LGBT persons.  To be sure, the Act also included specific anti-discrimination protections based on a limited number of characteristics such as race and religion.  But it did not grant special protections to a host of other identifiable minorities and interest groups—and not only the LGBT community.  In short, contrary to the ACLU's allegation, the Act did not "place[] a special burden on LGBT people within the governmental process," nor does the Act in any way "brand[] them as second-class citizens."  *See* ACLU Compl., ¶207.

96.     Third, unlike the law at issue in *Romer,* the Act did not "deprive[] LGBT people of protections against discrimination." *Id.* ¶208. When the Act was passed, the Charlotte Ordinance had not yet gone into effect.  Consequently, no one had yet developed a reliance on the ordinance in ordering their private affairs.  *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 365 (2010) (reliance interests hinge on "parties [acting] in conformance with existing legal rules in order to conduct transactions"); *Nordlinger v. Hahn*, 505 U.S. 1, 14 (U.S. 1992) (noting length of time is central to reliance interests").    Accordingly, the Act cannot properly be viewed as having meaningfully "deprived LGBT people" of existing protections or rights.

97.     Fourth, neither the LGBT community as a whole nor its constituent parts constitutes a suspect class entitled to heightened constitutional scrutiny.  The Supreme

Court in *Romer*—and in several subsequent decisions—has expressly declined to reach such a holding. With the lone exception of the Ninth Circuit (and a Second Circuit decision that the Supreme Court declined to follow on this issue), every federal circuit court to squarely address the issue since *Romer* has rejected the argument that discrimination on the basis of sexual orientation, gender identity, or gender expression is subject to heightened constitutional scrutiny. *See Massachusetts v. Dep't of Health and Human Servs.*, 682 F.3d 1, 9-10 (1st Cir. 2012) (applying rational basis review); *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 n.9 (10th Cir. 2008) (same); *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) (same); *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006) (same); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004) (same); *Lofton v. Sec'y of Dep't of Children and Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) (en banc) (same); *Nabozny v. Podlesny*, 92 F.3d 446, 458 (7th Cir. 1996) (same); *but see SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, *reh'g en banc denied*, 759 F.3d 990 (9th Cir. 2014); *Windsor v. United States*, 699 F.3d 169, 178 (2nd Cir. 2012), *affirmed on other grounds*, *United States v. Windsor*, 133 S. Ct. 2675 (2013).

98.     Fifth, unlike the law at issue in *Romer,* the Act was not motivated by ill will or animus toward anyone. Instead, the Act was motivated by a desire to protect the privacy and safety of all North Carolina citizens and residents. And the Act's preemption provisions were designed to ensure that no other North Carolina jurisdiction would enact "anti-discrimination" legislation with the irresponsible features of the Charlotte Ordinance.

99.    Sixth, the Act's preemption provisions are supported by numerous legitimate, rational bases.  For example, the Act rationally furthers the legitimate purpose of ensuring that no other North Carolina subdivision will enact an irresponsible law like Charlotte's public facility law under the guise of "anti-discrimination."  The Act also serves the legitimate purpose of protecting religious people from being sued because of how they live their faith.  *See*, *e.g.*, *Elane Photography, LLC v. Willock*, 309 P.3d 53 (N.M. 2013), *cert denied*, 134 S.Ct 1787 (2014); *Matter of Gifford v McCarthy,* 137 A.D.3d 30, 37-38 (N.Y. App. Div. 3d Dep't 2016).

## ANSWER TO COUNT II:  PRIVACY CLAIM

100.    Re-alleging all preceding paragraphs above, Intervenors deny the allegations in the ACLU's due process-based "privacy" claim contained in paragraphs 220 through 226, which fail to state a claim on which relief can be granted.  For several reasons, the ACLU's argument that the Act violates the rights of transgendered individuals under the Due Process Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.  This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

101.    First, the ACLU's premise—that the Act "*requires* the disclosure of highly personal information regarding transgender people to each person who sees them using a restroom or other facility inconsistent with their gender identity or gender expression"— is incorrect as a matter of law. *See* ACLU Compl. ¶224 (emphasis added). The Act does not require that "transgender" people use any facility "inconsistent with their gender

27

identity or expression." Indeed, the Act makes express provision for public buildings to employ single-use restrooms that are open to people of any "gender identity." And, to the extent certain persons feel a need to use a facility that is "inconsistent with their gender identity or expression," the Act allows them to easily avoid any disclosure simply by using such facilities when no one else is using them. It also allows people to obtain the right to use any facilities they choose by obtaining a corresponding change to their birth certificates.

