# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; H.S., by her next friend and mother, KATHRYN SCHAFER; ANGELA GILMORE; KELLY TRENT; BEVERLY NEWELL; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, <br><br> Plaintiffs, <br><br> v. <br><br> PATRICK MCCRORY, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; and W. LOUIS BISSETTE, JR., in his official capacity as Chairman of the Board of the University of North Carolina, <br><br> Defendants, <br><br> PHIL BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIM MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, <br><br> Intervenor-Defendants. | Case No. 1:16-cv-00236-TDS-JEP |

## INTERVENOR-DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF GOVERNOR MCCRORY'S MOTION FOR EXPEDITED DISCOVERY

By: /s/ S. Kyle Duncan

S. KYLE DUNCAN* (DC Bar #1010452)
  *Lead Counsel*
GENE C. SCHAERR* (DC Bar #416638)
SCHAERR | DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC 20006
202-714-9492; 571-730-4429 (fax)
kduncan@schaerr-duncan.com
*\* Appearing under Local Rule 83.1(d)*

By: /s/ Robert D. Potter, Jr.

ROBERT D. POTTER, JR. (NC Bar #17553)
ATTORNEY AT LAW
2820 Selwyn Avenue, #840
Charlotte, NC 28209
704-552-7742
rdpotter@rdpotterlaw.com

*Attorneys for Intervenor-Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION.......................................................................................................... 1

BACKGROUND............................................................................................................ 5

ARGUMENT ................................................................................................................. 9

    I.    The Court should hold a hearing and make findings on the critical factual issues raised by the ACLU's arguments concerning the likelihood of success on the merits. ........................................................................................ 9

        A.    The ACLU misreads *G.G.* and the other legal authorities on which their claims depend. .................................................................................. 10

        B.    Even accepting the ACLU's reading of *G.G.*, their likelihood of success on the merits depends on factual issues on which a hearing and fact-finding are needed—as *G.G.* itself makes clear. ............................. 13

            1.    The ACLU's claims depend on the contested assumption that there is no legitimate factual basis for distinguishing between persons who have complied with the requirements for changing their birth certificates and those who have not. ..................................... 14

            2.    More generally, the ACLU's claims depend on the factual assertion that HB2 does not advance, or sufficiently advance, North Carolina residents' expectations of bodily privacy in communal shower, locker room and bathroom facilities. ..................... 18

            3.    The ACLU's claims also depends on the factual assertion that HB2 does not advance, or sufficiently advance, the State's interest in protecting the safety of North Carolina residents. ................ 21

    II.    The Court should hold a hearing and make findings on the critical factual issues raised by the ACLU's arguments on the other preliminary injunction factors. ....................................................................................................... 22

        A.    Plaintiffs' claims of irreparable injury raise factual issues that require an opportunity for discovery and a hearing. ................................................... 22

        B.    Plaintiffs' claims as to the balance of harms and the public interest likewise raise factual issues requiring discovery and a hearing. ................... 26

III.  The Court should provide the parties adequate opportunity to develop the necessary evidence, test each other's evidence, and present it to the Court. ........ 27

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Auer v. Robbins*,
   519 U.S. 452 (1997) ........................................................................... 10

*Beard v. Whitmore Lake Sch. Dist.*,
   402 F.3d 598 (6th Cir. 2005) ............................................................ 19

*Brannum v. Overton Cnty. Sch. Bd.*,
   516 F.3d 489 (6th Cir. 2008) ............................................................ 19

*Caribbean Marine Services Co., Inc. v. Baldrige*,
   844 F.2d 668 (9th Cir. 1988) ............................................................ 22

*Doe v. Luzerne Cnty.*,
   660 F.3d 169 (3d Cir. 2011) ............................................................. 19

*Faulkner v. Jones*,
   10 F.3d 226 (4th Cir. 1993) .............................................................. 19

*G. G. v. Gloucester Cnty. Sch. Bd.*,
   ___ F.3d ___, 2016 U.S. App. LEXIS 7026 (4th Cir. Apr. 19, 2016) .................. *passim*

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) .............................................................. 9

*Lee v. Downs*,
   641 F.2d 1117 (4th Cir. 1989) .......................................................... 19

*N.C. State Conf. v. McCrory*,
   2016 U.S. Dist. LEXIS 5151 (M.D.N.C. Jan. 15, 2016) ........................... 26

*NASA v. Nelson*,
   562 U.S. 134 (2011) ......................................................................... 24

*Raza v. City of New York*,
   998 F. Supp. 2d 70 (E.D.N.Y. 2013) ................................................ 27

*Sepulveda v. Ramirez*,
   967 F.2d 1413 (9th Cir. 1992) .......................................................... 19

*State of Texas et al. v. United States of America et al.*,
   No. 7:16-cv-00054 (N.D. Tex. May 25, 2016) ...................................... 8

*Static Control Components, Inc. v. Future Graphics, LLC*,
   2007 U.S. Dist. LEXIS 36474 (M.D.N.C. May 11, 2007) ........................ 22

*Sun Microsystems, Inc. v. Microsoft Corp.*,
   333 F.3d 517 (4th Cir. 2003) ............................................................ 26

*United States v. Virginia,*
    518 U.S. 515 (1996) ................................................................................. 19

*Wagner v. Atlas Tri-State SPE, LLC,*
    2011 U.S. Dist. LEXIS 157275 (N.D. W.Va. Nov. 1, 2011) ........................ 22

*Whalen v. Roe,*
    429 U.S. 589 (1977) ................................................................................. 24

**Statutes and Legislative History**

20 U.S.C. § 1681 *et seq.* ............................................................................. 6, 10

2016 N.C. Sess. Laws 3 .......................................................................... 5, 6, 23

N.C. Gen. Stat. § 115C-47 ................................................................................ 5

N.C. Gen. Stat. § 115C-521.2 .................................................................. 13, 23

N.C. Gen. Stat. § 130A-118(b)(4) ................................................ 6, 11, 13, 14

N.C. Gen. Stat. § 143-760(c) ......................................................................... 23

**Regulations**

34 C.F.R. § 106.33 .......................................................................................... 10

**Court Documents**

Complaint, *Berger v. United States Dep't of Justice,*
    No. 5:16-cv-00240 (E.D.N.C. May 9, 2016) .................................................. 7

Complaint, *McCrory v. United States,*
    No. 5:16-cv-00238 (E.D.N.C. May 9, 2016) .................................................. 7

Complaint, *United States v. State of North Carolina et al.,*
    No. 1:16-cv-00425 (M.D.N.C. May 9, 2016) ................................................. 7

