# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; H.S., by her next friend and mother, KATHRYN SCHAFER; ANGELA GILMORE; KELLY TRENT; BEVERLY NEWELL; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, | No. 1:16-cv-00236-TDS-JEP |

*Plaintiffs,*

v.

PATRICK MCCRORY, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA; and W. LOUIS BISSETTE, JR., in his official capacity as Chairman of the Board of Governors of the University of North Carolina,

*Defendants,*

and

PHIL BERGER, in his official capacity as President *pro tempore* of the North Carolina Senate; and TIM MOORE, in his official capacity as Speaker of the North Carolina House of Representatives,

*Defendants-Intervenors.*

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT.......................................................................................................... 2

I.  Plaintiffs Are Likely to Succeed on Their Title IX Claim ...................................... 2

    A.  Plaintiffs' Claims Against the UNC Defendants are Justiciable.................. 2

        1.  UNC is Subject to H.B. 2's Discriminatory Mandate, Is
            Empowered to Implement that Mandate, and Has Done So ............. 3

        2.  Plaintiffs Have Standing to Bring Their Title IX and
            Constitutional Claims Against the UNC Defendants......................... 6

        3.  The UNC Defendants Are Not Immune From Plaintiffs'
            Constitutional Claims......................................................................... 8

    B.  The Fourth Circuit's Ruling in *G.G.* Governs Plaintiffs' Title IX
        Claim ...................................................................................................... 10

II.  Plaintiffs Are Likely to Succeed on Their Equal Protection Claim ...................... 13

    A.  H.B. 2 Must Be Tested Under the Rigors of Heightened Scrutiny ............. 13

        1.  *G.G.* Confirms that H.B. 2 Employs a Sex-Based
            Classification .................................................................................... 13

        2.  Discrimination Against Transgender Individuals Is Sex-
            Based ................................................................................................. 14

            a.  Sex Stereotyping ................................................................. 14

            b.  Gender Identity and Transgender Status............................... 18

            c.  Gender Transition................................................................. 20

        3.  Discrimination Based on Transgender Status is Subject to
            Heightened Equal Protection Scrutiny ............................................. 21

i

B.     H.B. 2 Fails Any Level of Scrutiny ............................................................ 23

      1.     Discrimination Against Transgender Individuals Does Not
          Promote Safety ................................................................................ 24

      2.     Discrimination Against Transgender Individuals Cannot
          Be Justified by Invocations of Privacy ............................................. 29

III.    Plaintiffs Are Likely to Succeed on Their Due Process Claims ............................ 33

A.     Plaintiffs Are Likely to Succeed in Proving that Provisions of
H.B. 2 Violate Their Constitutional Right to Privacy .................................. 33

B.     Plaintiffs Are Likely to Succeed in Proving that Provisions of
H.B. 2 Violate Their Due Process Right to Avoid Forced
Surgical Treatment ...................................................................................... 38

IV.    Plaintiffs Satisfy the Other Preliminary Injunction Factors ................................... 39

CONCLUSION ............................................................................................................. 43

CERTIFICATE OF SERVICE

# INTRODUCTION

Underneath the inflammatory rhetoric in the legislative record, and the ominous speculation about criminals and predators in Defendants' briefs,[1] are the transgender people—including three young plaintiffs—who were quietly going about their lives, participating in and contributing to civil society before House Bill 2 ("H.B. 2") targeted them. Now, these plaintiffs and other transgender North Carolinians face the impossible choice of subjecting themselves to harassment and violence by using facilities plainly inconsistent with their gender; physical harm from not being able to use public restrooms to perform one of life's most basic functions; or violation of the law and their schools' policies and any consequences that follow. In essence, Plaintiffs' request for preliminary relief is about restoring the security, normalcy, and dignity that they—along with everyone else—possessed before H.B. 2 branded them as outcasts by expelling them from the public spaces they previously used without incident. In addition to suffering irreparable harm if an injunction does not issue, Plaintiffs are likely to succeed on the merits, the balance of hardships is in their favor, and the injunction sought is in the public interest. The Court should thus enter an order preliminarily enjoining Part I of H.B. 2.

---

[1] In response to Plaintiffs' motion for preliminary injunction (ECF No. 21) and supporting memorandum (ECF No. 22, or "Pl. Mem."), separate responses were filed by Governor McCrory ("Governor") at ECF No. 55 ("Gov. Opp."), the University of North Carolina ("UNC") Defendants at ECF No. 50 ("UNC Opp."), and Defendants-Intervenors ("Intervenors") at ECF No. 61 ("Int. Opp."). Except where otherwise specified, "Decl." (*e.g.*, "Mull Decl.") refers to declarations submitted with Plaintiffs' opening brief (ECF Nos. 22-1 *et seq.*), "Reply Decl." (*e.g.*, "McGarry Reply Decl.") refers to declarations submitted contemporaneously herewith, and exhibit numbers (*e.g.*, Ex. _) refer to exhibits to the Reply Declaration of Luke C. Platzer submitted contemporaneously herewith.

1

## ARGUMENT

## I. Plaintiffs Are Likely to Succeed on Their Title IX Claim.

### A. Plaintiffs' Claims Against the UNC Defendants are Justiciable.

After making clear that they are subject to H.B. 2, the UNC Defendants now argue that the claims against them are not justiciable because, they contend, H.B. 2 imposes no new obligation on UNC, UNC has no power to enforce H.B. 2, and UNC has taken no steps to implement the law. UNC Opp. at 8-23. These arguments are belied both by the law and by UNC's own statements and actions: UNC is subject to H.B. 2's discriminatory mandate, has taken steps to implement that mandate, and is required to do so not only by UNC's general obligation to comply with state law, but also by H.B. 2's express terms. UNC's carefully drafted representations should not be allowed to obscure what is actually happening: since the passage of H.B. 2, transgender individuals on UNC campuses have *not* been free to use the restrooms or locker rooms that correspond to their gender identity.

UNC administrators' evasive statements do not provide Plaintiffs with assurance that they can live, learn, and work in UNC's facilities without fear of discriminatory consequences. To the contrary, UNC has made clear that "the University *is required* to fulfill its obligations under the law unless or until the [C]ourt directs otherwise." ECF No. 38-5 at 2 (emphasis added). Such direction from this Court is precisely the remedy Plaintiffs seek and the remedy to which they are entitled. It follows that Plaintiffs' claims against UNC are plainly justiciable.

2

## 1. UNC is Subject to H.B. 2's Discriminatory Mandate, Is Empowered to Implement that Mandate, and Has Done So.

The UNC Defendants' response relies on a logically incoherent premise: that somehow UNC can fulfill its obligations under H.B. 2 while creating no actionable harm to Plaintiffs. But UNC itself has recognized that its "obligations" under H.B. 2 are clear, stating that UNC "must require every multiple-occupancy bathroom and changing facility to be . . . used only by persons based on their biological sex." ECF No. 38-5 at 1 (April 5, 2016 guidance from President Spellings); *see also* UNC Opp. Ex. B at 3 (April 13, 2016 letter from UNC General Counsel: "the University is specifically covered by H.B. 2 and is required as a public agency to comply with its applicable portions, including the provisions related to multiple-occupancy bathrooms and changing facilities"); N.C. Exec. Order 93 § 3 (ECF No. 23-24 at 3); N.C. Gen. Stat. § 143-760(a)(2), (b). This is precisely the discrimination that Plaintiffs are challenging.

The UNC Defendants' attempt to create some sort of distinction between "*the Act's* requirements" and "*the University's* position," UNC Opp. at 17, is untenable. If UNC is complying with H.B. 2, then H.B. 2's discriminatory mandate *is* its position, and it is inflicting actionable harm on Plaintiffs by excluding them from restrooms and other facilities consistent with their gender identity. And UNC has unequivocally stated that it *is* complying with H.B. 2. *See* ECF No. 38-5 at 2 (April 5: "the University is required to fulfill its obligations under the law unless or until the [C]ourt directs otherwise"); *id.* at 1 (directing constituent schools to "fully meet their obligations under the Act"); UNC Opp. Ex. A (April 11: "As a state institution, the University is bound to comply with HB2 and

3

all other laws passed by the General Assembly and signed by the Governor."); ECF No. 23-27 at 2-3 (May 9: "The Act remains the law of the State, however, and the University has no independent power to change that legal reality.").

The UNC Defendants offer three arguments to distract the Court from its actionable discrimination, but none is availing. First, they contend that UNC's nondiscrimination policies "remain unchanged." UNC Opp. at 18. But that is irrelevant for purposes of this litigation, because defendants nowhere assert that they will apply the nondiscrimination policy *instead of* H.B. 2. *See, e.g.*, UNC Opp. Ex. B. To the contrary, President Spellings' message that "the University is bound to comply with HB2" (UNC Opp. Ex. A) makes clear that any internal nondiscrimination policy is subservient to state law. That the UNC Defendants will continue to apply their nondiscrimination policies in *other contexts* does not render their compliance with H.B. 2 any less actionable.

