**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| JOAQUÍN CARCAÑO, *et al.*,<br><br>            *Plaintiffs*,<br><br>v.<br><br>PATRICK MCCRORY, in his official capacity as<br>Governor of North Carolina, *et al.*,<br><br>            *Defendants*. | Case No. 1:16-cv-00236 |

## BRIEF IN SUPPORT OF UNC DEFENDANTS' MOTION TO DISMISS

The University of North Carolina is "a public, multicampus university dedicated to the service of North Carolina and its people." N.C. Gen. Stat. § 116-1. Its mission is straightforward yet vital: to educate its students. The University, however, now finds itself caught in a conflict between state law (which calls for separating bathrooms on the basis of biological sex) and federal guidance (which calls for separating bathrooms on the basis of gender identity). Forcing the University to participate in this highly charged political controversy distracts it from its educational mission.

Here, there is no basis for drawing the University into this dispute. Neither the University nor its Board of Governors (collectively UNC Defendants) played any role in enacting the Act, and neither has enforced or threatened to enforce its provisions. Indeed, the University's President has declared that the Act has no enforcement provisions and that she has no intent to take any action to enforce it. Plaintiffs have nevertheless sued

the UNC Defendants, seeking a declaration that the Act is unenforceable and an injunction prohibiting them from enforcing it. Multiple obstacles prevent Plaintiffs from prevailing against the UNC Defendants and require dismissal of these claims.

*First*, Plaintiffs' claims against all three UNC Defendants are neither justiciable under the Constitution nor ripe for consideration under prudential doctrines limiting judicial review, because the UNC Defendants neither enforce nor threaten to enforce the challenged statute. *Second*, Plaintiffs' constitutional claims against the Board and its Chairman contravene North Carolina's sovereign immunity (which protects them both) and exceed the scope of 42 U.S.C. § 1983 (which does not create a right of action against the Board). *Finally*, Plaintiffs cannot obtain a permanent injunction against any of the UNC Defendants, because a declaratory judgment alone would afford Plaintiffs an adequate remedy.

For these reasons, the Court should dismiss all of Plaintiffs' claims against the UNC Defendants pursuant to Civil Rule 12(b)(1). In addition, the Court should dismiss Plaintiffs' constitutional claims against the Board and Chairman pursuant to Civil Rules 12(b)(1), 12(b)(2), and 12(b)(6). Finally, the Court should dismiss Plaintiffs' request for a permanent injunction pursuant to Civil Rule 12(b)(6).

## NATURE OF THE MATTER

This lawsuit is about the validity of the Public Facilities Privacy and Security Act.

## STATEMENT OF FACTS

**1.** The University of North Carolina comprises sixteen constituent institutions of higher education and one constituent high school. N.C. Gen. Stat. § 116-4. The University's Board of Governors, headed by Chairman W. Louis Bissette, Jr., is responsible for "the general determination, control, supervision, management and governance of all affairs" of the University. *Id.* § 116-11(2). The University's President, Margaret Spellings, executes the University's policies subject to the Board's direction and control. Spellings Decl. ¶ 2, ECF No. 38-1. These policies include a prohibition on "unlawful discrimination against any person on the basis of . . . sex, sexual orientation, [or] gender identity." *The Code of the Board of Governors of the University of North Carolina* § 103 (2001), ECF No. 46-3.

**2.** On March 23, 2016, the North Carolina General Assembly enacted the Public Facilities Privacy and Security Act. The Act states that public agencies, including the University, "shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex" as "stated on [the] person's birth certificate." N.C. Gen. Stat. § 143-760(a)–(b). The Act allows public agencies to "provid[e] accommodations such as single occupancy bathroom or changing facilities upon a person's request due to special circumstances." *Id.* § 143-760(c). The Act contains no enforcement provisions and establishes no civil or criminal penalties.

**3.** The University has repeatedly made plain that the Act gives it no enforcement authority and that it consequently has no plans to enforce the Act. Specifically:

3

**a.** On April 5, President Spellings sent a memorandum about the Act to chancellors of the University's constituent institutions. Guidance Mem., ECF No. 46-5. The Guidance Memorandum, which "responds to requests for guidance . . . concerning the Act's requirements," consists of a series of frequently asked questions followed by President Spellings' answers. *Id.* at 1.

