```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
   JOAQUIN CARCAÑO, et al.,        ) 1:16CV236
 3                                 )
            Plaintiffs,            )
 4                                 )
   V.                              )
 5                                 )
   PATRICK McCRORY, in his         )
 6 Capacity as Governor of North   )
   Carolina, et al.,               )
 7                                 )
            Defendants,            )
 8                                 )
            and                    )
 9                                 )
   PHIL BERGER, in his official    )
10 Capacity as President Pro       )
   Tempore of the North Carolina   )
11 Senate; and TIM MOORE, in his   )
   Official capacity as Speaker of )
12 The North Carolina House of     )
   Representatives.                )
13                                 )
            Intervenor-Defendants. )
14 _____
   UNITED STATES OF AMERICA,       ) 1:16CV425
15                                 )
            Plaintiff,             )
16                                 )
   V.                              )
17                                 )
   STATE OF NORTH CAROLINA, et al. )
18                                 )
            Defendants,            )
19                                 )
            and                    )
20                                 )
   PHIL BERGER, in his official    )
21 Capacity as President Pro       )
   Tempore of the North Carolina   )
22 Senate; and TIM MOORE, in his   )
   Official capacity as Speaker of )
23 The North Carolina House of     ) Winston-Salem, North Carolina
   Representatives,                ) August 1, 2016
24                                 ) 10:00 a.m.
            Intervenor-Defendants. )
25 _____
```

TRANSCRIPT OF THE **PRELIMINARY INJUNCTION HEARING**
          BEFORE THE HONORABLE THOMAS D. SCHROEDER
2                UNITED STATES DISTRICT JUDGE

3  <u>APPEARANCES:</u>

4  1:16CV236

5  For the Plaintiff:   PAUL M SMITH, ESQ.
                       SCOTT B. WILKENS, ESQ.
6                      JENNER & BLOCK, LLC.
                       1099 New York Avenue, NW Suite 900
7                      Washington, DC 20005

8                      CHRISTOPHER A. BROOK, ESQ.
                       AMERICAN CIVIL LIBERTIES UNION OF NC
9                      P. O. Box 28004
                       Raleigh, North Carolina 27611-8004
10 1:16CV425

11 For the Plaintiff:   COREY STOUGHTON, ESQ.
                       U. S. DEPARTMENT OF JUSTICE
12                     Civil Rights Division
                       950 Pennsylvania Avenue, NW
13                     Washington, DC 20530

14                     RIPLEY RAND, U.S. ATTORNEY
                       101 S. Edgeworth Street, 4th Floor
15                     Greensboro, North Carolina 27401

16
   For the Defendants:
17
   (State of NC,
18 Governor McCrory,
   DPS)                KARL S. BOWERS , JR., ESQ.
19                     BOWERS LAW OFFICE, LLC
                       P.O. Box 50549
20                     Columbia, South Carolina 29250

21                     ROBERT C. STEPHENS, ESQ.
                       OFFICE OF THE GENERAL COUNSEL
22                     OFFICE OF THE GOVERNOR
                       116 W. Jones Street
23                     Raleigh, North Carolina 27699

24

25

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

```
 1  APPEARANCES (Continued):

 2

 3  (UNC)              NOEL J. FRANCISCO, ESQ.
                       JONES DAY
                       51 Louisiana Avenue, N.W.
 4                     Washington, DC 20001

 5                     CAROLYN C. PRATT, ESQ.
                       UNIVERSITY OF NORTH CAROLINA
 6                     P.O. Box 2688
                       Chapel Hill, North Carolina 27517

 7

 8  (Intervenors)      STUART K. DUNCAN, ESQ.
                       GENE SCHAERR, ESQ.
 9                     ROBERT POTTER, ESQ.
                       SCHAERR DUNCAN, LLP
10                     1717 K Street, NW, Suite 900
                       Washington, DC 20006

11

12  (Amici School Administrators)

13                     MARK R. SIGMON, ESQ.
                       NATE SMITH, ESQ.
14                     SIGMON LAW, PLLC.
                       5 W Hargett Street, Suite 812
15                     Raleigh, North Carolina 27601

16  Court Reporter:    BRIANA NESBIT, RPR
                       Official Court Reporter
17                     P.O. Box 20991
                       Winston-Salem, North Carolina 27120
18

19

20

21

22

23

24
        Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

```
 1                    P ROCEEDINGS
```

 2          **THE COURT:**  Good morning, everyone.  We are here on

 3  the Carcano case, 1:16CVC236, Carcano versus Patrick McCrory.

 4  We also have the United States here today as well, even though

 5  they are not a party to that, and I have the Intervenors and

 6  other parties.

 7          Let me ask you all to go ahead and make your

 8  appearances for the record, if you would, please.

 9          **MR. SMITH:**  Good morning, Your Honor.  I'm Paul Smith

10  from Jenner & Block in Washington, D.C., co-counsel with the

11  ACLU and Lambda Legal for the Carcano Plaintiffs.  With me at

12  counsel table is my colleague Scott Wilkens from Jenner as

13  well.

14          **THE COURT:**  Good morning.  Any other Plaintiffs?

15          **MS. STOUGHTON:**  Your Honor, this is Corey Stoughton

16  from the Department of Justice for the United States.

17          **THE COURT:**  Welcome.

18          **MR. RAND:**  Ripley Rand from the U.S Attorney's

19  Office.

20          **MR. BOWERS:**  Good morning, Your Honor, Butch Bowers

21  here for the Governor, and I'll allow Mr. Francisco and

22  Mr. Duncan to introduce themselves.

23          **MR. DUNCAN:**  Good morning, Your Honor, Kyle Duncan

24  here from Schaerr Duncan in Washington, D.C., and we're

25  representing the Intervenor Defendants in this case.

1          **MR. FRANCISCO:**  Good morning, Your Honor, Noel

2   Franciso of Jones Day for the University of North Carolina

3   Defendants.

4          **THE COURT:**  Good morning.  I have, I believe, counsel

5   for the Amici School Administrators.  Who is here?  Mr. Smith?

6          **MR. SIGMON:**  Good morning, Your Honor, Mark Sigmon.

7   I'm local counsel for Amici, and Mr. Smith is primary counsel.

8          **THE COURT:**  Did we run out of room up front?  You're

9   welcome to sit up here, if you'd like.

10          **MR. SIGMON:**  We're good, Your Honor.  Mr. Smith will

11   be doing all the real talking.

12          **THE COURT:**  All right.  Mr. Smith.

13          **MR. NATHANIEL SMITH:**  Your Honor, Mr. Nathaniel

14   Smith, Pillsbury Winthrop Shaw Pittman, for the School

15   Administrator Amici.

16          **THE COURT:**  All right.  We're here on the motion for

17   preliminary injunction raised by the ACLU and the Carcano and

18   other Plaintiffs in that case; but as I've indicated, I'm also

19   interested in hearing the views of the United States of

20   America, so I would like to hear your views as well.

21          There are a number of questions that I have.  I've

22   read the briefs.  I have extensive briefing from everybody,

23   including materials attached to that, and I've been through all

24   the briefing in this case as well as in the DOJ case, to the

25   extent it's been filed.  I understand all the responses are in.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  So I would be happy to hear from the parties as to any argument

2  you want to make, but, rest assured, I've read all the

3  materials.  I believe I understand your positions, but I do

4  have some questions that I am going to be asking as we go

5  along.

6          **MR. SMITH:**  Your Honor, thank you very much for the

7  opportunity to argue this motion on an expedited basis.  We

8  appreciate that.

9          Before we begin, I wonder, with the Court's

10  indulgence, if I might introduce to you as well three of our

11  individual Plaintiffs who are here in the front row:  Joaquin

12  Carcano, who is an employee at the University of North Carolina

13  at Chapel Hill, next one over is H. S -- she is still in high

14  school, so we are using her initials.  She's a rising senior at

15  the University of North Carolina School of the Arts here in

16  Winston-Salem -- and Payton McGarry is a full-time student at

17  the University of North Carolina in Greensboro.

18          **THE COURT:**  Good morning.

19          **MR. SMITH:**  Thank you for that, Your Honor.

20          We think the argument for a preliminary injunction

21  returning to the status quo before March of 2016 in this case

22  is, frankly, very strong for two basic reasons.  The first,

23  looking at the balance of the equities, is that we see this as

24  a law that created problems rather than solving problems.

25  There was no record prior to the passage of this law of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

problems being caused in North Carolina, or, frankly, anywhere
else, by transgender people using restrooms and changing
facilities consistent with their gender identity.

**THE COURT:** Is there any legislative record that was
considered by the General Assembly?

**MR. SMITH:** Your Honor, I am not aware of any. My
understanding is that the whole process consumed less than one
day and that the bill was produced and voted on in a matter of
minutes and hours on March 23. So I don't believe any evidence
was developed, and certainly nothing has been cited to this
Court, either from the legislative record or since, that would
show that there is a real factual basis for the --

**THE COURT:** Was there a hearing?

**MR. SMITH:** A hearing on --

**THE COURT:** Were there any kind of hearings on the
bill? I was looking for a transcript, and I have one page.

**MR. SMITH:** Your Honor, I believe, if I remember
correctly from the briefs, there was a committee that convened
and voted it out in a matter of minutes in one of the two
houses. I imagine that my colleagues over here can probably
give you more specifics on that. I apologize.

The second reason why we think that the case for a
preliminary injunction is very strong is on the merits. We
think that the legal arguments here are stong as well.

So these given those two, that there's -- really the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP  Document 103  Filed 08/04/16  Page 7 of 143

1 status quo was fine, this law created problems for a

2 specifically targeted group of people who have really

3 significant personal problems trying to figure out where they

4 are supposed to go to the restroom and change their clothes to

5 go to sports, and that the law is quite clearly on our side, at

6 least I hope to convince you of that, this seems like a really

7 easy case to go back and keep things under status quo, at least

8 until we go to trial, which, after all, is only a few months

9 away.

10          Let me start, if it makes sense, with the Title IX

11 claim that the three individuals have --

12          **THE COURT:**  And let me indicate I am familiar with

13 that, and I am familiar with the *G.G.* case.  I would be glad to

14 hear your argument, but I am most interested in not the

15 bathroom portion of your argument, but the remainder that was

16 not directly addressed in the holding of *G.G.*, and that is

17 showers and changing rooms.

18          **MR. SMITH:**  Sure.  It seems to me, though, given that

19 there is no sovereign immunity issue on Title IX and given that

20 the *G.G.* case is out there, at least as to restrooms, and we

21 can talk about changing facilities in a minute, the only real

22 issue that they've raised -- Mr. Francisco has raised is the

23 argument that the University of North Carolina, although it has

24 said it's compliant with the law, has not actually done enough

25 to be subject to an injunction, that there is not a sufficient

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 8 of 143

1  degree of enforcement; and, therefore, my clients, when they

2  are on the campuses of the University of North Carolina,

3  somehow aren't being harmed by the conduct of the University to

4  a sufficient degree.

5          It seems to me that the complete answer to that is in

6  the documents that are in the record, the statements that have

7  been made to my clients, to the world by the University of

8  North Carolina, making it a very clear that it is the policy of

9  the University of North Carolina, as state law mandates, that

10 people only access these facilities consistent with what the

11 law calls their biological sex, what we would say is their

12 gender assigned at birth.

13         **THE COURT:**  What is the enforcement mechanism of the

14 law?

15         **MR. SMITH:**  There is no specific provision in the

16 law, as there isn't in many kinds of law --

17         **THE COURT:**  Does the law -- does H.B. 2 expressly

18 prevent a transgender person from entering a restroom of their

19 choice?

20         **MR. SMITH:**  No, it is a law specifically directed to

21 the people who maintain and operate these facilities.  What has

22 happened then --

23         **THE COURT:**  It directs the agency to ensure that the

24 purpose of the law is carried out?

25         **MR. SMITH:**  Right.  So what's happened as a result of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  that mandate is the University of North Carolina has done that,

2  and I think it's important to look specifically at what

3  President Spellings has said on multiple occasions, and it's

4  also, I think, useful to consider what's actually happened to

5  my clients, one of whom is now using, by the mandate of his

6  employer, the University of North Carolina, a different

7  restroom facility than the one he was using for a number of

8  months or years before that without incident.

9       It's important I think to start with the April 5

10 guidance that President Spellings put out, and, Your Honor, we

11 have these in kind of loose forms, three or -- there's only

12 four or five documents, but since they are attached to

13 different motions and different parts of the record, I wonder

14 if it would be more convenient simply to hand up a couple of

15 copies.

16      **THE COURT:**  You are welcome to.  I am familiar with

17 them, and I've read them; but if you want to refer to them, I

18 would be happy to have a copy.

19      **MR. SMITH:**  I would appreciate that opportunity, Your

20 Honor.  Thank you.

21      **THE COURT:**  Sure.

22      **MR. SMITH:**  This is the guidance that came out just

23 about ten or eleven days after the bill was passed by President

24 Spellings directed to all the chancellors of all the campuses

25 at the University of North Carolina, and I think it's important

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  to start with obviously the guidance and paragraph that

2  recognizes what the act requires, which is that

3  multiple-occupancy bathrooms and changing facilities be

4  designated for and only used by persons based on biological

5  sex.

6          **THE COURT:**  Doesn't the act require the agency to

7  ensure that persons that are not permitted under the act to use

8  restrooms don't use them?

9          **MR. SMITH:**  Yes, the act mandates that there be

10  enforcement by --

11          **THE COURT:**  So is there anything in the University of

12  North Carolina's correspondence that says we will not

13  enforce -- we will not carry out our duty under the act?

14          **MR. SMITH:**  Well, it's an interesting finesse they

15  are trying to do because they try to say simultaneously they

16  are in full compliance with the act, as they have assured

17  people and told the students many times, but at the same time,

18  they are not doing anything to enforce it.

19          **THE COURT:**  Let me ask this:  Does the University --

20  I'll ask Mr. Francisco in a moment.  Does the University of

21  North Carolina through its various decision-makers have the

22  authority under North Carolina law to decide not to enforce the

23  act?

24          **MR. SMITH:**  The only authority they would have, Your

25  Honor, is if they were willing to say that they think that

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  paramount federal law requires them to disregard the provisions

2  of the act.  It's a statement they clearly have not been

3  willing to make to date; and, instead, what Ms. Spellings said

4  in this guidance on April 5 was that we're going to follow the

5  act unless and until a court directs otherwise, and we are

6  simply asking here, Your Honor, to direct otherwise.

7          It seems to us that, given what -- the other thing

8  she said at the time, there is no problem with justiciability

9  or with the suggestion that somehow no one is being harmed on

10  campus by the implementation of the law by the campus.  It says

11  in answer to question Number 2, what are the University's

12  obligations, Ms. Spellings says, "University institutions must

13  require every multiple occupancy bathroom and changing facility

14  to be designated for and used only by persons based on their

15  biological sex."  That's the answer to Number 2.

16          **THE COURT:**  And she's passed that along to all of her

17  constituent personnel in the University of North Carolina

18  system?

19          **MR. SMITH:**  What happens is this goes to each of the

20  chancellors of all the various campuses, Greensboro and Chapel

21  Hill.  We have in the record emails that were email blasts out

22  to the full staff and student body of the campus saying a

23  variety of things.  We can look at that them in a minute, but

24  they basically say House Bill 2 is in effect.  It is our

25  obligation to carry it out.  We apologize for the pain and

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  hardship this is causing you.  There are some single-use

2  facilities that you can use as accommodations.

3      So the message was directed out to the general public

4  on these campuses that we are complying with the act, and that

5  if you are a transgender person who has been using a men's room

6  even as a transgender men, you better stop doing it.  That is

7  the message because that is the policy of the University of

8  North Carolina.

9      It says if the sign on the men's room door now says

10  men but not transgender men, that is the announced policy which

11  has been communicated to my clients and other transgender

12  individuals who are on the campus.

13      **THE COURT:**  The University has raised issues of

14  rightness and justiciability.  Those turn, in part, on whether

15  certain people have the authority to enforce a law.  You have

16  sued the people you've sued because I believe it's your

17  position that they're the decision-makers and under *Ex Parte*

18  *Young* would have the ability to be sued under the

19  constitutional claims, and I know we're talking about Title IX,

20  but my question that remains that I'm troubled with is who

21  actually enforces the law and who has the discretionary

22  authority to decide whether not to enforce the law?  In other

23  words, the face of the law seems to say it's your obligation

24  not only to designate the men and women, but to ensure that

25  they are, quote, used only by.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    **MR. SMITH:**  Correct, Your Honor.

2    **THE COURT:**  And so it's unclear to me how any agency

3  could defy that language without violating the law.

4    **MR. SMITH:**  It's also noteworthy, Your Honor, if you

5  recall the telephone conference you had in the United States

6  case involving the Violence Against Women Act funding -- and I

7  have a transcript here.  We could hand it up if you are

8  interested, but you will probably recall that Mr. Stephens,

9  then speaking for the Governor -- you asked him, is it the

10  position of the Governor that the University of North Carolina

11  has the option of not enforcing House Bill 2, and he said very

12  clearly at the time that it is the obligation of the University

13  of North Carolina to enforce the law.

14         Frankly, while they have some things they've said to

15  try to make people feel less concerned about the law on campus,

16  the truth of the matter is they've said it is our policy that

17  we are going to start dividing people up based on biological

18  sex rather than based on gender identity.  We are going to

19  change our policy.

20         President Spelling says in her declaration in this

21  case, We'd like to go back to the old policy of allowing people

22  to use these facilities based on gender identity, but we can't

23  because of House Bill 2 until some court tells otherwise.

24         What is somewhat puzzling to me about the

25  University's position, Your Honor, frankly, is why they are

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

fighting so hard against allowing us to convince you to tell

them otherwise so that the problems that they have been

describing on campuses of the kinds of harms that have been

caused would be ameliorated, at least in the interim.

**THE COURT:** Do you know -- maybe Ms. Stoughton will

know. Do you know if -- the Charlotte school system, I think,

has announced that it doesn't intend to follow the law. Do

they have the authority to make that decision?

**MR. SMITH:** Well, Your Honor, in that same statement

that I was phrasing, Mr. Stephens said they didn't have that

authority either in that discussion about the Violence Against

Women Act. I don't know whether that statement, or anything

else that has occurred, has caused the Charlotte-Mecklenburg

schools to change their position on that. I expect, at least

since school is out at the moment, maybe the issue has less

salience than it may have --

**THE COURT:** I understand your position on the

University. You are welcome to argue as much as you want. I

think I understand where you are. I'm interested in some

fundamental questions about how the system worked before H.B.

2. So before H.B. 2, transgender individuals were using

various bathrooms and showers without incident apparently.

**MR. SMITH:** That's correct.

**THE COURT:** And there are various laws that seem to

be in effect to protect the interests asserted by the State:

The privacy laws, trespass laws, peeping laws.  So let me start
with the fundamental question, and, that is, why do we have
separate bathrooms for men and women?

        **MR. SMITH:**  Separate bathrooms are a custom that's
existed for probably two centuries in this country based on a
sense that that's more appropriate.

        **THE COURT:**  Why?

        **MR. SMITH:**  I think it goes to this country's
feelings of -- that the two sexes, the two genders, should be
separated except in marriage, I guess.  That's the traditional
-- the origin where it came from.

        **THE COURT:**  It doesn't appear to me that the
Plaintiffs are challenging the notion of separate facilities
between men and women, but, rather, the issue is who should be
using them?

        **MR. SMITH:**  That's correct, Your Honor.

        **THE COURT:**  Okay.  So is it fair to say that the
State's argument that there's a privacy interest has some
general basis to it as a reason for the separation of the
bathrooms?

        **MR. SMITH:**  Well, Your Honor, I guess what I would
say in response to that is that there is -- with transgender
individuals using a bathroom consistent with their gender
identity, the privacy concerns are very tenuous, if there are
any at all.  People in bathrooms use stalls.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

**THE COURT:** I understand that. The way bathrooms are constructed in the modern era, it's unlikely people would be exposed to each other's personal nudity, if you will, but my question is just generally -- I am trying to figure out why we have separate men and women's rooms. We have all taken it as a given, I think, for a millennia, as the State says. I'm trying to figure out, well, what interest is it that the Plaintiffs say they acknowledge, and where does the line get drawn.

**MR. SMITH:** Well, Your Honor, I guess we haven't challenged it because we don't see any harm being done by it. We think that both -- probably everybody being used to that state of affairs is more comfortable with --

**THE COURT:** Well, it's definitely sex discrimination; true?

**MR. SMITH:** Well, there's definitely a distinction drawn between people based on gender; that's correct, but since there's no stigma to either side and everybody is happy with it, we have not -- we wouldn't even think that it needs to be subjected to heightened scrutiny, Your Honor.

**THE COURT:** Does a transgender person, someone who's transgender, have a privacy interest in a bathroom, and, if so, how would you articulate that?

**MR. SMITH:** Well, I would think everybody has a privacy interest in not being unwillingly exposed to people that they think should not -- they would prefer not to be

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 17 of 143

exposed to. People have some autonomy about that sort of thing. A transgender person has no more or less privacy interest in using the bathroom than anyone else, and the reality of how the world was until March 23, 2016, in the state of North Carolina was that when Mr. Carcano went into the men's room, he went into the stall, no one thought a thing about it, and no one's privacy was implicated in the slightest. However, what this law says is if you want to use a multiple-user restroom facility, you, Mr. Carcano, have to go in the women's room.

        **THE COURT:** I understand that.

        **MR. SMITH:** And that is going to cause a great deal of upset.

        **THE COURT:** I fully understand that. I am just trying to get some baseline understanding of --

        **MR. SMITH:** I understand, and I'm trying to respond, Your Honor.

        **THE COURT:** I want to know where there's agreement, if any, between the folks and where there's disagreement, where it diverges.

