# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

       *Plaintiffs*,

      v.

PATRICK MCCRORY, *et al.*,

       *Defendants*,

     and

PHIL BERGER, *et al.*,

       *Intervenor-Defendants.*

No. 1:16-cv-00236-TDS-JEP

## PLAINTIFFS' SUPPLEMENTAL DUE PROCESS BRIEF

# TABLE OF CONTENTS

I.    H.B. 2 Infringes Plaintiffs' Due Process Rights By Coercing
      Disclosure of Private Information .......................................................................... 1

      A.    Plaintiffs' Right to Keep Their Transgender Status Private Is
            Independent of Whether Birth Certificates Are Available to
            the Public ...................................................................................................... 2

      B.    The Violation of Plaintiffs' Right to Privacy Is Attributable to
            H.B. 2 and Redressable by an Injunction Against H.B. 2 ............................ 7

II.   H.B. 2 Burdens Plaintiffs' Due Process Right to Make Medical
      Decisions Free from Government Coercion ............................................................ 9

III.  H.B. 2 Fails Strict Scrutiny ................................................................................. 14

      A.    There Is No Compelling Government Interest for H.B. 2 ........................... 14

      B.    H.B. 2 Is Not Narrowly Tailored to Further Privacy or Safety ................... 17

CONCLUSION ................................................................................................................ 20

CERTIFICATE OF SERVICE

Plaintiffs submit this supplemental brief pursuant to this Court's August 26, 2016 preliminary injunction order inviting additional briefing on Plaintiffs' due process claims. H.B. 2 violates Plaintiffs' due process rights in two ways: (1) by requiring Plaintiffs to use single-sex facilities inconsistent with their gender identity, H.B. 2 unconstitutionally forces Plaintiffs to disclose their transgender status and genital characteristics in contexts where this information would have been kept private; and (2) by requiring Plaintiffs to undergo invasive surgery in order to use single-sex facilities consistent with their gender identity, H.B. 2 imposes unconstitutional conditions on Plaintiffs' right to control their bodies and make their own medical decisions free from government coercion. Because H.B. 2 infringes Plaintiffs' due process rights, it must meet strict scrutiny—which it fails.

## I.    H.B. 2 Infringes Plaintiffs' Due Process Rights By Coercing Disclosure of Private Information.

The constitutional right to privacy protects against the disclosure of personal matters in which a person has a reasonable expectation of confidentiality. ECF No. 127 ("Order") at 61. Plaintiffs' expectation of confidentiality here is unquestionably reasonable in light of the information at stake and the context in which H.B. 2 coerces its disclosure. That information pertains not merely to the fact that an individual is transgender—which courts have uniformly held is entitled to constitutional privacy protection—but also to whether that individual has undergone genital surgery. *See Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999); *Love v. Johnson*, 146 F. Supp. 3d 848, 854-56 (E.D. Mich. 2015); *K.L. v. Alaska Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05431, 2012 WL 2685183, at *5-6 (Alaska Super. Ct. Mar. 12, 2012).

H.B. 2 excludes a girl like H.S. from the girl's restroom, for example, both because she is transgender and because she has not obtained surgical treatment that would permit her to amend her birth certificate. Forcing a 17-year-old girl like H.S. to use the men's restroom at a highway rest stop would effectively broadcast both her transgender status and her genital characteristics to strangers, placing her at serious risk of harassment and violence.

### A. Plaintiffs' Right to Keep Their Transgender Status Private Is Independent of Whether Birth Certificates Are Available to the Public.

Plaintiffs' reasonable expectations of privacy do not evaporate merely because the information on one's birth certificate may sometimes be available to the public. In North Carolina, an individual may be able to obtain an uncertified copy of another individual's birth certificate upon submission of appropriate documentation including picture identification and payment of a fee.[1] In most states, an individual *cannot* obtain a copy of another individual's birth certificate absent some legal relationship.[2] More importantly, however, "'[a]n individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may [already] be available to the public in some form.'" *Ostergren v. Cuccinelli*, 615 F.3d 263, 284 (4th Cir. 2010) (citing *U.S. Dep't of Defense v. Federal Labor Relations*

---

[1] North Carolina Health and Human Services, Frequently Asked Questions, *available at* http://vitalrecords.nc.gov/faqs.htm; North Carolina Health and Human Services, Order a Certificate, *available at* http://vitalrecords.nc.gov/order.htm.

