# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO *et al.*,

    Plaintiffs,

        *v.*

PATRICK MCCRORY *et al.*,

    Defendants

CASE NO. 1:16-CV-00236-TDS-JEP

**SUPPLEMENTAL BRIEF OF STATE DEFENDANTS AND INTERVENOR-DEFENDANTS IN OPPOSITION TO PLAINTIFFS' DUE PROCESS CLAIM**

# TABLE OF CONTENTS

Introduction ........................................................................................................... 1

Argument ............................................................................................................... 3

I.    HB2 does not implicate any informational privacy concerns and would be valid even if it did ........................................................................................ 3

    A.    HB2 implicates no due process concerns because it does not involve any government disclosure to begin with. ............................................. 4

    B.    Even assuming some government disclosure, HB2 does not require disclosure of confidential information. ................................................ 6

    C.    Even assuming the pertinent disclosure is a person's "transgender status," plaintiffs have not shown HB2 would result in disclosing that. .......... 10

    D.    Even if HB2 requires disclosure of private information, it is justified by compelling interests in privacy and safety ...................................... 13

II.    HB2 does not implicate any right to refuse unwanted medical treatment ............. 15

Conclusion .......................................................................................................... 20

Certificate of Service .......................................................................................... 22

# EXHIBITS

A. ..................................................................................... HB2 Legislative Transcripts

B ........................................................................................................ Executive Order 93

C ........................................................................................................ Charlotte Ordinance

D ................................................................................. DSM-V, "Gender Dysphoria"

E ............................................................................................ Affidavit of Catherine Ryan

F ............................................................................................ Dr. Paul Hruz Declaration

G ............................................................................... Dr. Quentin Van Meter Declaration

H ........................................................................................ Dr. Allan Josephson Declaration

I ....................................................................................... Dr. Lawrence Mayer Declaration

J ................................................................................................ Walt Heyer Declaration

K ......................................................................................Kenneth Lanning Declaration

L. ............................................................................. Sheriff Tim Hutchinson Declaration

M ..................................................................................................................Y.K. Declaration

N.................................................................................................................D.H. Declaration

O.................................................................................................................. S.H. Declaration

P............................................................................................Robert Gallagher Declaration

Q.................................................................................................................S.B. Declaration

R .................................................................................................................R.F. Declaration

Case 1:16-cv-00236-TDS-JEP   Document 173   Filed 10/28/16   Page 3 of 25

# INTRODUCTION

On March 23, 2016, the Public Facilities Privacy and Security Act (the "Act" or "HB2") was passed by the General Assembly and signed by Governor McCrory. Ex. A.[1] Part I requires public schools and agencies to designate multiple-occupancy restrooms, changing facilities, and showers according to "biological sex," while allowing single-occupancy facilities as an accommodation. HB2, Pt. I, §§ 1.2, 1.3.[2] The Act responded to the Charlotte City Council's ordinance—adopted February 22, 2016, and scheduled to take effect six weeks later on April 1—that would have required access to restrooms, showers, dormitories, and similar facilities based on "gender identity" and "gender expression," and would have applied to public and private entities, as well as anyone contracting with the City. Ex. C (*USA* Doc. 149-4).

HB2 has provoked legal challenges, including this motion seeking to preliminarily enjoin part I under Title IX, the Equal Protection Clause, and the Due Process Clause. Doc. 21. On August 26, 2016, this Court granted a limited preliminary injunction based on Title IX, denied an injunction based on equal protection, and requested additional briefing on plaintiffs' due process claims. Doc. 127 ("Order") at 81-82.

---

[1]    The legislative transcripts attached as Exhibit A have already been filed in the 425 case. *See United States v. State of North Carolina*, No. 1:16-cv-00425 (Docs. 149-5 to 149-8). They are attached, along with other exhibits from that case, to ensure that they form part of the record in both cases.

[2]    HB2 defines "biological sex" as "[t]he physical condition of being male or female, which is stated on a person's birth certificate." *Id.* §§ 1.2(A)(1); 1.3(A)(1). On April 12, 2016, Governor McCrory issued an executive order affirming HB2's application to cabinet agencies while also affirming anti-discrimination protections for state employees on the basis of "sex, sexual orientation, [and] gender identity." Ex. B (*USA* Doc. 149-3). The order also directed all agencies to provide "a reasonable accommodation" of single-occupancy facilities where practicable and "invited and encouraged" similar accommodations by "[a]ll council of state agencies, cities, counties, the University of North Carolina System and the North Carolina Community College System." *Id.*

Those due process claims assert that part I: (1) violates privacy rights by "requir[ing] the disclosure" of personal information about transgender people "to each person who sees them using a restroom or other facility inconsistent with their gender identity or gender expression" (Doc. 151, ¶ 213); and (2) violates the right to refuse unwanted medical treatment by "forc[ing] transgender people to undergo medical procedures" that may be inappropriate or unavailable (*id.* ¶ 219). They assert these claims on behalf of individual plaintiffs as well as the ACLU of North Carolina, which they estimate has about 8,500 members, "some of whom are transgender individuals." *Id.* ¶ 9; *see also id.* ¶ 127 (claiming "an estimated 37,800 transgender people" in North Carolina).

