**EXHIBIT A**

1

NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA HOUSE OF REPRESENTATIVES

---

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION, DEBATE ON HOUSE BILL 2

---

In Raleigh, North Carolina

Wednesday, March 23, 2016

Transcribed by Brad Worley

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

## 2

1            (Beginning of audio.)
2            SPEAKER MOORE:  Representatives
3    Blackwell, Bryan and Schaffer are recognized to
4    send forth a committee report.  The Clerk will
5    read.
6            CLERK:  Representatives Blackwell, Bryan
7    and Schaffer, Judiciary IV Committee report, House
8    Bill 2, Public Facilities Privacy and Security Act,
9    favorable.
10           SPEAKER MOORE:  Calendar.  Members on
11   motion of Representatives Brawley, Moore, Bishop
12   and all members of the Mecklenburg delegation, the
13   Chair is happy to extend the courtesies of the
14   gallery to City Councilmen Ed Driggs and LaWana
15   Mayfield.  Would you all please stand so we can
16   recognize you and thank you for being with us
17   today?
18           (Applause.)
19           Calendar.  House Bill 2.  The Clerk will
20   read.
21           CLERK:  Representatives Bishop, Stam,
22   Howard and Steinburg.  House Bill 2, A Bill to be
23   Entitled Acts to Provide for Single-Sex Multiple
24   Occupancy Bathrooms and Changing Facilities in
25   Schools and Public Agencies and to Create Statewide

## 3

1    Consistency and Regulation of Employment and Public
2    Accommodations.  The General Assembly of North
3    Carolina enacts.
4            SPEAKER MOORE:  For what purpose does the
5    gentleman from Wake, Representative Stam, arise?
6            REP. STAM:  To speak on the bill.
7            SPEAKER MOORE:  The gentleman has the
8    floor to debate the bill.  Members of the House
9    will come to order.  Members are asked to please
10   take their seats, or if members would like to have
11   a conversation, would ask members to please step
12   off the floor to do so.  The gentleman from Wake
13   has the floor to debate the bill.
14           REP. STAM:  Thank you, Mr. Speaker.
15   Members of the House, this is a common sense bill
16   that protects the privacy expectations of our
17   citizens, while clarifying local authority.
18   Representative Bishop will give us a
19   paragraph-by-paragraph explanation.  Would the
20   House indulge me if I went into history, just
21   the -- three or four minutes?
22           In 1669, the first law passed by the
23   Assembly, the Albemarle Assembly, protected debtors
24   fleeing from Virginia and South Carolina.  This was
25   not a good thing for commerce.  In 1787, the

## 4

1    United -- the Articles of Confederation, we
2    realized that we needed a true nation, and so the
3    Constitution protects interstate commerce and
4    requires the recognition of foreign judgments so
5    that we can collect the debts from those people in
6    Representative Tine's and Steinburg's districts.  I
7    think they're still there.  If they move toward
8    free flow of commerce and interstate commerce --
9    and that's why the United States is the economic
10   powerhouse of the world, plus natural resources.
11           In North Carolina, there's been a
12   continual struggle for free intrastate commerce.
13   Until 1835, people came down here to Raleigh: they
14   didn't have nice seats like this, but they came to
15   the other building, and they brought all sorts of
16   crazy economic things that would just apply to
17   their town.  And in the Constitution of 1835, we
18   said in Article 2, Section 24, there'll be no local
19   bills on trade.  We want intrastate commerce to be
20   free.  That is one of the main thrusts of this
21   bill, that when people want to do business, in this
22   state, on matters of employment rights, that
23   there'll be a common market without -- throughout
24   the state.
25           Common expectations.  If a person travels

## 5

1    to Hickory, they don't expect a different rule in
2    the government facilities of Hickory of who can be
3    in -- who can be in a washroom.  They don't want --
4    if they want to bid on a contract in Hickory, they
5    can expect that they can pay their employees
6    according to the law and there won't be some
7    special deal just for Hickory.  This will help the
8    economy of the state greatly and recognize the
9    privacy rights of every citizen of this state.
10           SPEAKER MOORE:  For what purpose does the
11   gentleman from Mecklenburg, Representative Bishop,
12   rise?
13           REP. BISHOP:  To debate the bill.
14           SPEAKER MOORE:  The gentleman has the
15   floor to debate the bill.
16           REP. BISHOP:  Thank you, Mr. Speaker.  As
17   we just did, in a good committee meeting, I'd like
18   to, briefly, tick through the three parts of the
19   bill and address the various components, for the
20   benefit of all the members.
21           The bill begins with a recitation of the
22   constitutional principles that Representative Stam
23   just referred to, that the General Assembly may not
24   enact local laws on -- or local acts -- regulating
25   labor, trade, mining and manufacturing, topics of

Case 1:16-cv-00236-TDS-JEP   Document 149-1   Filed 08/29/16   Page 3 of 75

## 6

1    commerce, business, and also that localities,
2    cities and counties, have the powers that are
3    delegated to them by the General Assembly.
4    Beginning with that premise, we then have three
5    parts of the substantive provisions of the bill.
6         Part one concerns single-sex multiple
7    occupancy bathroom and changing facilities and
8    within that part there are two sections:  one for
9    K-12 public schools, one for state agency local
10   government facilities.  In both instances, what
11   we're establishing is that bathrooms and other
12   distinctly private facilities will be maintained
13   according to -- and designated according to
14   biological sex, and that the usage of them will be
15   in accordance with that.
16        Biological sex, the sections both state,
17   is the physical condition of being male or female,
18   which is stated on a person's birth certificate.  I
19   made the point in committee and will make it again
20   here, that our existing laws concerning the content
21   of birth certificates provides that if someone has
22   sex-reassignment surgery and that's certified by a
23   physician, their birth certificate can be amended
24   as to the gender.  Both of these provisions, in
25   setting forth that if there are multiple occupancy

## 7

1    facilities, they'll be by sex, also says that there
2    is nothing to preclude any of these government
3    bodies from having single-sex or having -- having
4    single occupancy facilities that are designated
5    according to sex or unisex.
6         Nor are -- and there also are several
7    exceptions that apply.  For example, if someone
8    needs to go into the restroom or changing facility
9    to assist another person, and those are set forth
10   in detail.
11        The second part of the bill goes to the
12   part -- second and third parts relate to clarifying
13   the limits of local authority, for the sake of
14   having uniform and statewide consistency in
15   business regulation.  So part two makes those
16   provisions in two respects.
17        If you look at sections 2.2 and 2.3 on
18   Page 4, those say that when a local government
19   contracts with a vendor, a contractor to build a
20   building or a contractor to sell something, or
21   contracts for competitions for professional
22   services, in those events, cities and counties
23   cannot impose employment practices and/or policies
24   concerning the sales or -- or provision of goods,
25   services or accommodations to the public through

## 8

1    their contracting relationships.
2         I'm sorry.  I omitted to mention one
3    thing about the first part that's very, very
4    important.  As I said, as to multi-occupancy
5    bathroom facilities and other distinctly private
6    facilities, the regulation concerns government
7    facilities only.  It mandates nothing with respect
8    to private businesses.  They're free to adopt the
9    policies they seem -- they deem most appropriate.
10   So, back to part two.
11        Governments, local governments, cannot
12   impose employment and selling policies on their
13   contracting partners, who are private businesses.
14   And the third provision, which I'm going to come to
15   last, Section 2.1, makes clear that local
16   governments also cannot mandate wage practices in
17   private businesses.
18        And the reason it's here is because the
19   two provisions that we've modified in Sections 2.2
20   and 2.3 previously were modified in 2013 to make
21   clear that local governments could not mandate wage
22   policies through their contracting.  We've now
23   generalized that, appropriately, and we've made it
24   a subject of what we call field preemption.
25        The North Carolina Wage and Hour Act

## 9

1    already provides a complete and integrated
2    legislative scheme regulating wages and conditions
3    of employment, and we simply added a statement that
4    the law, candidly, already should reflect -- I
5    mean, that is to say, it is the law, although some
6    may dispute it or some may attempt to overstep it,
7    that the Wage and Hour Act preempts local
8    governments and -- and disallows them from
9    regulating in the same field.  They cannot regulate
10   wage policy of private businesses.  They can set
11   wage policy for themselves any way they want to.
12        Part 3 concerns protection of rights in
13   employment and public accommodations.  For the
14   first time, we are proposing that the General
15   Assembly enact a statement, a public policy
16   statement, on public accommodations discrimination,
17   disapproving that.  Since 1976, we've had a
18   parallel statement of public policy against
19   employment discrimination.  And both of these
20   policies cover all suspect and quasi-suspect
21   classifications recognized by the United States
22   Supreme Court:  race, color, religion, national
23   origin, sex.  They also cover, in the one instance,
24   the employment discrimination, age and handicap.
25        Those two are not added to the statement

Case 1:16-cv-00425-TDS-JEP   Document 149-5   Filed 08/29/16   Page 4 of 75

## 10

1    of public policy concerning public accommodations
2    discrimination. I'd like to take just a moment to
3    explain why. Age is uniquely appropriate for
4    protection in the -- in the employment
5    circumstance, and -- and that's why it appears in
6    the Employment Policy and not in the Public
7    Accommodations Policy. Handicap is actually
8    covered comprehensively in Employment as well as in
9    Public Accommodations in another part of the
10   General Statutes, Chapter 168A.
11        And there was a case in 2015 from the
12   Court of Appeals on the employment discrimination
13   side, in which the fact that handicap is mentioned
14   here, but not robustly treated here, a plaintiff
15   lost rights by bring their claim for relief under
16   the wrong law. The Court said had they proceeded
17   under 168A, they wouldn't have fallen into the trap
18   of not having secured their rights most robustly.
19   So, we've omitted that, because it would only be
20   window dressing to repeat that in the public
21   accommodations non-discrimination part.
22        But this is historic. There's never been
23   such a statewide non-discrimination statement on
24   public accommodations in North Carolina, and we're
25   doing it here. For both of these statements of

## 11

1    public policy, we've also done something else that
2    clarifies law: clarifies law concerning the
3    authority of localities. And that is to say, to
4    state, even though it would have otherwise been
5    evident in a court decision, that these -- that we
6    are regulating the field comprehensively. We are
7    preempting the field. That means that localities
8    are not free to adopt a patchwork of inconsistent
9    law governing these business practices across the
10   state.
11        In each case, that is to say in the
12   employment practices or employment discrimination,
13   as well as public accommodations discrimination
14   policy statements, the Human Resources Commission
15   of the Department of Administration is empowered to
16   receive complaints, investigate and conciliate
17   complaints arising under those areas.
18        Also, for the sake of consistency, places
19   of public accommodation -- the definition is
20   borrowed, by reference, from the Disability --
21   Anti-Discrimination Statute so that, again, we
22   don't have inconsistency in terms of what
23   constitutes a public accommodation.
24        The remainder of the bill, other than a
25   severability provision, is Part 5, and it merely

## 12

1    provides that this act becomes effective when it
2    becomes law and applies to any action taken on or
3    after that date, to any ordinance, resolution,
4    regulation or policy adopted or amended after -- on
5    or after that date or to any contract entered into
6    on or after that date. However, the provisions
7    concerning preemption will apply immediately, and
8    to prior ordinances, preempting those and ending
9    their effect as a matter of law. Thank you, Mr.
10   Speaker.
11        REP. JACKSON: Mr. Speaker?
12        SPEAKER MOORE: Just -- just a -- just a
13   moment, if you would. The Chair would like to
14   extend the courtesies of the floor to two
15   individuals. First of all, former Representative
16   Rick Glazier, who recently retired from us. Rick,
17   glad to have you here today with us. Please join
18   me in welcoming Representative Glazier.
19        (Applause.)
20        Additionally, the Chair is happy to
21   extend the courtesies of the gallery to
22   Representative-Elect Holly Grange, who will be
23   replacing Representative Catlin from New Hanover
24   County. Glad to have you here as well today.
25        (Applause.)

## 13

1        REP. JACKSON: Mr. Speaker? Mr. Speaker?
2        SPEAKER MOORE: And the Chair is not
3    being too presumptive: she has no opponent in the
4    fall, so -- let's see. The gentleman -- I believe
5    the Chair noticed Representative Jackson stood
6    first. So, for what purpose does the gentleman
7    from Wake, Representative Jackson, rise?
8        REP. JACKSON: To ask Representative
9    Bishop a question about his explanation.
10       SPEAKER MOORE: Does the gentleman from
11   Mecklenburg yield to the gentleman from Wake?
12       REP. BISHOP: I do.
13       SPEAKER MOORE: He yields.
14       REP. JACKSON: Representative Bishop,
15   thank you for that. I'm looking at Page 4, Section
16   3.2. Right at the bottom of the page, there's a
17   line. The new part of that section reads, "This
18   article does not create and shall not be construed
19   to create or support a statutory or common law
20   private right of action, and no person may bring
21   any civil action based upon the public policy
22   expressed herein." Do you see that?
23       REP. BISHOP: I do.
24       REP. JACKSON: I'll --
25       SPEAKER MOORE: Does the gentleman yield

Case 1:16-cv-00236-TDS-JEP   Document 170-1   Filed 08/29/16   Page 5 of 35

## 14

1  to an additional question?
2  REP. BISHOP: I yield.
3  SPEAKER MOORE: He yields.
4  REP. JACKSON: And would I be correct if
5  I stated that Section 143-422.2 is also in that
6  same article? Is that correct?
7  REP. BISHOP: That is correct.
8  REP. JACKSON: And -- Mr. Speaker, follow
9  up.
10  SPEAKER MOORE: Gentleman wish to ask an
11  additional question?
12  REP. JACKSON: I do.
13  SPEAKER MOORE: And does the gentleman
14  from Mecklenburg yield to an additional question?
15  REP. BISHOP: I yield.
16  SPEAKER MOORE: He yields.
17  REP. JACKSON: And so the effect of
18  putting that line in this -- in this proposed
19  legislation would be to eliminate all wrongful
20  discharge state law lawsuits against public policy.
21  Is that correct?
22  REP. BISHOP: No.
23  REP. JACKSON: Follow-up?
24  SPEAKER MOORE: Does the gentleman yield
25  to an additional question?

## 15

1  REP. BISHOP: I yield.
2  SPEAKER MOORE: He yields.
3  REP. JACKSON: Does it not say that no
4  person shall bring any civil action based upon the
5  public policy expressed herein?
6  REP. BISHOP: That's what it says.
7  REP. JACKSON: But you don't believe --
8  SPEAKER MOORE: Does the gentleman
9  yield -- does the gentleman yield to an additional
10  question?
11  REP. BISHOP: I yield.
12  SPEAKER MOORE: He yields.
13  REP. JACKSON: But it's your belief that
14  you would still have a Section 422.2 wrongful
15  discharge against public policy lawsuit if this
16  bill passes?
17  REP. BISHOP: There is no such thing as a
18  422.2 wrongful discharge lawsuit. There is -- if I
19  may explain.
20  The courts of North Carolina, under the
21  common law, have created a right of action for --
22  for violation of public policy in a termination of
23  employment. But it's not created by the statute.
24  It exists as a matter of common law, and it can
25  exist for a variety of public policy violations.

## 16

1  This is one of them. That is to say, this has been
2  read by courts to provide the basis of -- one of
3  the examples of a basis for public policy discharge
4  claim for relief.
5  And it's true, this language would end
6  that particular action, but in those cases, if
7  there is an employment discrimination violation,
8  the plaintiff in that situation, already has far
9  more robust relief under Title 7 of the federal
10  Civil Rights Act of 1964 than they have under this
11  provision. It costs them nothing substantively and
12  was necessary to make parallel the two provisions
13  that we are proposing to enact.
14  REP. JACKSON: Follow-up, Mr. Speaker?
15  SPEAKER MOORE: Does the gentleman yield
16  to an additional question?
17  REP. BISHOP: I yield.
18  SPEAKER MOORE: He yields.
19  REP. JACKSON: You would agree with me
20  that federal court rights and state court rights
21  would be two different constitutional rights. Is
22  that correct?
23  REP. BISHOP: Well, we're talking about
24  statutory rights, not constitutional rights, but
25  yes. The Title 7 has far more robust private

## 17

1  rights and remedies for someone who suffers
2  employment discrimination than are afforded by this
3  statute here -- or afforded as -- by virtue of the
4  public policy expressed in this statute.
5  REP. JACKSON: Follow-up, Mr. Speaker?
6  SPEAKER MOORE: Does the gentleman from
7  Mecklenburg yield to an additional question?
8  REP. BISHOP: I yield.
9  SPEAKER MOORE: He yields.
10  REP. JACKSON: Okay. So, looking at the
11  case law under that statute, there was a lady who
12  was fired for wrongful discharge because she
13  refused to provide sexual favors to her employer,
14  and the court held that she would have a case for
15  wrongful discharge under Statute 143-422.2 in state
16  court, and I ask you if we pass this law, would she
17  still have that right tomorrow?
18  REP. BISHOP: Well, I don't know if
19  that's an accurate reading of what the case would
20  say. It may say that she has a right of action for
21  public -- for -- for public -- discharge in
22  violation of public policy informed by this
23  statute, but it wouldn't be brought under the
24  statute. And she certainly would have a claim for
25  relief under Title 7, with rights of back pay,

Case 1:16-cv-00236-TDS-JEP   Document 170-1   Filed 08/29/16   Page 6 of 75

## 18

1  front pay, reinstatement, punitive damages,
2  attorney's fees, et cetera. She'd have, as I said,
3  far more robust relief under Title 7 than she would
4  have under this -- under the public policy
5  termination common law right of action informed by
6  this statement of public policy, along with many
7  other states of -- statements of public policy.
8      REP. JACKSON: Follow up, Mr. Speaker?
9      SPEAKER MOORE: Does the gentleman from
10 Mecklenburg yield to an additional question?
11     REP. BISHOP: I yield.
12     SPEAKER MOORE: He yields.
13     REP. JACKSON: If this young lady lived
14 in -- if she lived at the coast, where would she
15 file such a Title 7 action?
16     REP. BISHOP: She would file a charge of
17 discrimination with the Equal Employment
18 Opportunity Commission, and from that point -- I
19 mean, I can go through the whole process with you
20 if you want to, but she would file it in a regional
21 EEOC office --
22     REP. JACKSON: Right.
23     REP. BISHOP: -- originally. And then,
24 depending on how the charge was disposed of, she or
25 the EEOC would bring the -- a lawsuit in the

## 19

1  appropriate court where she lives. So, if you're
2  asking -- maybe you're asking about which court
3  system. She could bring it in state or federal
4  court. It could be removed to federal court.
5  That's usually what employers want to do.
6      REP. JACKSON: Follow up, Mr. Speaker?
7      SPEAKER MOORE: Does the gentleman yield
8  to an additional question?
9      REP. BISHOP: I yield.
10     SPEAKER MOORE: He yields.
11     REP. JACKSON: How about an employee who
12 is filed -- who is wrongfully discharged because of
13 their race? Would they have a state claim of
14 action, after this bill passes?
15     REP. BISHOP: They would have a federal
16 claim for relief under Title 7. They also would
17 have another claim for federal relief under 42 --
18 42 USE 1981.
19     REP. JACKSON: Final question, Mr.
20 Speaker.
21     SPEAKER MOORE: Does the gentleman yield
22 to a final question?
23     REP. BISHOP: I yield.
24     SPEAKER MOORE: He yields.
25     REP. JACKSON: Would it be fair to say

## 20

1  that they will have fewer claims of relief and
2  potential avenues of recovery with passage of this
3  bill?
4      REP. BISHOP: It's conceivable. Let me
5  make sure that I'm clear as I say this for the
6  folks who are non-lawyers. As you know,
7  Representative Jackson, when we file a lawsuit, we
8  name in the lawsuit all of the claims, all of the
9  legal claim theories that we can think of. But as
10 it also turns out, in many, many cases, it's
11 superfluous. That is, what you're interested in if
12 you're a plaintiff is what remedies do I get?
13     And that's why I've spoken over and over
14 again about the remedial rights that are available
15 under federal non-discrimination law. They are
16 very robust. There is nothing forfeited to a
17 plaintiff by not having a public policy cause of
18 action for this specific public policy issue, by
19 virtue of the change in this bill. They'll have
20 ample rights under federal law, as we've kind of
21 illustrated by our interchange.
22     SPEAKER MOORE: For what purpose does the
23 lady from Mecklenburg, Representative Cotham, rise?
24     REP. COTHAM: Thank you, Mr. Speaker. To
25 debate House Bill 2.

## 21

1      SPEAKER MOORE: The lady has the floor to
2  debate the bill.
3      REP. COTHAM: Thank you, Mr. Speaker.
4  Well, well, well. Here we are again, in a special
5  session. This time we are here to meddle in the
6  affairs of local government and disrespect local
7  elected leaders. This -- this special session is
8  clearly about -- and it was obvious in the
9  committee we were just in -- that this is to
10 advance some political careers and tarnish other
11 political careers in an election year. Imagine
12 that.
13     We must not allow fear-mongering and
14 discrimination against others. It has no place in
15 North Carolina, in this building, or any other
16 building. We must be a state that is inclusive --
17     REP. STEVENS: Mr. Speaker?
18     SPEAKER MOORE: Just a moment. For what
19 purpose does the lady from Surry, Representative
20 Stevens, arise?
21     REP. STEVENS: To see if the lady will
22 yield for a question.
23     SPEAKER MOORE: Does the lady --
24     REP. COTHAM: I will not at this time.
25     SPEAKER MOORE: Does the lady from

## 22

1   Mecklenburg yield to the lady from Surry?
2     REP. COTHAM: I will not.
3     SPEAKER MOORE: She does not yield at
4 this time. The lady from Mecklenburg continues to
5 have the floor to debate the bill.
6     REP. COTHAM: Thank you, Mr. Speaker. We
7 must be a state that is inclusive and welcomes
8 everyone in North Carolina and protects everyone,
9 every citizen in North Carolina. What we are doing
10 here today on this House floor is a bill that flies
11 in the face of inclusiveness. You all know this.
12 This is no surprise. Many of us, on my side of the
13 aisle especially, have focused very hard on
14 inclusiveness. I would hope that you would join
15 our fight.
16     As you know, I represent Charlotte and
17 Mecklenburg, along with many of you in here. We
18 hear from many people in Charlotte that they are
19 absolutely fed up with this Chamber's actions to
20 take part in hurting our city. It's not our first
21 time being the target, as you all know. Instead,
22 people want to talk about opportunities like a
23 great education or having a good-paying job that
24 could improve their lives, not about what we are
25 here doing today.

## 23

1     The voters of Charlotte elected the men
2 and women on the City Council to represent them.
3 They won. That's their choices. We should allow
4 the elected members to make decisions on behalf of
5 the people who elected them, not doing what we want
6 to do because we can. We should respect all
7 elected leaders.
8     But I want to talk about a part that's a
9 bit personal, and it's going to be personal to some
10 of you in this Chamber and maybe many listening.
11 As many of you know, I've had two babies while
12 serving here. They are young. They are not of
13 school age, and if any mother or father, but I'll
14 talk about myself, have to use the bathroom, this
15 bill says if I need to use the bathroom because I
16 have to go, not to accompany or help my child, but
17 because mommy has to go, my five-year-old and
18 two-year-old cannot come into the bathroom with me.
19     That's a serious problem, and that's
20 going to affect many people in North Carolina. I
21 think we are sending the absolute wrong message to
22 the people of North Carolina and especially to the
23 business community, of so many jobs that all of us
24 have talked about, that we are trying to attract
25 here in North Carolina.

## 24

1     And you are absolutely not protecting
2 children, and you are not protecting women. There
3 going to be many other points raised by my
4 colleagues about why this bill is so bad. I'm
5 asking you all to vote no. I will. Thank you.
6     SPEAKER MOORE: What purpose says the
7 gentleman from Durham, Representative Michaux,
8 arise?
9     REP. STEVENS: Mr. Speaker, I was just
10 going to see if she'd yield for a question now.
11     SPEAKER MOORE: I'm sorry. The Chair
12 will -- the Chair will entertain that. Does the
13 lady from Mecklenburg yield to the lady of Surry
14 for a question?
15     REP. COTHAM: No.
16     SPEAKER MOORE: She does not. Now, the
17 gentleman -- what purpose does the gentleman from
18 Durham, Representative Michaux, rise?
19     REP. MICHAUX: To speak on the bill and
20 for a motion after I speak.
21     SPEAKER MOORE: The gentleman is first
22 recognized to debate the bill.
23     REP. MICHAUX: Mr. Speaker and ladies and
24 gentlemen of the House, we have a bill before us
25 that we just got a chance to get a five-minute read

## 25

1 on during the meeting of the Committee, and it's a
2 bill that addresses approximately three or four
3 other ideas or other subjects other than what we
4 were expected to come in here and vote on. I would
5 call your attention -- you've got Parts 1, Parts 2
6 and Part 3 of this bill, and that they are all
7 different and separate parts of the bill. Mr.
8 Speaker, if you will?
9     For instance, the major reason that we're
10 here is found in Part 1 of the bill. But what has
11 been added to that is a usurpation of power for our
12 municipalities and our counties, involving
13 employment practices, involving public
14 accommodations practices, involving a lot of things
15 that we thought -- that had been, really, 50 to 60
16 years in the making, and which we have been living
17 fairly well with.
18     One of the things -- let me just give you
19 one little example of something in this bill. On
20 Page 5 of the bill, where it's -- it says Section
21 143-422-13, Investigation Conciliations. It says
22 that the Human Relations Commission in the
23 Department of Administration shall have the
24 authority. The question was asked in Committee
25 meeting, well, the Human Relations Commission, in

## 26

1    the budget, has not been funded.  They have been
2    defunded.  The answer to that was, well, there are
3    funds available.  But they are not recurring funds
4    in order to take care of any situation that may
5    arise under that.
6          As a result of this and having looked at
7    the bill, Mr. Speaker, and knowing that many of the
8    people -- there are people on our side who may want
9    to vote for Part 1.  There are some on your side
10   who may not want to vote for Part 2 or Part 3
11   because of the usurpation of power of local
12   governments.  We all have talked about how we like
13   things to happen at a local level, and what you're
14   doing in here is taking away complete and total
15   authority from those particular bodies.  And with
16   that, Mr. Speaker --
17         REP. STAM:  Mr. Speaker, Mr. Speaker?
18         SPEAKER MOORE:  For what purpose does the
19   gentleman from Wake, Representative Stam, rise?
20         REP. STAM:  Would Representative Michaux
21   yield for one question on that point for me?
22         SPEAKER MOORE:  Does the gentleman from
23   Durham yield for the gentleman from Wake?
24         REP. MICHAUX:  I yield.  Yes, sir.
25         SPEAKER MOORE:  He yields.

## 27

1          REP. STAM:  Representative Michaux, I
2    know you don't have a statute book in front of you,
3    but could you tell us what statute gives local
4    government the authority to regulate employment
5    practices or accommodations?
6          REP. MICHAUX:  The same statute that
7    takes away that authority from them.  In other
8    words, there is no -- there is no -- there is --
9          REP. STAM:  Ah.
10         REP. MICHAUX:  -- there is none.  And
11   what you're doing is, if they wanted to do it, like
12   some have done -- for instance, there are -- there
13   are cities and counties that have passed minimum --
14   minimum wage laws.  You want to come in to -- and
15   do that.
16         SPEAKER MOORE:  For what -- I think the
17   gentleman has another -- for what purpose does the
18   gentleman from Mecklenburg, Representative Bishop,
19   rise?
20         REP. BISHOP:  To ask the Representative
21   if he would yield for a question.
22         SPEAKER MOORE:  Does the gentleman from
23   Durham yield to the gentleman from Mecklenburg?
24         REP. MICHAUX:  Yes.
25         SPEAKER MOORE:  He yields.

## 28

1          REP. BISHOP:  Representative, do you
2    believe it's important that cities and counties act
3    within their legal authority?
4          REP. MICHAUX:  I believe that the -- that
5    cities and counties should act within their legal
6    authority, as long as it's for the betterment of
7    their community.  They are the ones that are closer
8    to the people than -- really, than we are, and they
9    are the ones that ought to be able to make
10   decisions for themselves and not have us do it up
11   here.
12         REP. BISHOP:  Follow-up, Mr. Speaker.
13         SPEAKER MOORE:  Does the gentleman from
14   Durham yield to an additional question?
15         REP. MICHAUX:  Yes, sir.  I yield.
16         SPEAKER MOORE:  He yields.
17         REP. BISHOP:  Wouldn't you agree, though,
18   that the rule of law requires that they follow the
19   limitations on their authority that are set forth
20   in statutes from the General Assembly?
21         REP. MICHAUX:  I would agree.  I would
22   agree also that states are required to do the same
23   thing as -- considering it's federal law and the
24   Constitution.
25         REP. BISHOP:  Thank you, sir.

## 29

1          REP. MICHAUX:  Mr. Speaker?
2          SPEAKER MOORE:  Does the gentleman desire
3    further debate or does the gentleman wish to make a
4    motion?
5          REP. MICHAUX:  I wish to make a motion,
6    pursuant --
7          SPEAKER MOORE:  The gentleman is
8    recognized for a motion.
9          REP. MICHAUX:  -- pursuant to section 313
10   of Mason's Manual, I move that sections 1, 2 and 3
11   be voted on and discussed separately.
12         SPEAKER MOORE:  The Chair's going to
13   review the bill and will advise once that's done.
14   House will be at ease.
15         (Members at ease.)
16         SPEAKER MOORE:  The House will come back
17   to order.  The -- the gentleman's recognized for an
18   amended motion I believe the gentleman wishes to
19   make.
20         REP. MICHAUX:  Mr. Speaker, I move that
21   Part 1 be separated and voted on separately, and
22   that Parts 2 and 3 be voted on separately.
23         SPEAKER MOORE:  Okay.  The Chair rules
24   that this motion is in order.  The gentleman's
25   recognized to debate his motion.

30

1      REP. MICHAUX:  Thank you, Mr. Speaker.
2  What it does, it gives you an opportunity to those
3  who didn't want to usurp the power of our cities
4  and counties to debate a little bit more on that.
5  Section 1 deals with the problem that was raised by
6  Charlotte, and that is why I ask for the separation
7  on it.  Because there are some who want to vote for
8  it; some who want to vote against it.  There are
9  also some on the other side who want -- who do not
10  want to usurp that power of their cities and
11  authorities.  I ask that you support the motion.
12      SPEAKER MOORE:  Members, there are
13  several lights on.  I would ask that those members
14  who wish to debate this motion, please activate
15  your lights.  If members are simply wanting to
16  debate the bill as a whole, please turn your lights
17  off.  The Chair will afford an opportunity to come
18  back to that.  For what purpose does the gentleman
19  from Harnett, Representative Lewis, arise?
20      REP. LEWIS:  To debate the motion.
21      SPEAKER MOORE:  The gentleman has the
22  floor to debate the motion.
23      REP. LEWIS:  Thank you, Mr. Speaker.  Mr.
24  Speaker and members, I would ask the members of the
25  Chamber to vote against this motion.  This bill is

31

1  a carefully crafted piece of legislation to make
2  sure that we are able to accomplish the ends that
3  the bill sponsors have explained during this
4  debate.  Without veering into the debate on the
5  bill, I would simply ask you to vote no on this
6  motion.
7      REP. MICHAUX:  Mr. Speaker, Mr. Speaker?
8      SPEAKER MOORE:  For what purpose does the
9  gentleman from Durham, Representative Michaux,
10  rise?
11      REP. MICHAUX:  To ask the Rules Committee
12  Chairman a question.
13      SPEAKER MOORE:  Does the gentleman from
14  Harnett yield to the gentleman from Durham?
15      REP. LEWIS:  I yield, Mr. Speaker.
16      SPEAKER MOORE:  He yields.
17      REP. MICHAUX:  Mr. Rules Chairman, would
18  you agree with me that Part 1 of this bill can
19  stand alone and be passed and enforced without
20  anything else, particularly anything involving Part
21  2 and 3?
22      REP. LEWIS:  Representative, what I would
23  agree is that this entire bill deals with
24  individual localities exceeding the authority that
25  they have had without coming through the General

32

1  Assembly.  Therefore, I believe they are related,
2  and I believe they should remain together.
3      REP. MICHAUX:  Another question.
4      SPEAKER MOORE:  Does the gentleman yield
5  to an additional question?
6      REP. LEWIS:  I yield.
7      SPEAKER MOORE:  He yields.
8      REP. MICHAUX:  So what you're saying is
9  that all three of these items are -- in fact, the
10  matter of restrooms and the matter of the power of
11  cities and -- are all related in that particular
12  aspect?  Is that what you're telling me?
13      REP. LEWIS:  Again, Representative,
14  without veering into the content of the bill, as
15  best I can, while I would agree that the gross
16  violation of privacy that the bathroom issue brings
17  about is more alarming to me personally, they both
18  have to do with the exceeding of local authority.
19      SPEAKER MOORE:  For what purpose does the
20  gentleman from Rutherford, Representative Hager,
21  arise?
22      REP. HAGER:  Speak on the amendment.
23      SPEAKER MOORE:  The gentleman has the
24  floor to speak to the motion.
25      REP. HAGER:  Thank you, Mr. Speaker.