102.     Second, and ironically, the ACLU's argument itself relies on stereotypes about transgender people—that is, the stereotype that if a person "identifies" as a man, that person will inevitably act and dress accordingly. But that is a dubious and suspect premise. Thus, the very kind of gender-based stereotyping about which the ACLU complains in its equal protection argument is the foundation of its right to privacy argument.

103.     Third, even assuming that the Act might arguably result in the disclosure of personal information, that information is not of the type that could or would trigger constitutional scrutiny under the Due Process Clause. A permanent record is not created when one uses a restroom, locker room or shower. Nor is one's name linked to the use of such facilities. Thus, any disclosure of private information is not of the sort that could easily lead to adverse action against the person by the government—or any other entity. *See*, *e.g., Whalen v. Roe*, 429 U.S. 589, 602 (1977) (asserted right to medical information on the part of state officials).

104. Fourth, even assuming that the Act impinged upon privacy interests protected by the Due Process Clause, the Act's public facility provisions clearly further—and are narrowly tailored to advance—the settled privacy rights of *others* who might use those facilities in a state of partial or full undress. If adopted, the ACLU's legal theory would mean that anyone would have a legal right to enter a restroom, locker room or shower designated for women simply by claiming that the person "identifies" as a female. But a female teenager using a public school shower has a legitimate privacy interest in *not* being confronted in that shower by another person displaying mature, functional male sex organs—even if that second person "identifies" as a female. Any privacy interest that the second person might have in preventing other biological males from learning the truth about that person's biology is outweighed by the privacy interests of those who would feel violated at the prospect of encountering them in places where people typically appear in a state of partial or full nudity.

105. The Act also furthers and is narrowly tailored to the compelling government interest in public safety. Indeed, the safety risks created by the Charlotte Ordinance are illustrated by the ACLU's complaint, which offers no way to distinguish pretextual or false claims of female "identification" from sincere claims. Thus, under the ACLU's legal theory and the Charlotte Ordinance that it seeks to defend, an ostensibly male sexual predator would have a legal right to enter a public women's shower or locker room simply by claiming to identify as female—whether that claim is true or false. And with some 23,000 registered sex offenders residing in North Carolina, preventing such a dangerous scenario is a legitimate, and even compelling concern. That concern,

29

moreover, is only partially addressed by the existence of laws making it unlawful for a person to physically harm others. *Cf.* ACLU Compl. ¶166. The prospect that a sexual predator—of whatever "gender identity"—may one day be punished *after* a sexual assault in a public shower or locker room is cold comfort to the victim. Accordingly, the purpose of the Act's public facilities provisions is not simply to ensure that those who enter such a facility for the purpose of sexual predation are punished after the fact. That Act also serves a prophylactic function: it is designed to enable the police and other public officials to ensure that sexual predators do not enter those facilities at all, or, if they do enter, that they can be removed before they attack.

106. Finally, even if these provisions of the Act could hypothetically violate the Due Process Clause (properly construed) in *some* of their possible applications, they cannot possibly be unlawful under that Clause in all of their possible applications, and for that reason cannot be facially unlawful. For example, even under the ACLU's interpretation of the Due Process Clause, the Act would presumably be lawful when applied to prevent a *known* male sexual predator from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone. Surely the ACLU's interpretation of the Due Process Clause would not require that people making claims of gender identity that are known to authorities to be false be allowed to enter a bathroom or shower designated for people of the opposite gender. Because the Act prevents entry into facilities designated for people of the opposite sex by those known to be making false claims of "gender identity" in addition to those making sincere claims, the Act clearly is not unlawful in *all* of its applications,

even under the ACLU's misinterpretation of the law, and therefore cannot be unlawful on its face.