**Other Authorities**

Balinski, Peter,
    *Sexual predator jailed after claiming to be 'transgender' to assault women in*
    *shelter,* LifeSiteNews (Mar. 4, 2014) ......................................................... 15

Carroll, Lewis,
    *Through the Looking Glass and What Alice Found There* (1871) .................. 1

Department of Education,
    *Dear Colleague Letter on Transgender Students* (May 13, 2016) ...... 8, 12, 25

Houston, Warner Todd,
    *Top Twenty-Five Stories Proving Target's Pro-Transgender Bathroom Policy Is*
    *Dangerous to Women and Children,* Bretibart.com (Apr. 23, 2016) ........... 15

Johnson, Ben,
    *Man strips in front of girls in locker room, says transgender law allows it*,
    LifeSiteNews (Feb. 18, 2016) ..................................................................... 15

Murphy, Jeanne, et al.,
    *"They Talk Like That, But We Keep Working": Sexual Harassment and Sexual Assault*
    *Experiences Among Mexican Indigenous Farmworker Women in Oregon*,
    17 J. Immig. And Minority H. 1834, 1835 (2015) ...................................... 15

Thiessen. Marc A.,
    *Yes, we should protect transgender people but we're going about it in a dangerous*
    *way*, American Enterprise Institute, Washington Post (May 16, 2016) ....................... 15

Wood, Melody,
    *6 Men Who Disguised Themselves as Women to Access Bathrooms*, The Daily Signal
    (Jun. 3, 2016) ....................................................................................... 15, 20

**INTERVENOR-DEFENDANTS' BRIEF IN RESPONSE TO PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF
GOVERNOR MCCRORY'S MOTION FOR EXPEDITED DISCOVERY**

## INTRODUCTION

Plaintiffs' preliminary injunction motion is nothing less than the tip of a legal spear that the ACLU—now aided and abetted by agencies of the federal government—has decided to hurl at the age-old tradition of sex-separated bathroom, locker-room and shower facilities. And what the ACLU evidently hopes to obtain as a result of its motion is a ruling it can tout as having established, at least preliminarily, that this tradition of sex-separated facilities itself constitutes irrational and bigoted "discrimination" against persons who believe their gender identities diverge from the biological sex with which they were born.

In a footnote, the ACLU soothingly denies that it "seek[s] to abolish sex-separated facilities." PI Memo [Doc. 22] at 18 n. 5. However, like its complaint, the remainder of the ACLU's motion makes clear that by "sex-separated facilities," the ACLU actually means facilities that are separated, *not* according to the biological sex of those facilities' users—the ordinary meaning of the term "sex-separated"—but instead according to users' *subjective* gender identities. The ACLU's reassurance thus deploys the rhetorical strategy popularized by Humpty Dumpty, that is, "When *I* use a word … it means just what I choose it to mean—neither more nor less." Lewis Carroll, *Through the Looking Glass and What Alice Found There* 124 (1871). That reassurance also ignores the reality that, once people with male sex organs are routinely allowed into women's showers and

changing rooms based on nothing more than their self-identifying as women, the public will likely demand that all such facilities be converted into single-user facilities, thereby effectively putting an end to sex-separated facilities and the efficiencies they provide.

In short, the ACLU's motion is indeed at the vanguard of a legal strategy, in concert with the federal government, to abolish "sex-separated facilities," as that term is understood by everyone else in America. Moreover, as established by recent sweeping directives from various federal agencies (under Title VII as well as Title IX), and the legal counter-attack launched by a number of other States, that strategy extends not just to North Carolina but to the entire Nation.

Given the nationwide importance of the ultimate issue presented here, Intervenors respectfully suggest that the resolution of Plaintiffs' motion deserves to be handled with the care for which this Court is rightly known. Specifically, the parties defending HB2— the North Carolina law that seeks to preserve the option of sex-separated facilities in this State—should be given every reasonable opportunity to test the legal *and* factual assertions on which the ACLU's motion depends.

To be sure, the ACLU's legal premises are easily rebutted. As shown below, for example, the Fourth Circuit's recent decision in *G.G.* did *not* "hold" that Title IX itself "requires schools to provide transgender students access to restrooms congruent with their gender identity." PI Memo at 12-13 (citing *G. G. v. Gloucester Cnty. Sch. Bd.*, ___ F.3d ___, 2016 U.S. App. LEXIS 7026 (4th Cir. Apr. 19, 2016), *en banc reh'd denied*, 2016 U.S. App. LEXIS 9909 (May 31, 2016)). *G.G.* did not interpret Title IX's statutory

prohibition on "sex" discrimination in federally funded educational programs at all. Instead, that decision addressed a *regulation* under Title IX, found it ambiguous as applied to "transgender students," and accorded deference to the agency's own interpretation of that regulation. *G.G.* did so, moreover, only in the context of restrooms, not in the even more problematic context of shower and locker room facilities, which are squarely implicated in this case but barely mentioned by the ACLU. *G.G.* also specifically noted that there was in that case no constitutional challenge to the regulation or agency interpretation—unlike this case, which presents numerous constitutional challenges to the interpretation of Title IX (and by extension, Title VII) on which the ACLU relies. And *G.G.* repeatedly noted the limited record on which it based its decision, which came to the Fourth Circuit on a motion to dismiss and not on a fully developed factual record.

In contrast to the ACLU's erroneous legal premises, the factual issues raised by the ACLU's motion cannot possibly be addressed through legal briefing alone. Its motion raises several critical and highly contested factual issues, including but not limited to:

- whether and to what extent HB2 serves the State's interest in protecting North Carolina residents' legitimate expectations of bodily privacy in bathroom and/or shower and locker facilities, and the psychological and social costs of violating those expectations;
- whether and to what extent HB2 serves the State's interest in protecting the safety of residents using bathroom and/or shower and locker facilities, and the psychological and social costs of alternative policies such as that favored by the ACLU;

3

- whether and to what extent the State has a legitimate interest in distinguishing in the use of public facilities between individuals who have taken the steps necessary to change the sex listed on their birth certificates and those who have not taken those steps;

- whether and to what extent the Plaintiffs and others similarly situated will suffer genuine harm absent an injunction; and

- the magnitude of any harm that may be suffered by the Plaintiffs if HB2 remains in effect compared to the magnitude of harm that may be suffered by others if the Court enjoins its enforcement.