Second, the UNC Defendants contend that they are without authority to enforce H.B. 2, because the law does not contain any specific provision for enforcement. UNC Opp. at 18. This argument is a red herring: H.B. 2 provides defendants all of the enforcement authority they need by directing that they "shall require every multiple occupancy bathroom or changing facility to be . . . only used by persons based on their biological sex." N.C. Gen. Stat. § 143-760(b). That the act does not specify the precise mechanism by which defendants "shall require" compliance does not obviate their obligation to do so. If the UNC Defendants' argument were taken to its logical conclusion, then UNC would be powerless to discipline students or employees who

4

violate any generally applicable law absent specific enforcement authority from the legislature. In any event, UNC has plenary authority to regulate conduct on its campuses. *See* N.C. Gen. Stat. § 116-11. Furthermore, as a factual matter, UNC has already assumed the ability to enforce state laws of general applicability: UNC-Greensboro and UNC-Chapel Hill both have codes of conduct that require compliance with state law and permit discipline for violating it.[2] *See* ECF No. 67-8 at 3 ("Students are responsible for observing . . . all federal and state laws"); ECF No. 67-9 at 7.

Third, the UNC Defendants contend that UNC has not taken any steps to actually implement H.B. 2's discriminatory mandate. UNC Opp. at 18. But President Spellings sent a memorandum to the chancellors of all constituent UNC schools instructing them that they "must" comply with H.B 2, including its discriminatory mandate regarding single-sex facilities. ECF No. 38-5 at 1. The memorandum further directs schools to "fully meet their obligations under the Act," including by "provid[ing] notice of the Act to campus constituencies as appropriate." *Id.* at 1-2. The record demonstrates that the schools complied with this directive, sending campus-wide emails regarding compliance with H.B. 2 that were personally received by Plaintiffs and that reiterated the applicability of H.B. 2's mandates. *See generally* ECF Nos. 67-5, 67-6, 67-11.

---

[2] Indeed, a key proponent of H.B. 2 has suggested that transgender people who violate H.B. 2 could be charged with trespass for using spaces consistent with their gender identity. ECF No. 67-7 at 7 (article by State Rep. Stam).

### 2. Plaintiffs Have Standing to Bring Their Title IX and Constitutional Claims Against the UNC Defendants.

The UNC Defendants' decision to comply with H.B. 2—including the steps that UNC has affirmatively taken to implement H.B. 2 where Plaintiffs live, learn, and work—is more than sufficient to establish an actual case or controversy as to whether UNC is violating Plaintiffs' rights under Title IX or the U.S. Constitution. Indeed, UNC's own statements admit that H.B. 2 creates a conflict between state and federal law. *See* ECF No. 23-28 (Chairman Bissette: "the University is . . . caught in the middle between state and federal law"); ECF No. 23-27 at 2 (President Spellings: "In ordinary circumstances, these obligations [of state and federal law] are not in tension."); UNC Opp. Ex. B at 3 (UNC General Counsel: "The University explained [to legislative staff] that H.B. 2's provisions could create tension with Title IX").

The UNC Defendants err in suggesting that they must actually physically bar or remove Plaintiffs from restrooms, or threaten to do so, for Plaintiffs to have standing. The Fourth Circuit's decision in *G.G. ex rel. Grimm v. Gloucester County School Board,* No. 15-2056, -- F.3d --, 2016 WL 1567467 (4th Cir. Apr. 19, 2016), shows why this argument is flawed. There, the school board passed a resolution requiring that single-sex facilities "be limited to the corresponding biological genders," and the Fourth Circuit held that sufficient to support a Title IX claim that plaintiff had been "excluded from participation in an education program," without an additional showing that the plaintiff himself was physically removed from the boys' restroom. 2016 WL 1567467, at *2, *4. H.B. 2's discriminatory mandate harms Plaintiffs by exposing them to stigma, physical

and psychological harm, the disclosure of private information about their transgender status, and the threat of physical violence. Given the UNC Defendants' avowed compliance with H.B. 2's mandate, it is no answer to assert that transgender individuals can resort to self-help by violating state law—and university policy—at their own peril.

Moreover, case law firmly establishes that even the UNC Defendants' litigating position—one that finds no support in its other conduct or statements—is insufficient to moot this controversy. "It is well established that a defendant's 'voluntary cessation of a challenged practice' moots an action only if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (quoting *Friends of the Earth, Inc. v. Laidlaw Evntl. Servs., Inc.*, 528 U.S. 167, 189 (2000)). And UNC bears a "'heavy burden'" in establishing otherwise. *Id.* (quoting *Friends of the Earth*, 528 U.S. at 189).

The cases cited by the UNC Defendants are factually inapposite. H.B. 2 is not an arcane law that lingers on the books, but rather the subject of numerous recent directives from the UNC Defendants, including direct communications to Plaintiffs. Although the UNC Defendants dismiss Plaintiffs' harms as mere "subjective" fear, university leaders have acknowledged that H.B. 2 serves objectively to exclude transgender individuals from full participation in the university community, stating, "We know [H.B. 2] has generated, and will continue to generate, concern and *concrete consequences* for our students, faculty, staff, and larger community." ECF No. 67-11 (emphasis added); *see also* ECF No. 67-5 at 2; ECF No. 67-6 at 3. This is precisely the type of harm that is

actionable under Title IX: when a university's policy "has a concrete, negative effect on the [plaintiff]'s ability to participate in an educational program or activity." *Jennings v. UNC*, 482 F.3d 686, 699 (4th Cir. 2007) (quotation marks and alterations omitted).

Finally, this Court should reject out of hand the UNC Defendants' attempts to absolve themselves of liability because Plaintiffs' injuries are ultimately rooted in a law passed by the legislature and signed by the governor. UNC Opp. at 20-21. The UNC Defendants are legally responsible for applying state law to UNC students and employees—a role that they have willingly taken up in promising to comply with H.B. 2. The UNC Defendants are not absolved from responsibility for constitutional or statutory violations merely because they are "just following orders." *Kennedy v. City of Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010) (quotation marks omitted); *see also Busche v. Burkee*, 649 F.2d 509, 517 (7th Cir. 1981). Taken seriously, the UNC Defendants' argument would effectively immunize *every* state officer from section 1983 liability for following unconstitutional state laws enacted by the legislature. In any event, that an injunction forbidding the UNC Defendants and their subordinates from enforcing H.B. 2 would suffice to redress H.B. 2's on-campus harms more than demonstrates that Plaintiffs have sued the correct defendants.

### 3. The UNC Defendants Are Not Immune From Plaintiffs' Constitutional Claims.

The UNC Defendants also contend that they are not the correct defendants under *Ex parte Young*, 209 U.S. 123 (1908), and thus that they enjoy sovereign immunity from

injunctive relief as to Plaintiffs' constitutional claims. UNC Opp. at 30-33.[3] While the UNC Defendants correctly note that a state officer amenable to suit under *Ex parte Young* must have a "specific duty" with regard to the law at issue, *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001), they err in assuming—without citation—that the Board of Governors and Chairman Bissette have no such role. To the contrary, the Board of Governors is "responsible for the general determination, control, supervision, management and governance of *all affairs* of the constituent institutions." N.C. Gen. Stat. § 116-11(2) (emphasis added). This is not a general authority to enforce all state laws, but rather a specific authority with regard to policies over the State's higher-education institutions. And Chairman Bissette not only chairs the Board of Governors but also has personally announced his and the Board's supervision of President Spellings's actions regarding H.B. 2, including specifically as they related to the interplay between "state and federal law." ECF No. 23-28.

The purpose of the *Ex parte Young* doctrine is to ensure that a defendant who is sued for a constitutional violation is one against whom injunctive relief would be effective. *See S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333-34 (4th Cir. 2008). The UNC Defendants offer no reason why an injunction as to the Chairman or the Board (or both)—who are empowered with plenary "control," "supervision," and "governance"

---

[3] The UNC Defendants' assertion of sovereign immunity applies only to Plaintiffs' constitutional claims. UNC Opp. at 29. Thus, even were this Court to rule that the UNC Defendants are entitled to sovereign immunity, Plaintiffs are still entitled to injunctive relief against UNC as to their Title IX claim.

over UNC, and have exercised such powers specifically as to this subject matter—could not suffice to redress H.B. 2's on-campus harms. For that reason, this Court should reject the UNC Defendants' claim of sovereign immunity.

### B. The Fourth Circuit's Ruling in *G.G.* Governs Plaintiffs' Title IX Claim.

The Fourth Circuit's binding decision in *G.G.* compels the conclusion that Plaintiffs are likely to succeed on the merits of their Title IX claim. The UNC Defendants do not challenge Plaintiffs' likelihood of success on their Title IX claim, other than by making the purely procedural arguments discussed above; they do not even reference *G.G.* or attempt to distinguish it. The UNC Defendants' waiver of any argument with respect to Plaintiffs' Title IX claim is an extraordinary, tacit admission that H.B. 2 is unlawful.