The Guidance Memorandum addresses the question: "What are the University's obligations under the Act relating to bathrooms and changing facilities?" *Id.* The memorandum answers: "University institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex." *Id.* The memorandum later states that, "[l]ike all public agencies, the University is required to fulfill its obligations under the law unless or until [a] court directs otherwise." *Id.* at 2.

The Guidance Memorandum then explains that University institutions "fully meet their obligations under the Act" by taking three steps: (1) "[d]esignat[ing] and label[ing] multiple-occupancy bathrooms and changing facilities for single-sex use with signage," (2) "[p]rovid[ing] notice of the Act to campus constituencies as appropriate," and (3) "[c]onsider[ing] assembling and making information available about the locations of designated single-occupancy bathrooms and changing facilities on campus." *Id.* at 1–2. It adds that University institutions "already designate and label multiple-occupancy bathrooms and changing facilities for single-sex use with signage" and thus need only "maintain these [existing] designations and signage." *Id.* at 2.

4

Finally, the Guidance Memorandum emphasizes that "[t]he Act does not contain provisions concerning enforcement." *Id.* It adds that "[t]he Act does not require University institutions to change their nondiscrimination policies," that "those policies should remain in effect," and that "constituent institutions must continue to operate in accordance with [those] policies and must take prompt and appropriate action to prevent and address any instances of harassment and discrimination." *Id.* at 1–2.

**b.** About one week later, President Spellings issued a supplement to the Guidance Memorandum. Spellings April 11 Statement, ECF No. 46-8. She reiterated that the memorandum "simply states what the General Assembly and Governor passed into law," that campuses already label bathrooms for men and women, and that "the law does not address enforcement and confers no authority for the University . . . to undertake enforcement actions." *Id.* She also reemphasized that the University maintains its "commitment to diversity [and] inclusion," "will not change existing non-discrimination policies," and "will not tolerate any sort of harassing or discriminatory behavior on the basis of gender identity or sexual orientation." *Id.*

**c.** Finally, President Spellings has submitted a sworn declaration confirming that the University "has not threatened to enforce the Act's requirement that the University require individuals to use the restroom or changing facility that corresponds with their biological sex." Spellings Decl. ¶ 13. She further swore that she had "no intent to exercise [her] authority to promulgate any guidelines or regulations that require that transgender students use the restrooms consistent with their biological sex." *Id.* ¶ 16.

5

She also swore that, "[i]f any transgender student or employee does complain that they have been forced to use a restroom inconsistent with their gender identity, [she] will ensure that the complaint is investigated to determine whether there has been a violation of the University nondiscrimination policy and applicable law." *Id.* ¶ 15.

**4.** Plaintiffs sued the University, the Board of Governors, and W. Louis Bissette, Jr. in his capacity as Chairman of the Board. Invoking § 1983, Plaintiffs assert that the Board and Chairman Bissette are violating the Equal Protection and Due Process Clauses of the Fourteenth Amendment. First Am. Compl. ¶¶ 183–234 (Counts I–III), ECF No. 9. Plaintiffs also assert that the University is violating Title IX of the Education Amendments of 1972 (Title IX). First Am. Compl. ¶¶ 235–243 (Count IV).

## QUESTIONS PRESENTED

1. Whether Plaintiffs' claims against the UNC Defendants violate constitutional and prudential restrictions on this Court's jurisdiction.

2. Whether Plaintiffs' constitutional claims contravene state sovereign immunity and exceed the scope of § 1983.

3. Whether Plaintiffs fail to state a claim for a permanent injunction because a declaratory judgment would constitute an adequate remedy.

## STANDARD OF REVIEW

Civil Rule 12(b)(1) allows a defendant to move for dismissal for "lack of subject-matter jurisdiction." When ruling on a Rule 12(b)(1) motion, the district court may "consider exhibits outside the pleadings" and "weigh the evidence [to] satisfy itself as to

6

the existence of its power to hear the case." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). The plaintiff "bears the burden of persuasion." *Id.*

Civil Rule 12(b)(2) allows a defendant to move for dismissal for "lack of personal jurisdiction." A defendant may use a Rule 12(b)(2) motion to raise a defense of sovereign immunity. *Frye v. Brunswick County Bd. of Ed.*, 612 F. Supp. 2d 694, 701 (E.D.N.C. 2009). When ruling on a Rule 12(b)(2) motion, the court may consider "the pleadings and affidavits." *Regent Lighting Corp. v. Galaxy Elec. Mfg., Inc.*, 933 F. Supp. 507, 509 (M.D.N.C. 1996). The plaintiff bears the burden of proving personal jurisdiction. *Mylan Laboratories, Inc. v. Ako, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