        **MR. SMITH:** I could address the --

        **THE COURT:** Does a biological female have a privacy interest in being exposed to the genitalia of a biological male in a bathroom or in a shower or changing room?

        **MR. SMITH:** I guess I would say that the State has a

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1　legitimate interest in shielding people, say in this case women

2　or teenage girls, for example, from being exposed to male

3　genitalia in a changing facility.  I understand that interest.

4　The question, though, is whether or not -- by allowing

5　transgender women who have not yet had genital surgery to use

6　that facility, is there any meaningful chance that anything

7　like that will happen.

8　　　　　　THE COURT:  I don't disagree.

9　　　　　　MR. SMITH:  Okay.

10　　　　　THE COURT:  My question is, first, this is the

11　baseline of what the interests are, and then the rest might

12　bear on what the factual record is.  And so I assume, by the

13　same token, a transgender would have a privacy interest, in

14　your view, in being exposed to the genitalia of somebody that

15　they don't identify with?

16　　　　　MR. SMITH:  You know, Your Honor, I'm not sure that

17　the transgender people are all that concerned about these

18　issues.  They are just trying to get through life; but in terms

19　of exposure to genitalia, they are probably the people that are

20　the least worried about it of anybody in the world.

21　　　　　THE COURT:  Okay.  Does a transgender female have a

22　privacy interest that the State has an interest in protecting

23　of being exposed to male genitalia in a shower or bathroom or

24　changing facility?

25　　　　　MR. SMITH:  Well, a transgender woman will have had

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 male genitalia or may still have male genitalia, so I think

2 that whatever privacy concern there is --

3    **THE COURT:** But they identify as female?

4    **MR. SMITH:** Yes, I understand that.

5    **THE COURT:** So would they have a privacy interest in

6 not being exposed to the sex opposite to which they identify?

7    **MR. SMITH:** I think they would have significant

8 interest in not being forced into a male facility where they

9 are being forced to act as if they were a male.  That's the

10 harm that it's caused, and it causes clinical harm to

11 transgender women when you do, but not so much because they are

12 going to see male genitalia.  They, of course, either have that

13 or have had that, and the law doesn't really purport to protect

14 transgender people's privacy.  It's really purporting to

15 protect other people's privacy from their presence in the

16 facility.  So it seems to me that's more what the law is really

17 about.

18    I don't know that you are going to get any complaints

19 from the transgender community about privacy concerns if we go

20 back to the status quo.  The status quo was working for

21 transgender people in that they could make these judgments.

22 They could use common sense.  In most instances, what happens

23 in a changing facility when a transgender person is in there

24 but doesn't have -- hasn't had surgical transition yet is that

25 they are just extraordinarily unlikely to expose themselves and

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  that part of their anatomy to the other people in the

2  environment precisely because it's not consistent with their

3  gender identity and because they know it may upset people, and

4  so they don't do that.  There is no history, there is no record

5  of transgender people going into, say, the ladies' locker room

6  and flaunting male genitalia.  It is not going to happen.

7            **THE COURT:**  I appreciate that, and I understand that.

8  I thought earlier you had said that transgender individuals,

9  like everybody else, have privacy interests in the bathroom.  I

10  am just trying to figure out what's the nature of the interest.

11  Is it the same for all people, or is it different?

12            **MR. SMITH:**  It's the same, Your Honor.

13            **THE COURT:**  Okay.

14            **MR. SMITH:**  Everybody has the same privacy interest

15  of not being observed going to the bathroom.  That is not a --

16  that's a natural, equal thing that everyone has.

17            **THE COURT:**  Now, putting the law aside for a moment,

18  does the State's interest in privacy with respect to bathrooms

19  and changing rooms and shower facilitates -- does the State

20  have any heightened interest if minors are involved?

21            **MR. SMITH:**  I suppose that I could agree with that,

22  Your Honor.

23            **THE COURT:**  So prior to House Bill 2, North Carolina

24  has and still has various laws, as far as I can tell, designed

25  to protect people's privacy and safety?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          **MR. SMITH:**  Sure.

2          **THE COURT:**  One would be we have a no-peeping law,

3   General Statute 14-202.  It applies to any, quote, room.  Is

4   there any dispute that that would include a bathroom?

5          **MR. SMITH:**  A no-peeping law, Your Honor?

6          **THE COURT:**  Yes, sir.

7          **MR. SMITH:**  I have no doubt it's illegal for people

8   to engage in that behavior in the state of North Carolina in a

9   bathroom.

10          **THE COURT:**  Or a changing facility?

11          **MR. SMITH:**  Or a changing facility, yes.

12          **THE COURT:**  We also have an indecent exposure

13   statute, 14-190.9.  How does that statute apply, if at all,

14   with respect to transgender individuals in bathrooms?

15          **MR. SMITH:**  Well, Your Honor, our position would be

16   that under the constitution they need to be allowed to use the

17   bathroom consistent with their gender identity, and that in

18   that setting, they would not be subject to some claim of

19   indecent exposure if they are in the bathroom consistent with

20   their gender identity.

21          It is certainly true that those laws are relevant

22   here because of the alleged concern about sort of predatory men

23   running into ladies' facilities and showing themselves and that

24   sort of thing.  This law is certainly not going to do anything

25   to prevent that kind of predatory behavior, which has existed

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    for a long time and will continue to exist, but it is certainly

2    illegal; and this law doesn't do anything to undermine the

3    enforcement ability of the State with respect to that kind of

4    conduct.

5         **THE COURT:**  All right.  And then the last set of laws

6    appears to be a trespass law.  In fact, there is a purported

7    case of I think a young man or boy of going into a girl's

8    restroom or shower or something in school, and it has a sign

9    that says ladies' or girls' room, and kids went in there and

10   they were charged with trespass.

11        Does that law apply in this context?  How is that

12   going to apply with respect to -- first, I assume it applies to

13   biological nontransgender individuals.  If a man goes into a

14   ladies' room, technically, they are trespassing.

15        **MR. SMITH:**  I have no dispute with that, Your Honor,

16   and both the Governor and Speaker Pro Tem Stam have said that

17   violators of House Bill 2, including transgender violators of

18   House Bill 2, would be committing trespass, that trespass is

19   the way in which the separation of genders in these facilities

20   is enforced by the police and others in the state.  And so one

21   of the things that my clients and others in the state face is

22   the threat that as transgender individuals they are going to be

23   punished with trespass.  Even if the University of North

24   Carolina says we are not really all that interested in

25   enforcing this law, that threat of a trespass prosecution hangs

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 23 of 143

1   over them because this law now says we are not going to let you

2   go use your judgment and follow your gender identity; we are

3   going to only look at the sex you were assigned at birth and

4   what your birth certificate says as a result.

5           **THE COURT:**  Does the State of North Carolina have

6   police jurisdiction over the constituent university system

7   campuses?

8           **MR. SMITH:**  My understanding is there are university

9   police, but certainly that the state police can go in -- and

10  university police can arrest people.  As well, I think the

11  state police could go on campus if there was a violation of

12  state law.  I don't know that it's insulated in some way from

13  general jurisdiction of the state police.

14          **THE COURT:**  All right.  Let me give you a

15  hypothetical.  Under the indecent exposure statute, if a

16  transgender female goes into a shower, and let's say it's a

17  girl's shower in a high school and a 17-year-old transgender

18  female is also for some reason showering with a 12-year-old

19  group of girls, would they be subject to the indecent exposure

20  statute in North Carolina which says, "any person who shall

21  willfully expose the private parts of his or her person in any

22  public place...except...where the same sex exposure is

23  incidental to permitted activity," et cetera, is in violation?

24  Is that a threat of prosecution?

25          **MR. SMITH:**  I'm not familiar with the details of how

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

that statute applies here, Your Honor. I do think that the
person -- that the transgender woman needs to be allowed access
to that facility, but that some common sense guidance to the
student saying we think that you ought to, when you are
changing your clothes, use the stall over here is the way that
this has, in fact, worked out, and that this is, therefore, a
really hypothetical question, which, of course, you are
entitled to ask. Hypothetical questions are the stuff of what
we do in oral arguments, Your Honor.

I think it's a hard question for that result because
you've got 12-year-old girls who are not familiar with male
anatomy and somebody older who's showing that to them, a mature
adult. I think that hypothetical is both entirely hypothetical
and that the law is so much broader that it covers, you know,
situations involving adults and situations involving pure
restrooms and things like that, that what we're talking about
is an extraordinarily unusual event that they used to sort of
whip up concern.

I understand that that is a legitimate concern in
many ways; where people who have a 12-year-old daughter who is
going to junior high that think that that might happen, it
would be a legitimate concern, but I just don't think that
that's really a justification for what this law does or
certainly a justification with respect to the narrow question
that we're dealing with right now, which is what should the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  status quo -- should the status quo be restored just for the

2  next two months.

3          And given that there is no indication that such an

4  event has ever happened or will ever happen, I just don't see

5  that it's ultimately a basis for avoiding the kind of relief

6  we're asking for today and the kind of harm -- we're inflicting

7  the kinds of everyday harms that the transgender community is

8  feeling, as Mr. Carcano has to go to a service elevator to go

9  down to the housekeeping area of his building to find a

10 restroom he is allowed to use, or as others have to go across

11 campus to go find a restroom that they can use, and it's not

12 just on campus, of course.  If you go to the Department of

13 Motor Vehicles, do they have a single-user bathroom that you

14 can use?

15         Certainly, the option of going back into the bathroom

16 that's assigned to the same people -- the sex that you were

17 assigned at birth, once you've transitioned, it's not a

18 feasible alternative.  You freak out people when you do that,

19 and it will cause harm to you medically to be forced to do

20 that.  So they are essentially left with no option, and those

21 are real problems that are happening every day.  The kind of

22 hypothetical that you mentioned, which I think is a really good

23 way to test the limits here, is so --

24         **THE COURT:**  All I am trying to do is figure out what

25 are the parameters that we're dealing with.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          **MR. SMITH:**  I appreciate that, Your Honor.

2          **THE COURT:**  That's really all I am trying to do.

3          So is there any way a user of a restroom, changing

4    facility, or bathroom can under H.B. 2 be charged with

5    anything?

6          **MR. SMITH:**  Well, as I think we were just discussing,

7    I don't think there is any doubt that you -- I mean, if you're

8    talking about a transgender --

9          **THE COURT:**  No, just under H.B. 2 --

10          **MR. SMITH:**  Yeah --

11          **THE COURT:**  -- not the trespass.  The reason I talked

12    about trespass and others was those are separate laws.  Does

13    H.B. 2 provide any kind of way to charge somebody if they want

14    to use the different restroom?

15          **MR. SMITH:**  Not the statute itself.  So it's only a

16    question of what consequence do you have either as a result of

17    breaking some university policy as a student or perhaps as a

18    person arrested for trespass.  Those are the kinds of threats

19    that are out there.

20          Of course, the other thing that happens in the real

21    world is people know H.B. 2 is out there.  They may know in

22    your environment that you're a transgender individual.  If you

23    continue to try to use the restroom consistent with your gender

24    identity, people are going to call you on it, like

25    Mr. Carcano's employer said, well, sorry, we can't let you do

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  that anymore.  We know it wasn't causing any trouble, but we

2  have to follow the law.  So that's the -- we're all stuck in

3  this together, and that's what happens.

4          **THE COURT:**  Now, get to the changing rooms and

5  showers.  The *G.G.* case dealt with, and its holding, the

6  bathrooms because that was a facility in Virginia.

7          **MR. SMITH:**  Right.

8          **THE COURT:**  Judge Niemeyer points out that the

9  reasoning may very well be hard to distinguish if you want to

10  try to draw lines elsewhere.

11         **MR. SMITH:**  I agree with that.  There was very little

12  I agree with in --

13         **THE COURT:**  I thought you might.  So my question is

14  explain to me why that is.

15         **MR. SMITH:**  Well, first of all, as a matter of Title

16  IX law, the same interpretive guidance that was used by the

17  Fourth Circuit to analyze the regulation in which then becomes

18  the binding obligation under Title IX refers both to restrooms

19  and changing facilities.  So the Department of Education has

20  made the determination, as a matter of Title IX policy, it is

21  not appropriate to exclude students from changing facilities

22  that are consistent with their gender identity, that that's a

23  violation of Title IX; that is a form of sex discrimination.

24         And that is a sensible outcome precisely because, as

25  the University of North Carolina's various publications and

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP  Document 103  Filed 08/04/16  Page 28 of 143

statements make clear, in practice that works out fine.  I

mean, the University of North Carolina says, Margaret Spellings

says, we never prevented anybody from using a changing facility

based on their gender identity.  We would like to go back and

do that right now, and the reason is people have common sense.

Mr. McGarry says in his declaration that he was using

lockers rooms routinely at the University of North Carolina in

Greensboro, and he goes in there and what he does is he changes

his gym shorts in the stall.  That's what people do.  As a

result, he's not excluded from the environment where male

students are supposed to be, and he is allowed to have full

enjoyment of the facilities of the University of North

Carolina.

**THE COURT:**  The reason I was asking about the

exposure laws and other things was one of the concerns the

State raises is the privacy concern.

**MR. SMITH:**  Sure.

**THE COURT:**  And I think you indicated that the State

has some interest in that.  There may be a dispute over where

to draw the line.  As a practical matter, if people change in

private areas where nobody will see them, then the other laws

that arguably could apply, indecent exposure -- you can

disagree whether it applies, but it's one that somebody could

argue applies.

**MR. SMITH:**  Exactly.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    **THE COURT:**  Then they don't come into play because as

2   a factual matter it won't occur.  I appreciate that.  There is

3   a lot of accommodation that seems to made, and I want to hear

4   from the School Administrators about that.

5        My question, I guess, is the State's interest is one

6   of privacy.  We've talked about people of various ages.  I am

7   trying to figure out whether that indecent exposure law would

8   probably apply or not apply in a situation like that if

9   somebody changes -- they're biologically different from the

10  people they're around, and so they change in a private

11  facility.  Let's say somebody decides they don't want to do

12  that and they want to change out in the open.  Would that be a

13  problem under the law or not, under the exposure law?

14       **MR. SMITH:**  Your Honor, I don't think so.  Let me try

15  to differentiate between two things.  The first is the privacy

16  interests of the other students in the environment.  I don't

17  think that there is any significant privacy concern over a

18  bunch of male students being observed by a transgender male

19  student in that environment who has -- who has, in fact, got a

20  male gender identity.  That concern is very attenuated, I would

21  submit, and --

22       **THE COURT:**  I thought earlier you told me that people

23  generally have a privacy interest in not being exposed to the

24  genitalia that's biologically different.

25       **MR. SMITH:**  That's the second half.  I was talking

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 30 of 143

1  about the privacy interests of the other users of the facility

2  from not being observed by the transgender person.

3  　　　　Now, the question that you asked before, which is

4  sort of the other side of the coin, is is there a State

5  interest, I don't know whether it's privacy or something else,

6  in shielding the other users who might be female from observing

7  anatomical features of the transgender person who are not yet

8  female or may never be.  I think I conceded that that might be

9  some interest at a certain age in theory if that ever happened,

10 but as people get to be adults and people -- you know, I think

11 that that interest becomes more and more attenuated as a matter

12 of principle, even if it's always attenuated as a matter of

13 practice simply because the problem doesn't arise.

14 　　　　I just wanted to differentiate between the two sides

15 of the privacy coin.  I don't really think that the State has

16 much interest in protecting a bunch of men in a locker room

17 from a transgender man walking in and seeing them in the

18 shower.  I mean, people see other people in the shower.  If

19 people want to be out in the locker room when they are getting

20 showered, they are out in the locker room when they are getting

21 showered.  That's just -- they've made that choice.

22 　　　　**THE COURT:**  Well, there is a host of cases in other

23 contexts where they say people have a privacy interest in not

24 only not exposing -- not being exposed to somebody else who is

25 different, which is what we talked about, but also not having

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  to expose yourself to others of the opposite sex.  They

2  typically are in the prison context and otherwise where male

3  guards are watching females go to the restroom and that kind of

4  stuff.

5          I mean, is that not an interest that at some level

6  there is a State interest in?

7          **MR. SMITH:**  Well, you know, Your Honor, what we are

8  talking about here is the transgender man entering a men's

9  locker room.  I don't think it's fair to equate that with a

10  woman entering the men's locker room.  That is just not what

11  we're talking about here.  This is a person who's got a male

12  gender identity, has a male appearance, is living as a man, is

13  a man for purposes of how life is going to be led for that

14  person, and to protect others in that environment who choose to

15  be naked and visible in a visible way, which some people do and

16  some people don't in a locker room, from that seems to be a

17  very attenuated interest, if there is an interest there at all.

18          **THE COURT:**  I understand.  Anything else on *G.G.*?

19          **MR. SMITH:**  Your Honor, I do think *G.G.* controls here

20  for the reasons that you explained, that the logic leads you

21  directly to that, and the Department of Education says there's

22  no problem.  The University of North Carolina agrees with them,

23  that we would like to go back to the old rules.

24          The School Administrators' brief and the Walker

25  declaration, a lot of different materials we put in this record

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  suggest that the locker room thing is not a big deal, that it

2  is not really a problem, and that the real problem is the kind

3  of H.B. solution, which is to say we are going to legislate at

4  the state level who gets to go in these places regardless of

5  your gender identity, a problem which is kind of a problem the

6  legislature created simply to send a message of disapproval of,

7  I guess, Charlotte but also of transgender people.  It's rather

8  unfortunate they went well beyond preempting that statute to go

9  out of their way and decide which transgender people are

10 allowed in which facility at the state level when there was no

11 record of any issue over that.

12         Now, we could talk about the constitutional claims

13 against the State, if you'd like, Your Honor.

14         **THE COURT:**  I do want to get into that because my

15 impression is relief on Title IX is not going to give full

16 relief in this case.

17         **MR. SMITH:**  No, Your Honor.  We are only asserting

18 Title IX against the University of North Carolina as a

19 corporate body.  The other claims in the complaint are all

20 constitutional claims, equal protection and due process claims,

21 and they cover the rest of the public facilities in the state

22 of North Carolina that are covered by House Bill 2.

23         And I would also note that we have an additional

24 plaintiff on -- asserting those claims at the moment, which is

25 the ACLU of North Carolina asserting associational standing on

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  behalf of its member.  So we have a broader array of people who

2  are asking for both preliminary and permanent relief at the

3  moment on the constitutional claims than we do on Title IX,

4  although there is a very strong possibility we will be amending

5  the complaint to add the ACLU of North Carolina as a Title IX

6  plaintiff in the near future as well.

7         **THE COURT:**  The letter you handed up a minute ago,

8  the April 5th letter, I think it's in the record.

9         **MR. SMITH:**  It certainly is, Your Honor.  It was

10  attached to an exhibit to the Spellings declaration, which was

11  first filed when they were seeking a stay on behalf of the UNC,

12  but it's been cited both -- in our reply brief a number of

13  times.

14         **THE COURT:**  In the event that there is any question

15  about that, I am going to accept it and admit it for today as

16  well so there's a record.

17         **MR. SMITH:**  Thank you, Your Honor.

18         **THE COURT:**  Okay.  Well, let's turn to the

19  constitutional claims.

20         **MR. SMITH:**  Right.  So on the constitutional equal

21  protection claim, we have made a number of different arguments

22  which we think are why that this form of discrimination, this

23  law, which basically singles out one group of people,

24  transgender people, and says we are going to treat you

25  differently than everybody else -- why that needs to be

1 subjected to heightened, kind of intermediate, equal protection

2 scrutiny of the kind that is given to gender discrimination.

3     **THE COURT:** So let me ask. You mentioned

4 intermediate scrutiny. Is there any question but that this is,

5 in fact, sex discrimination in some form and fashion?

6     **MR. SMITH:** We don't think so, Your Honor, but

7 there's a number of the circuits out there that have held that

8 discrimination against people because they changed their sex,

9 because they are transgender is a form of sex discrimination.

10     **THE COURT:** Let me back up a minute. The law says we

11 are going to separate bathrooms based on your gender, right,

12 not necessarily your gender identity, just your gender?

13     **MR. SMITH:** Right.

14     **THE COURT:** Isn't that per se sex discrimination?

15 The question is whether it's unlawful sex discrimination or

16 lawful sex discrimination, but it is a form of discrimination

17 based on sex?

18     **MR. SMITH:** Right, which is why they needed an

19 exception in Title IX to allow them to have such things.

20     **THE COURT:** The case law seems to indicate that sex

21 discrimination is entitled to -- or gets intermediate scrutiny.

22     **MR. SMITH:** Right.

23     **THE COURT:** And I heard you say "intermediate." Is

24 that the argument of the Plaintiffs, that I should apply

25 intermediate scrutiny?

1       **MR. SMITH:**  Yes, Your Honor.

2       **THE COURT:**  Okay.

3       **MR. SMITH:**  And both because we think it's a form of

4  sex discrimination going all way back to the *Frontiero* case --

5  that's the intermediate scrutiny that is given to gender

6  discrimination -- but also because if you look at it as a

7  separate kind of discrimination, transgender discrimination,

8  you want to see that as a separate thing.

9       If you apply the factors that the Supreme Court has

10  enunciated for determining when heightened scrutiny should

11  apply, those factors all apply here in a very -- they're not

12  difficult to apply.  Basically, what the Supreme Court has said

13  is when we have a law that singles out a group of people, and a

14  that's group of people that have a long history of

15  discrimination against them, they are not politically powerful

16  enough to protect themselves in the political process, it's not

17  a characteristic that interferes with your ability to

18  contribute to society, and it's not a characteristic that you

19  can easily change, in those situations, the courts need to take

20  a closer look at whether the Government has a real interest in

21  what it's doing and has to sort of apply some skepticism, which

22  is essentially what intermediate scrutiny is, to the law.