[2] Attached as Exhibit A is a chart detailing the availability of a birth certificate in all 50 states based on information collected from state government websites.

*Auth.*, 510 U.S. 487, 500 (1994)). "[T]he fact that 'an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information.'"[3] *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 770 (1989) (holding that disclosure of FBI "rap sheets" would invade privacy even though "events in a rap sheet have been previously disclosed to the public"). Put simply, context matters.

These principles have particular salience where a privacy interest depends not merely on the ability to keep information secret but also to *control* its disclosure. The Fourth Circuit has distinguished between these two interests. The first privacy interest "hinges upon whether information has been kept secret." *Ostergren*, 615 F.3d at 283. In that context, one's privacy interest "fade[s] when the information involved already appears in the public record." *Id.* (internal quotation marks omitted). But there is a second privacy interest in which "one does not mind publicity itself but nonetheless would prefer to control how personal information will be used or handled." *Id.* "Under this conception, privacy does not hinge upon secrecy but instead involves the individual's *control* of information." *Id.* (emphasis in original; internal quotation marks omitted). For example, there is nothing embarrassing about one's social security number; but its public

_____

[3] For example, even though most individuals may not possess a privacy interest in their home address, there can be exceptions to that general rule, notwithstanding that such information generally "is a matter of public record." *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 833 F.2d 1129, 1135 (4th Cir. 1987); *cf. Kallstrom v. City of Columbus*, 136 F.3d 1055, 1063-64 (6th Cir. 1998) (holding that the government's disclosure of contact information for undercover officers imposed a cognizable burden on their privacy rights); *U.S. Dep't of Defense*, 510 U.S. at 501-02.

3

disclosure nonetheless undermines privacy interests. Distinguishing between these two privacy interests is significant: the notion that one's privacy interests are diminished when information is available in a public record makes more sense where privacy hinges upon secrecy, but "makes noticeably less sense where privacy hinges upon control." *Id.*

Here, H.B. 2 significantly undermines both privacy interests and particularly Plaintiffs' *control* over disclosure of their transgender status—including when, where, how, and to whom that information is disclosed. That is true regardless of whether their birth certificates are available to third parties as a theoretical matter—or, for that matter, whether Plaintiffs may be open about their transgender status in other aspects of life. *Cf. C.N. v. Wolf*, 410 F. Supp. 2d 894, 903 (C.D. Cal. 2005) (recognizing that a lesbian student had a privacy interest against disclosure of her sexual orientation to her parent, even though she was open about her sexual orientation with other students); *Virgil v. Time, Inc.*, 527 F.2d 1122, 1127 (9th Cir. 1975). When North Carolina forces H.S. to use the men's restroom, she effectively becomes a walking billboard that broadcasts her transgender status and genital characteristics to the world around her. No public record has ever "waived" her right against that type of compelled disclosure.

The Fourth Circuit's decision in *Walls v. City of Petersburg*, 895 F.2d 188 (4th Cir. 1990)—which did not deal with a transgender individual's right to privacy—does not undermine, much less foreclose, Plaintiffs' claim. Requiring an employee to list prior marriages in a background questionnaire, for example, does not implicate a reasonable expectation of privacy over either information that should be kept secret *or* information

4

that should remain within an individual's control. *Id.* at 193. While it may not be unreasonable for an employer to ask certain information for a background check, that is a far cry from the government forcing transgender individuals to out themselves to strangers in order to use any single-sex public facility. Indeed, given *Walls*'s holding that financial information such as a credit card balance is entitled to constitutional protection, it is difficult to see how deeply personal information about one's transgender status and genital characteristics could receive lesser protection. Additionally, the employee in *Walls* still largely retained control over the information at issue. *Id.* at 194 (noting that the questionnaire was kept in locked filing cabinet accessible by four individuals but that if the information "had been more widely distributed, [the court's] conclusions might have been different"). That stands in stark contrast to Plaintiffs' critical loss of control over disclosure of their transgender status and information about their genitalia.