In their pleadings, plaintiffs define a "transgender individual" as someone whose "sex assigned at birth," as noted on a birth certificate, "does not accurately reflect his gender identity." *Id.* ¶ 22; *see also* Doc. 22 at 9 ("The term 'transgender' refers to individuals who have a gender identity that differs from the sex assigned to them at birth."). They define "gender identity" as "the person's internal sense of belonging to a particular gender." Doc. 151, ¶ 23; *see also* Doc. 22 at 9 (same). Plaintiffs explain that "gender dysphoria" is "the medical diagnosis for the clinically significant distress" transgender persons "can experience," because their gender identity diverges from their birth sex. Doc. 151, ¶¶ 26, 28.[3] They observe that treatment must be "individualized," but includes "accessing single-sex spaces such as restrooms and locker rooms" consistent with gender identity. *Id.* ¶ 29-31.

---

[3]     With respect to "gender dysphoria," plaintiffs reference "the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) (DSM-V)." *Id.* ¶ 28. For the Court's reference, the DSM-V chapter containing the referenced definition is attached as Exhibit D.

2

I. **HB2 DOES NOT IMPLICATE ANY INFORMATIONAL PRIVACY CONCERNS AND WOULD BE VALID EVEN IF IT DID.**

The Supreme Court has "assume[d], without deciding," that the Constitution protects a "privacy interest in avoiding disclosure of personal matters." *NASA v. Nelson*, 562 U.S. 134, 138 (2011) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977)). Even if it exists, however, "the right … is not absolute." Order at 61 (quoting *Walls v. Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990)). "'[T]he question is not whether individuals regard … information about themselves as private, which they surely do, but whether the Constitution protects such information.'" *D.M. v. Louisa Cty. Dep't of Human Servs.*, __ F.Supp.3d __, 2016 WL 3766441, at *3 (W.D. Va. July 8, 2016) (quoting *Adams v. Drew*, 906 F.Supp.2d 1050, 1057 (E.D. Va. 1995)). For instance, the right would only prevent "disclosure" of "information … within an individual's reasonable expectations of confidentiality," and is thus inapplicable "to the extent that th[e] information is freely available in public records." *Walls*, 895 at 192, 193.[4] And even if a law implicates informational privacy, it is justified if it is "reasonable" and does not result in "undue" disclosure of personal information. *NASA*, 562 U.S. at 151, 157.

---

[4]     *See also, e.g., Lucas v. Henrico Cty. Sch. Bd.*, 822 F.Supp.2d 589, 613 (E.D. Va. 2011) ("If information is made public or freely available in public records, such information cannot be deemed entitled to privacy protection.") (citing *Walls*); *Cunningham v. U.S. Veterans Affairs*, 2008 WL 3926452, at *2 (W.D. Va. Aug. 26, 2008) (observing "the right to privacy does not extend to information that is freely available in the public records") (citing *Walls*); *Taylor v. Miller*, 853 F.Supp. 305, 307-08 (W.D. Wis. 1994) ("No court has found that an individual has a fundamental privacy right in information that is a matter of the public record.") (citing *Walls, supra*; *Trade Waste Mgmt. Ass'n, Inc. v. Hughey*, 780 F.2d 221, 234 (3rd Cir. 1985); *Scheetz v. The Morning Call, Inc.*, 946 F.2d 202 (3rd Cir. 1991); *Puricelli v. Borough of Morrisville*, 820 F.Supp. 908 (E.D. Pa. 1993)).

For several reasons, plaintiffs are unlikely to succeed on their claim that HB2 unconstitutionally requires disclosure of private information.

### A.    HB2 implicates no due process concerns because it does not involve any government disclosure to begin with.

The premise of an informational privacy claim is that the government threatens to reveal, or actually reveals, private information. Privacy claims have challenged, for instance, government background checks into sensitive areas (*NASA*, 562 U.S. at 141-42; *Walls*, 895 F.2d at 190), and a government database that could have revealed narcotics prescriptions (*Whalen*, 429 U.S. at 599-604). They have also challenged intentional government disclosures, such as when a prison guard revealed to inmates that a fellow inmate was an HIV-infected transsexual, and when a policeman threatened to reveal an arrestee's sexual orientation to his family. *See Powell v. Schriver*, 175 F.3d 107, 109-111 (2nd Cir. 1999); *Sterling v. Borough of Minersville*, 232 F.3d 190, 192, 196 (3rd Cir. 2000)); *see also* Order at 66 ("most of Plaintiffs' cases" involve such scenarios).

HB2 does not involve the kind of government action common to informational privacy cases. The Act requires persons to use certain public facilities based on "biological sex," and refers to birth certificates only to specify what "biological sex" means. *See* HB2, § 1.3(b) (requiring facilities to be "designated for and only used by persons based on their biological sex"); *id.* § 1.3(a)(1) (defining "[b]iological sex" as "the physical condition of being male or female, which is stated on a person's birth certificate"). But the Act has nothing to do with how North Carolina compiles, manages, or releases the information on birth certificates. Nor does the Act require persons to

present their birth certificates before entering any facility. Consequently, HB2 fails to implicate any informational privacy right under the Due Process Clause.

Plaintiffs' claims confirm this. They do not challenge North Carolina's system for managing birth certificates. Nor do they allege that HB2 requires the government to release those documents or any information they contain. Nor do they allege that HB2 requires them to present a certificate before entering any facility. Instead, they allege only that HB2 "requires the disclosure" of personal information in the sense that a third party may "see[ ] them using a restroom or other facility inconsistent with their gender identity or gender expression." Doc. 151, ¶ 213. That is not a "disclosure" at all, however, and assuredly not the government disclosure contemplated in due process privacy cases. And plaintiffs have not identified any case recognizing a privacy claim based on the possibility that *third parties* may infer private information about someone. As the Court recognized, these gaps in plaintiffs' arguments raise serious questions as to "what extent *any* Due Process concerns are attributable to Part I." Order at 67 (emphasis added).