33

1  Guys, these three pieces of this bill, as
2  Representative Lewis said, all have something in
3  common.  They talk about taking power away from the
4  state that we have always had, and,
5  constitutionally, we always will have, and giving
6  into the cities and counties.  That's what these
7  three pieces have in common; that's why they have
8  that common denominator.
9      These cities and counties, especially in
10  this case, have operated outside their boundaries
11  and they're into the boundaries of the State.
12  These three pieces are integrated, they're --
13  they're tied together, so I ask you to vote no on
14  this motion.
15      SPEAKER MOORE:  Further discussion,
16  further debate on the motion?  For what purpose
17  does the lady from Orange, Representative Insko,
18  rise?
19      REP. INSKO:  Thank you, Mr. Speaker.
20  Ladies and gentlemen of the House, I would like for
21  you to vote yes on this motion.  Partly because --
22  Section 3 especially, that Representative Jackson
23  talked about, is excessive and unnecessary and
24  would put North Carolina -- it would join North
25  Carolina as the only state without any state law

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 10 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-5   Filed 08/27/16   Page 10 of 75

## 34

1    protecting private sector employees. We don't want
2    to do that. We need to separate these out so that
3    we can vote on them separately. So, please, vote
4    yes.
5        SPEAKER MOORE: Further discussion,
6    further debate? If not, the question for the House
7    is the adoption of a Motion 12 set forth by
8    Representative Michaux. Those in favor will vote
9    aye; those opposed will vote no. The Clerk will
10   open the vote.
11       (Votes recorded.)
12       SPEAKER MOORE: The Clerk will lock the
13   machine and record the vote. 35 having voted in
14   the affirmative and 72 in the negative, the motion
15   fails. We're now back on debate on the bill.
16   Members who wish to debate, please activate your
17   lights. What purpose does the lady from Guilford,
18   Representative Harrison, arise?
19       REP. HARRISON: To debate the bill.
20       SPEAKER MOORE: The lady has the floor to
21   debate the bill.
22       REP. HARRISON: Thank you, Mr. Speaker.
23   This bill is so wrong on process and substance, but
24   I'm going to leave it to my colleagues to talk
25   about that. About the cost of this session, the

## 35

1    appropriateness of this session, the potential loss
2    of significant federal funding, the economic
3    impact. I'm going to focus on, sort of, the
4    humaneness and the compassion element of this.
5        I wanted to talk about the transgender
6    community, and we heard some compelling testimony
7    in the hearing prior to this -- the committee
8    hearing on the bill. I don't think many of us in
9    this chamber really understand what transgenders go
10   through in term of the harassment and indignity and
11   discrimination on a daily basis. Everything from
12   employment to housing to jobs to restaurant access,
13   hotel access, and, yes, restroom access. So I --
14   we also received an email from a doctor in Cary
15   that talked about the suicide rate among
16   transgenders being as high as 41 percent. I
17   thought that was pretty -- pretty compelling, and
18   you can safely say no one chooses to be
19   transgender.
20       It got me thinking about my constituents.
21   I have constituents who are the parents of a
22   transgender daughter, and I -- she's grown now, but
23   what if this bill had been in place? She was going
24   to be forced to use the boys' locker room in high
25   school, a transgender girl, and forced to use the

## 36

1    boys' bathroom in high school. And you can just
2    imagine what kind of harassment and bullying and
3    potential harm might come to that young woman. And
4    this is a scenario that will play out all over the
5    state and affect all kinds of transgender
6    individuals, young and old.
7        It's been repeated, but it bears
8    repeating again, that 200 communities across the
9    nation have enacted these protections for this
10   community, and there has been little incident. It
11   does not encourage sexual predators. There are
12   already laws against sexual predators. It's a ruse
13   to state otherwise. This is also described as the
14   most anti-LBGT legislation in the country.
15       We should not be on the wrong side of
16   history on this. We should instead be focused on
17   real issues that affect women and children, like
18   restoring the EITC, raising the minimum wage, paid
19   sick leave, protecting clean air and clean water.
20   I urge you to vote no.
21       SPEAKER MOORE: For what purpose does the
22   gentleman from Wake, Representative Martin, arise?
23       REP. MARTIN: To send forth an amendment.
24       SPEAKER MOORE: The gentleman is
25   recognized to send forth an amendment. The Clerk

## 37

1    will read.
2        CLERK: Representative Martin moves to
3    amend the bill on Page 4, Lines 26 by inserting
4    between and biological the phrase, "veteran
5    status, sexual orientation, gender identity."
6        SPEAKER MOORE: The gentleman from Wake,
7    Representative Martin, has the floor to debate
8    the -- to debate the amendment.
9        REP. MARTIN: Thank you very much, Mr.
10   Speaker. Members, my amendment does not deal, for
11   the most part, with anything to do about some of
12   the more controversial parts of this legislation, I
13   hope. But I think we would all agree that we are
14   putting this legislation together as we go. It's
15   been a pretty quick process that we've all been
16   called back into session, and we have had limited
17   time to put it together.
18       But understand one of the goals of this
19   legislation to be to implement a statewide
20   anti-discrimination policy, and to take that out of
21   the purview of the local governments. So whether
22   one agrees or disagrees with that policy, I think
23   all 120 of us would agree that we need to do it
24   right, and we need to sure -- make sure that we
25   don't make any mistakes in doing it. So my

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 10 of 75

## 38

1    amendment seeks to address one of those mistakes.
2        I think you'll find one portion of it
3    uncontroversial.  The other portion, one that's
4    needed, but one that y'all may have some heartache
5    with, but we will see.
6        But if you look through the various
7    counties and local governments in North Carolina,
8    one of the categories you will see in the
9    anti-discrimination ordinances that they have
10   adopted is, in fact, veteran status.  And that is
11   something that, as I have, in the short time that
12   we've had it before us, looked through this bill,
13   is not present.  What you will also see in my
14   amendment is that it does, in fact, prohibit in our
15   statewide anti-discrimination policy --
16   discrimination on the basis of sexual orientation
17   and gender identity.
18       I think we can have a broader debate on
19   that also.  But without a doubt, it's something, I
20   think, needs to be in our policy.  Members, I'm
21   happy to explain why discrimination on the basis of
22   veteran status should be prohibited and why we
23   should not blindly strip from our local governments
24   the ability to protect it, and I'm happy to yield
25   any questions on that or any other matter that's

## 39

1    related to this amendment, but I would urge your
2    support.
3        SPEAKER MOORE:  For what purpose does the
4    gentleman, from Guilford, Representative Blust,
5    arise?
6        REP. BLUST:  To see if Representative
7    Martin will yield for a question.
8        SPEAKER MOORE:  Does the gentleman from
9    Wake yield to the gentleman from Guilford?
10       REP. MARTIN:  I would gladly yield to
11   John Marshall Blust.
12       SPEAKER MOORE:  He yields.
13       REP. BLUST:  Thank you.  The term
14   "veteran status," could that not be interpreted as
15   a two-sided coin, in which a veteran who served is
16   a veteran on one side of the coin, but someone who
17   didn't serve has a veteran status in that they're
18   not a veteran, and could putting this in the law be
19   interpreted to outlaw veteran preferences programs
20   for things like hiring?
21       REP. MARTIN:  I think the clear answer to
22   that is that throughout the country, both at the
23   state level and in some cases at the federal level,
24   and then certainly as I have described at the local
25   government level, there are no shortage of

## 40

1    anti-discrimination policies prohibiting
2    discrimination on the basis of veteran status, and
3    I am unaware of any problems similar to that which
4    the gentleman suggests.
5        SPEAKER MOORE:  The gentleman has the
6    floor to continue debating if the gentleman desires
7    further debate.  Further discussion or debate on
8    this -- for what purpose does the gentleman from
9    Wake, Representative Stam, rise?
10       REP. STAM:  To speak on the amendment and
11   make a motion.
12       SPEAKER MOORE:  The gentleman has the
13   floor to debate the amendment.
14       REP. STAM:  Ladies and gentlemen, first
15   of all, let's be clear.  Page 3, Line 44, makes
16   clear that cities and counties can have whatever
17   classifications they want that are otherwise lawful
18   for their own employees.  Here we're talking about,
19   you know, not their own employees.
20       In my youth, I was in the military, and
21   so I -- I've been a veteran for 45 years.  I have
22   yet to ask anybody at the -- have ever ask -- had
23   anyone ask me before I bought groceries, are you a
24   veteran?  And it's had to imagine that anyone would
25   discriminate against you in employment because

## 41

1    you're a veteran.  So I don't even understand the
2    need for veteran status.  It's not a mark against
3    the person.
4        But secondly, you can go endlessly on.
5    Now, the other two items that Representative Martin
6    have mentioned suffer from definitional problems,
7    but let's take New York City, for example.  They
8    prohibit discrimination on the basis of arrest
9    history, convict status, incarceration history,
10   credit history, source of income, caregiver status,
11   occupation, ancestry, weight, height, place of
12   birth, homelessness, political affiliation, student
13   status, the list can go on and on.  What is in the
14   bill are the suspect classes that have already been
15   recognized in law.
16       Representative Martin is right, that if
17   he wants to change that law, he's at the right
18   place, the General Assembly, but the wrong time,
19   and this should not be done by cities and counties.
20   So, Mr. Speaker, I move to table the amendment.
21       SPEAKER MOORE:  The gentleman has been
22   recognized for motion.  The gentleman has moved
23   that the bill do lie upon the table.  Is the motion
24   seconded?  And seconded by Representative
25   Cleveland.  The question for the House is the

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 12 of 75

## 42

1 motion to lay the amendment upon the table. Those
2 in favor will vote aye, those opposed will vote no.
3 The Clerk will open the vote.
4 (Votes recorded.)
5 SPEAKER MOORE: Representative
6 Baskerville, Representative Brown on the floor,
7 Rayne Brown? The Court will lock the machine and
8 record the vote. 70 having voted in the
9 affirmative and 36 in the negative, the motion is
10 adopted. The bill does lie upon the table.
11 We're now back on the bill. For what
12 purpose does the gentleman from Mecklenburg,
13 Representative Moore, rise?
14 REP. R. MOORE: To speak very briefly on
15 the bill.
16 SPEAKER MOORE: The gentleman has the
17 floor to debate the bill.
18 REP. R. MOORE: Well, colleagues, we have
19 expensed a great deal of money to come back to
20 Raleigh. We were here a couple of weeks ago to
21 talk about -- talk about bathrooms. But let's
22 drill down into what the intent of this particular
23 legislation is.
24 This is really not about bathrooms. This
25 is about -- this is about fear, because, first of

## 43

1 all, you -- the City of Charlotte has a sovereign
2 responsibility and duty to make and pass ordinances
3 that have been given a charter by the State of
4 North Carolina. Does not mean that the State of
5 North Carolina at any time can supersede local
6 authority, but we've been through that for the last
7 four or five years here, so that's -- that's not --
8 that's nothing new. It's not a problem.
9 But it is a problem. Because what you
10 have here is -- you have fear-stoking. The LGB --
11 I've done the research. This ordinance is in over
12 200 cities, as it was referenced before, and there
13 has not, to my knowledge, been any catastrophic
14 incident of assaults, of rapes in these bathrooms
15 or anything, and so the argument that this is such
16 a grave challenge or a grave issue of public
17 safety, just doesn't -- just doesn't mesh;
18 doesn't -- doesn't pan out based upon the data.
19 And so now, let's walk back on that one.
20 We also know that the business community,
21 which we are here, our sole purpose is to create
22 jobs and to put forth a potentially good business
23 climate so that we can attract and retain jobs in
24 North Carolina. The business community has no
25 heartburn with this ordinance. As a matter of

## 44

1 fact, if you look at some of our largest employers
2 in the state of North Carolina, they have policies
3 that address LGBT instances of their employees and
4 other things, so that can't be what we're doing
5 here.
6 And so what we -- what we dial back to
7 what I see resonantly clear, is the fact that
8 differences scare us. And so we want to put our
9 anvil, our hammer on the City of Charlotte to
10 affect the whole state, to say we -- we want
11 uniformity in these laws. Well, actually, it is
12 the -- it is the right of each municipality to --
13 to do their own laws or their own ordinances; that
14 we gave them that authority. If you don't want to
15 do that, then I'm sure I will -- whoever that is, I
16 will not yield. Dan, I will not yield. Thank you.
17 SPEAKER MOORE: For what purpose does the
18 gentleman from Union, Representative Arp, arise?
19 Oh, I'm sorry. Does the gentleman desire further
20 debate, I thought -- to debate the bill?
21 REP. R. MOORE: No, I'm not finished.
22 SPEAKER MOORE: All right, apologize.
23 REP. R. MOORE: I -- I --
24 SPEAKER MOORE: There was a long pause,
25 there, Representative Moore.

## 45

1 REP. R. MOORE: And I was -- I was
2 waiting for Dan to do his thing. Can I continue?
3 SPEAKER MOORE: The gentleman has the
4 floor to continue debating the bill.
5 REP. R. MOORE: Okay. And I'll wrap this
6 up very quickly. I am against -- I am against this
7 bill because it -- it -- it's not -- the spirit of
8 the bill is not what the bill says that it's
9 intended to do. We've been here before.
10 We know the ugly history of the state and
11 of this nation as it relates to LGBT, as it relates
12 to people of color, immigrants and other things.
13 And we have -- we have a very tricky, slippery
14 slope in this country, that we have had so much
15 rhetoric going on about people who are different
16 than us or supposedly different than us. But if
17 you're a Christian as some of you claim, we are all
18 children of -- of the Most High God, and brothers
19 and sisters in Christ. And so if you look at it
20 from that perspective, I ask that you look into
21 your hearts and that you defeat this measure.
22 Thank you.
23 SPEAKER MOORE: For what purpose does the
24 gentleman from Union, Representative Arp, arise?
25 REP. ARP: To debate the bill.

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 13 of 75

## 46

SPEAKER MOORE: The gentleman has the floor to debate the bill.

REP. ARP: Thank you, Mr. Speaker. Colleagues, ladies and gentlemen, let me be very, very clear on what we're doing here today. I'm not running for a Congressional seat. Opponents -- I don't want opponents to distract from what we're doing here.

Summer's coming. Spring is here, summer's coming. Emily and Ashante, 7-year-old girls, are so excited to go to the pool. Their mother's taking them to the pool. They go into the locker rooms. They're bouncing off the walls with excitement. They have been good all winter long and now their mother is taking them to the community pool to go swimming. 'All right, girls. Calm down. Go ahead and take off your clothes and get on your bathing suits and we will go to the pool.'

As they begin to do so, in walks a biological male. Sits down on the wooden bench in front of the lockers right beside them and begins to disrobe. What just happened? Emily, Ashante and her mother just lost their privacy.

Some municipalities have mandated through

## 47

their ordinance that this very situation will occur over and over and over again. This bill is necessary to stop that from happening. Just common sense. Biological men should not be in women's bathrooms, showers or locker rooms. All North Carolina citizens expect bodily privacy in showers, locker rooms and bathrooms. Make no mistake, this bill ensures all North Carolina citizens the privacy, protections they in fact have.

Do you know that courts have found that even prisoners have the right to use restrooms, changing areas, without regular exposure to viewers of the opposite sex? There have been two court cases that settled this. There's a -- it's a -- courts have recognized a constitutional violation where guards regularly watch inmates of the opposite sex who were engaged in personal activities such as undressing, using toilet facilities or showering.

So, prisoners actually have more privacy than Emily and Ashante and her mother. These seven-year-old girls. Prisoners.

We do a lot of hard things up here, a lot of complicated things here, but, ladies and gentlemen, this is not hard. This is really

## 48

simple. All North Carolina citizens expect privacy in showers, bathrooms and locker rooms. I do not think counties and municipalities and local governments have the authority to strip all North Carolina citizens of their right to privacy in showers, bathrooms and locker rooms. I do not think counties, municipalities and local governments should have the right to strip any North Carolina citizen of their right to privacy in showers, locker rooms and bathrooms or mandate other businesses to do so. It's just that simple.

How is it compassionate to strip North Carolina citizens of their right to privacy? It's been mentioned about the schools. This bill actually provides the authority, broad authority, of the schools to accommodate any student in any manner without stripping other students of their right to privacy in showers, in locker rooms and bathrooms.

Make no mistake, we would not be here if a municipality had not stripped North Carolina citizens of their right to privacy in bathrooms, locker rooms and showers. I can think of us having no greater purpose than to spend whatever amount of money it takes to make sure all North Carolina

## 49

citizens are not stripped of their privacy in locker rooms, showers and bathrooms. Ladies and gentlemen, I urge you to vote yes on this bill. Thank you.

SPEAKER MOORE: For what purpose does the gentleman from Cumberland, Representative Floyd, rise?

REP. FLOYD: To send forth an amendment, Mr. Speaker.

SPEAKER MOORE: The gentleman is recognized to send forth an amendment. Is the Clerk in possession of the amendment?

REP. FLOYD: Yes, he is.

SPEAKER MOORE: The Clerk will read.

CLERK: Representative Floyd moves to amend the bill on Page 1, Line 4 by deleting "employment and."

SPEAKER MOORE: The gentleman has the -- Chair is reviewing the amendment, the gentleman has the floor to -- the gentleman has the floor to debate the amendment.

REP. FLOYD: Mr. Speaker, when we first heard and learned about the Charlotte bill, we was under the impression that this session would address the Charlotte bill. And -- but what we see

Case 1:16-cv-00236-TDS-JEP   Document 178-1   Filed 08/29/16   Page 14 of 75

## 50

1  is that this session has gone beyond the Charlotte
2  bill and added employment.
3      But what my amendment does is to remove
4  the section that relates to employment and allow
5  the bill to move forward. And as Representative
6  Shaw -- Representative Michaux mentioned, that it
7  can stand alone and be voted on. It -- that's
8  simply that it's gone beyond what we originally
9  thought that this session would be called for.
10     SPEAKER MOORE: The Chair notices several
11  lights. Again, if members would only have their
12  lights on if they wish to debate this amendment.
13  To what purpose does the gentleman from
14  Mecklenburg, Representative Bishop, arise?
15     REP. BISHOP: To debate the amendment.
16     SPEAKER MOORE: The gentleman has the
17  floor to debate the amendment.
18     REP. BISHOP: The amendment would take
19  out not only the provision clarifying that local
20  governments may not regulate wage policy, but also
21  those sections that provide that localities cannot
22  regulate the employment practices and selling
23  practices of contractors to those governments. And
24  it affords an opportunity to say, this really is
25  one of the most egregious aspects of the overreach

## 51

1  of authority reflected in the Charlotte ordinance.
2      For it wasn't enough to mow down the
3  right of anyone to disagree with the social policy
4  revisions being done, but they also -- within the
5  City of Charlotte, but they also sought to reach
6  beyond their borders and instruct businesses
7  throughout the state of North Carolina, who might
8  seek to do business with the city of Charlotte, how
9  they must operate their businesses.
10     Which -- which points up again why it's
11  important. You know, we -- we sit in one house of
12  a bicameral legislature. Bicameralism exists now
13  the world over as a bulwark against invasions of
14  freedom. And I've learned, in the short time being
15  up here, that having five or six people think
16  something is a good idea is a long way from home
17  when it comes to making a law. You have to get a
18  old ornery committee chairman like Chairman Brawley
19  to allow you to be heard in his committee. You
20  have to answer a lot of questions. And you find
21  out that if you haven't vetted out your language
22  very carefully, as the case has been in Charlotte,
23  where, by the way, if you read the plain language,
24  they eliminated same-sex specific facilities
25  completely.

## 52

1      And then if you go -- if you get through
2  the questions in that committee, you've probably
3  got a serial referral to another committee, maybe
4  two. And after you get favorable reports from
5  those committees, if you can do that, then you come
6  to the floor of the House, where people are making
7  speeches if they're running for Congress.
8      REP. MEYER: Mr. Speaker?
9      SPEAKER MOORE: For what purpose does the
10  gentleman from Orange, Representative Meyer, arise?
11     REP. MEYER: Can I ask Representative
12  Bishop a question?
13     SPEAKER MOORE: Does the gentleman from
14  Mecklenburg yield to the gentleman from Orange?
15     REP. BISHOP: I'm on a roll, so I don't
16  think I'll yield.
17     SPEAKER MOORE: He doesn't yield at this
18  time.
19     REP. BISHOP: And then, if you get a
20  majority of this body of 120 people to vote yes,
21  then it really gets tough, because you have to go
22  across the chamber and start over again with a
23  whole 'nother set of committees, one of which is
24  rules. You have to get through both bodies and
25  that's how something becomes law.

## 53

1      Or here's a neat trick. Let's just go to
2  a city council where you can find a handful of
3  radicals under the influence of an activist group.
4  It's got a lot of money from out of state. And get
5  six of those people to enact something that goes to
6  the heart of some -- of statewide interest. And
7  then impose that not only on your own citizens, but
8  on everyone that might be operating a business
9  across the state. That is the picture of the
10  subversion of the rule of law.
11     And the reason I asked the question --
12  nobody yet has suggested that there's a statute in
13  the general statutes that confers authority on the
14  City Council of Charlotte to do what they've done.
15  Indeed, to my colleague, Representative Moore, who
16  spoke of this being about fear, I want to suggest
17  to all of us that we'd be better served in our
18  debating with one another if we did not ascribe the
19  basest of motives to the opposition that we face.
20  Fear and ignorance. I don't know how many times
21  I've heard in the last month or so that everyone
22  who might be opposed to what Charlotte has done
23  must be acting out of fear and ignorance.
24     REP. R. MOORE: Mr. Speaker.
25     SPEAKER MOORE: What purpose does the

54

1   gentleman from Mecklenburg, Representative Moore,
2   arise?
3       REP. R. MOORE:  To ask my -- my
4   delegation member Representative Bishop a question.
5       SPEAKER MOORE:  Does the -- does --
6   Representative Bishop, does the gentleman yield to
7   a question from Representative Moore?
8       REP. BISHOP:  Returning the favor, I'm
9   not yet done, not at this time.
10      SPEAKER MOORE:  He does not yield.  The
11  gentleman, the -- Representative Bishop continues
12  to have the floor to debate the amendment.
13      REP. BISHOP:  Thank you, Mr. Speaker.  I
14  would submit that taking the step of mandating a
15  particular approach on every business of whatever
16  ilk throughout the city of Charlotte and across the
17  state of North Carolina that might want to do
18  business with the city of Charlotte implies fear.
19  Can we not trust that people acting in good will
20  will find ways to accommodate each other without
21  having an ever-expanding list of groups and
22  sub-groups and sub-sub-groups laid out in law so
23  that we can divide each other up?
24      It's got nothing to do with fear.  I
25  trust my fellow man and woman to do the right thing

55

1   almost all of the time.  They need not be rode herd
2   on, if you will.  That's why we establish things
3   like bicameral legislatures and separation of
4   powers.  I didn't even mention that.  Once you get
5   through the committees, the Senate and the House,
6   you gotta go to the Governor and get a signature.
7   None of that occurs when you can get a few people
8   to come up and run something through that's a great
9   idea, as far as they know.
10      So I urge you, ladies and gentlemen, this
11  bill is a carefully crafted, integrated measure,
12  reasonably, to deal with an abuse of authority.
13  And I urge you to defeat the amendment.
14      SPEAKER MOORE:  For what purpose does the
15  gentleman from Mecklenburg, Representative Moore,
16  arise?
17      REP. R. MOORE:  To -- ask my colleague
18  a -- a question.
19      SPEAKER MOORE:  Does the gentlemen from
20  Mecklenburg yield to the gentleman from
21  Mecklenburg?
22      REP. BISHOP:  At this time, I'm pleased
23  to yield.
24      SPEAKER MOORE:  He yields.
25      REP. R. MOORE:  Senator -- I'm sorry,

56

1   Representative Bishop --
2       REP. BISHOP:  Yes, Congressman?
3       REP. R. MOORE:  All right.  Trust me --
4   and -- and, Representative Bishop, for some reason
5   that's -- that's a slip of the -- a Freudian slip.
6   Sir, do you really believe -- or -- or do -- you
7   talked about outside groups coming in and -- and
8   pandering and those things.  Is that not done on
9   either side of the -- of the political philosophy
10  spectrum, whether you're a far right or far left
11  advocate?  Is -- is that -- is that not the -- the
12  norm of our political process, at this particular
13  point in time?
14      REP. BISHOP:  I think general assemblies
15  like ours are the worst of all possible forms of
16  government, except for the others.  That is to say,
17  a lot of garbage comes out of here.  A lot of
18  influence is -- is peddled around.  A lot of things
19  I disagree with happen.
20      But I think, to my core, that the system
21  of government that we all live under, the
22  institution that we have here with all you fine
23  people on the floor and those in the other chamber
24  and those in the United States Congress that's --
25  that's similarly separated for checks and balances

57

1   upon the abuse of power, those devices are core and
2   fundamental to our maintenance of our freedoms, and
3   they're -- and they absolutely deserve to be
4   respected.
5       And one political -- if one political
6   force decides they're going to take a shortcut and
7   they're going to try to restructure things, or
8   overstep their authority until they're stopped,
9   then they ought to be stopped, for the sake of the
10  institutions that we hold dear.  And they're not
11  just institutions for their own sake, but because
12  they protect our freedom.
13      SPEAKER MOORE:  For what does the
14  gentleman from Cumberland, Representative Floyd,
15  arise?
16      REP. FLOYD:  To speak a second time, Mr.
17  Speaker.
18      SPEAKER MOORE:  The gentleman has the
19  floor to debate the amendment a second time.
20      REP. FLOYD:  Mr. Speaker, the reason why
21  I sent forth this amendment, because I strongly
22  believe that this statute -- that this portion of
23  the bill can be addressed in the short session,
24  'cause anything can happen in a short session, or
25  it could be addressed in the long session.  So I

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 16 of 75

## 58

1　urge your support of the amendment.
2　　　　SPEAKER MOORE: For what purpose does the
3　gentleman from Wake, Representative Martin, arise?
4　For what purpose does the gentleman from Orange,
5　Representative Meyer, arise?
6　　　　REP. MEYER: Thank you, Mr. Speaker. To
7　ask the gentleman from Mecklenburg, the bill
8　sponsor, two questions.
9　　　　SPEAKER MOORE: Does the gentleman from
10　Mecklenburg yield to the gentleman from Orange?
11　　　　REP. BISHOP: I yield for one question,
12　and we'll see.
13　　　　SPEAKER MOORE: He yields.
14　　　　REP. MEYER: I think -- I think you'll be
15　able to answer both of these questions right here.
16　　　　REP. BISHOP: I'll try my best.
17　　　　REP. MEYER: All right. In your
18　comments, you said that a city -- an elected city
19　council of seven members -- I don't know how many
20　members are on the Mecklenburg Board, but you said
21　that a elected city council, because they have
22　fewer members and a different process than our
23　legislature, that them enacting a local ordinance
24　is a subversion of the rule of law?
25　　　　REP. WARREN: Mr. Speaker?

## 59

1　　　　SPEAKER MOORE: Just a moment. For what
2　purpose does the gentleman from Rowan,
3　Representative Warren, arise?
4　　　　REP. WARREN: Mr. Speaker, it seems to me
5　that -- we've -- the discourse has gotten off
6　the -- the -- is not germane to the amendment.
7　　　　SPEAKER MOORE: Well, the -- I think the
8　gentleman is rising to a point of order. The Chair
9　will simply -- the Chair believes the gentleman
10　from Orange is -- is still within the confines of
11　the debate. And the Chair did give the gentleman
12　from Mecklenburg a little bit of wide latitude to
13　debate the amendment. So I think that questions of
14　a wide latitude probably would -- would be
15　permissible. The gentleman from Orange has the
16　floor to continue propounding the question.
17　　　　REP. MEYER: Thank you, Mr. Speaker.
18　Representative Bishop, can you elaborate on your
19　point that a city council passing a local ordinance
20　is somehow a subversion of the rule of law?
21　　　　REP. BISHOP: I certainly can. Thank you
22　for the question. City councils and county
23　commissions -- I was a county commissioner -- are
24　critical to the functioning of state government.
25　They represent -- they -- they handle matters of

## 60

1　local concern. And they are agents of the General
2　Assembly and seeing to it that good government --
3　government is available everywhere. And in
4　appropriate areas, they maximize local control.
5　　　　But the -- but it is fundamental to the
6　operating of that system properly that authority be
7　delegated, and that authority exercised by
8　localities be properly -- that be -- be within
9　their delegated authority.
10　　　　So, for example, zoning is a power we
11　have expressly conferred upon municipalities and
12　counties. And folks know the needs and
13　requirements of zoning questions in Charlotte and
14　Mecklenburg County in ways and details we couldn't
15　possibly know of here. The conditions in Charlotte
16　and Mecklenburg are far different than they are in
17　my mother's home county, Bladen, and -- and so
18　different decisions need to be made.
19　　　　What we're talking about here is
20　something for which there's never been a delegation
21　of authority to a locality, and furthermore, it is
22　a matter of statewide interest. It is not
23　something that varies in terms of what is right and
24　just from community to community and how the law
25　can be orderly.

## 61

1　　　　We make those decisions as a statewide
2　community. That's the way the system is set up.
3　　　　REP. FLOYD: Mr. Speaker?
4　　　　SPEAKER MOORE: For what purpose has the
5　gentleman from Cumberland, Representative Floyd,
6　rise?
7　　　　REP. FLOYD: Is this in reference to my
8　amendment?
9　　　　SPEAKER MOORE: Representative Meyer
10　asked the question, so I --
11　　　　REP. FLOYD: I'm just - I'm referring
12　that this reference might end --
13　　　　SPEAKER MOORE: Representative Floyd, the
14　Chair did give some wide latitude to Representative
15　Bishop to debate the amendment, and the Chair also
16　gave Representative Meyer a wide latitude for a
17　question, but is probably time to rein it in just a
18　little bit.
19　　　　REP. FLOYD: Yes, sir, that is what I am
20　calling. May I, Mr. Speaker?
21　　　　SPEAKER MOORE: Well --
22　　　　REP. FLOYD: May I?
23　　　　SPEAKER MOORE: For what purpose does the
24　gentleman from Cumberland rise?
25　　　　REP. FLOYD: A call for the previous

## 62

```
1    question.
2         SPEAKER MOORE:  The gentleman has moved
3    the adoption of the previous question.  Those in
4    favor of the previous question will vote aye; those
5    opposed will vote no.  The Court will open the
6    vote.
7         (Votes recorded.)
8         SPEAKER MOORE:  Is Representative Lambeth
9    on the floor?  The Clerk will lock the machine and
10   record the vote.  89 having voted in the
11   affirmative and 18 in the negative, the previous
12   question has been adopted.  The question before the
13   House now, is the amendment sent forth by
14   Representative Floyd to House Bill 2.  Those in
15   favor of the amendment will vote aye.  Those
16   opposed will vote no.  The Clerk will open the
17   vote.
18        (Votes recorded.)
19        SPEAKER MOORE:  The Clerk will lock the
20   machine and record the vote.  35 having voted in
21   the affirmative and 72 in the negative, the
22   amendment fails.  We are now back on debate on the
23   bill.  For what purpose does the gentleman from
24   Durham, Representative Michaux, arise?
25        REP. MICHAUX:  To speak a second time on
```

## 63

```
1    the bill.
2         SPEAKER MOORE:  The gentleman has the
3    floor to debate the bill a second time.
4         REP. MICHAUX:  Mr. Speaker and ladies and
5    gentlemen of the House, my rising to speak this
6    time does not go to what Charlotte did.  I still
7    think it is in their wisdom to do whatever they
8    want to do.  For instance, I don't want you telling
9    Durham that they can't make any rules or
10   regulations regarding who comes into Durham to want
11   to build a building in Durham.  Durham ought to
12   have that authority, an authority which you're
13   taking away from them with this bill.
14        And that is my whole purpose here  - is
15   to that usurpation of power that the citizen --
16   even the authority that you have given them, you
17   have given them in the past, you have taken it away
18   from them.  You gave cities and counties the
19   authority to do zoning.  Yet in a couple of
20   sessions, you took away zoning authority,
21   particularly in Durham.  I'm -- I'm -- I'm a
22   witness to that.
23        But let me ask you this.  You say this
24   bill was well crafted -- that it had a lot of
25   thought that went into it.  Have you ever asked
```

## 64

```
1    yourself how much or if any cost would be involved
2    in this bill?  The reason I am raising that is
3    because you define the parameters of -- no, I'm
4    sorry.  You define the parameters of what is
5    discrimination and what is discriminatory and what
6    is not discriminatory.
7         If the federal government comes up and
8    says, 'Well, you don't have, for instance, in here
9    anything concerning sexual orientation,' which is
10   not mentioned in here.  And what I have today -- I
11   have a piece of paper involving -- just Title IX
12   education funds, and if you have described what
13   your parameters of discrimination are, and they
14   don't comport to what the feds are, you know you
15   stand to lose about $4 billion in education
16   funding?  Here it is, right here.
17        So, what we have tried to say to you is
18   that you have gone far beyond what's in a restroom
19   or who goes into a restroom or how it affects
20   somebody personally.  What you have done is you
21   have not looked at this bill as to what effect it
22   may have on you in terms of your appropriations.
23   As I said before, you put in this bill that
24   disputes would be settled by the Human Relations
25   Commission, a commission that has been defunded and
```

## 65

```
1    no money going to them, but they are the ones
2    who -- who are going to do this.
3         You haven't looked at this carefully.
4    All you have done is come in and rushed because of
5    one hot button issue.  You've come in and taken
6    that hot button issue and turned it into something
7    else that you even have a problem digesting.
8         I still say that there is an opportunity
9    right now for you all to do what you want, what you
10   came in here to do, and not affect the cities and
11   counties in the authority that they may have and
12   what they may not have.
13        REP. STAM:  Mr. Speaker?
14        SPEAKER MOORE:  What purpose does the
15   gentleman from Wake, Representative Stam, rise?
16        REP. STAM:  Would Representative Michaux
17   yield for a question?
18        REP. MICHAUX:  Yes, sir.
19        SPEAKER MOORE:  Does the Representative
20   from Durham yield to the gentleman from Wake?
21        REP. MICHAUX:  I sure do.
22        REP. STAM:  Mr. Michaux, do you know
23   that, in the last 44 years, not a single school has
24   lost Title IX funding for enacting laws and
25   policies that require students to use restrooms and
```

## 66

```
1   locker rooms of their biological sex?  Not once in
2   44 years.
3          REP. MICHAUX:  I understand that.
4          REP. STAM:  Answer the question.
5          REP. MICHAUX:  I understand that they
6   have not yet lost anything.  Yes.
7          REP. STAM:  Second question.
8          SPEAKER MOORE:  Does the gentleman yield
9   to an additional question?
10         REP. MICHAUX:  I do yield.
11         SPEAKER MOORE:  He yields.
12         REP. STAM:  Does the paper you have there
13  happen to mention that 34 Code of Federal
14  Regulations, Section 106.33, says that quote, "a
15  recipient may provide separate toilet, locker room
16  and shower facilities on the basis of sex."  Have
17  they told you that in their little talking point?
18         REP. MICHAUX:  I do not need for them to
19  tell me that, because I know that, but I also know
20  that in some federal law there is a mention of
21  sexual orientation also, Representative Stam, which
22  is not in your bill here today.
23         SPEAKER MOORE:  For what purpose does the
24  gentleman from Mecklenburg, Representative
25  Alexander, rise?
```

## 67

```
1          REP. ALEXANDER:  To debate the bill.
2          SPEAKER MOORE:  The gentleman has the
3   floor to debate the bill.
4          REP. ALEXANDER:  Thank you, Mr. Speaker.
5   In going over this and thinking about it and
6   talking to folk up here, I think it is important
7   that you know two things.  Number 1, I am not
8   running for Congress, and, Number 2, that if this
9   bill passes, we will have finally after a couple of
10  hundred years figured out how to outlaw two-hole
11  outhouses.
12         Now, dealing with the serious matters.
13  You know, I -- I am a firm believer, as are many of
14  you, that regardless of what our Constitution says,
15  that ultimately, the power derives from the consent
16  of the governed.  It derives from the people.  And,
17  like many of you, I have argued over and over that
18  when you start looking at issues, you should go and
19  find out what the people did.
20         Now, we've listened to a discussion of
21  how a bill becomes a law in the General Assembly
22  with kind of an implication that the process lower
23  down isn't quite as legitimate or as thorough.  I
24  want to challenge that.
25         In the last couple of years down in
```

## 68

```
1   Mecklenburg County, specifically in Charlotte, this
2   whole issue of the anti-discrimination ordinance
3   came up, was discussed, was debated at one City
4   Council, and then became something that was
5   discussed in the next mayoral and City Council
6   campaigns.  So people who were running for office
7   went all over the community, showed up at numerous
8   forums, answered questions, and told people what
9   their position was going to be.  At least one
10  mayoral candidate -- the candidate who prevailed --
11  likewise went around the community at those same
12  forums, made speeches, told folk what her intention
13  was going to be, should she be elected.  And the
14  people of Charlotte went to the polls in -- fully
15  aware of these discussions, and voted in a City
16  Council committed to making some changes and a
17  mayor committed to making the changes.
18         Now, in my looking at Political Science
19  101, that's the essence of democracy.  We had a
20  democratic process.  It produced a result that some
21  folk like, some folks don't like, but it was a
22  democratic result.
23         I admonish you, ladies and gentlemen, to
24  be very careful to substitute consistently the will
25  of the people at the county and at the municipal
```

## 69

```
1   level with the will of 170 folk from all over
2   everywhere, most of whom are not from Mecklenburg
3   or Wake or Durham or Perquimans, or wherever the
4   next flashpoint will be.  We should be very, very
5   careful when we exercise our constitutional
6   authority to intervene in localities.
7          Now, there was a time when my colleagues
8   that ride the elephant would always talk about
9   local control and the importance of local control.
10  I want to remind them that that principle which you
11  used to champion and hold up, that principle is
12  still an important principle and should not be
13  forgotten in this debate.
14         I also want to remind you that there are
15  a lot of cities that already have adopted the kind
16  of legislation that you -- that we seek to outlaw
17  in this bill.  I don't know how many of you may
18  have traveled down to the state of Florida and have
19  gone to Disney World or Universal Studios or
20  whatnot.  You know that's -- all of those in a
21  little town called Orlando that has the same kind
22  of ordinance that Charlotte has adopted.  And I
23  don't think any of you had any problems when you
24  went to the toilets down there.  Or any of your
25  constituents have reported predators lurking around
```

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 19 of 75

## 70

1 Shamu's pool. You know, it just hasn't been a
2 issue.
3     I don't know how many of you may have
4 gone down to Myrtle Beach, where they have a
5 similar ordinance, or gone down to Charleston,
6 where they have a similar ordinance. The point
7 that I'm making is that this is not really new
8 ground that is being plowed. I mean, I have
9 received -- as have you, I am sure -- phone calls,
10 text messages, e-mails, you know, from citizens who
11 have been fearful of what might happen at their
12 schools, what might be happening out in the park,
13 what might be happening in various and sundry
14 places. It created these scenarios of fear. We
15 should not be playing into fear.
16     I don't know how many millions of people
17 go to Disney World or Universal Studios. It's a
18 lot. And yet, nothing like what we've been hearing
19 in this debate, from some quarters, has ever
20 happened.
21     We should, ladies and gentlemen, vote
22 against this measure. Because from all counts,
23 whether you're talking about contracting, whether
24 you're talking about the ability of people in a
25 given locality to want to create a higher standard

## 71

1 in how they deal ethically with their businesses,
2 whether you're talking about who's on first in
3 going to the outhouse. However you want to cut the
4 cake, these are decisions that should be left to
5 local governments -- to local people, and should
6 not be relegated to us spending $42,000 a day to
7 debate this stuff up here in Raleigh.
8     I appreciate you listening to me. I hope
9 some of you will vote with me, and I'm going to
10 vote red when it comes up. And hopefully we can
11 change the number up. Everything -- I've noticed
12 it's been going like thirty-some-odd folk to
13 seventy-some-odd folk. I don't know how many
14 people came up here with their minds made up, but I
15 trust that some of this debate and discussion will
16 allow you to see the light at the end of the
17 tunnel, and vote against this totally unnecessary
18 measure. Thank you, Mr. Speaker.
19     SPEAKER MOORE: For what purpose does the
20 gentleman from Wake, Representative Martin, arise?
21     REP. MARTIN: To debate the bill.
22     SPEAKER MOORE: The gentleman has the
23 floor to debate the bill.
24     REP. MARTIN: Thank you very much, Mr.
25 Speaker. Members, I want to talk about two

## 72

1 aspects -- two problems with this bill. The first
2 problem results from the convoluted and rushed
3 process by which the bill has found its way to us,
4 in which many members -- perhaps most members --
5 did not even see the language of it until this
6 morning.
7     And now, as I understand the leadership's
8 intent, it is to run it through this body and then
9 send it right over to the Senate, where it's going
10 to have a rushed committee process and go through
11 the Senate today. I'm open to be enlightened if
12 there's going to be a more deliberative process,
13 and would be happy to hear so, but my understanding
14 is still that it's going to happen this day. And
15 my experience here, in over a decade, has been,
16 regardless of which party is in charge, that rushed
17 legislation, a rushed process, leads to mistakes
18 and omissions. It can lead to laws that have bad
19 effects that we did not intend, and that we could
20 have avoided with more deliberation and more
21 consideration.
22     And I would submit to you, members, that
23 the omission of veteran status from our state's new
24 anti-discrimination policy is one of those
25 mistakes. I do think every member here, even my

## 73

1 Marine friend from Wake County who spoke of -- who
2 moved to table my amendment, would, upon
3 consideration and education, understand why we do
4 need to be able to protect discrimination on the
5 basis of veteran status.
6     One of the things that we have found,
7 particularly in the employment context -- but also,
8 in some cases, in the public accommodations
9 context, is that veterans are at risk of some
10 discrimination. There is a perception -- one that
11 is inaccurate -- particularly of veterans from the
12 current conflicts in Iraq and Afghanistan, that
13 we've all come back somehow scarred mentally from
14 the experience, and are unstable. In many folks'
15 minds, that perception could lead to a desire to
16 quietly bar a veteran from their premises if they
17 have a Marine or Army tattoo, or so forth.
18     It's also clearly an issue in the
19 employment context. And that's why you see at the
20 federal level, most state levels -- many state
21 levels, rather -- and certainly in local levels,
22 you do see discrimination, both in public
23 accommodations and in employment, prohibited. And
24 that's something that some counties in North
25 Carolina have chosen to do.