## ANSWER TO COUNT III:  MEDICAL TREATMENT CLAIM

107.    Re-alleging all preceding paragraphs above, Intervenors deny the allegations in the ACLU's due process-based "unwanted medical treatment" claim contained in paragraphs 227 through 234, which fail to state a claim on which relief can be granted.  Moreover, for several reasons, the ACLU's argument that the Act violates the rights of transgendered individuals under the Due Process Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.  This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

108.    First, the ACLU's premise—that the Act "*forces* transgender people to undergo medical procedures … in order to access facilities consistent with their gender identity"—is incorrect as a matter of fact and law.  The Act does not require that "transgender" people use any facility "inconsistent with their gender identity or expression."  Indeed, the Act makes express provision for public buildings to employ single-use restrooms that are open to people of any "gender identity" or "expression."  Nor does the Act force anyone to undergo any medical procedure.  *Cf., e.g., Washington v. Harper*, 494 U.S. 210, 229 (U.S. 1990) (involving a "forcible" injection); *United States v. Charters*, 829 F.2d 479, 482 (4th Cir. Va. 1987) (forcible medication).

109.    Second, and ironically, the ACLU's argument seeks to transform an effort to *accommodate* the interests of "transgender" people into a constitutional liability.  The

provisions of the Act allowing "transgender" people to change their birth certificates if they obtain a "sex change" operation simply give those people an additional option by which they can use the restrooms and other facilities of their choice.  To claim that the mere presence of that additional accommodation constitutes a denial of due process is ludicrous.

110.    Third, contrary to the ACLU's claim, it is entirely rational and sensible to require sex reassignment surgery before changing a birth certificate to reflect a "transition" in a person's sex.  Sex reassignment surgery ensures that a person has, as far as medically possible, the anatomical characteristics of the biological sex appearing on his or her birth certificate.  Such surgery also reduces risk that female users of women's restrooms, locker room and showers will be sexually assaulted by persons born with male sex organs.

111.    Fourth, even assuming the Act impinged upon interests protected by the Due Process Clause, the Act's public facility provisions clearly further—and are narrowly tailored to advance—the settled privacy rights of others who might use those facilities.  If adopted, the ACLU's legal theory would mean that anyone would have a legal right to enter a restroom, locker room or shower designated for women simply by claiming that the person "identifies" as a female.  But a female teenager using a public school shower has a legitimate privacy interest in *not* being confronted by another person displaying mature, functional male sex organs—even if the second person "identifies" as a female.  Any constitutionally protectable interests that the second person might have are outweighed by the privacy interests of those who would feel violated at the prospect of

encountering them in places where people typically appear in a state of partial or full nudity.

112. The Act also furthers and is narrowly tailored to the compelling government interest in public safety. The ACLU's legal theory, like the Charlotte Ordinance, offers no way to distinguish false claims of female "identification" from sincere claims. Thus, an ostensibly male sexual predator would have a legal right to enter a public women's shower or locker room simply by claiming to identify as female— whether that claim is true or false. And with some 23,000 registered sex offenders residing in North Carolina, preventing that scenario is a legitimate and even compelling concern. It is a concern, moreover, only partially addressed by the existence of laws making it unlawful for a person to physically harm others. *Cf.* ACLU Compl. ¶166. The prospect that a sexual predator—of whatever "gender identity"—may one day be punished *after* a sexual assault in a public shower or locker room is cold comfort to the victim. Accordingly, the purpose of the Act's public facilities provisions is not simply to ensure that those who enter such a facility for the purpose of sexual predation are punished after the fact. The Act also serves a prophylactic function: it is designed to enable the police and other public officials to ensure that sexual predators do not enter those facilities at all, or, if they do enter, that they can be removed before they attack.