More generally, the ACLU's motion also raises profound factual issues in the medical realm—for instance, the origins and proper treatment of what the ACLU calls "gender dysphoria." And, most fundamentally, the motion seeks to legally re-engineer the whole concept of "sex" as something based entirely on a person's internal, subjective sense of being a man or a woman—and divorced from the concrete reality of one's *body*. Intervenors intend to vigorously contest the ACLU's positions on each of these issues.

However, to provide the kind of factual record this Court needs to render a sound decision on issues of such grave importance to the State and the Nation, Intervenors and the other defendants who choose to address them will need a reasonable amount of time—time to locate and consult with the appropriate expert and fact witnesses, time to depose the expert and fact witnesses who have already appeared on the ACLU's behalf, and time to present all of the resulting evidence to the Court in a coherent fashion. The ACLU has already had months to recruit experts and other witnesses and to develop the evidence it believes it needs to support its position in court. It is only fair that Intervenors and other defendants be provided a reasonable time to do the same.

4

Accordingly, as Governor McCrory has already proposed by separate motion, *see* Doc. 52 at ¶ 7; Doc. 53, the following timetable would be a reasonable way to govern future proceedings on the ACLU's motion:

1. Forty-five (45) days for disclosure of experts witnesses, along with expert reports, and the identity and contact information of any fact witnesses;

2. Sixty (60) days thereafter for deposing all witnesses (both expert and fact);

3. Fifteen (15) days following the conclusion of expedited discovery for plaintiffs to file and serve any supplemental briefing in support of their motion for preliminary injunction;

4. Thirty (30) days following the conclusion of expedited discovery for defendants and intervenors to file and serve any supplemental briefing in opposition to plaintiffs' motion for preliminary injunction; and

5. Five (5) days for the hearing on plaintiffs' motion for preliminary injunction.

Such a schedule will provide for a reasonably prompt resolution of the ACLU's motion, while at the same time protecting the ability of the Intervenors, the other defendants and the Court to test the remarkable and highly debatable factual premises on which that motion depends.

## **BACKGROUND**

This case arises out of a recent North Carolina law designed to strike a sensible balance between the interests of individuals experiencing what the ACLU calls gender dysphoria and the interests of all North Carolina citizens in privacy and security in publicly owned restrooms, locker rooms and showers. That law, called the Public Facilities Privacy and Security Act ("HB2"), was passed on March 23, 2016, by the

North Carolina General Assembly, and signed into law by Governor McCrory that same day. In relevant part, HB2 provides that public multiple-occupancy restrooms, changing facilities, and showers shall be "designated for and only used by persons based on their biological sex." 2016 N.C. Sess. Laws 3, amending N.C. Gen. Stat. § 115C-47. However, rather than requiring that "biological sex" be determined as of the time of one's birth, as the ACLU erroneously suggests, HB2 determines biological sex based on the person's *current* birth certificate. *Id.* Because North Carolina law already allows people to change the sex listed on their birth certificates by completing certain requirements, including reassignment surgery where needed, *see* N.C. Gen. Stat. § 130A-118(b)(4), HB2 thus allows people who wish to use facilities designated for the opposite sex to do so—after they have complied with the legal requirements for changing their birth certificates. HB2 also expressly allows public agencies to provide single-occupancy facilities to persons who need an accommodation, 2016 N.C. Sess. Laws 3 §§ 1.2(C), 1.3(C) , and allows the development of different policies in privately-owned restrooms, changing facilities, and showers.

HB2's enactment provoked a flurry of legal activity. The ACLU of North Carolina, Equality North Carolina, and individual plaintiffs (collectively "ACLU") filed the present action on March 28, 2016, asserting claims under the Equal Protection and Due Process Clauses and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* They filed an amended complaint on April 21, 2016. Subsequently, on May 4, 2016, the United States Justice Department ("DOJ") sent letters to Governor McCrory,

6

the Secretary of the North Carolina Department of Public Safety ("DPS") and the President of the University of North Carolina ("UNC"), claiming that the Act facially violated two federal laws in addition to Title IX—Title VII of the Civil Rights Act of 1964 and the Violence Against Women Act ("VAWA"). DOJ gave each recipient three business days—until Monday, May 9—to repudiate the Act and, additionally, to put in place new policies whereby persons who declare their gender identity to diverge from their biological sex be allowed to use the public bathroom, locker, and shower facilities of their choosing.

In response, on May 9, 2016, three declaratory judgment actions were filed. Senator Berger and Speaker Moore, the leaders of the North Carolina General Assembly and the Intervenor-Defendants here, sued DOJ in the Eastern District of North Carolina seeking a declaration that the Act facially complies with Title VII, Title IX, and VAWA and that the Department's actions violate both the Administrative Procedure Act and the United States Constitution. Complaint, *Berger v. United States Dep't of Justice*, No. 5:16-cv-00240 (E.D.N.C. May 9, 2016). The Governor and the DPS Secretary also sued the Department in the Eastern District, seeking a declaration that the Act complies with Title VII and VAWA, but without mentioning Title IX. Complaint, *McCrory v. United States*, No. 5:16-cv-00238 (E.D.N.C. May 9, 2016). DOJ then filed suit in this Court against Governor McCrory, the DPS, UNC, and UNC's Board of Governors, seeking a declaration that the Act facially violates Title VII, Title IX, and VAWA, and seeking

7

preliminary and permanent injunctive relief. Complaint, *United States v. State of North Carolina et al.,* No. 1:16-cv-00425 (M.D.N.C. May 9, 2016) ("DOJ Complaint").[1]

Shortly thereafter, on May 13, 2016, DOJ and the Department of Education ("DOE") also issued a joint "Dear Colleague Letter," instructing all federally-funded education programs in the United States that Title IX's prohibition on "sex" discrimination also encompasses discrimination based on "gender identity." Department of Education, *Dear Colleague Letter on Transgender Students* at 1 (May 13, 2016) ("2016 DOE Letter"), available at: http://1.usa.gov/25aBJLM. The letter demands that schools must treat a student's "gender identity" as the student's "sex" for purposes of Title IX compliance, and—taking the same position as the ACLU in this case—explains that "gender identity" refers to a person's self-determined "internal sense of gender," without regard to biological sex and without any requirement of a medical diagnosis, medical treatment, or sex-reassignment surgery. *Id.* Shortly thereafter, in May 25, 2016, Texas and ten other States responded by suing DOJ, DOE and the EEOC in federal court in the Northern District of Texas. *State of Texas et al. v. United States of America et al.,* No. 7:16-cv-00054 (N.D. Tex. May 25, 2016).