Intervenors attempt to step into the UNC Defendants' shoes and challenge on the merits Plaintiffs' likelihood of success on their Title IX claim, Int. Opp. at 10-13, but their attempts to distinguish *G.G.* are meritless. First, Intervenors remarkably assert that "*G.G.* did not 'hold' that 'Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity.'" Int. Opp. at 10. But that was its *verbatim* language: "At the heart of this appeal is whether Title IX requires schools to provide transgender students access to restrooms congruent with their gender identity." *G.G.*, 2016 WL 1567467, at *1. The Fourth Circuit squarely addressed this very issue and reversed the district court's dismissal of G.G.'s Title IX claim. *Id.* On remand, the district court also granted G.G.'s motion for a preliminary injunction. *G.G. v. Gloucester*

*Cty. Sch. Bd.,* No. 4:15-cv-00054 (E.D. Va. June 23, 2016) (ECF No. 69) (Ex. A).

The Fourth Circuit recognized that, unless a statutory or regulatory Title IX exception applied, the school board's exclusion of G.G., a transgender boy, from the boys' restroom would discriminate "on the basis of sex" in violation of Title IX. Therefore, the Fourth Circuit focused on whether a statutory or regulatory exception applied. *G.G.*, 2016 WL 1567467, at *4 (holding that "distinctions on the basis of sex" must qualify for an exception). If the school board policy did not discriminate "on the basis of sex" under Title IX's statutory language, there would have been no purpose in determining whether an exception applied. Furthermore, had the Court merely found a regulatory exception inapplicable—without resolving whether the policy discriminated on the basis of sex under Title IX's statutory language—it could not have held, as it did, that the plaintiff had stated a valid claim under Title IX. *Id.* at *1.

Second, there is no difference between the school board policy in *G.G.* and Part I of H.B. 2. Both condition access to facilities based on so-called "biological gender" or "biological sex" rather than gender identity. That H.B. 2 purports to limit its discrimination to "only a *subset*" of transgender individuals, Int. Opp. at 14, changes nothing. *See infra* Section II.A.2.a. Excluding transgender individuals who have not had genital surgery—which, incidentally, was true of G.G. himself and is true of the individual plaintiffs here—from facilities consistent with their gender identity violates Title IX, regardless of how H.B. 2 treats other transgender individuals.

Third, the *reasoning* of *G.G.* cannot be limited to restrooms, and that reasoning is

binding with respect to the public facilities (including restrooms) at issue here. Intervenors do not explain how the definition of "sex" under Title IX can fluctuate depending on whether an individual stands in a restroom versus a locker room. Int. Opp. at 10-12. And any such distinction would violate *G.G.*'s instruction that "sex" must be "construed uniformly throughout Title IX and its implementing regulations." 2016 WL 1567467, at *8.

Finally, Intervenors assert that the application of Title IX here is unconstitutional, but they refer only to *their answer* as support, thus failing to carry their burden to oppose Plaintiffs' motion. Int. Opp. at 13 (citing "Prop. Answer and Counterclaims [Doc. 36], at ¶¶ 124-125, 128-130"). Intervenors' brief also fails to provide any analysis explaining its assertion of unconstitutionality, thereby further waiving that argument. Merely reciting phrases such as "parents' constitutional rights," "Spending Clause," and "Tenth Amendment" provides nothing for this Court to analyze or for Plaintiffs to answer. Int. Opp. at 13. Such conclusory assertions without legal support are inadequate. *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006).[4] Nor can Intervenors' failure to provide *legal* analysis be excused by a purported need for *factual* discovery.

_____

[4] In any event, Intervenors' assertions in their answer that it is *unconstitutional* for the government to bar discrimination against transgender people in accessing facilities—as both Title IX and laws in numerous jurisdictions do—are meritless. Banning such discrimination does not violate the constitutional privacy rights of non-transgender people. *See infra* Section II.B.2. Nor does any parent have a constitutional right to insist that a school discriminate against students. *See Runyon v. McCrary*, 427 U.S. 160, 176-77 (1976); *Herndon ex rel. Herndon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174, 179 (4th Cir. 1996). Title IX does not "commander" state property or otherwise violate the Tenth Amendment. It is valid under both the Spending Clause and Section 5

**II.    Plaintiffs Are Likely to Succeed on Their Equal Protection Claim.**

**A.    H.B. 2 Must Be Tested Under the Rigors of Heightened Scrutiny.**

The Governor and Intervenors cannot escape the legal conclusion that H.B. 2 triggers heightened equal protection scrutiny, as it plainly amounts to discrimination on the basis of sex and transgender status.[5]

**1.    *G.G.* Confirms that H.B. 2 Employs a Sex-Based Classification.**

The Equal Protection Clause does not provide Plaintiffs with less protection from discrimination on the basis of sex than Title IX does.  Although *G.G.* was decided under Title IX, its underlying rationale leaves no room for this Court to chart a contradictory course as to whether "sex" has been taken into account under the Equal Protection Clause.[6]  Defendants fail to articulate how the exact same exclusionary treatment can logically be based on sex under Title IX but not under the Equal Protection Clause.

---

of the Fourteenth Amendment.  *See* Emily Martin, *Title IX and the New Spending Clause*, American Constitutional Soc'y Issue Brief (2012) (Ex. B).  And recipients of federal funds like UNC have clear notice that Title IX encompasses all forms of intentional sex discrimination, although notice is also not required for injunctive relief (in contrast to damages).  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175, 182-83 (2005); *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999).

[5] The Governor's asserted rationales for immunity (and the authorities he cites) apply only to a congressionally crafted waiver of immunity such as Title IX (which is not asserted against him); they thus have no relevance to Plaintiffs' constitutional claims.

[6] *G.G.*'s recognition that there was differential treatment "on the basis of sex" under Title IX's *statutory* language, *see supra* Section I.A, did not rest upon *Auer* deference.  Thus, the Fourth Circuit's opinion cannot be dismissed as merely reflecting the views of an agency and having no relevance to the equal protection question.  Defendants also concede that, even if "sex" were limited to external genitalia, as the dissent in *G.G.* argued, H.B. 2 nonetheless employs a sex-based classification that causes injury and thus triggers heightened scrutiny in any event.  *See* Pl. Mem. at 13 n.3 & 18.

To be sure, the government may attempt to *justify* a sex-based classification under heightened scrutiny, but that is a fundamentally different inquiry from whether there is a sex-based classification at all. The Governor's attempt to distinguish *G.G.* on the basis that it did not address locker rooms, for example, is a *non sequitur* response to the threshold question of whether H.B. 2 employs a sex-based classification.[7] The Governor conflates the question of what level of scrutiny applies with the application of that test to the discrimination at issue.

## 2. Discrimination Against Transgender Individuals Is Sex-Based.

### a. Sex Stereotyping

The Governor and Intervenors do not contest that all individuals are protected from discrimination based on sex stereotypes, but they instead attempt to draw arbitrary distinctions to limit that protection for transgender people. Gov. Opp. at 10.

The Governor first argues that protection against sex stereotyping extends only to gender nonconforming behavior, such as when a person "fail[s] to act" in conformity with social expectations. Gov. Opp. at 10. That makes no sense. If a tall woman with wide shoulders is fired from a job because she does not fit a physical stereotype of a woman, she has experienced discrimination because of sex, even though her "behavior" is irrelevant. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (describing

---

[7] The Governor also asserts in a footnote—without any analysis whatsoever—that the supposed "redefinition" of sex in *G.G.* violates the Administrative Procedure Act and the separation of powers. Gov. Opp. at 10 n.1. But the Fourth Circuit acted properly both in interpreting the language in a statute—a core judicial function—and in deferring to the agency's regulatory interpretation under *Auer. G.G.*, 2016 WL 1567467, at *4-9.

plaintiff's perceived gender nonconformity in appearance). Likewise, a transgender woman who does not conform to the physical characteristics expected of a woman is also protected against discrimination—regardless of which sex-related physical characteristics are targeted. *See, e.g.*, *Finkle v. Howard Cty.*, 12 F. Supp. 3d 780, 789 (D. Md. 2014) (holding that a transgender female stated a claim based on sex stereotyping where she stood 6'3", weighed 220 pounds, and had broad shoulders).

Intervenors then contest the very premise that H.B. 2 discriminates against transgender people: they insist that the law does not apply "across-the-board to *all* gender dysphoric individuals" but instead "bars only a *subset* of those individuals," who have not had "sex reassignment surgery." Int. Opp. at 14 (emphases in original). By that logic, an employer would not discriminate on the basis of race by laying off darker-skinned African-American employees so long as the employer retained lighter-skinned African-American employees. But "[i]t is the individual . . . who is entitled to the equal protection of the laws—not merely a group." *Mitchell v. United States*, 313 U.S. 80, 97 (1941); *see also Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (per curiam) (discrimination against women with children is still sex discrimination even if women without children were not discriminated against).