Civil Rule 12(b)(6) allows a defendant to move for dismissal for "failure to state a claim upon which relief can be granted." When ruling on a Rule 12(b)(6) motion, the district court should "accept as true all well-pled facts in the complaint." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2013). The court may, "without converting the motion to dismiss into one for summary judgment," consider extrinsic documents "quoted by, relied upon, incorporated by reference [by] or otherwise integral to the complaint." *Plymouth County Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 536–37 (M.D.N.C. 2013) (Schroeder, J.).

## ARGUMENT

### I. PLAINTIFFS' CLAIMS AGAINST THE UNC DEFENDANTS ARE NEITHER JUSTICIABLE NOR RIPE

Federal courts have jurisdiction only to resolve live cases and controversies, not to adjudicate abstract debates. But there is no live controversy here between Plaintiffs and

7

the UNC Defendants: As President Spellings' Declaration confirms, the UNC Defendants have neither enforced nor threatened to enforce the Act, and thus have not inflicted the sort of injury that is a prerequisite to suing in federal court. In accordance with Civil Rule 12(b)(1), the Court should dismiss all claims against them. *See Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 480–81 (4th Cir. 2003) (lack of justiciability is grounds for dismissal under Rule 12(b)(1)); *ProEnglish v. Bush*, 70 Fed. Appx. 84, 86–88 (4th Cir. 2003) (lack of ripeness is grounds for dismissal under Rule 12(b)(1)).

## A. The Lawsuit Against The UNC Defendants Is Not A Justiciable Case Or Controversy Under Article III

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. It is "abundantly clear" that a challenge to the validity of a statute presents a justiciable case or controversy only if the defendant enforces or threatens to enforce the statute. *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986). The UNC Defendants have done neither. In fact, the only steps the UNC Defendants have taken in response to the Act comport fully with Plaintiffs' understanding of the Equal Protection Clause, Due Process Clause, and Title IX. That alone defeats all of Plaintiffs' claims against the UNC Defendants.

### 1. A challenge to a statute is justiciable only if the defendant enforces or threatens to enforce it

The "mere existence" of a statute does not make a challenge to that statute "an adversary case" under Article III. *Poe v. Ullman*, 367 U.S. 497, 507 (1961) (plurality

8

opinion); *see Doe*, 782 F.2d. at 1207. To the contrary, a challenge to a statute qualifies as a proper case or controversy only if the defendant enforces the statute, or there exists a "credible threat" that the defendant will enforce the statute, against the plaintiff. *Susan B. Anthony List v. Driehaus* (*SBA List*), 134 S. Ct. 2334, 2342 (2014); *see Doe*, 782 F.2d at 1206.

This credible-threat requirement flows from the doctrine of Article III standing. A plaintiff has standing to maintain a lawsuit in federal court only if (1) he has suffered an "injury in fact"—*i.e.*, an "invasion" of a judicially cognizable interest that is "concrete and particularized" and "actual or imminent," (2) the injury is "fairly traceable to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (alterations and internal quotation marks omitted). A challenged statute can cause "actual or imminent" injury only if the defendant is enforcing the statute against the plaintiff, or if there is a "credible threat" that the defendant will enforce the statute against the plaintiff. *SBA List*, 134 S. Ct. at 2341–42.

The credible-threat requirement also exists in the ripeness doctrine. Article III prohibits federal courts from adjudicating "abstract disagreements" that have not ripened into "concrete case[s] or controvers[ies]." *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 579–80 (1985). A disagreement about a statute's validity does not become "a ripe controversy" until there is a "live dispute involving the actual or threatened application" of the challenged law. *Renne v. Geary*, 501 U.S. 312, 320–21 (1991).