23       So we can get there that by calling this sex

24  discrimination.  It is obviously a form of sort of enforced

25  sex -- gender conformity to say to people because you were born

1   and assigned the gender of male, we are never going to let you

2   change or at least recognize that change for these purposes.

3            **THE COURT:**  The law technically seems to distinguish

4   based on birth certificate, which is a proxy for your

5   biological sex.  Is that your view?

6            **MR. SMITH:**  It is in North Carolina a proxy because

7   in order to your change your birth certificate, you have to

8   have had --

9            **THE COURT:**  Right, but that's the focus of the law,

10  that it distinguishes based on sex, based on your birth

11  certificate, which is a proxy for your gender.

12           **MR. SMITH:**  Right, your gender, meaning what they

13  call biological --

14           **THE COURT:**  Biological.

15           **MR. SMITH:**  -- I would say is your sex assigned at

16  birth, which is what somebody decided you were the minute you

17  were born.

18           **THE COURT:**  I understand.  Help me understand this.

19  I understand how it's affecting your clients.  I appreciate

20  that, but the law seems to distinguish not based on gender

21  identity.  It doesn't say if you have a certain gender

22  identity, you have to do this or do that.  It simply says we

23  are going to separate bathrooms and changing facilities and

24  showers based on biological sex, period.

25           **MR. SMITH:**  Correct.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          **THE COURT:**  So help me understand how that is

2   anything more than just sex discrimination based on biological

3   sex.

4          **MR. SMITH:**  Well, it is more than that because we

5   have a population of people who have a gender identity

6   different from what the law calls biological sex, and they are

7   the only people that such a law has harmed because if you

8   happen to be assigned male at birth and your gender identity

9   for the rest of your life is male, House Bill 2 doesn't do

10  anything to you.  House Bill 2 only has a meaningful impact on

11  your life if what they call biological sex is not, in fact, a

12  gender identity and the identity that you are living your life

13  out as.

14          So there is a very specific group of people that

15  necessarily are the only people harmed and affected by this

16  law.  It is discriminating against that narrow and

17  discriminatory group of people in saying we are not going to

18  let you live your life consistent with your gender identity, at

19  least for purposes of access to these facilities.  Of course,

20  you can't go back to the old facilities either because you are

21  a guy now.  You know, you can't go in the women's room or vice

22  versa.  You know, H. S. is not going to go in the men's room

23  when she goes to high school.  That is not going to work.

24          So what does this law do?  It says to these people --

25  everybody else is completely unaffected.  To these people, they

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  have no good option in life and are put in a situation where
2  both their health -- in terms of the recovery from gender
3  dysphoria, their urinary health, lots of things are going to go
4  wrong for them.

5          **THE COURT:**  What are your best cases -- or case or
6  cases on the proposition that when a law purports to
7  distinguish on what's otherwise a ground like sex, biological
8  sex, which may have justification -- I think earlier you said
9  you weren't challenging the fact that we have separate
10  bathrooms for men and women.  So what are the cases that say
11  when it has the effect of -- even though that wasn't the
12  expressed statement of the law, when it has the effect of
13  discriminating against others, in this case transgenders, then
14  that's an equal protection violation.  What is the best
15  authority for that?

16          **MR. SMITH:**  I would have to think about that.
17  Obviously, I would point to *G.G.* as the case where the same
18  basic recognition is that --

19          **THE COURT:**  That's Title IX, though, of course.

20          **MR. SMITH:**  It is, but, of course, Title IX is an
21  implementation of the Fourteenth Amendment and has much the
22  same logic --

23          **THE COURT:**  There is a little bit of an issue there
24  because that's the interpretation by the Department of
25  Education as opposed to a court's interpretation, but I don't

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  want to bog down into that.

2          **MR. SMITH:**  The other thing I could point to, Your

3  Honor, is the marriage case that said everybody was free to

4  marry in this country.  The only people who were singled out

5  prior to *Obergefell*, though, were the people who wanted to

6  marry people of the same gender because of their sexual

7  orientation.  So while such a law could be viewed as just

8  having a -- as not singling out any population, all of the laws

9  that regulated both sodomy and marriage ended up being targeted

10 at the gay community in much the same way.

11         **THE COURT:**  That's the answer I was looking for.

12         **MR. SMITH:**  Your Honor, there are certainly cases

13 about transgender discrimination that I would point to.

14 Perhaps the best one is the *Glenn* case from the Eleventh

15 Circuit in which the Court unanimously said that if you fire

16 somebody, because this was an employee of the Georgia

17 legislature, who was a man, came to work the following week

18 having transitioned to the female gender identity, was fired as

19 a result of that, that's a violation of the Fourteenth

20 Amendment.

21         **THE COURT:**  Right.  That's why I asked what I asked,

22 though, because I understand in those cases, if you fire

23 somebody because they are transgender, that's a violation.  And

24 in this case, the State's argument is, well, we're not doing

25 that; we are separating you because of your biological

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  conditions.

2        **MR. SMITH:**  Right.  The answer I hope I was clear on

3  is that the focus on sex assignment at birth or birth

4  certificate or biological sex, or whatever you want to call

5  that, is a problem only for one discrete community and

6  everybody else it's not a problem, and it's perfectly clear

7  what they were trying to do when they passed this law; they

8  were trying to send a message of disapproval of transgender

9  people coming into these facilities consistent with their

10  gender identity.  I don't think you can view this law as

11  anything other than an attack on that community.

12        **THE COURT:**  Okay.  So that's an intent argument.  I

13  mean, are you also arguing that the intent of the law was to

14  discriminate directly against transgenders?

15        **MR. SMITH:**  Well, there are plenty of things that we

16  put in in the form of clippings that show, I think, a fair

17  degree of animus, as the term is used in *Romer* and *Lawrence* and

18  other cases.  It is not a lynchpin, I don't think, of our

19  argument here because I would read this law on its face as

20  discriminatory in its focus on so-called biological sex.  You

21  don't need to look at animus to decide that that was the

22  purpose of the law because everybody reading the terms of the

23  law would understand that.

24        **THE COURT:**  All right.  So if intermediate scrutiny

25  applies, then the State needs to demonstrate important State

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP  Document 103  Filed 08/04/16  Page 41 of 143

1  interests and a substantial relationship between those

2  interests and the law.  Do you agree that's the framework?

3          **MR. SMITH:**  Yes, sir.

4          **THE COURT:**  So tell me why they have not done that.

5          **MR. SMITH:**  Well, we have -- first of all, we have no

6  effort to put any evidence in this record at all to support

7  those justifications at this point, and so as the motion stands

8  now, you are basically supposed to kind of assume things for

9  their purposes that they haven't even tried to support.

10         On the issue of safety that the -- there is a

11 reference to various incidents that have occurred around the

12 country when men have proceeded into women's facilities and

13 either have been peeping Toms or predators in some other way.

14 I would submit to you that the idea that this law would in any

15 way affect the occurrence of those behaviors in the state of

16 North Carolina is fanciful.  It doesn't really make any sense,

17 and so that, I think, is largely an emotional argument, not a

18 logical argument, done to drum up support for a statute which

19 really can't have had that as its purpose.

20         If people are determined wrongdoers, as the Supreme

21 Court said last year -- this was in the *Whole Women's Health*

22 network case, which we cite in our brief -- if there is a

23 determined wrongdoer out there, this kind of regulation isn't

24 going to prevent them.  It's already illegal to do those

25 things.  I don't see that as an argument.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      So then it really comes back down to privacy, the
2   other justification that's been -- we've talked about that
3   already.
4          **THE COURT:**  We have, and this, I think, is going to
5   get us back into our earlier discussion, which is why I am
6   concerned about the existing laws that apparently are designed
7   to ensure that the interests that the State says it has in this
8   arena are properly protected; and that's why I asked the
9   questions earlier about who can complain and who can't complain
10  about it being exposed -- or exposing themselves to somebody in
11  certain areas because those are the interests the State says,
12  among others, that --
13         **MR. SMITH:**  And if it was an ordinarily tailored law,
14  there might be some arguments that could be --
15         **THE COURT:**  How would they do that?
16         **MR. SMITH:**  Well, if this was a law about what people
17  do in junior high, that might be different from a law that
18  covers every public facility in the state of North Carolina,
19  including restrooms where everybody is using the stall.  There
20  is no meaningful privacy concern in that situation for a
21  transgender women to go into a women's facility.  It's just not
22  a meaningful concern.
23         **THE COURT:**  In our society, there are some people
24  that will just do whatever they want to do.  That's why we have
25  certain laws.  Let's say that some male just decides I want to

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  go in and use the ladies' room because I don't think we should

2  have gender-specific bathrooms.  I'm personally opposed to it.

3  So they go to the basketball game and decide they're going to

4  go into the ladies' room.  Presumably that would be a trespass

5  because they are not supposed to go in there, everything else

6  being equal; and if they then expose themselves in there,

7  presumably the exposure laws might apply to them.

8          So my question is what happens if all those facts are

9  the same, but we now found out that the male was actually a

10  transgender male?

11          **MR. SMITH:**  Your Honor, it's a women's room, and we

12  are talking about a transgender woman going in or transgender

13  male?  I mean, I am trying to get --

14          **THE COURT:**  I think the exposure law seems to suggest

15  that you can't expose yourself knowingly in even a bathroom

16  unless it's for a permitted -- incidental to a permitted

17  purpose, I mean, if they just want to strip naked in a

18  bathroom.

19          **MR. SMITH:**  Well, I think that would be illegal in

20  any bathroom.  There is no purpose in being naked in the

21  bathroom.

22          **THE COURT:**  So that's really my question, and, that

23  is, does that law on indecent exposure apply to anybody

24  irrespective of their gender identity?  And I thought I heard

25  you say, well, it probably does.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

           **MR. SMITH:**  Your Honor, I'm not sure I have been

clear on this.  Our position is that people should be able to

access bathrooms and changing facilities consistent with their

gender identity, even if their genitals don't yet conform to

that gender identify.  That's the issue --

           **THE COURT:**  I understand.  And your argument is that

the privacy concerns are well protected because people aren't

going to go expose themselves?

           **MR. SMITH:**  Exactly, and then if they do, if they're

loitering around the locker room or they're being peeping Toms

or they're being predatory in some other way, it's not going to

be the transgender people who are doing that, Your Honor, in

reality; but they are subject to the law like everybody else,

and if they are harassing others in that sensitive environment,

and it is a sensitive environment, then they are going to be

subject to the law, but the idea that somehow this law is going

to help law enforcement address the other problem, which is

with creepy guys who go into restrooms and do bad stuff, is

simply a fantasy.

           **THE COURT:**  All right.  I understand.

           **MR. SMITH:**  Your Honor, perhaps I should let others

talk for a little while, but at the end, I might do some

rebuttal.

           **THE COURT:**  All right.  Thank you very much.

Ms. Stoughton, would you like to go next?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      **MS. STOUGHTON:**  Sure, Your Honor.  Thank you for the

2  opportunity to address the Court today.

3      **THE COURT:**  Sure.

4      **MS. STOUGHTON:**  We strongly urge the Court to find

5  that H.B. 2 is irreconcilable with Title IX because it is

6  discrimination on the basis of gender identity following the

7  controlling precedent of *G.G.*

8      Rather than repeat anything Mr. Smith said, which I'm

9  sure would please nobody, I would like to address a few points

10  related to the specific questions that Your Honor raised,

11  particularly as to privacy and also enforcement by the

12  University of North Carolina.

13      The Court asked a fundamental question which I think

14  pertains and relates to the debate about the indecent exposure

15  law that was just occurring, which is why do we have separate

16  facilities in the first place.  I think the answer to that is

17  clearly that we have a social convention that nondiscrimination

18  laws like Title IX accommodate.  That's reflected in the

19  regulation that the Department of Education and the Department

20  of Justice has put out, and we accommodate that because,

21  although it is facially a sex-based classification, it causes

22  no harm.  I am not stigmatized because I am not permitted to

23  use the men's room as a woman, but the exclusion of transgender

24  people, as H.B. 2 does, is a classification that does cause

25  harm.  That's reflected in the Department of Justice and

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  Department of Education interpretive guidance of the Title IX

2  regulation, which says that if a funding recipient separates

3  and has sex-separate facilities, they must provide access to

4  that consistent with gender identity, and that relates back to

5  the indecent exposure hypothetical that Your Honor offered.  I

6  think it's very clear from the text of North Carolina's

7  indecent exposure laws that they would not apply to the mere

8  presence of a transgender woman in a women's bathroom or locker

9  room.

10         **THE COURT:**  What do you mean mere presence?

11         **MS. STOUGHTON:**  Well, the statute -- the misdemeanor

12  statute, as I understand it, covers willful exposure and then

13  exempts same-sex exposure that's incidental to legitimately

14  being in that place.  Both the term "willful" and that

15  exemption would cover the presence of a transgender women in a

16  women's locker room precisely because she -- a transgender

17  woman is a woman and is changing in that facility just like any

18  other woman would be changing in that facility, and any

19  exposure of that body in that space wouldn't be any different

20  from the routine exposure that happens in that place.

21         If it crossed the line -- as Your Honor pointed out,

22  people do things, we have laws -- and became some sort of

23  aggressive or willful exposure, and certainly if it rose to the

24  level of exposure with the intent to provide sexual

25  gratification of that person, it would become a felony under

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 47 of 143

1  North Carolina law, and those laws are fine and exist to cover

2  the kind of behavior that I think motivated H.B. 2, but

3  those -- the interest in constraining that behavior, as

4  Mr. Smith pointed out, cannot justify a law that excludes, in

5  violation of federal nondiscrimination law, transgender women

6  from women's facilities and transgender men from men's

7  facilities.

8         **THE COURT:**  The law clearly allows no accommodation

9  short of just a separate facility, and that's the only kind.

10 There's no need to require that.  It just says agencies may,

11 but that's the only accommodation, and so I understand that

12 practical accommodations of privacy curtains and other things

13 are not an option currently that this law would permit; right?

14        **MS. STOUGHTON:**  You mean H.B. 2 when you say the law?

15        **THE COURT:**  Yes.

16        **MS. STOUGHTON:**  Well, the law does not require those

17 accommodations.

18        **THE COURT:**  Right.  It's the only one that's

19 available, though, is a separate -- the only accommodation

20 available under this law is a separate facility.

21        **MS. STOUGHTON:**  Well, I do want to push back on the

22 characterization there because that accommodation is available

23 irrespective of Title IX.  It's kind of -- the notion that --

24 again, putting the issue of transgender people aside for the

25 moment, in any given school or workplace or public building, if

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   a -- if the people in charge of the facilities in that building

2   decided that to accommodate privacy interests in general, they

3   wanted to create single-user facilities or they wanted to erect

4   privacy curtains in a locker room, I think nothing prevents

5   anyone from doing that ever.

6         What H.B. 2 does, though, is it starts with the

7   premise that transgender women are no longer welcome in the

8   women's room and men in the men's room and then acknowledges

9   that, of course, a school, a public agency could construct

10   single-user facilities, and there is nothing that stands in

11   anyone's way of using those facilities. I think to assume, as

12   the drafters of H.B. 2 did, that that accommodation could erase

13   the discriminatory effect of the exclusion from the facility in

14   the first place is not consistent with Title IX. It's not

15   consistent with the Departments of Education and Justice's

16   interpretation of Title IX, and as a practical matter, it

17   doesn't actually do that because the harm from

18   discrimination -- you know, some of the harm comes from can a

19   person actually find a place to use the bathroom, but much of

20   the harm comes from the stigma of exclusion.

21         Both the United States and, more relevant to this

22   motion, the Carcano Plaintiffs have put in an extensive record

23   on the nature of that stigma, both in the form of testimony

24   from actual transgender people talking about that and in the

25   form of expert testimony from people who have experienced

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP Document 103 Filed 08/04/16 Page 49 of 143

1  treating transgender people and speak more generally about the

2  interference that that kind of exclusion operates on the way

3  that transgender people perform the social transition when they

4  come to live as their gender identity in society.

5          So I think there can be no question that as an

6  accommodation that that does not erase the discriminatory

7  effect and the way in which H.B. 2 creates a conflict with

8  federal nondiscrimination law.

9          **THE COURT:**  I don't disagree.  My only question was

10  that was the only accommodation that the law would allow;

11  right?

12          **MS. STOUGHTON:**  Yes.

13          **THE COURT:**  That was the only point I was trying to

14  make sure I understood.

15          **MS. STOUGHTON:**  And I apologize for the digression

16  then.

17          **THE COURT:**  That's all right.

18          **MS. STOUGHTON:**  So I also wanted to address the

19  question Your Honor asked -- you asked whether women have a

20  privacy interest in not being exposed to, you know, male

21  genitalia.  I think the answer to that question is that there

22  is not an interest there that can trump federal

23  nondiscrimination law.

24          We have had and can have a discussion about the

25  nature of that interest, but I think for purposes of the legal

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 50 of 143

1  discussion today, that is really all that matters, but I think

2  it's also worth -- and there is case law that we have cited,

3  you know, that suggests that that kind of interest, which has

4  been present in the courts' application of nondiscrimination

5  laws from the dawn of nondiscrimination laws, just simply is

6  not an interest that permits discriminatory laws, but I think

7  it's also worth noting that H.B. 2 doesn't actually prevent

8  that.  If a transgender woman changes her birth certificate --

9          **THE COURT:**  I understand.

10         **MS. STOUGHTON:**  -- it doesn't change that.

11         I think it's also in this context -- if the Court is

12 engaged in that kind of balancing of privacy interests, you

13 know, we would ask the Court to consider the interests of

14 transgender people in not having their privacy violated by

15 being outed.

16         Imagine the scenario where a transgender women is in

17 her -- on her campus and all her women friends are walking into

18 the women's bathroom, and she has to explain to them why she

19 cannot go in with them and must go somewhere else.  I think

20 that is a privacy interest that also has to be considered.

21         **THE COURT:**  What does the record show about whether

22 there -- the only accommodation that the law -- H.B. 2 allows

23 is a separate facility.  What does the record show about the

24 reasonable availability of separate facilities for bathrooms,

25 changing rooms, and showers?  Are they reasonably available, or

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 51 of 143

1   are they reasonably unavailable?  What does our record show on

2   that?

3          MS. STOUGHTON:  The only record the Court has today

4   on this motion is the record put in by the Plaintiffs, the

5   Carcano Plaintiffs, where they have individual testimony from a

6   number of their plaintiffs discussing the difficulties that

7   those individuals have had in locating and reaching accessible

8   facilities.  So today, for purposes of this motion, the only

9   record the Court has strongly suggests that those facilities

10  are not readily accessible.

11         You know, I think when considering the broader legal

12  question raised, I think it's important to note that H.B. 2

13  does not require that accommodation.

14         THE COURT:  I understand.

15         MS. STOUGHTON:  At the end of the day, I think they

16  are ultimately -- the notion that there is a transgender person

17  out there who had this extra burden would be sufficient in and

18  of itself to underscore that distinction between having

19  sex-segregated bathrooms in the first place and segregating

20  people from access to facilities consistent with their gender

21  identity and the extra burden and harm that that places on

22  them.

23         I also wanted to address specifically the question of

24  locker rooms because I understand the Court to be focusing on

25  that and I understand why, because it is true that the *G.G. v.*

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

*Gloucester* decision, which I think we're in agreement with the Plaintiffs here unquestionably controls the question of likelihood of success on the merits on Title IX, did not address locker rooms. They addressed only bathrooms.

**THE COURT:** The opinion also seemed to, whether intentional or not, indicate that in the bathroom context there were partitions, and so their privacy interests seemed to be protected.

**MS. STOUGHTON:** Well, Your Honor, it did address that, but more fundamentally what the circuit -- the circuit's approach was to acknowledge that the balancing of these various interests is really in the realm of the agency's judgment, and what the circuit said is that in the context of this interpretive guidance of this Title IX regulation, that the circuit was persuaded that the Department of Education properly exercised its responsibilities as an agency to balance the varying interests that go into a requirement that sex-segregated facilities be available consistent with gender identity and concluded that the law requires that they must.

So the court really dismissed the privacy and security interests raised by the school district in that case, which are exactly the same as the interests the Defendants raise here, by saying that that -- in deferring -- that that's the agency's job to balance those things, and the agency did that, and the rule is still there, and it's entitled to the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 53 of 143

1 deference that's required.

2          And, critically, for the purposes of locker rooms,

3 that interpretive guidance and the regulation it was

4 interpreting do not distinguish between bathrooms and locker

5 rooms.  It includes them in the same provision.  It treats them

6 identical.  Not only, I think, does that effectively mean that

7 *Gloucester* does control the question of locker rooms and

8 changing facilities in addition to bathrooms, but I think it's

9 also important to acknowledge the importance of consistent

10 interpretation of the nondiscrimination mandate and the illogic

11 that would and kind of regulatory chaos -- that's probably too

12 strong a word, but it would be an odd regulatory environment

13 for educational institutions to be in when they are required

14 under nondiscrimination law to treat transgender girls as girls

15 in the context of a bathroom but not in other contexts.  That's

16 not really a --

17          **THE COURT:**  But they do draw lines; right?  The

18 Department of Education draws lines on sports; right?  Aren't

19 there certain areas -- even the guidance letter says you can

20 draw a line.  Isn't that why the word "generally" was used as

21 the guidance from the Department of Education?

22          **MS. STOUGHTON:**  Well, there's a couple of things in

23 there that I want to address.  First, the Departments of

24 Education and Justice do not draw a line between bathrooms and

25 changing facilities.  When it comes to facilities access, the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

line is the same.  Those two things are equivalent.  So whether
there are lines drawn in sports teams I don't think pertains to
the question of the line between bathrooms and changing
facilities.  The critical question is when the circuit requires
controlling weight deference to this interpretive guidance,
does the interpretive guidance draw the line, and it doesn't.