Furthermore, the ability to inspect an individual's birth certificate does not make that individual's transgender status "freely available" under *Walls* to other users of facilities covered by H.B. 2. 895 F.2d at 193. As a practical matter, for example, individuals cannot readily obtain a copy of the birth certificate of the person using the restroom stall next to them. To do so, one would typically first need the other individual's name, parents' names, state of birth, and other identifying information; and even then, the request will often need to be made in writing to the relevant government agency before a copy of a birth certificate is provided. The Supreme Court has explained that there is a "vast difference" between information that could theoretically be gleaned

5

from "public records that might be found after a diligent search" and information that is neatly packaged and readily accessible. *Reporters Comm. for Freedom of the Press*, 489 U.S. at 764. While a search of public records may be "more practicable" in the context of an employment background check, Order at 66, the same cannot be said for real-time investigation of the birth certificate of a fellow restroom user.

Even if *Walls* could be read to stand for the proposition that information on a public record can never be afforded privacy protection under any circumstance, the compelled disclosure at issue here goes beyond the information on a birth certificate. A birth certificate itself does not disclose transgender status: a third party merely looking at H.S.'s birth certificate cannot, without more, discern that she is transgender. It is only when a birth certificate is connected to additional information—such as an individual's physical appearance—that disclosure can reasonably occur, as this Court has recognized. Order at 67. Thus, H.B. 2 does not merely coerce the disclosure of Plaintiffs' birth-assigned sex; instead, it does so in contexts that reveal their transgender status. Privacy intrusions are most pronounced where, as here, disclosure occurs alongside other identifying information—reinforcing the importance of context in assessing privacy interests. *Cf. Sherman v. U.S. Dep't of Army*, 244 F.3d 357 (5th Cir. 2001); *In re Crawford*, 194 F.3d 954, 958 (9th Cir. 1999); *Kallstrom*, 136 F.3d at 1064.

"Some information still needs to be private, disclosed to the public only if the person voluntarily chooses to disclose it." *Walls*, 895 F.3d at 194-95. That is especially so for the information at stake here: "The excruciatingly private and intimate nature of

transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate." *Powell*, 175 F.3d at 111.

**B.**   **The Violation of Plaintiffs' Right to Privacy Is Attributable to H.B. 2 and Redressable by an Injunction Against H.B. 2.**

The intrusions upon Plaintiffs' privacy rights are attributable to H.B. 2, even if H.B. 2 causes those harms in concert with other laws governing the modification of birth certificates. The Court's order stated that "it is not readily apparent to what extent any Due Process concerns are attributable to Part I as opposed to the laws that govern the modification of birth certificates." Order at 67. Before H.B. 2, however, Plaintiffs were not put in the untenable position of outing themselves to strangers in facilities inconsistent with their gender identity. Now, they are, and an injunction against H.B. 2 would redress that injury. That is illustrated by the preliminary injunction that this Court issued. For the three individual transgender Plaintiffs, the preliminary injunction redresses the privacy violations caused by H.B. 2 to the extent they occur at the University of North Carolina.

The possibility that additional lawsuits could be brought challenging the various state laws that govern modification of birth certificates does not in any way undermine the due process claim before this Court. In *Love*, for example, the court held that the privacy violations caused by Michigan's driver's license policy were legally cognizable under facts similar to those here. 146 F. Supp. 3d at 851. Michigan refused to update the gender marker on an individual's driver's license unless the individual obtained an amended birth certificate with an updated gender marker; but obtaining an amended birth

7

certificate was conditioned upon surgical treatment in many states, including Michigan. *Id.* The court recognized that the driver's license policy caused the plaintiffs harm and could therefore be directly challenged, despite the fact the plaintiffs could have also challenged the underlying birth certificate laws in Michigan and elsewhere.[4] Here, H.B. 2 is similarly a but-for cause of Plaintiffs' privacy harms, even if it produces those harms by working in concert with other laws. *Cf. K.L.*, 2012 WL 2685183, at *6 (recognizing that the government did not directly disclose party's transgender status but that its driver's license policy nonetheless caused the privacy violations).