The decisions in *Love* and *K.L.* fail to support plaintiffs' privacy claim. As the Court has pointed out, those cases involved challenges to State policies for modifying public documents like driver's licenses or personal identification cards. Order at 66 (discussing *Love v. Johnson*, 146 F.Supp.3d 848 (E.D. Mich. 2015); *K.L. v. Alaska, Dep't of Admin., Div. of Motor Vehicles*, No. 3AN-11-05341, 2012 WL 2685183 (Alaska Sup. Ct. Mar. 12, 2012)). There, the plaintiffs claimed the government prevented them from altering such documents to reflect their gender expression, requiring them to present unaltered documents and reveal private information. *See, e.g., Love*, 146 F.Supp.3d at

851. Here, by contrast, plaintiffs do not challenge North Carolina's system for altering birth certificates or any other document. Instead, their claim is that—because HB2 requires plaintiffs to use certain public facilities—third parties may infer allegedly private information about them. Doc. 151, ¶ 213. Such a claim is not presented in, or supported by, the decisions in *Love* and *K.L.* or any other due process case.

**B.    Even assuming some government disclosure, HB2 does not require disclosure of confidential information.**

Even assuming HB2 requires some disclosure, any information disclosed is not protected by an informational privacy right for at least two reasons. First, at most the Act may result in disclosing a person's sex, which is not confidential information. Second, even assuming the Act may result in disclosing the sex listed on a birth certificate, that information is freely available in North Carolina public records.

First, by requiring persons to use certain facilities based on "biological sex," the Act may result at most in disclosing to some third parties the fact that a person is physiologically male or female. *See* Order at 55 (privacy interests justifying sex-separated facilities "arise from physiological differences between men and women"). But no case recognizes a person's constitutional right to keep private the *fact* of being physiologically male or female. To be sure, cases have recognized privacy protection for "intimate or personal … information," *Walls*, 895 F.2d at 192, but it would stretch that category beyond coherence to include within it the simple fact that one was born male or female. *Cf., e.g., Bloch v. Ribar*, 156 F.3d 673, 685-86 (6th Cir. 1998) (recognizing privacy interest in "personal sexual matters" such as the "confidential and intimate details of a rape"); *Eastwood v. Okla. Dep't of Corr.*, 846 F.2d 627, 631 (10th Cir. 1988)

6

(protected "personal sexual matters" include questions about an applicant's "sexual past") (citing *Thorne v. City of El Segundo*, 726 F.2d 459 (9th Cir. 1983)).

*Powell v. Schriver*—a Second Circuit decision noted in the Court's order (pp. 62-63)—does not stand for the broad proposition that a person's "biological sex" is private information for due process purposes. Instead, that case involved a prison guard's revealing to other inmates that a fellow inmate "had had a sex-change operation and was HIV-positive," which according to the Second Circuit implicated the inmate's "right to maintain medical confidentiality," especially in the volatile prison context. 175 F.3d at 109, 112-13. But if *Powell* stands for some broader proposition concerning the private nature of a person's biological sex, then it is contrary to Fourth Circuit law.[5]

Second, as the Court has suggested, one may argue that HB2 could result in disclosure—not merely of whether a person is physiologically male or female—but of the sex noted on a person's birth certificate. Even then, however, that information is "freely available in [North Carolina] public records." *Walls*, 895 F.2d at 193. North Carolina birth certificates contain "those items recommended by the federal agency responsible for national vital statistics," N.C. Gen. Stat. § 130A-102, among which is sex. *See* U.S. Centers for Disease Control, *U.S. Standard Certificate of Live Birth* (2003), *available at* http://www.cdc.gov/nchs/data/dvs/birth11-03final-ACC.pdf (listing "sex" as item on

---

[5]      *See, e.g., Sherman v. Jones*, 258 F.Supp.2d 440, 443 (E.D. Va. 2003) (observing that "*Whalen* points persuasively to the conclusion that there is no general fundamental constitutional right to privacy in personal medical information" and that "the Fourth Circuit has also declined invitations to declare a constitutional right to privacy in one's personal medical information") (citing *Watson v. Lowcountry Red Cross*, 974 F.2d 482, 487-89 n.2 (4th Cir. 1992); *Taylor v. Best*, 746 F.2d 220, 225 (4th Cir. 1984)); *Cooke v. U.S. Bureau of Prisons*, 926 F.Supp.2d 720, 736-37 (E.D.N.C. 2013) (noting that, "like the Supreme Court, the Fourth Circuit has never held that an inmate has a constitutional right to privacy in medical treatment") (and collecting cases).

7

standard birth certificate).[6] The sex listed on a North Carolina birth certificate is a "public record"[7] and not confidential. *See* Ex. E (decl. of N.C. State Registrar) at ¶ 8 (stating that "[a]lthough some information on a birth certificate is specifically designated confidential by law, the sex designation is not among that confidential information"). Moreover, as plaintiffs concede, anyone can obtain an uncertified copy of another person's North Carolina birth certificate. *See* Doc. 156 (Supp. Br.) at 2 (citing North Carolina Health and Human Services, Frequently Asked Questions, *available at* http://vital records.nc.gov/faqs.htm; North Carolina Health and Human Services, Order a Certificate, *available at* http://vitalrecords.nc.gov/order.htm); *see also* Ex. E at ¶ 6.