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 20 of 75

## 74

1    Like it or not, this bill we have before
2 us pretty clearly will repeal any ordinance -- any
3 city, county ordinance or local government
4 ordinance -- including, like the one in Orange
5 County, and probably several other counties.
6 That's going to happen, and that's something, I
7 think, if we'd had a more deliberative process, we
8 could have come to a bipartisan agreement that we
9 could have put in there.
10    But let me talk about something that
11 really goes to the heart of this legislation, and
12 why it is a horrific policy. What this legislation
13 will do, in the end, will make it very clear that
14 it is not against the law in North Carolina,
15 anywhere in our state, to discriminate on the basis
16 of sexual orientation. And at a time in our
17 nation's history where our men and women, gay and
18 straight, are still fighting, and still dying to
19 protect our right to come here on short notice and
20 blow hot air in the name of democracy, it is
21 abhorrent to discriminate against them.
22    Ladies and gentlemen, this nation has
23 not -- this is not the first time we've done this.
24 In the past, we have sent a class of people off to
25 war to defend our rights, and yet discriminated

## 75

1 against them when they've returned to our country.
2 I contend that that is one of the greatest
3 injustices ever perpetrated on a class of people in
4 our country. It was wrong then, and it is wrong
5 when we do it again today, and I will be voting no.
6    SPEAKER MOORE: For what purpose does the
7 lady from Surry, Representative Stevens, arise?
8    REP. STEVENS: To speak on the bill.
9    SPEAKER MOORE: The lady has the floor to
10 debate the bill.
11    REP. STEVENS: Members of the House, make
12 no doubt about it. This bill is not about
13 discrimination. This bill was passed because
14 Charlotte did an ordinance that would be effective
15 prior to us entering regular session. There's been
16 this talk about the cost of this session, $42,000.
17 That is a drop in a bucket compared to the
18 litigation that we would have to go through, and
19 that the State has been through several times, with
20 many counties and municipalities, only to have the
21 Court of Appeals tell them, 'You can't overreach,
22 counties. You can't overreach, cities. You have
23 limited authority; stay within it.' That's what
24 we're here about.
25    For those of you who don't know a lot

## 76

1 about municipal law, and I really didn't until I
2 got down here, we are what is called a Dillon Rule
3 state. That means the cities and counties only get
4 the authority we delegate to them. They can't just
5 take off and do home rule. Those of you who are
6 talking about, well, let these people back at home
7 do whatever they want to, they know what's best.
8 But that's not how it's done.
9    In addition, this particular ordinance
10 didn't purport to just take place in Charlotte or
11 Mecklenburg County. It purported to take place in
12 all the public schools that are run by the State.
13 It purported to take place in private business
14 facilities, if they want to do business with the
15 State. It purported to do with businesses who are
16 in other counties that might want to do business
17 with Charlotte. It far overstepped its bounds.
18    We can go back to this -- the same thing
19 we had to do with Durham County one time, when
20 Durham County was attempting to establish a minimum
21 wage. That was not within their realm. So this is
22 truly about one privacy. That is an overreaching
23 concern that we've had, people's right to privacy
24 in completing a private function. And the second
25 is, cities and counties, don't overreach. You've

## 77

1 got your authority.
2    Now, there was this discussion of the
3 person who went door-to-door, politicking so that
4 she could get this changed in her county. Well,
5 that's the problem. It's not just her county; it's
6 the state. If she wanted that authority, she needs
7 to be going door-to-door and getting all her
8 friends together to replace everybody in this body,
9 because that's where the authority lies. I'd ask
10 that you vote for this bill.
11    SPEAKER MOORE: For what purpose does the
12 gentleman from Orange, Representative Meyer, arise?
13    REP. MEYER: To speak on the bill.
14    SPEAKER MOORE: The gentleman has the
15 floor to debate the bill.
16    REP. MEYER: Thank you, Mr. Speaker. I'm
17 going to save Representative Bishop from my second
18 question, but go ahead and continue the debate that
19 we had there for a second. Representative Bishop
20 suggested that the deliberative process of this
21 body is superior to the deliberative process of
22 local elected bodies. He ran through what it takes
23 to get a bill passed in this body, and compared it
24 to what -- something that, quote, "a handful of
25 people can do through a locally elected body."

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 20 of 75

## 78

1        I would simply like to point out to the
2  people of North Carolina that in the record of the
3  Charlotte City Council debate on the ordinance
4  we're discussing, there are 214 pages of official
5  record, and 28 attachments. Whereas,
6  Representative Bishop's own bill that we're hearing
7  today was only introduced to us at 10 a.m. this
8  morning, and will be passed in just a handful of
9  hours.
10       So apparently, the people of North
11  Carolina need to understand that if you would like
12  to have a bill put through this deliberative body,
13  you don't really need the whole process that he
14  outlined. What you need is a majority party who's
15  willing to call a special session and push a bill
16  through in one day only for the purpose of
17  discriminating against the residents of our own
18  fine states. I urge you to vote against the bill.
19       SPEAKER MOORE: For what purpose does the
20  lady from New Hanover, Representative Hamilton,
21  arise?
22       REP. HAMILTON: To debate the bill.
23       SPEAKER MOORE: The lady has the floor to
24  debate the bill.
25       REP. HAMILTON: Okay. Thank you, Mr.

## 79

1  Speaker. And where do I begin? I was one of those
2  people driving up here this morning, having not
3  seen the specifics of the bill, yet who was
4  clearly, you know, quite unsure as to how I was
5  going to vote. I am, after all, a mother and, as a
6  parent, all parents want what's best for their
7  children, and certainly we want to protect our
8  children against any evil that may lurk out there.
9  By the way, it can happen anywhere. But then I saw
10  the bill, and read through it, and I asked quite a
11  few questions in committee. And I want to thank
12  Chairman Blackwell for his lenience in letting us
13  ask a lot of questions this morning.
14       I've discovered, through Fiscal Research,
15  that the investigations and conciliations portion
16  of the bill -- it's on Page 5, Line 22 -- this
17  "Human Relations Commission and the Department of
18  Administration shall have the authority to receive,
19  investigate, and conciliate complaints of
20  discrimination in public accommodations."
21       Representative Richardson asked a very
22  good question during the committee hearing, and she
23  asked, has that division -- that Commission,
24  indeed, been funded by the department -- in the
25  current budget cycle. The answer to the question

## 80

1  from Fiscal Research is this: the Human Relations
2  Commission was placed on a continuation review.
3  They are currently on non-recurring funding, and
4  the General Assembly will have to decide whether to
5  appropriate recurring money to this Commission in
6  the short session, or else the Commission will be
7  eliminated. So unless this body acts during the
8  short session to fully fund, in a recurring way,
9  the Human Relations Commission, then there'll be no
10  place for people who feel they've been
11  discriminated against to come and make their case
12  in North Carolina.
13       I assure you many North Carolinians are
14  going to be watching what we do in the short
15  session regarding the Human Relations Commission.
16  I will be one of them, I will be here, and I will
17  not be letting this issue go.
18       The second thing -- and this has already
19  been brought up by Representative Michaux, but I
20  wanted to put a little finer point on it. In G.G.
21  versus Gloucester County School Board, on November
22  2nd of 2015, the courts ruled this: the United
23  States Department of Education's Office of Civil
24  Rights has determined that a school or school
25  district that violates Title IX when it fails to

## 81

1  provide access to restrooms and locker rooms
2  consistent with a transgender student's gender
3  identity. That's less than six months ago that the
4  courts have ruled that that is a violation --
5       REP. BISHOP: Mr. Speaker?
6       REP. HAMILTON: -- of Title IX.
7       SPEAKER MOORE: For what purpose does the
8  gentleman from Mecklenburg, Representative Bishop,
9  arise?
10       REP. BISHOP: To ask a question of the
11  Representative.
12       SPEAKER MOORE: Does the lady from New
13  Hanover yield to the gentleman from Mecklenburg?
14       REP. HAMILTON: I do not.
15       SPEAKER MOORE: The lady has the floor to
16  continue her remarks.
17       REP. HAMILTON: Thank you. So, how does
18  that relate to North Carolina? What that does is
19  put close to $4 billion at risk in education
20  funding in our state. If we are threatened with a
21  Title IX violation, and I feel very confident that
22  we probably will be, just like Tennessee is
23  currently grappling with the same issue, then we
24  put at risk $4 billion of Title IX funding toward
25  public education at all levels. I think you really

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 22 of 75

82

1    ought to consider this in your -- your review of
2    this bill. You ought to consider the most recent
3    ruling in this regard, and you should vote against
4    this.
5         SPEAKER MOORE: For what purpose does the
6    gentleman from Cumberland, Representative Lucas,
7    arise?
8         REP. LUCAS: To debate the bill.
9         SPEAKER MOORE: The gentleman has the
10   floor to debate the bill.
11        REP. LUCAS: Thank you, Mr. Speaker.
12   Ladies and gentlemen, I have sat very attentively
13   as the debate has gone on, and as I've tried to
14   decipher how I could best relate to this bill. I
15   have not had the opportunity to even know what the
16   bill might contain, other than what I heard in the
17   media relative to restroom privileges, Section 1.
18   I think I heard that distinctly prior to coming
19   here. Sections 2 and 3, I knew nothing about until
20   today.
21        Regarding all three of those sections,
22   suffice it to say that in Section 1, I pretty much
23   know that we ought to be human beings first, and
24   that we ought to do everything within our power to
25   limit opportunities for perversion or mistreatment.

83

1    And we get sometimes really emotional about
2    children. Probably everybody that has children, or
3    have had children, and none of us want to expose
4    our children to this kind of circumstance. That's
5    just common sense. We don't want that.
6         And I don't know if any amount of
7    legislation is going to prevent those who have
8    ulterior motives from attempting to implement those
9    motives. We just simply have to deter them as best
10   we can. And we'll all be committed to doing just
11   that. We all love our children.
12        As to how we handle the other sections of
13   that bill, that is micromanaging. That greatly
14   disturbs me. We all have a -- most of us, I should
15   say, let me qualify that, most of us have reached
16   the consensus that government is best when it's
17   handled at the lowest level possible. Ordinances
18   enacted by our cities and our counties, we ought to
19   respect, because they are close to the people that
20   they govern. We have railed, here at the state
21   level, about big brother federal government handing
22   down mandates, and expecting us to comply.
23   Probably all of us have railed against that, but
24   now it seems like we want to do the very same thing
25   and pass the buck on down to those who are

84

1    subservient to us. They are elected bodies, as we
2    are, and I do not know what's best for Mecklenburg
3    County. I will try my best to represent Cumberland
4    County, because that's who elected me.
5         We have to judge decisions that we make
6    here based on some previous experience. I
7    understand that there are such ordinances in a
8    sister state, like South Carolina, which is right
9    next to us, and I'm not aware of any problems that
10   they've encountered simply because they have
11   implemented good old common sense. And that's what
12   it takes. Common sense. I don't want to be in the
13   position of telling county commissioners, I know
14   much more about how to run your county than you do;
15   or to tell city councils, I have a better, a
16   greater, understanding of what you ought to be
17   doing, what you ought to be implementing, than you
18   know at that local level. So I think we need to
19   think long and hard about this decision. Thank
20   you.
21        SPEAKER MOORE: For what purpose does the
22   lady from Wilson, Representative Martin, arise?
23        REP. MARTIN: To debate the bill.
24        SPEAKER MOORE: The lady has the floor to
25   debate the bill.

85

1         REP. MARTIN: Thank you, Mr. Speaker.
2    I'd just like to share some appreciation to the
3    work committee, and the folks who put a lot of
4    effort into drafting this legislation. And as a
5    mother of two teenage daughters who've been in the
6    schools recently -- and that, as often happens
7    around our family, we talk about what's going on.
8    What are you up to? What's happening at work? And
9    we talked about this issue, and that -- just the
10   appall that they had at the idea of it being wide
11   open for anyone to come into the restrooms at
12   school.
13        And I understand there were certain
14   intentions that perhaps they were trying to do
15   locally, but the result was just wide open ability,
16   without any discrimination at all, for anyone to
17   walk into either restroom at any time. So I would
18   just like to say thank you for this legislation,
19   and the common sense approach to protecting
20   everyone's privacy, and I think this is important.
21        It's common sense. It protects the
22   privacy for every citizen in this state, and that's
23   important. And I do also support that we have a --
24   a local control as much as possible, and that we
25   support those things that our local governments

## 86

1  have the authority to do. And the more clear that
2  we can be, that we have given this authority, and
3  not that authority, then the less time that they
4  have to waste, and that we waste. And so I think
5  it's important that we clearly lay out, what
6  authority has been given and not given, and that
7  those things that have statewide importance are
8  handled at the state level.
9      But -- but most importantly, I just
10 wanted to rise as a mother and a parent of -- of
11 daughters, and thank you for protecting our
12 privacy, and urge you to support the bill.
13     SPEAKER MOORE: For what purpose does the
14 lady from Orange, Representative Insko, arise?
15     REP. INSKO: To debate the bill.
16     SPEAKER MOORE: The lady has the floor to
17 debate the bill.
18     REP. INSKO: Thank you, Mr. Speaker.
19 Ladies and gentlemen of the House, this is wrong.
20 This is bad wrong. We're sent up here to solve
21 problems, not to create them. This bill is
22 supposed to protect girls and women. This bill
23 doesn't protect transgender girls or transgender
24 women. Transgender girls, now, who will be forced
25 to go into the male bathroom, or the male's locker

## 87

1  room. Are they going to be treated well?
2      The only thing I can think of that's good
3  about this, is that we're finally talking about it
4  in public. That means our consciousnesses are
5  being raised. There was a time when we didn't know
6  someone who was gay: now, we all know someone who
7  is gay, and have gay friends. There was a time
8  when we didn't know anyone who was transgender.
9  Someday, that will be -- we'll be all familiar with
10 that issue, and tolerant of it. But for now, we're
11 really struggling, and I think this is a -- the
12 debate, I hope, will make us think about who we
13 really are trying to protect.
14     This is a -- this is a local issue. We
15 have a lot more gay and transgender bisexual people
16 in Orange County. It's a tolerant community, so
17 why shouldn't we be able to have a local ordinance
18 that we choose, that protects the population that
19 lives in Orange County? Just looking at this
20 Section 3 that we talked about before, about how
21 this removes state protections against
22 discrimination: because, after all, everyone can go
23 to the federal court.
24     You may not know this, but in North
25 Carolina, our state laws protect people with sickle

## 88

1  cell disease. It's a local state issue. It's not
2  a federal issue, but it's appropriate, for we
3  have -- that we have that here, because we have a
4  large population of people with sickle cell
5  disease. I was the health program administrator
6  for the UNC Sickle Cell Program, which was part of
7  a Duke UNC Sickle Cell Center. We have a large
8  population here, and a lot of support for that
9  population.
10     A lot of good research has gone into this
11 state, and we have a local population that needs
12 this protection, and we have a -- a state law that
13 protects that population. It's a local issue. It
14 is a state issue. Just like this is a local issue.
15 This is a bad bill. It's a wrong -- it's wrong to
16 do. Please vote no.
17     SPEAKER MOORE: For what purpose does the
18 gentleman from Wake, Representative Dollar, arise?
19     REP. DOLLAR: To debate the bill.
20     SPEAKER MOORE: The gentleman has the
21 floor to debate the bill.
22     REP. DOLLAR: Thank you, Mr. Speaker,
23 Members of the House. I have tried to listen very
24 carefully to the debate in Committee and to the --
25 the debate on this floor. And let me respond first

## 89

1  to a couple of issues that have been thrown out.
2      One, Representative Hamilton mentioned
3  the issue of a continuation review for the Human
4  Relations Council. Well, I know of no continuation
5  review, not in my time in this Chamber, that didn't
6  result in the program being continued. More
7  importantly, a continuation review means that we're
8  examining the program. This provision would
9  actually help enhance the Human Relations
10 Commission, and the money is already provided to
11 continue that function in the second year of the
12 biennium. The money has already been funded, so
13 it's there, and not in any jeopardy.
14     There was a question that was raised with
15 respect to Title IX, and -- and I would again point
16 out from Title IX itself, which is obviously a very
17 long title, but "Nothing contained herein shall be
18 construed to prohibit any educational institution
19 receiving funds under this act from maintaining
20 separate living facilities for the different
21 sexes," and then particularly under Title IX's
22 regulation, under the Code of Federal Regulation,
23 it specifically states, "A recipient may provide
24 separate toilet, locker room and shower facilities
25 on the basis of sex."

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 24 of 75

90

1    So if there was a Title IX issue, the
2  Charlotte ordinance would certainly not be the
3  remedy for that.  That would be an issue that we
4  would have to deal with at the state level.  So
5  that is sort of another red herring in this.
6    There was an issue raised with respect to
7  veterans, and I would only comment that I'm sure
8  the gentleman is well aware of the myriad of
9  veteran protections that we have in this state.
10  Now, let me mention just a couple.  We have 60, 60
11  local veterans' services offices in this state.
12  There is specific protection, employment
13  protection, for veterans as well as members of --
14  of the National Guard.  And I have worked with
15  those in real life, from my time in state
16  government, I know they are there, and I know what
17  those provisions are, and they are ample and in no
18  way diminished by anything in this legislation.
19    Now, Representative Stevens very well
20  stated the issue with respect to timeliness and
21  cost.  The reason why we're acting now is that what
22  we do today will save not only the cost of any
23  litigation there would have to be brought to
24  address the Charlotte ordinance, but also deals
25  with their April 1st enactment date.  They could

91

1  have delayed that.  Charlotte could have delayed
2  that and allowed the General Assembly, in its
3  normal course, to come in and to consider the
4  matter.  They chose not to do that.  So what we are
5  doing is both timely and cost-effective.
6    But the real issue, for me, anyway, when
7  I looked at this, and it first came up, and the
8  first discussion about enacting -- looking at this,
9  gets back to what is the function of a local
10  municipality, a county or a city?  And I would just
11  quote from a recent court -- court case, in the
12  last few years, from the North Carolina Supreme
13  Court -- the Lanvale decision, which was a decision
14  regarding beyond taking zoning, certain statutes,
15  and trying to construe them to mean more than what
16  they actually meant.
17    And the Court stated this:  "In the
18  exercise of ordinary governmental functions,
19  counties and cities are simply agents of the state,
20  constituted for the convenience of local
21  administration in certain portions of the state's
22  territory.  And in the exercise of such functions,
23  they are subject to almost unlimited legislative
24  control, except where this power is restricted by
25  constitutional provision."

92

1    That is an interpretation that our
2  Supreme Court has stated again and again and again
3  in a variety of cases, and it is how our government
4  in North Carolina is structured.  And I would note
5  that no one in here in this debate -- I have yet to
6  hear in the hours or so that we've debated this, no
7  one has cited a specific local authority that the
8  General Assembly has enacted that would allow for
9  this local ordinance to be put in place by the City
10  of Charlotte or any other municipality.  They lack
11  specific statutory authority to do what they did.
12    Members of this House, let me just say
13  this.  Our cities, our counties do a tremendous
14  function for us in this state.  They do a
15  tremendous job, and we want them to continue to
16  focus on those issues -- police, fire, parks,
17  recreation, economic development, water,
18  wastewater, recycling, sidewalks -- all of those
19  issues which have been clearly delegated to the
20  local municipalities, to the counties, as well as
21  other functions, specific by this body, by the
22  General Assembly of this state.  They need to work
23  to hone those functions, to provide those services
24  to the citizens, and we do not need any municipal
25  government acting outside of its appropriate

93

1  authority, particularly when they are seeking to
2  make political statements.  And I would ask you to
3  vote for the bill.  Thank you.
4    SPEAKER MOORE:  For what purpose does the
5  lady from Franklin, Representative Richardson,
6  rise?
7    REP. RICHARDSON:  Thank you, Mr. Speaker;
8  to debate the bill.
9    SPEAKER MOORE:  The lady is recognized to
10  debate the bill.
11    REP. RICHARDSON:  If I'm correct, today
12  in our committee meeting, I think I understood the
13  bill presenter to make the statement that, in order
14  to use the appropriate bathrooms, that you needed
15  to change your birth certificate to identify with
16  whatever transgender identity that you were to
17  identify with.
18    And the thought that has come to my mind,
19  is, if that's the case, then those, quote,
20  "preverts" [sic] that we are saying would raid our
21  women's bathroom, and go in and hurt our children;
22  what's to stop them from changing their birth
23  certificate?  Because nothing in here says that
24  anybody has to have any type of ID or anything to
25  change their birth certificate.  So are we really

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 25 of 75

## 94

1 protecting, or are we giving people who would do
2 harm another avenue to access our children?
3 Because if I could just change my birth certificate
4 and go in any bathroom I wanted to, then anybody
5 can do that.
6           So I was wondering if there is any
7 requirements for someone changing their birth
8 certificate, or will the schools monitor that birth
9 certificate? Or how will we know that I didn't
10 just change my birth certificate because I wanted
11 to go in the girls' bathroom? Thank you.
12           SPEAKER MOORE: For what purpose does the
13 gentleman from Guilford, Representative Blust,
14 arise?
15           REP. BLUST: To see if Representative
16 Bishop --
17           SPEAKER MOORE: Representative --
18 Representative Bishop is at the speaker's dais
19 right now. Does the gentleman wish to debate the
20 bill, or does the gentleman --
21           REP. BLUST: No, I'll -- I'll direct my
22 question to Representative Stam.
23           SPEAKER MOORE: Does the gentleman from
24 Wake yield to the gentleman from Guilford?
25           REP. STAM: I do.

## 95

1           SPEAKER MOORE: He yields.
2           REP. BLUST: Representative Stam, I had
3 two understandings about this, that I -- I don't --
4 I want to be sure about, about this matter.
5 Representative Dollar just covered one, which was
6 the fact that what the -- the Charlotte ordinance
7 absolutely went beyond what was already permitted
8 by law, and we're just making it clear, what that
9 law that already exists is.
10           The other one is -- is, as I understood
11 it, is the Charlotte ordinance didn't just affect
12 Charlotte. And I want to be sure on this, that
13 that ordinance affected anyone who -- from the
14 state who visited Charlotte, or who did business in
15 Charlotte, and hence, it had statewide
16 implications, and that the legislature that
17 represents the entire state, therefore, is the
18 proper forum in which this kind of matter can be
19 corrected.
20           REP. STAM: That -- that is correct,
21 Representative Blust. The -- that ordinance
22 affected anyone who traveled through Charlotte. It
23 affected all the business owners, the non-profit
24 owners, because of their place -- their place of
25 public accommodation, the -- the definition was

## 96

1 extremely broad. It affected every business that
2 wants to do business with Charlotte by contracting
3 with Charlotte, so I -- I would say it was economic
4 imperialism.
5           SPEAKER MOORE: For what purpose does the
6 gentleman from Durham, Representative Hall, arise?
7           REP. HALL: To speak on the bill the
8 first time.
9           SPEAKER MOORE: The gentleman has the
10 floor to debate the bill.
11           REP. HALL: Thank you, Mr. Speaker, and I
12 appreciate the opportunity to speak on this bill
13 the first time. And I wanted to look at a couple
14 of things, and -- and make it real simple, because
15 we've made it a little bit more complicated in the
16 discussion of this bill.
17           We've created a special session, and
18 we've all acknowledged, although we thought we were
19 going to get a look at the bill last night, that we
20 had an official five-minute period to read the bill
21 in the committee meeting today.
22           Now, Representative Bishop made a big
23 deal about the fact of all the different hoops and
24 steps you would go through for a bill in this
25 General Assembly to pass. Some people might would

## 97

1 call that partially due diligence. That's not what
2 happened with this bill, though.
3           Let's go back and review what happened.
4 Folks got a look at this bill this morning, and we
5 are here today on this floor. It didn't go to a
6 second committee, didn't go to a third committee,
7 didn't have a notice to public hearing on it,
8 didn't have any of those protections. So let's not
9 get confused what normally happens around here with
10 what happened with this bill.
11           Now, for some reason we decided we had to
12 have a special session. And yes, we're going to
13 spend $42,000, but that's not the real cost of this
14 bill. We know everybody in here. I don't know
15 what your billing rate is, or what revenue or
16 income you're sacrificing, or how much time it took
17 you to get here, or what responsibilities you had
18 in your community that you won't be able to
19 discharge because you're here, but add that on top
20 of the $42,000. That's the cost to your
21 communities, your family, and our state for us to
22 be here for a non-emergency. So we're here, and
23 someone said this is an emergency, even though
24 we're coming back on the 26th to do business --
25 that this is an emergency, that we have to do all

Case 1:16-cv-00236-TDS-JEP   Document 113-1   Filed 08/29/16   Page 26 of 75

## 98

1    of that upheaval right now.
2         Well, if it's an emergency, what is the
3    standard for it to be an emergency session? We've
4    done this twice: once in 1981 when there was an
5    error that we made in an adjournment resolution,
6    and we had a member-demanded session to come back
7    and correct the adjournment resolution for the
8    legislature. And this is the second time.
9         So what makes this, in the history of
10   North Carolina, so important that we should come
11   back and use that -- you know, some people call
12   that trickeration. But it is a legal methodology
13   to call a session. So it's legal, and we can do
14   it, and so we did it. But what made this rise to
15   the level of being an emergency, that we have a
16   special session?
17        Now, 500,000 North Carolinians who could
18   get health care if we increase our Medicaid, they
19   might say, well, that's an emergency. Five hundred
20   thousand North Carolinians who should get health
21   care, they may say that's an emergency. How about
22   our teachers that are moving out of the state,
23   because they can't --
24        REP. STEVENS: Mr. Speaker?
25        REP. HALL: -- get paid a decent wage.

## 99

1    They may say --
2         SPEAKER MOORE: The gentleman will
3    suspend. For what purpose does the lady from
4    Surry, Representative Stevens, arise?
5         REP. STEVENS: Point of order. Are we
6    sticking --
7         SPEAKER MOORE: The lady may state her
8    point of order.
9         REP. STEVENS: Just, are we sticking with
10   the bill? Is this germane to the bill that's
11   before us?
12        SPEAKER MOORE: The lady's comments are
13   duly taken by the Chair. The -- the Chair would
14   ask the gentleman to temper -- to keep his remarks
15   relevant to the bill at hand. I understand the
16   gentleman is trying to talk about other priorities,
17   but inasmuch as possible, germane to the bill at
18   hand. The gentleman does have the floor to
19   continue debate.
20        REP. HALL: Thank you, Mr. Speaker,
21   and -- and I hope I'll be granted the latitude to
22   speak about the process regarding the bill as well?
23   I'll take that as a yes. So what --
24        REP. HALL: -- makes this be an important
25   enough issue for us to call a special session?

## 100

1    That is the discretion of the members who said,
2    this is important. The people of North Carolina
3    didn't say it was important enough to do that. The
4    teachers who are leaving the state because their
5    salaries are not sufficient for their families to
6    live and work in -- in this state of North
7    Carolina, they didn't say that. The people who
8    want to improve education, they didn't say that.
9         REP. LEWIS: Mr. Speaker?
10        REP. HALL: Why, all of a sudden, is it
11   important that this item --
12        SPEAKER MOORE: Representative Hall, the
13   gentleman will please suspend. For what purpose
14   does the gentleman from Harnett, Representative
15   Lewis, rise?
16        REP. LEWIS: Point of order. I don't
17   believe the gentleman is speaking on the merits
18   contained within the House Bill 2, which is before
19   the Chamber.
20        SPEAKER MOORE: The Chair will -- will in
21   this case rule that the gentleman's comments have
22   drifted pretty far astray from being germane to the
23   bill. If the gentleman will please contain his
24   remarks germane to the bill.
25        REP. HALL: Thank you, Mr. Speaker. And

## 101

1    as we talk about the bill itself, and not the
2    process by how it got here, apparently that's
3    irrelevant that -- that we created this situation.
4         Then let's talk about the bill itself.
5    What is the bill doing? Is it expressing the will
6    of the people? Is it addressing the issues of most
7    importance to the people? Let's talk about the
8    companies and the business interests in the
9    community that employ the local people who said
10   they support, by providing at their places of
11   employment, protection. Carolinas HealthCare
12   System, Wells Fargo, these are all private
13   organizations, yes, and these are all organizations
14   and businesses that work with the local community,
15   and do the very thing that Representative Dollar
16   said local communities are supposed to do: provide
17   and participate in economic development. The very
18   thing we do when we provide incentives to companies
19   to come to North Carolina. Well --
20        REP. BISHOP: Mr. Speaker?
21        REP. HALL: -- Wells Fargo, Wal-Mart
22   Stores --
23        SPEAKER MOORE: Just a moment.
24        REP. HALL: -- Bank of America --
25        SPEAKER MOORE: To what purpose does the

Case 1:16-cv-00236-TDS-JEP   Document 119-5   Filed 08/29/16   Page 27 of 75

## 102

1    gentleman from Mecklenburg, Representative Bishop,
2    rise?
3        REP. BISHOP:  To ask Representative Hall
4    a question.
5        SPEAKER MOORE:  Does the gentleman from
6    Durham yield to the gentleman from Mecklenburg?
7        REP. HALL:  Why, it would be my pleasure
8    to yield, as soon as I finish my comments.
9        SPEAKER MOORE:  He doesn't yield at this
10   time.  The gentleman from Durham has the floor to
11   continue debate.
12       REP. HALL:  And -- and I would continue
13   the list:  Bank of America, Novant Health Systems,
14   American Airlines, Food Lion, Harris Teeter
15   Supermarkets, Lowe's Companies, Duke Energy
16   Corporation, Apple, Siemens, AT&T, Microsoft, Bank
17   of America; all organizations and businesses that
18   help partner with us in the development of our
19   state, contributing to the education of our
20   children, developing a future that we all aspire to
21   have North Carolinians have an opportunity to
22   participate in.  But yet and still, their expressed
23   preference, by making their workplaces safe for all
24   North Carolinians, are being ignored.  And so what
25   would we expect that future companies would say if

## 103

1    all of our citizens can't be respected, our valued
2    employees can't be treated fairly?  Then they won't
3    come to North Carolina and take a risk on that.
4        It gets even worse, though, because when
5    you think about it, South Carolina bests us again.
6    Can you believe it?  South Carolina has enough
7    sense to be inclusive, and North Carolina, once
8    again, we're getting our lunch eaten by South
9    Carolina, over and over.
10       The fiscal note that was talked about:  if
11   you don't have a fiscal note, how are we going to
12   make a responsible decision about this bill?  What
13   is it really costing us?
14       I heard Representative Dollar say, "Well,
15   we're going to have funding available, although
16   it's under a continuation review."  It's not in
17   this bill that guarantees there'll be funding
18   there.  There's nothing in the bill that says that.
19   In the answer today to the committee, he indicated
20   there was funding there, it's taken care of.  It's
21   not committed.  It's not committed for this.  It
22   may be there, it may not, and there's no
23   alternative way --
24       REP. DOLLAR:  Mr. Speaker?
25       REP. HALL:  -- to address those issues.

## 104

1        SPEAKER MOORE:  For what purpose does the
2    gentleman from Wake, Representative Dollar, rise?
3        REP. DOLLAR:  To see if the gentleman
4    would yield for a question.
5        SPEAKER MOORE:  Does the gentleman from
6    Durham yield to the gentleman from Wake?
7        REP. HALL:  Yes, Mr. Speaker, I'd be glad
8    to yield after my comments, after Representative
9    Bishop's --
10       SPEAKER MOORE:  He does not yield at this
11   time.  The gentleman from Durham has the floor to
12   continue debating the bill.
13       REP. HALL:  Thank you, Mr. Speaker.  And
14   I think it's extremely important that we note
15   what's going on here.  You know, as Republican
16   primary voters left the polls, they said they had a
17   60 percent disapproval rating for their Republican
18   leadership.  And so now, we've created this
19   emergency fiction, and we're going to have an
20   emergency solution, that we haven't done our work
21   on in passing it.  Again, a one-day bill, one
22   committee, an hour's hearing, five minutes for you
23   to review it, and you're getting ready to vote it
24   up or down based on floor debate, without a fiscal
25   note.