113. Finally, even if these provisions of the Act could hypothetically violate the Due Process Clause (properly construed) in *some* of their possible applications, they cannot possibly be unlawful under that Clause in all of their possible applications, and for that reason cannot be facially unlawful. For example, even under the ACLU's

interpretation of that provision, the Act would presumably be lawful when applied to prevent a *known* male sexual predator with functioning male sex organs from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone.  Surely the ACLU's interpretation of the Due Process Clause would not require that people making claims of "gender identity" that are known to authorities to be false be allowed to enter a bathroom or shower designated for people of the opposite sex.  Because the Act prevents entry into facilities designated for people of the opposite sex by those known to be making false claims of "gender identity" in addition to those making sincere claims of gender identity, the Act clearly is not unlawful in *all* of its applications, even under the ACLU's misinterpretation of the law, and therefore cannot be unlawful on its face.

## ANSWER TO COUNT IV:  TITLE IX CLAIM

114.  Re-alleging all preceding paragraphs above, Intervenors deny the allegations in the ACLU's Title IX claim contained in paragraphs 235 through 243, which fail to state a claim on which relief can be granted.  Moreover, for several reasons, the ACLU's argument that the Act violates the rights of "transgender" individuals under Title IX, both facially and as applied, is erroneous as a matter of law.  This will be established in greater detail (with appropriate citations) in briefing on the merits.  But following are a few of the salient reasons.

115.  First, the ACLU's premise—that the Act *"requires"* persons to use restrooms and other facilities "inconsistent with their gender identity"—is incorrect as a matter of fact and law.  Indeed, the Act makes express provision for public buildings to

34

employ single-use restrooms that are open to people of any "gender identity" or "expression." The Act requires no one to use any particular facility; it simply forbids people from using *multiple-occupancy* facilities that are inconsistent with their biological sex.

116. Second, the ACLU's premise that the Act discriminates against "transgender" persons or discriminates on the basis of "gender identity" is patently incorrect. On the face of the Act, a person's ability to use a particular multi-occupancy bathroom, locker room or shower facility depends, *not* on the person's gender identity, but on the person's "biological sex"—as determined by the person's birth certificate. *See* HB2 §§ 1.2, 1.3. Accordingly, the face of the Act refutes any notion that it discriminates on the basis of "gender identity" and, hence, against "transgender" persons. Moreover, although a "separate but equal" approach is clearly inappropriate with respect to racial classifications, separating the sexes based on legitimate physical and anatomical characteristics has always been viewed as consistent with Title IX and other non-discrimination statutes – especially in the context of bathrooms, locker rooms and showers.

117. This conclusion is particularly evident with respect to Title IX, which both by statute and regulation expressly authorizes the provision of facilities or programs segregated by sex, provided each is comparable for males and females. *See, e.g.,* 20 U.S.C. § 1686 (allowing educational institutions to "maintain[ ] separate living facilities for the different sexes"); 34 C.F.R. § 106.32 (allowing funding recipients to "provide separate housing on the basis of sex," provide those facilities are "[p]roportionate in

quantity" and "comparable in quality and cost"); 34 C.F.R. § 106.34 (allowing "separation of students by sex" within physical education classes and certain sports "the purpose or major activity of which involves bodily contact"). Most pertinent here, longstanding Title IX regulations issued by the Department of Education in 1975, and reaffirmed in 1980, expressly allow recipients of federal funding to "provide separate toilet, locker room, and shower facilities on the basis of sex," provided that the facilities provided for "students of one sex" are "comparable" to the facilities provided for "students of the other sex." 34 C.F.R. § 106.33.

118.    In light of that, the ACLU is plainly wrong to conclude that, by complying with the Act, the defendants are thereby "discriminating on the basis of sex" in contravention of Title IX. By requiring public multiple-occupancy bathrooms, locker rooms, and showers to be segregated by "biological" sex, the Act has done nothing remotely out of line with the clear statutory and regulatory directives in Title IX.  To the contrary, the Act is *authorized* by the most directly applicable Title IX regulation, which allows sex-segregated "toilet[s], locker room[s], and shower facilities."  34 C.F.R. § 106.33.

119.    Third, and more fundamentally, the ACLU is incorrect in contending that Title IX's prohibition on discrimination on the basis of "sex" extends to discrimination on the basis of "gender identity."  There is no indication in Title IX's language or legislative history of any purpose on Congress's part to reach alleged discrimination on the basis of "gender identity."  Furthermore, that view has been uniformly rejected by every federal circuit court to consider it, and by virtually all of the district courts as well.