Seven weeks after filing its original complaint in this case—on May 16, 2016— the ACLU moved for a preliminary injunction. A few days later, on May 25, 2016,

---

[1] Senator Berger and Speaker Moore's motion to intervene in that action, filed on May 17, 2016, is pending.

Senator Berger and Speaker Moore ("Intervenors") moved to intervene in this matter, a request this Court granted on June 6, 2016.

## ARGUMENT

If the ACLU's motion for preliminary injunction raised only legal issues, it could easily be dispatched based on legal briefing alone. However, that motion—supported as it is by ten different declarations including three expert witnesses and over three hundred pages of evidence—also raises a host of contested factual issues that deserve to be tested through limited discovery, presentation of competing evidence, and fact-finding. Indeed, that is as true of the ACLU's arguments on the likelihood of success on the merits as it is of its arguments on the other preliminary injunction factors. *See, e.g., League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 236 (4th Cir. 2014) (listing preliminary injunction factors). And because the ACLU has had months if not years to develop its evidence on these points, Intervenors and the other defendants should be given a fair opportunity to contest the ACLU's evidence before the Court rules on its motion.

I. **The Court should hold a hearing and make findings on the critical factual issues raised by the ACLU's arguments concerning the likelihood of success on the merits.**

The ACLU contends that it is likely to succeed on the merits of its Title IX and constitutional claims. As shown below, however, the ACLU's arguments as to both claims are based upon a misreading of the relevant law, including especially the Fourth Circuit's recent decision in *G.G. v. Gloucester County School Board*, __ F.3d __, 2016 U.S. App. LEXIS 7026 (4th Cir. Apr. 19, 2016), *en banc reh'd denied*, 2016 U.S. App.

LEXIS 9909 (May 31, 2016). In addition, and more importantly, the ACLU's arguments on the merits rest upon remarkable factual assertions that deserve to be tested through the usual adversarial processes.

### A. The ACLU misreads *G.G.* and the other legal authorities on which their claims depend.

With respect to its Title IX claim (and to some extent its equal protection claims), the ACLU asserts it is likely to succeed on the merits based almost entirely on the Fourth Circuit's recent decision in *G.G. v. Gloucester County School Board*, *supra*. *See* PI Memo. at 12 (asserting that *G.G.* "compels" conclusion that plaintiffs will succeed on Title IX claim); *id.* at 17 (asserting that *G.G.* "triggers heightened equal protection scrutiny"). The ACLU badly misreads that decision, however.

First, contrary to the ACLU's claims, *G.G.* did not "hold" that "Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity." PI Memo. at 12. Indeed, *G.G.* did not interpret Title IX's statutory prohibition on "sex" discrimination in federally funded educational programs at all. Rather, *G.G.* addressed a *regulation* under Title IX concerning sex-separated "toilet, locker room, and shower facilities," and concluded that a DOE opinion letter purporting to clarify how the regulation applies to transgender students should receive *Auer* deference. *See G.G.*, 2016 U.S. App. LEXIS at *17-*28 (considering only whether DOE letter concerning 34 C.F.R. § 106.33 should receive deference under *Auer v. Robbins*, 519 U.S. 452 (1997)).

*G.G.*, moreover, did not even address whether the school board policy at issue in that case—or any other policy, for that matter—constituted "sex discrimination" in

violation of Title IX itself. And since *G.G.* failed even to reach the question whether the school board policy violated Title IX itself, it is clear that *G.G.* cannot stand for the proposition that the ACLU attribute to it. Rather, for the reasons stated in Intervenor-Defendants' proposed answer and counterclaims, the plain language of Title IX establishes that sex-separated public facilities of the kind regulated by HB2 do *not* constitute "sex discrimination" under Title IX." *See* Prop. Answer and Counterclaims [Doc. 36], at ¶¶ 117-20; 20 U.S.C. § 1681 *et seq*.

Instead of reaching any holding under Title IX itself, *G.G.* remanded to the district court for further consideration of the plaintiffs' motion for preliminary injunction based on DOE's regulation. *Id.* at *37 (vacating denial of preliminary injunction and remanding for further "consideration of G.G.'s evidence"). And *G.G.*, of course, expressly declined to address the Equal Protection Clause. *See id.* at *14 n.3 (stating that "[w]e will not proceed to the merits of G.G.'s equal protection claim on appeal without the benefit of the district court's prior consideration").

Second, *G.G.* limited its holding to the specific school-board policy at issue in that case. *See id.* at *9 (quoting policy that "male and female restroom and locker room facilities … shall be limited to the corresponding biological genders" and allowing provision of "alternative appropriate private facilit[ies]" to "students with gender identity issues"). That is significant because, unlike HB2, that policy did not provide any specific *criteria* governing the use of public multi-occupancy facilities by persons with gender identity issues. In particular, unlike HB2, the policy did not address whether persons

who had undergone sex re-assignment surgery could use public facilities corresponding to their revised birth certificate. *See id.* at *23 (noting "[i]t is not clear to us how the regulation would apply" where "a transgender individual … had undergone sex-reassignment surgery"); *cf.* N.C. Gen. Stat. § 130A-118(b)(4) (providing for alteration of "sex" on North Carolina birth certificates "because of sex reassignment surgery").

Third, contrary to the ACLU's argument, *G.G.* expressly limited its opinion to restroom use and disavowed any view on the soundness of the agency interpretation as applied to other facilities, such as locker rooms or showers. *See G.G.*, 2016 U.S. App. LEXIS at *7 n.2 (noting "[o]nly restroom use is at issue in this case" and refusing to address "use of the boys' locker room"). The ACLU's memorandum flatly contradicts this key limitation on *G.G.*'s holding. *See* PI Memo. at 14 (claiming that *G.G.* "applies with equal force to 'changing facilities,' such as locker rooms"). Going far beyond anything contemplated in *G.G.*, the ACLU's motion explicitly urges that its interpretation of Title IX should apply across the board to "'restrooms, locker rooms, shower facilities, housing, athletic teams, and single-sex classes.'" *Id.* at 15 (quoting 2016 DOE Letter, at 2).

Fourth, *G.G.* specifically noted that there was no *constitutional* challenge to the agency's interpretation of the Title IX regulation at issue there. *See G.G.*, 2016 U.S. App. LEXIS at *32 (affording deference "where there is no constitutional challenge to the regulation or agency interpretation"). In sharp contrast, here Intervenors have raised numerous constitutional challenges to the interpretation of Title IX on which the ACLU

relies. *See, e.g.,* Prop. Answer and Counterclaims [Doc. 36], at ¶¶ 124-25, 128-30 (showing that ACLU's interpretation would render Title IX unconstitutional because it would require States to "violate persons' constitutional rights to bodily privacy and parents' constitutional rights to direct the education and upbringing of their children," constitute an "unconstitutional commandeering of state property and lawmaking processes," and violate the Spending Clause and the Tenth Amendment).