Moreover, reliance upon a surgical distinction hardly helps Intervenors, because it only exposes the sex-based expectation at issue. H.B. 2 attempts to discriminate against transgender people whose genital characteristics do not conform to what the government expects for men or women. For example, despite Mr. Carcaño's male gender identity, the

Governor views him as "still, *in actuality*" a woman, unless he obtains surgery to conform his genital characteristics to what the government expects of men. Gov. Opp. at 6 (emphasis in original). If the plaintiff in *Price Waterhouse* could not be coerced to "dress more femininely," 490 U.S. at 235, the government cannot insist that individuals go under the knife to conform to its gender-based expectations about their bodies.

The Governor also disagrees that the prohibition against sex stereotyping bars discrimination based on transgender status. But there is no principled distinction between the perceived gender nonconformity at issue in sex stereotyping cases like *Price Waterhouse* and the perceived gender nonconformity of transgender individuals. Courts may not "legitimize discrimination based on the plaintiff's gender non-conformity by formalizing the non-conformity into an ostensibly unprotected classification." *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004). A man like Mr. Carcaño does not satisfy H.B. 2's standard for maleness precisely *because* of the characteristics that define him as a transgender individual—the fact that, even though he has a male gender identity, he was assigned the sex of female at birth.

The Governor's and Intervenors' positions are contrary to "the weight of circuit authority concluding that discrimination against transgender individuals constitutes discrimination 'on the basis of sex.'" *G.G.*, 2016 WL 1567467, at *12 (Davis, J., concurring); *see also* Pl. Mem. at 21-22 (collecting cases). The Governor's reliance upon an anomalous case, *Etsitty v. Utah Transit Authority*, 502 F.3d 1215 (10th Cir. 2007), only reinforces the point. The Fourth Circuit did not follow *Etsitty* in *G.G.*, although the

school board asked it to do so. Brief of Appellee at 16, 24-25, *G.G.*, No. 15-2056 (4th Cir. Nov. 23, 2015) (ECF No. 47; 2015 WL 7565764). Other federal appeals courts have repudiated the authorities on which *Etsitty* relies, because its view that sex is limited to aspects of a person's biology or anatomy cannot be reconciled with *Price Waterhouse*. *See Smith*, 378 F.3d at 573 (holding that *Price Waterhouse* "eviscerated" those authorities); *Glenn v. Brumby*, 663 F.3d 1312, 1318 & n.5 (11th Cir. 2011) (same); *see also Schroer v. Billington*, 577 F. Supp. 2d 293, 305 (D.D.C. 2008) (rejecting the reasoning of *Etsitty*).

Recognizing that H.B. 2 discriminates on the basis of sex stereotyping does not lead to the Governor's hyperbolic fear that everything becomes a stereotype, and any person can use any restroom. Gender identity continues to anchor the definition of sex: the fact that a transgender boy can use the boys' restroom does not mean a non-transgender girl can also use the boys' restroom. The Fourth Circuit's holding in *G.G.* demonstrates that maintaining sex-separated facilities is not mutually exclusive with upholding nondiscrimination. Certainly, Defendants would agree that a non-transgender woman could not be barred from the women's restroom because she is deemed insufficiently feminine by some people. The same protection applies to a transgender woman. Furthermore, a woman (transgender or not) could not successfully invoke sex stereotyping to demand access to the men's restroom for an independent reason: differential treatment does not by itself create an injury in fact when it does not result in any unconstitutional stigma or tangible harm to the plaintiff. *Johnson v. U.S. Office of*

*Pers. Mgmt.*, 783 F.3d 655, 666 (7th Cir. 2015).  In sum, protecting against sex

stereotypes does not require ending sex-separated facilities.

### b.    Gender Identity and Transgender Status

The Governor asserts that the Equal Protection Clause protects only so-called

"biological sex" and thus does not protect gender identity.  This compounds legal errors

with factual errors.

First, *Price Waterhouse* conclusively rebuts Defendant's assertion as a matter of

law.  The plaintiff in that case was not denied partnership because of her chromosomes or

her genitalia; she was denied partnership because she failed to conform to what was

expected of a woman, without regard to whether that nonconformity was biological or

immutable.  490 U.S. at 235; *accord Glenn*, 663 F.3d at 1316; *Schwenk v. Hartford*, 204

F.3d 1187, 1201 (9th Cir. 2000).  The Fourth Circuit has similarly recognized that sex

discrimination is not limited to biology.  *Bauer v. Lynch*, 812 F.3d 340, 347 n.9 (4th Cir.

2016) ("Both biological and cultural differences can give rise to Title VII sex

discrimination.").  Like Title VII, the Equal Protection Clause also contains no biology-

based litmus test for its proscription against sex discrimination.[8]  *See J.E.B. v. Alabama*

*ex rel. T.B.*, 511 U.S. 127, 139 n.11 (1994); *Glenn*, 663 F.3d at 1317; *Smith*, 378 F.3d at

---

[8] Even if the Equal Protection Clause could be limited solely to external genitalia, H.B. 2
would not escape heightened scrutiny, given that H.B. 2 attempts to classify individuals
on precisely that basis, rather than gender identity.  As the Governor notes, "the Act itself
references one's biological sex."  Gov. Opp. at 11.  While genitalia-based restroom
classifications do not cause cognizable injury for non-transgender people, and thus do not
trigger heightened scrutiny as to them, as discussed above, the same cannot be said for
transgender individuals like Plaintiffs, for whom H.B. 2 causes substantial harm.

574.  And contrary to the Governor's bald assertion, many courts have recognized that gender identity is encompassed within protections against sex discrimination.  Pl. Mem. at 23-24.

Second, trying to carve out gender identity from the Equal Protection Clause on the grounds that it is not biological or immutable is also factually incorrect.  No Defendant rebuts Plaintiffs' showing: that medical evidence suggests a strong biological basis to an individual's gender identity, and that gender identity—regardless of its precise biological origins—is not subject to voluntary control.  Adkins Decl. ¶¶ 21-22, 28-34; *infra* Section II.A.3; *cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015) (recognizing that sexual orientation is immutable without opining on its origins). [9]

Third, the Governor's ruminations on "modern gender theory" do not provide a reason to wall off gender identity from sex-discrimination protections.  Gov. Opp. at 7.  The notion that some individuals may not express their gender in ways stereotypically expected of them is hardly groundbreaking.  *See Price Waterhouse*, 490 U.S. at 235.  And the notion that some individuals may "manifest a gender identity that otherwise defies traditional classification" is equally true with respect to anatomical sex-related characteristics.  Gov. Opp. at 7.  For example, there are intersex conditions where an individual has external genitalia typically associated with both males and females, and

---

[9] Indeed, the Governor attaches a newspaper article confirming that there are individuals whose gender dysphoria has persisted since childhood.  Gov. Opp. Ex. F at 2.  Those individuals are transgender.  Nowhere does the article suggest that those individuals may voluntarily change their gender identity or simply wish their gender dysphoria away.

where an individual's external genitalia changes during the lifespan. Adkins Decl. ¶¶ 28, 35-39; *G.G.*, 2016 WL 1567467, at *6 ("What about intersex individuals? What about an individual born with X-X-Y sex chromosomes? What about an individual who lost external genitalia during an accident?"). Indeed, genital characteristics manifest with sufficient variation that they are classified along a spectrum. Adkins Decl. ¶ 36. However, as the Governor's own materials point out with respect to gender identity, "[t]he gender binary works fine for most of us." Gov. Opp. Ex. D at 2. That is true of transgender individuals just as it is for non-transgender individuals.

### c. Gender Transition

The Governor admits that the only way for a transgender individual like Mr. McGarry to access the facilities consistent with his gender identity is if he "completes a transition" on terms dictated by H.B. 2. Gov. Opp. at 11. That requirement applies even if the surgery envisioned by H.B. 2 is medically inadvisable for a particular person. *Cf. De'lonta v. Johnson*, 708 F.3d 520, 523 (4th Cir. 2013) (recognizing that surgical treatment is only necessary for some).

Because the terms of what purportedly constitutes a "complete" transition are sex-based, this confirms that H.B. 2 discriminates on the basis of sex. *See Fabian v. Hosp. of Cent. Conn.*, No. 3:12-cv-1154, -- F. Supp. 3d --, 2016 WL 1089178, at *12 (D. Conn. Mar. 18, 2016) (holding that sex discrimination includes discrimination on the basis of sex-related considerations); *Lusardi v. McHugh*, No. 0120133395, 2015 WL 1607756, at *8 (EEOC Apr. 1, 2015) (holding that an employer may not "condition access to facilities

20

. . . on the completion of certain medical steps that the [employer] itself has unilaterally determined will somehow prove the bona fides of the individual's gender identity").