9

The Supreme Court and courts in this Circuit have applied the credible-threat requirement in a wide range of cases. For example, the Supreme Court dismissed a constitutional challenge to a law regulating railroad operations because "Plaintiffs did not allege that [the state Attorney General] threatened or intended to do anything for the enforcement of the statute." *Ex parte La Prade*, 289 U.S. 444, 458 (1933). The Court also dismissed a constitutional challenge to a law regulating contraception because "years of [state] history" revealed a "tacit agreement" not to enforce the law. *Poe*, 367 U.S. at 508. Similarly, the Fourth Circuit held that an unmarried couple could not challenge a state law prohibiting "fornication and cohabitation" because "[r]ecorded cases" and "recent arrest records" revealed that the challengers "face[d] only the most theoretical threat of prosecution." *Doe*, 782 F.2d at 1206. And a district court in this state dismissed a challenge to an ordinance regulating speeches on public streets because the plaintiff "made no allegation . . . that anyone threatened to apply the law to him." *Moore v. Asheville*, 290 F. Supp. 2d 664, 671 (W.D.N.C. 2003).

As these cases make clear, the credible-threat requirement protects vitally important interests. It "maintains proper separation of powers" by ensuring that federal courts do not "come to operate as second vetoes, through whom laws must pass for approval before they could be enforced." *Doe*, 782 F.2d at 1205–06. It safeguards "the integrity of the judicial process" (*Poe*, 367 U.S. at 505) by "provid[ing] courts with arguments sharpened by the adversarial process" and "narrow[ing] the scope of judicial scrutiny to specific facts" (*Doe*, 782 F.2d at 1205). And it "protects federalism by

10

allowing the states to control the application of their own" statutes. *Id.* The credible-threat requirement defeats Plaintiffs' request here.

### 2. The UNC Defendants have shown that they do not enforce or threaten to enforce the Act

A plaintiff challenging a statute, as "[t]he party invoking federal jurisdiction," "bears the burden of establishing" that the defendant enforces or threatens to enforce that statute. *SBA List*, 134 S. Ct. at 2342. The defendant, however, may negate the existence of a case or controversy by disclaiming any intention to enforce the law. For example, there was no case or controversy in *CIO v. McAdory*, 325 U.S. 472, 475 (1945), precisely because state officials had "agreed not to enforce" the challenged provision.

Here, Plaintiffs cannot carry their burden of demonstrating a justiciable controversy in light of the University's repeated (and uncontested) disclaimers of any authority or intention to enforce the Act—and, indeed, any authority or intention to take any action that Plaintiffs seek to prohibit:

- "The Act does not contain provisions concerning enforcement of the bathroom and changing facility requirements." Guidance Mem. 4.

- "We caution that the law does not address enforcement and confers no authority for the University or any other public agency to undertake enforcement actions." Spellings April 11 Statement.

- "The law does not address enforcement and confers no authority for the University . . . to undertake enforcement actions. . . . The University has no process or means to enforce [the Act's] provisions." Shanahan April 13 Letter to Dept. of Justice, ECF No. 46-9.

- "Throughout all of this time, the University has recognized that the Act does not address enforcement and therefore has not taken any steps to

11

enforce the statute's requirements on its campuses." Spellings May 9 Letter to Dept. of Justice, ECF No. 46-10.

- "The University has not threatened to enforce the Act's requirement that the University require individuals to use the restroom or changing facility that corresponds with their biological sex, as listed on their birth certificate. In fact, I have repeatedly cautioned the constituent institutions that the Act confers no enforcement authority on the University or any other entity." Spellings Decl. ¶ 13.

- "If any transgender student or employee does complain that they have been forced to use a restroom inconsistent with their gender identity, I will ensure that the complaint is investigated to determine whether there has been a violation of the University nondiscrimination policy and applicable law." *Id.* ¶ 15.

- "Pending a final judgment in this case, I have no intent to exercise my authority to promulgate any guidelines or regulations that require that transgender students use the restrooms consistent with their biological sex." *Id.* ¶ 16.

In light of these assurances, there is no live controversy between Plaintiffs and the UNC

Defendants to adjudicate.