I think that's -- then a second thing is the word
"generally."  I mean, first, that word does not appear in all
of the guidance that the Departments of Justice and Education
have put out on this question, all of which guidance is equally
entitled to *Auer* deference, but secondly --

THE COURT:  Let me ask about that because one of the
guidance letters is dated in May of this year, after the
lawsuits were filed, I believe.  Does that -- are you arguing
that that letter is entitled to the same *Auer* deference as the
January letter?

MS. STOUGHTON:  Yes, Your Honor.

THE COURT:  Even though it's been developed after the
commencement of litigation?

MS. STOUGHTON:  Yes, Your Honor.  The law is very
clear that under *Auer* deference whether -- the relationship
between the regulatory and interpretive guidance and litigation
is only relevant to the extent that it suggests that the
Federal Government is developing a position solely for the
purposes of litigation, but that guidance from May is merely a

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 55 of 143

continuation of consistent guidance that's come from the
Federal Government since as early as 2013, and so I don't think
there's any question that that guidance would not be afforded
the same deference by the Fourth Circuit as was afforded to the
Department of Education's letter from earlier in the *Gloucester*
decision.

So, Your Honor --

**THE COURT:** Can I ask this? What does the Department
of Education and the Department of Justice say about how these
rules apply to minors, particularly young people in the public
school system? My impression is that through grades --
kindergarten through some grade in elementary school, a lot of
kids use a single bathroom in the classroom, or something like
that. Then as they get into middle school, junior high, high
school, there are multi-use bathrooms that are more prevalent.
I don't know if that's, in fact, what it is, but I am now
drawing back to my memory of many years ago, but I remember it
being like that.

What is the Government's position on how these rules
are going to be carried out in terms of transgenders in
multi-use changing rooms and showers for young-aged children?

**MS. STOUGHTON:** Well, a couple of things, Your Honor.
First, I am not going to dodge your question, but I do think
it's worth pointing out that for purposes of deciding this
motion, that question isn't directly relevant because H.B. 2's

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 56 of 143

1 broad scope would still -- even if the answer to that is

2 somehow problematic, H.B. 2's broad scope couldn't be

3 justified.

4        But to answer your question, the Departments of

5 Justice and Education have guidance suggesting that even in

6 those facilities that nondiscrimination mandate applies and

7 that facilities must be -- sex-segregated facilities must be

8 made available consistent with gender identity.  The Department

9 of Education and the Federal Government generally have been

10 involved in actions enforcing, in the high school context,

11 Title IX's nondiscrimination mandate.

12        **THE COURT:**  Okay.  So are accommodations put in place

13 to avoid young people from being exposed to people that are of

14 a different biological sex or people of I would call

15 impressionable years?  I don't know what that is any more, but

16 you can pick an age.

17        **MS. STOUGHTON:**  Well, Your Honor, they can be.  Your

18 know, the Federal Government has put out -- the Department of

19 Education put out an emerging practices document as part of the

20 extensive guidance that it's provided to funding recipients

21 that cites a number of educational institutions around the

22 country that have confronted the question of providing

23 gender-identity access to transgender students, and a lot of

24 those emerging practices do involve those schools taking other

25 steps to generally in a nondiscriminatory manner address

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  privacy concerns.

2          In this case, the record also provides evidence of

3  that.  The Carcano Plaintiffs put in an affirmation from a

4  school administrator here in North Carolina.  In the record for

5  the United States' motion --

6          **THE COURT:**  That's the Greensboro administrator?

7          **MS. STOUGHTON:**  That's right, I think.

8          **MR. SMITH:**  That's correct, Your Honor.

9          **MS. STOUGHTON:**  Thank you.  In the United States'

10 motion, there's an affirmation from a woman named Janice Adams,

11 who testified to extensive experience discussing with parents

12 who actually raised concerns and reporting that actually in the

13 end everything is fine, that there are ways that schools have

14 to accommodate privacy interests while not discriminating

15 against transgender children.

16          I think that really speaks to two things.  One is the

17 way in which the concerns that motivate laws such as H.B. 2 are

18 really a shaking foundation on which to build a discriminatory

19 law, but, secondly, the rightness of the Fourth Circuit's

20 decision affording deference to the interpretive guidance and

21 allowing the agency that is charged with enforcing Title IX to

22 properly balance the concerns in the educational environment.

23          I also can't help but say, not that it's relevant,

24 that my two young children, who are in pre-kindergarten,

25 actually use an open bathroom.  There are not individual

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  bathrooms.  They actually -- they all use -- you know, mine are

2  getting potty trained, but I think for supervisory purposes,

3  they all just use this open bathroom area.  I just raise that

4  to show that every educational environment has to deal with

5  these questions regardless of the presence of transgender

6  students, and all that the nondiscrimination laws require that

7  they do is that they do that in a way that doesn't discriminate

8  in a way that, as the record demonstrates, causes enormous harm

9  to transgender people while they sort those things out.

10        **THE COURT:**  What's the percentage, if you know, of

11  transgender students in the public school system who use or

12  wish to use showers and changing facilities as opposed to

13  bathrooms?  Is it high?  Low?  I mean, do they tend not to?  Do

14  you have any idea?

15        **MS. STOUGHTON:**  Your Honor, I just have no idea what

16  the answer to that question is.  I think relevant to that

17  question there is record evidence suggesting that when

18  transgender people do use these facilities, that -- I mean,

19  there's record evidence from people who have enormous

20  experience dealing with large numbers of transgender people and

21  counseling them and having conversations about this topic with

22  them and testifying that in the experience of those people,

23  that when transgender people use these facilities, that they

24  are not interested in exposing their bodies, that this notion

25  that there will be this raft of exposure -- I mean, it's not

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  only belied by that testimony, but, frankly, as Mr. Smith

2  indicated, by the fact that we have not had H.B. 2 in North

3  Carolina, and indeed in many, many states and municipalities

4  throughout this country, there are affirmative legal

5  protections that allow transgender people to use facilities

6  consistent with gender identity and, yet, despite all of that

7  available record to draw from, the Defendants in this case have

8  no record that there are a rash of privacy complaints, let

9  alone security concerns, that demand the kind of response that

10 H.B. 2 represents.

11        I would also, while I'm here, just want to address

12 the questions of enforcement and enforceability with regard to

13 the University of North Carolina that were raised earlier.  I

14 would first -- the Court asked the question of whether H.B. 2

15 has an enforcement mechanism.

16        **THE COURT:**  It's not clear to me how the law is

17 supposed to work other than that the agencies are supposed to

18 follow it.

19        **MS. STOUGHTON:**  But I think that's enough.  I mean,

20 the enforcement mechanism is the power that a superior -- that

21 form a -- or a level of government has over constituent

22 government institutions to direct their policies and actions.

23 I don't want to present as an expert in North Carolina law, but

24 I think looking at the law and the governing structures of the

25 University of North Carolina, it seems clear to us that the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  University, through its Board of Governors, is beholden to the

2  laws of the state of North Carolina.

3      **THE COURT:**  So why wouldn't the Governor, as the

4  chief law enforcement officer -- I guess that's a question --

5  of the state -- why wouldn't he be covered?  In other words,

6  why do you need the University of North Carolina in this case?

7  If I invalidate the law, Title IX, isn't the Governor a

8  suitable defendant for that purpose, and do you need to have

9  other defendants?

10      **MS. STOUGHTON:**  Well, unfortunately, for purposes of

11  your question, Title IX covers educational institutions.  So

12  Title IX is a requirement on UNC as a federal funding recipient

13  to not discriminate in its educational programs and activities.

14      **THE COURT:**  What is the relationship of the

15  University to the state of North Carolina?  It's an agency, is

16  it not, an agency of the -- isn't the board treated as an

17  agency, and isn't that part of the government of North

18  Carolina?

19      **MS. STOUGHTON:**  Well --

20      **THE COURT:**  Maybe these are questions for the

21  Defendants.  It's not entirely clear to me why they are in the

22  case other than it's abundantly clear to me the conduct that's

23  involved, but if the Governor is the chief law enforcement,

24  there must be more to it that the University has to be sued

25  separately to get to the University.  Otherwise, you can sue

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 all these various agencies in the state that have bathrooms

2 that are not compliant with the law.

3     **MS. STOUGHTON:**  Well, no, Your Honor.  I think the

4 right way to come out on this question is from the statute, and

5 the statute is a requirement on the University not to

6 discriminate, and so the question -- the question -- I mean,

7 not to be too simplistic about it, but the question is is the

8 University discriminating.  That's separated from the question

9 of why are they discriminating.

10     I think it's probably fair to say that the University

11 is only discriminating because H.B. 2 was passed by the State

12 of North Carolina, but that's not relevant to the question of

13 are they, and I think they are for all the reasons that have

14 been said.

15     I won't get into the Spellings memorandum.  I mean,

16 the Court is clearly very familiar with that, but this question

17 of -- I think the critical question is what is the University

18 of North Carolina's policy with regard to access to its

19 bathrooms and changing facilities.  The University, as

20 Mr. Smith noted, has kind of been slippery about this.  In

21 certain contexts, it said, well, this is definitely not our

22 policy, but it has nonetheless said that it is complying with

23 H.B. 2.  It's not only said that, but it's also said it's

24 required by law to comply, and, in fact, it said that it will

25 do so until a court orders otherwise.  Those statements can't

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  be reconciled, Your Honor.

2          **THE COURT:**  I understand that.

3          **MS. STOUGHTON:**  So that's -- I mean, our position --

4  again, it gets back to the question of what does Title IX

5  require, and Title IX -- and the rightness questions also need

6  to be viewed in the context of that statute because Title IX

7  says that no student -- or no person shall be discriminated or

8  denied the benefits of or subject to discrimination in an

9  educational program.  And to the extent that UNC's announced

10 its intent to comply with H.B. 2, that is in violation of

11 federal law, that in and of itself.  Whether UNC is taking

12 additional steps to enforce it is irrelevant.

13          This notion that has been offered in some of UNC's

14 more recent submissions that it interprets H.B. 2 to only

15 require it to take these, you know, three discrete steps which

16 the University claims are not harmful, that doesn't work for

17 two reasons.  One is that is a nonsensical interpretation of

18 H.B. 2.  H.B. 2 says very clearly public agencies shall require

19 that, et cetera, et cetera, and the notion that that -- all

20 that means is that you send the law out and then you also stand

21 up and say and we are not going to do anything about that, I

22 don't think that can be reconciled with the statutory text,

23 which takes us back to the circuit case law, *North Carolina*

24 *Right to Life*, in which the circuit clearly said that when a

25 statute kind of very clearly can be interpreted to cover

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  certain behavior, a promise that a defendant will not interpret

2  it or enforce it in a way that is clearly contrary to the text

3  of the statute is really just the same as a litigation promise;

4  it's not sufficient grounds to hold that a case is

5  nonjusticiable.

6          **THE COURT:**  All right.  I appreciate --

7          **MS. STOUGHTON:**  I'll stand down now and maybe let the

8  other side have a chance.

9          **THE COURT:**  I think what I am going to do is take

10  about a 10-minute break, and then I would like to hear from the

11  Defendants.  I am going to finish before lunch.  We tend to eat

12  lunch a little later in the day here, so that might be a little

13  later than for some folks.  We'll take a 10-minute recess, and

14  then we'll come back.

15      (The court recessed at 11:37 a.m.)

16      (The court was called back to order at 11:37 a.m.)

17          **THE COURT:**  Before I start with the Defendants,

18  Ms. Stoughton, the Department of Justice -- the United States

19  has its own case.  Is there any statutory relief in that case

20  that, if granted, would reach all of the conduct in the state

21  of North Carolina without having to get to a constitutional

22  issue?  Do you follow me on the question?

23          **MS. STOUGHTON:**  Yes, Your Honor.

24          **THE COURT:**  You have Title VII and the VAWA claim,

25  but my question is that would not reach everybody.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          **MS. STOUGHTON:**  I think the answer to your question

2   is, yes, there is conduct that would be reached by the

3   constitutional claims that is broader than that which is

4   covered by the three statutes.

5          **THE COURT:**  That's what I thought.  All right.  Thank

6   you.

7          Mr. Bowers.

8          **MR. BOWERS:**  Thank you, Your Honor.

9          **THE COURT:**  Tell me, what was the problem that this

10  portion of Part I of H.B. 2 was remedying that preexisted for a

11  millennia in North Carolina?

12         **MR. BOWERS:**  I'm not sure I understand your question,

13  Your Honor.

14         **THE COURT:**  Well, I assume the statute was passed to

15  make sure that there was some problem that was cured.  What was

16  the problem?

17         **MR. BOWERS:**  It was in -- Your Honor, speaking solely

18  on behalf of the Governor -- Mr. Duncan here, of course, is

19  here to speak for the Legislature Intervenors -- the problem

20  was simply the overreach by the City of Charlotte in their

21  local ordinance.

22         **THE COURT:**  But if you strike down that ordinance,

23  which Part II of H.B. 2 effectively did, then why do you need

24  Part I?  What is it doing?

25         **MR. BOWERS:**  It's clarifying what the public policy

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

of the state of North Carolina is, and it's also reaffirming
the important government interests of ensuring privacy in the
most intimate -- some of the most intimate segments in life.

    **THE COURT:** Did the state have transgenders using
restrooms that was of the sex they identified with prior to
H.B. 2?

    **MR. BOWERS:** I'm certain that's probably the case.

    **THE COURT:** Was there any problem with that?

    **MR. BOWERS:** I am not aware of any problem with that.

    **THE COURT:** Is there any legislative record here that
indicated that there was a problem that needed to be addressed?

    **MR. BOWERS:** Your Honor, to my knowledge, though I
will defer to Mr. Duncan on that, I know there were some
legislative record, but I can't say that there was, as I stand
here today.

    **THE COURT:** Okay. So what's wrong with the State
going back to the policy it had before the Charlotte ordinance
was passed from a -- I don't mean wrong, I mean, from a point
of protecting the interests that the State says it's seeking to
protect?

    **MR. BOWERS:** Your Honor, that's an interesting
question, and I would say that -- I would turn that on its head
actually, and I would say in the context of this preliminary
injunction hearing, what's wrong with H.B. 2 on its face
reaffirming the important government interests in ensuring

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   privacy in that setting?

2          **THE COURT:**  Well, as I understand the argument from

3   the Plaintiffs, the argument is, in part, that it doesn't do

4   that, that it doesn't reaffirm the policy, that the protections

5   in place in North Carolina were there with the various laws,

6   trespass and others, which is why I asked about those, and that

7   what this actually does is now exclude a certain group of

8   people who previously were using restrooms and showers and

9   changing facilities apparently without incident all the way up

10  until the time Charlotte passed its ordinance.  That's their

11  position, I think.  They can correct me, but --

12         **MR. BOWERS:**  Right.  Well, Your Honor, I'll just go

13  back to Mr. Smith's arguments a little while ago -- or his

14  statements, rather, is that there is a privacy interest in not

15  being exposed to people, and that privacy interest applies to

16  everyone, transgender or otherwise, and again H.B. 2 simply

17  reaffirms and ratifies that that privacy interest --

18         **THE COURT:**  Is that privacy interest protected by the

19  indecent exposure and trespass and peeping laws and laws like

20  that that I think you all pointed out to me as well in your

21  briefing?

22         **MR. BOWERS:**  Yes, Your Honor, I think that's true.

23         **THE COURT:**  Why aren't those sufficient to protect

24  those interests, or are they?

25         **MR. BOWERS:**  Your Honor, I would say, like in the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 67 of 143

1    setting of traffic laws -- let's just use that as an analogy.

2    You know, there are certain traffic laws that may, in fact, be

3    duplicative or cover similar areas, but that doesn't mean that

4    they are inappropriate.  So, for example, speeding versus --

5    speeding is -- exceeding the speed limit is against traffic

6    laws, and also improper lane changes are against traffic laws,

7    but they are all designed towards safety.  So just because

8    there are multiple laws doesn't mean that you can't have

9    additional laws.  So this is just an additional law to, again,

10   confirm and reaffirm and ratify that --

11            **THE COURT:**  How does this law make bathrooms and

12   changing rooms and showers safer in North Carolina?

13            **MR. BOWERS:**  Well, I will go back to your question

14   that you asked I think it was at the start, maybe, you know,

15   one of the top two or three questions -- the first two or three

16   questions you asked, and, that is, haven't we, as a society,

17   forever had separate facilities for men and women, and the

18   answer is yes.  And so is that an appropriate sex

19   discrimination?  And I haven't heard any dispute.  I think the

20   answer is, yes, that's -- a legitimate government interest is

21   served, and H.B. 2 simply amplifies that and confirms that

22   the -- again, the legitimate government interests of the

23   safety -- I'm sorry -- of privacy rights of individuals from

24   not having -- not being exposed to the genitalia of people of

25   the opposite sex is --

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1       **THE COURT:** Let's start with the bathrooms. But in

2  the bathrooms, how are they ever going to be exposed to

3  somebody with -- nudity of somebody of the opposite biological

4  sex? They are in partitions generally.

5       **MR. BOWERS:** But not always, not always. Let's just

6  use a hypothetical. If a transgender female goes into a

7  women's public restroom, it's possible that --

8       **THE COURT:** How is that going to be possible? The

9  last time I thought about it, there aren't any urinals in the

10 ladies' room, are there?

11      **MR. BOWERS:** Not to my knowledge. I'll give you a

12 perfect example.

13      **THE COURT:** I am at a loss as to what the

14 circumstance would be, unless somebody strips down naked in the

15 bathroom, which I think is in violation of the law, as I

16 understand it.

17      **MR. BOWERS:** Your Honor, I am aware -- in military

18 facilities, I am aware that there are public restrooms where

19 there are stalls but not doors. That's one potential

20 opportunity for the exposure.

21      **THE COURT:** All right. Are any of those involved in

22 our case?

23      **MR. BOWERS:** They may be. We haven't developed the

24 record yet.

25      **THE COURT:** So under the law, as I understand it, a

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  transgender female, who, from all outwardly appearances, lives

2  the life as a female, dresses as a woman, is considered by

3  everybody to be the gender to which they identify, now has to

4  use the men's room, how on earth is that supposed to work?  So

5  we are now going to have people dressed like women using the

6  men's room, as required by this law, particularly if there is

7  no available accommodating single-use facility; and, vice

8  versa, we are going to have people dressed like men who

9  consider themselves male walking into the ladies' room.  How is

10 that going to work?

11        **MR. BOWERS:**  I think you answered the question

12 partially by talking about the single-occupancy restrooms.

13 Admittedly, they won't always be available; but when they are,

14 that's one way.  Secondly, I mean -- and this is not argument.

15 It's pure speculation on my part, but my guess is that some

16 transgender individuals will continue to use the bathroom that

17 they always used and nobody will know.

18        **THE COURT:**  Yeah, but now they are violating the law.

19 So what's the point?

20        **MR. BOWERS:**  But there is no enforcement provision of

21 the law.

22        **THE COURT:**  Then why have it?  I don't understand.

23        **MR. BOWERS:**  Right.  Your Honor, that might be a

24 question better reserved for Mr. Duncan and the Legislature

25 Intervenors, but from the Governor's perspective, we have the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

law.  He signed the law into effect, because it does stand for
the proposition of protecting the privacy rights of
individuals.

      **THE COURT:**  I understand.  Hold on just a minute.  I
don't know if you had other information you wanted to --

      **MR. BOWERS:**  I do briefly.

      **THE COURT:**  Okay.  Go ahead.

      **MR. BOWERS:**  Just very briefly, Your Honor, I wanted
to talk about the Plaintiffs' equal protection claim.  As Your
Honor is aware, to state a claim for sex discrimination under
the Equal Protection Clause, they must allege purposeful
discrimination based on sex; and the core of their arguments,
as I read it, is based on their belief that the *G.G.* case
governs this Court's analysis under the Equal Protection
Clause, and that argument appears on page 18 of their initial
brief.

      Well, Your Honor, unless I'm misreading *G.G.*, that
can't be the case, because in Footnote 3, the Court
specifically declined to reach the equal protection issue.

      **THE COURT:**  I think their argument, and they can
speak for themselves, is that typically Title IX and Title VII
and equal protection are all read in tandem, and, therefore,
the analysis of the Title IX ought to, therefore, not be
inconsistent with the others.  The interesting question there
is, of course, usually the courts will be determining the equal

1  protection analysis; whereas, the Department of Education has

2  determined the analysis for Title IX.  I understand that

3  distinction.

4          **MR. BOWERS:**  And, Your Honor, if I could follow up on

5  that briefly.  As you well know, they have a specific Title IX

6  claim in addition to their equal protection claim, and so I

7  think if we take the Fourth Circuit at face value with *G.G.*

8  where they specifically declined to reach the equal protection

9  issue, then I think because there's a separate Title IX claim,

10  you have to go look at the Title VII case law, and Plaintiffs

11  rely heavily on the *Price Waterhouse* case and its line of

12  cases.

13          And, Your Honor, I think that it's instructive to

14  look at those *Price Waterhouse* cases, and a close reading of

15  those cases shows that the individual status as a transgender

16  person is not relevant.  The relevance is was there

17  discrimination based on sex stereotyping; and maybe I missed

18  the point, but in reading the Plaintiffs' briefs, it seems as

19  though they are trying to mix and match sex stereotyping with

20  transgender, but that's not the case.