While some privacy violations may involve government officials intentionally seeking to cause harm through the disclosure of private information, Order at 66, that is by no means required. Even if there were no malevolent motive behind H.B. 2, the injury caused by its invasion of transgender individuals' privacy would be no less. In *Walls*, for example, there was no indication that the employer's questions were posed for the purpose of causing the employee harm. To the contrary, even where the government has permissible motives for relying upon the information sought—such as guarding against corruption in public employment, 895 F.3d at 194—disclosure of constitutionally protected information must still be narrowly tailored to advance a compelling interest.

---

[4] Similarly, prior to the Supreme Court's invalidation of bans against marriage for same-sex couples, courts held that denying same-sex couples of benefits associated with marriage was itself unconstitutional, without adjudicating the constitutionality of the marriage bans themselves. *See, e.g.*, *Diaz v. Brewer*, 656 F.3d 1008, 1013 (9th Cir. 2011); *Bassett v. Snyder*, 951 F. Supp. 2d 939, 964 (E.D. Mich. 2013).

In any event, lawmakers were well aware that H.B. 2 would cause many transgender individuals to be outed. Ex. B, House Jud. Comm. Tr. at 29:11-13 (testimony of transgender woman: "it freaks people out when I go to the men's room. Would you like to go to the men's room with me? I don't think so."); Ex. C, Sen. Jud. Comm. Tr. at 49:14-17 (testimony of transgender male student: "Imagine yourself in my shoes, being a boy walking into a ladies room. It's awkward and embarrassing and can actually be dangerous"); *id.* at 52:11-12 ("This bill would force [a transgender] man with a full beard, to use the women's restroom.").

H.B. 2's irreparable harms are not negated by the prospect that some transgender individuals—such as those who have obtained updated birth certificates, Order at 67—may escape privacy violations. Plainly, Plaintiffs and many other transgender individuals are not among those fortunate few. Not all transgender individuals can update their birth certificates, whether because their state of birth does not allow it or because the prerequisites to update it are prohibitively expensive or medically contraindicated.

## II. H.B. 2 Burdens Plaintiffs' Due Process Right to Make Medical Decisions Free from Government Coercion.

H.B. 2 also imposes unconstitutional conditions on Plaintiffs' right to control their bodies and make their own medical decisions free from government coercion by conditioning Plaintiffs' right to use single-sex facilities consistent with their gender identity on whether Plaintiffs undergo invasive surgery.

Such a condition violates Plaintiffs' substantive due process rights, as "the government may not deny a benefit to a person because he exercises a constitutional

9

right." *Koontz v. St. Johns Rivers Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594 (2013) (canvassing case law in support of the "overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up"); *accord Patton v. State of North Carolina*, 381 F.2d 636, 640 n.11 (4th Cir. 1967) ("Denying a benefit because of the exercise of a right in effect penalizes that exercise"). While the Court is correct that H.B. 2 does not mandate that individuals be "strapped down and forced to submit to medication" against their will, Order at 69, it is no less infirm: H.B. 2 compels Plaintiffs to choose between their medical autonomy and their ability to use single-sex restrooms in public buildings (including highway rest stops, airports, the DMV, and courthouses) that correspond with their gender identity. In effect, Plaintiffs must choose between surgery and safety. Indeed, the unconstitutional conditions doctrine applies "regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right." *Koontz*, 133 S. Ct. at 2595.

The unconstitutional conditions doctrine has been applied in a variety of settings in which the government attempted to condition certain "benefits" on the exercise of constitutional rights, including where the benefit at issue was a land use permit, a tax benefit, health care, public employment, crop payments, and a business license. *Koontz*, 133 S. Ct. at 2594 (collecting cases); *see also Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (public disclosure of an individual's social security number imposes a substantial burden on the right to vote); *Lebron v. Sec'y, Fla. Dept. of Children and*

10

*Families*, 710 F.3d 1202, 1217 (11th Cir. 2013) (striking down Florida statute requiring suspicionless drug testing as a condition of eligibility for temporary assistance benefits). H.B. 2's burden on the right to refuse unwanted medical treatment is as least as significant as the burdens imposed in these cases.