Thus, with respect to birth certificates, North Carolina is an "open records" state like several others.[8] Most other States have "closed" birth records. *See*, *e.g.*, Virginia

---

[6]     *See also* U.S. Centers for Disease Control, *Birth Edit Specifications for the 2003 Proposed Revision of the U.S. Standard Certificate of Birth*, at Item 3, pp. 1-2, (updated 3/18/2005) (recommending that birth records reflect "whether the infant is male, female or if the sex of the infant is not yet determined"), *available at* http://www.cdc.gov/nchs/data/dvs/birth_edit_specifications.pdf; U.S. Centers for Disease Control, *Guide to Completing the Facility Worksheet for the Certificate of Live Birth and Report of Fetal Death*, at 36 (No. 31) (2003 rev., updated May 2016) (noting that provider should "[e]nter whether the infant is male, female, or if the sex of the infant is ambiguous, enter 'unknown'), *available at* http://www.cdc.gov/nchs/data/dvs/GuidetoCompleteFacilityWks.pdf.

[7]     *See* N.C. Gen. Stat. § 130A-93(b) (providing that "[a]ll … birth data"—except for the names, addresses, and social security numbers of children and parents—"shall be public records pursuant to Chapter 132 of the General Statutes"); *id.* § 132-1(b) (providing that "public records and public information" compiled by the State and its subdivisions "are the property of the people" and that "the people may obtain copies of their public records and public information free or at minimal cost unless otherwise specifically provided by law"); *id.* § 132-1.2 (enumerating categories of "confidential information" that do not include "sex" on birth certificates).

[8]     *See* **California**, http://www.cdph.ca.gov/certlic/birthdeathmar/Pages/default.aspx ("Authorized Copy vs. Informational Copy") ("If you cannot obtain an authorized copy [of a birth or death certificate] under California law, you can obtain an informational copy … [which] contains the same information as an authorized copy" but cannot be used to "establish identity."); **Kentucky**, KRS §61.872 (providing "[a]ll public records shall be open for inspection by any person"); **Ohio**, https://www.odh.ohio.gov/vitalstatistics/vitalmisc/vitalstats.aspx) (FAQ 14: "[V]ital records (records of births, deaths, marriages and terminations of marriage) are considered to be public records by the State of Ohio. This means that anyone who can submit the basic facts of a certificate may request a copy of it."); **South Dakota**, S.D. Admin. Rule 44:09:06:08 (allowing electronic issuance of an "informational copy of

8

Dep't of Health, http://www.vdh.virginia.gov/vital-records/ (stating "[b]irth records are public information 100 years after the date of the event"); *see also generally* "State Public Records Laws," http://www.foiadvocates.com/records.html (providing links to public records laws of all 50 States). In contrast to those States, North Carolina law makes the sex listed on a birth certificate freely available in the public records. Therefore, even on the assumption that HB2 may result in "disclosing" that information for due process purposes—which, as explained, it does not—it would still not raise any informational privacy concerns.[9]

Plaintiffs assert that their privacy claims should not depend on whether HB2 requires disclosure of information that is publicly available, but instead on whether HB2 compromises their ability to "*control* … disclosure" of that information. Supp. Br. 3 (emphasis in original). This argument, however, depends on cases even further afield than the due process privacy cases discussed above. Plaintiffs' main authority is *Ostergren v. Cuccinelli*, 615 F.3d 263 (4th Cir. 2010), Supp. Br. at 2-4, a First Amendment case considering whether media outlets may be sued (or penalized by the government) for disseminating confidential information—such as when a television

---

a vital record"); **Vermont**, https://www.burlingtonvt.gov/CT/birth-certificates ("Birth certificates are considered to be public documents by the State of Vermont."); https://www.sec.state.vt.us/archives-records/vital-records/informational-copies.aspx ("Pursuant to 18 V.S.A. § 5002, there are no restrictions on public access to Vermont vital records."); **Washington**, https://www.vitalchek.com/birth-certificates/washington/washington-state-center-for-health-statistics ("Who can order? The State of Washington is an open record state, which means that anyone may order copies of Washington birth certificates, as long as they can provide the required information."); **Wisconsin**, https://www.dhs.wisconsin.gov/vitalrecords/birth.htm (stating that "[a]n uncertified copy of a birth certificate is available to anyone who applies … [and] will contain the same information as a certified copy but will not be acceptable for legal purposes, such as obtaining identification").

[9]     Plaintiffs do not limit their informational privacy claims only to persons born in particular States, nor do they raise a claim under the Privileges or Immunities Clause of the Fourteenth Amendment.

station broadcasts the name of a rape victim, or a newspaper publishes the names of juvenile offenders or confidential information leaked from a judicial inquiry commission. *See Ostergren*, 615 F.3d at 273-76 (discussing, *inter alia*, *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469 (1975); *Landmark Comm., Inc. v. Virginia*, 435 U.S. 829 (1978); *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979); *The Florida Star v. B.J.F.*, 491 U.S. 524 (1989)). In those cases, the loss of "control" over private information arose from widespread "dissemination" of the information by newspaper, television, or websites. *See, e.g., Ostergren*, 615 F.3d at 268 (describing activist plaintiff who "began posting copies of public records containing unredacted SSNs obtained from government websites" to protest government mishandling of confidential information). This case— which as already explained involves no cognizable "disclosure" to begin with—does not remotely involve the kinds of widespread media dissemination addressed by those First Amendment cases.[10]

### C. Even assuming the pertinent disclosure is a person's "transgender status," plaintiffs have not shown HB2 would result in disclosing that.