## 105

1    I can't say that's responsible.  I'm not
2    sure any of you could say that's a responsible way
3    for us to legislate.  I know you feel that you have
4    to vote a certain way, and many of us will have to,
5    but we would have hoped we could have done better
6    than this.  Not economic development, not funding
7    for our schools, not health care for our citizens,
8    we came back to do this.  It's really a shame that
9    we could do this to the people of North Carolina.
10   I'd ask that you vote against the bill.
11       SPEAKER MOORE:  For what purpose does the
12   lady from Mecklenburg, Representative Cotham, rise?
13       REP. COTHAM:  Thank you, Mr. Speaker:  to
14   send forward an amendment.
15       SPEAKER MOORE:  The lady's recognized to
16   send forth an amendment.  The Clerk will read.
17       CLERK:  Representative Cotham moves to
18   amend the bill on Page 3, Lines 24 through 25, by
19   inserting the following lines to read.
20       SPEAKER MOORE:  The lady's recognized to
21   debate the amendment.
22       REP. COTHAM:  Thank you, Mr. Speaker and
23   members.  I hope that this is a clarifying
24   amendment.  I have shown it to the bill sponsors,
25   and they are on board.

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 29 of 75

## 106

1  You may recall I talked about if you are
2  a mother and have a very young child, could be an
3  infant, could be a three-year-old, and you need
4  that child to go into the restroom with you. Now,
5  this -- these children are not going to help you as
6  a parent, but for safety, you need them in there
7  with you, because what are you going to do with a
8  three-year-old or five-year-old? This simply
9  clarifies this, so that if you are a parent, and
10  you have a child up to the age of seven, that he or
11  she can accompany a parent or anyone who is caring
12  for that child -- could be a grandmother, could be
13  an aunt -- but I'm sure many of us who are parents,
14  we have been in this situation. So I ask for your
15  support.
16  SPEAKER MOORE: Further discussion or
17  debate on the amendment? The -- the gentleman from
18  Mecklenburg, Representative Bishop, is recognized
19  to debate the amendment.
20  REP. BISHOP: Thank you, Mr. Speaker. We
21  support the amendment.
22  SPEAKER MOORE: Further discussion,
23  further debate? If not, the question before the
24  House is the adoption of Amendment 3, set forth by
25  Representative Cotham. Those in favor of the

## 107

1  amendment will vote aye: those opposed to the
2  amendment will vote no. The Clerk will open the
3  vote.
4  (Votes recorded.)
5  SPEAKER MOORE: Representatives Speciale
6  and Malone, do the gentlemen intend to vote no on
7  this amendment that's been agreed to by all
8  parties? Okay. The Clerk will -- the Clerk will
9  lock the machine and record the vote. 107 having
10  voted in the affirmative, and none in the negative,
11  Amendment 3 is adopted. We're now back on the
12  bill. For what purpose does the gentleman from
13  Gaston, Representative Hastings, arise?
14  REP. HASTINGS: To debate, Mr. Speaker.
15  SPEAKER MOORE: The gentleman has the
16  floor to debate the bill.
17  REP. HASTINGS: And I had not planned to
18  speak, and I'll be very brief, Mr. Speaker. But I
19  have to admit, I've had to go through a
20  constitutional gut check today. I've had people
21  talk about local control and other issues, so I had
22  to go back to the delineation of power in my own
23  mind and let the people back home know what I'm
24  doing. And, of course, that flow of power is from
25  God to the people, and then to the Constitution and

## 108

1  to the General Statutes.
2  And so I thought I would just mention,
3  the real defining line for me is the 10th Amendment
4  to the U.S. Constitution, and that reads, "The
5  powers not delegated to the United States by the
6  Constitution nor prohibited by it to the states are
7  reserved to the states respectively, or to the
8  people."
9  And of course that flow then took me to
10  the State Constitution, to Article 7, Local
11  Government, and it reads, "The General Assembly
12  shall provide for the organization and government
13  and the fixing of boundaries of counties, cities,
14  and towns, and other governmental subdivisions,
15  and, except as otherwise prohibited by this
16  Constitution, may give such powers and duties to
17  counties, cities and towns and other governmental
18  subdivisions as it may deem advisable." That
19  certainly sounds like we are in the framework of a
20  valid constitutional consideration, and I plan to
21  support the bill.
22  SPEAKER MOORE: For what purpose does the
23  gentleman from Lee, Representative Reives, rise?
24  REP. REIVES: To debate the bill.
25  SPEAKER MOORE: The gentleman has the

## 109

1  floor to debate the bill.
2  REP. REIVES: I, like, Representative
3  Hastings, wasn't intending to have any conversation
4  on this, but it -- we are still continuing a
5  pattern that I -- I wish we would take a second
6  look at. I understand Page 1 of this bill
7  perfectly. I don't know where the last four pages
8  of the bill came in, or came from, but I would say
9  that -- I would remind most of us in here, that
10  for -- everything we continue to say about local
11  counties -- local commissions, local city councils,
12  boards of education, a lot of us came up through
13  those ranks. A lot of us were good public servants
14  at the local level.
15  I think to continue to insinuate or
16  directly disparage people who have taken the time
17  to serve as our County Commissioners, our city
18  councilmen, our board of education members at other
19  times, is not the route that we want to continue to
20  go. I agree with Representative Lucas's earlier
21  statement, the lower the level of government that
22  can handle matters, the better off we are.
23  If we're going to continue down a path
24  where we're going to take over a lot of the local
25  functions, I just don't think that's the way to go,

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 29 of 75

## 110

```
1    because at some point in time, we've got things
2    that are statewide issues that we've got to pay
3    attention to, and it took us 10 months last year to
4    handle just those matters.  And so I would ask that
5    we take that into consideration as we're thinking
6    about our votes on this bill, and as we proceed
7    through the short session.
8            But I have to say I wholeheartedly
9    disagree with taking away local power, and I
10   wholeheartedly disagree with taking away a cause of
11   action for discrimination at a state level.
12           For those of us who are -- practice law
13   and for those who have ever been unfortunate enough
14   to be involved in a discrimination suit, getting a
15   federal discrimination suit started is not a simple
16   matter.  If it were a simple matter, nobody would
17   care if you could have a state cause of action, and
18   so doing these type of things, I just don't think
19   are appropriate.  I don't think that they have
20   anything to do with Page 1 of the bill, and I would
21   just ask you to keep those things in consideration.
22           REP. ARP:  Mr. Speaker?
23           SPEAKER MOORE:  For what purpose does
24   the --
25           REP. ARP:  Mr. Speaker?
```

## 111

```
1            SPEAKER MOORE:  For what purpose does the
2    gentleman from Union, Representative Arp, arise?
3            REP. ARP:  I wonder if my good friend,
4    Representative Rieves, would yield to a question?
5            SPEAKER MOORE:  Does the gentleman from
6    Lee yield to the gentleman from Union?
7            REP. REIVES:  Happily.
8            SPEAKER MOORE:  He yields.
9            REP. ARP:  Thank you, Representative
10   Reives.  I admire you greatly.  I've heard a lot of
11   this theme that comes in here.  I don't know if
12   you're aware -- the actual amendment that Charlotte
13   had passed, which would be applicable, actually
14   amends the statewide bid laws to where they would
15   be not required to take the lowest bidder in a
16   project, because they have not yielded to privacy
17   rights of bathrooms and -- and of that nature.  Do
18   you support them not -- paying more for a contract
19   and -- in contravention to the state bidding laws,
20   in order to have generalist bathrooms?
21           REP. REIVES:  No, and actually, I -- with
22   the great respect I have for you, Representative
23   Arp, and people on your side that have been able to
24   put together some bills, I think that we can
25   articulate and directly address problems with
```

## 112

```
1    Charlotte, or any other municipality, or any other
2    county, that does something that's in direct
3    contravention with state law.
4            And I think we can address and we can
5    attack those issues and be done with those issues.
6    And I think that to just say, well, you've made a
7    mistake here, so we just think you shouldn't have
8    the authority anymore, might be a little
9    overreaching on our part.
10           REP. ARP:  Follow-up?
11           SPEAKER MOORE:  Does the gentleman yield
12   to an additional question?  Representative Rieves,
13   does the gentleman yield to an additional question?
14           REP. REIVES:  I was trying to think of I
15   would.  Yes, sir, I will.
16           SPEAKER MOORE:  He yields.
17           REP. ARP:  Okay.  Do you think when a
18   local municipality does not take the low bid on a
19   project because a contractor does not have that
20   policy in place regarding same-sex bathrooms, do
21   you think that's in violation of our -- of our
22   laws?
23           REP. REIVES:  Well, again, candidly, I
24   think it's good that you bring that point up.  But
25   in a 24-hour period, which is all that we've had
```

## 113

```
1    time to really review what we're doing to change
2    that law, I don't have enough information to tell
3    you.  It sounds, from what you're saying, that
4    you're completely correct, but I do not know.  And
5    I just don't know the answer, and I wish I did know
6    the answer.  And I -- that's why I wish we were
7    doing this in the short session, when we had time
8    to sit around and talk about it.  Thank you.
9            SPEAKER MOORE:  For what purpose does the
10   lady from Carteret, Representative McElraft, rise?
11           REP. MCELRAFT:  To speak on the bill.
12           SPEAKER MOORE:  The lady has the floor to
13   debate the bill.
14           REP. MCELRAFT:  Thank -- thank you, Mr.
15   Speaker and members.  I wasn't going to say
16   anything, but I just wanted to let people know that
17   as a former three-term town commissioner, and a
18   county commissioner, there are lots of us that are
19   for this bill.  And we don't feel like when we're
20   at our local duties, that this would give us any
21   reason to be mad at the State.
22           When I was a town Commissioner, we knew
23   there were certain things that we could do and
24   could not do, especially if we had a great town --
25   town manager or county manager that reminded us of
```

## 114

1    that, or county or -- or a city attorney. We knew
2    that we couldn't do environmental legislation;
3    that's a restriction on towns. We can't, even
4    though we'd like to, reduce some of the
5    restrictions the state has on septic tanks down at
6    the coast, we can't do that. That's
7    State-mandated. We were never given the authority
8    to do that.
9        But I will let you know, that as a mother
10   and a grandmother of a fourteen-year-old
11   grandchild, this is about common sense. This is
12   about protecting, not from a transgender,
13   necessarily, but from a predator, who had the
14   authority then, as a man, to go in a young woman's
15   dressing room in high school, or a -- women's
16   bathroom.
17       I had a friend who just traveled through
18   Charlotte. They said they were afraid for their
19   child to go into the restroom -- a teenager --
20   because they didn't know if the law in Charlotte
21   had already changed. So this doesn't affect just
22   the people from Charlotte. It affects all of us
23   from all over this state that goes through -- that
24   go through Charlotte. It affects businesses.
25       This is common sense legislation, and

## 115

1    there are those of us who are offended that there
2    are town commissioners and county commissioners
3    that are offended by this. We, as town
4    commissioners and county commissioners, think this
5    is a good thing to do, direction from the General
6    Assembly, where we don't overstep our boundaries.
7    There are things we can do and things we can't do.
8        We just had a situation from town
9    commissioners down at Emerald Isle. They had the
10   Sierra Club sit there, every meeting for five or
11   six meetings, putting pressure on them to adopt a
12   resolution. Those town commissioners all came up
13   to me and said that they felt like they were forced
14   into doing it, or they couldn't get any other work
15   done. There are pressures that are put on these
16   town commissioners, pressures to vote a certain
17   way, which they regret.
18       So I think that we need to do what we
19   need to do up here, and they need to understand the
20   responsibility at the town and county level.
21       SPEAKER MOORE: For what purpose does the
22   lady from Mecklenburg, Representative Cunningham,
23   arise?
24       REP. CUNNINGHAM: To speak to the bill.
25       SPEAKER MOORE: The lady has the floor to

## 116

1    debate the bill.
2        REP. CUNNINGHAM: Thank you, Mr. Speaker.
3    So how did we get here? Today we are here, once
4    more discussing something that Mecklenburg County
5    city officials decided to do. So how did we get
6    here? Same way we did the last time, picking up
7    something that really is not looking at the needs
8    of the people in our district.
9        Policy will not change perception. Minds
10   will not change. Over 50 years ago, Martin Luther
11   King, Jr., professed that you cannot legislate
12   people to have a change of heart. That's why we
13   had the Civil Rights Movement. Did it change
14   people's hearts? Still today, people's hearts are
15   not changed. Still today, in this Chamber,
16   people's hearts have not changed.
17       Every day in public, all over the State
18   of North Carolina, we still see acts of racism,
19   acts of violence against people that are just
20   slightly different from us, all over. The
21   multiplicity of issues that the people in my
22   district live with and face every day, this does
23   not relegate. This does not relegate to the
24   feeding of the hungry children in my district, for
25   us to come down here and do this piece of

## 117

1    legislation.
2        Mecklenburg County -- currently 50th in
3    the country on upward mobility, unemployment
4    continues to be high in the African American
5    community, so we don't need to lose any jobs.
6        I understand what transgender is about,
7    because I have a brother that is fully transgender,
8    but he does not live in the State of North
9    Carolina. He lives in New York. They have unisex
10   bathrooms, so only one person can go in at a time.
11   But here in North Carolina, that's where we are,
12   North Carolina, the great North Carolina.
13       Usually I like to look at people, even
14   our own people back home. Mecklenburg County, the
15   City Council made a decision. Yeah, they made it.
16   But did they negotiate? We hear a lot about
17   negotiate, mediate. Are we in the position that we
18   should be thinking about mediating and negotiating
19   on things, so that some things don't have to go
20   other places? Some things can be handled there,
21   and it not have to come down here for us to have to
22   clean it up, or fix it up, or even mess it up
23   further. Are we there yet? No, we're not there
24   yet, but that's okay. Here we are. Here we are
25   again.

Case 1:16-cv-00236-TDS-JEP    Document 178-5    Filed 08/29/16    Page 30 of 75

## 118

When I make a major decision, I first ask myself -- am I doing any harm? I don't know how many people do that, but maybe we should start saying, am I doing any harm? Because if we look at, right now, what's going on on the national level, Trump is loose. I heard somebody talk about Cooper in the meeting -- committee meeting, when Trump is loose, and we can't get him back in the box, so is he in the room?

So are we exercising good judgment or are we inciting more violence and discrimination and prejudice? I cannot support the bill, but I ask you -- are we doing more harm? Thank you.

SPEAKER MOORE: The gentleman from Mecklenburg, Representative Bishop, is recognized to send forth an amendment. The Clerk will read.

CLERK: Representative Bishop moves to amend the bill on Page 3, Lines 46 through 47, by deleting those lines and substituting the following.

SPEAKER MOORE: The gentleman has the floor to debate the amendment.

REP. BISHOP: Thank you, Mr. Speaker. At that location, this is the portion of the bill per -- clarifying that cities and localities don't

## 119

have authority to regulate wage levels. And there are exceptions in the bill to make sure that, for example, the local government can regulate its own compensation levels to employees, and then there are several items relating to federal community development block grants and economic development incentives, where those are integral to the -- to the program.

In Item Number 2, we -- by including Part 2H of Article 10 of Chapter 143B, as opposed to just Chapter 143B, we had -- were insufficiently complete. So we are changing that line to make sure that there's no interference with the economic development incentives programs. And I support the amendment.

SPEAKER MOORE: Further discussion or debate on the amendment? Any of -- I see three lights; any of these members wish to debate the amendment? For what person does the lady from Guilford, Representative Harrison, arise?

REP. HARRISON: To ask the amendment sponsor a question.

SPEAKER MOORE: Does the gentleman from Mecklenburg yield to the lady from Guilford?

REP. BISHOP: I would defer the question

## 120

to Representative Hager.

SPEAKER MOORE: Does the -- would the lady redirect her question to the gentleman --

REP. HARRISON: Sure.

SPEAKER MOORE: -- from Rutherford?

REP. HARRISON: Please.

SPEAKER MOORE: And does the gentleman yield?

REP. HAGER: I do.

SPEAKER MOORE: He does.

REP. HARRISON: I -- I just want to make sure I heard it right, because the City of Greensboro has -- has a living wage standard for its employees. Are you saying that by clarifying in this language, that the cities will be able to adopt policies to pay their employees living wages?

REP. HAGER: Representative Harrison, that has not changed. What this deals specifically with is, Part 2H of Article 10 dealt with the One NC Fund and how those contracts are laid with a -- with the local piece of it, and those have certain wage goals. We actually had missed JDIG, so we actually added JDIG back in there, and this captures JDIG now.

SPEAKER MOORE: Further discussion or

## 121

debate on the amendment? If not, the question before the House is the adoption of Amendment 4 sent forth by Representative Bishop. Those in favor will vote aye; those opposed will vote no. The Clerk will open the vote.

(Votes recorded.)

SPEAKER MOORE: The Clerk will lock the machine and record the vote. 108 having voted in the affirmative, and none in the negative, the amendment is adopted. We're now back on debate on the bill. For what purpose does the gentleman from Mecklenburg, Representative Moore, rise?

REP. R. MOORE: To ask a question of my delegation mate, Representative Bishop.

SPEAKER MOORE: Does the gentleman from Mecklenburg yield to the other gentleman from Mecklenburg?

REP. BISHOP: I yield.

SPEAKER MOORE: He yields.

REP. R. MOORE: Representative Bishop, you mention in your comments that private businesses were not -- there was no mandate for private business, but let me ask you this. What -- how do you -- I need some clarity for private businesses who -- who require public

Case 1:16-cv-00236-TDS-JEP   Document 173-5   Filed 08/29/16   Page 32 of 75

122

accommodations, like bars, restaurants, movie theaters, and those things. How does this particular law apply to that? I just -- just wanted to get some clarity on -- on that particular piece of it.

REP. BISHOP: If I understand the representative's question, the answer is that they're free to adopt whatever policies they think best.

REP. R. MOORE: Follow-up?

SPEAKER MOORE: Does the gentleman yield to an additional question?

REP. BISHOP: I yield.

SPEAKER MOORE: He yields.

REP. R MOORE: And so, without framing it in -- in a -- in a very ugly way, so you're saying that if a private business is -- a private business refuses, by their particular policy, to not serve a person based upon their sexual orientation or -- or -- something of that nature, or sexual identity, then that would be allowed by that private business, and we wouldn't have any -- would have any jurisdiction over that particular choice, is what I want to say?

REP. BISHOP: Well, the -- the statewide

123

public -- statement of public policy concerning public accommodations discrimination is -- sets forth the -- all of the protected classes under Supreme Court jurisprudence and quasi-suspect -- suspect classes. So the ones that are listed in there, those are the ones that there is a public policy statement concerning discrimination. And otherwise, there's not a mandate on people -- people's bathroom use, one way or the other. They're free to do what they wish.

SPEAKER MOORE: For what purpose does the gentleman from Vance, Representative Baskerville, rise?

REP. BASKERVILLE: To debate the bill.

SPEAKER MOORE: The gentleman has the floor to debate the bill.

REP. BASKERVILLE: Thank you, Mr. Speaker, and I will be brief. There would have been a lot of votes on this side of the aisle if we were just dealing with the restroom issue. If we were just dealing with the restroom issue, that bill would have passed, and it would have passed very quickly. But when we include these other provisions dealing with contracting and employment, there are very grave concerns that -- that I have,

124

where I'm trying to find the consistency in reasoning and application in this bill.

So we say that a local municipality can adopt their own policies in terms of discrimination in hiring. So if the City of Raleigh wants to adopt a policy for the City of Raleigh saying, 'We're not going to discriminate against gay folks in hiring them to work for the City of Raleigh,' that's okay. But at the same time, today, we're saying that businesses that contract with the City of Raleigh, that are getting paid from the City of Raleigh, can discriminate against gay people in their hiring practices and policies. That, to me, is not consistent. That, to me, begs reason.

It seems as though, to me, that gay folks pay taxes, too. And it would be unconscionable for you to tell someone, "I understand that you pay taxes, some of your tax money is going to pay these contractors that we have hired to our city to perform city duties, and the money that you've paid in taxes to hire this company to do a service for us, that company is -- you would never be allowed to work for that company, because that company discriminates against gay people in their hiring and we, by statute, have allowed that." That's

125

inconsistent, that's illogical, and it's unconscionable.

I want you to go back to your districts and look at your constituents -- look them in the eye. It would be very insulting to me, as a younger person, as a black person, as a male, as a Vance County native, for me to pay my taxes, to go and hire a company that will not hire Vance County people, that will not hire males, that will not hire young people. That would be insulting to me.

So I want you to go back and talk to all your constituents in your districts, look them in the eye, and tell them how you've insulted them today. Tell them that they may have friends, they may have family members that may be gay, and their tax money is used to hire companies that you made it legal for them to discriminate against.

We're spending tax money to pay companies to do work for us that are discriminating against people. How is that common sense? How is that consistent and logical reasoning? That's why I'm voting no.

SPEAKER MOORE: For what purpose does the gentleman from Mecklenburg, Representative Bishop, arise?

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 33 of 75

### 126

1    REP. BISHOP:  To debate the bill a second
2  time.
3    SPEAKER MOORE:  The gentleman has the
4  floor to debate the bill a second time.
5    REP. BISHOP:  I do know that making good
6  decisions requires accurate facts, and there are a
7  couple of items that I think it worth attending to
8  that have been said during the course of the debate
9  or -- or they've been said in the community.  WRAL
10  today released a story early on saying that a
11  version of a draft of the bill eliminated
12  protections for folks with disabilities from
13  discrimination.  And I just want to say, I've said
14  it in committee, I just want to say it here: that's
15  factually wrong.
16    Now, we have a separate -- there's a
17  separate general statutes -- separate statute in
18  North Carolina Chapter 168A, that provides
19  comprehensive protection from discrimination for
20  those who are disabled; that's in addition to
21  federal law, federal Americans with Disabilities
22  Act.  So that's just factually wrong.
23    In the course of the Minority Leader's
24  comments, I understood he listed the names of a lot
25  of companies who have policies, enlightened

### 127

1  policies, concerning how employees will be treated.
2  And I think it was clear, but I just want to make
3  it clear in case there was an implication to the
4  contrary, those companies will be entirely free to
5  continue pursuing the policies that they, in their
6  wisdom, have decided to adopt.  And that's
7  perfectly consistent with the idea that we want to
8  maximize freedom of -- of, in fact -- in fact, the
9  absence of -- of a problem that should've led to
10  the creation of an emergency that -- as it has
11  occurred.
12    Representative Hamilton recited, or
13  stated she was reciting, part of the holding in
14  a -- in a lawsuit in -- in -- that was pending
15  in -- the eastern district of Virginia decided in
16  2015, that is now on appeal to the 4th Circuit
17  Court of Appeals.  And she -- in -- in reciting
18  what she said was the holding, she was reciting, in
19  fact, the position of the Obama Department of
20  Education, to say that not allowing a child in
21  school to go into the multi-occupancy bathroom
22  facilities of the opposite sex, as a -- as a
23  transgender child, was a violation of Title IX.
24    In fact, the court there held against the
25  Obama Administration.  So that decision's on appeal

### 128

1  in the 4th Circuit.  But that position, that some
2  have suggested could have some implication for
3  Title IX funding, the Obama Administration's
4  position, has not been accepted by any court
5  anywhere in the country.
6    The other decision out on that point
7  comes from -- it's in a case, Johnson versus
8  University of Pittsburgh, from the Western District
9  of Pennsylvania, that one was in March of 2015.
10  That case is on appeal as well, in the 3rd Circuit.
11  But no court has embraced that position at this
12  point in time.  Should that occur some day, should
13  a court with jurisdiction over this area, decide
14  that Title IX is -- does not mean, when it says
15  sex, what everybody's always understood that it
16  means, and that the regulation under Title IX
17  that's been quoted twice by Representative Dollar
18  and Representative Stam, that explicitly permits
19  separate toilet, locker room and shower facilities
20  on the basis of sex; if that regulation is, by
21  virtue of those decisions -- of -- of a decision to
22  be -- here -- you know, hereafter to occur will be
23  invalidated, then there will be a process after
24  that point in time which North Carolina or any
25  other jurisdiction that has had separate bathrooms

### 129

1  for boys and girls, will be able to adapt, before
2  there would ever be any implication for Title IX
3  funding to go away.  So that is really immaterial
4  to the decision we're making today.
5    And -- and I guess I should also say, if
6  those decisions occur, they would preempt what
7  we're doing today to the extent there was an
8  inconsistency.  So it is a figment of folks'
9  imagination to say that that is a risk.
10    To the point about why we're here.  In
11  January, January 19, I believe it was, I released a
12  public statement in anticipation -- because the
13  Mayor of Charlotte, newly elected, had repeated
14  time and again that this was going to be at the top
15  of the City Council's priority list, amazing as
16  that is.  And I urged her and the City Council not
17  to go down this divisive route.  And I spent --
18  I've spent an inordinate amount of time, because I
19  laid out for them the law, and the fact that they
20  were not authorized to do what they contemplated
21  doing.
22    I would have been better served, on
23  behalf of the people that I represent, if I could
24  have spent the time that I've spent on this,
25  learning more about our process for Medicaid

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 34 of 75

130

1 reform, about additional tax reform that we need to
2 do, about budget adjustments in the upcoming short
3 session. We'd all be better served if those folks
4 had not precipitated this need for a short session.
5 I wish that they had not.
6 I regret that it has produced the
7 division among us that it has, but I am confident
8 that this body owes it to the people of North
9 Carolina to correct this egregious overreach and
10 poor public policy. Thank you very much.
11 SPEAKER MOORE: Further discussion,
12 further debate? If not, the question before the
13 House is the passage of House Bill 2 on its second
14 reading. Those in favor will vote aye; those
15 opposed will vote no. The Clerk will open the
16 vote.
17 (Votes recorded.)
18 SPEAKER MOORE: The Clerk will lock the
19 machine and record the vote. 83 having voted in
20 the affirmative, and 25 in the negative, House Bill
21 2 passes its second reading and will be read a
22 third time.
23 CLERK: The General Assembly of North
24 Carolina enacts.
25 SPEAKER MOORE: Further discussion,

131

1 further debate? If not, the question before the
2 House is the passage of House Bill 2 on its third
3 reading. Those in favor will vote aye; those
4 opposed will vote no. The Clerk will open the
5 vote.
6 (Votes recorded.)
7 SPEAKER MOORE: Is Representative Dobson
8 still on the floor? The Clerk will lock the
9 machine and record the vote. 83 having voted in
10 the affirmative, and 24 in the negative, House Bill
11 2 passes its third reading. The bill is ordered
12 engrossed and sent to the Senate. Representative
13 Dobson, the Chair saw you on the floor when the
14 question was put. Does the gentleman wish to be
15 recorded as having voted aye?
16 REP. DOBSON: Yes.
17 SPEAKER MOORE: The gentleman will be
18 recorded as having voted, aye.
19 (End of audio.)
20
21
22
23
24
25

132

STATE OF NORTH CAROLINA
COUNTY OF WAKE
CERTIFICATION OF TRANSCRIPT
This is to certify that the foregoing transcript of
proceedings held on March 23, 2016, is a true and accurate
transcript of the proceedings as transcribed by me or under
my supervision. I further certify that I am not related to
any party or attorney, nor do I have any interest
whatsoever in the outcome of this action.
This 16th day of April, 2016.

Brad Worley, transcriptionist
Worley Reporting
P.O. Box 99169
Raleigh, NC 27624
919-870-8070
brad@worleyreporting.com

Case 1:16-cv-00236-TDS-JEP    Document 173-1    Filed 08/29/16    Page 35 of 75

# EXHIBIT E

NORTH CAROLINA GENERAL ASSEMBLY

NORTH CAROLINA SENATE

_____

TRANSCRIPT OF THE PROCEEDINGS

FLOOR SESSION

_____

In Raleigh, North Carolina

Wednesday, March 23, 2016

Transcribed by Brad Worley

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

**2**

1    LT. GOV. FOREST:  This being the time and
2    place, in accordance with the Constitution of the
3    State of North Carolina, and pursuant to the joint
4    proclamation issued by the President of the Senate
5    and the Speaker of the House, after receiving
6    written requests of three-fifths of all members of
7    the Senate and House of Representatives for the
8    convening of the 2016 second extra session of the
9    General Assembly of North Carolina, the Senate will
10   come to order.  The Sergeant-at-Arms will close the
11   doors.  Members will go to their seats.  Members
12   and guests in the gallery, please silence all your
13   electronic devices.
14       Leading the Senate in prayer is the
15   Reverend Peter Milner, Senate Chaplain.  All
16   members and guests in the gallery will please
17   stand, and remain standing for the Pledge of
18   Allegiance following the prayer.
19       REV. MILNER:  Let's bow our heads and
20   pray.  Almighty God, thank you for life.  Thank you
21   for a beautiful day, for gathering us together.  As
22   we gather with our hopes and dreams, and as we
23   watch spring come to life around us, Lord, help us
24   to remember we are entirely dependent upon you.  We
25   can't do anything without you.  Lord, in you alone

**3**

1    is my soul at rest, for our true hope comes from
2    you.  You alone are our stronghold, our rock, our
3    fortress.  In Him, we can stand firm.  Fill us,
4    then, with renewed hope in you, for in you alone is
5    our soul at rest.  It's in Jesus' name we pray.
6    Amen.
7        LT. GOV. FOREST:  Please join me for the
8    Pledge of Allegiance.
9        (Pledge of Allegiance recited.)
10       LT. GOV. FOREST:  The Reading Clerk will
11   read the joint proclamation.
12       CLERK:  Joint proclamation to convene the
13   General Assembly of North Carolina in extra
14   session.  Whereas, Article 2, Section 11.2 of the
15   Constitution of North Carolina authorizes and
16   requires the Speaker of the House of
17   Representatives and the President of the Senate to
18   convene the General Assembly in extra session by
19   joint proclamation upon receipt of written request,
20   signed by three-fifths of all members of the House
21   of Representatives and the Senate; and whereas, the
22   President of the Senate and the Speaker of the
23   House of Representatives have each received written
24   requests from three-fifths of the members of the
25   House of Representatives and the Senate; now,

**4**

1    therefore, the Speaker of the House of
2    Representatives and the President of the Senate do
3    hereby proclaim the General Assembly of North
4    Carolina shall convene in extra session in the City
5    of Raleigh, North Carolina, in the State
6    Legislative Building, at 10 o'clock a.m. on
7    Wednesday, March 23rd, 2016, to consider bills
8    concerning the organization or operation of the
9    extra session, in bills to provide for single-sex,
10   multiple occupancy bathroom and changing
11   facilities, and to create statewide consistency in
12   regulation of employment and public accommodations.
13   A copy of this proclamation shall be delivered to
14   each member of the House of Representatives and the
15   Senate, and a copy to the Governor of North
16   Carolina and the Secretary of State.  Issued this
17   22nd day of March, 2016.  President of the Senate,
18   Dan Forest.  Speaker of the House, Representative
19   Tim Moore.
20       LT. GOV. FOREST:  Written petitions from
21   31 Senators and 72 Representatives are on file in
22   the respective offices of the principal clerks,
23   where -- where they shall remain for a period of
24   two years.  The names of those signatories shall be
25   spread upon the Journal.

**5**

1        Senators, the record shall reflect that
2    Senator Josh Stein of District 16 submitted his
3    letter of resignation, effective March 21st, 2016.
4        The Clerk will now call the roll of the
5    2016 Senate.  When your name is called, please
6    stand and remain standing, and respond by speaking
7    into your microphone.
8        CLERK:  Senate of 2015 North Carolina
9    General Assembly, call of the roll.  Alexander?
10       SEN. ALEXANDER:  Here.
11       CLERK:  Apodaca?
12       SEN. APODACA:  Present.
13       CLERK:  Barefoot?
14       SEN. BAREFOOT:  Present.
15       CLERK:  Barringer?  Barringer?  Berger?
16       SEN. BERGER:  Present.
17       CLERK:  Bingham?
18       SEN. BINGHAM:  Present.
19       CLERK:  Blue?
20       SEN. BLUE:  Present.
21       CLERK:  Brock?
22       SEN. BROCK:  Present.
23       CLERK:  Brown?
24       SEN. BROWN:  Present.
25       CLERK:  Bryant?  Bryant?  Clark?  Clark?

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 37 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-6   Filed 08/27/16   Page 37 of 75

6

1     SEN. CLARK: Present.
2     CLERK: Cook?
3     SEN. COOK: Present.
4     CLERK: Curtis? Curtis? Daniel?
5     SEN. DANIEL: Present.
6     CLERK: D. Davis?
7     SEN. D. DAVIS: Present.
8     CLERK: J. Davis?
9     SEN. J. DAVIS: Present.
10    CLERK: Ford? Ford? Foushee?
11    SEN. FOUSHEE: Present.
12    CLERK: Gunn?
13    SEN. GUNN: Present.
14    CLERK: Harrington?
15    SEN. HARRINGTON: Present.
16    CLERK: Hartsell?
17    SEN. HARTSELL: Present.
18    CLERK: Hise?
19    SEN. HISE: Present.
20    CLERK: B. Jackson?
21    SEN. B. JACKSON: Present.
22    CLERK: J. Jackson?
23    SEN. J. JACKSON: Present.
24    CLERK: Krawiec? Lee?
25    SEN. LEE: Present.

7

1     CLERK: Lowe?
2     SEN. LOWE: Present.
3     CLERK: McInnis?
4     SEN. MCINNIS: Present.
5     CLERK: McKissick?
6     SEN. MCKISSICK: Present.
7     CLERK: Meredith?
8     SEN. MEREDITH: Present.
9     CLERK: Newton?
10    SEN. NEWTON: Present.
11    CLERK: Pate?
12    SEN. PATE: Present.
13    CLERK: Rabin of Harnett?
14    SEN. RABIN: Present.
15    CLERK: Rabon of Brunswick?
16    SEN. RABON: Present.
17    CLERK: Randleman?
18    SEN. RANDLEMAN: Present.
19    CLERK: Robinson?
20    SEN. ROBINSON: Present.
21    CLERK: Rucho? Rucho? Sanderson?
22    SEN. SANDERSON: Present.
23    CLERK: Smith? Smith? Smith-Ingram?
24    SEN. SMITH-INGRAM: Present.
25    CLERK: Soucek? Soucek? Tarte?