36

The court cases on which the ACLU apparently relies deal with sex and gender *stereotyping,* not "gender identity" or sexual orientation per se, and are therefore not controlling on the questions here.

120.   Fourth, the ACLU cannot justify its erroneous reading of Title IX by relying on recent Department of Education guidance letters suggesting that Title IX's prohibition on "sex" discrimination extends to discrimination based on "gender identity." *See* Letter from James A. Ferg-Cadima, Acting Deputy Assistant Secretary for Policy, Office for Civil Rights, U.S. Dep't of Education (Jan. 7, 2015); Department of Education, *Dear Colleague Letter on Transgender Students* (May 13, 2016).   Even assuming the Fourth Circuit was correct in determining recently that a mere "opinion letter" merits deference, *see G.G. v. Gloucester County School Board*, 2016 U.S. App. LEXIS 7026 (4th Cir. Jan. 27, 2016), the ACLU nonetheless cannot prevail here because the opinion letter is plainly erroneous, inconsistent with Title IX and its regulations, and would render Title IX unconstitutional.  *See id.*, 2016 U.S. App. LEXIS at 23 (explaining that agency interpretation of Title IX regulation merits deference under *Auer v. Robbins*, 519 U.S. 452 (1997), unless interpretation is "plainly erroneous or inconsistent with the regulation or statute"); *id.* at 32 (observing that there was "no constitutional challenge to the regulation or agency interpretation").

121.   The Department of Education's notion that "sex" discrimination encompasses "gender identity" discrimination is also plainly erroneous and inconsistent with both Title IX and its implementing regulations. Among other things, it would render incoherent Title IX's longstanding and express allowance of sex-segregated facilities and

programs. More fundamentally, the opinion letter's interpretation would render Title IX unconstitutional: as explained below, it would require States to violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children; it would violate the Spending Clause and the Tenth Amendment by conditioning States' receipt of federal funds on a novel requirement that no State could have reasonably foreseen; and it would violate the constitutional separation of powers by purporting to enact new legislation outside the constraints of Article I of the Constitution.

122. Moreover, *Gloucester* does not purport to decide the actual question posed by the ACLU's action—namely, whether Title IX *itself* is facially violated if a State limits public multiple-occupancy restrooms, changing facilities, and showers to persons of the same biological sex (while permitting a system for accommodating persons with conflicting gender identities through single-occupancy facilities). *Gloucester* did not reach that issue (and, indeed, had nothing to do with changing facilities or showers at all), but decided only that a Department of Education opinion letter purporting to interpret an implementing regulation under Title IX merits *Auer* deference, absent a showing that the letter is plainly erroneous, inconsistent with Title IX, or unconstitutional. *Gloucester* remanded for further proceedings on the Title IX issue, leaving open the ultimate question of whether Title IX facially permits a State to require public multiple-occupancy restrooms, changing facilities, and showers to be segregated by biological sex (while permitting a system for accommodating persons with conflicting gender identities through single-occupancy facilities).

38

123.    In addition, the Fourth Circuit's *Gloucester* opinion is incorrect. An agency can impose new obligations or prohibitions on regulated parties only through notice-and-comment rulemaking—not through a unilateral "opinion letter."  Thus, the ACLU cannot rely on the Education Department's guidance to re-cast Title IX's prohibition on "sex" discrimination as a prohibition on "gender identity" discrimination. Instead, the ACLU can only rely on the plain meaning of Title IX and its implementing regulations, which for decades have unambiguously permitted sex-segregated restrooms, changing rooms, and shower facilities.

124.    Fifth, the federal government lacks the constitutional authority to deploy the ACLU's novel reading of Title IX to preempt the States' efforts to protect the privacy and safety of residents using public bathroom, locker room and shower facilities.  Indeed, the ACLU's reading of Title IX would *compel* States to violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children with respect to matters of sexuality.  The ACLU's reading of Title IX would therefore infringe the States' Tenth Amendment authority to provide for their citizens' privacy and well-being, and would additionally constitute an unconstitutional commandeering of state property and lawmaking processes.  For those reasons, too, Title IX cannot constitutionally be construed in the manner the ACLU contends.