In sum, *G.G.* does not remotely "compel" a victory for the ACLU on its Title IX or its constitutional claims. To the contrary, the decision raises as many legal questions as it answers—including constitutional questions raised by the Intervenors in this case.[2]

### B. Even accepting the ACLU's reading of G.G., their likelihood of success on the merits depends on factual issues on which a hearing and fact-finding are needed—as G.G. itself makes clear.

Even if the ACLU's interpretation of *G.G.* were correct, that alone would not establish a likelihood of success on the merits on any of its claims. For the ACLU's likelihood-of-success arguments also depend upon a number of highly contestable—and contested—positions on factual issues, issues that the Court and the parties are entitled to test before any preliminary injunction could issue.

---

[2]    The ACLU's equal protection and due process claims—which the ACLU says it is also likely to win on the merits—rest upon even weaker legal footing. The ACLU's legal arguments on those claims have already been rebutted at paragraphs 81-113 of Intervenor-Defendants' Answer and Counterclaims. Doc. 54. For the sake of brevity, those points are incorporated here by reference. Intervenors also agree with Governor McCrory's analysis of the ACLU's claims in his response. *See* Doc. 55, at 2-19. However, Intervenors believe it makes more sense for the Court to conduct the discovery and hearing described in this brief and in the Governor's motion for expedited discovery before resolving the legal issues discussed in the ACLU's motion and the Governor's response on the merits.

13

1. **The ACLU's claims depend on the contested assumption that there is no legitimate factual basis for distinguishing between persons who have complied with the requirements for changing their birth certificates and those who have not.**

One obvious distinction between this case and *G.G.* is that the policy at issue there of barring students from single-sex facilities not matching the students' birth sex applied across-the-board to *all* gender dysphoric individuals. HB2, by contrast, is more nuanced: it bars only a *subset* of those individuals from single-sex facilities not matching their birth sex, namely, those who have not complied with the requirements for changing their birth certificates, including sex reassignment surgery. *See* N.C. Gen. Stat. § 115C-521.2; N.C. Gen. Stat. § 130A-118(b)(4). Thus, it is inaccurate as a matter of law to say, as the ACLU repeatedly does, that HB2 "discriminates against transgender individuals" (PI Memo. at 17-21) or on the basis of "transgender status" (*id.* at 22, 26).

In fact, rather than discriminating *against* anyone, HB2 could at most be said to implicitly distinguish *among* gender dysphoric individuals based on whether or not they have taken the necessary steps to have their birth certificates altered, as North Carolina law allows them to do. Indeed, the ACLU itself recognizes this point when it complains (at 26) that HB2 "discriminates against those [transgender individuals] who ... do not 'complete' gender transition."

But this raises both a legal and a factual question. The legal question is whether there is any material difference between individuals who have completed the requirements for changing the sex listed on their birth certificates and those who have not. The answer is a resounding "yes": Under North Carolina law—which obviously

14

applies to the vast majority of transgender individuals residing in North Carolina—one can change the sex on his or her birth certificate only through sex reassignment surgery. *See* N.C. Gen. Stat. § 130A-118(b)(4).

This in turn raises a fact question that lies at the heart of the ACLU's motion: Does the fact that one has undergone sex reassignment surgery make any difference to the privacy or safety of others who may be using a particular shower, changing room or bathroom? The ACLU obviously believes it does not make a difference. But common sense suggests the ACLU is wrong—that, for example, women and girls using a female communal shower are much more likely to feel unsafe, and to feel that their privacy is invaded, by the presence in that same shower of someone displaying mature male sex organs.[3] Indeed, common sense suggests that women and girls in that situation are *in fact* at greater physical or psychological risk.[4] And before the Court decides whether to issue

---

[3]     *See, e.g.*, Jeanne Murphy, et al., *"They Talk Like That, But We Keep Working": Sexual Harassment and Sexual Assault Experiences Among Mexican Indigenous Farmworker Women in Oregon*, 17 J. Immig. And Minority H. 1834, 1835 (2015) (noting women may avoid using the bathroom when they fear sexual assault).

[4]     A good deal of evidence also supports that conclusion. *See, e.g.*:

- Melody Wood, *6 Men Who Disguised Themselves as Women to Access Bathrooms*, The Daily Signal (Jun. 3, 2016), available at: http://dailysignal.com/2016/06/03/6-examples-highlight-serious-problems-with-obamas-bathroom-rule/;

- Marc A. Thiessen, *Yes, we should protect transgender people but we're going about it in a dangerous way*, American Enterprise Institute, Washington Post (May 16, 2016), available at: https://www.washingtonpost.com/opinions/yes-we-should-protect-transgender-people-but-not-by-opening-restrooms-to-predators-who-pretend-to-be-transgender/2016/05/16/3a9713ce-1b76-11e6-b6e0-c53b7ef63b45_story.html;

- Warner Todd Houston, *Top Twenty-Five Stories Proving Target's Pro-Transgender Bathroom Policy Is Dangerous to Women and Children*, Bretibart.com (Apr. 23, 2016),

a preliminary injunction in the ACLU's favor, the Intervenors and other defendants, in fairness, should have an opportunity to establish those common-sense conclusions through appropriate evidence.

The ACLU's contention that the sex listed on one's birth certificate is an "inaccurate proxy" for one's sex (and hence an arbitrary and irrational line for the state to draw, see PI Memo. at 33) also raises numerous medical and scientific issues concerning biology, genetics, and human sexual development—as demonstrated by the ACLU's own expert reports. For example, on the basis of expert *ipse dixit*, the ACLU asserts that "gender identity" is a fixed, core feature of a person's "sex" and trumps all other sex-related characteristics. PI Memo. at 25 ("Gender identity serves as the core of sex—not genitalia or gonads or any other sex-related characteristic."); *see also, e.g.,* Adkins Decl. at ¶¶ 15 (asserting that "gender identity refers to a person's inner sense of belonging to a particular gender, such as male or female"); *id.* at ¶ 23 (asserting that, "[f]rom a medical perspective, the appropriate determinant of sex is gender identity"); *id.* at ¶ 30 (asserting that gender identity is "fixed, cannot be changed by others, and is not undermined or

---

available at: http://www.breitbart.com/big-government/2016/04/23/twenty-stories-proving-targets-pro-transgender-bathroom-policy-danger-women-children/;

- Ben Johnson, *Man strips in front of girls in locker room, says transgender law allows it*, LifeSiteNews (Feb. 18, 2016) available at: https://www.lifesitenews.com/news/man-strips-in-front-of-girls-in-swimming-pool-locker-says-transgender-law-a;

- Peter Balinski, *Sexual predator jailed after claiming to be 'transgender' to assault women in shelter*, LifeSiteNews (Mar. 4, 2014), available at: https://www.lifesitenews.com/news/sexual-predator-jailed-after-claiming-to-be-transgender-in-order-to-assault.

altered by the existence of other sex-related characteristics that do not align with it"). Intervenors are entitled to, and will, contest this controversial worldview as a matter of sound medicine, psychology, physiology, and human sexual development.