By analogy, if the government discriminated against an individual for supposedly failing to "complete" a conversion to Judaism—say, by observing the Sabbath but not keeping kosher—that would similarly discriminate on the basis of religion. *Fabian*, 2016 WL 1089178, at *13 (holding that discrimination "against those who practice . . . religion the 'wrong' way, is obviously discrimination 'because of religion'"). H.B. 2 is no different in its regulation of what constitutes a "complete" gender transition.[10]

### 3.  Discrimination Based on Transgender Status is Subject to Heightened Equal Protection Scrutiny.

The Governor challenges, on three grounds, whether discrimination based on transgender status should be subject to heightened scrutiny. Although Plaintiffs are not required to demonstrate the existence of *every* factor to warrant heightened scrutiny, *see Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977), the Governor's challenges are unavailing in any event.

As an initial matter, the Governor calls into question whether transgender people

---

[10] The Governor also argues that, prior to what H.B. 2 deems as the "completion" of gender transition, a transgender person "is treated according to his or her present biological sex" and that "[t]his is the same, equal treatment received by all persons, according to biology." Gov. Opp. at 11. But the mere fact that a classification may be equally applied does not make it discrimination-neutral with respect to the characteristic at issue. *See Loving v. Virginia*, 388 U.S. 1, 8-9 (1967) (rejecting that equal application of anti-miscegenation laws rendered them race-neutral); *J.E.B.*, 511 U.S. at 135-142 (analyzing sex-based peremptory challenges that could be applied equally against men and women).

are a sufficiently discrete group to merit heightened scrutiny.  But a trait need not be obvious to passers-by or discernible in every instance for it to merit heightened scrutiny. Classifications based on legitimacy, for example, are subject to heightened scrutiny, *see Trimble v. Gordon*, 430 U.S. 762, 767 (1977), even though they may require a court proceeding to determine.  Sex-based classifications are subject to heightened scrutiny, even though individuals do not always fall into traditionally-defined sexual categories (*e.g.*, in the case of intersex individuals, *see* Adkins Decl. ¶¶ 35-39), and even though individuals "transition from one sex to the other," as the Governor himself acknowledges. Gov. Opp. at 12.  Indeed, alienage-based classifications are suspect even though that characteristic is not fixed.  *See Nyquist*, 432 U.S. at 9.  It suffices that gender identity is sufficiently fixed and fundamental that it is repugnant for the government to penalize someone for being unwilling or unable to change it.  *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000); *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407, 438-39 (Conn. 2008); *Adkins v. City of New York*, 143 F. Supp. 3d 134, 139-40 (S.D.N.Y. 2015).

Nor can the Governor seriously contest that transgender individuals have faced pervasive discrimination.  Even if the Governor does not believe that barring transgender individuals from single-sex facilities amounts to discrimination, the evidence offered by Plaintiffs establishes that transgender individuals face widespread discrimination in every aspect of life including employment, education, health care, housing, transportation, places of public accommodation, police protection, courts, and government benefits programs, and that this discrimination too frequently takes the form of violence,

harassment, and other abuse.  *See generally* ECF Nos. 23-35, 23-36.

Finally, the Governor errs in focusing on the public reaction to H.B. 2 (which itself has proven insufficient to change state law) as dispositive of the political power of transgender individuals.  In *Frontiero v. Richardson*, the Supreme Court applied heightened scrutiny to sex-based classifications even though "the position of women in America has improved markedly in recent decades" and women no longer could be described as a "powerless minority."  411 U.S. 677, 685-86 & n.17 (1973).  What the *Frontiero* Court found dispositive was that women continued to face barriers and discrimination, including "most conspicuously, in the political arena," and that the nation's political bodies would thus not adequately ward off bias in lawmaking— therefore meriting greater judicial oversight.  *Id.* at 686.  Thus properly focused, it is clear that transgender individuals meet this prong: the Governor cannot possibly dispute that that—as a small, stigmatized, and oppressed minority—transgender individuals face immense barriers to asserting their rights through the traditional political process.

### B.      H.B. 2 Fails Any Level of Scrutiny.

Plaintiffs seek only equal treatment—nothing more and nothing less.  Contrary to Defendants' bald assertions, this case is not part of some grand conspiracy to end the practice of separating restrooms and other facilities on the basis of sex.  Mr. Carcaño and Mr. McGarry seek to use the men's restroom—not to make all restrooms gender-neutral. Plainly, single-sex facilities existed before H.B. 2, and they will continue to exist after the unlawful provisions of H.B. 2 challenged by Plaintiffs' motion are enjoined.

Accordingly, in analyzing the government's proffered justifications for H.B. 2, the question is not whether providing separate facilities for males and females serves safety or privacy as a general matter, even though the Governor and Intervenors rebut a straw man argument to that effect. *See, e.g.*, Gov. Opp. at 2-3; Int. Opp. at 19-20. Instead, the question is whether the exclusion of transgender individuals from facilities consistent with their gender identity serves those interests. Under either heightened scrutiny or rational basis review, the answer is no.

**1.    Discrimination Against Transgender Individuals Does Not Promote Safety.**

In *G.G.*, the Fourth Circuit refused to dismiss a transgender individual's right to equal treatment under the law based on illusory threats to safety and privacy, and this Court should follow that same path here. Although Intervenors try to distinguish *G.G.*'s dismissal of safety concerns and privacy interests as limited by the evidentiary record in that case, the Fourth Circuit rejected the notion that "G.G.'s use—*or for that matter any individual's appropriate use*—of a restroom" would infringe upon others' constitutional rights. 2016 WL 1567467, at *8 n.10 (emphasis added). Furthermore, the record in *G.G.* mirrors the one here: it too "is devoid of any evidence tending to show that [Plaintiffs'] use" of the facilities matching their gender identity somehow "creates a safety issue." *Id.* at *8 n.11.[11] Defendants' promises to proffer evidence in the future, which they failed to

---

[11] In *G.G.*, the parties did not engage in any discovery prior to the hearing on plaintiff's preliminary injunction motion, and no testimony was elicited at the hearing. Order at 1, *G.G.*, No. 4:15-cv-00054 (E.D. Va. Sept. 4, 2015) (ECF No. 53) (Ex. C).

proffer when responding to Plaintiffs' motion, despite having the opportunity to do so, cannot change the record that currently exists.

The Governor's and Intervenors' anemic evidentiary submission, which consists solely of news reports, fails to supply the all-important link to connect H.B. 2 with the promotion of safety. To the contrary, the news reports illustrate that criminal conduct can occur without regard to whether state or local law provides express protection to gender identity. *See, e.g.*, Gov. Opp. Ex. B (reporting an incident in Virginia—where state law does not expressly prohibit discrimination on the basis of gender identity—in which an individual filmed others without consent in the restroom of a shopping mall and was criminally charged).[12] None of the articles show how banning transgender people from restrooms or other facilities consistent with their gender identity would have prevented non-transgender people from committing crimes.

The Governor and Intervenors deny the deterrent effect of criminal law—dismissing it as "notoriously ineffective." Int. Opp. at 22. Even if that is so, H.B. 2 does even *less* than a criminal law, given that it imposes no explicit criminal penalties. No Defendant explains the mechanism through which H.B. 2 is supposed to achieve its promised prophylactic benefits if existing criminal law could not achieve those benefits.

---

[12] The Governor also cites a news report showing that individuals may deliberately use facilities incongruent with their gender identity as political stunts; but nondiscrimination laws provide no shelter for such conduct. *See, e.g.,* Gov. Opp. Ex. A (describing a "protest" against Washington's nondiscrimination law); *Doe v. Reg'l Sch. Unit 26*, 86 A.3d 600, 603 (Me. 2014) (describing male student who followed transgender female student into restroom in order to harass her).

H.B. 2 no more requires stationing government officials outside every government restroom to check birth certificates or genitals before entrance than the criminal law. Thus, while H.B. 2 excludes *law-abiding* transgender people from the government facilities consistent with their gender identity, it does nothing at all to stop Defendants' imagined non-transgender predators, who were already lawbreakers before H.B. 2. *Cf. Whole Woman's Health v. Hellerstedt*, No. 15-274, -- S. Ct. --, 2016 WL 3461560, at *21, (Jun. 27, 2016) ("Determined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to adopt safe practices by a new overlay of regulations. . . [and there is] nothing to suggest that H. B. 2 would be more effective").

Defendants' news reports also fall far short of rebutting Plaintiffs' evidence establishing that gender identity-inclusive nondiscrimination protections have not undermined public safety in the myriad jurisdictions where they exist. *See generally* Mull Decl. Indeed, Plaintiffs' requested preliminary injunction does not even seek to restore Charlotte's non-discrimination ordinance; it would merely enjoin government officials from affirmative discrimination against transgender people. Defendants fail to articulate any plausible explanation for why North Carolina suddenly cannot do without this affirmative discrimination requirement. From statehood until March 23, 2016, North Carolina never had any such requirement, and neither do forty-nine other states.