3. **Plaintiffs cannot show that the UNC Defendants enforce or threaten to enforce the Act**

Even putting aside the University's assurances that it will not take enforcement action, Plaintiffs still cannot show a justiciable controversy. To establish such a controversy, a plaintiff must show that the defendant threatens to inflict a "specific . . . objective harm" upon one who violates the challenged statute. *Doe*, 782 F.2d at 1206. The "mere existence of the [challenged] statute" does not suffice. *Id.* Likewise, a "subjective fear" of harm also does not suffice, because justiciability requires an

12

"objective threat" of enforcement rather than a "subjective chill." *Id.* "Even past threats of prosecution may not be sufficient." *Id.*

Here, Plaintiffs have not even alleged—let alone proved—that the UNC Defendants enforce or threaten to enforce the Act. The complaint does not identify a single incident in which the UNC Defendants responded to a transgender person's use of a bathroom consistent with his or her gender identity by removing the person from the bathroom, by taking disciplinary action, by filing a police report, by seeking civil or criminal punishment, or by imposing *any* other concrete harm. Indeed, the complaint never even explains what, exactly, the UNC Defendants are doing that Plaintiffs want them to stop doing. Because Plaintiffs fail even to *allege* a credible threat that the UNC Defendants will inflict a "specific objective harm" upon transgender people who use bathrooms consistent with their gender identity, the lawsuit against these defendants is not justiciable.

### B. The Lawsuit Against The UNC Defendants Is Not Ripe

Plaintiffs' claims against the UNC Defendants are also not "ripe for judicial review. *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003). To determine whether a case is prudentially ripe, "courts must balance 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002). The plaintiff bears "[t]he burden of proving ripeness." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

13

Plaintiffs cannot show the fitness for judicial review of their claims against the UNC Defendants. A claim is unfit for judicial review if it is "prematur[e] and abstrac[t]" (*Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972)), and a challenge to a state law is "premature" and "abstract" when there is no imminent threat of enforcement (*Doe*, 782 F.2d at 1207–08). For example, a challenge to an administrative policy concerning dental practices was unfit for review where the state dental board did "not plan to take any action" on the basis of the policy. *Int'l Acad. of Oral Med. & Toxicology v. N.C. State Bd. of Dental Exam'rs*, 451 F. Supp. 2d 746, 751 (E.D.N.C. 2006). So too, here, where the UNC Defendants do not plan to take any enforcement action on the basis of the Act.

Nor would denying review cause hardship. Hardship "is measured by the immediacy of the threat . . . of enforcement." *Miller*, 462 F.3d at 319. Here, of course, there is *no* threat of enforcement, much less an *immediate* one.

Since Plaintiffs cannot show fitness for review or hardship in the absence of review, the Court should dismiss their claims against the UNC Defendants as prudentially unripe.

## II. PLAINTIFFS' CONSTITUTIONAL CLAIMS VIOLATE SOVEREIGN IMMUNITY AND EXCEED § 1983'S SCOPE

Plaintiffs raise three constitutional claims under § 1983 against the Board and Chairman Bissette (Counts I–III) and one Title IX claim against the University (Count IV). Plaintiffs' constitutional claims against the Board and Chairman Bissette violate North Carolina's sovereign immunity, and the constitutional claims against the Board

14

exceed the scope of the right of action established by § 1983. In accordance with Rules 12(b)(1), 12(b)(2), and 12(b)(6), the Court should dismiss these constitutional claims (thereby eliminating the Board and its Chairman as defendants in this case). *See Andrews v. Daw*, 201 F.3d 521, 524 (4th Cir. 2000) (Fourth Circuit has treated sovereign immunity as grounds for dismissal under both Rule 12(b)(1) and Rule 12(b)(6)); *Frye*, 612 F. Supp. 2d at 701 (treating sovereign immunity as grounds for dismissal under Rule 12(b)(2)); *Costello v. Univ. of North Carolina at Greensboro*, 394 F. Supp. 2d 752, 761 (M.D.N.C. 2005) (lack of right of action under § 1983 is grounds for dismissal under Rule 12(b)(6)).

## A. The Constitutional Claims Against The Board Violate Sovereign Immunity And Exceed § 1983's Scope

The Constitution of the United States presupposes that "each State is a sovereign entity in our federal system" and thus "[is] not . . . amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Where "the State or one of its agencies or departments is named as the defendant," "[t]his jurisdictional bar applies regardless of the nature of the relief sought." *Pennhurst State Sch. & Hosp v. Halderman*, 465 U.S. 89, 100 (1984). This immunity extends to "[s]tate-funded colleges and universities" that have "close ties to the State." *Blackburn v. Trs. of Guilford Tech. Cmty. Coll.*, 822 F. Supp. 2d 539, 542–43 (M.D.N.C. 2011) (Schroeder, J.) (citing *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 263 (4th Cir. 2005)). In *Huang v. Board of Governors of University of North Carolina*, 902 F.2d 1134 (4th Cir. 1990), the Fourth Circuit held that sovereign immunity precludes a lawsuit under § 1983 against the University of North Carolina's Board of Governors. *Id.* at 1139. This Court

15

likewise concluded in *Costello v. University of North Carolina at Greensboro*, 394 F. Supp. 2d 752 (M.D.N.C. 2005), that the Board "enjoy[s] the state's [sovereign] immunity." *Id.* at 756.