21          And the best -- to me, the best case is from 2015,

22  the *Johnston* case, where, you know, the courts said that sex

23  stereotyping claims are based on behaviors, mannerisms, and

24  appearances.  And in the *Johnston* case, "Plaintiff has not

25  alleged that Defendants discriminated against him because of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  the way he looked, acted, or spoke.  Instead, Plaintiff only

2  alleges that the University refused to permit him to use the

3  bathrooms and locker rooms consistent with his gender identity

4  rather than his birth sex."  And then the Court went on to say,

5  of course, "Such an allegation is insufficient to state a claim

6  for discrimination under a sex stereotyping theory."

7          That's what we have here, Your Honor.  I would just

8  again emphasize that H.B. 2 is not based on sex stereotyping,

9  and so, therefore, as a result, their equal protection claim

10  must fail.

11          **THE COURT:**  All right.  Are you going to address the

12  due process claim?

13          **MR. BOWERS:**  I was going to let Mr. Duncan handle

14  that, if that's okay?

15          **THE COURT:**  Okay.  Let me ask before you sit down.

16  I'm not sure who knows the answer to this, but as a practical

17  matter, how many single-use facilities for accommodation are

18  available in North Carolina or how many -- what percentage?

19          **MR. BOWERS:**  As a percentage?

20          **THE COURT:**  Yes.  Is there any record on that, that

21  there is, in fact, the availability of them?  I have record

22  evidence from the Plaintiffs that they're not readily

23  available.  Is there anything else on that?

24          **MR. BOWERS:**  As I stand here before you today, I'm

25  not sure, but that might be something -- a number that we can

1  capture.

2          **THE COURT:**  Let me ask, for example, all the roadside

3  bathrooms along the highways, the interstates --

4          **MR. BOWERS:**  Rest stops?

5          **THE COURT:**  Rest stops, are they typically divided

6  men/women and without a separate accommodating facility or not?

7          **MR. BOWERS:**  Your Honor, again, I am not dodging the

8  answer.  Just anecdotally, based on my own personal experience,

9  I really never noticed because I always go into men's room, but

10  that's probably some information that we can gather, if it will

11  be helpful to Your Honor.

12          **THE COURT:**  All right.  Thank you.

13          **MR. BOWERS:**  I am not just sure as I stand here

14  today.

15          **THE COURT:**  Thank you.  All right.

16          **MR. DUNCAN:**  Good afternoon -- or it's almost the

17  afternoon, Your Honor.  May it please the Court, Kyle Duncan,

18  representing the Intervenor Defendants, and we appreciate the

19  opportunity to argue before you.

20          It was and is my intention to hit the Title IX and

21  the due process argument, but I would like to take a crack

22  first at some of the more basic questions that Your Honor was

23  asking earlier.  Let me start here.  One of the basic questions

24  you asked was why do we have separate bathrooms.  I think by

25  extension you could say, why do we have separate locker rooms?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  Why do we have separate shower facilities?

2          I would like to give you two answers that I sort of

3  view as anchor points on this, and the first one is from the

4  Fourth Circuit, 1993, case called *Faulkner v. Jones*.  The

5  Fourth Circuit there talks about, quote, society's undisputed

6  approval of separate public restrooms for men and women based

7  on privacy concerns.

8          And then I would also like to give you Justice

9  Ginsburg's answer from *Virginia v. United States*, 1996, which

10  was, as Your Honor knows, about allowing women under the Equal

11  Protection Clause to enroll at VMI.  Here is what Justice

12  Ginsburg said in that case:  "Admitting women to VMI would

13  undoubtedly require alterations necessary to afford members of

14  each sex privacy from the other sex in living arrangements, and

15  to adjust aspects of the physical training programs."

16          So just taking those two anchor points, I think with

17  a very solid answer, we can get to Your Honor's question.  One

18  answer is physical privacy between the sexes that is

19  inescapably rooted in biology.  Otherwise, those two quotes

20  that I just read don't make any sense.

21          Now, let me get to *G.G.* because I want to talk about

22  *G.G.* in its Title IX context, and we know Your Honor has read

23  carefully *G.G.* and must take it seriously because it's from the

24  Fourth Circuit.  Here is what *G.G.*, the majority, says at the

25  end of its opinion.  It says:  "We agree that it has indeed

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

been commonplace and widely accepted to separate public

restrooms, locker rooms, and shower facilities on the basis of

sex.  We agree that an individual has a legitimate and

important interest in bodily privacy such that his or her nude

or partially nude body, genitalia, and other private parts are

not involuntarily exposed."  Of course, the dissent amplifies

that point by citing cases about one having a constitutionally

protected interest in not being exposed to the opposite sex.

So I think if you take those three ideas together, it

provides a very clear and straightforward answer to Your

Honor's question.  We have separated those facilities because

they are intimate facilities.  We separated them not because of

some kind of social convention, not because we just didn't

think about it carefully enough, but because of real concrete

interests in bodily privacy.  That applies to anybody, no

matter what their gender identity is, and it's rooted in

biology.

One other point I would like to make.  We've been

talking a lot about the status quo and that H.B. 2 upset the

status quo or did it return us to the status quo.  I would

submit this, Your Honor.  If the Charlotte ordinance were

accomplishing anything, it was to ensure that people could

access restrooms, shower facilities, and changing rooms based

on their gender identity.  It thought it was accomplishing

something obviously.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

         Now, if the status quo were that there was no problem
accessing those facilities on the basis of gender identity
alone, then I don't understand what the Charlotte ordinance was
doing, and I submit this, that what was the true status quo.
The true status quo is expressed -- and this will get me to
Title IX and *G.G.*  The true status quo is expressed by Title IX
and the consistent understanding of that law and the
regulations under it, that it existed until about January of
2015.  That consistent understanding was that facilities can be
separated, meaning locker rooms, restrooms, and shower
facilities as well as living arrangements and others, can be
separated on the basis of sex.

         We submit, Your Honor, that understanding was
biological sex, and we don't need to speculate about that
because it was only in January 2015 that the DOJ put forward
the opinion letter that the *G.G.* Court thought it needed to
defer to, and it said in the opinion, that is a "novel"
understanding of the regulation.  It is "perhaps not
intuitive," I'm quoting, and it only came about through an
opinion letter in January 2015.

         Admittedly, the *G.G.* Court recognizes there were a
couple of enforcement actions by the DOJ going back to 2014,
but my point is this is a novel understanding of what Title IX
requires in the separation of intimate public facilities.  The
status quo, based on Title IX and based on common expectations,

1  was that these facilities are separated on the basis of

2  biological sex.  The only reason --

3       **THE COURT:**  Was part of the status quo, though, that

4  people who were transgender were nevertheless using facilities

5  that corresponded with their gender identity, and it was under

6  the radar?

7       **MR. DUNCAN:**  I submit to Your Honor the only way we

8  know anything about that right now is because of the affidavits

9  that the Plaintiffs have submitted in that case.  Those

10  affidavits, as Mr. Smith has stressed, are about those

11  Plaintiffs' particular circumstances and what they were doing.

12  Okay, so we may know that about them, but to take that and

13  extrapolate it to this broad --

14       **THE COURT:**  I have a little more than that, I think,

15  because I have the School Administrators in these cases saying

16  that, well, they have been dealing with these issues for at

17  least a number of years, and they do what they can to

18  accommodate transgender persons in the school system.

19       **MR. DUNCAN:**  Well, this is something that Mr. Bowers

20  said we are going to develop a much more robust evidentiary

21  record on, but to even take these affidavits and extrapolate

22  that the status quo was DOJ and ACLU's policy -- I guess that's

23  my ultimate point.  The policy being asserted by the Justice

24  Department and by the ACLU is that anyone should be able to use

25  restrooms, locker rooms, and shower facilities based on their

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  own internal self-understanding of their gender identity.

2          That's the policy, as I understand it, that is being

3  put forth by the Justice Department and the ACLU.  I think it

4  stretches credibility to the breaking point to say that that

5  was the status quo in North Carolina or anywhere else before

6  H.B. 2 was passed.  H.B. 2, as Mr. Bowers said, was clarifying

7  the status quo.

8          **THE COURT:**  Would it be more accurate, from your

9  point of view, to say that the status quo before H.B. 2 was

10 that biological men and women would use the bathrooms that

11 corresponded biologically with their sex but that transgenders

12 were also using the ones to which they identified, but we just

13 had no incidents of anybody worrying about that?

14         **MR. DUNCAN:**  I just don't think we have any basis in

15 this record for making a broad statement like that.

16         **THE COURT:**  Can't we assume that since we have 44,000

17 or so transgender individuals in the state of North Carolina

18 and that many of them are living the life of the gender that

19 they identify with, that since we haven't seen lots of people

20 appearing as men walking into ladies' rooms or vice versa, that

21 they must have been doing that?

22         **MR. DUNCAN:**  Honestly, Your Honor, I do not think you

23 can generalize, and here is one reason why I don't think you

24 can generalize.  By the very nature of the claims that the

25 Plaintiffs are making, this is a transition process in which

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

people will present as being more or less masculine or feminine
along a continuum.  I think that's perfectly illustrated by the
named plaintiff in this case, who, until late 2015, was using
the women's bathroom, if I understand the affidavit correctly.

So I don't think you can just say, at least I don't
think the record supports it, that there is this population,
this discrete population of people who are a certain way and
who are doing a certain thing with respect to bathrooms, be it
in men's or women's bathrooms.  I think it is far, far more
complex than that, which is one reason why we look forward to
developing a more robust evidentiary record on this issue, but
the one thing I do resist is the idea of the status quo before
H.B. 2 is a DOJ policy.  I don't think that's supported by the
record, and I think it's belied by what the DOJ has been doing
with its guidance documents.  If that were the status quo, why
do we need a January 2015 guidance document from DOE that says
how people ought to be treated?  I think the fairer thing to
say is that this is an area in flux.  The flux has been
happening more and more rapidly.  For what reasons, I don't
know why, but it's an area in flux, which is why you see such
rapid action by the DOJ.

As Your Honor pointed out, not a week after these
lawsuits were filed, we have a "Dear Colleague" letter
submitted by DOJ and DOE that expands on what the 2015 letter
was doing, and it expands it not only to restrooms, locker

1  rooms, and shower facilities, but also to overnight

2  accommodations, to housing facilities.  It does stop short on

3  sports, Your Honor.  We do agree with Your Honor on sports.

4  The guidance given in the DOE letter is confusing with respect

5  to sports, but it's very clear with respect to showers, with

6  overnight housing, and with dorm rooms or housing foundations.

7         So having said all that, let me address -- and I

8  understand -- I want to be brief on this because I understand

9  the time constraints.  On Title IX, we've already briefed why

10  we don't think *G.G.* compels success on the merits on Title IX,

11  so I am not going to rehash that.  I know Your Honor's read it.

12         Let me emphasize one specific point that we make.  It

13  seems to us clear that the *G.G.* Court said there were no

14  constitutional objections raised to the agency interpretation.

15  That seems clear to us.  It also seems clear that both the

16  Governor and the legislators are raising a number of

17  constitutional claims to the agency interpretation.  In other

18  words, if Title IX and its implemented regulations mean what

19  DOJ and ACLU say it means, we are raising constitutional

20  objections.

21         Let me emphasize one in particular, and why?  Because

22  I think the *G.G.* decision paradoxically actually proves it for

23  us, and that's the Spending Clause objection.  Title IX is

24  obviously a Spending Clause measure, and it is settled law,

25  it's been settled since 1981 in the *Pennhurst v. Halderman*

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 81 of 143

1  decision, also reiterated in *Arlington Central School District*

2  *v. Murphy*, that when the Federal Government puts spending

3  conditions on federal funds, they must be unambiguous.  The

4  spending recipient must have clear notice so that those

5  conditions must be, quote, clearly understood by the recipient.

6          Now, we submit, Your Honor, the *G.G.* decision

7  demonstrates that if Title IX means what the ACLU thinks it

8  means, it's unconstitutional because there is no way that a

9  funding recipient of Title IX funds could have anticipated that

10  sex in Title IX and its implementing regulation includes gender

11  identity, the self-assertion of an internal sense of gender.

12  We don't need to speculate about that.  If it were clear, why

13  would DOJ have to issue a January 2015 letter followed by a

14  "Dear Colleague" letter explaining it to everyone?  It wasn't

15  clear.  Again, we don't need to speculate because the *G.G.*

16  Court found that the regulation itself was ambiguous.  That's

17  why it applied *Auer* deference to begin with.

18          So if it found that it was ambiguous, Title IX cannot

19  mean that gender identity discrimination is included because

20  it's a funding mechanism that would violate the *Pennhurst*

21  principle.  So that's something that the *G.G.* Court did not

22  consider, left it open.  There you have a local school district

23  policy.  Here you have a state law, right, and you have

24  enforcement action by the DOJ and an action by the ACLU,

25  seeking to hold that unconstitutional and in violation of Title

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  IX.

2         What's missing here is the idea that funding

3  recipients could have possibly known about this.  That's just

4  something the *G.G.* opinion didn't address, and so we can take

5  *G.G.* -- we disagree with *G.G.*, obviously.  We don't need to

6  hide the ball.  We disagree with it, but we can take it at face

7  value and still say it doesn't address the constitutionality of

8  imposing that requirement on Title IX funding recipients under

9  the *Pennhurst* principle.

10        I want to address due process very quickly.

11        **THE COURT:**  So are you saying that I could find that

12 *G.G.* doesn't apply to me because it's unconstitutional as

13 applied in this case?

14        **MR. DUNCAN:**  No, Your Honor.  We're saying that *G.G.*

15 left open the question of whether the agency interpretation of

16 Title IX is constitutional.  *G.G.* specifically said it didn't

17 consider that question.  Whether because it wasn't raised, I

18 don't know, but it wasn't raised.

19        Here you have a different situation.  You have a

20 state law that has been passed, and you have a DOJ and ACLU

21 action that says it violates Title IX.  That inescapably puts

22 into question the Title IX funding for the state.  When the

23 attorney general announced this lawsuit on May 9, she said --

24 and I am not quoting; I'm paraphrasing.  She said funding is

25 not an issue yet.  We reserve the right to make it an issue.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  It's obviously an issue.

2       And by the way, Your Honor, we don't agree or admit

3  that DOJ can strip funding.  We would fight that tooth and

4  nail, but what we're saying is if funding is an issue under

5  Title IX, Title IX cannot mean what the ACLU and DOJ thinks it

6  means because that would violate *Pennhurst*.  I just don't see

7  how one could argue that this requirement for a funding

8  recipient is unambiguous under *Pennhurst*.  The *G.G.* opinion

9  itself said it was ambiguous and that there were two possible

10 interpretations:  One was biological sex and one was sex plus

11 gender identity in some combination, biological sex plus gender

12 identity.  But the Fourth Circuit very clearly said we are not

13 choosing between those two.  They are both reasonable.  We

14 defer over here.  So that's the Title IX --

15      **THE COURT:**  Is that a timing issue, if I were to

16 agree with that, that the -- if it's an issue in the case, is

17 it a timing issue that for some next cycle of funding, then the

18 State would be put on notice that that's the interpretation if

19 you want to receive the funding?

20      **MR. DUNCAN:**  I don't think so, Your Honor.  I think

21 it's an issue of pure statutory construction.  In other words,

22 you can't put -- I don't see how you could put funding

23 recipients on notice through an agency letter like that.  That

24 would be a very strange way of putting an agency on notice.

25 Let me make that more concrete.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    I've got the agency letter right here.  This is the

2  January 2015 letter to which the Fourth Circuit deferred.  It

3  says, quote, on page 2, OCR refrains from offering opinions

4  about specific facts, circumstances, or compliance with federal

5  Civil Rights laws without first conducting an investigation.

6  So that would be an awfully counterintuitive way of putting a

7  whole state on notice that either all or part of its federal

8  funding has been put at issue.

9    I think it's a straightforward application of

10  *Pennhurst* here, and it's something that's -- quite frankly,

11  it's just something that the *G.G.* opinion didn't consider.

12    **THE COURT:**  So what does that mean at this stage of

13  the litigation?

14    **MR. DUNCAN:**  I think it means that they don't have a

15  substantial likelihood of success on the merits on Title IX.

16  It certainly means that *G.G.* doesn't compel that conclusion,

17  which gets to some of our other arguments that I know Your

18  Honor has read already about the limitations on *G. G.*

19    Let me just note very quickly.  *G.G.* is limited to

20  the specific policy at issue in Gloucester County.  That policy

21  does not have any provisions for people who have undergone

22  sexual reassignment surgery.  In fact, the opinion said that

23  was a question that concerned the panel.  H.B. 2 obviously does

24  address that question.  It's a policy decision by North

25  Carolina to address it that way.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          And the second thing is we've heard a lot of

2   discussion about the limitations of *G.G.* to restrooms.  It's

3   difficult to understand how that could be in question because

4   the *G.G.* majority opinion dropped a footnote that said -- sort

5   of, and I'm paraphrasing here, waving its hands, saying we are

6   only dealing with restrooms.  We are only dealing with

7   restrooms.  How *G.G.* could stand for the proposition that the

8   ACLU is specifically arguing here that it extends to locker

9   rooms as well simply defies what the opinion says, and I think

10  I heard the DOJ say that *Auer* deference per *G.G.* also extends

11  to the "Dear Colleague" letter, and the "Dear Colleague" letter

12  extends to showers and overnight accommodations and housing

13  facilities.  How *G.G.* solves those is -- well, it's not a

14  mystery to me.  It doesn't solve those questions.

15          **THE COURT:**  Well, doesn't Judge Niemeyer in his

16  dissent say he doesn't see any principal basis to distinguish

17  between bathrooms and showers and locker rooms based on the

18  majority's --

19          **MR. DUNCAN:**  He's criticizing the majority's

20  reasoning in showing that it's wrong, but I can't stand here

21  and argue to you that it was wrong, but I can stand here and

22  argue to you that the majority limited -- whether the

23  limitation makes sense or not, the majority limited the reach

24  of its opinion to restrooms, and, of course, locker rooms

25  weren't at issue in *G.G.* because the --

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    **THE COURT:**  Its holding is limited to the restroom

2 because that's all *G.G.* was interested in; right?

3    **MR. DUNCAN:**  That's correct, but, I mean, I assume

4 that the footnote where it says this is limited to restrooms is

5 part of the holding in the case.

6    **THE COURT:**  Right.

7    **MR. DUNCAN:**  If it goes beyond restrooms, then all

8 the things that *G.G.* says about privacy and safety concerns are

9 out the window because now we're talking about locker rooms,

10 now we're talking about showers, now we're talking about

11 overnight accommodations, and now we're talking about housing

12 facilities per the "Dear Colleague" letter.

13    I want to make just a couple of brief points about

14 due process, but before I do, because we've already talked

15 about equal protection, if I may make one point about equal

16 protection, and that's this.  You know, it seems fairly clear

17 that the ACLU's preliminary injunction motion relies heavily on

18 the *Price Waterhouse* sex stereotyping theory.

19    You know, reading through all those cases, one comes

20 away with a distinct impression about what sex stereotyping is,

21 and what sex stereotyping is is a claim of sex discrimination

22 where the discriminator has discriminated on the basis of

23 mannerisms, or the appearance, the behavior of a person.  Just

24 to put it in plain terms, I've discriminated against a man

25 because that man doesn't act enough like a man.  He's not

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 87 of 143

1  masculine enough.  I've discriminated against a woman because

2  that woman doesn't act enough like my view of a woman, right.

3  That's what *Price Waterhouse* was.  It was a partner, somebody

4  up for candidacy at Price Waterhouse, and the other -- all the

5  male partners said, you know, you are too aggressive.  Woman

6  shouldn't act like that.  Put on some lipstick, right.  That

7  was in the record.  And the Court had no trouble finding that

8  that was sex discrimination.  As a matter of fact, when I read

9  *Price Waterhouse* for the first time, I was surprised by how

10  little discussion there was of the sex stereotyping theory.

11  The *Price Waterhouse* case is about the burden of proof in those

12  kind of claims.  It's not really about sex stereotyping.  There

13  is not some grand disagreement about sex stereotyping.  It is

14  what it is.

15          Now, as Your Honor knows, there are a number of

16  circuit cases that apply the *Price Waterhouse* sex stereotyping

17  theory to claims by transgender individuals, and the other side

18  has briefed them.  Here's -- by and large, here is what those

19  cases are all about.  You have an employee who's been fired or

20  being demoted or being discriminated against in some way

21  because the employee has said I'm transitioning from male to

22  female and my appearance is going to be changing, and the

23  employer or colleagues of the employee say we are not okay with

24  that, right.  We don't think a man should look like that.  We

25  don't think a woman should look like that.  So we take some

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP  Document 103  Filed 08/04/16  Page 88 of 143

adverse employment action against you.  You get fired, you get

demoted, you don't get the promotion, that sort of thing.  All

those cases are about that.

Consider for a second whether that's what H.B. 2 is

doing.  I submit to you, Your Honor, H.B. 2 is doing the exact

opposite of sex stereotyping.  If H.B. 2 were sex stereotyping,

here is what it would said.  Mr. Smith said earlier, the sign

on the bathroom.  If H.B. 2 were sex stereotyping, here is what

the sign on the bathroom would say.  It would say, Only men can

use this bathroom if they are sufficiently masculine; but if

they are not sufficiently masculine, if they present as a

woman, if they have a high voice, whatever, then they can't use

the men's bathroom.  They would have to use the women's

bathroom.  That's sex stereotyping.

Now, does that sound like an absurd law?  Yes, it

sure does.  I can't imagine a law like that, but if H.B. 2 did

that, it would be sex stereotyping.  H.B. 2 does exactly the

opposite.  H.B. 2 says -- and I'm paraphrasing because it

doesn't say this, but here's the gist of it.  It doesn't matter

how you present as a man, it doesn't matter how masculine you

are, it doesn't matter how high your voice it, it doesn't

matter.  Men use the men's bathroom.  The same for women.