Indeed, the burden imposed by H.B. 2 is substantial. There is no question that being denied access to single-sex facilities consistent with one's gender identity in government buildings throughout the state is a significant harm. The Fourth Circuit in *G.G.* had "little difficulty" concluding that appropriate restroom access is a critical benefit of a school's educational program. *G.G. ex rel. Grimm v. Gloucester County Sch. Bd.*, 822 F.3d 709, 718 n.4 (4th Cir. 2016). In addition, having appropriate restroom access is a basic condition of employment. *See Lusardi v. McHugh*, No. 0120133395, 2015 WL 1607756, at *9 (EEOC Apr. 1, 2015) ("Equal access to restrooms is a significant, basic condition of employment."); Occupational Safety & Health Administration, *A Guide to Restroom Access for Transgender Workers* 1, https://www.osha.gov/Publications/OSHA3795.pdf (the ability of transgender people to access a restroom consistent with their gender identity is necessary to ensure a "safe and healthy working environment"); *Baker v. John Morrell & Co.*, 220 F. Supp. 2d 1000, 1011, 1014 (N.D. Iowa 2002) (describing access to restroom facilities as "fundamental" and noting that the denial of equal access to such facilities "has been found to alter the terms and conditions of a plaintiff's employment").

11

The denial of this benefit to Plaintiffs is significant, and the record in this case shows ample dignitary, psychological, and physical harms to Plaintiffs as a result of being denied access to the single-sex facilities that correspond with their gender identity. *See, e.g.*, ECF No. 22-1 at 6-7; ECF No. 22-16 at 3-4; ECF No. 73-1.  This burden is not lessened by the impractical notion that Plaintiffs are "free to use facilities that align with their biological sex" or that "they may have access to single-user facilities," as no such facility may be available, and the benefit at issue is use of the single-sex facility that corresponds with Plaintiffs' gender identity.  Order at 69.  Indeed, this Court has acknowledged that "on this record, the court has no basis for doubting Plaintiffs' assertions that they cannot use multiple occupancy facilities that match their birth certificates for fear of harassment and violence, that single occupancy facilities are not reasonably available to them, and that they are at a serious risk of suffering negative health consequences as a result." *Id.* at 72.  H.B. 2 puts Plaintiffs in the impossible position of either having to sacrifice their constitutionally protected right to make medical decisions free from coercion or being barred from single-sex facilities that correspond with their gender identity.

There does not need to be a total bar on the use of any restroom for Plaintiffs' liberty interests to be unconstitutionally burdened.  For example, the federal government's refusal to recognize the marriages of same-sex couples infringed their due process rights even though the federal government did not forbid them from marrying altogether.  *See United States v. Windsor*, 133 S. Ct. 2675, 2693-94 (2013).  Laws can

12

impose an undue burden on a right, even when they do not result in a complete prohibition. *See, e.g.*, *Whole Woman's Health*, 136 S. Ct. at 2317-18; *see also King v. Rubenstein*, 825 F.3d 206, 217 (4th Cir. 2016) (holding that prisoner stated a valid Fourth Amendment claim where he faced two options: genital surgery to remove implanted foreign objects or administrative segregation and loss of parole eligibility).