Plaintiffs suggest that HB2 requires "disclosure," not merely of their birth sex, but of their "transgender status." Supp. Br. 2, 4, 5. They hypothesize that third parties may infer from "an individual's physical appearance" that his birth sex diverges from his gender identity, and they argue this will result in unwanted disclosure of "information about their genitalia." *Id.* at 6, 5. Plaintiffs go so far as to claim that HB2 will turn

---

[10] Perhaps sensing the poor fit of these First Amendment cases, plaintiffs assert that HB2 forces transgender persons to become "walking billboard[s]" that "broadcast[ ] [their] transgender status and genital characteristics to the world around [them]." Supp. Br. 4. As explained in I.C, *infra*, plaintiffs' own allegations refute this exaggerated claim. In any event, plaintiffs do not even argue that any "disclosure" allegedly occasioned by HB2 approaches the kinds of widespread media dissemination of private information involved in cases like *Ostergren*.

10

transgender people into "walking billboard[s] that broadcast[ ] [their] transgender status and genital characteristics to the world around [them]." *Id.* at 4. These exaggerated claims are undermined by plaintiffs' own allegations and not supported by the evidence.

With respect to their due process claims, plaintiffs seek broad injunctive relief on behalf of an undifferentiated class of transgender members of the ACLU of North Carolina. *See* Doc. 151 at 48 (Count II) (asserting due process claim on behalf of "ACLU of NC"). While not specifying the class size, plaintiffs' allegations put the number into the thousands. *See id.* ¶ 9 (estimating 8,500 members of the ACLU-NC, "some of whom are transgender individuals"); *id.* ¶ 127 (claiming "an estimated 37,800 transgender people" in North Carolina). Moreover, plaintiffs define "transgender" persons as "individuals who have a gender identity that differs from the sex assigned to them at birth," Doc. 22 at 9, and "gender identity" as a "person's internal sense of belonging to a particular gender." Doc. 151, ¶ 23. They do not define someone as "transgender" based on appearance or on whether a person has undergone (or is undergoing) hormone therapy or surgery. Indeed, plaintiffs assert it is "inappropriate" to "classify[ ] someone as male or female" based on external physiological characteristics, and that a person's internal "[g]ender identity … should control" for purposes of "assign[ing] a particular gender to an individual." Doc. 22 at 10. The medical evidence referenced by plaintiffs and accompanying their preliminary injunction motion confirms that "transgender" status turns on one's internal sense of gender and not on appearance.[11]

---

[11] *See* Doc. 22-1 at ¶¶ 15 (Adkins decl.) (stating "[a] person's gender identity refers to a person's inner sense of belonging to a particular gender, such as male or female"); Ex. D (DSM-V) at 451 (defining "gender identity" as a "category of social identity [that] refers to an individual's identification as male, female, or occasionally, some category other than male or female"); *id.* (defining "transgender"

11

11

Consequently, Plaintiffs' own allegations make it extremely unlikely they could succeed on a due process claim premised on the theory that HB2 forces disclosure of "transgender status." They assert claims on behalf of a broad class of persons defined according to their purely *internal* sense of gender and not by external appearance or other external characteristics. But their privacy claims turn entirely on the notion that third parties will necessarily infer someone's "transgender status" merely because that person enters a restroom or other facility. *See, e.g.,* Order at 67 (explaining "Part I could only disclose an individual's transgender status inasmuch as third parties are able to infer as much in light of the person's birth certificate *and appearance*") (emphasis added). Nor have plaintiffs submitted evidence showing these sort of third-party inferences will inevitably occur. To be sure, they have selected individual plaintiffs who externally appear to be a sex different from their birth sex (due to hormone treatments or surgery or both), but their due process claims are on behalf of thousands of undifferentiated transgender individuals. According to plaintiffs' own allegations, someone may well fall within that group solely based on their "internal sense of belonging to a particular gender," without any reference to external appearance. And even assuming some subset of those persons have appearances tending to favor one sex or the other, plaintiffs have made no showing that it is necessarily the case that a "third party" will infer anything

---

as "the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender"); *cf. id.* (defining "transsexual" as "an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment and genital surgery"). Defendants' medical experts, while disagreeing with plaintiffs' theories on many other points, do not disagree on this point. *See* Ex. F (*USA* Doc. 149-9) at ¶¶ 10-12; Ex. G (*USA* Doc. 149-10) at ¶¶ 21-25; Ex. H (*USA* Doc. 149-11) at ¶¶ 12-21; Ex. I (*USA* Doc. 149-12) at ¶¶ 13-40; Ex. J (*USA* Doc. 149-13) at ¶¶ 17-31 (discussing concepts of "gender identity," "transgender," and "gender dysphoria").

about any particular person's "transgender status" based on the mere fact of their walking into a restroom or other facility.[12]

### D.    Even if HB2 requires disclosure of private information, it is justified by compelling interests in privacy and safety.