8

1     SEN. TARTE: Present.
2     CLERK: Tillman?
3     SEN. TILLMAN: Here.
4     CLERK: Tucker?
5     SEN. TUCKER: Present.
6     CLERK: Van Duyn?
7     SEN. VAN DUYN: Present.
8     CLERK: Waddell? Waddell? Wade?
9     SEN. WADE: Present.
10    CLERK: Wells?
11    SEN. WELLS: Present.
12    CLERK: Woodard?
13    SEN. WOODARD: Present.
14    LT. GOV. FOREST: With 42 members
15  present, and having properly received and
16  subscribed to the oath of office, a quorum is
17  present. Members may be seated.
18     The Constitution of North Carolina,
19  General Statutes and the Senate Rules of the 2015
20  regular session provide for two-year terms for
21  Senate officers. Without objection, the record
22  will reflect that the officers of the 2015 regular
23  session shall -- shall serve as officers of this
24  extra session. Senator Apodaca is recognized.
25     SEN. APODACA: Mr. President, send forth

9

1  rules for the Special Session.
2     LT. GOV. FOREST: Send forth rules,
3  Senator. Introduction of Resolutions. The Clerk
4  will read.
5     CLERK: Introduction of Rules. The
6  Senate Resolution document, Permanent Rules of the
7  Senate for the 2016 Second Extra Session of the
8  General Assembly.
9     LT. GOV. FOREST: Senate Resolution 1.
10  The Clerk will read.
11    CLERK: Senate Resolution. The Senate
12  Resolution adopting the Permanent Rules of the
13  Senate for the 2016 Second Extra Session of the
14  General Assembly.
15    LT. GOV. FOREST: Senator Apodaca is
16  recognized to explain the Resolution.
17    SEN. APODACA: Thank you, Mr. President
18  and members. This authorizes two committees during
19  this special session. That'll be Judiciary II, and
20  the Rules Committee. It allows bills to be
21  introduced and read on the same day of filing. It
22  limits the scope of bills that can filed to those
23  providing for single-sex, multiple occupancy
24  bathroom and changing facilities, and to create a
25  statewide consistency in regulation of employment

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/20/16   Page 38 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-6   Filed 08/23/16   Page 38 of 75

## 10

1 and public accommodations. Rule 41 is the
2 crossover rule. We are reserving this rule so that
3 there is no eligibility for those bills.
4 The rest of this pretty well says same
5 day, meaning we can operate the same day on first,
6 second reading: ratification: anything coming from
7 the House, we can handle the same day. Senator
8 Jackson, this has nothing to do with independent
9 redistricting. And with that being said, I'll be
10 happy to answer any questions.
11 LT. GOV. FOREST: Do we have any
12 questions on the Rules? Thank you, Senator.
13 The Chair directs the Principal Clerk to
14 send a message to the House of Representatives --
15 hold on one second. Sorry, Senators, we have to
16 vote those Rules in. So, any further discussion or
17 debate on the Rules? Questions to Senator Apodaca?
18 Hearing none, the question before the Senate is the
19 motion to adopt the Rules for Senate Resolution 1.
20 All in favor, vote aye; opposed, vote no. Five
21 seconds to be allowed for the voting. The Clerk
22 will record the vote.
23 (Votes recorded.)
24 LT. GOV. FOREST: 31 having voted in the
25 affirmative, and 11 in the negative, the motion to

## 11

1 adopt has passed. So, now, the Chair directs the
2 Principal Clerk to send a message to the House of
3 Representatives, informing that honorable body that
4 the Senate is now ready to proceed with the
5 business for which it has been reconvened.
6 Senators, we have leaves of absence requested today
7 for your approval. They're granted for Senators
8 Barringer, Bryant, Smith, Soucek, Rucho, Ford and
9 Waddell. Senator Berger is recognized.
10 SEN. BERGER: Thank you, Mr. President.
11 I move that the Senate stand in recess subject to
12 the standard stipulations set forth in Senate Rule
13 24.1, Receipt and Referral of Committee Reports,
14 and Receipt of House Messages, to reconvene at 2:30
15 p.m. today.
16 LT. GOV. FOREST: The Senate stands in
17 recess until 2:30 this afternoon.
18 (Recess.)
19 CLERK: Message from the House: Mr.
20 President, pursuant to a joint proclamation issued
21 by the House Representative and the Senate on March
22 22nd, 2016, the House of Representatives is
23 organized and is now ready to proceed with the
24 public business of the State in the second extra
25 session of the 2015 General Assembly.

## 12

1 Respectfully, Denise Weeks, Principal Clerk.
2 (Recess.)
3 LT. GOV. FOREST: The Senate will stand
4 in recess subject to the standard stipulations set
5 forth in Senate bill -- excuse me, Senate Rule
6 24.1, the Receipt and Referral of Committee Reports
7 and the Receipt of House Messages, to reconvene at
8 4:00 p.m.
9 (Recess.)
10 CLERK: Message from the House: House
11 Joint Resolution 3, the joint resolution providing
12 for adjournment, sine die, of the 2016 Senate extra
13 session, Calendar.
14 (Recess.)
15 LT. GOV. FOREST: So, just another update
16 here. The Assembly will stand in recess subject to
17 the standard stipulations set forth in Senate Rule
18 24.1, the Receipt and Referral of Committee Reports
19 and the Receipt of House Messages, to reconvene at
20 5:00 p.m.
21 (Recess.)
22 CLERK: Message from the House: House
23 Rule 2, An Act to Provide for Single-Sex, Multiple
24 Occupancy Bathroom and Changing Facilities in
25 Schools and Public Agencies, and to Create

## 13

1 Statewide Consistency in Regulations of Employment
2 and Public Accommodations. Sponsor:
3 Representatives Bishop, Stam, Howard, Steinburg.
4 Refer to Judiciary II.
5 (Recess.)
6 LT. GOV. FOREST: So we're standing in
7 recess subject to standard stipulations set forth
8 in Senate Rule 24.1, the Receipt and Referral of
9 Committee Reports and the Receipt of House
10 Messages, to reconvene at 5:45.
11 (Recess.)
12 LT. GOV. FOREST: The Senate will come to
13 order. Sergeant-at-Arms, close the doors.
14 Members, go to their seats. Members and guests in
15 the gallery, please silence all electronic devices.
16 Senators, let the record reflect that Senator
17 Barringer is now in the chamber. Reports of
18 Standing Committees.
19 SEN. RANDLEMAN: Send forth the
20 committee.
21 LT. GOV. FOREST: Senator Randleman, you
22 can send forward your committee report. The Clerk
23 will read.
24 CLERK: Senator Randleman, the Judiciary
25 II Committee submits the passage, House Bill 2,

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 39 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-6   Filed 08/27/16   Page 39 of 75

### 14

1    Public Facilities Privacy and Security Act,
2    favorable.
3         LT. GOV. FOREST:  House Bill 2, Calendar.
4    So that takes us right into our Calendar, House
5    Bill 2.  The Clerk will read.
6         CLERK:  House Bill 2, Public Facilities
7    Privacy and Security Act.
8         LT. GOV. FOREST:  Senator Newton is
9    recognized to explain the bill.
10        SEN. NEWTON:  Thank you, Mr. President.
11   Thank you, members.  I rise to discuss this
12   legislation that we have been brought back to town
13   to address.  As -- as we all know, unfortunately,
14   the City Council of Charlotte lost their mind, and
15   decided to embark upon a very radical course and
16   a -- a new -- I guess you would call it an
17   ordinance.  Something that -- that they knew that
18   they didn't have the authority to do.  They didn't
19   care.
20        The City Council of Charlotte -- the
21   majority, anyway, decided that they would bow to
22   the altar of -- of radical political correctness.
23   And in so doing, created a -- a real public safety
24   risk with the citizens of this state that -- that
25   may choose to visit Charlotte; or that live in

### 15

1    Charlotte; or, frankly, for those who visit
2    Charlotte from other places in the country.  And
3    this standard would allow, as we've heard in the
4    media -- would allow men into the locker rooms and
5    the bathrooms of females -- of our daughters, of
6    our wives.  This policy must not be allowed to go
7    forward.  And that is why we're here today, because
8    the City of Charlotte and its City Council have
9    decided that, quite frankly, that they don't --
10   they don't care about common sense, and that they
11   don't really -- are -- are not really that
12   concerned about public safety of folks that -- that
13   go in the bathroom in -- in the City of Charlotte.
14   And I know that sounds harsh, but that is -- that's
15   the reality.
16        And, colleagues, I -- I will point out
17   that the City of Charlotte knew, they acknowledged
18   privately to some folks, and I think there was even
19   some public acknowledgement -- they knew they
20   didn't have the authority to do this.  They -- they
21   just wanted to do it anyway.  And it's important
22   that we recognize that we live in a state of laws,
23   and we have a Constitution.  And it is important
24   that the state have a uniform system of rules -- of
25   rules and regulations.  And that common sense tells

### 16

1    us that men don't belong in the ladies' bathroom.
2    It's a matter of public safety.
3         Under this ordinance that they've put
4    forward, anyone, quite frankly, with -- with that
5    intent, could use this Charlotte ordinance as an
6    excuse to be somewhere that we all know they don't
7    belong.  So if the City of Charlotte had listened
8    to the lawyers, who told them not to do it, that
9    they didn't have the authority; if they'd listened
10   to Representative Bishop, who represents part of
11   Charlotte and a very, very smart attorney who sent
12   them a letter detailing to them why this was a bad
13   idea; if they'd listened to the Governor, warned
14   them not to do it, we wouldn't be here today.  And,
15   frankly, if the Attorney General would do his job,
16   we wouldn't be here today.  It would've been easy
17   for him to put this to a stop before we had to have
18   a special session.
19        And frankly, I -- I just can't believe
20   that we're here today having to talk about this.
21   But for the City Council of Charlotte, we wouldn't
22   have to talk about these things.  All of us have
23   been receiving thousands and thousands of e-mails
24   and letters, phone calls from our constituents,
25   begging us to solve this problem, to fix this

### 17

1    insanity, before it goes into effect.  And that's
2    why we're here.
3         So we have got a very good piece of
4    legislation before us today that will address these
5    issues.  Many of us were in the committee that we
6    just held, in the Judiciary Committee.  We had a --
7    a full explanation.  We heard from the public.  I
8    think there's been quite a long explanation over on
9    the House side, in their Judiciary Committee and on
10   the floor.  I'll be happy to go over details for
11   people, if there are questions from other members.
12        But the broad aspects of this bill are
13   that we're going to set a statewide standard for
14   who belongs in which bathroom.  We're going to do
15   this in public buildings across the state.  We're
16   going to do this for municipalities and counties,
17   courthouses, and we're going to do this for our
18   public schools.
19        We're also going to make sure that it's
20   clear that cities and counties don't have the
21   authority to wade into the policies of -- of
22   questions like what should be the minimum wage, or
23   what should be the employment practices of
24   companies here in North Carolina.  And we do this
25   to protect our businesses and protect our working

Worley Reporting

## 18

1    environment.  There should not be a patchwork from
2    one end of the state to the other, where businesses
3    have to hire a lawyer in each community, or each
4    county, to try to figure out what regulation
5    they're subject to today, and which ordinance
6    changes tomorrow.
7        And -- and frankly, the rules on things
8    like this, what should be the same in Asheville, as
9    they are in Boone, as they are in Morehead City, as
10   they are in Greenville, or in Raleigh.  And it's
11   important for this body, and for this institution
12   and General Assembly, to set forth these standards.
13       But even more important, it's important
14   for the members to understand that, in the course
15   of putting this legislation together, and trying to
16   decide how was the best way to move forward with
17   the policy of North Carolina, it became clear that
18   something was lagging, that we had not taken care
19   of here in the State of North Carolina.  And
20   federal law's pretty clear about discrimination in
21   employment and public accommodation.  But the State
22   of North Carolina had never enacted a public policy
23   on public accommodation, stating that you shouldn't
24   discriminate against someone say, based on their
25   religion or their race, and deny them, say, a hotel

## 19

1    room.  We're fixing that in this legislation.
2        This legislation expands the public
3    policy of this state to clarify that discriminating
4    based on race and religion -- and it's even
5    stronger than the federal law -- that that's not
6    acceptable here in this state, and it's long
7    overdue; it's long overdue.
8        So those are the main highlights of what
9    this bill does.  But I urge you to join me in
10   passing this legislation, and joining the House in
11   passing this legislation, to clarify what the
12   standards are in North Carolina; to clarify that we
13   don't need to worry about who is in the bathroom in
14   the City of Charlotte; to clarify, for the
15   citizens, that they can have confidence about who
16   is sharing the locker room with them.  It's
17   imperative that we do this today.
18       I appreciate your attention, I commend
19   the bill to you, and I'm happy to answer any
20   questions.  Thank you.
21       LT. GOV. FOREST:  Do we have any
22   discussion or debate?
23       SEN. BLUE:  I have a question.
24       LT. GOV. FOREST:  Senator Blue, for what
25   purpose do you arise?

## 20

1        SEN. BLUE:  Well, Senator Newton here for
2    a question.
3        LT. GOV. FOREST:  Senator Newton, do you
4    yield?
5        SEN. NEWTON:  I do.
6        SEN. BLUE:  Senator Newton, does this
7    bill have any enforcement mechanisms in it?
8        SEN. NEWTON:  Senator Blue, you mean,
9    in -- as it relates to the -- the new policy of --
10   on the public accommodations?  Is that what you're
11   referring to?
12       SEN. BLUE:  In any aspect of it.  In
13   either of the three sections of the bill, is there
14   any enforcement mechanism?
15       SEN. NEWTON:  No.
16       SEN. BLUE:  Another question, Mr.
17   President, follow-up?
18       LT. GOV. FOREST:  Does the Senator yield?
19       SEN. NEWTON:  I do.
20       SEN. BLUE:  Perhaps you could explain to
21   me, if, in fact, a man goes into a woman's
22   bathroom, what is the crime that's been committed,
23   under this bill?
24       SEN. NEWTON:  Under existing law, it
25   would be a second degree trespass, unless there are

## 21

1    other circumstances -- like they were going in
2    there to clean it.
3        SEN. BLUE:  Another question, Mr.
4    President.
5        LT. GOV. FOREST:  Senator Newton, do you
6    yield?
7        SEN. NEWTON:  I do.
8        SEN. BLUE:  So under existing state law,
9    it is an offense for a male to go into a female's
10   bathroom.
11       SEN. NEWTON:  It has been held as such in
12   case law in this state.
13       SEN. BLUE:  One -- one final question,
14   Mr. President.
15       LT. GOV. FOREST:  Senator Newton, do you
16   yield?
17       SEN. NEWTON:  I do.
18       SEN. BLUE:  Does a local government have
19   the power to override a state law without being
20   given specific consent by the state to do that?
21       SEN. NEWTON:  Senator Blue, I really
22   appreciate that question, and I think it -- it begs
23   examination by the public and this body, as to why
24   it is that our Attorney General remains silent in
25   enforcing the laws of this state?  It is clear that

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 41 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-6   Filed 08/27/16   Page 41 of 75

22

1 an ordinance does not trump state law.
2 SEN. BLUE: Okay. Speaking on the bill,
3 Mr. President.
4 LT. GOV. FOREST: Senator Blue, you have
5 the floor. Speak to the bill.
6 SEN. BLUE: Mr. President, ladies and
7 gentlemen of the Senate, we're here three weeks
8 before our regular session. And, to be honest with
9 you, disrupting a very narrow window that many of
10 us have to earn a living when this place is not in
11 session. And we're here because I think that we've
12 played on fears of the citizenry unjustly and
13 unfairly.
14 I have a wife, a daughter, five
15 granddaughters, and rest assured, there's nothing
16 that I wouldn't do to protect them, whether at
17 school, in public places, or anywhere else, against
18 anybody who would harm them in any way at all. And
19 when I first heard of -- of this ordinance by the
20 City of Charlotte, I started examining it on the
21 same basis that Senator Newton -- that I asked
22 Senator Newton these questions, and concluded that
23 if we are serious about really protecting kids from
24 bathrooms, then we'd make it serious offenses for
25 males to be in women's bathrooms. This bill does

23

1 nothing to do that. So we're using that as a basis
2 for this legislation, and not doing anything to
3 address the real issue.
4 For the past several weeks, and certainly
5 more intentionally over the last week, I've tried
6 to figure out what was going on in the drafting of
7 this bill, since this seemed so urgent, and we
8 could have some input. Because if we generally
9 have the fears about what the bill does from the
10 standpoint of safety, all of us ought to be
11 involved in fixing it. Well, seemingly, whatever
12 my ideas were didn't matter at all, because they
13 weren't sought, and weren't solicited or listened
14 to.
15 And so, it made me look at the broader
16 aspects of this bill in light of some of my
17 fundamental beliefs. I believe in small government
18 in many ways, and the people's right to govern
19 themselves. And there are 800-plus-thousand people
20 in Charlotte, over a million in Mecklenburg County,
21 and I respect their ability to govern themselves,
22 as they should be able to. And the voters in
23 Charlotte, whether they're afraid of this or
24 anything else, have the ability to put them out of
25 office, which is what they should do if they

24

1 jeopardize the safety of the citizens of Charlotte.
2 But it's the broader points that cause me
3 concern, because I think that we are abandoning the
4 fundamental value of limited government and shared
5 government in many ways in this bill. If we
6 proclaim ourselves to be constitutionalists, then
7 we start creating unconstitutional discrimination
8 of any form, then we're being hypocritical.
9 To rescind local nondiscrimination
10 policies at the local level pulls the rug from
11 under millions of voters across the state that
12 entrust the 500-and-plus local governments that are
13 closer to them to decide best how they want to
14 proceed.
15 Now, I agree with Senator Newton; if the
16 City of Charlotte had no authority to do this, it
17 would have taken 15 minutes to get a temporary
18 restraining order, 10 days to get a preliminary
19 injunction, and if it was so clear, then a couple
20 of weeks later, to get a permanent injunction from
21 this ordinance ever going into effect, without
22 scaring the bejesus out of the citizens of this
23 state. And so, I look at it in a broader sense,
24 because I think that the turning of our backs on
25 North Carolinians by frightening them is not in our

25

1 best interest.
2 But I worry about the local government
3 and the economic impact of this kind of
4 legislation, because I was in Indiana last year at
5 the height of that -- when the question got to be
6 whether or not a state or a city was intentionally
7 embracing some form of discrimination. And I saw
8 the fallout. Whether people fully understood what
9 they were trying to accomplish or not, I saw the
10 fallout. And I'm frightened for that kind of
11 fallout in North Carolina. When you look at what
12 21st Century companies start looking like, we're a
13 state that celebrates intolerance, and we'll take
14 some hit for taking pride in perpetuating prejudice
15 and repealing statutes that, over time -- over a
16 thirty- or forty-year period -- that these local
17 governments have adopted, whether it's relating to
18 their local human -- human relations commissions,
19 as -- as it relates to the state Human Relations
20 Commission, and slowly pecking away at different
21 forms of discrimination. And I think that as we
22 debate this bill, there are already Fortune 500
23 companies that have expressed their grave concerns
24 and very strong opposition. I think about things
25 like that.

Case 1:16-cv-00236-TDS-JEP Document 174-1 Filed 10/20/16 Page 42 of 75
Case 1:16-cv-00425-TDS-JEP Document 149-6 Filed 08/26/16 Page 42 of 75

26

1        This bill essentially ties a noose around
2  the necks of the cities and counties, and it
3  smothers their ability to govern in the way that
4  their citizens think they ought to.
5        If we think that something ought to be a
6  crime, the State's job is -- our job is to make it
7  a significant crime, so that people who do it are
8  punished.
9        So, given the fact that, number one, it
10  seems that whatever our thoughts on this issue may
11  have been, they're irrelevant and unimportant.  And
12  given the fact that you got a direct assailment on
13  the ability of people to govern themselves, that
14  you've got a rollback of 40-plus years of
15  antidiscrimination activity, that we, as Democrats,
16  have determined that since we aren't important to
17  it, we don't have to be a part of it.
18        And so, we're not participating in this
19  effort that you make, to roll back the clock in
20  this state, to take away powers from local
21  governments; not just as it relates to
22  discrimination; but as it relates to their ability
23  to do what we say that we authorize them to do.
24  And ultimately, perhaps it would be best if we
25  started down the road to suspending their charters

27

1  by taking away their roles as extensions of us, as
2  county governments.  And I think that this is a far
3  cry from the kind of legislation that merits
4  emergency legislation, since we will be here in three
5  days -- three weeks, anyhow.
6        SEN. APODACA:  Mr. President?
7        LT. GOV. FOREST:  Senator Apodaca, for
8  what purpose do you rise?
9        SEN. APODACA:  Would Senator Blue yield
10  to a question?
11        LT. GOV. FOREST:  Senator Blue, do you
12  yield?
13        SEN. BLUE:  I yield.
14        SEN. APODACA:  Senator Blue, do we need
15  to take a recess so that your members can come back
16  and do their constitutional duty?
17        SEN. BLUE:  Their constitutional duty is
18  to vote and participate when their participation is
19  allowed.  It is the -- it has not been allowed in
20  this process, Senator Apodaca.  So -- so we do not
21  need to take a recess.
22        SEN. APODACA:  Well, I say we move on,
23  Mr. President.
24        LT. GOV. FOREST:  Is there any further
25  discussion or debate?  Senator Berger, for what

28

1  purpose do you arise?
2        SEN. BERGER:  Speak to the bill.
3        LT. GOV. FOREST:  Senator Berger, you
4  have the floor.
5        SEN. BERGER:  Thank you, Mr. President.
6  I -- I think it's interesting.  We are here today
7  for two reasons, primarily.  One, because the City
8  of Charlotte decided that they were going to pass
9  an ordinance that allows grown men to share
10  bathrooms and locker facilities with girls and
11  women.  That's one reason we're here today.
12        The second reason we're here today,
13  though, is something pointed out by Senator Blue,
14  interestingly enough -- because our Attorney
15  General would not do his job.  He's right.  What
16  should have happened is the chief law enforcement
17  officer of this state should have filed a court
18  case to enjoin the adoption, or the implementation,
19  of this ordinance.  Somebody wasn't doing their
20  job.  And so we are now here today because of that
21  double failure.  The failure on the part of the
22  Charlotte City Council to listen to reason, and the
23  failure on the part of the Attorney General to do
24  his job.
25        So what do we have?  We have -- we have a

29

1  bill that makes it clear that we are not going to
2  put our citizens in further danger because of the
3  recklessness of the Charlotte City Council.  I
4  think Sheriff Barnes of Guilford County made it
5  quite clear when he said that a majority of the
6  people should not have to compromise their safety
7  and privacy in public bathrooms, showers and locker
8  rooms.  And he also felt that it was inappropriate
9  to have officers put in the awkward position of
10  trying to determine whether or not someone thinks
11  they're a man, or thinks they're a woman, as far as
12  going to the restroom is concerned.  No, there's no
13  question that we would not be here if not for the
14  Charlotte City Council.
15        And the natural consequence -- the
16  natural consequence of -- of what Charlotte has
17  done has actually been pointed out fairly recently
18  in the city of Seattle, that had something fairly
19  similar to this.  In -- in Seattle, what happened
20  is, a man shows up in a locker room that is being
21  used by girls' swim team.  He disrobes, sits
22  there while the girls come in to change into their
23  swimming gear.  And when confronted, he says, I
24  have a right to be here because I'm transgender.
25  Now, that is, unfortunately, a consequence of -- of

## 30

1    what happened in Seattle, and something a lot worse
2    could very well happen as a result of this
3    ordinance.
4         I said a couple of weeks ago that -- that
5    the adoption of the ordinance by the City Council
6    of Charlotte was just crazy, and I think most
7    people in this state feel the same way. I think
8    one of the interesting facts that has really not
9    been talked about is, we have spent more time, the
10   House and the Senate today, considering, debating,
11   talking about, answering questions, trying to get
12   an understanding of the consequence of the
13   ordinance, and the consequence of this bill, than
14   the City Council of Charlotte spent in adopting the
15   ordinance. There was no committee -- no committee
16   to -- to review the ordinance. There was no public
17   discussion, as we've -- as we've had here. There
18   was no debate back and forth, as we've had here in
19   both the House and the Senate. No. This body has
20   taken a very measured approach to what has been a
21   very radical action by the City Council of
22   Charlotte. I urge you to support the bill.
23        SEN. APODACA: Mr. President?
24        LT. GOV. FOREST: Senator Apodaca, what
25   purpose do you rise?

## 31

1         SEN. APODACA: I move the vote taken on
2    House Bill 2 be done by roll call, please.
3         LT. GOV. FOREST: No objection, so
4    ordered. Any further discussion or debate?
5    Hearing none, the question before the Senate is the
6    passage of House Bill 2 on its second reading and
7    we will have a roll call vote. Clerk will read the
8    roll.
9         CLERK: State of North Carolina General
10   Assembly, call of the roll.
11        LT. GOV. FOREST: All in favor -- excuse
12   me, Clerk. All in favor, vote aye, those opposed,
13   vote no.
14        CLERK: Alexander?
15        SEN. ALEXANDER: Aye.
16        CLERK: Apodaca?
17        SEN. APODACA: Aye.
18        CLERK: Barefoot?
19        SEN. BAREFOOT: Aye.
20        CLERK: Barringer?
21        SEN. BARRINGER: Aye.
22        CLERK: Berger?
23        SEN. BERGER: Aye.
24        CLERK: Bingham?
25        SEN. BINGHAM: Aye.

## 32

1         CLERK: Blue? Blue? Brock?
2         SEN. BROCK: Aye.
3         CLERK: Brown?
4         SEN. BROWN: Aye.
5         CLERK: Bryant? Bryant? Clark? Clark?
6    Cook?
7         SEN. COOK: Aye.
8         CLERK: Curtis?
9         SEN. CURTIS: Aye.
10        CLERK: Daniel?
11        SEN. DANIEL: Aye.
12        CLERK: D. Davis? D. Davis? J. Davis?
13        SEN. J. DAVIS: Aye.
14        CLERK: Ford? Ford? Foushee? Foushee?
15   Gunn?
16        SEN. GUNN: Aye.
17        CLERK: Harrington?
18        SEN. HARRINGTON: Aye.
19        CLERK: Hartsell?
20        SEN. HARTSELL: Aye.
21        CLERK: Hise?
22        SEN. HISE: Aye.
23        CLERK: B. Jackson?
24        SEN. B. JACKSON: Aye.
25        CLERK: J. Jackson? J. Jackson?

## 33

1    Krawiec?
2         SEN. KRAWIEC: Aye.
3         CLERK: Lee?
4         SEN. LEE: Aye.
5         CLERK: Lowe? Lowe? McInnis?
6         SEN. MCINNIS: Aye.
7         CLERK: McKissick? McKissick? Meredith?
8         SEN. MEREDITH: Aye.
9         CLERK: Newton?
10        SEN. NEWTON: Aye.
11        CLERK: Pate?
12        SEN. PATE: Aye.
13        CLERK: Rabin of Harnett?
14        SEN. RABIN: Aye.
15        CLERK: Rabon of Brunswick?
16        SEN. RABON: Aye.
17        CLERK: Randleman?
18        SEN. RANDLEMAN: Aye.
19        CLERK: Robinson? Robinson? Rucho?
20   Rucho? Sanderson?
21        SEN. SANDERSON: Aye.
22        CLERK: Smith? Smith? Smith-Ingram?
23   Smith-Ingram? Soucek? Soucek? Tarte?
24        SEN. TARTE: Aye.
25        CLERK: Tillman?

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 44 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-6   Filed 08/29/16   Page 44 of 75

34

1  SEN. TILLMAN: Aye.
2  CLERK: Tucker?
3  SEN. TUCKER: Aye.
4  CLERK: Van Duyn? Van Duyn? Waddell?
5  Waddell? Wade?
6  SEN. WADE: Aye.
7  CLERK: Wells?
8  SEN. WELLS: Aye.
9  CLERK: Woodard? Woodard?
10  LT. GOV. FOREST: 32 having voted in the
11  affirmative, 0 in the negative, House Bill 2 passes
12  its second reading, and will be read a third time.
13  CLERK: North Carolina General Assembly
14  enacts.
15  SEN. APODACA: Mr. President, I move that
16  we do third reading electronically, please. I
17  don't think they're going to show back up.
18  LT. GOV. FOREST: Without objection, to
19  the orders. Is there any further discussion or
20  debate? Hearing none, all in favor of the passage
21  of House Bill 2 on its third reading will vote aye,
22  opposed will vote no. Five seconds will be allowed
23  for the voting. The Clerk will record the vote.
24  (Votes recorded.)
25  LT. GOV. FOREST: Lee, Senator Lee aye.

35

1  32 having voted in the affirmative, and 0 in the
2  negative, House Bill 2 passes its third reading and
3  will be enrolled and sent to the Governor via
4  special message.
5  House Joint Resolution 3, the Clerk will
6  read.
7  CLERK: House Joint Resolution 3.
8  Adjourn 2016 Second Extra Session. Senator Apodaca
9  is recognized to explain the resolution.
10  SEN. APODACA: Thank you, Mr. President
11  and members. We've been down this path before.
12  This takes us out until hopefully Wednesday, well,
13  takes us to April 25th. So I ask for your support,
14  unless you want to stay around a little longer, but
15  April 25th.
16  LT. GOV. FOREST: Is there any discussion
17  or debate? Hearing none, the question for the
18  Senate is the passage of House Joint Resolution 3
19  on its second reading. All in favor, vote aye,
20  those opposed, vote no. Five seconds to be allowed
21  for the voting, the Clerk will record the vote.
22  (Votes recorded.)
23  LT. GOV. FOREST: 32 having voted in the
24  affirmative and 0 in the negative, House Joint
25  Resolution 3 passes its second reading, and will be

36

1  read a third time.
2  SEN. APODACA: Mr. President?
3  CLERK: North Carolina General Assembly
4  enacts.
5  LT. GOV. FOREST: Senator Apodaca, for
6  what purpose do you arise?
7  SEN. APODACA: Speak on third reading,
8  please.
9  LT. GOV. FOREST: Senator Apodaca, you
10  have the floor.
11  SEN. APODACA: Thank you, Mr. President
12  and members. What this does is takes us out today,
13  sine die until April the 25th. I ask for your
14  support.
15  LT. GOV. FOREST: Is there any further
16  discussion or debate? Hearing none, all in favor
17  of the passage of House Joint Resolution 3 on its
18  third reading will say aye.
19  (Voice vote.)
20  LT. GOV. FOREST: Opposed, no? The ayes
21  have it. House Joint Resolution 3 passes its third
22  reading and will be enrolled.
23  Senator Berger, for what purpose do you
24  arise? Hold on, Senators, we're not done yet.
25  Senator Berger, you have the floor.

37

1  SEN. BERGER: Mr. President, I have a
2  motion to get us out of here, so --
3  LT. GOV. FOREST: Senator Berger, you
4  have the floor for your motion.
5  SEN. BERGER: Thank you, Mr. President.
6  Having concluded the business for which the Senate
7  was convened, I move that the Senate be now
8  adjourned. The 2016 Second Extra Session, sine
9  die, in accordance with House Joint Resolution 3
10  subject to the standard stipulations set forth in
11  Senate Rule 24.1, the Receipt of House Messages and
12  the Ratification of Bills and Resolutions.
13  LT. GOV. FOREST: Motion to the Senate to
14  now adjourn. The second extra session, sine die,
15  in accordance with House Joint Resolution 3 subject
16  to the stipulations stated by Senator Berger,
17  seconded by Senator Apodaca. All in favor, say
18  aye.
19  (Voice vote.)
20  LT. GOV. FOREST: Opposed, no. The ayes
21  have it, and the second extra session stands
22  adjourned, sine die.
23  (Adjournment sine die.)
24  LT. GOV. FOREST: Clarification of rules.
25  The Clerk will read.

Case 1:16-cv-00236-TDS-JEP   Document 143-6   Filed 08/29/16   Page 45 of 75

38

1          CLERK:  Enroll to Bill.  Enrolling Clerk
2     reports the following bill is duly ratified for
3     presentation to the Governor.  House Bill 2, An Act
4     to Provide for Single-Sex, Multiple Occupancy
5     Bathroom and Changing Facilities in Schools and
6     Public Agencies and to Create Statewide Consistency
7     in Regulation of Employment and Public
8     Accommodations.  And the following resolution duly
9     ratified, properly enrolled, and prepared for the
10    presentation to the Office of Secretary of State.
11    House Joint Resolution 3, A Joint Resolution
12    Providing for Adjournment, Sine Die, of the 2016
13    Second Extra Session.
14         (Break in audio.)
15         CLERK:  Message from the House.  Mr.
16    President, it is ordered that a message be sent to
17    the Senate, informing that honorable body, that the
18    House of Representatives has concluded the business
19    in the 2016 Second Extra Session of the 2015
20    General Assembly in pursuant to HJR 3, first
21    edition, A Joint Resolution Providing for
22    Adjournment, Sine Sie, of the 2016 Second Extra
23    Session stands adjourned, sine die.  Respectfully,
24    Denise Weeks, Principal Clerk.
25         (End of proceedings.)

39

STATE OF NORTH CAROLINA
COUNTY OF WAKE
          CERTIFICATION OF TRANSCRIPT
     This is to certify that the foregoing transcript of
proceedings held on March 23, 2016, is a true and accurate
transcript of the proceedings as transcribed by me or under
my supervision.  I further certify that I am not related to
any party or attorney, nor do I have any interest
whatsoever in the outcome of this action.
     This 16th day of April, 2016.

Brad Worley, transcriptionist
Worley Reporting
P.O. Box 99169
Raleigh, NC 27624
919-870-8070
brad@worleyreporting.com

Worley Reporting

# EXHIBIT F

NORTH CAROLINA GENERAL ASSEMBLY

HOUSE JUDICIARY IV COMMITTEE

---

TRANSCRIPT OF THE PROCEEDINGS

MARCH 23, 2016

---

In Raleigh, North Carolina

Wednesday, March 23, 2016

Transcribed by Brad Worley

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

2

1    REP. BLACKWELL: If you would, try to
2  find a seat. I've got some preliminary matters
3  that I want to go over, so hopefully we'll
4  understand what we're going to try to do, and we'll
5  need to be a little bit flexible, I understand.
6    I want to start by saying to the members
7  of the committee, to help us judge the time that we
8  need to dispose of the bill by 11:45, which is my
9  intention, I would like you to indicate to the
10  staff behind me, as soon as you possibly can, if
11  you intend to offer an amendment. I don't have to
12  know what the amendment is, but I'd just like to
13  have an idea of how many we might possibly be
14  dealing with, if you could accommodate that.
15    If you're interested in speaking for or
16  against the bill, or if you simply want to speak on
17  the bill, if you will, register in the back; I
18  think there's a sign-up sheet back there. If you
19  don't consider yourself for or against, you might
20  want to sign up on the shortest list. You can
21  explain that you signed up on that side, but that
22  you're not really for or against.
23    My intention at this point, subject to
24  getting us out of here by about 11:45, 11:50, is to
25  try to allow 30 minutes of public comment, up to

3

1  two minutes per speaker. If we don't need that
2  much time, fine. If we need more time because of
3  anticipated amendments, I may have to cut back on
4  that, but we'll go as far on the list as we can.
5  My intention is that we will begin by having the
6  sponsors present the bill. They'll then -- we'll
7  have discussion by the committee. We'll then take
8  public comments. And then we will come back and
9  have such amendments and votes as the committee
10  needs, with the idea, again, of being finished by
11  11:45. So, with your cooperation, hopefully we can
12  stick to that schedule.
13    Okay. The Chair recognizes
14  Representative Bishop to present the bill.
15  Representative Bishop, you want to come to the
16  podium? And while Representative Bishop is coming
17  up, I'll say -- I'll try to remind you, but when we
18  get to the public comments time, please identify
19  yourself and any organization or agency that you
20  may be associated with. Okay. And we welcome
21  Representative Stam, and -- and we'll let them
22  present this in such order as they may choose.
23    REP. STAM: Mr. Chair -- Mr. Chairman,
24  members of the committee, I'd like to give you an
25  overview -- an overview for about two minutes, and

4

1  then Representative Bishop will be going paragraph
2  by paragraph, so that we completely understand it.
3  This is a common sense bill that ensures the status
4  quo ante. That is -- what do I mean by that? If
5  you pass the bill, really, nothing is changed from
6  yesterday until tomorrow, but it prohibits other
7  deleterious changes in the future. It protects
8  privacy. It also clarifies what units of local
9  government can do on a couple of disputed issues.
10  I would contend that it is not changing that, it's
11  just clarifying and making clear -- that is, making
12  clear what local -- what units of local government
13  can do and not do.
14    The reason this is important, is that we
15  need -- for economic development, we need a good
16  intrastate common market. We have 100 counties, we
17  have 500-plus cities, and businesses that want to
18  grow and expand. It's not a good idea for them to
19  have to have different employment rules in
20  different places where they do business.
21  Obviously, infrastructure will be different, zoning
22  will be different, the fees will be different, the
23  taxes will be different, but they shouldn't have to
24  guess or to comply with rules made by one city that
25  apply to everybody who's going to contract with

5

1  that city, even if their -- even if their other
2  place of business is in, say, Wake County.
3    So, for example, if Catawba County were
4  to issue certain rules on employment practices for
5  their bidders, and I wanted to bid on that from
6  Wake County, Catawba County should not be able to
7  tell my business in Wake County what to do. We
8  need to put a stop to that. This is important at
9  the intrastate level. It's important at the
10  interstate level, and even in world trade, but
11  especially intrastate and interstate. I'd like to
12  ask the Chair to recognize Representative Bishop,
13  who will go through it paragraph by paragraph.
14    REP. BLACKWELL: Representative Bishop,
15  you're recognized.
16    REP. BISHOP: Thank you, Mr. Chairman. I
17  hail from Charlotte, and -- and as Representative
18  Stam said today, I think what we're doing is
19  preserving sense of privacy that people have long
20  expected in private facilities. And we are
21  restoring and clarifying -- clarifying the existing
22  authority and limits of authority of local
23  governments. The recitals at the beginning of the
24  bill say that. They point out that the power of
25  localities in North Carolina comes from delegation

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 48 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/29/16   Page 48 of 75

**6**

1    by the General Assembly.