125.    Sixth, the ACLU's novel reading of Title IX to encompass "gender identity" discrimination would make Title IX run afoul of the Spending Clause and the Tenth Amendment.  The conditions the federal government attaches to the States' receipt

39

of federal funds must be clear and unambiguous, so that States may make an informed choice about whether to accept the funds. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 15-16 (1981). No State could have reasonably foreseen that a condition on accepting federal funds prohibiting "sex" discrimination would somehow evolve through unilateral agency action into a prohibition on "gender identity" discrimination—particularly when Title IX's longstanding regulations expressly allow States to maintain sex-segregated restrooms, locker rooms, and shower facilities. Furthermore, by exposing the State to a potentially catastrophic loss of federal funding if the State did not acquiesce in the agency's novel reading of Title IX, the ACLU's reading would violate the Tenth Amendment.

126.   Finally, even if the Act could hypothetically violate Title IX (properly construed) in *some* of its possible applications, it cannot possibly be unlawful under Title IX in all of its possible applications, and for that reason cannot be facially unlawful.  For example, even under the ACLU's interpretation of Title IX, the Act would be lawful when applied to prevent a known male sexual predator from falsely claiming to "identify" as female so that he can enter a women's bathroom and prey upon a little girl whom he has seen enter alone.  Surely the ACLU's interpretation of Title IX would not require that people making claims of gender identity that are *known* to authorities to be false be allowed to enter a bathroom or shower designated for people of the opposite gender.  Because the Act prevents entry into facilities designated for people of the opposite sex by those making knowingly false claims of gender identity in addition to those making genuine claims of gender identity, the Act clearly is not unlawful in *all* of

40

its applications, even under the ACLU's interpretation of Title IX, and therefore is not unlawful on its face.

### AFFIRMATIVE DEFENSE: UNCONSTITUTIONALITY OF THE ACLU'S STATUTORY INTERPRETATION

127. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein.

128. The Constitution's federalism guarantees constrain the federal government's ability to place conditions on the States' receipt of federal funds through legislation under the Spending Clause of Article I. The federal government must make its conditions on receipt of federal funds clear and unambiguous, so that States may make an informed decision about whether to accept the funds and the resulting diminution in their sovereign authority. Furthermore, the federal government may not attach conditions to the receipt or retention of federal funding that effectively coerce the States into accepting the conditions.

129. Based on those settled principles, the ACLU's attempt to impose novel and unforeseeable interpretation of Title IX on North Carolina constitutes a violation of the Spending Clause and the Tenth Amendment. When North Carolina officials and agencies accepted the conditions originally attached to federal funding under those statutes, they could not have foreseen the radical change in those conditions represented by the ACLU's recent determination letters. *See, e.g., Pennhurst*, 451 U.S. at 15-16. Furthermore, by deeming North Carolina in violation of its novel reinterpretation of Title IX and VAWA, the ACLU has attempted to coerce North Carolina into complying with

the ACLU's illegal demand, in violation of the Tenth Amendment. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2601 (U.S. 2012).

130.    In addition, the ACLU's reading of Title IX would *compel* States to violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children with respect to matters of sexuality.  The ACLU's reading of Title IX would therefore infringe the States' Tenth Amendment authority to provide for their citizens' privacy and well-being, and would additionally constitute an unconstitutional commandeering of state property and lawmaking processes. For those reasons, too, Title IX cannot constitutionally be construed in the manner the ACLU contends.

## COUNTER-CLAIMS

**ADDITIONAL FACTUAL ALLEGATIONS PERTINENT TO INTERVENORS'
COUNTERCLAIMS**

131.    Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein.