The ACLU's attack on HB2's distinction between individuals who have completed the steps necessary to change their birth certificate and those who have not also relies upon highly debatable factual assumptions on other matters. For example, the ACLU's positions in both its Title IX and constitutional claims rely upon debatable factual assumptions regarding the only appropriate treatment for persons suffering from gender dysphoria (namely, social transitioning, followed by hormone therapy and sometimes by surgery), as well as dire predictions about the costs of not following plaintiffs' preferred approach. *See* PI Memo. at 38-39; *see also, e.g.,* Adkins Decl. at ¶ 27 (asserting that "[m]edical science" has "recognized that the treatment appropriate" for such individuals is "through supporting outward expressions of the person's gender identity and bringing the body into alignment with that identity to the extent deemed medically appropriate"); *id.* at ¶ 34 (asserting that, "[w]ith the exception of some serious childhood cancers, gender dysphoria is the most fatal condition I treat because of the harms that flow from not properly recognizing gender identity"). Here again, Intervenors and the other defendants are entitled to, and will, contest plaintiffs' narrow and inflexible view about the range of appropriate treatments for gender dysphoria, as a matter of sound medicine, psychology, physiology, and human sexual development.

In short, Intervenors and the other defendants are entitled to develop a detailed, comprehensive factual record on all of these matters in order to demonstrate the reasonableness—and more—of linking access to sex-segregated public facilities to the sex on a person's birth certificate. Such a record will allow the Court to better assess the ACLU's likelihood of success on both its Title IX claim and its constitutional claims.

> 2.    **More generally, the ACLU's claims depend on the factual assertion that HB2 does not advance, or sufficiently advance, North Carolina residents' expectations of bodily privacy in communal shower, locker room and bathroom facilities.**

Another more general factual issue that must be resolved before any decision on a preliminary injunction is whether and to what extent the challenged features of HB2 serve the State's interest in protecting North Carolina residents' legitimate expectation of bodily privacy in communal shower, locker room and bathroom facilities. The ACLU, of course, asserts that HB2 "is neither rationally nor substantially related to an interest in privacy." PI Memo. at 30. And the ACLU has submitted evidence purporting to establish that conclusion. *Id.* at 31. In fairness, Intervenors and the other defendants should be given an opportunity to rebut that evidence and, in so doing, establish that HB2 does indeed protect legitimate interests in bodily privacy.

Among other things, that evidence will establish that people's legitimate interest in bodily privacy includes not just a desire to avoid having private areas of their own bodies *seen* by people with anatomies characteristic of the opposite sex, as the ACLU's analysis naively assumes. *See id.* The expectation of bodily privacy, the evidence will show, also includes a desire to avoid being *confronted* by persons with genitalia characteristic of the

18

opposite sex using those same communal facilities. For reasons already explained, HB2 clearly protects that aspect of the right to privacy as well. As the evidence will also show, HB2 protects both aspects of privacy far more effectively than the ACLU's own proposal—that is, to force people who feel vulnerable or distressed about displaying their private parts to people of the opposite sex to change in bathroom stalls rather than in the more open changing rooms. *See* PI Memo. at 31 (asserting that "any individual who does not wish to be undressed in front of others … can simply use a restroom stall to change").

The ACLU's legal arguments on this point are also meritless. For instance, contrary to the ACLU's argument, the Fourth Circuit in *G.G.* did not "reject" the validity of privacy concerns in general. To the contrary, the Court "agree[d]" that an individual has "'a legitimate and important interest in bodily privacy such that his or her nude or partially nude body, genitalia, and other private parts' are not involuntarily exposed." *G.G.*, 2016 U.S. App. LEXIS 7026 at *27 (quoting *id.* at *62 (Niemeyer, J., concurring in part and dissenting in part)). The court simply thought the record *in that case* did not bear out any privacy concerns with respect to the plaintiff's own use of the school bathrooms at issue there. *See id.* at *27 n.10.

Finally, the ACLU's wholesale rejection of privacy concerns in this area as a mere stalking horse for racism is both offensive to the citizens of North Carolina and legally wrong. Numerous decisions—including decisions from the Fourth Circuit—recognize that individuals have a "constitutional right to privacy" that "includes the right to shield one's body from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty.*

*Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *see also, e.g., Doe v. Luzerne Cnty.,* 660 F.3d 169, 176–77 (3d Cir. 2011) (an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); *Beard v. Whitmore Lake Sch. Dist.,* 402 F.3d 598, 604 (6th Cir. 2005) ("Students of course have a significant privacy interest in their unclothed bodies"); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining that "[t]he right to bodily privacy is fundamental" and that "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample); *Lee v. Downs,* 641 F.2d 1117, 1119 (4th Cir. 1989) (recognizing that, even in the prison setting, the "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating"); *and see also generally United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) (observing that privacy in co-educational facilities remains "necessary to afford members of each sex privacy from the other sex"); *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993) (noting "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns"). Intervenors and the other defendants should be given a fair opportunity to establish, through appropriate evidence, that HB2 is appropriately tailored to protect that constitutional right.

3.    The ACLU's claims also depends on the factual assertion that HB2 does not advance, or sufficiently advance, the State's interest in protecting the safety of North Carolina residents.

The ACLU also denies that HB2 has "any connection" to safety.  PI Memo. at 28. But its erroneous arguments show, at a minimum, the need for factual development on this point as well.