Contrary to the Governor's newfound reliance on safety in this litigation, he has publicly disowned safety as a rationale for H.B. 2. In multiple media appearances, he has disclaimed that H.B. 2 was connected to any safety rationale, pivoting to privacy

arguments instead.[13]  The Governor was correct to disavow that argument, as North Carolina's own history shows.  Plaintiffs and other transgender people used facilities consistent with their gender identity before H.B. 2, and they continue to do so in private facilities.  Carcaño Decl. ¶¶ 15-16, 23, 26, 29-30; H.S. Decl. ¶¶ 19, 25-26; McGarry Decl. ¶¶ 17-22.  The Governor concedes that this has caused no public safety problem.  *See, e.g.*, ECF No. 23-26 at 13.  These are admissions he cannot now recant.

Furthermore, if Defendants' safety justification is to be believed, H.B. 2 leaves gaping swaths of the government's purported interest unprotected, given that the law regulates only public rather than private facilities—and, even then, excludes public facilities leased to private entities.  N.C. Exec. Order 93 § 4 (ECF No. 23-24 at 3); *cf. Central Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016) (holding that an ordinance that prohibited the display of a private flag, but not a government flag, discredited the city's purported safety justification).  This defies rationality.  If the Governor sincerely believes that H.B. 2 is needed to prevent "terrible things from happening," Gov. Opp. at 14 (referencing rape, assault, and indecent exposure), he fails to explain why those "terrible things" are unworthy of prevention merely because they

---

[13] During one interview, the Governor admitted that he was not aware of any cases in North Carolina where transgender people had committed crimes in restrooms.  ECF No. 23-26 at 13.  When asked, "Why not just then let it go if there's . . . not a case of transgender people going in and molesting little girls," he responded, "I haven't used that at all.  This is an issue of . . . an expectation of privacy." *Id.*  In another appearance, the interviewer noted that "90 percent of the cases of molestation happen with someone you know," and if criminals "want to sneak into a bathroom they'll do it."  She asked, "So, what is the fear about the transgender situation and the bathrooms?"  McCrory responded that his rationale for supporting H.B. 2 "is not a fear" about safety.  Ex. D at 17.

occur in non-government facilities, or why perpetrators would not simply shift their conduct to non-government facilities.

In addition to a safety justification for H.B. 2, the Governor also advances the avoidance of civil liability for the government as a justification for the law. Avoiding purported civil liability based on the mere presence of transgender individuals is not a legitimate government interest; but the notion that H.B. 2 sought to avoid civil liability for the government is also a *post hoc* and implausible contrivance. *See Lusardi*, 2015 WL 1607756, at *9 n.6 (holding that the belief that a transgender employee could raise "liability issues" is illegitimate). The Governor provides no showing that avoidance of government liability actually motivated H.B. 2's enactment. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (prohibiting justifications invented *post hoc*). Nor is there any logic to the idea that the State is avoiding liability by refusing to allow everyone in the State to use facilities consistent with their gender identity, as the State had been doing without incident until the recent passage of H.B. 2.

Exacerbating H.B. 2's lack of connection to any valid government interest is its erroneous reliance on birth certificates as a proxy for genital characteristics. Reliance on this proxy certainly does not "directly advance" a government interest, as required for heightened scrutiny. *Stuart v. Camnitz*, 774 F.3d 238, 250 (4th Cir. 2014). Intervenors' only response is that North Carolina's birth certificate statute—which permits the gender marker on a birth certificate to be changed after surgical treatment—"obviously applies to the vast majority of transgender individuals residing in North Carolina." Int. Opp. at 14-

15.  But nearly half of North Carolina residents (42%) were born outside the state.  Ex. F.
In contrast to North Carolina, several states do not require surgical treatment in order to
change gender markers on birth certificates, and some states do not allow changes to
gender markers even after such surgery.  Pl. Mem. at 32-33.  Legislation may not need to
have a "perfect" fit to achieve its goals, but H.B. 2 falls short of any adequate fit to
achieve its goal.

Taken together, all of these considerations point to the inevitable conclusion that
"safety" operates as a mere smokescreen for impermissible animus, as not even H.B. 2's
proponents actually believe that the law is needed to preserve safety.  Furthermore, the
avoidance of civil liability is a mere *post hoc* contrivance that deserves no weight.

### 2.  Discrimination Against Transgender Individuals Cannot Be Justified by Invocations of Privacy.

Defendants also claim that H.B. 2 is necessary to protect privacy in situations
involving the "opposite sex," Gov. Opp. at 2, but this argument fails for multiple reasons,
in addition to those already discussed in the context of safety.  It is premised upon a
fundamental misunderstanding of transgender people and a dehumanizing denial of their
gender.  Adkins Decl. ¶¶ 19-20, 23-34.  When Mr. McGarry uses the men's restroom,
other men in that facility are not using a restroom with someone of the "opposite sex";
rather, they are using a restroom with a person of the same sex.

Tellingly, no Defendant articulates how H.B. 2 serves an interest in avoiding
exposure of one's body in the restroom context.  Restrooms have stalls and thus do not

involve the exposure of one's body to others no matter who is using the restroom.[14] Nor does the privacy argument justify discrimination in changing facilities. Any individual who objects to sharing a changing facility with a transgender person can, for example, use a restroom stall to change rather than a locker room. *See* Walker Decl. ¶ 16; ECF No. 23-39 at 14-15; *cf. Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150-51 (1980) (invalidating a sex-based classification where a sex-neutral approach could achieve the government's objective).

There are other alternatives as well. Using privacy partitions and curtains is a practice already recognized in state law, and simple measures like this one have been deployed smoothly and successfully across a range of settings. *See* 10A N.C. Admin. Code 13G.0309 (mandating privacy partitions or curtains for showers and toilets in North Carolina adult care homes); *G.G.*, 2016 WL 1567467, at *2 (noting that the school had made a "series of updates" to improve "privacy for all students, including adding or expanding partitions between urinals in male restrooms"); ECF No. 71 at 14-19. Nor could Defendants object to such straightforward solutions since, as Intervenor Speaker Tim Moore has insisted, the State "cannot put a price tag" on measures to enhance privacy and safety. ECF No. 23-9 at 3.

Both H.B. 2 and the Governor's Executive Order also expressly contemplate the

_____

[14] Megyn Kelly pressed the Governor on this point during his interview, stating, "I've been in women's bathrooms my whole life. . . . We've got like the stalls. And we get to go in, we go to do our business and . . . we don't see each other. So, why are you concerned about . . . young girls exposing themselves or seeing somebody else exposed in a woman's bathroom?" The Governor did not provide an answer. Ex. D at 16.

government's ability to make accommodations "due to special circumstances" in restrooms and other facilities. *See, e.g.*, N.C. Gen. Stat. § 143-760(c); N.C. Exec. Order 93 § 3 (ECF No. 23-24 at 3). Necessarily, then, the State also stands ready to offer accommodations as needed for individuals who object to sharing communal spaces with transgender people.

The Governor responds that those with such objections should not have to "hide" themselves, such as by changing in a "more private place," even though they also paradoxically purport to seek privacy. Gov. Opp. at 15. The Fourth Circuit confronted this same argument in *G.G.* but was not persuaded. Accommodations for those who object to the presence of transgender people impose a "minimal or non-existent hardship" on them—in stark contrast to the painful stigma that class-based segregation imposes on transgender people themselves. *G.G.*, 2016 WL 1567467, at *13 (Davis, J., concurring).

Defendants' hand is not strengthened simply by arguing that the State's interest in protecting privacy is particularly strong for minors, Gov. Opp. at 3-4, 13-14, since the school administrators who actually run school facilities day-in-and-day-out have uniformly disclaimed such arguments. *See generally* Walker Decl.; Ex. E (reporting that Charlotte-Mecklenburg Schools will continue allowing transgender students access to sex-specific facilities in accordance with gender identity); UNC Opp. (declining to make any arguments about safety and privacy); *see also* ECF No. 71 at 14-19.

H.B. 2 also cannot be defended through a newfound "privacy" interest to avoid the mere sight of transgender people. This goes well beyond a right of privacy against

involuntary exposure of one's *own* body discussed in Defendants' cases.  Recognizing this deficiency in legal support, the Governor analogizes seeing a transgender man like Mr. McGarry in a men's facility as equivalent to exposing children to "sexually explicit material."  Gov. Opp. at 14.  That is preposterous and offensive.  Mr. McGarry's mere presence in a men's restroom or locker room is not pornographic.