Separately, § 1983 creates a private right of action only against a "person" who deprives an individual of constitutional rights under color of state law. A State or state agency "is not a 'person' within the meaning of § 1983," and thus may not be sued under that statute. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65 (1989). In *Huang*, the Fourth Circuit explained that the Board, "as [an] alter eg[o] of the state," "[is] not [a] 'perso[n]' within the meaning of § 1983." 902 F.2d at 1139 n.6. This Court has agreed that the Board is "an alter ego of the State of North Carolina" and thus may not be sued under § 1983. *Googerdy v. N.C. Agr. & Tech. State Univ.*, 386 F. Supp. 2d 618, 625 (M.D.N.C. 2005); *accord Mann v. Winston Salem State Univ.*, No. 14-1054, 2015 WL 5336146, at *4 (M.D.N.C. Sep. 14, 2015); *see also* N.C. Gen. Stat. § 116-3 ("The Board of Governors . . . [is] a body politic and corporate").

Here, under a straightforward application of these principles, Plaintiffs cannot sue the Board. Plaintiffs cannot bring their constitutional claims against the Board because it enjoys sovereign immunity. And Plaintiffs do not have a right of action for their constitutional claims against the Board because the Board is not a "person" that can be sued under § 1983.

16

**B. The Constitutional Claims Against Chairman Bissette Violate Sovereign Immunity**

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court held that, notwithstanding state sovereign immunity, "officers of the state, [who] are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence an action . . . to enforce an unconstitutional state statute, may be enjoined from doing so." *Id.* at 156. *Young* establishes a "narrow exception" to state sovereign immunity, and where the exception does not apply state officers sued in their official capacity remain immune from suit—even where the plaintiff seeks purely prospective relief. *Seminole Tribe*, 517 U.S. at 76; *see Wright v. North Carolina*, 787 F.3d 256, 261–63 (4th Cir. 2015).

Two prerequisites to the applicability of *Ex parte Young* are pertinent here. One: The state officer in question must have a "duty in regard to the enforcement" of the challenged law. *Young*, 209 U.S. at 156. A "general duty to enforce the laws" is not enough; the officer must have a "specific duty to enforce the challenged statut[e]." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001); *accord Wright*, 787 F.3d at 261–63. Two: The state officer must "threaten and [be] about to . . . enforce [the challenged] state statute." *Young*, 209 U.S. at 156. If the state officer has not "personally" "enforced, threatened to enforce, or advised other agencies to enforce the [challenged statute] against [Plaintiffs], the *Ex parte Young* fiction cannot apply." *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010).

17

Here, Plaintiffs satisfy neither prerequisite and, as a result, Chairman Bissette is entitled to sovereign immunity. First, Chairman Bissette does not have a duty to enforce the challenged statute. As an initial matter, Chairman Bissette does not even have a general responsibility for executing state laws. The North Carolina Constitution provides that "[t]he Governor shall take care that the laws be faithfully executed" (N.C. Const. art. III, § 5, cl. 4), thus "clearly assign[ing] the enforcement of laws to [him]" (*Wright*, 787 F.3d at 262). Neither North Carolina's Constitution nor its statutes makes the Chairman of the University's Board of Governors responsible for executing state law. *See* N.C. Gen. Stat. § 116-8 (establishing office of Chairman); *The Code of the Board of Governors of the University of North Carolina* § 202 (empowering the Chairman to preside over Board meetings, not to execute state law). And Chairman Bissette certainly does not have (as *Ex parte Young* requires) specific responsibility for enforcing the statute challenged here. Quite the contrary, the Act says nothing at all about its enforcement.

Second, even if Chairman Bissette (who is merely one of 32 voting members of the Board) *could* do something to enforce the challenged statute, Plaintiffs have not shown that he *would* do so. Plaintiffs have not even alleged, much less proved, that Chairman Bissette has "personally" "enforced, threatened to enforce, or advised other agencies to enforce" the Act against Plaintiffs. *Ex parte Young* thus does not come into play, and Chairman Bissette remains immune from Plaintiffs' lawsuit.