That's not sex stereotyping.  That's the opposite of sex

stereotyping.  That's why they haven't stated a claim under

*Price Waterhouse*, and that's why even if you accept all of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 89 of 143

those cases applying the *Price Waterhouse* theory, they don't get the Plaintiffs where they want to be. This is not a sex stereotyping case.

**THE COURT:** So even people who have sex reassignment surgery, if they can't get their birth certificate changed, would still have a problem under the current law, would they not?

**MR. DUNCAN:** Well, they might have a problem, but that goes to tailoring, Your Honor. That goes to tailoring. If, in fact, this is sex discrimination and you have to meet intermediate scrutiny -- we don't say that it is. We think it's rational basis, but if it's heightened scrutiny, then the fit of the law has -- you know, there has to be a good fit. It doesn't have to be perfect, right. There are cases in the Fourth Circuit that say you don't have to have a perfect fit to meet intermediate scrutiny.

**THE COURT:** How do you say it's rational basis? Is it not discrimination based on sex whether, even under your articulation, it's based on whether your biological male or biological female?

**MR. DUNCAN:** No, Your Honor, we don't agree with the -- we don't agree with the proposition that this is sex discrimination per se.

**THE COURT:** How are we discriminating against bathroom use?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      **MR. DUNCAN:**  Let me start with Title IX, Your Honor.

2  I know we are on equal protection, but I think Title IX informs

3  this.  Title IX says no sex discrimination.  That's what the

4  statute says.  Then in a regulation, it says, but you can

5  provide sex-separated facilities as provided -- as long as they

6  are comparable, as long as they are comparable.

7          I don't think that's an exception to Title IX sex

8  discrimination here.  The Plaintiffs characterizes it as an

9  exception.  That's puzzling to me.  The regulation isn't stated

10  as an exception, nor are there any of the parts of Title IX

11  that allow separate living facilities for men and women.  It's

12  not an exception to sex discrimination.  It's a recognition

13  that sometimes you have to separate facilities by sex.  So I

14  don't think it's an exception to discrimination.

15          **THE COURT:**  I'm not sure I follow.  If we had

16  bathroom signs that said everybody who's a citizen use this

17  one, and everybody who is not a citizen use this one, there

18  would be national origin or citizenship distinctions, and we

19  would call that unlawful.  If we had them that said if you're

20  one race, use this, or another race -- one religion, use this,

21  Catholics here, Protestants here, that would be based on

22  religion.  And so we are saying men here, women there.  Why

23  isn't that at least sex?

24          **MR. DUNCAN:**  I think it is sex.  I don't think it's

25  discrimination.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      **THE COURT:**  All right.  That's a different point, but
2  it's discrimination based on sex.  There's all sorts of
3  discrimination every day, some of it's unlawful, some of it's
4  not.  I guess your position is it's not unlawful discrimination
5  based on sex?
6      **MR. DUNCAN:**  Well, also our position is that a claim
7  based on gender identity discrimination is not sex
8  discrimination for purposes of the Equal Protection Clause,
9  which is a different point.
10      And Your Honor asked where are the cases that hold
11  gender identity discrimination gets heightened scrutiny.  There
12  are precious few of those cases.  The vast majority of cases,
13  and these include cases that the Plaintiffs rely on, say that
14  there's no gender identity theory in the Equal Protection
15  Clause.
16      I point Your Honor to a few cases here.  Mr. Bowers
17  already cited the *Johnston* case from the Western District of
18  Pennsylvania.  That's a very recent case that surveys the
19  landscape.  One interesting thing that *Johnston* points out is
20  even the *Price Waterhouse* cases from the Sixth Circuit and
21  others that apply *Price Waterhouse* to sex -- to transgender
22  claims, even those cases, such as the *Barnes* case and the *Smith
23  v. City of Salem* case, those cases don't recognize that there
24  is a protected class under Title VII of transgender
25  individuals.  So the *Johnston* case I think is the best example

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   of the sort of surveying-the-waterfront kind of case.

2           **THE COURT:**  You are talking about strict scrutiny?

3           **MR. DUNCAN:**  No, they wouldn't get heightened

4   scrutiny, Your Honor, because it's not sex discrimination.  The

5   *Etsitty* case from the Tenth Circuit makes the same point, but I

6   think the most important point here is that there is a long

7   line of cases out of the Seventh Circuit, the *Ulane*, U-L-A-N-E,

8   line of cases.  There are decisions that I can certainly cite

9   to Your Honor that collect all of the cases that say the *Ulane*

10  line of cases is still good law.  *Ulane*, in an opinion by Judge

11  Wood, surveyed the legislative history of Title VII -- this is

12  relevant to the Equal Protection Clause as well -- surveyed the

13  legislative history of Title VII and said there is absolutely

14  no evidence that sex means anything other than biological sex.

15  In other words, it excludes the idea of gender identity or what

16  in that decision was called transsexualism.

17          So the Plaintiffs are saying that *Price Waterhouse*

18  quote, unquote eviscerated that line of cases, and it's not so.

19  *Price Waterhouse* is perfectly consistent with those cases.

20  *Price Waterhouse* does not change the definition of sex with

21  gender, or gender identity for that matter.

22          **THE COURT:**  Well, for purposes of Title IX, I think

23  that issue has been resolved by the Fourth Circuit.  You are

24  making a constitutional argument at this point?

25          **MR. DUNCAN:**  Hard to say, Your Honor.  We don't

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 think -- the Fourth Circuit starts out its opinion by saying,

2 we are going to address Title IX, and then it doesn't.  It

3 addresses a regulation under Title IX, and it says that, well,

4 the word can go either way, so we'll defer.

5    Now, is that an interpretation of Title IX?  We doubt

6 that it is, but in any event, the Title IX -- the *G.G.* opinion

7 leaves totally open the Title VII.  Well, of course, that would

8 be for purposes of the DOJ motion, but also the Equal

9 Protection Clause and the Due Process Clause.

10    Just three days ago, Your Honor, the Seventh Circuit

11 reaffirmed the *Ulane* -- that *Ulane* is still good law and its

12 decision of sex is still good law.  That decision is called

13 *Hively*.  I'm sorry.  It just came out so recently, and I've

14 been traveling.  I do not have a citation to that.

15    **THE COURT:**  Can you spell it?

16    **MR. DUNCAN:**  Mr. Bowers has it.  *Hively v. Ivy Tech*

17 *Community College*.  It's Number 15-1720.

18    **THE COURT:**  All right.

19    **MR. DUNCAN:**  The opinion is, by and large, about

20 whether sexual orientation discrimination is covered under

21 Title VII.  It says it's not, but in the course of that

22 opinion, it reaffirms the *Ulane* precedent.  So that's all I

23 have.

24    **THE COURT:**  Are you going to address the due process

25 claim?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    **MR. DUNCAN:** I will very briefly, Your Honor. I

2  think the cases cited by the Plaintiffs in the due process

3  sections show that this is not a -- they don't have a due

4  process claim basically, and I know you've read the cases, but

5  if I can just highlight a few things about the cases.

6         On the right-to-privacy issue, these cases generally

7  involve a government official deliberately forcing somebody to

8  reveal intimate public details, so, for example, a police

9  officer threatens to divulge a suspect's sexual orientation to

10 his family or a sheriff releases intimate details about a rape

11 to retaliate against a woman who criticized his rape

12 investigation or a job candidate for police officer is forced

13 during a polygraph examination to reveal all sorts of

14 inappropriate, irrelevant sexual details about her life. I

15 think -- or, for example, the *Powell* case, a prison guard

16 reveals to other prisoners a prisoner's transsexual status and

17 HIV positive status.

18         What these cases are about is the government taking a

19 deliberate targeted action against someone and saying, you will

20 reveal this information, and the cases have recognized a

21 right-to-privacy violation. You just don't have that situation

22 here. You have the government having basically a common sense

23 policy about bathrooms, and the allegation is, well, that will

24 necessarily require me to reveal all sorts of personal

25 information. Well, whether -- I mean, maybe in some particular

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  case perhaps, but it's not the same kind of situation that's

2  presented in all the due process cases that are cited.  In

3  fact, it's so far from them that those cases just don't apply.

4  There is no case that says that requiring somebody to use a

5  bathroom or a shower facility of their biological sex is a due

6  process right-to-privacy violation.  There is just no case that

7  says that, and I think their claims go beyond the cases.

8         The same thing for the unwanted medical treatment

9  case.  They cite one case, *U.S. v. Charters*, that has to do

10 with the forced administration of antipsychotic drugs by

11 federal prison administrators.  H.B. 2 is not doing that.  I

12 think it's obvious that it's not doing that.  It is making a

13 common sense distinction -- it's making a common sense link

14 between the privacy concerns in restrooms and showers and

15 lockers rooms and biology, and the biology is reflected on the

16 birth certificate.  That's what it's doing.  It's not forcing

17 anybody to have a surgery of any kind.

18        So with that, Your Honor, unless you have any further

19 questions, that's all I have.

20        **THE COURT:**  Thank you.  Mr. Francisco.

21        **MR. FRANCISCO:**  Good afternoon, Your Honor, Noel

22 Francisco for the University of North Carolina Defendants.

23        Judge Schroeder, the University of North Carolina is

24 an educational institution that's focused on educating

25 students, much like the named Plaintiffs that we have here

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 96 of 143

1  today. It had no role in enacting H.B. 2, and it certainly has

2  no desire to be dragged into this contentious --

3  **THE COURT:** I got the impression you don't want to be

4  here.

5  **MR. FRANCISCO:** Yes, Your Honor, we do not want to be

6  here.

7  **THE COURT:** I also got the impression that you

8  disagree with the law, your client does.

9  **MR. FRANCISCO:** Well, Your Honor, I think my client's

10  position is that under the law there is no obligation that they

11  enforce it. They are not currently enforcing it.

12  **THE COURT:** That's the part I don't understand.

13  **MR. FRANCISCO:** Sure.

14  **THE COURT:** It says that they shall make sure that

15  the facilities are used by only those people that the law

16  permits, Section 143-760(b), "Public agencies shall require

17  that" multi-use "bathrooms or changing facilities be designated

18  for and only used by...." So the first question is, are any of

19  your clients a public agency?

20  **MR. FRANCISCO:** Your Honor, I think that the

21  University of North Carolina is considered an agency of the

22  State. It's not part of the executive branch, but it is an

23  agency of the State. That being said, this is the case in

24  every single case that comes before a court where there is a

25  law on the books and that law is neither being enforced nor

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  threatened to being enforced.  Take, for example --

2        **THE COURT:**  But does your client have the authority

3  to say we choose not to enforce it?

4        **MR. FRANCISCO:**  Your Honor, a couple of answers to

5  that, and the bottom line is, yes, I think they have the exact

6  same authority that the prosecutors in the *Doe v. Duling* case

7  had when they stated that they were not enforcing nor was there

8  an intention to enforce the anti-cohabitation laws that were in

9  place in Virginia, the same authority that the Alabama State

10  officials had when they said that they were not enforcing or

11  threatening to enforce a law that required -- that prohibited

12  certain employees from joining labor unions, and numerous other

13  cases where you have the exact same fact pattern, a law on the

14  books and a government official who is saying that they are

15  neither enforcing nor do they intend to enforce that ordinance.

16  That removes any justiciable controversy, and just as

17  importantly, it undermines the allegation of any irreparable

18  harm because when it comes to irreparable harm, not only must

19  there be an incredible threat of enforcement in general, there

20  must be a virtual certainty of immediate enforcement so there's

21  actually something for you to enjoin.

22        **THE COURT:**  Do any of your clients -- have they

23  issued guidance to the students and faculty that say we do not

24  intend to enforce this law on our campus?

25        **MR. FRANCISCO:**  Yes, Your Honor, and we cite a lot of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 98 of 143

1   that in our briefs.  One of the places that they said it was in

2   the May 9 letter that the University of North Carolina sent to

3   the Department of Justice:  "The University has recognized that

4   the Act does not address enforcement and therefore is not

5   taking any steps to enforce the statute's requirements."

6   President Spellings' declaration:  "The University has not

7   threatened to enforce the Act's requirement.  I have no intent

8   to exercise my authority to promulgate any guidelines or

9   regulations that require transgender students to use restrooms

10  consistent with their biological sex."  And she's yet gone even

11  further by making clear that "if any transgender student or

12  employee does complain that they have been forced to use a

13  restroom inconsistent with their gender identity, I will ensure

14  that the complaint is investigated to determine whether there's

15  been a violation of University policy."

16          So I think it's quite clear that whatever you think

17  about H.B. 2 and whatever you think about the policy that it

18  sets for the state, it's not a policy that's backed up by a

19  concrete harm and enforcement at the University of North

20  Carolina.  And on this, I would like to say one very important

21  thing.  H.B. 2 is not the policy of the University of North

22  Carolina, though it is a policy that the State has enacted at

23  the statewide level; but even if it were a policy of the state

24  of North Carolina, it would still not a create a justiciable

25  controversy unless there was a threat of enforcing that policy

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 backed up by sanctions, disciplinary action, or something else

2 to enforce that policy.

3     **THE COURT:** Can somebody else come on campus and

4 enforce it? Can the local Chapel Hill police come on campus

5 and enforce it?

6     **MR. FRANCISCO:** Well, Your Honor, I think there are a

7 couple of things in that question. Could somebody come on to

8 the campus and enforce it like the state police? It's

9 possible. I don't actually know the jurisdictional authority

10 of the state police; but if that were the case, then the state

11 police would be the cause of any harm, and any remedy would

12 need to be directed towards the state police in order to

13 redress that harm. The University of North Carolina police, we

14 do not believe, could enforce that because it doesn't violate

15 any school policy, and it doesn't violate any criminal

16 sanction. There's no criminal -- I think one thing we all have

17 agreed on here is that H.B. 2 doesn't include any kind of

18 criminal prohibition. So there would be nothing for University

19 of North Carolina police to enforce, and to the extent that

20 other police officials under the direction of the Governor or

21 whomever else controls those other police forces, then that

22 harm is caused by somebody else and that harm would be remedied

23 by an injunction toward somebody else but not remedied towards

24 the University of North Carolina.

25     So to go back to whether or not this is the policy of

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

the state of North Carolina or the University of North

Carolina, in the *Doe v. Duling* case, again that Virginia case

out of the Fourth Circuit, the policy of the state of Virginia

was to prohibit cohabitation and to prohibit what the statute

deemed fornication.  Notwithstanding that policy, statewide in

the books passed by the legislature, signed by the governor,

that policy could not be challenged absent a credible threat of

enforcement of the policy backed up by sanctions.

Here, not only do you have the University officials

repeatedly saying that they are neither enforcing nor do they

intend to enforce the ordinance, you also have a record in this

case by the young men and women who have joined with the ACLU

to bring this action, and they put forward some very compelling

declarations, but what I would submit to you is the one thing

that those declarations do not say is that any University of

North Carolina official has taken any action to prohibit them

from using a restroom consistent with their gender identity or

to threaten that any adverse action would be taken whatsoever

if they use a restroom consistent with their gender identity.

Absent that kind of enforcement or credible threat of

enforcement, several things follow.  First, there's no

justiciable claim.  Second, there's no irreparable harm caused

by the University of North Carolina.  Third, we would also

assert that there's no likelihood of success on the merits as

to the University of North Carolina because there's no ongoing

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

conduct in which the University is engaged in that violates the law even if you accept the Plaintiffs' understanding of that law.

And, finally, Your Honor, even if you thought that there was an Article III justiciable controversy here, as a matter of prudential rightness, we believe it would be unwise to require the University of North Carolina to be dragged in this case when it does nothing other than undermine its ability to educate the good young men and women that are here with us today.

**THE COURT:** If the University system is opposed to enforcing the law and the Plaintiffs are asking for an order statewide that the law not be enforced, why didn't the University just file a one-page response saying, we don't like the law; we don't oppose an injunction?

**MR. FRANCISCO:** Because, Your Honor, it is the same position that every party is in when they are dragged into a proceeding where they are forced to undertake a very costly proceeding in a case where they are not doing anything that they believe violates the law.

**THE COURT:** I still don't understand. I have cases all the time where parties capitulate because they don't disagree with the relief sought, so they say enter -- tell us not to do this because we don't want to do it anyway is really what North Carolina's university system is saying. You could

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 have done that in one page.

2        MR. FRANCISCO:  Well, I think, Your Honor, our

3 position is we shouldn't be required to continue to participate

4 in these proceedings at all when the dispute can be carried on

5 because the parties who passed the law, the parties who

6 arguably have the authority to enforce the law, and the parties

7 who are being harmed by the law, those are everyone you need to

8 resolve this case.

9        THE COURT:  Well, the Plaintiffs say that the

10 university system is a separate agency, and let's assume for a

11 minute that the university system was enforcing the law.

12 Contrary to what you are telling me, let's assume that.  Would

13 you agree then you would be a proper defendant, or are you an

14 unnecessary defendant?

15        MR. FRANCISCO:  If we actually were enforcing the

16 law, so if President Spellings, for example, had issued

17 counterfactually a set of guidance that said you can't the use

18 the restroom, and if you do, you are going to be suspended for

19 three days or some other sanction --

20        THE COURT:  Correct.

21        MR. FRANCISCO:  -- yes, I think that they could be

22 brought, and if the other side prevailed on that case, they

23 would be entitled under Section 1983 to get attorneys' fees

24 from us, again, a costly resource that distracts the University

25 from its ability to carry out its core mission.  That's

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

precisely why the University doesn't believe it ought to be in the middle of this case where, amongst other things, it's subject to attorneys' fees and why the University thinks that since it's not doing anything, the case ought to be carried out by the parties who actually have joined one another in a live case or controversy.

**THE COURT:** So the University has issued the notice that the statute, H.B. 2, requires, which says, among other things, that "Public agencies shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex;" right? They have given that notice?

**MR. FRANCISCO:** Coupled with several other things, Your Honor.

**THE COURT:** I've heard what you've said. The Plaintiffs say, well, you are walking a fine line. You haven't actually said we will not enforce that policy on campus, and, therefore, transgenders may use the facility with which they identify. What is the closest statement to that that you have?

**MR. FRANCISCO:** Two things, Your Honor. First, I think we have essentially said that when we say, "The University has not threatened to enforce the Act's requirement that the University require individuals to use the restroom or changing facility that corresponds with their biological sex, as listed on their birth certificate. In fact, I have

repeatedly cautioned the constituent institutions that the Act confers no enforcement authority on the University or any other entity," paragraph 13 of President Spellings's declaration.

        **THE COURT:**  That last part I don't understand because it does say agencies have the obligation to ensure that the bathrooms are used based on biological sex.  Isn't that some enforcement authority?

        **MR. FRANCISCO:**  Well, no, Your Honor, because the first sentence is -- and I've got two responses to that.  The first sentence is "the University has not threatened to enforce the Act's requirement."

        **THE COURT:**  Well, they wouldn't threaten if they didn't have the authority.  I am confused by your position, I guess.  On the one hand, you are saying we have no enforcement authority under the law, but we are not going threaten to enforce it.  Why would they even make that statement if there's no enforcement authority?

        **MR. FRANCISCO:**  Well, Your Honor, because I think we need to clarify that we are not enforcing it, nor are we threatening to enforce it; but let me assume, for the sake of argument, that we actually did have the enforcement authority. It still wouldn't matter.

        In *Doe v. Duling*, the state prosecutors clearly had the enforcement authority over the anti-cohabitation law.  Just like in the Supreme Court's decision in *McAdory*, the state

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 105 of 143

1　prosecutors and enforcement officials clearly had the authority

2　to enforce Alabama's labor law, but the fact of the matter is

3　they made crystal clear that they weren't enforcing it, nor did

4　they intend to enforce it.  So wholly apart whether they have

5　-- whether somebody has the authority to enforce a law, you

6　still don't have a justiciable controversy unless there is a

7　credible threat of enforcement.

8　　　　　Let's suppose -- I've litigated a lot of cases

9　against the Federal Government, and they often follow a very

10　similar playbook.  Suppose that Congress were to pass a law

11　telling the Department of Education or the Department of

12　Justice that they have to do X or they have to do Y, and the

13　Department of Justice, whether because they disagreed with the

14　law or because they had other things to do and just hadn't

15　gotten around to it, had not yet put forth any kind of

16　regulation implementing that law.  I can you guarantee you that

17　if I represented a client suing the Department of Justice or

18　the Department of Education trying to challenge that law, the

19　first answer out of their mouths would be that there's no

20　credible threat of enforcement, there's no current enforcement,

21　there's no live controversy.

22　　　　　That's exactly what we have here even if assume, for

23　the sake of argument, that somehow the University of North

24　Carolina does have the authority to impose penalties for

25　somebody using a restroom consistent with their gender

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

identity.  The fact of the matter is they haven't imposed

penalties, they have not threatened to impose penalties, and

they have said nine ways to Sunday that they have no intention

of imposing any kind of penalties.  That is more than

sufficient under scads of case law to make clear that there is

no justiciable controversy here, and there's certainly no

irreparable harm flowing from any conduct that the University

of North Carolina is not engaging in.

I come back to turning the question around that Your

Honor put to me.  What exactly is it that the University of

North Carolina is doing that this Court is supposed to tell

them to stop doing?  They are not doing anything that violates

the law even if you accept the Plaintiffs' understanding of

that law.

**THE COURT:**  One option would be for the University of

North Carolina -- knowing that there's this discriminatory

basis for distinguishing between restrooms now because it's

based on biological sex and excludes transgender individuals,

one option is to make all restrooms and bathrooms single use.

I mean, it may not --

**MR. FRANCISCO:**  That would be an extraordinary thing

on a preliminary injunction, Your Honor.