Ruling in Plaintiffs' favor would not "cast serious doubts on a wide variety of laws," because courts are well-versed in reviewing challenges to laws involving medical issues, such as those noted by the Court. Order at 70. Indeed, in one of the examples cited by the Court, laws involving mandatory inoculation programs have been challenged a number of times and repeatedly found to be constitutional. *See, e.g.*, *Sherr v. Northport-East Northport Union Free Sch. Dist.*, 672 F. Supp. 81, 88 (E.D.N.Y. 1987) (observing "the compelling interest of society in fighting the spread of contagious diseases through mandatory inoculation programs"). Courts have similarly been able to dispense with challenges to regulations involving vision requirements for operating a motor vehicle. *See, e.g.*, *Sharon v. Larson*, 650 F. Supp. 1396, 1404 (E.D. Pa. 1986) ("The challenged regulation serves an important state interest, that of promoting highway safety."); *Allard v. Dep't of Transp.*, 609 A.2d 930, 937 (R.I. 1992). In contrast, as shown below, H.B. 2 is not narrowly tailored to serve a compelling government interest.

## III.    H.B. 2 Fails Strict Scrutiny.

### A.    There Is No Compelling Government Interest for H.B. 2.

Because H.B. 2 infringes Plaintiffs' due process rights, it "cannot be upheld unless the State demonstrates that it is narrowly tailored to serve a compelling interest." Order at 60. There is no such interest "of the highest order" here. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). The determination of whether an interest is compelling "is not to be made in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." *California Democratic Party v. Jones*, 530 U.S. 567, 584 (2000) (emphasis in original) (holding that privacy was not a compelling interest given the circumstances of the case); *accord Miller v. Brown*, 503 F.3d 360 (4th Cir. 2007) (same). The "aspect" of privacy and safety at issue here is the categorical exclusion of transgender individuals from facilities matching their gender identity, which Plaintiffs challenge, rather than the existence of sex-separated facilities, which Plaintiffs do not. Order at 79 (recognizing that "the issue currently before the court is whether Title IX or the Constitution prohibits Defendants from enforcing HB2's exclusion of transgender individuals from [covered facilities]").[5]

---

[5] This is also an essential reason why H.B. 2 fails even lower levels of scrutiny. The question presented here is not whether there is a valid justification for excluding non-transgender men from women's facilities and non-transgender women from men's facilities. The question instead is whether there is a valid justification for excluding transgender men from men's facilities and transgender women from women's facilities, which is what H.B. 2 changed in existing law. There is no such valid justification.

14

Furthermore, for an interest to be compelling, the government must be able to substantiate the precise harm at stake. "The state must specifically identify an 'actual problem' in need of solving." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). This requires a "high degree of necessity . . . [e]ven where the protection of children is the object." *Id.* at 804-05. "[U]nsubstantiated or speculative claims of harm . . . fall[] short of a compelling interest." *Doe v. Public Citizen*, 749 F.3d 246, 270 (4th Cir. 2014); *accord Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980). When the government defends its law "as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'" [6] *PSINet, Inc. v. Chapman*, 362 F.3d 227, 238 (4th Cir. 2004) (internal quotation marks omitted).

In nearly a dozen different ways, this Court's preliminary-injunction order shows why H.B. 2 is the quintessential solution in search of a problem. *See, e.g.*, Order at 44-45 ("the individual transgender Plaintiffs used bathrooms and locker rooms corresponding with their gender identity without complaint"); *id.* at 76 ("[existing] practices allowed the individual transgender Plaintiffs to use bathrooms and other facilities consistent with their gender identity for an extended period of time without causing any known infringement on the privacy rights of others"); *id.* at 77 ("the individual transgender

---

[6] Under strict scrutiny, "[o]nly the gravest abuses, endangering paramount interest, give occasion for permissible limitation." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). On its face, H.B. 2 recognizes that whatever interest it seeks to serve is not absolute and can give way to other countervailing interests. *See, e.g.*, N.C. Gen. Stat. § 143-760(d) (creating exceptions for custodial, maintenance, and other purposes).

Plaintiffs have used facilities corresponding with their gender identity for over a year without posing a safety threat to anyone"); *id.* at 78 ("The State acknowledges that it had no problems with that pre-2016 legal regime."). Likewise, Counsel for Governor McCrory admitted that there was no known problem caused by transgender individuals using facilities matching their gender identity before H.B. 2. ECF No. 103 at 66.