If HB2 implicates informational privacy rights under the Due Process Clause, plaintiffs claim it must satisfy strict scrutiny. Supp. Br. 14. That is incorrect. In *NASA v. Nelson*, the Supreme Court clarified that a law implicating informational privacy rights (assuming such rights exist), need not meet strict scrutiny. 562 U.S. at 153 ("reject[ing] the argument" that the government "has a constitutional burden to demonstrate that its [challenged background] questions are 'necessary' or the least restrictive means of furthering its interests").[13] Instead, *NASA* asked whether the government policy at issue was "reasonable," and then balanced the policy's rationales against any "undue" disclosure of personal information that might occur. *See id.* at 151 (concluding challenged questions were "reasonable, employment-related inquiries" that "further" government interests in "managing its internal operations"); *id.* at 157 (inquiring whether challenged policy would result in "*unwarranted* disclosures" or "*undue* dissemination" of "personal information collected by the Government") (emphases in original). Based on

---

[12]    Plaintiffs have not sought to certify a class of transgender persons based on any unifying feature of their external appearances or any other basis. *See* Doc. 161 (Ans. to 2nd Am. Compl.) at 47 (noting "plaintiffs have not followed the procedural requirements for pursuing a class action under the Federal Rules of Civil Procedure").

[13]    The Supreme Court emphasized that *NASA* was not breaking new ground on this issue. It explained that applying strict scrutiny would "run[ ] directly contrary to *Whalen*." *Id.* at 153 (discussing *Whalen*, 429 U.S. at 596-97). It also explained *Whalen*'s reasonableness analysis would apply regardless of whether the government was acting as a "regulator" or "the manager of its internal affairs." *NASA*, 562 U.S. at 153 (*Whalen*'s analysis "applies with even greater force where the Government acts, not as a regulator, but as the manager of its internal affairs").

13

that analysis, HB2 easily passes muster under the Due Process Clause, even assuming that it implicates informational privacy interests.

This Court has already determined that HB2's separation of intimate facilities by physiological sex is "substantially related" to the "important government interest" in the "protection of bodily privacy," and therefore easily satisfies intermediate scrutiny. Order at 49, 50, 56-60.[14] In light of that conclusion, HB2 is plainly "reasonable" under the less demanding due process privacy analysis. *See, e.g., NASA*, 562 U.S. at 153-54 (upholding background inquiries as "a reasonable position, falling within the wide latitude granted the Government in its dealings with employees") (internal quotes omitted).

Additionally—as explained in defendants' opposition to the United States' preliminary injunction motion, *see USA* Doc. 149—HB2 furthers compelling government interests in public safety in numerous ways, including by: (1) providing a "clear, objective standard" for determining who is authorized to access sex-separated restrooms and other intimate facilities, *id.* at 20, 26; (2) decreasing the ability of sex offenders to exploit subjective access policies (like the Charlotte Ordinance) to gain entry to intimate public facilities, *id.* at 22-23; (3) enhancing the ability of law enforcement officials to enforce pre-existing laws dealing with crimes such as peeping, indecent exposure, or trespass, *id.* at 28-29; and (4) protecting vulnerable persons whose histories of abuse

---

[14] In reaching this conclusion, the Court correctly relied on Supreme Court and Fourth Circuit precedent indicating that "the sexes are primarily defined by their differing physiologies." Order at 52-55 (discussing *Virginia v. United States*, 518 U.S. 515 (1996); *Tuan Anh Nguyen v. INS*, 533 U.S. 53 (2001); *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), *petition for cert. filed* (No. 15-1489) (Jun. 6, 2016)). The Court did not rely on plaintiffs' "expert declarations stating that from a 'medical perspective,' gender identity is the only 'appropriate' characteristic for distinguishing between males and females." Order at 51-52. As the Court noted, however, defendants have submitted contrary expert evidence in the United States case. *Id.* at 52 n.32; *see also* Exs. F-J (*USA* Docs. 149-9 to 149-13).

14

make them extremely apprehensive at the prospect of encountering persons of the opposite biological sex in intimate facilities, *id.* at 24-25.[15]

Finally, given the compelling privacy and safety interests furthered by HB2, any incidental disclosure of personal information linked to HB2 does not tip the balance. As already explained, it is doubtful that HB2 results in any government "disclosure" *at all* for due process purposes, and even if it did, any disclosure would be of information in which people have no reasonable expectation of confidentiality. *See supra* I.A, I.B. But even assuming HB2 may potentially result in disclosure of a person's "transgender status," as plaintiffs claim, any such disclosure would result only from the happenstance that a third party might "infer" from a person's appearance that his gender identity diverges from his birth sex. *See supra* I.C. Any incidental disclosure of information is insufficient to outweigh the compelling privacy and safety concerns furthered by HB2. *See, e.g., NASA*, 562 U.S. at 157 (observing that no "ironclad disclosure bar is needed" to protect putative constitutional privacy rights).

## II.  HB2 DOES NOT IMPLICATE ANY RIGHT TO REFUSE UNWANTED MEDICAL TREATMENT.

Plaintiffs' contention that HB2 violates the unconstitutional conditions doctrine by forcing them to undergo unwarranted medical procedures also fails. Supp. Br. at 9-10. Under the unconstitutional conditions doctrine, "the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 545 (1983).  HB2 does not involve imposition of

---

[15]     Defendants supported these public safety rationales through HB2's legislative record, *see id.* at 5-6, 20-22, and also offered the opinions of two public safety experts, *see* Ex. K (*USA* Doc. 149-14); Ex. L (*USA* Doc. 149-15), as well as witness testimony, *see* Exs. M-R (*USA* Docs. 149-16 to 149-21).