2        And in the case of the Charlotte

3    ordinance passed in February, there was exercised a

4    power that's never been delegated to the City of

5    Charlotte, or to any locality, except for a few in

6    their charters.  But not Charlotte.  So Article

7    VII, Section 1 of the North Carolina Constitution

8    sets forth that law.  That's our fundamental law of

9    this state.

10        Immediately below that, Representative

11    Stam made the point that consistent business

12    regulation statewide is critical for -- for the

13    success of business, and to make the kind of

14    business environment that we need for the people of

15    North Carolina to prosper.

16        Article II, Section 24 says that the

17    General Assembly cannot make local acts on

18    business.  That is to say, labor, trade, mining, or

19    manufacturing.  The Constitution specifically sets

20    that forth in order that we not have a balkanized

21    or patchwork system of business law, varying from

22    place to place within the state.  The other

23    recitals are consistent with that.  And now I'll

24    proceed to the operative parts of the bill.

25        The bill is in three parts.  The first

**7**

1    part establishes in two sections that in public

2    facilities in North Carolina, the policy will be

3    that bathrooms will be designated according to

4    biological sex, and usage of them will be according

5    to biological sex.  That's the law of North

6    Carolina already.  The North Carolina building code

7    specifies the number of facilities, and that

8    they'll be designated according to biological sex.

9    This clarifies it.

10        So in the two sections -- the first is

11    that in K-12 public education facilities, bathrooms

12    for students will be bathrooms and -- and their --

13    bathrooms and changing facilities: the terminology

14    you see -- single-sex, multiple occupancy bathroom

15    and changing facilities and also -- so you have

16    multiple and single occupancy, obviously.  If it's

17    a multiple-occupancy facility, then they'll be

18    designated and used according to biological sex.

19    Biological sex is to be designated on the birth

20    certificate.  And for those that may not know,

21    North Carolina already has in statute a provision

22    that if someone has sex reassignment surgery, then

23    they can amend their birth certificate so that it

24    is the -- so that it has the other gender.  And so

25    this is consistent with that.

**8**

1        The -- the Section 1 includes specific

2    accommodations that are allowed for various

3    circumstances.  It permits local boards of

4    education to maintain single occupancy bathroom or

5    changing facilities that students can use.  It also

6    has exceptions in Subpart -- in Subparagraph --

7    Subsection (d) listed for custodial purposes; for

8    maintenance of, or inspection purposes; to render

9    medical assistance: to accompany students needing

10    assistance or -- or a student needing to receive

11    assistance.

12        And -- and also the last one, Section --

13    Subsection (7) there, says, that has been

14    temporarily designated for use by that person's

15    biological sex.  It is often the practice in

16    athletic events in particular, where a team travels

17    to the opposite school, that a locker room of the

18    other gender than the sports team will be

19    temporarily designated for their use during that

20    event.  So that's covered as well.

21        Section 1.3 of the bill, the second

22    provision on bathroom policy, and it provides that

23    in other public facilities; so facilities operated

24    by state agencies, by localities and also other

25    types of bathrooms operated by local school boards,

**9**

1    the same policy will exist, and the same similar

2    exceptions apply.  Notice there is no mandate on

3    private business in this law.  Businesses are free

4    to regulate their own facilities as they see fit,

5    and we believe that's consistent with a good,

6    favorable business environment and appropriate

7    freedom of choice.

8        Now, Part 2.  Part 2 and Part 3 are the

9    portions that, as we introduced the bill, I

10    mentioned relate to clarifying what authority

11    exists for localities in certain areas.  Part 2 has

12    three sections.  Section 2.1 clarifies that local

13    governments lack authority, or "preempted" is the

14    term in law, to adopt regulation of wages.

15        Now, the reason that that is in this

16    bill, is because of the two sections that follow

17    that, Sections 2.2 and 2.3.  These sections provide

18    that if a local government, county, or city,

19    engages a contractor, it is not able to impose

20    regulations or controls on that contractor's

21    employment practices, or mandate or prohibit how it

22    will provide goods, services, or accommodations to

23    any member of the public.  These were the

24    provisions previously modified in 2013, when a city

25    overstepped its authority and used its contracting

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/20/16   Page 49 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/27/16   Page 49 of 75

## 10

1  policy to impose a minimum living wage, as the
2  terminology went, on -- on its contracting parties.
3  We've now made clear, instead of here, because what
4  we said there is, they're disabled from regulating
5  the employment practices generally of contracting
6  parties or their -- their way of selling services
7  or goods. Therefore, we've moved more generally,
8  and clarified something, again, that is not new
9  law. It's a clarification.
10  The Wage and Hour Act of North Carolina
11  is a complete and integrated legislative scheme
12  regulating wages and labor conditions. And we --
13  so, we've -- to make it abundantly clear that local
14  governments are disabled from this area, we've made
15  an explicit statement of preemption of the field.
16  That takes us to the third part, which is
17  titled Protection of Rights in Employment and
18  Public Accommodations. North Carolina has had,
19  since 1976, in Article -- in Chapter 143, a
20  statement of public policy against employment
21  discrimination on the basis of race, religion,
22  color, national origin, and sex. For the first
23  time, we are enacting -- proposing to enact a
24  statewide statement of public policy against
25  discrimination in public accommodations, on those

## 11

1  same categories. I've actually omitted two that
2  appear in the top, and I want to explain -- explain
3  this. So that -- in the employment discrimination
4  provision that's pre-existed, there's a -- covers
5  age, which is uniquely appropriate for employment
6  discrimination, not for public accommodations, for
7  reasons I can go into if someone has a question,
8  but the other one is disability.
9  There were reports in the media this
10  morning that we're curtailing protections for
11  disabilities. That's completely incorrect. That
12  is covered comprehensively in a separate State
13  statute. Chapter 168A of the General Statutes
14  provides comprehensive protection for disability
15  discrimination, including in public accommodations.
16  There was a case from the Court of
17  Appeals in 2015, in which the fact that handicap is
18  included in this employment nondiscrimination
19  public policy statement, creates a -- an enormous
20  confusion that the Court of Appeals had to work its
21  way through. And it is a potential trap for the
22  unwary. If people who suffer disability
23  discrimination should bring their claim
24  inadvertently under that public policy statement,
25  as opposed to under Chapter 168A, they can deprive

## 12

1  themselves of appropriate remedies.
2  So as we're -- as we're enacting, for the
3  first time in North Carolina, a statewide statement
4  of public accommodations nondiscrimination, we've
5  left handicapped to be covered completely and
6  comprehensively by the existing Chapter 168A. And
7  we've used, for consistency, the definition of
8  public accommodations in 168A to inform the
9  nondiscrimination policy that we are enacting here.
10  And we cover all of the -- of the -- what the
11  Supreme Court has termed suspect and quasi-suspect
12  classifications in this new comprehensive statement
13  opposed to discrimination in public accommodations.
14  In both of those statements of public
15  policy, we have also made -- we have also now
16  articulated clear statements of legislative intent,
17  that localities are preempted from acting in these
18  areas. But I want to emphasize to you all again,
19  that no one can point to a statute that has ever
20  explicitly delegated authority to cities and
21  counties to do that. And, in fact, if you read the
22  Williams versus Blue Cross and Blue Shield case
23  from 2003, the courts have already been active in
24  striking down exactly that sort of regulation.
25  Where there was a comprehensive employment

## 13

1  discrimination measure enacted in a county, the
2  Supreme Court said that county didn't have
3  authority to do that. But the matter appears to
4  remain unclear, and therefore we're proposing to
5  clarify it.
6  In both of these statements of public
7  policy -- the one on employment discrimination, the
8  other on public accommodations discrimination --
9  the Human Resources Commission within the
10  Department of Administration is empowered to
11  receive complaints, to investigate, and to
12  conciliate complaints that arise concerning either
13  of those.
14  At the end, there's a severability
15  provision; you all know what that's for. And as --
16  and -- and the final provision, Part 5, makes
17  clear, to the extent the field preemption
18  statements made elsewhere in the legislation
19  doesn't seem to cover it, or leaves any doubt at
20  all, makes clear that ordinances, regulations,
21  policies adopted that are inconsistent with this
22  law, are superseded and preempted. And that's from
23  front to back. Mr. Chairman.
24  REP. BLACKWELL: Thank you,
25  Representative Bishop. Before we take questions,

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 50 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/29/16   Page 50 of 75

## 14

1   let me do a couple of other housekeeping things.
2   One is, I had a question that, for members of the
3   committee, you do not have to offer amendments to
4   the bill in committee in order for them to be
5   considered on the floor. You can, under the rules
6   that were just adopted earlier in session,
7   amendments can be offered on the floor for the
8   first time. So you can take that into
9   consideration in deciding if you have something you
10  want to offer.
11      Also, I should point out to the committee
12  members and the public that are present, that we
13  have four House Sergeant-At-Arms that are around
14  the chambers that may be able to help you if you
15  have a concern. Young -- Young Bay is over here,
16  Jim Moran in the back by the door, Doug Harris is
17  back here, and Joe Crook is over by this door. So
18  we appreciate that.
19      One other thing is, because we were about
20  15 minutes late in getting started because of the
21  availability of the bill and the explanation for
22  the bill, we've gotten permission to extend that
23  time by which we take the vote from 11:45 to 12:00.
24  We may not need that, but I'm going to do that in
25  my discretion, so that hopefully we won't have to

## 15

1   cut short public comment.
2       With that being said, are there questions
3   from the committee for Representative Bishop, or --
4   is Representative -- I don't know if Representative
5   Stam is still here. I don't know if the other
6   sponsors are present, if they want to come up,
7   Representative Howard or Steinberg, if they're in
8   the room, but are there questions from the
9   committee? Representative Richardson.
10      REP. RICHARDSON: Thank you, Mr.
11  Chairman. I don't necessarily -- well, I have a
12  question in the sense of, we just got this bill
13  just before the explanation started. There are a
14  lot of statutes that are listed in this bill, and I
15  think it's very unfair to the committee to ask us
16  to make an informed decision on this bill that
17  seems to impact some things that we're not aware
18  of. Is it a -- a possibility that we could be
19  given at least five to ten minutes to read this for
20  ourselves, from front to back? Because right now,
21  listening to him and trying to read along with all
22  these statutes, I'm not sure of what is really in
23  this bill.
24      REP. BLACKWELL: Representative
25  Richardson, if you think five minutes would do it,

## 16

1   why don't we give you the lesser of the times you
2   requested, and we'll be at ease for five minutes to
3   give members of the committee that haven't seen
4   this before a chance to look at it.
5       REP. RICHARDSON: Thank you, Mr.
6   Chairman.
7       (Members at ease.)
8       REP. BLACKWELL: The committee will be
9   back in order. Are there further questions from
10  members of the committee? Representative Warren, I
11  think I saw earlier that you had your hand up?
12      REP. WARREN: Thank you, Mr. Chair. I'd
13  just like to be recognized. It's an appropriate
14  time to make a motion.
15      REP. BLACKWELL: All right. Any other
16  questions from members of the committee at this
17  point? Seeing none, we will go to public comment.
18  The first public comment, if you'll go to the
19  speaker in the back, and use the mic, and identify
20  yourself, and if you are with an agency or
21  organization, on whose behalf you are speaking, if
22  you'd let us know that. And our first speaker is
23  Chris Sgro. If it's -- I hope I didn't -- is that
24  okay? Two minutes, each, please.
25      MR. SGRO: Good morning. My name is

## 17

1   Chris Sgro. I'm the Executive Director of Equality
2   North Carolina, the statewide LGBT advocacy
3   organization, representing over 170,000 members,
4   and we have many of our allies here with us today.
5   What Charlotte did is not unique or extreme. Their
6   democratically-elected City Council overwhelmingly
7   passed a protection ordinance for LGBT people. Two
8   hundred-plus cities across the nation, have these
9   protections already, including Myrtle Beach and
10  Columbia, South Carolina. We're talking about
11  other similar cities, not just New York or San
12  Francisco.
13      There have not been public safety
14  concerns in any of those cities for the decades
15  that these ordinances have been in place. That is
16  a fact, and facts matter. What is extreme, is this
17  special session. The first since 1981, wasting
18  42,000 taxpayer dollars a day, more than a North
19  Carolina educator's yearly salary, is what you are
20  doing here.
21      This ordinance is a best practice. What
22  this NCGA stands to do is a worst practice.
23  Republicans in Tennessee and South Dakota have
24  killed less sweeping bills because of concerns that
25  we have not had time to evaluate in the five

Case 1:16-cv-00236-TDS-JEP   Document 179-1   Filed 10/20/16   Page 51 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/29/16   Page 51 of 75

18

1  minutes that we just gave folks, to digest this
2  lengthy legislation.  This would be the most
3  sweeping anti-LGBT bill in the nation.  We cannot
4  allow state policy to be crafted, or passed, for
5  political gain or out of factless fear.
6        My community deserves to be protected.
7  Yes, in restrooms, and in restaurants, and in
8  hotels, and in ability to hail a taxi.  Those are
9  common sense protections.  This session is not
10  common sense.  The eyes of North Carolina, our
11  business community, my trans and gay brothers and
12  sisters, and the nation, are focused on you here
13  today.  Please reject fear.  My community's safety
14  and facts must trump the perceived politics of
15  this.  Vote against.
16        REP. BLACKWELL:  Thank you, Mr. Sgro.
17  The next speaker is Chloe Jefferson, if I'm getting
18  that name correctly.  Ms. Jefferson.
19        MS. JEFFERSON:  Hi.  My name is Chloe,
20  and I'm in my junior year at Greenville Christian
21  Academy.  When the Charlotte City Council passed
22  their bathroom ordinance, I was immediately
23  fearful.  I was fearful because, if Charlotte can
24  do something like this, what city will be next, my
25  own?  Changing in front of my girl peers is already

19

1  intimidating enough.  The teen years are especially
2  difficult with different body image perceptions
3  being pushed on us through social media, magazines,
4  and Hollywood.  We start to believe that there's a
5  certain way to look, and to not look.  Now we add
6  the possibility of males changing and showering
7  alongside me.  This is something that makes me, and
8  I'm sure other girls, even more self-conscious.
9  Girls like me should never be forced to undress or
10  shower in the presence of boys.  I would imagine
11  being born a boy but thinking you're a girl is very
12  scary and confusing.  But being a teenage girl is
13  confusing, too.
14        What about my rights to privacy and
15  wishes to not be exposed to young males changing
16  and showering beside me?  I think everyone has the
17  freedom to believe in what they want, but they
18  shouldn't change laws for a small number of
19  students that punish and single out the rest of us.
20  That wouldn't be fair.
21        Not only is this bathroom ordinance a
22  problem for my privacy, but also a problem for my
23  safety.  I would no longer feel safe using the
24  bathroom in public places.  Knowing that a man
25  could easily walk into the women's bathroom, with

20

1  no limitation, is completely frightening.
2  Charlotte's bathroom ordinance allows men complete
3  access to private places reserved for women.  With
4  this access, there's no stopping what people may
5  do.  How can my parents possibly send me into a
6  bathroom -- public bathroom, knowing that a man
7  could possibly be waiting for me.  This ordinance
8  will be used as a way to have access to unarmed
9  girls in what should be a private setting.
10        Charlotte is only the first city, and if
11  Governor McCrory and the General Assembly do not
12  fix what Charlotte has done, I think others will
13  follow.  I am not the only girl scared, if
14  Charlotte's ordinance is not changed.  Everyone
15  should be aware that it would be girls like me who
16  are affected by ordinances like Charlotte and we
17  deserve protection.  Thank you.
18        REP. BLACKWELL:  Thank you.  The next
19  speaker on our list is Sarah Preston.
20        MS. PRESTON:  Good morning.  My name is
21  Sarah Preston.  I'm the acting Executive Director
22  for the ACLU of North Carolina.  As an organization
23  that cares deeply about ensuring equality for all
24  North Carolinians, including lesbian, gay, bisexual
25  and transgender individuals, we are very concerned

21

1  about this legislation.  We all understand that
2  this proposal came about because of an ordinance
3  passed by Charlotte.  This ordinance was not
4  complicated.  It is a simple measure designed to
5  protect all individuals in public accommodations,
6  including restaurants, bathrooms, hotels,
7  transportation, and even accessing government
8  services.
9        I know that many people probably do not
10  understand what it means to be transgender, or
11  identify with a sex other than the one that was
12  assigned at birth, and that's okay.  But the
13  reality is that a transgender woman is a woman, and
14  a transgender man is a man, living his life just
15  like any other man, and he should be able to
16  the men's restroom.  These men and women should be
17  able to expect fair and equal treatment from their
18  governments, and in public accommodations.
19  Instead, half of the transgender individuals
20  surveyed in North Carolina recently reported being
21  harassed in public accommodations, and eight
22  percent reported being assaulted.  We are here
23  today thinking about adding to that harassment,
24  encouraging those assaults and violence, and we
25  should do better for this community.

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 52 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/29/16   Page 53 of 75

## 22

1　　　If this body truly wants to consider a
2　nondiscrimination ordinance, they must include
3　gender identity and sexual orientation.  It is
4　important that we protect all of the vulnerable
5　communities in our state and not pick and choose
6　which we want to provide full accommodations to.
7　Thank you.
8　　　REP. BLACKWELL:  Our next speaker is, if
9　I'm -- again, Eleana Smith.
10　　　MS. FEDORUK:  Good morning, Mr. Chairman,
11　members of the committee.  I'm Kelly Fedoruk, and
12　I'm here to read the statement from Eliana Smith,
13　because she's unable to come here today.  She's in
14　Charlotte, and asked that I read her statement to
15　all of you this morning.  "I'm Eliana Smith, and
16　I've lived here in Charlotte for eight years.  I
17　write to you today because I truly believe this
18　Charlotte ordinance creates dangerous and
19　vulnerable situations for women, children, and men.
20　I'm going to share something today that I never
21　thought I would share publicly, but I feel is
22　really necessary due to the direction that our city
23　is going in.
24　　　I was sexually assaulted as a young girl,
25　and in the years that followed, I had a real fear

## 23

1　of men hurting me.  This fear followed me for a
2　long time.  I actually remember when I was
3　searching for colleges, and the thought of co-ed
4　dorms making me incredibly nervous.  I specifically
5　picked a school where I knew girls would all be on
6　the same floor, because I wanted to make sure my
7　privacy, as a woman, was protected.  Thankfully, I
8　found healing and peace from the terrible pain that
9　I experienced, and I did come to realize that I
10　could be safe again.
11　　　In recent weeks, the thought of what I
12　experienced has come back to my mind as I watched
13　the Charlotte City Council vote to allow biological
14　males into women's bathrooms, locker rooms, and
15　showers.  I have serious concerns and anxiety that
16　I may encounter a man in the bathroom.  But more
17　than the pain and nervousness I feel, because of
18　what has happened to me in my life, I fear even
19　more for my children.  I have four young children,
20　and I never want any of them to go through the
21　pain, the humiliation, and the trauma I suffered
22　for years.  How will I be able to go into the
23　bathroom, knowing that at any moment a man, or
24　someone pretending to be a woman, could walk in?  I
25　won't have peace about my little girls showering

## 24

1　and changing at the Y, where there very well could
2　be a man in that room.
3　　　In passing this ordinance, the City
4　Council ignored its obligation to protect all
5　citizens of Charlotte, and demonstrated that they
6　really don't care about my concerns.  Instead, the
7　City Council values and chose its political agenda
8　over safety, privacy, and common sense."
9　　　Mr. Chairman, I see I'm out of time.  May
10　I have a couple seconds to finish her statement?
11　Keep it short?  Thank you.
12　　　"My concerns and my fears are real, and
13　it's not right for anyone to discount them or for
14　anyone to call me a bigot and a fearmonger, because
15　I want to keep my family safe.  As a victim of
16　sexual abuse, it is very difficult to speak up or
17　defend yourself.  There's this fear, especially as
18　a young girl, that if you speak up, you or your
19　family will pay somehow.  The same fear returns in
20　a different way and I ask you all today to pass
21　this bill, and I urge Governor McCrory to sign this
22　and protect all citizens of this great state."
23　Thank you.
24　　　REP. BLACKWELL:  Our next speaker, and
25　let -- let me say, before -- I appreciate

## 25

1　everybody's decorum, but at various points, before
2　we get through, please remember that we don't have
3　clapping or demonstrations of support, pro or con,
4　and you all are doing great, making my job easy,
5　but thought I would remind you of that.  The next
6　speaker is Angela Bridgeman.
7　　　MS. BRIDGEMAN:  Good morning.  My name is
8　Angela Bridgeman.  I'm here representing my own
9　self, a transgender person, and a respected member
10　of the North Carolina business community, who moved
11　a successful business to this state from the State
12　of Pennsylvania.
13　　　I bring money from out of the state into
14　the state, and I am asked to pay taxes to finance
15　the discrimination which I face every day as a
16　transgender person.  Now, I am post-operative.  My
17　birth certificate says female, my license says
18　female, this is not going to affect me.  But that's
19　not what I'm here to talk about today.
20　　　What I'm here to talk about today, is in
21　1998, I was denied a college education because I am
22　a transgender person.  Five days after Matthew
23　Shepard was killed in Wyoming, I was told by my
24　then-college, Sullivan College [sic] in Louisville,
25　Kentucky, that I would only be allowed to use male

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 53 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/29/16   Page 53 of 75

## 26

1  restrooms. What would you all do? I did the only
2  thing I could. I chose my safety. At five days
3  after Matt Shepard is killed, I'm told that I have
4  to put myself in a position where I'm probably
5  going to be beat up, or worse. I dropped out of
6  college, and I never went back. I was denied a
7  college education just because I'm transgender.
8       I don't mean to be insensitive to some
9  people that maybe have suffered sexual assaults and
10  are fearful, but I have a right to be safe, too. I
11  have a right to be safe, too, and I have a right to
12  get a college education, which was denied to me. I
13  have a right. And the bore for the point -- this
14  isn't going to affect me now, because I am in every
15  way legally female. But nobody else should have to
16  go through what I did. Nobody should have to make
17  the kind of choice I had to make. Thank you.
18       REP. BLACKWELL: Our next speaker is John
19  Amanchukwu.
20       MR. AMANCHUKWU: I'm John Amanchukwu,
21  Executive Director for the Upper Room Christian
22  Academy. When there's no such thing as right or
23  wrong, man is left with flawed ideologies and
24  philosophies. When virtues are smothered through
25  party platforms, man becomes confident in

## 27

1  legalizing anarchy. This ordinance is the corrupt
2  fruit of treason. It is an inside job from the
3  hearts of traitors.
4       Marcus Cicero said, a nation can survive
5  its fools and even the ambitious, but it cannot
6  survive treason from within. An enemy at the gates
7  is less formidable where he is known and carries
8  his banner openly. But the traitor moves amongst
9  those within the gate freely, his sly whispers
10  rustling through all the alleys, heard in the very
11  halls of government itself. He rots the soul of a
12  nation.
13       How do you spell traitor? How do you
14  spell treason? Today you spell it R-O-Y
15  C-O-O-P-E-R. Once again, our Attorney General is
16  failing to stand up for the people of this great
17  state. So today, we reject and push back against
18  neutrality for the voices of thousands of boys and
19  girls in our public or private schools, and the
20  countless teachers and administrators.
21       It's common sense that boys should go to
22  the boys room, and girls should go to the girls
23  room. I believe that God got it right in Genesis 5
24  and 2, when He said that He created them male and
25  female. If God didn't give you access to a male or

## 28

1  female bathroom via your anatomy, neither should we
2  give you access via ordinance or legislation.
3  According to the American Psychiatric Association,
4  as many as 98 percent of gender-confused boys and
5  88 percent of gender-confused girls eventually
6  accept their biological sex, after naturally
7  passing through puberty.
8       In my closing, allowing men to use
9  women's bathrooms, showers, and locker rooms puts
10  both women and children in situations of grave
11  danger. Evidence shows that bathrooms are one of
12  the most prevalent places in which sexual assault
13  and rape take place. This ordinance is a passive
14  form of child abuse. So we ask the General
15  Assembly to send a clear message today to any other
16  municipality that this kind of government overreach
17  will not be tolerated.
18       REP. BLACKWELL: Our next speaker will be
19  Madeline L. Goss.
20       MS. GOSS: Thank you. My name is
21  Madeline Goss, and I'm transgender. I'm a mother,
22  and a partner, and I'm a software engineer here in
23  Research Triangle Park. I grew up in Hickory,
24  North Carolina, and I loved Hickory. But I was
25  bullied and tortured mercilessly there. And where

## 29

1  did it happen? It happened in the men's room.
2  This place is a place of danger for me. And what
3  this bill would do is send me back there. I left
4  Hickory for places that are safe, like Charlotte
5  and Raleigh. I now live in Raleigh, and I am happy
6  there. I'm happy with my partner and I'm happy
7  with my nine-year-old daughter, Sophia.
8       I can't use the men's room. I won't go
9  back to the men's room. It is unsafe for me there.
10  People like me die there every day. Not -- not the
11  least to say, it freaks people out when I go to the
12  men's room. Would you like to go to the men's room
13  with me? I don't think so. The point is this.
14  These LGBT protections are common sense
15  protections. They make places like Raleigh and
16  Charlotte safe and welcome for people like me.
17  They're not new, they're not unique, and they're
18  not radical.
19       This -- they've already been passed in
20  over 200 cities in the United States. People
21  aren't getting thrown in jail. People aren't
22  getting raped and murdered. People are just going
23  to the bathroom. That's all I'm asking, is a safe
24  place for me, and people like me, to go to the
25  bathroom. Please, vote no on this bill.

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/20/16   Page 54 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/27/16   Page 54 of 75

## 30

1    REP. BLACKWELL:  Our next speaker is
2  Tammy Fitzgerald.
3    MS. FITZGERALD:  Good afternoon, members
4  of the committee.  Charlotte's bathroom ordinance
5  is unconstitutional.  And this is the first domino.
6  Other cities will follow if we don't stop what
7  happened in Charlotte.  Under North Carolina's
8  Constitution, cities only have those powered
9  explicitly delegated to them by the state.
10  Charlotte exceeded its delegated powers by passing
11  an ordinance that jeopardizes both the health and
12  the safety of its citizens.
13    It creates laws that are not uniform
14  across the state, making it harder to do business
15  in Charlotte than other parts of the state.  This
16  hurts business.  It violates the right to earn a
17  livelihood free of government interference, because
18  of the business regulations it imposes.  The
19  Charlotte ordinance unfairly allows the government
20  to overreach into the private businesses and
21  churches, by forcing them to provide service,
22  promote ideas, participate in events, that conflict
23  with their beliefs.  This violates the First
24  Amendment, as well as our own state constitution.
25  If the General Assembly does not stand firm, a

## 31

1  precedent will be set for municipalities to usurp
2  power on any number of issues.
3    Now, because Roy Cooper has failed to do
4  his job, we are looking to you and the Governor to
5  call this law unjust, and to overturn it.  The
6  Charlotte bathroom ordinance was heavily promoted
7  by a convicted sex offender, and we've said quite a
8  bit about that.  But there are -- this has actually
9  happened in states where these laws are already in
10  place.  Sex offenders are using these laws to their
11  advantage.
12    In 2011, transvestite Thomas Lee Benson,
13  a convicted sex offender for having sexual contact
14  with a minor girl, dressed as a woman so he could
15  go into the women's locker room at a swimming pool
16  in Oregon.  There were young girls present in the
17  locker room, changing into their swimsuits, while
18  Benson was inside.  Previously, he had dressed as a
19  woman to enter another locker room in Portland,
20  Oregon.  Young girls were changing into their
21  swimsuits in that dressing room, too.
22    We have presented over 35,000 petitions
23  to you, and to the City of Charlotte, to stop this
24  ordinance, and we would appreciate your action
25  today.  Sixty-six percent of the people in this

## 32

1  state think the ordinance should be overturned, and
2  so we are looking to your leadership.  Thank you so
3  much for your time.
4    REP. BLACKWELL:  Our next speaker is
5  Tracy Hollister.
6    MS. HOLLISTER:  Hello.  My name is Tracy
7  Hollister, and I'm with several organizations
8  today, proudly:  Equality North Carolina, ACLU of
9  North Carolina, and the Human Rights Campaign.  And
10  I'm here specifically to talk about Provision 1,
11  and to take a stand for my transgender brothers and
12  sisters.
13    Paul Stam earlier talked about
14  consistency in this bill, consistency across the
15  state, but I want to argue to you that this bill is
16  inherently inconsistent.  What is it inconsistent
17  with?  North Carolina values and common sense.
18  Treating people with respect, as we'd want to be
19  treated.  Respecting local democratic processes.
20  And being champions of safety and protection.
21    We hear, on the one hand, fears of what
22  happens when transgender people go to restrooms.
23  And we hear, on the other hand, a mountain of
24  evidence of how dangerous it is, and how unsafe
25  transgender people feel.  I want to ask the

## 33

1  legislators here today, by show of hands, how many
2  of you personally know a transgender person?
3    REP. BLACKWELL:  We can't allow a show of
4  hands on that, but you can continue with your
5  remarks, please.
6    MS. HOLLISTER:  I would submit to you,
7  that if you do not know a transgender person
8  personally in your life; if you have not heard
9  their story, like you've heard Maddy's story, and
10  other stories; that you need to do your homework,
11  and be transparent about what you understand and
12  don't understand.
13    Fortunately, Bobbie Richardson gave us
14  five minutes.  We need far more than five minutes
15  to talk about a bill like this.  And this is not an
16  emergency.  Nothing really bad is going to happen
17  when people who feel like they are -- like --
18  people who are women go to women's restrooms, and
19  people who are men go to men's restrooms.  I have a
20  cousin who is transgender.  He writes that he came
21  out at age 19.  He asked me to share this with you,
22  after experiencing gender dysphoria for years.  And
23  when he came out, he had a fear of public
24  bathrooms.  A lot of transgender people avoid
25  bathrooms.  The last thing they want to do in a

Case 1:16-cv-00236-TDS-JEP   Document 174-1   Filed 10/28/16   Page 55 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-7   Filed 08/25/16   Page 55 of 75

## 34

1 bathroom is to create any trouble. They just want
2 to relieve themselves, like he would like to
3 relieve me right now.
4     REP. BLACKWELL: Thank you. I want to
5 remind you to state your name as you start, and if
6 you are with an agency, business or a group, if
7 you'll identify the group that you may be
8 representing. The next speaker is John Rustin.
9     MR. RUSTIN: Thank you, Mr. Chairman,
10 Members of the Committee. I'm John Rustin,
11 President of the North Carolina Family Policy
12 Council. As you've heard, on February 22nd, the
13 Charlotte City Council approved a set of highly
14 controversial and hazardous ordinance changes, and
15 we have three primary concerns.
16     First, these changes mean that men can
17 enter women's restrooms, shower rooms, bathhouses
18 and similar facilities in any public accommodation
19 in the City of Charlotte, placing the privacy,
20 safety, and dignity of women, children, the
21 elderly, and others at great risk. The City's
22 extremely broad definition of public accommodation
23 means this new ordinance would apply to essentially
24 any business or organization in the City that
25 provides any goods or services. And please keep in

## 35

1 my mind, there is no exception. There is no
2 exception for churches, church schools, and
3 church-related ministries.
4     Secondly, many citizens have sincere
5 religious beliefs that inform the way they live
6 their lives and operate their businesses. Similar
7 ordinances in other states have been used to force
8 small business owners, such as florists, bakers,
9 photographers, bed and breakfast owners, and
10 others, to either conform to a government-dictated
11 viewpoint in violation of those sincerely-held
12 religious beliefs, or to face legal challenges,
13 fines, and other penalties that have ultimately
14 caused some to go out of business. The City of
15 Charlotte should not be authorized to impose such
16 an unconstitutional mandate as a condition of doing
17 business.
18     And thirdly, Charlotte far exceeded its
19 authority when it passed these ordinance changes.
20 Cities and counties in North Carolina derive the
21 full extent of their authority only from the state
22 Constitution and acts that are passed by this
23 General Assembly. The North Carolina General
24 Assembly has granted neither the City of Charlotte,
25 nor any other city or county in the state, the

## 36

1 authority to do what Charlotte has done. If these
2 ordinance changes are allowed to stand, they will
3 serve as a precedent for other city and county
4 governments to undermine proper governmental
5 authority in North Carolina and to create a
6 patchwork of disparate ordinances across the state.
7     For these reasons, we applaud you for
8 considering the legislation that you are today, and
9 we ask that you support it. Thank you.
10     REP. BLACKWELL: We have now consumed
11 about 25 to 26 minutes of the allotted public
12 comment time, so we're going to take two more
13 speakers from -- one from each side. The next
14 speaker will be Vivian Taylor.
15     MS. TAYLOR: Hello. My name is Vivian
16 Taylor. I am here today representing the
17 organization, Believe Out Loud. It's a Christian
18 organization. But I'm also here representing
19 myself. I am an eleventh-generation North
20 Carolinian. My family has been here since our
21 ancestor Kinchin Pennington was given a piece of
22 land as a payment for his service in the
23 Revolution. I graduated from North Carolina public
24 schools. I served in the War in Iraq with the
25 North Carolina National Guard. I'm a transgender

## 37

1 woman.
2     These protections that Charlotte passed
3 are common sense. Transgender folks face
4 incredible amounts of violence, and these
5 protections just do the basic moral job of looking
6 out for people and keeping them safe. You can look
7 at all the other cities that have passed similar
8 protections, and you can see there have not been
9 issues. There has not been violence. We are North
10 Carolina, we are one of the greatest states -- we
11 are the greatest state in this union, and we can do
12 better than -- than giving into fears. We can
13 protect everyone. I love this state, and I -- and
14 because of that, I call on you to reject this bill.
15 Thank you very much.
16     REP. BLACKWELL: Our next and final
17 speaker is Heather Garofalo, I believe.
18     MS. GAROFALO: Good afternoon. My name
19 is Heather Garofalo. I'm a small business owner
20 servicing Charlotte. I'm a mom of three children.
21 I have many friends and family in the LGBT
22 community, and I love them. Every American private
23 business owner in North Carolina should be free to
24 live and work according to their views, without
25 fear of being punished, unjustly, by the

Case 1:16-cv-00236-TDS-JEP   Document 179-7   Filed 08/29/16   Page 56 of 75

## 38

1  government.  In 2015 the Pew Charitable Trust
2  organization identified the top 10 states for job
3  growth.  Eight out of 10 of these states do not
4  contain state nondiscrimination ordinances with
5  language of sexual orientation and gender identity.
6      Charlotte is a beautiful city because of
7  its diversity.  There are many different world
8  views and world religions.  There is strength in
9  diversity.  True equality means everyone is free to
10  speak their piece, without fear of being silenced
11  and punished.  I'm pleased to report today, that
12  not one single case has been filed by the ACLU
13  alleging that an individual or organization has
14  discriminated against our friends in the LGBT
15  community here in Charlotte.
16      As a business owner, I fear the
17  unintended consequences of this ordinance, the
18  negative impact on labor, trade and commerce, as I
19  service many cities in the state.  There would be
20  inconsistency, lack of uniformity.  For small and
21  large business owners like myself, we would be
22  forced to check our deepest-held beliefs at the
23  door, or suffer fines of $500, jail time, lawsuits.
24  I am asking for a right to provide for my family.
25      Also, business owners across the state

## 39

1  will be forced to cancel their contracts.  The city
2  will cancel contracts in just nine days.  Cancelled
3  contracts means a loss of revenue.  A loss of
4  revenue could mean tens of thousands of jobs laid
5  off in North Carolina.  This could mean -- this
6  could mean trouble, financially, for many families
7  in this 2016 election year.
8      I am equally concerned as a mom of three,
9  that this ordinance violates the safety and privacy
10  of every child in North Carolina.  I am not fearful
11  of my transgender friends.  I am fearful of all the
12  sexual offenders that are here.  If you put a sweet
13  transgender child, and you move them from one
14  restroom to the next, that's not going to take care
15  of their fears and concerns and desire to be
16  accepted.  That's actually going to subject them to
17  being -- oops, sorry.
18      REP. BLACKWELL:  Okay.  Thank you for all
19  the comments.  I now will go back to the committee.
20  Are there further comments or questions from
21  members of the committee?  Representative Hamilton.
22  Are there members of the committee that have
23  questions or wish to speak on the bill?
24  Representative Hamilton.
25      REP. HAMILTON:  Thank you, Mr. Chairman.