132.    As relevant here, the Act requires that a "multiple occupancy restroom or changing facility" operated by any "public agency" in North Carolina be "designated for and only used by persons based on their biological sex." HB2, § 1.3(B).  "Biological sex" is defined as "[t]he physical condition of being male or female, which is stated on a person's birth certificate." *Id.* § 1.3(A)(1).  A "multiple occupancy restroom or changing facility" is defined as "[a] facility designed or designated to be used by more than one person at a time where persons may be in various states of undress in the presence of

42

other persons" and "may include, but is not limited to, a restroom, locker room, changing room, or shower room." *Id.* § 1.3(A)(3). A "public agency" includes executive branch agencies; the legislative and judicial branches; political subdivisions; local and municipal governments; all state agencies, boards, offices and ACLUs under the direction and control of a member of the council of state; and local boards of education. *Id.* § 1.3(4)(A)-(H); § 1.2.

133. The Act, however, does not apply to any "single occupancy bathroom or changing facility," which is defined as "[a] facility designed or designated to be used by only one person at a time where persons may be in various states of undress," and includes "a single stall restroom designated as unisex or for use based on biological sex." *Id.* § 1.3(A)(5); § 1.2(A)(3).

134. In fact, the Act expressly allows public agencies to "provid[e] accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances[.]" *Id.* § 1.3(C); *see also id.* § 1.2(C) (providing that "[n]othing in this section shall prohibit local boards of education from providing accommodations such as single occupancy bathrooms or changing facilities or controlled use of faulty facilities upon a request due to special circumstances").

135. On April 12, 2016, Governor McCrory issued Executive Order No. 93, entitled "To Protect Privacy and Equality." Among other things, the Order (1) affirmed that "private businesses can set their own rules for their own restroom, locker room and shower facilities"; (2) confirmed that multiple-occupancy restroom, locker rooms, and shower facilities in cabinet agencies must comply with the Act; but (3) emphasized that

"all cabinet agencies shall provide a reasonable accommodation of a single occupancy restroom, locker room or shower facility upon request due to special circumstances," and encouraged all "council of state agencies, cities, counties, the University of North Carolina System and the North Carolina Community College System" to make similar accommodations where practicable.

136. The ACLU's assertions that the Act facially violates Title IX and the Fourteenth Amendment place Intervenors and the State of North Carolina in an intolerable position that threatens to disrupt the integrity of its public agencies, the financial stability of its universities and school systems, and, most profoundly, the ability of its public officials to provide for the common good of North Carolina citizens.

137. On the one hand, if Intervenors and other legislators in the North Carolina General Assembly and the State's public agencies and officials resist the ACLU's demands and continue implementing the will of the citizenry as expressed in the Act, the State's school systems could lose hundreds of millions of dollars of federal education funds. Such a loss would not only impair the teaching and research mission of UNC, but would also affect K-12 education throughout the State. Local schools would likely be forced to curtail programs, fire teachers and increase class sizes—all to the detriment of the State's hundreds of thousands of schoolchildren. All this because the federal government, if the ACLU carries out its threat, would refuse to return to the people of North Carolina federal tax dollars that those very people have paid into the federal treasury.

138.     On the other hand, if Intervenors and other legislators in the North Carolina General Assembly, or any of the State's public agencies and officials, capitulate to the ACLU's demands, this would subject the people of North Carolina to the very risks the Act was designed to prevent.  As previously explained, the ACLU demands that the State allow *anyone* to use *any* public bathroom, locker room or shower based solely on that person's self-declared "gender identity."  Such a policy would necessarily lead to partially or fully unclothed women and girls coming into close proximity and visual contact with individuals who, whatever their gender identity, nonetheless display male sex organs.

139.     Such a policy would also inevitably create an opportunity for sexual predators of whatever "gender identity" to abuse the policy to facilitate their predation. And in so doing, such a policy would violate settled, legitimate expectations of privacy and safety that have long prevailed in the State.  Indeed, under the ACLU's legal theory, a biological male found in a woman's restroom has a legal right to be there if he merely *claims* to "identify" as female.  And a police officer summoned to remove such a person in a public restroom, locker room, or shower would have no practical way to determine quickly whether the person is acting in bad faith.