For instance, the ACLU relies on blanket factual assertions that following its own preferred policy—namely of allowing unfettered access to restrooms and locker rooms based purely on anyone's subjective, internal sense of gender—will "cause no safety risks for others," and that consequently HB2 "has *no effect* on the safety of the general non-transgender population," and will in fact "greatly increase[ ] the risk of harassment and bodily harm for transgender North Carolinians."  Memo at 29-30 (emphasis added); *see also* Mull Decl. at ¶ 17 (stating that "I am aware of no evidence or information to support the notion that individuals will use non-discrimination ordinances to engage in, or justify, predatory or criminal behavior"); *but see, e.g.,* Melody Wood, *6 Men Who Disguised Themselves as Women to Access Bathrooms*, The Daily Signal (Jun. 3, 2016) , available  at:  http://dailysignal.com/2016/06/03/6-examples-highlight-serious-problems-with-obamas-bathroom-rule/.    These  are  sweeping  factual  assertions  that  deserve adversarial testing at a hearing.

Furthermore, the ACLU is plainly wrong that any safety concerns are "already comprehensively addressed through the criminal law."  PI Memo. at 29.  To the contrary, North Carolina is entitled to *prevent* criminal activity before it happens by enforcing a

21

sensible policy like HB2. After-the-fact punishment is notoriously ineffective at preventing crime—which is one of the things HB2 is designed to do. At a minimum, Defendants are entitled to develop and present evidence to show that a policy like the ACLU's "anything goes" approach would make preventative measures utterly unworkable.

Finally, the ACLU is again wrong that *G.G.* "rejected" any safety concerns in this area. That overstates what *G.G.* held and again ignores that *G.G.* came to the Fourth Circuit on a limited record. In fact, *G.G.* said only that the record *in that case* was "devoid" of any evidence demonstrating safety concerns caused by the plaintiff's use of the boys' restroom. 2016 U.S. App. LEXIS 7026 at *28 n.11. Intervenors and the other defendants are entitled to develop and present a more robust record on this issue to demonstrate how a law like HB2 actually promotes and protects safety.

## II. The Court should hold a hearing and make findings on the critical factual issues raised by the ACLU's arguments on the other preliminary injunction factors.

The ACLU's arguments on the remaining preliminary injunction factors—irreparable harm, balance of harms, and public interests—also raise numerous unresolved fact issues that require exploration through discovery and a hearing.

### A. *Plaintiffs' claims of irreparable injury raise factual issues that require an opportunity for discovery and a hearing.*

As to irreparable injury, the ACLU claims that HB2 "risks actual and imminent harms" to the individual plaintiffs—such as physical and emotional harm from being forced to "avoid[ ] public restrooms altogether"; possible adverse effects on their jobs,

court access, or travel by being forced to "avoid use of government buildings and other public facilities"; and harm from being forced to "disclose their transgender identity to others in and around bathrooms that they use." PI Memo. at 40-41. On their own terms these claims are inadequate to establish the kind of imminent and irreparable harm justifying entry of a preliminary injunction; and, at a minimum, the claims require substantial factual development before the Court can properly rule on them.

First, the ACLU's broad claim of "imminent" harm from HB2 is not credible. The ACLU first filed this action on March 28, 2016, and then waited *seven* weeks before seeking a preliminary injunction on May 16. If the irreparable harms allegedly threatened by HB2 were as "imminent" as the ACLU claims, one would have expected Plaintiffs to immediately seek a preliminary injunction, or at least a temporary restraining order, when they filed their complaint. They did neither, casting serious doubt on the "imminence" of any claimed harms. *See, e.g., Static Control Components, Inc. v. Future Graphics, LLC,* 2007 U.S. Dist. LEXIS 36474, *7 (M.D.N.C. May 11, 2007) (noting that a six to nine week delay can weigh against showing of irreparable harm); *see also Caribbean Marine Services Co., Inc. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988) (noting requirement of immediate threatened injury); *Wagner v. Atlas Tri-State SPE, LLC*, 2011 U.S. Dist. LEXIS 157275, *19 (N.D. W.Va. Nov. 1, 2011) (same). In any event, the timing of the preliminary injunction motion belies any claim by the ACLU that a reasonable discovery period is somehow inappropriate.

Second, the fundamental premise of the ACLU's irreparable harm argument—that HB2 *forces* the plaintiffs and others like them to use restrooms that do not correspond to their "gender identity"—is flawed as a matter of fact and law. As a matter of law, HB2 makes express provision for public buildings to employ single-use restrooms that are open to people of any "gender identity" or "expression." 2016 N.C. Sess. Laws 3, to be codified as N.C. Gen. Stat. §§ 115C-521.2(c); 143-760(c). But HB2 forces no one to use any particular restroom; it simply forbids people from using *multiple-occupancy* facilities that are inconsistent with their biological sex. And as a matter of fact, the ACLU makes no attempt to show that such single-use restrooms are so rarely available in government building or other public facilities (such as the Department of Motor Vehicles or North Carolina rest areas) that HB2 necessarily forces anyone to use a multiple-occupancy restroom out of alignment with their "gender identity." *See, e.g.,* McGarry Decl. at ¶¶ 30, 31 (claiming inability to use public restrooms at DMV and North Carolina rest areas, without addressing availability of single-user facilities). Indeed, the lead plaintiff in this case, Joaquìn Carcaño, admits that a "single-occupancy restroom" is currently available in the same building where Carcaño works. Carcaño Decl. at ¶ 20. In any event, at a minimum the ACLU's claims of irreparable harm demand significant development of the record before the Court can properly rule on them.

Third, the ACLU's assertion—which is also central to its due process claims—that HB2 necessarily violates plaintiffs' privacy by requiring them to involuntarily disclose their "transgender identity," PI Memo. at 41, is also flawed as a matter of fact and law.

As a matter of law, as already explained, HB2 expressly encourages accommodations for those in plaintiffs' position through single-occupancy restrooms, and therefore does not force anyone to use a restroom out of alignment with their gender identity. Moreover, even assuming that HB2 might in some cases result in disclosure of personal information about a person's gender identity issues, that information is not of the type that could or would trigger constitutional scrutiny under the Due Process Clause. *NASA v. Nelson*, 562 U.S. 134, 149-50 (2011) (examining history and tradition to determine scope of right to privacy); *Whalen v. Roe*, 429 U.S. 589, 602 (1977) (noting certain types of disclosures certain types of disclosures "do[] not automatically amount to an impermissible invasion of privacy."). Hence, it is unclear why such disclosure could constitute irreparable harm for purposes of a preliminary injunction. That is particularly true here, where the ACLU has brought a highly-publicized lawsuit in the individual plaintiffs' own names, with declarations that showcase their color photographs. *See* Carcaño Decl. at ¶ 4 ("Below is a color photograph of me."); McGarry Decl. at ¶ 3 (same); H.S. Decl. at ¶ 3 (same).