Defendants' hypothesized outcry to the mere sight of transgender individuals in facilities consistent with their gender identity finds no support in any of Plaintiffs' lived experiences, whether in government facilities prior to H.B. 2 or in private facilities.  *See generally* Carcaño Decl.; H.S. Decl.; McGarry Decl.  Defendants have failed to explain why existing privacy shields (such as private stalls) were inadequate prior to H.B. 2's enactment, or why transgender individuals might want to expose private parts of their bodies to others in communal spaces.  Defendants have also failed to substantiate their predicted objections through transgender individuals in North Carolina who *have* obtained updated birth certificates from their home states without having to undergo genital surgery—and who can continue to use facilities consistent with their gender identity under H.B. 2.  Indeed, contrary to all of Defendants' predictions, it was when Mr. McGarry used the restroom *inconsistent* with his gender identity that others objected to his presence.  McGarry Decl. ¶ 28 (Mr. McGarry's testimony that, when he tried to use women's restrooms in high school, he "would be screamed at, shoved, slapped, and told to get out").  Similarly, Mr. Carcaño's treating medical professional advised him not to use facilities inconsistent with his gender identity, where he would be recognized as male

given his physical appearance. Carcaño Decl. ¶ 15. If H.B. 2 seeks to cater to the preferences of individuals sharing spaces with transgender people, it works in diametric opposition to how those preferences operate in the real world.

Furthermore, even if a right to privacy can be extended to encompass seeing transgender people (in contrast to being seen by transgender people), H.B. 2 would still fail constitutional scrutiny. As already discussed, both the government and the individual who objects to sharing visual space with transgender people have limitless options at their disposal to prevent visual contact—whether that is being seen or seeing others. A privacy curtain, for example, works equally well in both directions.

Ultimately, no matter how a right to privacy is formulated here, the objection that Defendants seek to validate would give one group of objectors the power to oust a minority from communal spaces based on discomfort with the latter's mere presence. That exclusion is profoundly damaging. As history has taught time and again, it is precisely when public attitudes (even those sincerely held) give way to discrimination that an unwavering commitment to the promise of equality is most needed.

III.   **Plaintiffs Are Likely to Succeed on Their Due Process Claims.**

   A.   **Plaintiffs Are Likely to Succeed in Proving that Provisions of H.B. 2 Violate Their Constitutional Right to Privacy.**

The constitutional right to privacy protects transgender individuals from the forced or coerced disclosure of their transgender status or any medical information related to their treatment. Pl. Mem. 35-38; *Whalen v. Roe*, 429 U.S. 589, 599-600 & n.23 (1977) (the Due Process Clause provides a "zone of privacy" against "disclosure of personal

33

matters"); *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (the constitutional right to privacy protects "[p]ersonal, private information in which an individual has a reasonable expectation of confidentiality"); *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (describing it as "really beyond debate" that transgender individuals have a "particularly compelling" interest in "preserving [the] privacy" of their transgender identities). The Governor's and Intervenors' arguments to the contrary are entirely without merit.

Misconstruing Plaintiffs' claim and misapplying the appropriate legal standard, the Governor argues that any right to keep private one's "biological sex" is not "deeply rooted in this Nation's history and tradition" or "implicit in the concept of ordered liberty." Gov. Opp. 17-18 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). The question is not whether there is a fundamental right to keep private information related to one's "biological sex" as a general mater, but whether the fundamental right to privacy protects against the forced disclosure of one's transgender status. It does.

Numerous courts have recognized that the Due Process Clause protects transgender individuals from involuntarily disclosing their transgender status, and that such involuntary disclosure can expose transgender individuals to violence and discrimination. *Powell*, 175 F.3d at 111-13; *Love v. Johnson*, No. 15-11834, -- F. Supp. 3d --, 2015 WL 7180471, at *5 (E.D. Mich. Nov. 16, 2015) (concluding that "by requiring Plaintiffs to disclose their transgender status, [Michigan's driver's license

34

policy] directly implicates their fundamental right to privacy"); *K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431 CI, 2012 WL 2685183, at *6 (Alaska Super. Ct. Mar. 12, 2012) (agreeing "that one's transgender[] status is private, sensitive personal information" and "is entitled to protection"). Indeed, the Governor does not even attempt to distinguish any of Plaintiffs' authorities—unsurprising, given it is "really beyond debate" that the constitutional right to privacy protects transgender individuals from the forced disclosure of their transgender status. *Powell*, 175 F.3d at 111.

Intervenors recognize a constitutional right to privacy but assert that the forced disclosure of one's transgender status "is not the type [of personal information] that could or would trigger constitutional scrutiny under the Due Process Clause." Int. Opp. at 25 (citing *NASA v. Nelson*, 562 U.S. 134, 149-50 (2011); *Whalen*, 429 U.S. at 602)). But as explained above, the unrebutted case law flatly contradicts Intervenors' argument. Neither of the Intervenors' cited cases supports their argument. To the contrary, *Whalen* supports Plaintiffs' privacy claim by expressly holding that the Due Process Clause provides a "zone of privacy" against "disclosure of personal matters." *Whalen*, 429 U.S. at 599-600 & n.23. To be sure, certain types of disclosure "do[] not automatically amount to an impermissible invasion of privacy," but the *Whalen* Court was referring to the "disclosure[] of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies [that] are often an essential part of modern medical practice"—not the forced *public* disclosure of such information. 429 U.S. at 602. If Mr. Carcaño is forced into a women's restroom in every rest stop, his

status as a transgender person is disclosed to every stranger who happens to be in that rest stop and not, as in *Whalen*, to medical personnel and insurance companies who have separate obligations to keep private that information.

*Nelson* also does not support the public disclosure of private matters. In *Nelson*, the Court expressly relied on federal statutory guarantees against the public dissemination of the information at issue—employee treatment or counseling for recent illegal drug use—in holding that there was no violation of the right to privacy. *NASA v. Nelson*, 562 U.S. 134, 138 (2011). In other words, the Court found no such violation because there were separate safeguards to protect against the widespread disclosure of the private information. Here, there are no such safeguards, and each time a transgender person is forced into a restroom that does not accord with their gender identity, they are in effect forced to announce the fact of their transgender status to complete strangers with no control over what those strangers do with that information.

Intervenors also assert that H.B. 2 does not actually force transgender individuals to publicly disclose their transgender status because the law "expressly encourages accommodations for those in plaintiffs' position through single-occupancy restrooms." Int. Opp. 24-25. But rather than *encourage* accommodations, as Intervenors claim, H.B. 2 simply states that "*nothing in this section shall prohibit*" local boards of education and public agencies "*from providing accommodations* such as single occupancy bathroom or changing facilities *upon a person's request due to special circumstances.*" N.C. Gen. Stat. §§ 115C‑521.2(c), 143-760(c) (emphasis added). In addition to the acute

and ongoing harm that Plaintiffs have shown, which flows from forcing a transgender individual to use a segregated facility away from others, the use of conspicuously separate facilities also risks disclosure of their transgender status to others who observe them repeatedly using the separate facilities. Pl. Mem. at 7-8; Carcaño Decl. ¶¶ 20-21; McGarry Decl. ¶¶ 20, 24-25. In any event, places like rest stops and courthouses may not have single-user facilities, thereby forcing transgender individuals to in effect announce their transgender status by entering single-sex spaces that do not accord with their gender identity. This forced disclosure cannot be squared with due process.

Rather than take seriously the privacy interests of transgender individuals, Intervenors make the ill-conceived argument that, because the individual named plaintiffs have disclosed their transgender status in bringing this suit, they cannot have any further privacy interest against forced public disclosure of their transgender identity. Int. Opp. 25. But bringing this suit is quite different from Plaintiffs having to announce their transgender status on a day-to-day basis to strangers and to explain why they are in a particular restroom or locker room. The day-to-day reactions Plaintiffs would receive entail a significant risk of harassment and harm. *Powell*, 175 F.3d at 111-13; *Love*, 2015 WL 7180471, at *5. While Plaintiffs may be recognized as transgender in many aspects of life, one could certainly imagine a situation in which Mr. Carcaño would have to stop to use a rest stop restroom, and by entering the restroom designed for women out himself as transgender to individuals who have no familiarity with him. Furthermore, not all transgender people are out as such, and H.B. 2 forces them to disclose this deeply private

information in all aspects of their lives, threatening their bodily autonomy and security.

In short, neither the Governor nor Intervenors have provided any genuine challenge to Plaintiffs' likelihood of success on their claim that the right to privacy protects transgender individuals from the forced disclosure of their transgender status.