18

### III. PLAINTIFFS FAIL TO STATE A CLAIM FOR A PERMANENT INJUNCTION BECAUSE DECLARATORY RELIEF WOULD SUFFICE

Plaintiffs also have no entitlement to a permanent injunction against the UNC Defendants, because a declaratory judgment would constitute an adequate remedy for any violation of federal law. In accordance with Rule 12(b)(6), the Court should dismiss the prayer for a permanent injunction. *See Foster v. Wells Fargo Bank, N.A.*, No. 14-17, 2014 WL 3965059, at *7 (WD Va. Aug. 13, 2014) (adequacy of other remedies is grounds for dismissal of a request for an injunction under Rule 12(b)(6)).

A permanent injunction is "a drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "If a less drastic remedy" (such as a declaratory judgment) "suffic[es] to redress [the plaintiff's] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Id.* at 165; *see Nat'l Audobon Soc'y v. Dept. of Navy*, 422 F.3d 174, 200 (4th Cir. 2005).

In cases against government actors, courts begin with the presumption that the government "will abide by" a declaratory judgment (*Utah v. Evans*, 536 U.S. 452, 460 (2002)), leaving the plaintiff with "the burden of showing that [the government's] bad faith or other circumstances requir[e] the issuance of an injunction" (*R.I. Comm. on Energy v. GSA*, 561 F.2d 397, 405 (1st Cir. 1977)). For example, in *Douglas v. Jeannette*, 319 U.S. 157, 165 (1943), an injunction against a city's enforcement of a solicitation ordinance was neither "necessary [n]or appropriate," because there was "no allegation . . . and no proof" that the officials "would not . . . acquiesce" in a declaration of unconstitutionality. *See also Poe v. Gerstein*, 417 U.S. 281, 281 (1974) (*per curiam*)

19

("prope[r]" to "refus[e] to issue [an] injunction" in light of the presumption "that the State would respect the declaratory judgment"); *R.I. Comm.*, 561 F.2d at 405 (proper to "refus[e] to issue an injunction" where there is no "showing [of] bad faith"). Courts have applied these principles even at the pleadings stage. *See, e.g.*, *Bryant v. Blanton*, 463 F. Supp. 155, 157 (W.D. Tenn. 1979) (rejecting prayer for injunctive relief at the pleadings stage because "[i]t is presumed that defendants intend to and will abide by [a] declaratory judgment").

Here, the Court must presume that the University, Board, and Chairman—all government actors—will give full credence to any declaratory judgment that the Court issues. The Guidance Memorandum—which the complaint quotes (First Am. Compl. ¶ 240) and which the Court may therefore consider on a motion to dismiss (*Plymouth County Ret. Ass'n*, 966 F. Supp. 2d at 536–37)—expressly reinforces this presumption. It makes clear that the University will "fulfill its obligations under the [Act] *unless or until the court directs otherwise*." Guidance Mem. at 2 (emphasis added).

The complaint does not include any allegations that the University, Board, or Chairman would disregard a declaratory judgment or otherwise act in bad faith. The prayer for injunctive relief should therefore be dismissed.

## CONCLUSION

This Court should grant the Motion to Dismiss.

Dated:   July 18, 2016

Respectfully submitted,

/s/ Carolyn C. Pratt
Carolyn C. Pratt
NC Bar No. 38438
The University of North Carolina
P.O. Box 2688
Chapel Hill, NC 27515
Tel: (919) 962-3406
Fax: (919) 962-0477
Email: ccpratt@northcarolina.edu

/s/ Noel J. Francisco
Noel J. Francisco
Glen D. Nager
James M. Burnham
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina, the Board of Governors of the University of North Carolina, and W. Louis Bissette, Jr., in his Official Capacity as Chairman of the Board of Governors of the University of North Carolina*

## CERTIFICATE OF SERVICE

I certify that on July 18, 2016, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:   July 18, 2016

/s/ Noel J. Francisco
Noel J. Francisco
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: njfrancisco@jonesday.com

*Counsel for the University of North Carolina, the Board of Governors of the University of North Carolina, and W. Louis Bissette, Jr., in his Official Capacity as Chairman of the Board of Governors of the University of North Carolina*