**THE COURT:**  It may not be a practical option, but you

say there is nothing else they can do.  It's a little bit like

putting signs on the doors that distinguish based on religion

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  or race, and then saying, but we are not going to enforce that,

2  but we are going to leave the signs on the doors.

3      **MR. FRANCISCO:**  With one huge exception.  Nobody here

4  is claiming that designating one restroom as a men's restroom

5  and one restroom as a women's restroom somehow constitutes

6  discrimination, and that's all that the University of North

7  Carolina has done here.  Nobody is telling them, and I

8  certainly heard nobody here say, that that general policy has

9  to stop.  The question is whether when Miss H. S. wants to use

10  the women's restroom, the sign designated women's, is she being

11  prevented from doing that.  And as the record in this case

12  makes clear, there is no nobody at the University of North

13  Carolina that has threatened to impose any kind of sanction at

14  all were she to undertake that conduct.

15      **THE COURT:**  If I were to grant Title IX relief in

16  this case with respect to the North Carolina public school

17  system -- I assume Title IX covers the public school system as

18  well in North Carolina, among other things -- does it matter if

19  the University of North Carolina system is in the case?

20  Wouldn't they -- would they be covered nevertheless by an

21  injunction?

22      **MR. SMITH:**  Your Honor, I'd have to see what it would

23  have said, but if it was an injunction that says as to all

24  educational institutions in the state, Title IX applies and it

25  is not going to be in effect -- H.B. 2 will not be in effect

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 pending this case, that would certainly solve that problem.

2       **MR. FRANCISCO:** Your Honor, I can even take it a

3 slight step further. I can guarantee you that if you were to

4 issue that kind of ruling against the public school system, it

5 certainly would not cause the University of North Carolina to

6 start doing something that it's not been doing all along.

7       **THE COURT:** I understand. All right. Thank you.

8       **MR. FRANCISCO:** Thank you, Your Honor. Oh, may I

9 make one small point?

10       **THE COURT:** Yes.

11       **MR. FRANCISCO:** We've filed motions to dismiss in

12 both cases that largely overlap with the issues Your Honor and

13 I just discussed. It should be fully briefed up by the end of

14 this month. Given this hearing, we do not believe that another

15 hearing is necessary on that and would be perfectly content

16 with Your Honor to rule on the papers on those motions.

17       **THE COURT:** Thank you. Before you leave, let me ask

18 you. It's been indicated somehow that the school system in

19 Charlotte, the public school system, is intending not to

20 enforce H.B. 2. Are you aware of that, and if so, is that

21 situation any different from the University's situation?

22       **MR. FRANCISCO:** Your Honor, I don't have any personal

23 knowledge of what's going on in the Charlotte school system, so

24 I don't know precisely what their position is; but I would

25 suggest that if there is no credible threat that they're

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 enforcing this against their schools, a lawsuit against that

2 Charlotte system would have -- they would have similar

3 arguments to the ones I am articulating today.

4          **THE COURT:**  Okay.  Thank you.

5          **MR. BOWERS:**   Your Honor --

6          **THE COURT:**  Give me just a minute.  Let me make sure

7 I didn't have anything else.

8          In the university system, there is a code of conduct,

9 among other things, and I believe part of the code of conduct

10 is if you violate a state law or something, then you can be in

11 violation of the student code of conduct or honor code, et

12 cetera.  What's the school's position about whether any person

13 who wished to use the restroom to which they identify would be

14 in violation of any of those codes?

15          **MR. FRANCISCO:**  Sure, two positions, Your Honor.

16 First of all, I think, as there's been widespread agreement

17 here, H.B. 2 doesn't directly regulate private conduct.  So if

18 a person uses a restroom consistent with their gender identity,

19 they would not be directly violating H.B. 2.  So for that

20 reason, the code of conduct wouldn't apply; but let's put that

21 aside.

22          Even assuming in theory the code of conduct could

23 apply, Ms. Spellings has made clear that she has no intention

24 of enforcing the code of conduct in this manner, and so there's

25 no threat that the code of conduct will be applied in this

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  manner, and it won't be applied in this manner.

2          **THE COURT:** Thank you. Before I get back to you,

3  Mr. Bowers, Mr. Duncan, I did have a question about what's the

4  legislative record on this?

5          **MR. DUNCAN:** Yes, Your Honor. There are transcripts

6  of both committee hearings and also the full General Assembly

7  hearing in the matter, and we are prepared to put those in

8  evidence as we compile an evidentiary record in this case.

9          **THE COURT:** How long did they meet on this; do you

10  know?

11          **MR. DUNCAN:** It's two days, I think. I don't know

12  the exact number of hours, but I believe it was two days.

13          **THE COURT:** Were there witnesses who testified?

14          **MR. DUNCAN:** I am not aware that there were witnesses

15  testifying, but we have the transcripts. We are preparing the

16  transcripts so that we can have them in evidence.

17          **THE COURT:** Do you agree that the statute, Part I,

18  does not appear to directly tell people which bathroom they

19  have to use?

20          **MR. DUNCAN:** Let me see if I understand the question,

21  Your Honor, because I am looking at the statute right here.

22  Your question is does the statute not tell people what

23  bathrooms they have to use?

24          **THE COURT:** The statute itself doesn't tell me what

25  bathroom I have to use, does it?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      **MR. DUNCAN:**  I don't think so, Your Honor.  Let me

2  just read from the statute where sort of the operative

3  provision is.  I'll read from the one -- the part of it dealing

4  with public agencies.  It says, "Public agencies shall require

5  every multiple occupancy bathroom and changing facility to be

6  designated for and only used by persons based on their

7  biological sex."  Then at the same time, it says, right above

8  that -- sorry, let me just find the right part.

9      **THE COURT:**  Well, I think that's the operative

10  language.  So my question is --

11      **MR. DUNCAN:**  But then there's the single occupancy

12  provisions as well.

13      **THE COURT:**  So my question is what is the enforcement

14  mechanism of the statute?

15      **MR. DUNCAN:**  Well, I think -- let me answer it this

16  way.  So the first part of the statute is addressed to local

17  boards of education.  I do think that the statute would preempt

18  any contrary policy of a local board of education.  The parts

19  addressed to public agencies -- and public agency is defined

20  there as, you know, six or seven different kinds of agencies.

21  The statute is a directive to those public agencies I think to

22  implement policies.

23      I think we all agree, the statute doesn't have a

24  standalone enforcement mechanism.  The third thing I would say

25  is -- this doesn't go to an enforcement mechanism, but I think

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   this goes to the purpose of the statute.  The purpose of the
2   statute is to clarify situations like the ones addressed by
3   Your Honor in examples about the indecent exposure law or the
4   trespass law or the peeping law.  When there's an ambiguity in
5   a situation caused by someone who is claiming to be a different
6   gender identity than their biological sex, I do think the
7   statute clarifies for whoever is enforcing that provision about
8   how the indecent exposure law or the peeping law or the
9   trespass law ought to apply.  I do think the statute --
10         **THE COURT:**  Can't those challenges, if you will, in
11  enforcement mechanisms be used independent of House Bill 2?  In
12  other words, if the privacy concerns that the legislature says
13  it's interested in raised their head and there's a problem,
14  don't existing laws provide remedies for that?
15         **MR. DUNCAN:**  Your Honor, not if the policy with
16  respect to Title IX and the Equal Protection Clause is as the
17  Justice Department and the ACLU believes it to be.  In other
18  words, not if the law is that someone may access, say, a shower
19  facility based purely on their subjective gender identity.
20  Then I think enforcing something like an indecent exposure law,
21  and Your Honor's hypothetical is the perfect hypothetical for
22  that, becomes extraordinarily difficult, if not possible,
23  because of the nature of the DOJ policy, which is a pure
24  assertion -- subjective assertion policy.  H.B. 2, obviously
25  not with respect to DOJ policy, but with respect to the

1  Charlotte ordinance, was intended to clarify what the status

2  quo was with respect to all sorts of potential privacy

3  violations.

4          **THE COURT:**  What is the legislature's position on the

5  University's claim that it's not going to enforce the statute?

6          **MR. DUNCAN:**  I'm not sure we have a position on that,

7  Your Honor.  I mean, we represent to Your Honor that the law is

8  a directive to public agencies to implement certain policies.

9          **THE COURT:**  Well, it sounds like you may have a

10  situation where everybody may say, well, that's great, but

11  we're not following it because Charlotte is not going to follow

12  it, Chapel Hill doesn't -- I say Chapel Hill, the UNC system

13  doesn't want to follow it.  What if everybody in the state

14  says, well, this is great, and it's your law; we are not

15  following it?

16          **MR. DUNCAN:**  Well, I would submit to Your Honor, then

17  that's a problem -- if that's indeed a problem, then that's a

18  problem that we all need to deal with at the state level in

19  terms of state government.

20          **THE COURT:**  Well, that's why I am asking.  Is it a

21  problem or not?  I mean, presumably the law had some importance

22  because the legislature felt the need on an expedited basis to

23  pass it, and now you have important institutions in the state

24  saying we don't intend to follow it; and it seems a critical

25  question of, well, is that a concern to the legislature and the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 Governor or not?  I don't see any threat letters that I am

2 aware of to the university system or to the school system

3 saying you are in violation of law, you need to follow this, et

4 cetera.

5          **MR. DUNCAN:**  I am not aware of anything like that,

6 Your Honor.  I will just repeat what I said and that this is a

7 matter that would need to be taken up internally in terms of

8 state government, without taking away anything from what

9 Mr. Francisco said about the absence of the justiciable case

10 with respect to UNC.

11          **THE COURT:**  Okay.  I understand.  Mr. Bowers.

12          **MR. BOWERS:**  Thank you, Your Honor, very briefly.  I

13 just want to follow up on the hypothetical that you proposed a

14 few minutes ago, and you addressed it to Plaintiffs' counsel,

15 regarding the notion that if you entered a preliminary

16 injunction only on the Title IX claim, would the UNC Defendants

17 be a necessary party.  I wanted to follow up on that, Your

18 Honor, and if, in fact, the Court is inclined to enter such a

19 preliminary injunction, that we take the position that it

20 should be very narrowly tailored.  A, Plaintiffs have not

21 brought a Title IX claim on behalf of a class of plaintiffs,

22 and so we believe that if it is entered, it should be limited

23 solely to not only the Title IX claim, but also solely to the

24 three named Plaintiffs.

25          **THE COURT:**  I've got the ACLU in the case.  They've

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  made a representational claim, have they not?

2          **MR. BOWERS:**  I don't think they did, Your Honor.  In

3  Count Four, page 53, of their first amended complaint,

4  Plaintiffs have not brought the Title IX claim on behalf of a

5  class of plaintiffs.  So we take the position --

6          **THE COURT:**  Well, it's not a class action.

7          **MR. BOWERS:**  It's not a class action; right.  So we

8  take the position that only the three named Plaintiffs would be

9  covered, and also that consistent with *G.G.*, that it would be

10  limited to public restrooms only.

11          Secondly, Mr. Duncan and I both referenced the

12  *Johnston* case.  If I may, I would like to put that in the

13  record.  It's *Johnston v. University of Pittsburg of the*

14  *Commonwealth System of Higher Education*.  That's a U.S.

15  District Court for the Western District of Pennsylvania case,

16  and the citation is 97 F. Supp. 3d 657, 2015.

17          **THE COURT:**  Thank you.

18          **MR. BOWERS:**  Thank you, Your Honor.

19          **THE COURT:**  All right.

20          **MR. SMITH:**  Your Honor, I am not going to take much

21  time to reply here, but I do think, given the representations

22  that Mr. Francisco made about how there is no harm being caused

23  to anyone on the campuses of the University of North Carolina,

24  I want to respond briefly to that.

25          First of all, he made the suggestion that none of the

1 named Plaintiffs has claimed to have had anything changed in

2 their lives on the campus. As I indicated before, Mr. Carcano

3 was directed by his supervisors to stop using the only

4 bathrooms on the floor where he works and to go down a service

5 elevator to the housekeeping territory where he could use a

6 single-occupancy bathroom. That's the University of North

7 Carolina and Chapel Hill. It's described in paragraphs 20 and

8 21 of his declaration where he describes being humiliated by

9 having to stand in front of his coworkers at the service

10 elevator whenever he needs to use the facilities and how he

11 avoids going to the bathroom as much as possible to avoid that

12 humiliation.

13      I would also think, given that representation, it

14 would be useful if we could hand up two more documents to you,

15 Your Honor. These are actual blast emails that went out at

16 UNC-Greensboro and UNC-Chapel Hill to the students and

17 employees of those institutions in which the chancellors of

18 each of those institutions acknowledged the extreme amount of

19 distress, unhappiness, and pain that was being caused to those

20 people on these campuses by the fact that, as the University

21 has had to acknowledge over and over again, House Bill 2 is, in

22 fact, applicable to the University and is in effect on the

23 University campuses.

24      So the first one, Your Honor, is the one with the big

25 box on it on the first page. It is, in fact, an email that was

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  sent out to Mr. Carcano and everybody else I believe on the

2  campus at UNC-Chapel Hill on April 8, and it was Exhibit D to

3  my declaration in opposition to the motion to stay, but it's

4  also cited in our reply brief on the preliminary injunction

5  motion.

6         If you look at page 2 of that email that went out

7  from Chancellor Folt to the Chapel Hill community, the first

8  full paragraph, the first thing that she acknowledges is "the

9  memo from UNC General Administration," that's the Spellings

10 memo, "also confirms that the law relating to public restrooms

11 and changing facilities does apply to the University."  This is

12 what Mr. Carcano and everybody else there was told.  Then she

13 went on to say, "This is an issue that is deeply personal and

14 involves some of our most basic and extremely private

15 dignities."  At the end of that paragraph:  "We have added and

16 will continue to add public gender-neutral single-use restrooms

17 and changing facilities throughout our campus, and we will be

18 adding additional signage," an obvious indication that they

19 have changed the use of the multiple-user facilities on campus.

20        If you look two paragraphs further down, the second

21 to last paragraph:  "The University must do its best to comply

22 with all laws that govern us while taking practical steps to

23 lessen discomfort and distress."

24        If I could take you back to the first page, there are

25 two more things that I would like to note on this document,

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 118 of 143

1  this email, Your Honor.  The last sentence of the first

2  paragraph, quote, and many on our campus now feel excluded and

3  unwelcomed here and in our state, unquote.

4          If you skip down to the third paragraph on the first

5  page:  "Although the policies on our campus remain, there is no

6  question that many in our LGBTQ community and many others are

7  feeling unwelcome, unsafe, and unhappy in the communities where

8  they live and work."

9          The second document is the email that was sent out on

10  UNC-Greensboro campus to the entire staff and student body, as

11  attested to by the declaration of Mr. McGarry that was

12  submitted in opposition to the UNC motion for a stay.  This is

13  from Chancellor Franklin Gilliam, Jr., and I would only point

14  you to the paragraph that appears underneath the three bullet

15  points and the sentence that says, "We know this has generated

16  and will continue to generate concern and concrete consequences

17  for our students, faculty, staff, and larger community."

18          So the reality of the matter is not only was

19  Mr. Carcano's actual access to a multiple-user restroom cut off

20  by his supervisor, but the chancellors of both of these

21  campuses have acknowledged repeatedly the amount of harm and

22  so-called concrete consequences that is occurring there because

23  the University has acknowledged over and over again that it is

24  bound to implement House Bill 2.

25          **THE COURT:**  What if the University were to say, we

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 119 of 143

1  understand that the statute could be interpreted to have an

2  enforcement mechanism, and to the extent it does, we hereby

3  inform you that we disagree with it, and, therefore, we will

4  not enforce those provisions; we've put the signs on that we've

5  always had on the bathrooms, and we will not enforce any of

6  those -- seek to enforce use provisions?  Would that be

7  sufficient?

8         **MR. SMITH:**  That wouldn't be sufficient for us, in

9  part, because we have a governor in this state who has

10  threatened to arrest people for trespass if they violate House

11  Bill 2 or use the facilities --

12        **THE COURT:**  But that would not be -- I mean, I'm

13  looking at the University as a defendant.  Maybe you can sue

14  the Governor to do that, but would that provide the adequate

15  assurance from the university system where they no longer are

16  capable of being -- violating any rights?

17        **MR. SMITH:**  It's difficult to answer a question about

18  it promised that it's apparently going to be unenforceable, and

19  it might be rescinded tomorrow if the Governor and the

20  legislature go to Ms. Spellings and say you are violating the

21  law, and you better stop.  Hard to understand why --

22        **THE COURT:**  Well, I guess what I'm confused about a

23  little bit is there are cases that say if somebody chooses not

24  to enforce the law, then there's no credible threat, and,

25  therefore, the case may not be justiciable.  That assumes that

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  the person who says they won't enforce it is the one who gets

2  to make that decision, I think.

3         So in the cohabitation case, if the State of Virginia

4  says we are not going to enforce this law, then that's the end

5  of it because it's on the books.  We have lots of laws on the

6  books.  Some of them are very curious, and you read them and

7  nobody enforces them, and so that's the end of it.

8         Doesn't that beg that question of who gets to enforce

9  this law, and if it's the University as an agency, do they then

10  have the ability to say, well, we are not going to do that; in

11  which case, that would be a nonjusticiable issue, at least for

12  now?  In which case, that's fine, that the University may have

13  that view, but they don't get to make that call.

14         **MR. SMITH:**  I think that in view of the language of

15  Title IX, which it gives everybody the right to enjoy the equal

16  benefits of the educational institution regardless of sex, that

17  the University can avoid liability by simply saying, sure, we

18  put up signs that say men and women, and we've told you that

19  that means not transgender men and not transgender women, but

20  because we are not going to enforce it, don't take it too

21  seriously; you can still go in here and probably nothing bad

22  will happen to you.  That is essentially what the position is

23  that they are taking.

24         If they want to put out an official pronouncement

25  that says we will revert to the policy which we had before,

1  which we think was really great, we've already heard that from

2  Ms. Spellings, that people make these decisions based on their

3  own personal gender identity and that's the policy of the

4  University, fine, but they are not doing that.  I think it's

5  very important to understand every time they put out one of

6  these memos, they say, by the way, we're bound to implement

7  House Bill 2.  That's why all this distress and unhappiness --

8  **THE COURT:**  Have you asked the university system

9  whether they would issue such a statement that would satisfy

10  you?

11  **MR. SMITH:**  I don't believe that there's been

12  separate conversations about that at this point.  Our desire

13  for such a thing was made fairly clear by all the documents we

14  filed in the court.

15  **THE COURT:**  I understand.

16  **MR. SMITH:**  I am not going to deal with the Spending

17  Clause argument, Your Honor, that Mr. Duncan made.  I think the

18  United States may have some words to say about that.  I would

19  just say, though, that the only defendant we currently have on

20  a Title IX claim is the University of North Carolina, and they

21  did not make that argument, and they are not making that

22  argument.  So I am not entirely clear whether or not that

23  argument is even preserved --

24  **THE COURT:**  I think it's raised in the other case, if

25  I'm not mistaken.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

          MR. SMITH:  That may be, Your Honor.  I think -- the
only thing I want to know is we have this gentleman in from San
Diego, Mr. Smith, who is representing the School
Administrators, that may have something to offer.  You had sort
of indicated through Ms. Engle that it might useful for him to
be here.

          THE COURT:  I would hate to have him come all this
way and not get an opportunity to speak, so I would be happy to
talk with him.  Let me do this first.  Ms. Stoughton, did you
have something else you wanted to add?  And then I'll hear from
Mr. Smith because I do have some questions.

          MS. STOUGHTON:  I do, Your Honor, thank you.  Well,
let me first address the Spending Clause issues since Mr. Smith
invited me to do that.  I think that's a red herring.
*Pennhurst* is a problem when the United States seeks to use old
money to coerce a funding recipient into abiding by --

          THE COURT:  That's why I was asking about a new
policy.

          MS. STOUGHTON:  There's two reasons why that doesn't
apply.  One is that their funding has not been put at issue
yet.  There is no case that suggests that when the United
States is enforcing Title IX in the way that it's enforcing
here, which is to say -- or when a private plaintiff is seeking
to enforce Title IX by way of an injunction to cease
discrimination prospectively, that that creates a Spending

1  Clause problem.

2         The second reason it's not a problem is that this is

3  not a new rule.  The rule -- and this is why Mr. Duncan's

4  Spending Clause argument runs straight into the wall of *G.G. v.*

5  *Gloucester* because the upshot of that decision is that it's

6  the -- the interpretive guidance is not the source of law.

7  Title IX is the source of law, and that case rejected the

8  premise of Mr. Duncan's argument, which is that Title IX, until

9  the Justice Department suddenly said otherwise, meant

10  biological sex in the sense that the Defendants are using that

11  term here.  It expressly rejected that argument.  The Fourth

12  Circuit rejected that and instead said that it would defer to

13  the interpretive guidance because it did not find that guidance

14  inconsistent with some clearer meaning of Title IX that existed

15  prior to that guidance.  So that is I think a fatal problem --

16  both of those arguments are fatal problems.

17         This was not briefed, so I do think there's a couple

18  of cases that, as tedious as it may be, I want to point the

19  Court to as cases that underscore the arguments I've just made.

20  They are both Supreme Court cases, and they are *Davis v. Monroe*

21  *County*, which is 526 U.S. 629.  That's a case that is about --

22  it rejects the exact argument that Mr. Duncan is making here in

23  the context of the interpretation of Title IX to extend to

24  schools' obligations to prevent student-on-student sexual

25  harassment.  Schools in that context also made the argument

1  that that was a new interpretation of Title IX, and the courts

2  rejected that.

3     And the second case is *Bennett v. Kentucky Department*

4  *of Education*, that's 470 U.S. 656, where the Court said that,

5  you know, it may be that certain applications of the

6  nondiscrimination funding condition are not immediately -- been

7  in the front of people's mind, but that does not make the

8  condition itself unenforceable, and that what's Mr. Duncan is

9  asking the Court to find here, which would be contrary to that

10  law.