The imagined privacy and safety issues supposedly caused by transgender people living openly as who they are do not exist in the real world. That is powerfully illustrated by Plaintiffs' lived experiences. The government does not have a *compelling* interest in preventing other men from merely seeing Mr. Carcaño while he washes his hands in a restroom or otherwise sharing a communal facility with him. *See* Order at 4 ("for obvious reasons, transgender individuals generally seek to avoid having their nude or partially nude bodies exposed in bathrooms, showers, and other similar facilities").[7] That already happened before H.B. 2; it happens daily at the University of North Carolina under the preliminary injunction; and it will continue to occur in restaurants, stores, and gyms unaffected by H.B. 2, no matter the outcome of this litigation. There is absolutely no demonstrable harm to anyone else from Mr. Carcaño living his life as a man and going about his business. "As counsel for Governor McCrory candidly acknowledged . . .

---

[7] Particularly given the lack of any meaningful risk of bodily exposure, there is no legitimate (much less compelling) interest in preventing someone from merely being in the "vicinity" of a transgender individual in a sex-separated facility. Order at 7; *see Bd. of Educ. of Highland Local Sch. Dist. v. U.S. Dep't of Justice*, No. 2:16-CV-524, 2016 WL 5372349, at *17 (S.D. Ohio Sept. 26, 2016) (rejecting the notion that other students' privacy rights would be violated by a transgender girl merely entering the girls' restroom).

'some transgender individuals will continue to use the bathroom that they always used and nobody will know.'" Order at 76. Preventing "harm" that is unknown and unsubstantiated cannot conceivably constitute a compelling interest.

### B. H.B. 2 Is Not Narrowly Tailored to Further Privacy or Safety.

Even if a compelling interest were present here, H.B. 2 does not further it through narrowly-tailored means. H.B. 2 must be "actually necessary" in order to solve a problem, which is a demanding standard that is rarely satisfied. *Brown*, 564 U.S. at 799. The law must "in fact alleviate [identified] harms in a direct and material way." *PSINet*, 362 F.3d at 238. A law that "is at once too narrow and too broad" cannot satisfy the narrow-tailoring requirement. *North Carolina State Conference of NAACP v. McCrory*, -- F.3d --, 2016 WL 4053033, at *19 (4th Cir. 2016) (internal quotation marks omitted).

H.B. 2 is the antithesis of a narrowly-tailored law: it imposes a blanket ban against Plaintiffs' use of facilities matching their gender identity, and it precludes a "flexible, case-by-case" approach to addressing privacy or safety concerns. Order at 74. Previously, schools could develop "a 'tailored' plan that addresse[d] the unique needs and circumstances of each case." *Id.* at 9. H.B. 2 has now taken the ability to "tailor" off the table and replaced it with a categorical "one-size-fits-all" approach that is insensitive to context. *Id.* at 81.

There are other ways to maintain privacy and safety without banishing transgender people from facilities matching their gender identity. One way is through generally applicable criminal law, which directly prohibits improper exposure of one's body to

17

others. North Carolina's trespass, peeping, and indecent exposure laws "protect the privacy and safety of all citizens, regardless of gender identity." *Id.* at 81. These laws did so before H.B. 2, and they will continue to do so without H.B. 2. *See Whole Woman's Health*, 136 S. Ct. at 2314 ("The record contains nothing to suggest that [Texas's] H.B. 2 would be more effective than pre-existing [criminal] law at deterring wrongdoers.").

Another way to preserve privacy is through the use of partitions, curtains, and other practical solutions. Order at 41-42 ("as in *G.G.*, other forms of accommodation might be available to protect privacy and safety concerns"). For example, there is no meaningful risk of exposure to nudity in the context of restrooms, given their partitioned nature. *Id.* at 9 & 42 n.26; *accord Highland Local Sch. Dist.*, 2016 WL 5372349, at *17-19 (holding that the exclusion of a transgender boy from the boy's restroom failed to rationally or substantially further an interest in privacy given the existence of restroom stall dividers); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, No. 16-CV-943-PP, 2016 WL 5239829, at *3 (E.D. Wis. Sept. 22, 2016) (rejecting school's contention that a transgender boy's use of the boys' restroom violates other students' privacy rights). Indeed, the same is also often true in the context of showers, which "today often contain partitions, dividers, and other mechanisms to protect privacy similar to bathrooms." Order at 41. Additionally, nothing prevents the government from accommodating any individual who wants greater privacy, for whatever reason, in a variety of ways, including allowing a student to use a single-occupancy restroom.