15

any such condition. Instead, it merely codifies the time-honored practice of separating certain facilities on the basis of biological sex. *See* HB2, Pt. I, §§ 1.2, 1.3. Because the United States Constitution indisputably permits a government to limit access to facilities in which individuals are partially or wholly undressed according to sex, HB2 cannot be said to impose any unconditional conditions.

As the Court previously noted, plaintiffs' argument would cast constitutional doubt on a wide array of laws, including those that require students to be immunized before enrolling in school and those that require some individuals to wear corrective lenses before operating a motor vehicle. *See* Order at 69-70 (citing N.C. Gen. Stat. § 130A-155 and 19A N.C. Admin. Code § 3B.0201(a)(3)). In point of fact, the logic of plaintiffs' position would result in strict scrutiny for any law that implicates an individual's physical condition. Plaintiffs do not appear to contest that this is true, but nevertheless insist that courts would not overturn these other laws—even though they would, according to plaintiffs, be subjected to strict scrutiny.

Unfortunately for plaintiffs' efforts to offer such soothing assurances, the cases they cite for support of their approach did not present challenges under the unconstitutional conditions doctrine and do not provide examples of how plaintiffs' novel analytical scheme would work in practice. *See* Supp. Br. at 13. In the case plaintiffs cite involving a state regulation on the types of corrective lenses that would be permitted to qualify a person for a driver's license, the court considered the plaintiffs' constitutional challenge using only rational basis review. *Sharon v. Larson*, 650 F.Supp. 1396, 1404 (E.D. Pa. 1986) ("[T]he regulatory ban on bioptic lenses rests upon a *rational* factual

16

foundation, and is *rationally* related to the State's *legitimate interest* in promoting highway safety.") (italics added). Rational basis review was similarly applied in considering the regulation at issue in plaintiffs' other case involving regulation of a driver's vision. *Allard v. Dep't of Transp.*, 609 A.2d 930, 938 (R.I. 1992) ("[T]he visual requirements … do in fact bear a *logical and rational relation* to the legislative aim of protecting the public's safety and welfare on the state's roadways.") (italics added). Likewise, plaintiff's third case, *Sherr v. Northport-East Northport Union Free School District*, 672 F.Supp. 81 (E.D.N.Y. 1987), did not involve a broad based challenge to the constitutionality of requiring immunizations of children as a condition of attending school. That case instead concerned whether the scope of a religious exemption provided by state statute was constitutionally valid. 672 F.Supp. at 84. Indeed, despite finding a "compelling interest … in fighting the spread of contagious diseases through mandatory inoculation programs," the district court actually held that the state could *not* require one of the two sets of plaintiff parents to immunize their child prior to her being enrolled in school. *Id.* at 88, 99. As such, plaintiffs' examples provide little guidance for cabining the reach of strict scrutiny under the unconstitutional conditions doctrine for any laws that might burden a person's desire to avoid medical treatment.

It is true that under the Due Process Clause "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990). No case cited by plaintiffs, however, has ever found that a law like HB2 results in coercing or forcing unwanted medical treatment in a manner that violates the Due Process Clause. Indeed,

17

the only case cited by plaintiffs in their supplemental brief that even concerns surgery, *King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016), is not even an unconstitutional conditions doctrine case. Instead, the Fourth Circuit there held that, for purposes of a Rule 12(b)(6) motion to dismiss, a prisoner stated a valid § 1983 claim where prison officials allegedly conducted unwanted surgery, without a sufficient reason, to remove marbles previously implanted in the prisoner's penis. In holding that the plaintiff could state a claim, the court dispensed with the argument that the plaintiff could have refused the surgery because it was alleged that, had he done so, he would have been placed in solitary confinement and lost eligibility for parole—a threat the court found sufficiently severe to obviate the plaintiff's consent. 825 F.3d at 217. In contrast, HB2 does not involve anything on the level of choosing between unwanted surgery and the threat of unjustified confinement apart from others. *See Davis v. Ayala*, 135 S.Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (noting the "human toll wrought by extended terms of isolation" and stating that "even for prisoners sentenced to death, solitary confinement bears a further terror and peculiar mark of infamy") (internal citation and quotation marks omitted).

Quite simply, neither the Supreme Court nor the Fourth Circuit has ever found a violation of the unconstitutional conditions doctrine based on so tenuous a connection between the benefit allegedly conferred and the right allegedly to be surrendered. Contrary to plaintiffs' suggestion, Supp. Br. at 10, this is not a case where the government attempts to compel an uncompensated taking of property as an express condition for issuance of a land use permit, *Koontz v. St. Johns River Water Mgmt. Dist.*,

133 S.Ct. 2586, 2593 (2013), or expressly requires suspicionless drug tests (a form of unreasonable search) in order to receive public assistance, *Lebron v. Sec'y, Fla. Dep't of Children and Families*, 710 F.3d 1202, 1217 (11th Cir. 2013), or even expressly conditions the right to register to vote on provision of a Social Security Number, which is then made publicly available, *Greidinger v. Davis*, 988 F.2d 1344, 1352 (4th Cir. 1993). Rather, HB2 simply codifies a commonsense principle that plaintiffs disclaim any desire to overturn: men and women should use separate multiple-occupancy restrooms, showers, and changing facilities. The corollary to such a rule is that, when a person changes sex through surgery, that person must use the facility that corresponds with the individual's new sex. HB2 accomplishes just that. The choice of what sex to be remains with the individual, and the only consequence that attends that choice is a constitutional one— namely, using the facility that matches the individual's current biological sex.