## 40

1  If I may, I have a -- several questions.  I have a
2  series of questions, if -- if I can just get
3  started.
4      REP. BLACKWELL:  To whom do you want --
5  do want to address these, or are these rhetorical?
6      REP. HAMILTON:  No, they're -- I would
7  like some answers to them.
8      REP. BLACKWELL:  Representative Stam and
9  Representative Bishop, you all want to step up to
10  the podium, and we'll let you handle these?
11      REP. HAMILTON:  Thank you, gentlemen.
12  Thank you, Mr. Chairman.  And it may involve staff
13  as well.  Okay.  My first question is related to
14  the change in the third section, from just a simple
15  reference to sex, changing it as biological sex.
16  The question is, if a -- if a gender-change
17  operation has taken place, the new sex -- say
18  you've -- a female has -- has had a sex-change
19  operation to become a male.  Is that considered his
20  biological sex?
21      REP. BISHOP:  It is according to the
22  definition in the statute.  It says biological sex
23  is sex according to the birth certificate.
24      REP. HAMILTON:  According to the birth
25  certificate.

## 41

1      REP. BISHOP:  And they can have the birth
2  certificate changed.
3      REP. HAMILTON:  And their birth
4  certificates can be changed.
5      REP. BISHOP:  That's correct.
6      REP. HAMILTON:  Thank you.  My -- my
7  second question is really related to the contract
8  portions of the bill, Sections 2 and 3.  I -- the
9  focus has been, from the media standpoint and from
10  the public standpoint, just on the bathrooms, as it
11  relates to the Charlotte ordinance.  But what
12  concerns me about this bill is that we have -- we
13  have expanded the conversation, and now we are
14  delving into the cities' and counties' ability to
15  contract with private vendors.  So my first
16  question is, how will minority, women, and
17  business-owned entities be impacted by the changes
18  in this statute, or will they be affected in any
19  way?
20      REP. STAM:  May I, Mr. Chairman?
21      REP. BLACKWELL:  Yes.
22      REP. STAM:  I think there are three parts
23  to that.  I -- it I -- I would not agree with your
24  premise that it affects their ability to contract:
25  they certainly can contract.  What your question

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 57 of 75

---

**42**

1  goes to is, frankly, one of the more egregious
2  aspects of the overreach that -- that is involved
3  here, which is this -- in this -- in a particular
4  locality, this -- that has imposed -- purported to
5  impose employment or -- or selling practices on a
6  business with whom they -- they will contract,
7  whoever's going to bid for their jobs, they reach
8  well beyond the limits of their city to impose
9  this -- whatever their notions are, on folks across
10  the state, and even out of the state. So it
11  illustrates one way in which is particularly
12  problematic.
13      However, to the other point that you've
14  asked, or to the rest of it, if you will look in
15  Chapter 143 -- and I'd get you a reference, but
16  there are already -- there already is a -- a
17  comprehensive set of rules concerning
18  nondiscrimination in contracting on -- on the --
19  all the suspect and quasi-suspect classes and
20  requirements for program-setting goals for the
21  utilization of minority and -- and -- and women
22  business enterprises.
23      REP. HAMILTON: Thank you,
24  Representative.
25      REP. BLACKWELL: Did that answer the

---

**43**

1  question, Representative Hamilton?
2      REP. HAMILTON: Another question. Yeah.
3  Yes, thank you very much. As it relates to private
4  corporations, it is my understanding there are a
5  number of private corporations inside and outside
6  of North Carolina that already have -- have rules
7  and regulations that address the use of bathrooms
8  in their -- in their corporate buildings. Does
9  this, in any way, deny a private corporation from
10  being able to enforce rules that are, quite
11  honestly, very similar to the rules that Charlotte
12  hopes to impose on April the 1st?
13      REP. BISHOP: Mr. Chairman, may I
14  respond?
15      REP. BLACKWELL: Yes.
16      REP. BISHOP: Thank you for the question,
17  Representative, and it gives an opportunity to --
18  to emphasizes, again, that our legislation does not
19  impair, in any respect, private business's ability
20  to -- or to accommodate issues like that in the
21  manner they see fit.
22      REP. HAMILTON: Follow-up, Mr. Chairman?
23  So, it only restricts a government's ability from
24  having laws or rules in place that are similar to
25  rules that many of our nation's corporations are

---

**44**

1  adopting across the country?
2      REP. BISHOP: Well, it -- it prohibits --
3  it -- it preempts the ability of localities to
4  adopt laws in this area.
5      REP. HAMILTON: And if a state were
6  contracting -- follow-up, last follow-up --
7      REP. BLACKWELL: Last follow-up, and then
8  I need --
9      REP. HAMILTON: -- and then I have --
10      REP. BLACKWELL: -- to let some others
11  so -- we can come back to you --
12      REP. HAMILTON: I understand.
13      REP. BLACKWELL: -- if we have time.
14      REP. HAMILTON: Thank you, Representative
15  Blackwell. They -- so if, in that scenario, a --
16  say, the City of Wilmington wants to contract with
17  a -- with a private entity that has these rules and
18  regulations in place, will not be precluded from
19  doing so?
20      REP. BISHOP: That's correct.
21      REP. HAMILTON: Okay.
22      REP. STAM: It would be -- the only --
23  the only restriction is imposing mandates on -- or
24  requirements on business. It wouldn't, in any way,
25  prevent a business from having those -- those

---

**45**

1  requirements if they choose.
2      REP. HAMILTON: Thank you, Mr. Chairman.
3  Final question, and it's probably a staff question,
4  it's very short. I'd like to request a fiscal note
5  on this issue, based on the comments that were made
6  a few minutes ago by one of our presenters, that
7  there will be certain contracts that the City of
8  Charlotte, and maybe others, would have to break,
9  if you will. This could cost jobs, it could cost
10  public money, and I'd like to ask staff to -- to
11  put that together for us.
12      REP. BLACKWELL: Representative Bishop.
13      REP. BISHOP: One thing to say about
14  that -- that -- is -- the premise of that's not
15  accurate. That is to say, the bill doesn't require
16  anybody to break any contract. It takes effect
17  only with respect to contracts entered into in the
18  future.
19      REP. BLACKWELL: Representative
20  Richardson, we've got your name next.
21      REP. RICHARDSON: Thank you, Mr.
22  Chairman. I am concerned about Page 5, where the
23  investigation is going to be done by the Department
24  of Administration. If I recall correctly, we
25  defunded that Human Resources Department in our

---

Case 1:16-cv-00236-TDS-JEP   Document 119-1   Filed 08/29/16   Page 58 of 75

## 46

budget last year. Do we plan to go back and fund
that department so that we will have staff there?

REP. STAM: I -- I think the premise of
the question's inaccurate, but I'll defer it to
Representative Dollar. That is to say, I think
there -- there may have been some discussion about
that, but I don't think it occurred, and it wasn't
last session.

REP. DOLLAR: The budget is sufficient to
accommodate the bill. And I would also note, with
respect to a fiscal note, I believe fiscal notes
are restricted to things that impact the state's
budget, and I see nothing in this bill, as the
Senior Budget Chair, that in any way impacts the
finances of the state.

REP. RICHARDSON: Follow-up, Mr. Chair?

REP. BLACKWELL: Representative
Richardson.

REP. RICHARDSON: Following
Representative Dollar's comment, when we advertise
for federal money, we have to put a disclosure
there that we do not discriminate. So does that
mean we may lose federal dollars if that clause is
not there, based on the -- the information that
you're putting here?

## 47

REP. BLACKWELL: Representative Bishop,
you want -- or Stam, you want to respond to that?

REP. STAM: I'll do it, Mr. Chairman.
There's no change at all, with respect to state
policy of nondiscrimination. That is to say, and I
made reference to the sections in Chapter 143
that -- that specify a nondiscrimination policy in
contracting. So -- and -- and we've always had the
1976 statement with respect to employment
discrimination. That's been there for quite a long
time. There's no change at all with respect to
that, so I can't imagine that it would have the
effect that you asked about.

REP. RICHARDSON: Thank you. One last
question, please.

REP. BLACKWELL: Representative
Richardson.

REP. RICHARDSON: Yes. Thank you, Mr.
Chairman. When we stated that, what is it, Chapter
160.8.A covers handicap?

REP. BISHOP: Yes, ma'am.

REP. RICHARDSON: Can we not add that to
this bill so that there will be total clarity here
and we would not have to flip-flop from different
documents?

## 48

REP. BISHOP: Well, let -- let me say
two -- two things, if I might, to that. Or --
for -- in the -- in the first instance, that the
Chapter 168A that furnishes protections from
disability discrimination, is actually referenced
here. The public accommodations definition is --
comes from that chapter. And let -- let me try to
explain what the Court of Appeals held in the -- in
the parallel situation, and why I say that would
possibly foment confusion, possibly cause
plaintiffs in the future to forfeit rights that
they otherwise would have under law.

Under the parallel statement of public
policy concerning employment discrimination
practices, it merely says the State of North
Carolina declares to be against public policy to --
for there to be employment discrimination based on
race, color, age, national origin, sex, I -- and --
and handicap. But the other statute is much more
comprehensive. There was a case in 2015 in which
the Court of Appeals considered a claim that
someone brought under that general public policy
statement. And because they brought it under that,
and they did not bring it under the disability
statute, the court said, there are no -- there's no

## 49

private claim for relief created here, they have no
right to reasonable accommodation under that
statute.

So I suggest to you that having
handicapped mentioned here is a trap for the unwary
if a lawyer doesn't happen to know the difference
between the two statutes, and inadvertently brings
it to the wrong place. The protection is
comprehensive under the disability chapter. And to
mention it here, merely for the sake of window
dressing, if you will, would actually hurt people,
rather than help them.

REP. RICHARDSON: I thank you for your
comment, but it was confusing because in one sense,
you said an attorney, if he wasn't aware of 168A,
would probably lose his case. But then, you're
saying it would be put here for window dressing.
But thank you, anyway, for your comment.

REP. BLACKWELL: Are there further
questions or comments from members of the
committee? I am not seeing any. In the absence of
any further comments or questions from the
committee, is --

REP. RICHARDSON: Mr. Chairman, excuse
me. Mr. Chairman, excuse me. There is one more

Case 1:16-cv-00236-TDS-JEP   Document 173-1   Filed 08/29/16   Page 59 of 75

50

1      comment.  May I make that?
2           REP. BLACKWELL:  Okay.  We'll go come --
3      go back to Representative Richardson.
4           REP. RICHARDSON:  I'm sorry.  And this is
5      a reference to a statement Representative Stam
6      made.  I live in Franklin County, and I certainly
7      hope that my elected officials would be able to set
8      policies and procedures and practices that would be
9      unique to Franklin County, and anybody coming in
10     that county from other counties would not feel that
11     they cannot live here.  I just can't see us having
12     uniform practices and policies for 100 counties,
13     when we don't have similar resources, we don't have
14     similar needs, we don't have similar economic
15     development.  And I just wanted to comment on that
16     statement.
17          REP. BLACKWELL:  Thank you,
18     Representative Richardson.  Representative Warren,
19     you're recognized for a motion.
20          REP. WARREN:  Thank you, Mr. Chair.  I'd
21     like to make a motion for a favorable report for
22     House Bill 2, the referral to the floor.
23          REP. BLACKWELL:  Okay.  All those in
24     favor will signify by saying aye.
25          (Voice vote.)

51

1           REP. BLACKWELL:  Opposed, no.  The ayes
2      have it, and the motion is adopted.  The House will
3      reconvene at 12:15, and the committee is adjourned.
4           (End of proceedings.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

52

STATE OF NORTH CAROLINA
COUNTY OF WAKE
          CERTIFICATION OF TRANSCRIPT
     This is to certify that the foregoing transcript of
proceedings held on March 23, 2016, is a true and accurate
transcript of the proceedings as transcribed by me or under
my supervision.  I further certify that I am not related to
any party or attorney, nor do I have any interest
whatsoever in the outcome of this action.
     This 16th day of April, 2016.




Brad Worley, transcriptionist
Worley Reporting
P.O. Box 99169
Raleigh, NC 27624
919-870-8070
brad@worleyreporting.com

Worley Reporting

# EXHIBIT G

NORTH CAROLINA GENERAL ASSEMBLY

SENATE JUDICIARY II COMMITTEE

_____

TRANSCRIPT OF THE PROCEEDINGS

MARCH 23, 2016

_____

In Raleigh, North Carolina

Wednesday, March 23, 2016

Transcribed by Brad Worley

Worley Reporting

P.O. Box 99169

Raleigh, NC 27624

919-870-8070

**2**

1          SEN. RANDLEMAN: Terry Barnhardt? Thank
2    you. Larry Hancock? Steve McKaig? Thank you.
3    Matt Urben? Thank you. And Dale Huff? For those
4    who are here that would like to speak in opposition
5    to the bill, there -- Dale Huff has a list --
6    sign-up sheet. We're going to allow those in
7    support and those in opposition to sign -- to speak
8    for two minutes, so if you want to go ahead and get
9    your name on the list, we will take up to five
10   speakers.
11         Let me introduce my co-chairs, Senator
12   Tamara Barringer and Senator Warren Daniel. Do
13   each -- either of you have comments? Okay. Thank
14   you. So we will go ahead and call House Bill 2
15   forward. I think it's going to be handled by
16   Senator Buck Newton and Representative Dan Bishop.
17   Where is Buck? One moment, please.
18         (Members at ease.)
19         SEN. RANDLEMAN: So, Senator Buck Newton
20   and Senator [sic] Dan Bishop, if you'll come
21   forward and present the bill. Excuse -- soon --
22   soon to be -- soon to be, Representative. Thank
23   you.
24         SEN. NEWTON: Thank you, Madam. Thank
25   you, Madam Chairman. May I proceed?

**3**

1          SEN. RANDLEMAN: Please.
2          SEN. NEWTON: Okay. Thank you. Thank
3    you very much, and thank you, colleagues, and --
4    for being here today. It's a -- actually very
5    unfortunate that we have to be here today. I can't
6    believe that we are -- actually, I can't believe we
7    are here today and we're having to address this --
8    this -- this issue that has been sent to us
9    gift-wrapped by the City Council of Charlotte.
10         As we all know, we have a problem. The
11   City of Charlotte and their City Council has
12   decided to push a very radical and dangerous
13   policy, and thrust itself into the spotlight, by
14   passing this ordinance that allows men to share the
15   bathroom and shower facilities with young girls and
16   women. That's why we're here today.
17         Charlotte's ordinance clearly violates
18   common sense. It also violates a number of state
19   laws, criminal trespass law, indecent exposure law
20   and building codes. You know, I'll just say it
21   like this: the radical left wing groups and the
22   liberal politicians like our current Attorney
23   General are afraid to stand up to the political
24   correctness mob and fight for common sense. They
25   refuse to take action to protect the safety and

**4**

1          privacy of women and children. I will not, and I
2    don't believe we will, be bullied by this political
3    correct mob.
4          They should have never passed this
5    ordinance. They were warned not to pass this
6    ordinance. The governor warned them privately, and
7    I think even publicly, many of the members of the
8    council acknowledged that they had no authority to
9    pass such an ordinance. Politics have reached a
10   new extreme when a municipality's top priority is
11   to find a way to allow men into a women's locker
12   room or bathroom. Tens of thousands of our
13   constituents, my constituents, your constituents,
14   across this state, have called on us to put a stop
15   to this nonsense. We've called on Roy Cooper to
16   put a stop to this nonsense, and he refuses to do
17   his job.
18         He refuses to enforce the law of this
19   state, so it falls to us. It falls to us. This
20   ordinance legalizes conduct, which in any other
21   place in North Carolina, would expose people to
22   going to jail. You don't have to be an attorney to
23   know that it's a bad idea if men start using the
24   ladies' room here at the General Assembly or
25   anywhere else. There's going to be problems, and

**5**

1          everywhere else, these men would be arrested, and
2    it's basic common sense.
3          Sheriff B.J. Barnes said a majority of
4    people of Guilford County should not have to
5    compromise their safety and privacy in public
6    bathrooms and showers. Said he didn't want his
7    officers to be put in the awkward position of
8    determining who is entitled to be in the bathroom.
9          This ordinance not only endangers women
10   and children, but those from places far away who
11   visit Charlotte, and I'll point out, visit
12   Charlotte by passing through its busy airport. And
13   it's a shame, and it's a tragedy that we have to be
14   here today to deal with it.
15         You know, all you have to do is look at
16   recent news reports from Seattle detailing how a
17   grown man went into the changing room, I believe it
18   was at a pool, for young girls. And when
19   confronted over it, he claimed, "The law's changed
20   and I have a right to be here," and that's what
21   we're going to face if we don't address this
22   problem.
23         That can and that will happen here in
24   North Carolina if we allow this ordinance to go
25   into effect. That is why municipalities need to

Case 1:16-cv-00236-TDS-JEP   Document 174-8   Filed 10/20/16   Page 62 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 62 of 75

**6**

1  follow the same law across this state.  That is why
2  it is important that we have a statewide standard
3  to deal with these issues.
4      I will point out to you that one of the
5  leaders of this effort to pass this ordinance was a
6  registered sex offender here in North Carolina.
7  One of the main vocal proponents of this -- of this
8  ordinance, and the media covered it up.  They knew
9  all about it, but they refused to tell the public.
10  That's unacceptable.  We're not going to stand for
11  it.
12      So we have a solution.  We have it in
13  this bill that's before us.  This bill addresses
14  these serious safety concerns.  They've been raised
15  by Charlotte's ordinance by setting a single
16  statewide standard to ensure that men cannot use
17  ladies' bathrooms, locker rooms.  And that the same
18  standard applies in our public schools, public
19  buildings and other places of public accommodation
20  throughout the State of North Carolina.  This bill
21  does not prohibit schools or other facilities from
22  providing reasonable accommodations like single
23  occupancy bathrooms for people who may be facing
24  gender identity issues.  It does not prohibit those
25  kinds of reasonable accommodations, but it does set

**7**

1  a single standard of multiuse facilities.
2      For the first time, this bill will also
3  establish a unify -- a uniform statewide
4  antidiscrimination policy.  I think this is very
5  important for people to realize.  For the first
6  time, this bill will establish a uniform statewide
7  antidiscrimination policy on the basis of race,
8  religion, color, national origin, age, sex or
9  handicap.  This new antidiscrimination policy is
10  actually stronger than federal law, and it's long
11  overdue.
12      In going through the process of preparing
13  this legislation, and trying to figure out how we
14  were going to deal with this -- this insanity and
15  this ordinance, we realized that this was overdue,
16  and that this was part of the solution.  This bill
17  will take steps to prevent future situations like
18  Charlotte's overreaching ordinance by creating
19  statewide consistency for laws relating to
20  employment and public accommodation.  These are
21  policies that ought to be set at the state level,
22  and not in a patchwork, inconsistent framework.
23  Our businesses and our citizens deserve no less
24  than to understand that what they have in Morehead
25  City or Greenville or Wilson or Raleigh is the same

**8**

1  that they will find in Charlotte.  Forcing
2  businesses to learn and comply with a patchwork of
3  different rules in different cities across the
4  state doesn't make any sense.  It discourages them
5  from doing business here in North Carolina, and
6  this bill will help prevent that from happening.
7      Madam Chairman, if I could, at this time,
8  I will -- I ask if staff could go through the bill
9  in its particulars, and then I will be happy to
10  address questions from the committee.
11      SEN. RANDLEMAN:  Any comments from
12  Representative Bishop?
13      REP. BISHOP:  No, Madam Chairman.  I
14  think that proceeding in the way that Senator
15  Newton has outlined is just fine, and I'm here if
16  there are any questions I can help with.
17      SEN. RANDLEMAN:  Thank you.  Then we will
18  ask Kara McCraw to go over the bill for the
19  members.
20      MS. MCCRAW (STAFF):  Kara McCraw, Staff
21  Attorney with the Legislative Analysis Division.
22  On Page 1 of the bill, you'll see where it says
23  starting on Line 23 of 24, Part 1, Single Sex
24  Multiple Occupancy Bathroom and Changing
25  Facilities, Section 1.1 and 1.2 go together.  1.1

**9**

1  is a conforming change.  Section 1.2 would require
2  schools or -- I'm sorry, local school
3  administrative units and local boards of education
4  to require that any multiple occupancy bathrooms or
5  changing facilities in the facilities be designated
6  for student use based on the student's biological
7  sex.  The next -- on Page 2, you'll see
8  accommodations permitted.
9      The statute then goes on to say that
10  local boards may provide accommodations upon
11  request due to special circumstances, but it does
12  limit those accommodations to not allowing students
13  to use multiple occupancy bathrooms or changing
14  facilities based -- designated for the opposite
15  sex.  There are a list of exceptions in D and
16  reasons that someone of the opposite sex might
17  enter the bathroom, and those are -- you can see
18  the list there:  custodial purposes, maintenance
19  inspections, medical assistance, assistance to a
20  student, receiving assistance in using the
21  facility, accompanying a person other than a
22  student who needs assistance, and temporary
23  designation for -- based on a use by the person's
24  biological sex.  That last one would allow
25  something like a visiting sports team to use a

Case 1:16-cv-00236-TDS-JEP   Document 149-8   Filed 10/20/16   Page 63 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 63 of 75

## 10

boys' locker room on the night of the girls' game.

Section 1.3 then creates a similar statute for other public agencies in North Carolina, and that would cover the legislative, judicial and executive branch agencies as well as local governments. Would require those public agencies to designate multiple occupancy bathrooms for use based on biological sex. It has similar accommodations, language and similar exceptions to allow for custodial purposes, maintenance, medical assistance, rendering -- accompanying a person needing assistance for a minor using -- under the age of seven who accompanies a person caring for that minor or that have been temporarily designated for use for by that person's biological sex.

Part 2 of the bill then deals with employment and contracting. Section 2.1 is part of the Wage and Hour Act, and adds a new section that specifically preempts local governments from creating or imposing requirements upon employers pertaining to compensation of employees. There are several exceptions to this preemption. Those in -- one, local governments can still have regulation requiring their own employees. Two, economic development incentives under Chapter 143B. Three,

## 11

economic development incentives under the Local Development Act of 1925. Four, a requirement of federal community development brought block grants. And five, programs established under two statutes dealing with community development programs.

Section 2.2 and 2.3 deal with cities and counties -- they're parallel statutes -- and they would say that when a city and a county contract, they are restricted from including in the contract regulations or controls on contract -- contractors' employment practices or mandating or prohibiting provisions of goods, services or accommodations except as otherwise required or allowed in state law.

Part 3 of the bill has two sections. The first section is 3.1 and 3.2: modify the Equal Employment Practices Act in North Carolina. That act creates a public policy of employment without discrimination based on certain protected classes.

In Subsection C that's created on Page 4, there is a preemption statute that would say that local governments and other political subdivisions would not be allowed to impose regulations or requirements on employers pertaining to the regulation of discriminatory practices in

## 12

employment. However, it would still allow them to regulate their own employees. Section 3.2 adds language to specify that the Equal Employment Practices Act does not create a statutory or common law private right of action. And then on Page 5, there is a new statute, a new article being created to create an equal access to public accommodations statute in North Carolina.

That language first states the public policy of the state to protect and safeguard the rights of individuals with regard to enjoyment of goods, services, facilities, privileges, advantages and accommodation of places of public accommodation free of discrimination based on race, religion, color, national origin or biological sex. There is an exception for providing separate bathrooms.

Subsection B then has similar preemption language to the previous section that says that local governments are not permitted to regulate or impose requirements pertaining to regulation of discriminatory practices in places of public accommodation. The definition of public accommodation mirrors 168A, which deals with provision of handicapped facilities and discrimination and access to facilities for

## 13

handicapped.

And then finally, there is -- the investigation provision on Page 5 allows the Human Relations Commission at the state level to receive complaints of discrimination and to engage in a process to try to reach amicable resolution of those complaints. And then there's similar language as there was in the previous statute indicating that this does not create a statutory or common law private right of action. Section 4 is a severability clause, and then Section 5 is your effective date.

SEN. RANDLEMAN: Thank you. Senator Newton, would you like to speak further on the bill?

SEN. NEWTON: No, thank you, Madam Chairman. I'm happy to answer any questions from the committee.

SEN. RANDLEMAN: Questions from the committee? Senator Bingham?

SEN. BINGHAM: Thank you, Madam Chairman. Senator Newton, on page -- let's see, Page 3 under sub-item, or -- that would be D, it lists public authority as defined and it gives the General Statute. Would you further explain that, please?

Case 1:16-cv-00236-TDS-JEP   Document 1749-8   Filed 10/20/16   Page 64 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 64 of 75

## 14

1        SEN. NEWTON: I'm sorry, Senator Bingham.
2  Could you tell me which line again you're talking
3  about?
4        SEN. BINGHAM: Sorry. Page -- it's Page
5  3. It would be Line 1 under D. It's got public
6  authority as defined, and what would that
7  definition be as "public authority"? I'm just --
8        SEN. NEWTON: If I -- I would ask -- I'll
9  give this answer and then if -- if it can be
10  expanded upon by staff, I will. The intent of this
11  purpose was to cover every -- every government
12  entity that might be out there. So you have public
13  authorities -- what would be a good example? If --
14  I'm trying to think of a good -- my mind went
15  blank. Airport authority, different quasi-
16  governmental authorities that have been created
17  around the state.
18        SEN. BINGHAM: Okay. Thank you. Thank
19  you, ma'am.
20        SEN. RANDLEMAN: Did that answer your
21  question, or did you want to -- some explanation of
22  the statutory reference?
23        SEN. BINGHAM: Well, that would be fine
24  also --
25        SEN. RANDLEMAN: Okay. Kara, if you

## 15

1  could speak to the statutory reference, please?
2        MS. MCCRAW: So, the definition that's
3  referenced there comes from the Local Government
4  Budget and Fiscal Control Act, and "public
5  authority" is defined there as a municipal
6  corporation other than a unit of local government,
7  not subject to the State Budget Act or a local
8  government authority, board, commission, council or
9  agency, that -- and then there are three criteria:
10  is not a municipal corporation, is not subject to
11  the State Budget Act, and operates on an area,
12  regional or multi-unit basis and the budgeting and
13  accounting systems of which are not fully a part of
14  the budgeting and accounting systems of a unit of
15  local government.
16        SEN. RANDLEMAN: Answer your question?
17        SEN. BINGHAM: Yes, ma'am. Thank you,
18  Madam Chairman, Senator Newton.
19        SEN. RANDLEMAN: Other questions from the
20  committee? Yes. Senator Van Duyn?
21        SEN. VAN DUYN: Madam Chairman, I put
22  forth an amendment, which you --
23        SEN. RANDLEMAN: I -- I have those.
24        SEN. VAN DUYN: Okay.
25        SEN. RANDLEMAN: We're going to be doing

## 16

1  those shortly.
2        SEN. VAN DUYN: Thank you.
3        SEN. RANDLEMAN: Do you have a question?
4        SEN. VAN DUYN: No. Thank you very much.
5        SEN. RANDLEMAN: Questions from the
6  committee? Yes. Senator Jackson?
7        SEN. JACKSON: Thank you. My question is
8  about -- let's see, Page 5, Lines 25 through 31,
9  regarding the Human Relations Commission. It says,
10  "This article does not create and shall not be
11  construed to create or support a statutory" --
12  "statutory or common law private right of action,
13  no person may bring a civil action based upon
14  public policy expressed herein." My question is,
15  does that modify existing law in North Carolina?
16  My understanding is that there is common law
17  regarding wrongful discharge in contravention of
18  public policy that, in effect, does allow for a
19  private right of action when someone is discharged
20  because of their race or because of their gender,
21  and how does this impact that existing common law?
22        SEN. RANDLEMAN: Senator Newton?
23        SEN. NEWTON: Thank you, Madam Chairman.
24  Thank you, Senator Jackson. It -- it is my opinion
25  and -- and my belief that the -- those of us who

## 17

1  were involved in the drafting of this language, it
2  was our intent to keep the status quo and not to
3  create any new private right of action. And my
4  answer to you would be, it is my opinion that it
5  doesn't change anything that is currently existing
6  law as it -- as it relates to the ability to bring
7  a cause of action for a wrongful discharge. There
8  may be others that have a different opinion. I
9  know that question was raised to me privately
10  before this meeting, but that is my opinion, and I
11  haven't seen anything as of yet that would change
12  that opinion.
13        SEN. RANDLEMAN: Follow up?
14        SEN. JACKSON: So just to specify: there
15  is no specific objection and nothing in this bill
16  that is intended to end the common law wrongful
17  discharge in contravention of public policy. Is
18  that my understanding?
19        SEN. NEWTON: That -- that's my
20  understanding, and that's -- that's my opinion.
21        SEN. JACKSON: I have another --
22        SEN. RANDLEMAN: Follow up?
23        SEN. JACKSON: I have another question on
24  a different subject, but I'll take my turn if
25  someone else --

Case 1:16-cv-00236-TDS-JEP   Document 1749-8   Filed 10/20/16   Page 65 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 65 of 15

## 18

1     SEN. RANDLEMAN: You can proceed with
2  your other question.
3     SEN. JACKSON: Okay. My other question
4  is about Title 9 and whether this is going to
5  impact Title 9 funding. I know the Office of Civil
6  Rights, the Federal Office of Civil Rights, has
7  issued legal guidance saying that sexual
8  discrimination including against transgender
9  students does violate -- and I know that Tennessee
10  was considering this bill, and very recently the
11  Republican Governor of Tennessee decided not to go
12  forward with this bill specifically out of a
13  concern that it would cost Tennessee billions of
14  dollars in lost federal funding. I know that North
15  Carolina receives billions of dollars in federal
16  funding, and what is our level of concern that this
17  is going to be put in jeopardy?
18     SEN. RANDLEMAN: Senator Newton?
19     SEN. NEWTON: Thank you. Thank you,
20  Madam Chairman. Thank you, Senator Jackson.
21  Again, that -- that question has been brought up to
22  us before. We don't see any risk to federal
23  funding under Title 9. The Obama Administration
24  has a very -- very radical and extreme view of what
25  would constitute discrimination against

## 19

1  transgender. And they have tried to pursue that in
2  court, and twice, they have been rejected, in
3  Virginia and in Pennsylvania. So the current state
4  of the law does not hold their view, and it is --
5  it is our view that -- that this would in no way
6  jeopardize Title 9 funding.
7     SEN. JACKSON: Do you wish to add
8  something?
9     REP. BISHOP: Yeah. Let me just add,
10  so -- so there's not a -- not a case in the country
11  anywhere that's embraced their view. It's on
12  appeal in the Fourth Circuit and in the Third
13  Circuit, but should that ever turn out going the
14  other way in the future in law, there would be
15  ample opportunity past that point. There would be
16  an entitlement to a matter before an administrative
17  law judge. Even after that's concluded, you have a
18  period of time after that. So there's nothing in
19  the doing of this that would have any impact
20  whatsoever on that. And -- and in fact, if there
21  were a decision that were adverse -- in -- in favor
22  of the Obama Administration's position at some
23  point in time, it would supersede and -- and there
24  still wouldn't be a loss of Title 9 funding; it
25  would just revert to a different rule, under

## 20

1  supremacy principles.
2     SEN. RANDLEMAN: Other questions from the
3  committee? Yes. Senator Cook?
4     SEN. COOK: I -- as the grandfather of
5  two beautiful young granddaughters, I thank you.
6  Thank you. This is much, much needed legislation.
7  Thank you.
8     SEN. NEWTON: Thank you, sir.
9     SEN. RANDLEMAN: Other questions or
10  comments? Yes. Senator McInnis?
11     SEN. MCINNIS: Thank you, Madam
12  Chairperson. Senator Newton, I -- heard you say
13  on Page 5, starting on Line 8, that we -- we found
14  that there was a void. It appeared in our statutes
15  that -- that left it to -- our folks were not
16  protected against some types of discrimination, and
17  I -- I'd just like for you to expound on that. I
18  heard what you said, and I -- I applaud you for
19  bringing this forward. That's one of the great
20  things about delving into something, you find
21  some -- you find a void in there. And this is a
22  grand opportunity to fix something that was -- that
23  was certainly in need of repair.
24     SEN. RANDLEMAN: Senator Newton?
25     SEN. NEWTON: Thank you. Thank you,

## 21

1  Madam Chairman. Thank you, Senator McInnis. I --
2  I appreciate your comments. There -- there's a --
3  a lot of, I think, confusion about where a citizen
4  whose -- who's being discriminated against might
5  have their -- their -- their way to get their day
6  in court. And, you know, federal law on this
7  matter has been clear for some time. North
8  Carolina -- I'm not sure exactly why, but
9  historically, North Carolina just had never adopted
10  any kind of public accommodation or --
11  antidiscrimination statewide policy to -- to, you
12  know, make it clear that you -- you can't
13  discriminate against, say, an African-American, you
14  know, renting a hotel room, for example. And --
15  and I think we all today agree and know and
16  understand that that's off limits and should be off
17  limits, but this process -- I mean -- I hate to say
18  there's anything good about this process, but I
19  guess this would be one of them.
20     It became clear to us that there was no
21  such statewide standard and policy, and it was
22  better for us to go ahead and -- and really do more
23  than what federal law was, and expand this
24  protection from a policy standpoint for the state,
25  so that -- that we -- we wouldn't be faced with

Case 1:16-cv-00236-TDS-JEP   Document 174-8   Filed 10/20/16   Page 66 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 66 of 75

**22**

1  questions of, you know, in -- in this jurisdiction,
2  you know, it was against the public policy to do X,
3  Y, Z, but in that jurisdiction, it's only X and Y
4  and -- and this jurisdiction it's P, D, Q, and --
5  and we just thought it was important for business
6  and for our citizens to -- to have this clear
7  public policy statement of antidiscrimination. It
8  was -- it was long overdue, and -- and -- does
9  that -- that fairly -- you know, when it became
10 clear to everybody, we were like we -- we need to
11 do that, so thank you.
12     SEN. RANDLEMAN: Follow up?
13     SEN. COOK: Yes, ma'am. I just want to
14 say I appreciate the writers and those that have
15 put forth the thought on this, and to -- to right
16 the wrong that we originally came here for, and to
17 be able to -- to add some solid things that are
18 absolutely great for our state. And on behalf of
19 my family and my grandchildren, as Senator Cook
20 alluded to from his, I appreciate what you're doing
21 here today, and we'll bring this matter to a head
22 going about our business. Thank you so much.
23     SEN. NEWTON: Senator, may I add
24 something --
25     SEN. RANDLEMAN: Please.