140.     Before long, moreover, such a policy would likely provoke a public outcry demanding that single-sex facilities be abandoned altogether and replaced with single-user bathroom, shower and locker facilities.  That in turn would likely force the Intervenors and other members of the General Assembly to authorize funding to retrofit

countless public buildings, at a taxpayer cost of hundreds of millions if not billions of dollars.

141. Because this suit relies on a view of "sex" inconsistent with North Carolina's history and tradition—not to mention every other human society's—implementation of that view would require extensive changes to North Carolina law on a variety of subjects, including state employment law, fair housing law, and family law. These are all matters within Intervenors' responsibility as leaders of the General Assembly. And no one is as well situated to explain and elaborate these issues as the Court wrestles with the ACLU's proposed brave new world.

142. In all these ways, if North Carolina and its public agencies and officials, including Intervenors, were to capitulate to the ACLU's demands, they would violate the trust of the North Carolina citizenry to protect their privacy and safety.

## COUNTER-CLAIM ONE: EQUAL PROTECTION

143. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein. For all of the reasons explained there, among others, the ACLU's argument that the Act's public facility provisions violate the Equal Protection Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.

144. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein. For all of the reasons explained there, among others, the ACLU's argument that the Act's preemption provisions violate the Equal Protection

Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.

145. Intervenors are entitled to a declaratory judgment establishing each of these points.

## COUNTER-CLAIM TWO: RIGHT TO PRIVACY

146. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein. For all of the reason explained there, among others, the ACLU's argument that the Act violates the right to privacy protected by the Due Process Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.

147. Intervenors are entitled to a declaratory judgment establishing each of these points.

## COUNTER-CLAIM THREE: UNWANTED MEDICAL TREATMENT

148. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein. For all of the reason explained there, among others, the ACLU's argument that the Act violates the right to be free from unwanted medical treatment protected by the Due Process Clause of the Fourteenth Amendment, both facially and as applied, is wrong as a matter of law.

149. Intervenors are entitled to a declaratory judgment establishing each of these points.

## COUNTER-CLAIM FOUR: TITLE IX

150. Intervenors reallege all matters alleged in the preceding paragraphs and incorporate them herein. For all of the reasons explained there, among others, the ACLU's argument that the Act violates Title IX, both facially and as applied, is wrong as a matter of both law and proper procedure. Alternatively, under the ACLU's interpretation, Title IX violates the federal Constitution.

151. Intervenors are entitled to a declaratory judgment establishing each of these points.

## PRAYER FOR RELIEF

For the foregoing reasons, Intervenors request that the Court dismiss the ACLU's claims. Intervenors further request that the Court enter a final judgment in Intervenors' favor declaring Intervenors' rights as follows:

a) A final judgment declaring that the Act does not facially violate the Equal Protection or Due Process Guarantees of the Fourteenth Amendment to the U.S. Constitution;

b) A final judgment declaring that the Act does not facially violate Title IX;

c) An award of attorneys' fees and costs; and

d) Any other relief to which Intervenors are entitled.

## REQUEST FOR JURY TRIAL

Intervenors hereby request a trial by jury in this matter.

Respectfully submitted,

| | |
|---|---|
| /s/ S. Kyle Duncan | /s/ Robert D. Potter |
| S. KYLE DUNCAN* (DC Bar # 1010452) | ROBERT D. POTTER, JR. (NC Bar # 17553) |
| *Lead Counsel* | ATTORNEY AT LAW |
| GENE C. SCHAERR* (DC Bar # 416638) | 2820 Selwyn Avenue, #840 |
| SCHAERR | DUNCAN LLP | Charlotte, NC 28209 |
| 1717 K Street NW, Suite 900 | 704-552-7742 |
| Washington, DC 20006 | rdpotter@rdpotterlaw.com |
| 202-714-9492 | |
| 571-730-4429 (fax) | |
| kduncan@schaerr-duncan.com | |
| gschaerr@schaerr-duncan.com | |
| *Specially Appearing Pursuant to Local Civil Rule 83.1(d)* | |

*Attorneys for Intervenors*

May 25, 2016

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/  S. Kyle Duncan
S. Kyle Duncan
*Attorney for Proposed Intervenors*