Furthermore, the plaintiffs' own allegations raise serious factual and legal questions about the nature of the "harm" alleged here, and whether it is "irreparable." For instance, in Carcaño's own declaration Carcaño admits to adopting a male first name about 18 months ago (in January 2015) and to beginning to use the men's restroom only about six or seven months ago (in late 2015). *See* Carcaño Decl. at ¶¶ 11, 15, 23. At a minimum, this raises the factual question of why using a women's restroom is really "no longer an option" for Carcaño, and the concomitant legal question of why this relatively

recent shift from the women's to the men's restroom can support a claim of irreparable harm. In any event, at a minimum these kinds of questions should be developed through discovery and explored at a hearing before the Court can properly rule on them.

### B. Plaintiffs' claims as to the balance of harms and the public interest likewise raise factual issues requiring discovery and a hearing.

The ACLU's arguments about the balance of harms and the public interest raise similar, and similarly troubling issues—issues that likewise require further factual exploration through discovery and a hearing.

For instance, the ACLU blithely claims that there are "not any adequate countervailing interests" supporting enforcement of HB2 during adjudication of their claims. PI Memo. at 43. But that argument depends on the ACLU's broad assertion that "hundreds of jurisdictions … across the country" have allowed use of public restrooms in accordance with "gender identity," and not biological sex, and have done so "without any increase in public safety events." *Id.* At a minimum, Intervenors are entitled to test that sweeping generalization with countervailing evidence. *See, e.g.,* note 4, *supra.*

Moreover, the ACLU's position in this case expressly extends—not only to restrooms—but also to "'locker rooms, shower facilities, housing, athletic teams, and single-sex classes.'" PI Memo. at 15 (quoting 2016 DOE Letter, at 2). This raises serious factual questions about whether the magnitude of any harm suffered by the plaintiffs, if HB2 remains in effect, is outweighed by the harms to privacy, dignity, and safety that may be suffered by others if the Court preliminarily enjoins its enforcement and, in so doing, adopts the ACLU's theories.

26

For similar reasons, the ACLU's contention that a preliminary injunction would be in the public interest is also flawed as a matter of law. An injunction that threatens substantial harm to large segments of the public while mitigating harm to the plaintiffs that is speculative, at best, clearly would *not* be in the public interest. *See, e.g., Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 525 (4th Cir. 2003) (noting that "[t]he traditional office of a preliminary injunction is to protect the status quo"); *N.C. State Conf. v. McCrory,* 2016 U.S. Dist. LEXIS 5151, *69 (M.D.N.C. Jan. 15, 2016) (examining public interest considerations). At a minimum, the Court will not be in a position to reach such a conclusion until the Intervenors and other defendants have been given an opportunity to test the ACLU's evidence on these points, and this Court has had an opportunity to evaluate that evidence for itself.

III. **The Court should provide the parties adequate opportunity to develop the necessary evidence, test each other's evidence, and present it to the Court.**

As the above discussion shows, the ACLU's motion raises profound factual issues about a wide range of issues, including issues as fundamental as the very concepts of sex and gender, the proper treatment of gender dysphoria, the nature of bodily privacy, and the risks to both privacy and safety posed by the ACLU's preferred policy toward communal bathrooms, locker rooms and showers, which would allow anyone to access those intimate public facilities based on their self-identified sense of gender and nothing more. Intervenors intend to vigorously contest the ACLU's positions on each of these issues.

However, to provide the kind of factual record this Court needs to render a sound decision on issues of such grave importance to the State and the Nation, Intervenors and the other defendants who choose to address them will need a reasonable amount of time. That includes the time necessary to locate and consult with the appropriate expert and fact witnesses, the time necessary to depose the expert and fact witnesses who have already appeared on the ACLU's behalf, and the time necessary to present coherently all of the resulting evidence to this Court. The ACLU has already had months—perhaps years—to recruit experts and other witnesses and to develop the evidence it believes it needs to support its position in court. It is only fair that Intervenors and the other defendants be provided a reasonable time to do the same.

Intervenors therefore propose the following general timetable for future proceedings on the ACLU's motion, which is identical to the timetable proposed by Governor McCrory:

1. Forty-five (45) days for disclosure of experts witnesses, along with expert reports, and the identity and contact information of any fact witnesses;
2. Sixty (60) days thereafter for deposing all witnesses (both expert and fact);
3. Fifteen (15) days following the conclusion of expedited discovery for plaintiff to file and serve any supplemental briefing in support of their motion for preliminary injunction;
4. Thirty (30) days following the conclusion of expedited discovery for defendants to file and serve any supplemental briefing in opposition to plaintiffs' motion for preliminary injunction; and
5. Five (5) days for the hearing on plaintiffs' motion for preliminary injunction.

This schedule is similar to—indeed, more expedited than—the schedules adopted by this Court and other federal district courts in resolving contested motions for preliminary injunctions. *See, e.g, Raza v. City of New York*, 998 F. Supp. 2d 70 (E.D.N.Y. 2013) (eight to nine months of discovery in preparation for preliminary injunction hearing). Such a schedule will provide for a reasonably prompt resolution of the ACLU's motion. At the same time, the proposed schedule will protect the ability of the Intervenors, the other defendants and the Court to test the implausible factual premises on which the ACLU's motion depends.

## CONCLUSION

For all these reasons, the ACLU's motion for preliminary injunction should be denied. At a minimum, before a decision on that motion is reached by this Court, Intervenors and the other defendants should be given a fair opportunity to rebut the remarkable factual assertions on which the ACLU's motion rests.

Respectfully submitted,

By: /s/ S. Kyle Duncan
S. KYLE DUNCAN* (DC Bar #1010452)
  *Lead Counsel*
GENE C. SCHAERR* (DC Bar #416638)
SCHAERR | DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC 20006
202-714-9492; 571-730-4429 (fax)
kduncan@schaerr-duncan.com
*Appearing under Local Civil Rule 83.1(d)*

By: /s/ Robert D. Potter, Jr.
ROBERT D. POTTER, JR. (NC Bar #17553)
ATTORNEY AT LAW
2820 Selwyn Avenue, #840
Charlotte, NC 28209
704-552-7742
rdpotter@rdpotterlaw.com

*Attorneys for Intervenor-Defendants*

29

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ S. Kyle Duncan
S. Kyle Duncan
*Attorney for Intervenor-Defendants*