**B.     Plaintiffs Are Likely to Succeed in Proving that Provisions of H.B. 2 Violate Their Due Process Right to Avoid Forced Surgical Treatment.**

The Governor's and Intervenors' briefs further support Plaintiffs' argument that H.B. 2 violates their substantive due process rights by forcing them to undergo serious and invasive surgery—which, for many, is unwanted, unnecessary, or unavailable—in order to use the restroom or other facility that corresponds with their gender identity.  As both the Governor and Intervenors not only concede but tout as the reason they say the law is not discriminatory, H.B. 2 explicitly ties access to sex-separated facilities to the gender marker listed on one's birth certificate.  Gov. Opp. at 11 ("If a person completes a transition to the opposite biological sex, the law treats that person accordingly."); Int. Opp. at 14 ("In fact, rather than discriminating *against* anyone, HB2 could at most be said to implicitly distinguish *among* gender dysphoric individuals based on whether or not they have taken the necessary steps to have their birth certificates altered" (emphasis in original)).

To the extent that states permitting change of one's birth certificate, including North Carolina, require transgender people to undergo some form of surgical treatment in order to bring the gender marker on their birth certificate into alignment with their gender identity, *see* N.C. Gen. Stat. § 130A-118(b)(4) (requiring "sex reassignment surgery"),

H.B. 2 improperly forces Plaintiffs to either: (1) give up their constitutional right to decline invasive, painful, and in some cases, medically contraindicated surgery, Ettner Decl. ¶ 22, or (2) stop using the restroom that corresponds with their gender identity, even though such use is necessary not only for their psychological well-being but also to avoid the harassment, discrimination, and violence they face if forced to use facilities that are inconsistent with their gender identity. For Plaintiffs and other transgender North Carolinians, this is truly no choice at all, and as such, the provisions of H.B. 2 violate Plaintiffs' autonomy.

## IV.     Plaintiffs Satisfy the Other Preliminary Injunction Factors.

As Plaintiffs made clear in their motion, a preliminary injunction is necessary to avoid irreparable harm to Plaintiffs, the balance of hardships weighs in favor of an injunction, and an injunction is in the public interest. Defendants have not rebutted Plaintiffs' showing on these factors.[15] Indeed, during the pendency of briefing on the motion, Mr. McGarry has developed health problems after avoiding use of the restroom because of H.B. 2. McGarry Reply Decl. ¶¶ 1-4 (describing significant pain during urination). The facts of *G.G.* further confirm that avoiding use of the restroom often has health consequences. 2016 WL 1567467, at *13 (finding that plaintiff had shown irreparable harm based on psychological harm as well as increased risk for developing

---

[15] The Governor and Intervenors attempt to delay resolution of this motion by seeking an extended period of discovery before this motion can be decided. Gov. Opp. at 20; Int. Opp. at 27-29. As Plaintiffs will explain in their opposition to the Governor's motion for discovery, his request fails to meet the required standard and should be denied. Plaintiffs have made the showing necessary for immediate issuance of a preliminary injunction.

urinary tract infections (Davis, J., concurring)); *see also* Routh Decl. ¶¶ 14-15.

The Governor erroneously argues that Plaintiffs' burden to demonstrate the preliminary injunction factors is heightened, trying to recast Plaintiffs' request as seeking a mandatory rather than prohibitory injunction. Gov. Opp. at 19. But Plaintiffs simply seek to restore the status quo by returning to "the last uncontested status between the parties which preceded the controversy"—*i.e.*, the state of the law before both H.B. 2 and Charlotte's non-discrimination ordinance were enacted. *League of Women Voters v. North Carolina* ("*LWV*"), 769 F.3d 224, 236 (4th Cir. 2014) (quotation marks omitted). Indeed, this is the state of the law that, as the Governor describes it, had existed for "millennia." Gov. Opp. at 2. "'To be sure, it is sometimes necessary to require a party who has recently disturbed the status quo"—as occurred when H.B. 2 was adopted—"'to reverse its actions, but . . . [s]uch an injunction restores, rather than disturbs, the status quo ante.'" *LWV*, 769 F.3d at 236 (quoting *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012)) (quotation marks omitted). That is all that Plaintiffs seek here.

Intervenors claim that Plaintiffs' "delay" of "seven weeks" before seeking preliminary relief undermines their showing of irreparable harm. Int. Opp. at 23. Putting aside that Intervenors waited nearly two months before seeking to join this case, they complain in one breath about the extensive evidence Plaintiffs marshaled to support their motion, Int. Opp. at 9 (noting the "ten different declarations including three expert witnesses and over three hundred pages of evidence" Plaintiffs submitted), while complaining in the next that Plaintiffs did not prepare their evidence overnight.

Plaintiffs filed suit mere days after the legislature abruptly convened to rush H.B. 2 into law. Recognizing the urgency of the issues, Plaintiffs also worked to ensure that their preliminary injunction motion was well-supported given the gravity of the harms suffered by Plaintiffs and thousands of other transgender North Carolinians.

Contrary to Intervenors' argument that Plaintiffs have had "years" to prepare, Int. Opp. at 9, Part I of H.B. 2 is unlike any law passed in the country before or since. Moreover, absent any prejudice, courts have allowed delays much longer between the filing of a complaint and a preliminary injunction motion. *See, e.g.*, *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 137 (4th Cir. 2001) (holding one year delay did not undermine finding of irreparable harm and that only delay coupled with prejudice would support finding no irreparable harm); *Fairbanks Capital Corp. v. Kenney*, 303 F. Supp. 2d 583, 590 (D. Md. 2003) (holding 11-month delay "d[id] not lessen irreparable harm to [Plaintiffs]" and was reasonable).

Intervenors suggest that Plaintiffs' showing of irreparable harm fails unless Plaintiffs have affirmatively proven that there are no single-user restrooms in the range of public buildings across the state. Int. Opp. at 24. This misses the point. Although Plaintiffs have indeed shown that such restrooms often are not readily available, and that they are suffering health consequences as a result, *see* Carcaño Decl. ¶¶ 18-20; H.S. Decl. ¶ 27; McGarry Decl. ¶¶ 23-24; McGarry Reply Decl. ¶¶ 1-4, that is not their burden. H.B. 2's shunting of transgender people out of shared single-sex facilities—deeming them unfit to share communal spaces with others—itself causes irreparable harm.

41

Plaintiffs' ability to suffer through the violations of federal law foisted on them by H.B. 2 does not defeat their showing of irreparable harm.

Finally, the UNC Defendants argue that because they claim not to be enforcing H.B. 2, Plaintiffs cannot show irreparable harm. UNC Opp. at 24-26. But as described in Section I.A., above, UNC is expressly bound by H.B. 2 and has taken steps to implement it. Indeed, were UNC not enforcing H.B. 2 as they claim, it is difficult to understand how they could object to the preliminary relief Plaintiffs seek here. UNC argues that, without enforcement, there is "no justification for this Court to intrude" on the university's management of its own affairs. UNC Opp. at 28. But Title IX and the Equal Protection Clause cannot be waved off as some form of unwarranted intrusion. Because UNC disclaims any interest in enforcing H.B. 2, the preliminary injunction should be no intrusion at all.

No Defendant seriously disputes that the balance of the equities favors Plaintiffs. Nor could they, given the hardships H.B. 2 imposes on Plaintiffs, and the fact that Plaintiffs simply seek to return to the state of the law before the enactment of H.B. 2 and Charlotte's ordinance. Intervenors offer no new argument for their claim that enjoining H.B. 2 would disserve the public interest, simply repeating their unfounded allegations about risks to safety and privacy. Int. Opp. at 26. Those arguments fail for the reasons stated above. As Plaintiffs demonstrated in their motion, upholding constitutional rights and eliminating sex discrimination from our nation's educational institutions is always in the public interest. Pls. Mem. at 44 (collecting authorities). Plaintiffs respectfully urge

entry of a preliminary injunction to mitigate the profound harms H.B. 2 imposes upon them and thousands of other transgender North Carolinians.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (ECF No. 21) should be granted.

Dated:  June 27, 2016

Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook
N.C. State Bar No. 33838
AMERICAN CIVIL LIBERTIES UNION FOR
    NORTH CAROLINA LEGAL FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone:  919-834-3466
Facsimile:  866-511-1344
cbrook@acluofnc.org

Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone:  212-549-2627
Facsimile:  212-549-2650
egill@aclunc.org
cstrangio@aclu.org

*Appearing by special appearance
pursuant to L.R. 83.1(d).

Jon W. Davidson*
Tara L. Borelli*
Peter C. Renn*
Kyle A. Palazzolo*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone:  404-897-1880
Facsimile:  404-897-1884
tborelli@lambdalegal.org
prenn@lambdalegal.org
kpalazzolo@lambdalegal.org

Paul M. Smith*
Scott B. Wilkens*
Luke C. Platzer*
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, D.C. 20001-4412
Telephone:  202-639-6000
Facsimile:  202-639-6066
psmith@jenner.com
swilkens@jenner.com
lplatzer@jenner.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Christopher A. Brook, hereby certify that on June 27, 2016, I electronically filed PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION, as well as the supporting declarations and exhibits thereto, using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher A. Brook
Christopher A. Brook