11     I think that's probably sufficient.  I mean, I would

12  just add also that the newness that the Defendants ascribe to

13  the Department's position is wrong.  I mean, this did not

14  appear as an interpretation in 2015.  It was a consistent

15  interpretation, and I will say, by the way, the circuit pointed

16  that out.  You only need to read the circuit's interpretation.

17  There's a line in the Fourth Circuit's decision in *Gloucester*

18  where they note that the Department has been enforcing this --

19  the Departments of Education and Justice have been enforcing

20  this interpretation of Title IX consistently since 2014.

21     Again, I guess to the Court's question about is this

22  really a funding cycle problem, the truth is it's not a problem

23  at all because no one is seeking to withdraw or claw back any

24  money.  The only question is, going forward, what does

25  compliance with Title IX mean.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          **THE COURT:**  So in terms of remedy, the request is for

2   an injunction, but the State, I presume, can choose not to

3   participate in Title IX funding.  So are you asking for me to

4   declare what's required to continue to get Title IX funding, or

5   are you asking me to enjoin conduct?

6          I noted in the *G.G.* case, I think, they just enjoined

7   the conduct, but isn't there a question of whether the State

8   can just choose to opt out?

9          **MR. SMITH:**  Well, Your Honor, there is a private

10  right of action under Title IX to enforce it and get injunctive

11  relief if the State, in the face of such an injunction, says

12  we're withdrawing from the program and we're not taking Title

13  IX money -- any federal money for our university and our public

14  school system, which doesn't seem very likely, frankly.  In

15  theory, I guess, they could then come back into court and ask

16  for the injunction to be lifted, but we are entitled to

17  injunction under case law that goes back to the 1970s.

18          **THE COURT:**  Okay.

19          **MS. STOUGHTON:**  Your Honor, the United States' answer

20  isn't different from that.  We are asking the Court to issue an

21  injunction against the discriminatory behavior, and, again, I

22  think that's right.  If the State were to remove the

23  jurisdictional predicate for that injunction by voluntarily

24  disavowing the funds that subject it to Title IX, then I think

25  the jurisdiction of that ongoing injunction would be gone.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

**THE COURT:**  So they can do it if they want to; they are just not going to get funding?

**MS. STOUGHTON:**  That's right.  And under the statute, as long as that jurisdictional predicate is there, the Court has authority to issue the injunction enjoining the discriminatory behavior.  That's very clearly established under the law.

**THE COURT:**  What is the status of *G.G.*?  I know there was a request for Supreme Court review on an emergency basis and the briefing was filed last week.

**MR. DUNCAN:**  Your Honor, since we also represent the Gloucester County School Board fairly recently, we have asked the Supreme Court --

**THE COURT:**  Well, that's a helpful fact.  If I had known that earlier, I might have had more questions.

**MR. DUNCAN:**  I am happy to answer whatever questions you may have about it on behalf of our clients there and our clients here.  We have asked the Supreme Court for recall and stay of the mandate as well as to stay the subsequently issued preliminary injunction.  It has been briefed.  I am not aware of an order coming -- it was briefed as of noon Friday.  I am not aware of an order coming from the Supreme Court today, but I have been in this courtroom for quite some time.  So a ruling could come at any time.

**THE COURT:**  When does school start in Virginia; do

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 you know?

2          **MR. DUNCAN:**  Early September.  Well, it depends.  In

3 some places, early September and others, late August.  In

4 Gloucester County, it's September 6, I believe, and we'll be

5 filing a petition for writ of certiorari in that case.

6          **THE COURT:**  So you're asking for a stay of the

7 mandate pending your ability to file a cert petition?

8          **MR. DUNCAN:**  A recall and a stay of the mandate since

9 the mandate issued already.

10          **THE COURT:**  I understand.  So the status is that --

11 is that something -- it goes to the chief justice as the

12 circuit justice?

13          **MR. DUNCAN:**  That's correct.

14          **THE COURT:**  Is that something that the chief justice

15 can decide on his own, or does it have to be submitted to the

16 court for review?

17          **MR. DUNCAN:**  He could decide it on his own, or he

18 could refer to it to court.

19          **THE COURT:**  Do you have any idea about -- well, do

20 you know when school starts in North Carolina for the public

21 system?

22          **MR. DUNCAN:**  I am not prepared to answer that right

23 now, Your Honor.

24          **THE COURT:**  Somebody here might know that answer.

25          **MR. RAND:**  My son started school last week.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1          THE COURT:  Is he an eager beaver, or are there other
2    people there, too?
3          MR. RAND:  It was compulsory on his part.  He is not
4    the only one there.
5          MR. FRANCISCO:  Your Honor, I believe it's
6    August 29th.
7          MR. RAND:  There are many of the public schools in
8    North Carolina that do operate on a different calendar from
9    the, quote, traditional calendar.  There are modified
10   traditional, and there are year-round schools, and so my son,
11   to his great dismay, is in one of the modified traditional
12   calendars.
13         THE COURT:  Summer is over for your son.
14         MR. RAND:  It is definitively over in his mind, for
15   sure.
16         MR. FRANCISCO:  Your Honor, would you permit me just
17   to very briefly respond to a factual assertion that I would
18   like to clarify?
19         THE COURT:  Sure.
20         MR. FRANCISCO:  Mr. Smith suggested that
21   Mr. Carcano's declaration established that his supervisor had
22   directed him to use the single-use restroom.  I just point Your
23   Honor to paragraph 230 of that declaration where the relevant
24   sentence doesn't say quite that.  It says, "I was later told by
25   administrative staff in the building where I work that they had

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  learned of a single occupancy restroom based on building floor

2  plans." So it looks like somebody was just providing

3  information to him on where a restroom was. There's no

4  suggestion in there that he was directed to use a single-use

5  restroom by his supervisor. If that did happen, it would not

6  have been authorized under UNC policy.

7        The other two things I point out is that both of the

8  emails that Mr. Smith gave you included language that he didn't

9  read to Your Honor that stated, the first one, "As noted in the

10  memorandum, the law does not contain any provisions concerning

11  enforcement," and in the second one, "The law does not confer

12  authority to the University or any other public agency to

13  undertake enforcement actions."

14        That's all I have, Your Honor.

15        **THE COURT:** All right. I understand. By the way, I

16  don't know if those are in the record, but they are admitted as

17  exhibits. Anything that's been submitted, I am admitting in

18  the record as exhibits.

19        Ms. Stoughton?

20        **MS. STOUGHTON:** Your Honor, I would like to address

21  also these issues about UNC's enforcement. You know, putting

22  the details aside, I think the critical fact is that pursuant

23  to H.B. 2, putting gender markers on the front door of the

24  restrooms in the UNC system now signifies that transgender

25  women must use the men's restroom and transgender men must use

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   the women's restroom, and that is discrimination.

2           **THE COURT:**  Your point is there's nothing they can

3   say, as long as they have "men"?  And "women" on the doors.

4           **MS. STOUGHTON:**  That's right.  And I would link that

5   specifically to one of the three things that UNC has admitted

6   that it's done, which is that it has admitted it's complied

7   with the mandate of H.B. 2 to put gender markers on the doors.

8   Now, they said, well, we haven't changed the gender markers,

9   but the point is what does that sign signify, and under H.B. 2,

10  which the University has said, although we are not going to

11  enforce it in the meaning of enforcement, like, you know,

12  punishing somebody, we are complying with it.  So what that

13  means is that what that marker says is what's illegal under

14  *Gloucester* and the Government's interpretation of the Title IX

15  regulation, which says that generally those markers are not

16  discrimination when they're just segregating men and women, but

17  when you do not offer access to those facilities consistent

18  with gender identity, it becomes discrimination, and that is

19  the situation on campus on UNC today, and that violates Title

20  IX.

21          That's really as far as -- these questions about

22  exactly what are they doing and who gets to enforce are

23  important and helpful, and, actually, I think when you dig into

24  those for the reasons Mr. Smith said, UNC is still on the hook;

25  but you don't even need to get beyond that for the very simple

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  fact to establish liability under Title IX, given what Title IX

2  says, which is that UNC has an obligation to prevent

3  discrimination and ensure that students have access to the

4  benefits of its educational --

5          **THE COURT:**  So what can the University of North

6  Carolina system do to comply with not only -- I shouldn't say

7  comply with the law.  What can the university system do, in

8  your view, to not be violating the law?

9          **MS. STOUGHTON:**  Well, what we asked the University to

10  do --

11          **THE COURT:**  And not violating your clients' rights?

12          **MS. STOUGHTON:**  Right.  What we asked the University

13  to do in the letters that led to the United States' enforcement

14  action was to make it clear to the campus community that H.B. 2

15  is not the policy governing access to facilities on campus, and

16  UNC would not do that and has done the opposite in the, at

17  best, definitely mixed and confusing messages.

18          Again, the record on this, I think, has been put

19  forward clearly.  One side of it has been presented by

20  Plaintiffs, the other side by the University.  All that it

21  amounts to at the end of the day, at best for the University's

22  position, is a kind of confusing jumble.  And what the United

23  States asked the University to do is to state very clearly,

24  which included, you know, rescinding the parts of the Spellings

25  memorandum, which were widely distributed, that said that

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    UNC -- that it is obliged to and will comply with the terms of

2    H.B. 2 and make it very clear the other parts of the things

3    they've said.  They didn't do that.  The best statements that

4    UNC have made have really been in the course of this

5    litigation, and that's really a post-litigation, at best,

6    change, which does --

7              **THE COURT:**  I suppose if they eventually, though, say

8    what you want them to say, that's sufficient because then we're

9    talking about preliminary and injunctive relief.  So at some

10   point, if they roll over and say uncle, then you have to say,

11   okay, fine, there is no claim now, as long as they don't change

12   their view.

13             **MS. STOUGHTON:**  Your Honor, no, at this point, once

14   litigation has ensued, the only remedy that will completely

15   ensure no violation of Title IX is an injunction.  It can be an

16   injunction that's entered by --

17             **THE COURT:**  What if Mr. Francisco stood up right now

18   and said, you know something, I have the authority on behalf of

19   the board and president to tell you that we repudiate the law,

20   it's the worst thing that we've ever had, and we have no

21   intention of enforcing it, and it's contrary to everything we

22   believe in at the University system, we respect everyone's

23   rights, et cetera, et cetera?  How would I enter an injunction

24   against them if they are not going to do anything?  They are

25   going to openly defy the law.  Would I still enjoin them?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1    **MS. STOUGHTON:** Absolutely, you would, Your Honor,

2 and that's the upshot of the *North Carolina Right to Life* case

3 from the Fourth Circuit and all the lines of cases that follow,

4 including a case from the Fourth Circuit that came out the same

5 time day as *Doe v. Duling*, the case that UNC relies upon so

6 heavily, which distinguished cases -- it distinguished a couple

7 of things.  One is cases where you are dealing with kind of

8 moribund statutes where nobody is really clear if anyone ever

9 will enforce it or how they would enforce it, and cases where

10 you have a newly changed policy that there is every indication

11 that the clear reading of it is that it should be followed, and

12 then only kind of post-litigation a defendant offers an

13 interpretation that would alleviate the harm.  Even then, there

14 is jurisdiction to enter an injunction because post-litigation

15 changes could be reversed the minute we walk away.

16    In this case, that is a particularly troubling

17 potential because the exchange that Mr. Duncan gave to the

18 Court, when the Court asked Mr. Duncan what's the legislature's

19 position on UNC's disavowal of a desire to enforce, was, well,

20 he's not aware of any action taken, you know, as he said, as a

21 matter of state government now, but now we're in a litigation

22 posture.  So, frankly, that makes some sense to me.

23    What's to say that -- if the Court were to release

24 UNC from this case and, by doing so, eliminate the Title IX

25 claim from both the United States' and the private Plaintiffs'

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

Case 1:16-cv-00236-TDS-JEP   Document 103   Filed 08/04/16   Page 134 of 143

1  case, because UNC is the only proper defendant under the terms

2  of the statute of Title IX, then there is no more restriction

3  on what might happen.

4        **THE COURT:**  If I enter an injunction under Title IX,

5  does it not -- can I not enter one that covers the State of

6  North Carolina and all constituent parties?  I mean, I don't

7  have before me, I don't think, every Title IX entity, do I?

8        **MS. STOUGHTON:**  That's right; you do not.

9        **THE COURT:**  So I presume, because they are not all

10  before me, you all believe that if I enter an injunction,

11  following *G.G.* across the board on Title IX, that that would

12  cover all Title IX constituent agencies.  If I do that for the

13  school system, do you need the University system -- the public

14  school system, do you need them as a defendant?

15        **MS. STOUGHTON:**  Well, Your Honor, in this case the

16  only Title IX defendant is UNC.  For the purposes of a Title IX

17  injunction -- I mean, I would love it to be otherwise, but I

18  don't think --

19        **THE COURT:**  The Governor on behalf of the State

20  doesn't qualify to get the public school system?

21        **MS. STOUGHTON:**  Your Honor, no, Title IX is a mandate

22  directed at the educational institution.  You know, my

23  understanding, but maybe we'll need to follow up with the Court

24  on this, is that the only proper defendant under Title IX is

25  the educational institution.  So it is our understanding of the

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1   scope of certainly the United Nations' Title IX claim, that

2   notwithstanding that we have brought other claims against the

3   Governor and the State of North Carolina itself, that those are

4   not Title IX defendants because a proper Title IX claim would

5   need to be directed at the school district as the educational

6   institution to which the funding -- well, I should say it's not

7   the educational institution; it's the funding recipient.

8           **THE COURT:**  I would be interested in knowing, if you

9   all can submit it by the end of the week, whether I have

10  redundancy in parties for Title IX purposes and, if I do,

11  whether there is any way to simplify this.  I've had redundancy

12  in actions.  I am trying to simplify these cases, and I would

13  love to not have redundancy in parties, if, for no other

14  reason, for a cost point of view for everybody involved.

15          So if you all could brief that and let me know by the

16  end -- I don't want a lot, please.  I have plenty.  Less than

17  ten pages per side.

18          **MS. STOUGHTON:**  Absolutely, Your Honor.

19          **THE COURT:**  Just let me know whether you think that's

20  the case, and you are free to say, even if it is the case, you

21  think here is the reason not to dismiss them out or what have

22  you, but -- and it may depend on which way I rule, but I would

23  be interested in knowing your view.

24          **MS. STOUGHTON:**  Absolutely, Your Honor.  Thank you.

25          **THE COURT:**  All right.  It's late in the day -- it's

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  early in the afternoon, but late in the day.  Who is the
2  administrator?  Is it, Mr. Smith; is that right?
3         **MR. NATHANIEL SMITH:**  Yes, Your Honor.
4         **THE COURT:**  First of all, thank you for coming.  I
5  understood that you're an Amici in the case.  So what I am
6  really interested in is what was happening and what happens in
7  the school system to accommodate particularly changing rooms
8  and showers for the interest of transgender people?
9         **MR. NATHANIEL SMITH:**  Yes, thank you, Your Honor,
10 Nathaniel Smith of the Pillsbury firm for the School
11 Administrator Amici, also joined by Mark Sigmon, our local
12 counsel.  I appreciate your having us here today and accepting
13 our brief.
14         Now, our brief is on behalf of nearly 30 school
15 administrators from 20 states, including North Carolina,
16 Kentucky, individual superintendents and --
17         **THE COURT:**  So what North Carolina administrators are
18 you appearing for here today?
19         **MR. NATHANIEL SMITH:**  It was a board member of the
20 Durham Public Schools.
21         **THE COURT:**  Okay.
22         **MR. NATHANIEL SMITH:**  We also have an administrator
23 from a public school in Durham, New Hampshire, and Portland,
24 Oregon, and Portland, Maine.
25         **THE COURT:**  So maybe you ought to start with Durham.

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  So how does this play out in day-to-day practicality?

2         **MR. NATHANIEL SMITH:**  In day-to-day practicality,

3  what happens is there are concerns that are raised and fears

4  raised by parents and not by the kids and not by the students.

5  That was a consistent theme in all of the administrators that

6  --

7         **THE COURT:**  How are the students accommodated in

8  showers and changing facilities?  And, also, what is a changing

9  facility?  Is it basically a locker room?

10        **MR. NATHANIEL SMITH:**  So in locker rooms, there is

11  more privacy already in locker rooms than many of us recall

12  from school days.  You know, group showers have been replaced

13  with stalls and curtains or at least having one private stall

14  available for whatever reason, body image issues.  These are

15  educators who are familiar with students' concerns about

16  privacy and body image, you know, completely apart from

17  transgender and nontransgender students, and so they work with

18  transgender students, just as they would with any other

19  students, to say what can we do to create a more welcoming,

20  easier environment for you --

21        **THE COURT:**  Is there ever an instance where a

22  transgender student's interest is not capable of being

23  accommodated by including them in a shower or locker room so

24  that a separate facility is really the answer that's provided?

25  Does that ever occur?

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1      **MR. NATHANIEL SMITH:** I can't say if it's ever

2  occurred.  Is there ever a situation where there is not a --

3      **THE COURT:** A practical accommodation that can keep

4  them in the locker room or shower.

5      **MR. NATHANIEL SMITH:** None that I am aware of from

6  the Amici that we spoke with, from the administrators that we

7  spoke with.

8      **THE COURT:** For showers, for example, are there

9  separate curtains that are put in, or what is done to give

10  privacy if the privacy interest is trying to be respected?

11      **MR. NATHANIEL SMITH:** Well, in some schools, they

12  already have the private shower stalls with a shower curtain,

13  so nothing out of the ordinary is needed for a transgender

14  student in that situation.  Or the coach's office, they have a

15  shower facility in there that, again, a transgender student or

16  a nontransgender student who is just --

17      **THE COURT:** That's more along the lines of a separate

18  facility to accommodate whoever wants it?

19      **MR. NATHANIEL SMITH:** Uh-uh.

20      **THE COURT:** All right.

21      **MR. NATHANIEL SMITH:** Also, I learned through this

22  undertaking that actually students shower less now than --

23      **THE COURT:** I'm not sure that's a good thing.

24      **MR. NATHANIEL SMITH:** I'm not sure either.  That

25  probably raises other issues in late spring afternoons when you

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  are coming back to your English class, but, nonetheless, one of

2  the things is that students will strip down to their boxers and

3  undershirt, change into their PE shorts and PE shirt, go do PE,

4  come back, reverse, again only getting down to boxers and

5  undershirt.

6        **THE COURT:**  What's the prevalence of students who

7  want to use showers and changing rooms who are transgender; do

8  you know?

9        **MR. NATHANIEL SMITH:**  I really don't, Your Honor.

10       **THE COURT:**  I'm assuming the bathroom issue is the

11  most prevalent because it's a day-to-day issue, and that the

12  showers and changing rooms are something less than that.  Is

13  that true?

14       **MR. NATHANIEL SMITH:**  I think that's correct, locker

15  rooms less than bathrooms.  But also that there is another

16  common theme, talking with these educators and administrators,

17  was that transgender students are very discreet about their

18  bodies.  They are trying to blend in, not stand out, and so the

19  concerns and fears that a transgender student would be exposing

20  him or herself to other students is quite far from the mark.

21       **THE COURT:**  Are there different accommodations in the

22  school systems that are made depending on the age range of the

23  students involved in order to respect privacy interests or have

24  a safety issue?

25       **MR. NATHANIEL SMITH:**  I don't know the answer to

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1 | that, Your Honor.  I'm just thinking that probably locker rooms
2 | are more junior high and high school than elementary schools.
3 | **THE COURT:**  Are their showers and changing rooms in
4 | elementary schools; do you know?
5 | **MR. NATHANIEL SMITH:**  I don't know, but, again, the
6 | consistent experience from these Amici, again with policies
7 | that allow transgender students to use the bathroom that
8 | corresponds with their gender identity, is that it simply --
9 | you know, they've heard these fears, the same fears that
10 | sometimes are something being raised here, but in practice,
11 | they just don't play out.  It brings to mind the line, I think
12 | misattributed but to Mark Twain, that "I am an old man and have
13 | known many troubles in my life, but most of them never
14 | happened."  That's what we are hearing from the school
15 | administrators.  We hear these fears, we hear these concerns
16 | again overwhelmingly from parents, not from the students,
17 | students are fine, and these fears simply don't not
18 | materialize.
19 | **THE COURT:**  Thank you for coming, if for no other
20 | reason to enlighten us with a little Mark Twain.
21 | **MR. NATHANIEL SMITH:**  I'm glad to offer whatever I
22 | can, Your Honor.  We appreciate the Court's interest in
23 | subsequent briefing.
24 | **THE COURT:**  Sure.  Unless anybody else has anything
25 | pressing, I know folks are hungry, I want thank you all for all

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  of your hard work.  I have extensive briefing, and it's well

2  done, so thank you all.  I am going to endeavor to make a

3  decision as soon as I can.  I understand the school system is

4  about to crank up.  Apparently, for some unfortunate or

5  fortunate children, they've already started, but I will do the

6  best I can to issue a decision just as soon as I can, and we'll

7  proceed from there.

8          All right.  Thank you.  Have a good afternoon.

9      (END OF PROCEEDINGS AT 1:29 P.M.)

10

11                      * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carcano, et al. v. McCrory, et al. PI Hearing 8/1/16

1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF NORTH CAROLINA

3  CERTIFICATE OF REPORTER

4

5

6          I,  Briana L. Nesbit, Official Court Reporter,

7  certify that the foregoing transcript is a true and correct

8  transcript of the proceedings in the above-entitled matter.

9

10         Dated this 4th day of August 2016.

11

12

13         _____
           Briana L. Nesbit, RPR

14         Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25