18

There is "no concrete evidence of persuasive force" explaining why practical privacy solutions—already commonly implemented—are unworkable. *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 318 (4th Cir. 2013). It is absurd to contend that the federal government, forty-nine other states, thousands of local governments, and millions of businesses across America have failed to preserve privacy and safety by not expressly excluding transgender people from facilities matching their gender identity—but that North Carolina finally cracked the code in 2016 when it passed H.B. 2.

The utter lack of narrow tailoring is underscored by the fact that H.B. 2 now *creates* potential "alarm and suspicion" that did not previously exist by consigning a transgender man like Mr. Carcaño, whom everyone accurately perceives to be male, to women's facilities. Order at 76. As this Court recognized, "rather than protect privacy, it appears at least equally likely that denying an injunction will create privacy problems, as it would require the individual transgender Plaintiffs, who outwardly appear as the sex with which they identify, to enter facilities designated for the *opposite* sex . . . thus prompting unnecessary alarm and suspicion." *Id*.

Finally, "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Church of Lukumi Babalu Aye*, 508 U.S. at 547 (internal quotation marks omitted); *accord PSINet*, 362 F.3d at 238. This Court has already recognized that any government interest in safety or privacy is "undermined" by H.B. 2's reliance on birth certificates, which is an unreliable short-cut for presuming the genital characteristics of transgender

19

individuals. Order at 76. But, in addition to that, H.B. 2 leaves thousands of non-government facilities—like those in restaurants, stores, and gyms—wholly untouched. That underinclusion, standing alone, is sufficient to demonstrate the law is not narrowly tailored to address its ostensible goals. *See*, *e.g.*, *Brown*, 564 U.S. at 801-02 (holding that law banning depictions of violence in video games but not cartoons and other media was fatally underinclusive); *Central Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 634 (4th Cir. 2016) (holding that an ordinance banning the display of a private flag, but not a government flag, was fatally underinclusive). Of course, the government cannot show that anyone's privacy or safety has been imperiled by transgender people using facilities consistent with their gender identity in *any* setting—public *or* private.

## CONCLUSION

For the foregoing reasons, the Court should find that H.B. 2 violates Plaintiffs' right to privacy and right to refuse unwanted medical treatment.

Respectfully submitted,

Dated: September 30, 2016

/s/ Christopher A. Brook
 Christopher A. Brook
    N.C. State Bar No. 33838
Irena Como*
AMERICAN CIVIL LIBERTIES UNION OF
    NORTH CAROLINA LEGAL FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile: 866-511-1344
cbrook@acluofnc.org
icomo@acluofnc.org

Jon W. Davidson*
Tara L. Borelli*
Peter C. Renn*
Kyle A. Palazzolo*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
jdavidson@lambdalegal.org
tborelli@lambdalegal.org
prenn@lambdalegal.org
kpalazzolo@lambdalegal.org

20

James D. Esseks*
Leslie Cooper*
Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone: 212-549-2627
Facsimile:  212-549-2650
jesseks@aclu.org
lcooper@aclu.org
egill@aclunc.org
cstrangio@aclu.org

Paul M. Smith*
Scott B. Wilkens*
Luke C. Platzer*
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: 202-639-6000
Facsimile:  202-639-6066
psmith@jenner.com
swilkens@jenner.com
lplatzer@jenner.com

*Counsel for Plaintiffs*

*Appearing by special appearance pursuant to L.R. 83.1(d).

**CERTIFICATE OF SERVICE**

I, Christopher A. Brook, hereby certify that on September 30, 2016, I electronically filed the foregoing PLAINTIFFS' SUPPLEMENTAL DUE PROCESS BRIEF, as well as the exhibits thereto, using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher A. Brook_____
Christopher A. Brook

1