Though plaintiffs argue that HB2 denies them the benefit of using the multiple occupancy restrooms, showers, and changing facilities that "correspond[] with Plaintiffs' gender identity" (Supp. Br. at 12), North Carolina law has never recognized such a *gender identity*-based benefit for any individual, and more importantly the Constitution does not compel the state to recognize such a benefit. *See* Order at 47-60. To the contrary, this Court has already ruled that HB2 involves a commonly recognized example of a *sex*-based classification. Order at 48. Accordingly, no benefit is ever actually denied to any individual under HB2 because, at all times, a person is accorded the full protections of the Equal Protection Clause based on sex.

19

Moreover, this Court has already held that HB2's sex-based classification satisfies intermediate scrutiny. *See* Order 48-49, 59-60. By attempting to re-characterize HB2's permissible sex-based classification as an issue of unconstitutional conditions involving coerced medical treatment, however, plaintiffs invite this Court to apply strict scrutiny in contravention of binding precedent. Acceptance of such a radical position would mean that all state and federal laws involving sex-based classifications must hereafter be reviewed under strict scrutiny because in each such case any individual—whether transgender or not—is denied a benefit designated for the other sex unless he or she undergoes surgery to change sex. Of course, this is not the approach that the Supreme Court has countenanced, as it has made quite clear that sex-based classifications are subject to intermediate, rather than strict scrutiny, and plaintiffs cannot overturn Supreme Court precedent by purporting to recast the issue into a question involving the unconstitutional conditions doctrine. *See United States v. Virginia*, 518 U.S. 515, 532-33 (1996). HB2 thus does not impose an unconstitutional condition but rather describes a constitutional reality about sex-based classifications for certain state facilities. Because HB2 is perfectly consistent with Supreme Court and Fourth Circuit precedent regarding sex-based classifications, plaintiffs' arguments against it are without merit.

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for preliminary injunction based on their due process claims.

20

Respectfully submitted,

By: /s/ Karl S. Bowers, Jr.
Karl S. Bowers, Jr.*
Federal Bar #7716
*Counsel for the State of North Carolina,
Governor McCrory, and the North
Carolina Department of Public Safety*
BOWERS LAW OFFICE LLC
P.O. Box 50549
Columbia, SC  29250
Telephone:  (803) 260-4124
E-mail:  butch@butchbowers.com
*appearing pursuant to Local Rule 83.1(d)

By: /s/ Robert C. Stephens
Robert C. Stephens (State Bar #4150)
*Counsel for the State of North Carolina
and Governor McCrory*
General Counsel
Office of the Governor of North Carolina
20301 Mail Service Center
Raleigh, NC  27699
Telephone:  (919) 814-2027
E-mail:  bob.stephens@nc.gov
*appearing as Local Rule 83.1 Counsel

By: /s/ Robert N. Driscoll
Robert N. Driscoll*
*Counsel for the State of North Carolina,
Governor McCrory, and the North
Carolina Department of Public Safety*
McGLINCHEY STAFFORD
1275 Pennsylvania Avenue NW
Suite 420
Washington, DC  20004
Telephone:  (202) 802-9950
E-mail:  rdriscoll@mcglinchey.com
*appearing pursuant to Local Rule 83.1(d)

By: /s/ William W. Stewart, Jr.
William W. Stewart, Jr.
        (State Bar #21059)
Frank J. Gordon (State Bar #15871)
B. Tyler Brooks (State Bar #37604)
*Counsel for the State of North Carolina,
Governor McCrory, and the North
Carolina Department of Public Safety*
MILLBERG GORDON STEWART PLLC
1101 Haynes Street, Suite 104
Raleigh, NC  27604
Telephone:  (919) 836-0090
E-mail:  bstewart@mgsattorneys.com
fgordon@mgsattorneys.com
tbrooks@mgsattorneys.com

By: /s/ S. Kyle Duncan
S. Kyle Duncan* (DC Bar #1010452)
Gene C. Schaerr* (DC Bar #416638)
*Counsel for President Pro Tempore
Phil Berger and Speaker Tim Moore*
SCHAERR|DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC  20006
Telephone:  (202) 714-9492
E-mail:  kduncan@schaerr-duncan.com
 *appearing pursuant to Local Rule 83.1(d)

By: /s/ Robert D. Potter, Jr.
Robert D. Potter, Jr. (State Bar #17553)
*Counsel for President Pro Tempore
Phil Berger and Speaker Tim Moore*
2820 Selwyn Avenue, #840
Charlotte, NC  28209
Telephone:  (704) 5522-7742
E-Mail:  rdpotter@rdpotterlaw.com

21

**CERTIFICATE OF SERVICE**

I certify that, on this date, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participating attorneys.

This the 28th day of October, 2016.

/s/ S. Kyle Duncan
S. Kyle Duncan (DC Bar #1010452)
*Counsel for President Pro Tempore*
*Phil Berger and Speaker Tim Moore*
SCHAERR|DUNCAN LLP
1717 K Street NW, Suite 900
Washington, DC  20006
Telephone:  (202) 714-9492
E-mail:  kduncan@schaerr-duncan.com