**23**

1     SEN. NEWTON: -- Madam Chairman. You
2  know, I think it would be very, very, very ironic
3  if -- if members chose to vote against expanding
4  and clarifying the antidiscrimination policy of
5  this state on -- on some misnomer -- some -- some
6  mistaken idea. It's -- it's bad enough to talk
7  about, you know, men and women's bathrooms and
8  locker rooms, but it's hard for me to comprehend
9  that there's members of this body that would vote
10 against this policy that's identified in -- in this
11 section.
12     SEN. RANDLEMAN: Thank you, Senator
13 Newton. If the Sergeant-at-Arms will go ahead and
14 pass out the amendments? We have two amendments
15 for consideration.
16     (Members at ease.)
17     SEN. RANDLEMAN: The first amendment that
18 we're going to call is Senator Lowe.
19     SEN. DANIEL: We need to make sure that
20 she gets that.
21     SEN. RANDLEMAN: Okay. It would be
22 H2-ATC-2 Version 3, Senator Lowe. And I think
23 Senator Barringer needs a copy. Does everyone have
24 a copy? Staff needs copies. So the first one we
25 are calling forward is H2-ATC-2 Version 3, and I

**24**

1  will call on Kelly Tornow to explain the amendment.
2     MS. TORNOW (STAFF): Thank you, Madam
3  Chairwoman. Senator Lowe's amendment amends the
4  bill on Page 5, Lines 29 to 31 by deleting the
5  sentence that states, "This article does not create
6  and shall not be construed to create or support a
7  statutory or common law private right of action and
8  no person may bring any civil action based upon the
9  public policy expressed herein," so it deletes that
10 sentence.
11     SEN. RANDLEMAN: Senator Lowe, do you
12 wish to speak to the amendment?
13     SEN. LOWE: Yes. One of my concerns was
14 the -- that a person had no private right of
15 action. In other words, there's no State recourse.
16 If a person is being discriminated against, they
17 would automatically, as I understand it, have to go
18 to the federal level and not be able to do anything
19 at the state level. And I -- and I have a real
20 problem with discrimination at any level. So I
21 think that to say that no change is taking place
22 when indeed there is some change, is not true.
23     SEN. RANDLEMAN: Representative Bishop,
24 are you going to respond to the amendment? What do
25 you say?

**25**

1     REP. BISHOP: Senator -- Senator Newton
2  may want to add after I do, but I would like to
3  respond to that. There are ample cases at this
4  time saying that section doesn't create a cause of
5  action. There is a technical question whether
6  there is a common law claim for termination in
7  violation of public policy, that this is one of the
8  articulations of public policy that could affect
9  such a claim, but in each of those cases, the
10 remedial of -- the remedies that are available are
11 far more robust under federal law as things stand
12 anyway. So there's no -- there's no harm.
13     The -- they all -- the other thing is --
14 and what we've done is we've added an entirely new
15 statement of protection from discriminatory
16 treatment in public accommodations, and in order to
17 do exactly what the courts have done under the
18 previous -- and we've made it clear that we are not
19 creating a cause of action there, either. So in
20 other words, there -- there's not a change of
21 substance. There's a technical change, and it will
22 not undermine remedies. And that's my view about
23 it.
24     And so it is -- it is -- it is a
25 distinction without a difference, and -- and the

Case 1:16-cv-00236-TDS-JEP   Document 1749-8   Filed 10/20/16   Page 67 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/27/16   Page 67 of 75

26

1 section does -- I do want to emphasize that.
2 There's ample numbers of cases saying that this
3 section does not create a cause of action as of
4 today. So I would think that it would not be an
5 amendment that I would recommend.
6     SEN. RANDLEMAN: Senator Newton?
7     SEN. NEWTON: Thank you. Thank you,
8 Madam Chairman. Thank you, Senator.
9     Senator, I -- I detect from the way you
10 asked the question that there may be a
11 misunderstanding about -- about the law, and I kind
12 of touched on that before, about -- there's
13 confusion about where a person goes to get their
14 remedy. And in North Carolina, it is -- it has
15 always been under -- under Title 7, and -- and
16 other federal statutes that you have a right of
17 action on public accommodation or employment
18 practices for, say, racial discrimination, for
19 example. So you can bring that action in state
20 court, or you can bring it in federal court. It --
21 it -- both -- both courts can handle the matter,
22 but you have to meet the requisite requirements
23 to -- to bring such an action.
24     So when we were dealing with this, what
25 we -- what we didn't want to do was to create a

27

1 brand new right of action. There's -- there's --
2 we're not changing anything in that regard in -- in
3 this -- in this bill. We -- we felt like that
4 would be problematic in terms of trying to get
5 support all the way through for this provision, if
6 we created a brand new way to sue when there's
7 already ample ways to bring an action if one
8 alleges discrimination of some kind under federal
9 law, and -- and, which would -- which would fit
10 with this -- this public policy declaration. So
11 the short answer is, we're not minimizing or
12 reducing a person's right to bring an action.
13 We're just not adding a new way to bring a new
14 cause of action.
15     SEN. LOWE: Follow-up?
16     SEN. RANDLEMAN: Follow-up.
17     SEN. LOWE: My understanding as I -- as I
18 begin to read this is that it is something new.
19 Right now, we can go through our state courts to
20 deal with discrimination, and as I understand this,
21 we can only do it through a federal system. Is
22 that what -- am I missing something, or?
23     SEN. NEWTON: No -- that's -- that's --
24     SEN. RANDLEMAN: Senator Newton?
25     SEN. NEWTON: -- that's -- thank you,

28

1 Madam Chairman. That's not -- that's not an
2 accurate -- it's -- it's -- you don't have to go
3 through the federal system. Your -- your cause of
4 action was created under federal law, and that has
5 existed and continues to exist, and nothing we do
6 here today would affect that one bit. The forums
7 are -- are the same as they were before. You can
8 choose to file if -- if you -- if Senator Lowe is a
9 plaintiff -- has a cause of action, you can choose
10 to file that in Mecklenburg County Superior Court
11 or you can choose to file it in -- you all in the
12 Western District, right? Federal Western District
13 Court, so you -- the choice is yours.
14     This doesn't change any of that, and --
15 and -- and for that reason, I mean, I want members
16 to understand we're kind of getting into legal
17 weeds here. I would -- I would strongly encourage
18 my -- my colleagues to vote against the amendment.
19     SEN. RANDLEMAN: Other comments, Senator
20 Jackson?
21     SEN. JACKSON: May I speak to the
22 amendment, Madam Chair?
23     SEN. RANDLEMAN: Please. Proceed.
24     SEN. JACKSON: I think there's a really
25 good chance that there is an unintended

29

1 consequence, and I know it's unintended because
2 both of our bill sponsors have -- have caught it
3 unintended. They don't mean to be reducing an
4 existing right that exists under common law, but
5 that may be the impact of this. This amendment
6 would eliminate the chance of that unintended
7 consequence. And as for there being a federal
8 remedy and a state remedy that exists -- it's true.
9 There's a federal remedy exists, but there is also
10 a state remedy.
11     There are dozens and dozens and dozens of
12 reported cases in which wrongful discharge in
13 contravention of public policy have been reported
14 in North Carolina. This is a living, breathing
15 legal doctrine that exists in North Carolina that
16 lots of our citizens have availed themselves of,
17 and it may or may not go away once we pass this as
18 written. If we adopt the amendment, we know that
19 we protect that, and if want -- if you want to, you
20 know, we can revisit it someday when we have more
21 than, you know, 30 seconds to deal with all of
22 these problems.
23     SEN. RANDLEMAN: Representative Bishop?
24     REP. BISHOP: Thank you, Madam Chairman.
25 The remedies that are available under the federal

Case 1:16-cv-00236-TDS-JEP   Document 174-8   Filed 10/20/16   Page 68 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/29/16   Page 68 of 75

## 30

1   claim are as broad as you can imagine: back pay,
2   front pay, reinstatement, actual damages, punitive
3   damages, attorney's fees: all of that exists under
4   federal law. The state law adds not one whit of
5   remedial right.
6           To the point that you said there are
7   thousands -- there are many cases arising under the
8   common law right for termination in violation of
9   public policy, that's true, but that goes outside
10  of this. There are many articulations of public
11  policy that could give rise to that claim, this
12  being only one of them.
13          The remedy -- that's -- that's the point.
14  As many of the members, the lawyer members know, if
15  you're bringing a lawsuit, you articulate all of
16  the claim theories in the lawsuit that you have,
17  the different claims for relief. But what matters
18  to a plaintiff is what remedies they can recover,
19  what damages can they get. And to that point,
20  that's what I am saying, there is no diminution in
21  the remedies available whatsoever by the change
22  that is contemplated here.
23          SEN. RANDLEMAN: Senator Newton?
24          SEN. NEWTON: I -- I would just add,
25  Senator Jackson, you may not be aware that I've

## 31

1   practiced on both sides of these cases a number of
2   times of the years on both sides, the plaintiff and
3   the defense side. I -- I completely agree with
4   Representative Bishop's characterization, and --
5   and I'm very comfortable that -- that what we've
6   done here is -- is the right policy and does not
7   add any -- any new right of action, nor does it
8   diminish anything that -- that a legitimate
9   plaintiff would bring forth in court.
10          SEN. RANDLEMAN: Thank you. Other
11  comments or questions as to the amendment? Seeing
12  none, we will call for a vote on the amendment.
13  Those in favor say aye.
14          (Voice vote.)
15          SEN. RANDLEMAN: Those opposing, nay?
16          (Voice vote.)
17          SEN. RANDLEMAN: The nays have the vote,
18  so the motion -- the amendment fails. Excuse me.
19  The next amendment is H2-AST-1 Version 3. Does
20  everybody have a copy of the amendment? I will
21  call on staff to explain the amendment. Oh, excuse
22  me: some members do not have copies. Everyone have
23  a copy now? So, Kelly, if you will please explain
24  the amendment.
25          MS. TORNOW: Thank you, Madam Chairwoman.

## 32

1   So on Page 4, Line 28, that's Section 3.1 of the
2   bill. That adds sexual orientation and gender
3   identity to the list of protected classes listed
4   there. And then again, on Page 5, Line 12, which
5   is the -- which is Section 3.3, it does the same.
6   It adds sexual orientation and gender identity to
7   the list of protected classes.
8           SEN. RANDLEMAN: Thank you. Senator Van
9   Duyn, this is your amendment, so if you would like
10  to speak to your amendment.
11          SEN. VAN DUYN: Thank you, sir -- I'm
12  sorry. Thank you, Senator Randleman -- Madam
13  Chairman. We still have not received a copy of --
14  a correct copy of the amendment.
15          SEN. RANDLEMAN: We're going to take care
16  of that. If you'll hold just a second.
17          UNIDENTIFIED SPEAKER: Madam Chair?
18          SEN. RANDLEMAN: Yes, sir?
19          UNIDENTIFIED SPEAKER: They did
20  distribute another copy, but it was a -- a copy for
21  Senator Lowe's amendment.
22          SEN. RANDLEMAN: Okay. Making it now.
23  I'm going to go over the amendment number again.
24  It is H2-AST-1 Version 3. Does everybody have a
25  copy of the amendment? Senator Van Duyn?

## 33

1           SEN. VAN DUYN: Thank you, Madam
2   Chairman. I am not sure that I agree with this
3   bill's assumption that we need statewide
4   consistency in regulation of employment. I, for
5   example, come from a county with an extremely high
6   cost of living and an extremely low average wage.
7   And so things like encouraging living wages are
8   very important to my county. But nevertheless, if
9   we are going to standardize our [break in audio]
10  language statewide, I think it's very important
11  that we say loud and clear that North Carolina is
12  open to -- open for business to everyone. And for
13  that reason, I think it's incumbent on us that we
14  amend the bill to include in our nondiscrimination
15  language sexual orientation and gender identity.
16          SEN. RANDLEMAN: Senator Newton?
17          SEN. NEWTON: Thank you, Madam Chairman.
18  Before I comment on the amendment, may I inquire of
19  the amendment sponsor?
20          SEN. RANDLEMAN: Proceed.
21          SEN. NEWTON: Thank you. Senator Van
22  Duyn, how would you define gender identity in
23  this -- with this amendment?
24          SEN. RANDLEMAN: Senator Van Duyn?
25          SEN. VAN DUYN: I think -- I think

Case 1:16-cv-00236-TDS-JEP   Document 117-8   Filed 10/20/16   Page 69 of 75
Case 1:16-cv-00425-TDS-JEP   Document 149-8   Filed 08/29/16   Page 69 of 75

## 34

1  that's -- gender identity is how someone identifies
2  their gender.
3      SEN. RANDLEMAN: Senator Newton?
4      SEN. NEWTON: Follow up? Thank you. So
5  we don't have a definition before us in this bill.
6  And so, being a lawyer, and knowing that issues --
7  when you're talking about potentially opening the
8  door for litigation -- definitions of what is
9  gender identity would be important, so that's why I
10  asked the question. Would it be as -- for me,
11  gender identity would be what is on your birth
12  certificate, and how you were born. And -- and
13  you're saying that gender identity would be what
14  you -- what a person, I guess, thinks they are
15  today, or I don't know how else to describe it. So
16  that's why I'm asking you if you would define it
17  for me.
18      SEN. VAN DUYN: Well --
19      SEN. RANDLEMAN: Senator Van Duyn?
20      SEN. VAN DUYN: -- thank you, Madam
21  Chairman. I think it is clear that not everyone
22  who gets labeled at birth continues to identify
23  with the gender of that label, and in fact --
24  pursues at -- at -- at great expense emotionally
25  and otherwise the -- the gender that they truly

## 35

1  identify with. And I think it's important for us
2  to recognize the fact that -- that we need to be
3  tolerant of those people, that they are, in fact,
4  our neighbors, and they are very vulnerable at the
5  time because of these gender identity issues. And
6  I'm just suggesting that we need to acknowledge
7  that -- that the gender at birth is not necessarily
8  the gender that they -- they identify with as they
9  develop.
10      SEN. RANDLEMAN: Senator Newton?
11      SEN. NEWTON: Thank you, Madam Chairman.
12  Members, I would -- I would urge you to vote
13  against the amendment, and I think that the -- the
14  colloquy and the questions that -- that I've just
15  had with Senator Van Duyn illustrate the -- the --
16  difficulties of adding these categories to -- to
17  the bill.
18      These are discussions that are very
19  complicated, and -- and -- and very difficult, I
20  think, for society and as well as this body to get
21  their minds wrapped around, as well as to come up
22  with concrete definitions for terms that would be
23  important to establish what the public policy of
24  this state was. And I -- I candidly don't -- don't
25  believe that we have -- I've never had anybody

## 36

1  write to me and ask me to add this -- these kinds
2  of things to our state policy. So I think that at
3  this time, it would be best if we did not add
4  anything such as this into the bill, and I would
5  urge my colleagues to vote against the amendment.
6      SEN. RANDLEMAN: Senator Daniel?
7      SEN. DANIEL: Thank you, Madam Chairman.
8  This is a question for Senator Newton. So, Senator
9  Newton, I guess it is my understanding that this is
10  the similar language or maybe identical language to
11  what was included in the Charlotte ordinance, which
12  then prompted responses from thousands of our
13  citizens, which resulted in us being here in a
14  special session this week to deal with a problem
15  that was in only one city. So why would we then
16  come here to undo a problem in one county, and then
17  extend it across 99 other counties. I guess to me,
18  I just -- I don't understand the logic.
19      SEN. RANDLEMAN: Senator Newton?
20      SEN. NEWTON: I -- I think the best
21  response I can give is, I would agree.
22      SEN. RANDLEMAN: Senator Jackson? Other
23  questions from the members? Comments from the
24  members? Seeing none, we have before us Amendment
25  Number 2 to House Bill 2 --

## 37

1      SEN. BAREFOOT: Madam -- Madam
2  Chairman --
3      SEN. RANDLEMAN: Excuse me. Yes?
4      SEN. BAREFOOT: I'm -- I'm just --
5      SEN. RANDLEMAN: Senator Barefoot?
6      SEN. BAREFOOT: Thank you, Madam
7  Chairman. I'm just sitting here thinking through
8  this, and I agree with the bill sponsor. We don't
9  know what this amendment does, and I don't think it
10  is a wise thing to be voting on something where you
11  do -- you have no idea what it does. And so I'm --
12  I'm not sure if I'm stating this correctly, but I
13  think we ought to lay this amendment upon the
14  table, and that's my motion.
15      UNIDENTIFIED MEMBER: Second.
16      SEN. RANDLEMAN: So we have a motion to
17  lay upon the table? We have a second. This does
18  require a three-fifths vote in favor of the motion
19  to lay upon the table. So those supporting the
20  motion to lay upon the table, if you would raise
21  your hand? Can you count, Patrick? Those opposing
22  the motion to the lay upon the table? The
23  motion -- the motion to lay upon the table carries,
24  so the motion is not before the committee, so thank
25  you.

## 38

1     So we're -- we're back to the bill. Do
2 we have any other amendments to come forward
3 regarding the bill? Seeing none. We had a signup
4 sheet, and if we could have the Sergeant-at-Arms go
5 back to monitor the time, we're going to rotate
6 back and forth for those supporting and those in
7 opposition of House Bill 2, and I will begin with
8 Reverend Mykal Slack. Two minutes.
9     MR. SLACK: Good morning, Madam Chair.
10 My name is -- is the microphone on?
11     SEN. RANDLEMAN: Mash the button.
12     MR. SLACK: Is it on? I would -- I would
13 like to have my full time. Thank you. Good
14 afternoon. My name is Reverend Mykal Slack. I am
15 a minister of the Christian faith; a director of
16 congregational life at a church here in Raleigh. I
17 am a proud African-American Southerner, a resident
18 of North Carolina, a husband and a soon-to-be
19 father.
20     As a preacher, it is my job to speak as
21 plainly as I can in all the places I'm called to
22 with as much love in my heart as I can muster. So
23 let me be plain and clear today. Telling a lie
24 over and over and over again does not make it true.
25     I am a transgender male, and I am not a

## 39

1 threat to you. Nor are other transgender people
2 threats to you. I get up in the morning. I go to
3 work every day. I go to church every Sunday. I
4 kiss my wife's belly every night before we go to
5 sleep.
6     This is not about protecting privacy. If
7 it was, you'd be just as interested and invested in
8 the citizens of North Carolina who are transgender
9 people who are more statistically subject to
10 harassment and physical violence in restrooms than
11 anyone else.
12     This isn't about political correctness.
13 Charlotte sought to ensure that I and other
14 transgender people like me would feel as safe in
15 restrooms as other people feel. The Charlotte
16 ordinance didn't raise the bar. It actually
17 leveled the playing field.
18     But this is -- this is about putting my
19 life at risk. This is about, perhaps, your own
20 fear. This is, perhaps, about a lack of education.
21 These issues and these conversations are not
22 difficult conversations to have; they're just
23 conversations that perhaps many of us haven't had
24 much. So the issue here is to have deeper
25 conversation. Is this the kind of behavior do

## 40

1 you -- are you really interested in me being spit
2 on and pushed around and shoved because of who I am
3 in a restroom? I implore you not.
4     Legislating mistreatment, hatred and
5 misunderstanding is shameful. Not doing your
6 homework is irresponsible. I am a child of God, so
7 I don't need your permission to be who I am called
8 to be, but I do need you to legislate in ways that
9 offer protection for me and every person in this
10 state. It is true. You should not vote on
11 legislation or amendments that you do not fully
12 understand the impact that they will have, so I
13 implore you to vote no today. Thank you.
14     SEN. RANDLEMAN: Thank you. Heather
15 Garofalo?
16     MS. GARAFALO: Heather Garofalo, small
17 business owner servicing Charlotte. I have friends
18 and family in the LGBT community, and I love them.
19 Every American private business owner in North
20 Carolina should be free to live and work according
21 to their beliefs without fear of punishment
22 unjustly by the government. In 2015, the Pew
23 Charitable Trust organization identified the top
24 ten states for job growth. Eight out of 10 of
25 these states do not contain state nondiscrimination

## 41

1 laws containing language around sexual orientation
2 and gender identity. Charlotte is beautiful
3 because of its diversity.
4     There are many worldviews and world
5 religions. There is strength in diversity. True
6 equality means that everyone can speak their
7 beliefs without fear of being silenced and
8 punished. I am pleased to report that not one case
9 has been filed by the ACLU in Charlotte, North
10 Carolina alleging discrimination that may have
11 occurred on behalf of an individual or organization
12 against our friends in the LGBT community. As a
13 business owner servicing Charlotte and throughout
14 the state, I am concerned about the unintended
15 consequences of this ordinance.
16     It lacks for me consistency, clarity of
17 how I will do business and -- and run my policies
18 all across the state. Furthermore, it forces me to
19 violate my deepest held beliefs. Either I will
20 check these beliefs at the door, or I can be
21 subject to $500 in fines per day; lawsuits, jail
22 times and my business forced to close. In just
23 nine days, if you don't overturn this ordinance,
24 businesses across the state could have their
25 contracts cancelled simply because they hold a

Case 1:16-cv-00236-TDS-JEP   Document 173-8   Filed 08/29/16   Page 71 of 75

### 42

1   different worldview. A loss of contracts equals
2   loss of revenue. A loss of revenue could equal
3   tens of thousands of jobs lost across the state.
4   This means financial hardship for so many families
5   in North Carolina.
6       Our sweet transgender children deserve
7   better than this. Switching them from one bathroom
8   to the next does not help them with their fears of
9   being accepted. A little girl that may dress as a
10  boy that goes into the next bathroom could be
11  violated. I care about them and all children.
12      SEN. RANDLEMAN: Debra Thompson.
13      MS. THOMPSON: My name is Debra Thompson.
14  I live in Pitt County, and I come to you as a
15  mother. My son, Sky, plays soccer. He still
16  sleeps with his favorite stuffed animal, Charlie
17  Cow, and he frequently makes huge messes around my
18  house with awesome art projects. My child is also
19  transgender. I love my child. I loved Sky when I
20  thought he was my daughter and I love him now that
21  he is my handsome, intelligent and very brave son.
22  On a practical level, telling schools that my son
23  can't use the appropriate bathroom means that my
24  son's education is compromised. How would your day
25  look if you couldn't go to the bathroom?

### 43

1       I know trans youth in my community who
2   purposefully dehydrate themselves so they do not
3   have to use the bathroom at school. One of my
4   son's friends has had to have his mother pick him
5   up from school every time he needs to use the
6   bathroom.
7       But this debate is about more than just
8   bathrooms. Seventy-four percent of youth who are
9   transgender are sexually harassed, and 55 percent
10  of them are physically attacked at school.
11  Twenty-eight percent drop out of school because of
12  this harassment, and 50 percent attempt suicide.
13  Fifty percent. These are statistics that scare me
14  to my core as a parent.
15      This debate is about whether the state
16  cares about my son's health and safety. By telling
17  my son he's different from other kids in North
18  Carolina, not as worthy of protection, you're also
19  telling me that I'm less important than other
20  parents. You're giving Sky's teachers permission
21  to view my son as less worthy of an education.
22  You're giving Sky's peers permission to continue to
23  harass, exclude and bully him. So please protect
24  my son and tell him that he is just as important
25  and every bit as valued as any other kid in our

### 44

1   great state. Please do not legislate the right to
2   discriminate.
3       SEN. RANDLEMAN: Donna Eaton.
4       MS. EATON: My name is Donna Eaton, and I
5   come to you as a concerned mother. I have never
6   shared my story before publicly, but I'm coming to
7   you today because I felt compelled that somebody
8   had to speak out for what was going on. You see, I
9   was molested when I was a kid, and the trauma that
10  I experienced in the days after and the years after
11  was intense, to say the least. I lived in fear of
12  finding a man in my bathroom. It -- like, I
13  can't -- words don't begin to express what I went
14  through.
15      When I was in Massachusetts recently, a
16  transgender male was in the bathroom, and please
17  understand me to say that I am not saying that
18  anyone who is transgender is a -- is a threat to
19  society or that they are -- in that -- predators in
20  any way, shape or form. I believe that everybody
21  deserves to be treated with dignity and respect,
22  but seeing this man in the bathroom that -- with
23  me -- brought me -- it brought me right back to
24  where I was that years and years ago. If this bill
25  is not passed, it is going to open the door for

### 45

1   people with malicious intent who would masquerade
2   as transgenders to come in and actually take
3   advantage of and have access to our kids and
4   ourselves.
5       I'm here to implore -- implore you on
6   behalf of one in four women that -- who have been
7   sexually abused that -- to vote for common sense.
8   That if you don't stand up for this, all North
9   Carolinians that -- are going to be at risk for
10  being perpetually victimized. That every time they
11  go to the bathroom, they will have to actually turn
12  around and face this -- this unconscionable fear.
13  So I just -- I urge you to vote in favor of this
14  bill. Thank you.
15      SEN. RANDLEMAN: Laura Nazario.
16      MS. NAZARIO: Hello, my name is Laura
17  Nazario. I'm a transgender woman from Charlotte,
18  North Carolina. I'm an Air Force veteran, a
19  musician, and I'm an active member of my community.
20  There are several places where I'd rather be than
21  where I'm standing today. I'd rather be playing
22  guitar and writing music. I'd rather be spending
23  time eating pasta with my Italian girlfriend. I'd
24  rather be home where it's safe.
25      At home, I don't have to worry about

Case 1:16-cv-00236-TDS-JEP   Document 179-8   Filed 08/29/16   Page 72 of 75

## 46

1  whether someone will react to my masculine features
2  coupled with my feminine presentation. I don't
3  have to worry about someone noticing my Adam's
4  apple or my height or my broad shoulders. At home,
5  I don't have to worry about what bathroom to use.
6      This is a feeling that I've grown
7  accustomed to. The feeling that I should stay
8  hidden. That I should not be an active member in
9  my community. This feeling is fear.
10     The Charlotte non-discrimination
11 ordinance moved my city into the right direction.
12 It helps to create an environment where I can
13 simply live a normal life. Because isn't this what
14 any human being would want?
15     Removing these protections for people
16 like me only serve to set us back in Charlotte.
17 Not only in Charlotte, but in the entire state. I
18 urge you not to pass this bill. Help make North
19 Carolina a safe place for all members of the
20 community. Thank you.
21     SEN. RANDLEMAN: John Rustin.
22     MR. RUSTIN: Thank you, Madam Chairman.
23 Members of the committee, I'm John Rustin,
24 president of the North Carolina Family Policy
25 Council. On February 22nd, the Charlotte City

## 47

1  Council approved a set of highly controversial and
2  hazardous ordinance changes which you've heard
3  about today. We have three primary concerns about
4  these ordinance changes. First, these changes mean
5  that men can enter women's restrooms, shower rooms,
6  bathhouses and similar facilities in any public
7  accommodation in the City of Charlotte, placing the
8  privacy, safety and dignity of women, children and
9  the elderly at great risk.
10     The City's extremely broad definition of
11 public accommodations mean this -- this new
12 ordinance would apply to any business that provides
13 goods or services. Essentially, any business. And
14 there is no exception for churches, church schools
15 and related church ministries.
16     Secondly, many citizens have sincere
17 religious beliefs that inform the way they live
18 their lives and conduct their businesses. Similar
19 ordinances in other states have been used to force
20 small business owners such as florists, bakers,
21 photographers, bed-and-breakfast owners, and others
22 to either conform to a government-dictated
23 viewpoint in violation of those sincerely held
24 beliefs or to face legal charges, fines and other
25 penalties that have ultimately caused some to go

## 48

1  out of business.
2      The City of Charlotte should not be
3  authorized to impose such an intolerant and
4  unconstitutional mandate as a condition of doing
5  business. And thirdly, Charlotte far exceeded its
6  authority when it passed these ordinance changes.
7  Cities and counties in North Carolina derive the
8  full extent of their authority only from the State
9  Constitution and acts passed by the State
10 legislature. The North Carolina General Assembly
11 has granted neither the City of Charlotte nor any
12 other city in the state the authority to do what
13 the Charlotte City Council has done.
14     If the ordinance changes are allowed to
15 stand, they will serve as a precedent for other
16 city and county governments to undermine proper
17 governmental authority and to create a patchwork of
18 disparate ordinances across the state. For these
19 reasons, we applaud you for considering this
20 legislation and ask that you give it your full
21 support. Thank you.
22     SEN. RANDLEMAN: Sky Thompson.
23     MR. THOMPSON: Before I start, I'd like
24 to ask something with everyone listening. If you
25 have a firm belief on either side, please just try

## 49

1  to clear your mind for the next two minutes while I
2  give my story, and please consider my side. My
3  name is Sky Thompson, and I'm a fifteen-year-old
4  transgender student at South Central High School in
5  Greenville. I've dealt with bullying my whole
6  life, and now I worry that my own state lawmakers
7  are bullying me as well. I feel bullied by you
8  guys.
9      In schools all over the place,
10 transgender kids are bullied on the daily to the
11 extent of physical attacks. Being in a public high
12 school and not being allowed in the right bathroom
13 for our own gender is embarrassing, and it gives
14 bullies all the more reason to pick on us. Imagine
15 yourself in my shoes, being a boy walking into a
16 ladies room. It's awkward and embarrassing and can
17 actually be dangerous to have to go to the wrong
18 bathroom.
19     By putting this law into place, you're
20 putting me in danger and not protecting -- or not
21 protecting those who aren't being threatened in the
22 first place. I've always heard people say that us,
23 as children, have a bright future ahead, that we
24 can be anything we want, so why is this any
25 different? I've always been told to be myself, but

Case 1:16-cv-00236-TDS-JEP   Document 173-8   Filed 08/29/16   Page 73 of 75

## 50

1  now I am being myself, and I'm being bullied for
2  it. I'm being picked on for it.
3  So, please, for the sake of my peers, my
4  friends and myself, don't vote for hate. Vote to
5  protect my peers, to protect myself and to protect
6  my rights and my peers' rights. Thank you.
7  SEN. RANDLEMAN: John Amanchukwu.
8  MR. AMANCHUKWU: My name is John
9  Amanchukwu, executive director for the Upper Room
10  Christian Academy, youth pastor for the Upper Room
11  Church of God and Christ. In the book entitled The
12  Marketing of Evil by David Kupelian, he says that
13  neutrality is collaboration. And in 1967, at the
14  Riverside Baptist Church, Dr. King said there comes
15  a time when silence becomes betrayal. When you
16  merge these two powerful statements together, you
17  come to find out that neutrality is a form of
18  collaboration and betrayal.
19  So today we push back against neutrality
20  for the voiceless thousands of boys and girls in
21  our public and private schools and the countless
22  teachers, administrators and principals and parents
23  who know the impending danger and harm of this
24  ordinance. It's common sense that boys should go
25  to the boys' room and girls should go to the girls'

## 51

1  room, period. I believe that God got it right in
2  Genesis 5 and 2 when he made them male and female.
3  If God didn't give you access to a male or female
4  bathroom via your anatomy, neither should we give
5  you access via ordinance or legislation, period.
6  According to the APA, as many as 98
7  percent of gender-confused boys and 88 percent of
8  gender-confused girls eventually accept their
9  biological sex after naturally passing through
10  puberty. In my closing, allow -- allow -- allow me
11  say this: that today, I received a phone call. I
12  got word that someone called our school and called
13  me a homophobic bigot, and I want you to know today
14  that if standing up for my wife and for my son and
15  my daughter, for the precious children of this
16  state makes me a homophobic bigot -- bigot, I will
17  be a homophobic bigot until the day that I die.
18  SEN. RANDLEMAN: Maggie Caddell.
19  MS. CADDELL: Hello, my name is Maggie
20  Caddell. I've heard a lot today about protecting
21  women and girls in the state of North Carolina. I
22  am a woman who has been seen and raised as a woman
23  from the time I was born. There have been a number
24  of times I've been hassled and questions --
25  questioned in women's restrooms because of how I

## 52

1  look. The Charlotte ordinance would help me and
2  others like me. This bill would not, but would
3  discourage people to question my gender when all I
4  need to do is use the restroom.
5  In addition, my partner was brought up as
6  a girl and is now a man. However, he has not been
7  able to change his birth certificate due to having
8  been born overseas. Whether or not a person can
9  change their birth certificate is based on where
10  they were born, not where they choose to live.
11  This bill would force him, a man with a full beard,
12  to use women's restrooms. This bill that you're
13  proposing would force a man with a full beard to
14  use women's restrooms. I urge you to oppose this
15  bill.
16  SEN. RANDLEMAN: Mark Creech.
17  MR. CREECH: Ladies and gentlemen of the
18  committee, my name is Reverend Mark Creech, and I'm
19  the executive director of the Christian Action
20  League of North Carolina. I want to begin by
21  saying that on behalf of the League and the
22  thousands of churches that are connected to us,
23  thank you for holding this special session of the
24  legislature. The matter before you, as you well
25  know, is urgent.

## 53

1  There are some who will argue that by
2  overturning Charlotte's bathroom and public
3  accommodations ordinance, that you are
4  discriminating and victimizing one of the most
5  vulnerable groups of people in our state. I trust
6  that you will neither be distracted or disheartened
7  by such claims. It is unfortunate that the great
8  concepts of tolerance and compassion these days
9  have been often twisted to play upon our emotions
10  with unnecessary guilt. Tolerance doesn't mean
11  that we should accept all truth claims as valid,
12  and compassion doesn't require that we put our
13  women and children in danger.
14  The Charlotte ordinance defies logic. It
15  caters to the interest of a very few that embrace a
16  purely subjective reality and then require that the
17  rest of us adjust our reality accordingly. That's
18  not tolerance or compassion; that's absurdity.
19  The real victims of Charlotte's
20  ordinance are those who are endangered by
21  government's forced recognition that XX or XY
22  genetic markers are not objective, that blue is
23  pink and pink is blue. The real victims are
24  private businesses and churches forced to bow the
25  knee and cast their incense upon the altar of this

Case 1:16-cv-00236-TDS-JEP   Document 148-8   Filed 08/29/16   Page 74 of 75

## 54

1  new religion of gender denial and function.
2      You don't need to have any reservations
3  about upending this ordinance.  By upending it, you
4  will actually be exposing its true nature, which is
5  intolerance practiced in the name of tolerance;
6  selfish indifference practiced in the name of
7  compassion.  We commend the bill to you and urge
8  you to pass it.
9      SEN. RANDLEMAN:  The Chair will recognize
10  Senator Newton for closing remarks.
11      SEN. NEWTON:  Thank you, Madam Chairman,
12  thank you, members of the committee and -- and I
13  thank the members of the public who spoke to us
14  these last few minutes.  I want to make a couple of
15  points and -- then I hope the committee will move
16  forward with the legislation.
17      First, I'd like to say that we are a
18  state of laws.  We are a state of laws.  We -- we
19  have a constitution, and it's imperative that we,
20  as a state, enforce those laws.  And this applies
21  to whether or not a city or county has authority to
22  issue a certain ordinance on a certain kind of
23  policy or not.  And it's important today that we
24  set a statewide standard about what is appropriate
25  here in the state of North Carolina as it relates

## 55

1  to bathroom policy, or employment practices, or
2  what we would all agree upon today should be a
3  public policy against discrimination.
4      We are a state of laws.  Assault is
5  against the law.  If I'm assaulted by someone, it's
6  against the law.  Someone else, a member of this
7  public is assaulted, it's against the law.  Those
8  laws should be enforced.  I do not wish
9  discrimination upon anybody, and I don't believe
10  the members of this body do either.  I urge your
11  support of the bill.
12      SEN. RANDLEMAN:  Senator Bingham?
13      SEN. BINGHAM:  Madam Chairman, I'd like
14  to move that we move ahead with this bill and move
15  for a favorable report.
16      SEN. RANDLEMAN:  Do I hear a second?
17      SEN. ALEXANDER:  I second, Madam Chair.
18      SEN. RANDLEMAN:  Thank you, Senator
19  Alexander.  Members -- members of the committee, we
20  have a motion to give the House bill to a favorable
21  report.  Those in support of the legislation will
22  say aye.
23      (Voice vote.)
24      SEN. RANDLEMAN:  Those opposing?
25      (Voice vote.)

## 56

1      SEN. RANDLEMAN:  The motion carries, and
2  this meeting is adjourned.  Thank you.
3      (End of proceedings.)

## 57

STATE OF NORTH CAROLINA
COUNTY OF WAKE
     CERTIFICATION OF TRANSCRIPT
     This is to certify that the foregoing transcript of
proceedings held on March 23, 2016, is a true and accurate
transcript of the proceedings as transcribed by me or under
my supervision.  I further certify that I am not related to
any party or attorney, nor do I have any interest
whatsoever in the outcome of this action.
     This 16th day of April, 2016.

Brad Worley, transcriptionist
Worley Reporting
P.O. Box 99169
Raleigh, NC 27624
919-870-8070
brad@worleyreporting.com

Worley Reporting