# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO; PAYTON GREY MCGARRY; HUNTER SCHAFER; MADELINE GOSS; ANGELA GILMORE; QUINTON HARPER; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, | No. 1:16-cv-00236-TDS-JEP |
| *Plaintiffs*, | |
| v. | |
| ROY A. COOPER, III, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; MARGARET SPELLINGS, in her official capacity as President of the University of North Carolina; JOSHUA STEIN, in his official capacity as Attorney General of North Carolina; MACHELLE SANDERS, in her official capacity as Secretary of the North Carolina Department of Administration; MANDY K. COHEN, in her official capacity as Secretary of the North Carolina Department of Health and Human Services; and JAMES H. TROGDON III, in his official capacity as Secretary of the North Carolina Department of Transportation, | FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES |
| *Defendants*, | |
| PHIL BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; and TIM MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, | |
| *Intervenor-Defendants*. | |

1

## INTRODUCTION

1.      This lawsuit challenges North Carolina's House Bill 142 (Session Law 2017-4, "H.B. 142"), a law that discriminates against transgender individuals with respect to one of life's most basic and essential bodily functions—using the restroom—and, until December 2020, blocks local governments from protecting lesbian, gay, bisexual, and transgender ("LGBT") people against discrimination in employment and public accommodations.

2.      H.B. 142 is the culmination of a series of actions by North Carolina lawmakers targeting LGBT individuals, and particularly transgender individuals, for discrimination. By targeting all LGBT people for disfavored treatment and singling out transgender individuals for additional discrimination, H.B. 142 violates fundamental guarantees of equal protection and due process in the U.S. Constitution and statutory prohibitions on discrimination based on sex under Title IX and Title VII.

3.      LGBT individuals throughout North Carolina are exposed to invidious discrimination in their day-to-day lives simply for being themselves, and are denied protection against discrimination under state law. In February 2016, the City of Charlotte enacted an ordinance (the "Charlotte Ordinance" or the "Ordinance") that sought to address the pervasive discrimination faced by LGBT people—and particularly transgender people—by extending the coverage of Charlotte's existing anti-discrimination ordinance to bar discrimination based on sexual orientation and gender identity.

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 2 of 104

4.      Before the Charlotte Ordinance could take effect, the North Carolina General Assembly rushed to convene a special session rife with procedural irregularities with the express purpose of passing a statewide law preventing the Charlotte Ordinance from taking effect. In a matter of hours, the legislature introduced and passed House Bill 2 (Session Law 2016-3, Second Special Session, "H.B. 2") on March 23, 2016, and then-Governor Patrick L. McCrory ("Gov. McCrory") signed the bill into law that same evening. Lawmakers made no attempt to cloak their actions in a veneer of neutrality. Instead, they openly vilified transgender people, falsely portraying them as predatory and dangerous to others.

5.      H.B. 2 caused immense harm to the entire LGBT community, but particularly to transgender individuals throughout the state of North Carolina who were singled out for discrimination and barred from restrooms in public buildings and other single-sex, multiple-user facilities that accorded with their gender identity, absent an updated birth certificate matching their gender identity.

6.      In the months following the passage of H.B. 2, North Carolina lost hundreds of millions of dollars in revenue as entertainment, sports, and other business leaders and organizations withdrew activities and investments from North Carolina because of H.B. 2's discriminatory targeting of LGBT individuals.

7.      In November 2016, Governor Roy A. Cooper III ("Gov. Cooper" or "Defendant Cooper") was elected, defeating Gov. McCrory.

3

8.      Even before his inauguration, in an effort to bring business, sports, and entertainment activities and investments back to North Carolina, Gov. Cooper attempted to work with the North Carolina General Assembly to secure a repeal of H.B. 2. As a first step to securing the repeal of H.B. 2, the Charlotte City Council repealed the Charlotte Ordinance in December 2016. Shortly thereafter, the General Assembly convened a special session on December 21, 2016, solely for the purpose of repealing H.B. 2. Although numerous repeal bills were proposed—including a bill that would have cleanly repealed H.B. 2 and thus returned North Carolina to the pre-H.B. 2 landscape—none passed either chamber because legislators were unwilling to pass a bill that did not perpetuate anti-LGBT discrimination. The special session was adjourned with H.B. 2 still in effect.

9.      The General Assembly convened for the 2017 session on January 11, 2017. Multiple bills were introduced to repeal H.B. 2. No clean repeal advanced through either chamber of the legislature.

10.     On March 30, 2017, with the state facing the impending loss of still further sporting events, the General Assembly in one day introduced, heard, and passed—and Gov. Cooper signed—H.B. 142.

11.     H.B. 142 passed through the General Assembly precisely because it effectively continued, rather than ended, H.B. 2's discrimination against LGBT individuals. Like H.B. 2, H.B. 142's targeting of the entire LGBT population for

4

disfavored treatment and further singling out of transgender individuals is not incidental, but rather is an intentional feature of H.B. 142 that ensured its passage.

12. H.B. 142 bars "[s]tate agencies, boards, offices, departments, institutions, branches of government, including The University of North Carolina and the North Carolina Community College System, and political subdivisions of the State, including local boards of education," from regulating "access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly" (even though no current act of the General Assembly explicitly regulates such access).

13. Read literally, H.B. 142 would appear to prohibit even maintaining separate men's and women's rooms or the posting of any sign restricting the use of a multiple occupancy restroom, shower, or changing facility to "men" or "women." However, on information and belief, neither the state government nor any operator of a state government building in North Carolina is currently enforcing H.B. 142 to that effect.

14. On the day that he voted for H.B. 142, North Carolina State Representative Kevin Corbin stated that H.B. 142 "is not a repeal of HB2. . . . The bill clearly states that city councils like Charlotte and other government entities CANNOT regulate access of multiple occupancy restrooms, showers, or changing facilities. Only the NC General Assembly may enact bathroom ordinances. . . . What this essentially means is that the restroom provision of HB2 remains. . . ."

5

15.     While Gov. Cooper has stated that, as a result of the passage of H.B. 142, there currently is no North Carolina state law "barring the use of multiple occupancy bathroom facilities in accordance with gender identity," other North Carolina officials, including North Carolina State Senator Danny Britt, Speaker of the North Carolina Assembly Tim Moore ("Speaker Moore"), and North Carolina Representative Chuck McGrady, have stated that passage of H.B. 142 ensured that transgender individuals can be criminally prosecuted for using restrooms in public buildings that match their gender identity. The resulting uncertainty about whether they could be arrested or suffer other adverse consequences means that transgender individuals cannot safely use single-sex, multiple-user restrooms in government-controlled buildings in North Carolina.

16.     Because of the lack of clarity in H.B. 142, and statements by these and other elected officials, transgender individuals have been deterred from using restrooms and other single-sex, multiple-user facilities that match their gender identity. In addition, transgender individuals also fear using the restroom that does not match their gender identity; if a transgender man were to use the women's restroom, for example, he would also fear arrest in those circumstances, because he is likely to be generally perceived by others to be a non-transgender man.

17.     By deterring transgender individuals from using restrooms and other single-sex, multiple-user facilities that accord with their gender identity and preventing local governments from extending protections in employment and public accommodations

6

based on sexual orientation and gender identity, H.B. 142 violates the United States Constitution and federal laws prohibiting discrimination on the basis of sex.

18.     In addition to challenging H.B. 142, Plaintiffs in this lawsuit continue to challenge H.B. 2 in the event that this Court finds that (1) one or more provisions of H.B. 142 violate the U.S. Constitution or federal law and (2) H.B. 142's repeal of H.B. 2 is not severable from such provisions of H.B. 142. Plaintiffs who previously raised Title VII and/or Title IX claims regarding H.B. 2 also continue to seek nominal damages for the harms caused by H.B. 2's violation of those statutes.

## PARTIES

### A.     Plaintiffs

19.     Plaintiff Joaquín Carcaño ("Mr. Carcaño") is a 28-year-old man who resides in Carrboro, North Carolina. Mr. Carcaño is employed by the University of North Carolina and works at the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"). Mr. Carcaño is transgender.

20.     Plaintiff Payton Grey McGarry ("Mr. McGarry") is a 20-year-old man who resides in Greensboro, North Carolina. Mr. McGarry is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro"). Mr. McGarry is transgender.

21.     Plaintiff Hunter Schafer is an 18-year-old young woman from Raleigh, North Carolina. Until May 2017, Ms. Schafer resided in Winston-Salem, North Carolina,

7

where she attended school as a student at the University of North Carolina School of the Arts High School ("UNCSA-HS"). Ms. Schafer is transgender.

22.     Plaintiff Madeline Goss ("Ms. Goss") is a 41-year-old woman who resides in Raleigh, North Carolina. Ms. Goss works as the Development Operations Manager at Truven Health Analytics. Ms. Goss is transgender.

23.     Plaintiff Angela Gilmore ("Ms. Gilmore") is a 54-year-old woman who resides in Durham, North Carolina and is an Associate Dean and Professor at North Carolina Central University School of Law. Ms. Gilmore is a lesbian.

24.     Plaintiff Quinton Harper ("Mr. Harper") is a 32-year-old man who resides in Carrboro, North Carolina and works as the Field Director at Democracy North Carolina. Mr. Harper is bisexual.

25.     Plaintiff American Civil Liberties Union of North Carolina ("ACLU of NC") is a private, non-profit membership organization with its principal office in Raleigh, North Carolina. It has approximately 33,000 members in the state of North Carolina, including LGBT members. The mission of the ACLU of NC is to defend and advance the individual freedoms embodied in the United States Constitution and the nation's civil rights laws, including the rights of LGBT people to be free from invidious discrimination and infringements on their liberty interests.

26.     The ACLU of NC sues on behalf of its members, who include: (1) transgender individuals who, under H.B. 142, are deterred from using restrooms or other single-sex, multiple-user facilities and deprived of the protections of state agency or

8

local government policies granting transgender individuals the right to use restrooms or other single-sex, multiple-user facilities consistent with their gender identity—including the ability to advocate for the adoption of such policies by state agencies or local governments; (2) transgender individuals who were barred by H.B. 2 from using restrooms and other single-sex, multiple-user facilities in accordance with their gender identity in public schools and other government buildings and—if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142—would again be so barred; and (3) LGBT individuals who, under H.B. 2 and H.B. 142, have been stripped of or barred from local non-discrimination protections based on their sexual orientation, transgender status, and sex, including their gender identity.

### B. Defendants

27.    Defendant Roy A. Cooper, III is sued in his official capacity as the Governor of North Carolina, including, pursuant to Fed. R. Civ. P. 25(d), as successor to former Gov. Patrick L. McCrory. Pursuant to Article III, Section 1 of the North Carolina Constitution, "[t]he executive power of the State" is vested in Defendant Cooper in his capacity as North Carolina's Governor. Article III, Section 5(4) of the North Carolina Constitution also provides that it is the duty of Defendant Cooper in his capacity as North Carolina's Governor to "take care that the laws be faithfully executed." Pursuant to these and other authorities, on April 12, 2016, then-Gov. McCrory issued Executive Order No. 93, dated April 12, 2016, which, *inter alia*, interpreted the scope of H.B. 2's provisions regarding single-sex, multiple-user facilities and its provisions preempting local non-

9

discrimination ordinances. Gov. Cooper has not amended or rescinded Executive Order No. 93. Under North Carolina law, the Governor has the authority to "supervise the official conduct of all executive and ministerial officers," N.C. Gen. Stat. § 147-12(a)(1), and to "adopt reasonable rules and regulations governing the use, care, protection, and maintenance of public buildings and grounds," N.C. Gen. Stat. § 143-345.1. On information and belief, the Governor has the authority pursuant to N.C. Gen. Stat. §§ 143B-9 and 143B-16 and other authorities to remove or fire certain state officials or employees who attempt to ban transgender individuals from accessing restrooms. Gov. Cooper is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

28.    Defendant University of North Carolina ("UNC") is an education program or activity receiving federal financial assistance. Defendant UNC includes its constituent institutions, including, but not limited to, the University of North Carolina at Chapel Hill, the University of North Carolina at Greensboro, and the University of North Carolina School of the Arts High School. Defendant UNC, which has fifteen or more employees, is an employer within the meaning of 42 U.S.C. § 2000e(b) and a person within the meaning of 42 U.S.C. § 2000e(a).

29.    Defendant Margaret Spellings ("Defendant Spellings") is sued in her official capacity as the President of the University of North Carolina. Pursuant to N.C. Gen. Stat. § 116-14, Defendant Spellings, in her capacity as UNC President, is "the chief administrative officer of the University." President Spellings is a person within the

10

meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

30.    Defendant Joshua Stein ("Defendant Stein") is sued in his official capacity as the Attorney General of North Carolina. Pursuant to N.C. Gen. Stat. §§ 114-1 and 114-2, Defendant Stein, in his capacity as Attorney General, is the supervisor and director of the North Carolina Department of Justice and has the authority to "intervene . . . in proceedings before any courts, regulatory officers, agencies and bodies, both State and federal, in a representative capacity for and on behalf of the using and consuming public of this State" and to "institute and originate" such proceedings "in all matters affecting the public interest." Attorney General Stein is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

31.    Defendant Machelle Sanders ("Defendant Sanders") is sued in her official capacity as the Secretary of the North Carolina Department of Administration. Pursuant to N.C. Gen. Stat. § 143B-369, Defendant Sanders, in her capacity as Secretary of Administration, is the "head of the Department [of Administration]." The Department of Administration's duties include "provid[ing] for such ancillary services as the other departments of State government might need to insure efficient and effective operations." N.C. Gen. Stat. § 143B-367. Defendant Sanders is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

11

32.     Defendant Mandy K. Cohen ("Defendant Cohen") is sued in her official capacity as Secretary of the North Carolina Department of Health and Human Services. Pursuant to N.C. Gen. Stat. §§ 143B-137.1 and 143B-139, the Department of Health and Human Services, headed by Defendant Cohen, has the following duties, among others: "to provide the necessary management, development of policy, and establishment and enforcement of standards for the provisions of services in the fields of public and mental health and rehabilitation . . . ." Defendant Cohen is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

33.     Defendant James H. Trogdon III ("Defendant Trogdon") is sued in his official capacity as the Secretary of the North Carolina Department of Transportation. Pursuant to N.C. Gen. Stat. § 143B-348, Defendant Trogdon, in his capacity as Secretary of Transportation, is the "head of the Department of Transportation" and "shall carry out the day-to-day operations of the Department," among other duties. Defendant Trogdon is a person within the meaning of 42 U.S.C. § 1983 and was acting under color of state law at all times relevant to this complaint.

34.     Due to their respective duties and obligations, Defendants are responsible for enforcing H.B. 142, and—in the event that H.B. 2 is revived because of the invalidity of H.B. 142—will once again be responsible for enforcing H.B. 2. Each Defendant, and those subject to their direction, supervision, or control, has or intentionally will perform, participate in, aid and/or abet in some manner the acts alleged in this Complaint, has or

12

will proximately cause the harm alleged herein, and has or will continue to injure Plaintiffs irreparably if not enjoined. Accordingly, the relief requested herein is sought against each Defendant, as well as all persons under their supervision, direction, or control, including, but not limited to, their officers, employees, and agents.

## JURISDICTION AND VENUE

35.     This action arises under 42 U.S.C. § 1983 to redress the deprivation under color of state law of rights secured by the United States Constitution, under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX"), and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, ("Title VII").

36.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States, including laws providing for the protection of civil rights, and because this suit seeks redress for the deprivation, under color of state law, of rights secured by the United States Constitution.

37.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendant University of North Carolina resides within the District, and all Defendants reside within the State of North Carolina; and because a substantial part of the events that gave rise to the Plaintiffs' claims took place within the District.

38.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 13 of 104

39.     This Court has personal jurisdiction over Defendants because they are domiciled in North Carolina.

## FACTUAL ALLEGATIONS

**A.      Plaintiffs.**

40.     **Plaintiff Joaquín Carcaño** works for the University of North Carolina at Chapel Hill ("UNC-Chapel Hill") Institute for Global Health and Infectious Disease as a Project Coordinator. The project that he coordinates provides medical education and services such as HIV testing to the Latino/a population.

41.     Mr. Carcaño is a resident of the city of Durham, North Carolina, and works primarily in the city of Chapel Hill, North Carolina. He has also previously resided in the town of Carrboro, North Carolina. Durham is in Durham County, North Carolina, and both Carrboro and Chapel Hill are in Orange County, North Carolina.

42.     Mr. Carcaño is a man.

43.     Mr. Carcaño is transgender. This means that his sex assigned at birth was female, as his birth certificate reflects, but that designation does not accurately reflect his gender identity, which is male.

44.     A person's gender identity refers to the person's fundamental, internal sense of belonging to a particular gender. There is a medical consensus that gender identity is innate and that efforts to change a person's gender identity are unethical and harmful to a person's health and well-being.

14

45.     The gender marker on a birth certificate is designated at the time of birth usually based upon the appearance of an infant's external genitalia. However, a person's sex has many components, such as chromosomes, hormone levels, internal and external reproductive organs, and gender identity.

46.     When the components of sex do not align as all typically male or all typically female, a person's gender identity is what determines the gender a person lives as and should be recognized as in all aspects of life.

47.     Mr. Carcaño was diagnosed with gender dysphoria, the medical diagnosis for individuals who have a gender identity that differs from the sex they were assigned at birth and who experience clinically significant distress as a result.

48.     Gender dysphoria is a serious medical condition that, if left untreated, can lead to debilitating depression, and even suicidal thoughts and acts.

49.     Gender dysphoria is a condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth ed. (2013) (DSM-V), and by the other leading medical and mental health professional groups, including the American Medical Association and the American Psychological Association.

50.     Medical treatment for gender dysphoria must be individualized for the medical needs of each patient.

51. Treatment for gender dysphoria includes living one's life consistent with one's gender identity, including when accessing single-sex spaces such as restrooms and locker rooms.

52. Forcing transgender individuals to use single-sex, multiple-user spaces that do not match their gender identity or forcing them into separate facilities that no one else is forced to use is inconsistent with medical protocols and can cause anxiety and distress to the transgender person and result in harassment of and violence against them.

53. Mr. Carcaño was born and raised in South Texas. Since a very young age, around 7 or 8 years old, Mr. Carcaño was aware that he did not feel like a girl, but he did not know how to express how he felt.

54. Mr. Carcaño ultimately acknowledged his male gender identity to himself later in his adult life.

55. Since 2013, Mr. Carcaño has been in the continuous care of a licensed mental health clinician, who diagnosed Mr. Carcaño with gender dysphoria. Mr. Carcaño initially sought treatment for depression, which was caused in part by his gender dysphoria.

56. Mental health and medical professionals worldwide recognize and follow the evidence-based standards of care for the treatment of gender dysphoria developed by the World Professional Association for Transgender Health ("WPATH"). After diagnosing Mr. Carcaño with gender dysphoria, his therapist developed a course of treatment consistent with those standards. The goal of such treatment is to alleviate

16

distress by helping a person live congruently with the person's gender identity. Consistent with that treatment and his identity, in January 2015, Mr. Carcaño explained to his family and friends that he is a man.

57. A critical component of the WPATH Standards of Care is a social transition to living full-time consistently with the individual's gender identity. For Mr. Carcaño, that includes living in accordance with his male identity in all respects, including the use of a traditionally male name and male pronouns and the use of men's restrooms.

58. For transgender people, it is critical that social transition include transition in the workplace, including with respect to use of restrooms. Excluding a transgender man from the restroom that corresponds to his gender identity, or forcing him to use a separate facility from other men, communicates to the entire workplace that he should not be recognized as a man and undermines the social transition process.

59. Mr. Carcaño also began using Joaquín as his first name in January 2015. His friends, family, and coworkers now recognize him as a man, and they refer to him using his traditionally male name and male pronouns.

60. Also consistent with the WPATH Standards of Care, Mr. Carcaño's physician recommended and prescribed hormone treatment, which Mr. Carcaño has received since May 2015. For both hormone therapy and surgical treatment, the WPATH Standards of Care require persistent, well-documented gender dysphoria, which is a criterion that Mr. Carcaño satisfied. Among other therapeutic benefits, the hormone treatment has deepened Mr. Carcaño's voice, increased his growth of facial hair, and

given him a more traditionally masculine appearance. This treatment helped alleviate the distress Mr. Carcaño experienced due to the discordance between his birth-assigned sex and his gender identity and helped him to feel more comfortable with who he is.

61. As part of the treatment for his gender dysphoria, Mr. Carcaño also obtained a bilateral mastectomy and nipple reconstruction (also known as "top surgery") in January 2016. Consistent with WPATH Standards of Care, Mr. Carcaño satisfied the requirement of having a referral from a qualified mental health professional in order to obtain the surgical treatment.

62. As part of his social transition, Mr. Carcaño began using the men's restroom at work and elsewhere in late 2015, which occurred without incident for the five months or so before H.B. 2's enactment. Mr. Carcaño's therapist had also specifically recommended that he use only men's restrooms. She was concerned that using women's restrooms could compromise his mental health, well-being, and safety. By late 2015, Mr. Carcaño had grown facial hair facilitated by hormone treatment, and his therapist indicated that others would recognize Mr. Carcaño as a man based on his physical appearance.

63. Mr. Carcaño is now comfortable with the status of his treatment and, with the exception of the distress caused by the passage of H.B. 2 and H.B. 142, his distress has been managed through the clinically recommended treatment he has received. He plans to continue treatment under the supervision of medical professionals and based on his medical needs.

18

64. Until the passage of H.B. 2, Mr. Carcaño was recognized and treated like all other men at his job at UNC-Chapel Hill.

65. Apart from the building where he works, Mr. Carcaño also used other men's restrooms on the UNC-Chapel Hill campus without incident for approximately five months prior to H.B. 2's passage. In addition, when out in public, such as at restaurants and stores, Mr. Carcaño exclusively used men's restrooms.

66. There have been no incidents or, to the best of Mr. Carcaño's knowledge, complaints related to his use of restrooms designated for men.

67. The only restrooms on the floor where Mr. Carcaño works at UNC-Chapel Hill are designated either for men or for women. H.B. 2 prohibited him and H.B. 142 deters him from using the same restrooms that his coworkers typically use. This exclusion is stigmatizing and marks him as different and lesser than other men.

68. Using the women's restroom is not a viable option for Mr. Carcaño, just as it would not be a viable option for non-transgender men to be forced to use the women's restroom.

69. Forcing Mr. Carcaño to use the women's restroom would also cause substantial harm to his mental health and well-being and would force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

70. The idea of being forced into the women's restroom causes Mr. Carcaño to experience significant anxiety. He knows that it would be distressing for him and uncomfortable for others and possibly lead to violence and harassment against him or

19

even arrest given that he is perceived to be a non-transgender man. He fears for his safety because of the passage of H.B. 142 and of H.B. 2 before it.

71.     In the initial period after H.B. 2's passage, Mr. Carcaño generally used a single-user restroom not designated either for men or for women in another building on campus, which was approximately a 10-15 minute walk each way from the building in which he works.

72.     Mr. Carcaño was subsequently informed by administrative staff in the building in which he works that they had learned of a single-user restroom based on building floor plans. It is accessible using a special service elevator, and the restroom is tucked away in a cubby down a hallway in a part of the building used for housekeeping.

73.     Mr. Carcaño was not only humiliated by being singled out and forced to use a separate restroom from his colleagues and all other men that he works with, but also burdened by having to use a separate restroom on a different floor, which increases the likelihood that he will delay or avoid going to the restroom. During the period when H.B. 2 was preliminarily enjoined, Mr. Carcaño generally used the men's restrooms at UNC-Chapel Hill.

74.     Some North Carolina government officials have publicly stated that the passage of H.B. 142 maintains H.B. 2's bar on transgender individuals' use of single-sex, multiple-user facilities that match their gender identity. North Carolina government officials have also publicly taken the position that use of the "wrong" restroom could subject transgender individuals to criminal prosecution under trespass laws.

20

75.     In light of the numerous statements from North Carolina legislators that, under H.B. 142, transgender people are still barred from using restrooms that match their gender, Mr. Carcaño reasonably fears being arrested and/or prosecuted for trespass or for some other crime if he uses the men's restroom in public buildings. Though using the women's restroom is not feasible for him, if he were to use the women's restroom, he would also fear arrest in those circumstances given that he is generally perceived by others to be a non-transgender man.

76.     Since H.B. 142's passage and the Court's lifting of the preliminary injunction against enforcement of H.B. 2 with respect to Mr. Carcaño, the University of North Carolina has refused to state whether Mr. Carcaño is permitted to use restrooms or other single-sex, multiple-user facilities at UNC that are consistent with his gender identity. The University of North Carolina and its constituent institutions are expressly forbidden by H.B. 142 from regulating access to restrooms or other single-sex, multiple-user facilities. As a result, Mr. Carcaño is deterred from using UNC facilities that are consistent with his gender identity, and he cannot use the women's restrooms, which causes him to sometimes limit his use of restrooms at work altogether. Mr. Carcaño also visits public agencies, as defined by N.C. Gen. Stat. § 143-760, and intends to and will do so in the future. Both H.B. 2 and H.B. 142 cause Mr. Carcaño to fear using the restroom in public buildings, and he often takes steps to avoid restroom use altogether.

77.     As part of his job at UNC-Chapel Hill, Mr. Carcaño has had to visit the offices of the North Carolina Department of Health and Human Services many times in

the past, and he will continue to need to do so in the future. Prior to the passage of H.B. 2, he used the men's restroom while at their office, but he was banned from doing so under H.B. 2 and is deterred from doing so under H.B. 142.

78.     Mr. Carcaño has also visited the Division of Motor Vehicles under the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's license) and anticipates doing so again in the future, where he was banned from using the men's restroom under H.B. 2 and is deterred from doing so under H.B. 142.

79.     Mr. Carcaño also regularly uses the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation. For example, he uses the restrooms provided by that system when he travels approximately once a month to visit his brother in Atlanta, and when he visits Washington, D.C. periodically. He will need to continue to use those restrooms in the future, but he was banned from using the men's restroom under H.B. 2 and is deterred from doing so under H.B. 142. He cannot use the women's restrooms because he is a man, and he fears that he will face possible arrest and prosecution if he uses a multi-user restroom facility in a public agency.

80.     Under H.B. 142, the North Carolina Department of Health and Human Services, the Division of Motor Vehicles, and the Department of Transportation—like all other state agencies and local governments—are forbidden from regulating access to restrooms or other single-sex, multiple-user facilities. All of this deters Mr. Carcaño from use of the appropriate restroom when he visits facilities controlled by these or other state

22

agencies. This legal uncertainty causes Mr. Carcaño anxiety when he is forced to use a restroom at these state agencies. He often avoids all restroom use in government buildings as a result.

81.     Mr. Carcaño is aware that the governments of Carrboro (the town in which he previously resided and that he continues to visit), Chapel Hill (the city in which he primarily works), and Orange County (which encompasses both Carrboro and Chapel Hill) have regularly monitored local and state consideration of, respectively, ordinances and statutes that would, *inter alia*, prohibit discrimination in employment and public accommodations on the basis of sexual orientation and gender identity, including with respect to restrooms and other single-sex, multiple-user facilities. Mr. Carcaño is informed and believes, and on that basis alleges, that Carrboro, Chapel Hill, and Orange County would pass such ordinances if they were legally permitted to do so under H.B. 142.

82.     Mr. Carcaño regularly frequents places of public accommodation, such as restaurants and stores, in Carrboro, Chapel Hill, and Orange County. He would accordingly benefit from the protections of such anti-discrimination ordinances in those jurisdictions. Under H.B. 142, however, Mr. Carcaño is deprived of the protections of such ordinances and is prevented from advocating for such protections before local government bodies.

83.     With the passage of H.B. 2 and H.B. 142, Mr. Carcaño is also limited in his ability to increase non-discrimination protections for LGBT people in Carrboro, Chapel

Hill, Orange County, and elsewhere in North Carolina. Were these localities able to enact such protections, Mr. Carcaño would advocate for local ordinances that prohibit discrimination in employment and public accommodations based on sexual orientation and gender identity in these and other North Carolina jurisdictions.

84. Mr. Carcaño, who is an employee of the University of North Carolina within the meaning of 42 U.S.C. § 2000e(f), has exhausted administrative remedies before the Equal Employment Opportunity Commission ("EEOC") with respect to his rights under Title VII of the Civil Rights Act of 1964. He filed a charge of discrimination with the EEOC on April 20, 2016 alleging that UNC had violated Title VII's prohibition against sex discrimination. He requested his right to sue on October 19, 2016, after at least 180 days had elapsed from the filing of his charge, and he received his right to sue on November 21, 2016.

85. Mr. Carcaño is a member of the ACLU of NC.

86. **Plaintiff Payton Grey McGarry** is a full-time student at the University of North Carolina at Greensboro ("UNC-Greensboro"), where he is majoring in Economics with a minor in music. He is also a skilled musician and has played trumpet in many ensembles at UNC-Greensboro. He plays the guitar, baritone, clarinet, and saxophone.

87. Mr. McGarry is close to his family and has a younger brother who is also a member of the LGBT community. Mr. McGarry hopes to use his education to eventually go to law school and work to defend people's civil rights.

88. Mr. McGarry is a man.

24

89.     Mr. McGarry is transgender. As is true for Mr. Carcaño, Mr. McGarry's sex assigned at birth was female, as his birth certificate reflects, but that designation does not conform to his gender identity, which is male.

90.     Mr. McGarry has been diagnosed with gender dysphoria.

91.     Mr. McGarry was born and raised in Wilson, North Carolina. Throughout his childhood, Mr. McGarry felt like a boy and never really thought of himself as a girl. It was not until he started to go through puberty that he began to wrestle with the disconnect between his identity as a boy and his assigned birth sex.

92.     Mr. McGarry realized while he was in high school that he is transgender.

93.     In October 2013, during his senior year in high school, Mr. McGarry began mental health treatment with a licensed clinical social worker who diagnosed him with gender dysphoria.

94.     After diagnosing Mr. McGarry with gender dysphoria, his therapist developed a course of treatment in accordance with medical standards for treating the condition.

95.     Consistent with that treatment and his identity, in the fall and winter of 2013, Mr. McGarry explained to his friends and family that he is male and began to use male pronouns.

96.     In April 2014, under the care of an endocrinologist, Mr. McGarry began hormone therapy. This treatment helped alleviate the distress that Mr. McGarry

25

experienced due to the discordance between his birth-assigned sex and his identity and helped him to feel more comfortable with who he is.

97.     By the time he graduated high school in June 2014, Mr. McGarry used the name Payton and male pronouns in all aspects of his life. He is known as Payton McGarry to his family, friends, and peers, although he has not yet changed his legal first name to Payton.

98.     In the fall of 2014, Mr. McGarry enrolled as a freshman at UNC-Greensboro as Payton McGarry and as male.

99.     Since arriving at UNC-Greensboro, Mr. McGarry has identified and has been known to others as male for all purposes.

100.    Mr. McGarry is a member of Phi Mu Alpha Sinfonia, a music fraternity, and previously served as the Vice President of the Iota Epsilon Chapter of that fraternity. His fraternity brothers are aware that he is transgender and have no concerns with his use of men's restrooms and locker rooms.

101.    Although Mr. McGarry currently lives off campus, he is on campus six or seven days per week and always used restrooms designated for men in on-campus buildings prior to the passage of H.B. 2. He also used the locker room facilities at UNC-Greensboro and always used the facilities designated for men before the passage of H.B. 2.

102.    For the year and a half between when he enrolled at UNC-Greensboro and H.B. 2 was passed, Mr. McGarry used the men's restrooms and locker rooms on-campus

26

without incident. Mr. McGarry is unaware of any instance in which any person has complained about his use of the men's restrooms or locker room.

103.     Mr. McGarry works part-time as a visual technician for marching bands at different high schools around the state and regularly uses the restrooms designated as being for men when working as a visual technician. There have been no incidents or, to the best of Mr. McGarry's knowledge, complaints related to his use of the restrooms designated for men.

104.     In addition, when out in public, such as at restaurants and stores, Mr. McGarry always uses men's restrooms.

105.     To Mr. McGarry's knowledge, there are very few single-user restrooms on the UNC-Greensboro campus, and there are no single-user restrooms in many buildings where he has classes.

106.     If Mr. McGarry could not use the men's restrooms at UNC-Greensboro, he would have to search for single-user restrooms outside of the buildings where his classes are held every time he had to use the restroom. This would disrupt his ability to attend class and would interfere with his educational opportunities. Expelling him from the multiple-user restrooms and locker rooms available to all other male students is stigmatizing and marks him as different and lesser than other men.

107.     Since he started testosterone two years ago, Mr. McGarry's voice has deepened and his face and body have become more traditionally masculine in appearance.

108.    Using women's restrooms is not a viable option for Mr. McGarry, just as it would not be a viable option for non-transgender men to be forced to use women's restrooms. Forcing Mr. McGarry to use women's restrooms would also cause substantial harm to his mental health and well-being. It additionally would force him to disclose to others the fact that he is transgender, which itself could lead to violence and harassment.

109.    The idea of being forced into women's restrooms causes Mr. McGarry to experience significant anxiety, as he knows that it would be distressing for him and uncomfortable for others. He fears for his safety because of the passage of H.B. 2 and H.B. 142.

110.    Under H.B. 2, Mr. McGarry was barred from using the men's restrooms on campus, and Mr. McGarry would again be so barred if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142. While H.B. 2 was in force, and prior to the Court's entry of a preliminary injunction, given that Mr. McGarry could not use women's restrooms and there are only a few available single-user restrooms, he often avoided going to the restroom all day.

111.    Some North Carolina government officials have publicly stated that the passage of H.B. 142 maintains H.B. 2's bar on transgender individuals' use of single-sex, multiple-user facilities that match their gender identity. North Carolina government officials have also publicly taken the position that use of the "wrong" restroom could subject transgender individuals to criminal prosecution under trespass laws.

112.     In light of the numerous statements from North Carolina legislators that, under H.B. 142, transgender people are still barred from using restrooms that match their gender, Mr. McGarry reasonably fears being arrested and/or prosecuted for trespass or for some other crime if he uses the men's room in public buildings. Using the women's restroom is not an option for Mr. McGarry, but if he were ever to use the women's restroom in an emergency he would similarly fear arrest given that he is generally perceived to be a non-transgender man.

113.     Since H.B. 142's passage and the Court's lifting of the preliminary injunction against enforcement of H.B. 2 with respect to Mr. McGarry, the University of North Carolina has refused to state whether Mr. McGarry is permitted to use restrooms or other single-sex, multiple-user facilities at UNC that are consistent with his gender identity. The University of North Carolina and its constituent institutions are expressly forbidden by H.B. 142 from regulating access to restrooms or other single-sex, multiple-user facilities. As a result, Mr. McGarry is deterred from using UNC facilities that are consistent with his gender identity, and cannot use the women's facilities. Consequently, he sometimes limits his use of restrooms at UNC altogether.

114.     Violating school policy or state law is grounds for expulsion at the University of North Carolina. Because Mr. McGarry does not know if using the men's restroom constitutes an enforceable violation, he is afraid that using the men's restroom could put his educational future in jeopardy. He also cannot use the women's restroom.

This means that he is unable to safely use a multi-user facility on campus without fear of expulsion or other civil or criminal consequences.

115.    Mr. McGarry has also visited public agencies as defined by N.C. Gen. Stat. § 143-760, and intends to and will do so in the future. Both H.B. 2 and H.B. 142 cause Mr. McGarry to fear using the restroom in public buildings and he often takes steps to avoid restroom use altogether in such buildings because of H.B. 142 and, before it, H.B. 2.

116.    Mr. McGarry has visited the Division of Motor Vehicles of the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's license) and anticipates doing so again in the future. He was banned from using men's restrooms under H.B. 2, and is deterred from doing so under H.B. 142.

117.    Mr. McGarry also has used and will continue to use the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation. He will need to continue to use those restrooms in the future, but was banned from using men's restrooms under H.B. 2 and is deterred from doing so under H.B. 142.

118.    Under H.B. 142, the Division of Motor Vehicles, and the Department of Transportation—like all other state agencies and local governments—are forbidden from regulating access to restrooms or other single-sex, multiple-user facilities. All of this deters Mr. McGarry from use of the appropriate restroom when he visits facilities controlled by these or other state agencies. This legal uncertainty causes Mr. McGarry

anxiety when he must use a restroom at these state agencies. He often avoids all restroom use in government buildings as a result.

119.    Mr. McGarry is aware that the City of Greensboro has expressly prohibited discrimination in housing on the basis of sexual orientation and gender identity, and that it could expressly prohibit such discrimination in other contexts as well, including with respect to restrooms and other single-sex, multiple-user facilities.

120.    Mr. McGarry regularly frequents places of public accommodation, such as restaurants and stores, in Greensboro. He would accordingly benefit from the protections of anti-discrimination ordinances. Under H.B. 142, however, Mr. McGarry is deprived of the protections of such ordinances and is prevented from advocating for such protections before local government bodies.

121.    With the passage of H.B. 2 and H.B. 142, Mr. McGarry is also limited in his ability to increase non-discrimination protections for LGBT people in Greensboro and elsewhere in North Carolina. Were these localities able to enact such protections, Mr. McGarry would advocate for local ordinances that prohibit discrimination in employment and public accommodations based on sexual orientation and gender identity in Greensboro and other North Carolina jurisdictions.

122.    **Plaintiff Hunter Schafer** is a recent graduate of the University of North Carolina School of the Arts High School ("UNCSA-HS"). The oldest of four children, she is close to her family, who love and support her. She is an accomplished artist and studied visual arts at UNCSA-HS.

31

123.    Ms. Schafer is a young woman.

124.    Until the passage of H.B. 2, Ms. Schafer was recognized as a girl at school and when out in public.

125.    Ms. Schafer is transgender. She was assigned the sex of male at birth, as her birth certificate reflects, but that designation does not accurately reflect her gender identity, which is female.

126.    Ms. Schafer has been diagnosed with gender dysphoria.

127.    Ms. Schafer was born in New Jersey but moved to North Carolina when she was 11 years old. From as young an age as two or three, Ms. Schafer gravitated towards clothing and toys generally associated with girls. Like many other girls, she would always want to wear pink princess dresses at pre-school and to play with Barbie dolls.

128.    After completing pre-school, Ms. Schafer did not feel comfortable expressing her identity as a girl and tried to immerse herself in traditionally masculine spaces and activities. She tried to do things that she felt she was supposed to do as a boy. But nothing felt right.

129.    Starting in seventh grade, Ms. Schafer again began to gravitate toward clothes and activities that were considered more feminine.

130.    By eighth grade, Ms. Schafer again began to express a more stereotypically feminine gender and at times would wear makeup and high-heeled shoes at school.

131.     As puberty began to approach in ninth grade, severe gender dysphoria and anxiety began to hit Ms. Schafer, and she experienced significant distress around her body and identity. She finally went to her parents, who recognized that she was suffering.

132.     In ninth grade, Ms. Schafer began therapy with an expert on treating transgender young people and was diagnosed with gender dysphoria.

133.     In 2013, Ms. Schafer started high school at Broughton High School in Raleigh. In the middle of her freshman year, Ms. Schafer began hormone blockers to prevent the onset of male puberty and the development of secondary sex characteristics associated with men. This treatment delayed puberty while Ms. Schafer continued to understand her female identity. Though Ms. Schafer continued to experience some distress and dysphoria, the hormone blockers greatly reduced her suffering.

134.     At the end of ninth grade, Ms. Schafer felt fully comfortable embracing her identity as a girl at school and had the full support of her parents. On the last day of school of her freshman year, Ms. Schafer wore a skirt to school that her mother had purchased for her. It was an important and symbolic turning point in her comfort with and embrace of her identity as a girl.

135.     By sophomore year, Ms. Schafer was perceived as a girl and began to use the girls' bathrooms at school and in public. She was also known by this time by female pronouns such as she, her, and hers.

136.    During her sophomore year, Ms. Schafer was elected to the Queen's Court at her school, an honor that had, in the seventy-five years of the tradition, been bestowed only on non-transgender girls.

137.    Under the care of her endocrinologist, during her sophomore year in high school, Ms. Schafer continued to assess her medical treatment for gender dysphoria and began to consider hormone replacement therapy. At the end of her sophomore year, in the spring of 2015, Ms. Schafer began estrogen therapy to continue her medical transition. Ms. Schafer never underwent puberty as a boy.

138.    An accomplished visual artist, Ms. Schafer applied to the UNCSA-HS for her junior year and was accepted.

139.    In the fall of 2015, Ms. Schafer moved to Winston-Salem to attend UNCSA-HS as a boarding student. She studied visual arts there and aspires to a career in fashion.

140.    Ms. Schafer lived in the girls' dormitory at UNCSA-HS.

141.    Until the passage of H.B. 2, Ms. Schafer exclusively used the girls' or women's restrooms at school and could not imagine ever using a restroom designated for boys or men. Ms. Schafer is unaware of any instance in which any person complained about her use of the women's restrooms.

142.    In addition, when out in public, such as at restaurants and stores, Ms. Schafer uses the restrooms designated for women and girls.

34

143.    Outside of Ms. Schafer's dorm room, there were no single-user restrooms available to her at UNCSA-HS in the spring semester of 2016, and it was disruptive to her education to have to avoid the use of the restroom or to return to her room or locate a single-user restroom off campus every time she needed to go to the restroom. Ms. Schafer was also unaware of any single-user restrooms that were readily available to her in all the buildings where she had class in the fall semester of 2016 or spring semester of 2017.

144.    Forcing Ms. Schafer out of spaces shared with her female peers is stigmatizing and marked her as different and lesser than other girls and young women at school.

145.    Particularly because she never went through puberty as a boy and began estrogen treatment beginning in 2015, Ms. Schafer has a traditionally feminine appearance. She is recognized as female in all aspects of her life.

146.    Using boys' or men's restrooms is not a viable option for Ms. Schafer, just as it would not be a viable option for non-transgender women and girls to be forced to use restrooms designated for men and boys. Forcing Ms. Schafer to use restrooms designated for men and boys would also cause substantial harm to her mental health and well-being and would put her in danger of harassment and violence. It would also force her to disclose to others the fact that she is transgender, which itself could lead to violence and harassment. Given that she is perceived to be a non-transgender woman in all aspects of her life, use of a boys' or men's restroom could also lead to someone calling the police and her arrest.

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 35 of 104

147. The idea of being forced into restrooms designated for boys and men at school and in public has caused Ms. Schafer to experience significant anxiety and brings up painful memories and anxiety from her earlier childhood. She has feared for her safety because of the passage of H.B. 2 and H.B. 142.

148. Some North Carolina government officials have publicly stated that the passage of H.B. 142 maintains H.B. 2's bar on transgender individuals' use of single-sex, multiple-user facilities that match their gender identity. North Carolina government officials have also publicly taken the position that the use of the "wrong" restroom could subject transgender individuals to criminal prosecution under trespass laws.

149. In light of the numerous statements from North Carolina legislators that, under H.B. 142, transgender people are still barred from using restrooms that match their gender identity, Ms. Schafer reasonably fears being arrested and/or prosecuted for trespass or for some other crime if she uses the women's room in public buildings. Though using a men's restroom is not an option for her, she would similarly fear arrest if she used a men's restroom given that she is generally perceived to be a non-transgender woman.

150. After H.B. 2 was passed, Ms. Schafer limited or delayed use of restrooms in public buildings because of fear of reprisals if she used restrooms designated for women and girls and because she feared for her safety if she used restrooms designated for men and boys, as the law required.

151.     Ms. Schafer has also visited public agencies as defined by N.C. Gen. Stat. § 143-760, and intends to and will do so in the future. Both H.B. 2 and H.B. 142 cause Ms. Schafer to fear using the restroom in public buildings and she has often taken steps to avoid restroom use altogether in such buildings because of H.B. 142 and, before it, H.B. 2.

152.     Ms. Schafer has visited the Division of Motor Vehicles of the North Carolina Department of Transportation on prior occasions (*e.g.*, to obtain a driver's license) and anticipates doing so again in the future. She was banned from using the women's restroom under H.B. 2 and is deterred from doing so under H.B. 142.

153.     Ms. Schafer has used and will continue to use the North Carolina Rest Area System, which maintains public restrooms along highways and is operated by the North Carolina Department of Transportation. She will need to continue to use those restrooms in the future, but she was banned from using women's restrooms under H.B. 2 and is deterred from doing so under H.B. 142.

154.     Under H.B. 142, the Division of Motor Vehicles, and the Department of Transportation—like all other state agencies and local governments—are forbidden from regulating access to restrooms or other single-sex, multiple-user facilities. All of this deters Ms. Schafer from use of the appropriate restroom when she visits facilities controlled by these or other state agencies and she cannot use the men's facilities. This legal uncertainty causes Ms. Schafer anxiety about using a restroom at these state agencies and as a result she often avoids restroom use altogether.

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 37 of 104

155.    Ms. Schafer has regularly frequented places of public accommodation, such as restaurants and stores, in Raleigh, where her family resides. She would accordingly benefit from the protections of anti-discrimination ordinances. Under H.B. 142, however, Ms. Schafer is deprived of the protections of such ordinances and is prevented from advocating for such protections before local government bodies.

156.    With the passage of H.B. 2 and H.B. 142, Ms. Schafer is also limited in her ability to increase non-discrimination protections for LGBT people in Raleigh and elsewhere in North Carolina. Were these localities able to enact such protections, Ms. Schafer would advocate for local ordinances that prohibit discrimination in employment and public accommodations based on sexual orientation and gender identity in Raleigh and other North Carolina jurisdictions.

157.    **Plaintiff Madeline Goss** is a resident of Raleigh, North Carolina. Ms. Goss was born in Hickory, North Carolina, and has lived most of her life in the state. She is a devoted parent to her 11-year-old daughter, and enjoys teaching TaeKwonDo.

158.    Ms. Goss is a woman.

159.    Ms. Goss is transgender. Ms. Goss's sex assigned at birth was male, but she recalls knowing that she was female since her earliest memories as a child.

160.    Ms. Goss had made efforts to transition earlier in life, but it took until 2006 for her to develop the support network she needed to begin living consistent with her life-long gender identity as a woman.

38

161.    Ms. Goss was diagnosed with gender dysphoria (then known as gender identity disorder) in 2006. By 2007, Ms. Goss had begun hormone therapy and was living as a woman full-time. Ms. Goss had sex reassignment surgery in 2011.

162.    Ms. Goss has updated her identity documents to reflect her female name and gender, including her driver's license, social security card, birth certificate, and passport.

163.    Ms. Goss lives as a woman in all aspects of her life. Ms. Goss uses women's restrooms in privately owned buildings, such as at restaurants and stores, and at her job.

164.    There have been no incidents or, to the best of Ms. Goss's knowledge, complaints related to her use of restrooms designated for women in these non-government buildings.

165.    Ms. Goss accesses public buildings governed by H.B. 142 on a regular basis. For example, Ms. Goss travels to visit family in western North Carolina approximately two to three times a year, and she uses public restrooms along the highways that are operated by the North Carolina Department of Transportation. Ms. Goss also has lobbied the legislature and visited the General Assembly building approximately six or seven times in the last year on behalf of the ACLU and Equality North Carolina, and she intends to continue doing so in the coming year. Some visits to the General Assembly last the better part of the day, making it impossible to participate

39

without using a restroom. Ms. Goss is not aware of any single-user restrooms in any of those public buildings.

166.    Although Ms. Goss was not prohibited by H.B. 2 from using women's restrooms in public buildings, because her birth certificate lists her gender as female, the law felt like an invitation for others to discriminate against transgender people, and that made her feel more worried about her safety.

167.    H.B. 142 has made her situation feel even more unsafe, however, since the law creates significant uncertainty about her right to access women's restrooms in public buildings. Ms. Goss fears that H.B. 142's targeted discrimination against transgender people invites others to single her out for discrimination, harassment, or worse yet, possible violence. The law leaves her with the frightening feeling that anything could happen when she uses a restroom in a public building, and she worries that she might need to defend herself from an attack.

168.    In light of the numerous statements from North Carolina legislators that, under H.B. 142, transgender people are barred from using restrooms that match their gender, Ms. Goss reasonably fears being arrested and/or prosecuted for trespass or for some other crime if she uses the women's room in public buildings. Though using a men's restroom is not an option for her, she would similarly fear arrest if she used a men's restroom given that she is generally perceived to be a non-transgender woman.

169.    Ms. Goss also knows how important local non-discrimination ordinances are to address discrimination against transgender people in private employment and

40

public accommodations, including with respect to the use of single-sex, multiple-user facilities. For example, when Ms. Goss transitioned, she was required for several months to go up three flights of stairs to use the female restroom of a different company – an indignity that she would have been spared had non-discrimination protections existed.

170.    Ms. Goss is aware that the governments of Carrboro, Chapel Hill, and Orange County, where she visits shops and restaurants, have regularly monitored local and state consideration of, respectively, ordinances and statutes that would, *inter alia*, prohibit discrimination in employment and public accommodations on the basis of sexual orientation and gender identity. Ms. Goss is informed and believes, and on that basis alleges, that Carrboro, Chapel Hill, and Orange County would pass such ordinances if they were legally permitted to under H.B. 142. Under H.B. 142, however, Ms. Goss is deprived of the protections of such ordinances, and is limited in her ability to increase and benefit from non-discrimination protections. Were she able to, Ms. Goss would advocate for local ordinances that prohibit discrimination based on sexual orientation and gender identity.

171.    Ms. Goss is a member of the ACLU of NC.

172.    **Plaintiff Angela Gilmore** is a resident of Durham, North Carolina. Ms. Gilmore has lived in North Carolina since 2011, when she moved from Florida to take a job at North Carolina Central University. She is currently the Associate Dean for Academic Affairs and Professor of Law at North Carolina Central University.

41

173.    Ms. Gilmore is a lesbian, and has been in a relationship with her wife, Angela Wallace, for almost twenty years. Ms. Gilmore and Ms. Wallace were married in Washington, D.C. in 2014.

174.    Ms. Gilmore looked for and accepted a job in North Carolina, after she and her wife fell in love with the state during a visiting teaching job Ms. Gilmore had at Elon University School of Law in Greensboro, North Carolina, in 2010.

175.    Both Ms. Gilmore and her wife, African American lesbians, felt that North Carolina, and Durham in particular, was a place where they could be fully themselves, comfortable in terms of both their race and sexual orientation.

176.    Ms. Gilmore and her wife love living in Durham, and they feel very much part of the community. Prior to the passage of H.B. 2, they had been looking at small towns in North Carolina where they might want to retire.

177.    Since moving to North Carolina, Ms. Gilmore has worked towards increasing non-discrimination protections for LGBT people. Ms. Gilmore is a member of the ACLU of NC, and she was on the ACLU of NC board between 2014 and 2015. During that time, the ACLU of NC actively worked to defeat anti-LGBT bills proposed in the state legislature and to pass local ordinances, like the Charlotte Ordinance, to protect LGBT people from discrimination at the local level. Ms. Gilmore also has spoken on panels at her law school and other law schools regarding non-discrimination protections for LGBT people.

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 42 of 104

178.    The passage of H.B. 2 and H.B. 142 have caused Ms. Gilmore and her wife distress, in that it has significantly undone their sense of belonging and value in the state, which is why they moved to North Carolina. Ms. Gilmore and her wife experience H.B. 2 and H.B. 142 as sending a clear message to them as lesbians that they are not welcome in North Carolina.

179.    Ms. Gilmore and her wife have visited the City of Charlotte and they plan to do so in the future. As two women traveling together with the same first name, they are often asked about the nature of their relationship, and they therefore regularly reveal themselves to be a lesbian couple. Under the Charlotte Ordinance, Ms. Gilmore and her wife would have been protected from sexual orientation discrimination in public accommodations in the city. With the passage of H.B. 2, the repeal of the Charlotte Ordinance as part of an effort to obtain a "clean repeal" of H.B. 2, and then the passage of H.B. 142, which bars reenactment of an ordinance similar to the Charlotte Ordinance until at least December of 2020, Ms. Gilmore worries that she and her wife will now be exposed to discrimination based on their sexual orientation.

180.    With the passage of H.B. 2 and H.B. 142, Ms. Gilmore also is limited in her ability to increase and benefit from non-discrimination protections for LGBT people in North Carolina. Were she able to, Ms. Gilmore would continue to advocate for local ordinances that prohibit discrimination based on sexual orientation and gender identity.

181.    As a non-transgender woman who always uses the facilities designated for women in both public and private spaces, Ms. Gilmore does not feel safer in these facilities because of the passage of H.B. 2 and H.B. 142.

182.    **Plaintiff Quinton Harper** is a resident of Carrboro, North Carolina.

183.    Mr. Harper is a bisexual man.

184.    Mr. Harper was born in Snow Hill, North Carolina, and moved to the Research Triangle area in 2003 to pursue his undergraduate education. Mr. Harper studied journalism and political science at UNC-Chapel Hill, where he received the Martin Luther King, Jr. Award for his service and leadership in the National Black AIDS Mobilization Movement. After leaving for a few years to work as an HIV/AIDS activist, Mr. Harper returned in 2009 to the state he will always consider home, and became a Carrboro resident.

185.    As a young African-American man, Mr. Harper has long been moved by the HIV epidemic that he saw disproportionately ravaging his community. He first worked for the Black AIDS Institute in Los Angeles, California, and became a leader in the National Black AIDS Mobilization Movement. He became a community organizer for the North Carolina AIDS Action Network upon moving back to North Carolina, before accepting his current position as Field Director with Democracy North Carolina.

186.    Active participation in the political system is a long-held ethic for Mr. Harper, who volunteered for his first political campaign when he was in high school. He also is engaged in the administration of local government, serving on two municipal

boards. He is a member of the Carrboro Human Services Commission, which advises the Board of Alderman on funding requests from non-profit agencies, and previously served as a board member for the Orange County Water and Sewer Authority. In addition, he previously served as the campaign manager for a Carrboro Board of Aldermen candidate; he is playing this role again in the current election cycle for another Carrboro Board candidate.

187.    Mr. Harper came out as bisexual while in high school in Snow Hill, where he was surrounded by supportive, diverse fellow students. He has experienced first-hand how important it is to be able to live as one's authentic self, without fear of reprisal or discrimination, so that one can thrive and contribute fully to the community.

188.    Mr. Harper knows through his work for the LGBT community that bias against lesbians, gay men, and bisexuals and against transgender individuals is entrenched. For example, he routinely encountered lesbian, gay, and bisexual people through his work with the North Carolina AIDS Action Network who had experienced discrimination based on their sexual orientation, and significant numbers of transgender people who were chronically unemployed because of pervasive anti-transgender bias among prospective employers. Mr. Harper himself worries that he will be exposed to discrimination in public accommodations based on his sexual orientation.

189.    Mr. Harper views local non-discrimination ordinances as a critical tool to help address the widespread discrimination affecting the LGBT community, and an important part of signaling to LGBT people that their local government values and

45

supports them. This is especially the case in the wake of H.B. 2 and H.B. 142, which Mr. Harper experiences as communicating that LGBT people are not welcome in North Carolina. In particular, Mr. Harper experienced the adoption of H.B. 142 as North Carolina leaders placing political interests above the inherent dignity of their fellow North Carolinians. Carrboro's motto is "feel free," but Mr. Harper feels like that motto will ring hollow as long as LGBT residents lack the local protection to be free from discrimination.

190.    Mr. Harper is aware that the governments of Carrboro (the town in which he resides), Chapel Hill (a city he visits frequently), and Orange County (which encompasses both Carrboro and Chapel Hill) have regularly monitored local and state consideration of, respectively, ordinances and statutes that would, *inter alia*, prohibit discrimination in employment and public accommodations on the basis of sexual orientation and gender identity. Mr. Harper is informed and believes, and on that basis alleges, that Carrboro, Chapel Hill, and Orange County would pass such ordinances if they were legally permitted to under H.B. 142.

191.    Mr. Harper regularly frequents places of public accommodation, such as restaurants and stores, in Carrboro, Chapel Hill, and Orange County. He would accordingly benefit from the protections of such anti-discrimination ordinances in those jurisdictions. Under H.B. 142, however, Mr. Harper is deprived of the protections of such ordinances.

192. Mr. Harper also is limited in his ability to increase and benefit from non-discrimination protections. Mr. Harper has long worked to protect LGBT people from discrimination, for example serving as a field organizer in the campaign that sought to defeat an amendment to the North Carolina Constitution banning marriage for same-sex couples. Were he able to, Mr. Harper would advocate for local ordinances that prohibit discrimination based on sexual orientation and gender identity.

193. As a non-transgender man who always uses the facilities designated for men in both public and private spaces, Mr. Harper does not feel safer in these facilities because of the passage of H.B. 2 or H.B. 142.

194. Mr. Harper is a member of the ACLU of NC.

**B.** **The City of Charlotte's Enactment of a Non-Discrimination Ordinance.**

195. Advocates have long worked for the passage of an ordinance that would ensure that LGBT people were expressly protected from discrimination within the City of Charlotte.

196. There was again extensive discussion and deliberation leading up to the February 2016 vote on the Charlotte Ordinance. The Charlotte City Council heard hours of robust public comment in a forum that included hundreds of people—both those who supported and opposed the Charlotte Ordinance. The Charlotte City Council also received significant legal analysis from the Office of the City Attorney regarding its authority to enact the Ordinance and the effect of the Ordinance.

47

197.     The impetus for the Charlotte Ordinance was the reality that LGBT people often face pervasive discrimination. Although same-sex couples may now marry throughout the United States as a result of the U.S. Supreme Court's ruling in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), lesbian, gay, and bisexual people remain vulnerable to discrimination in states like North Carolina where there is no express protection against sexual orientation discrimination in state law, making local anti-discrimination protections even more vital. Discrimination is especially pervasive for transgender people who face disproportionately high levels of harassment, discrimination, and violence in all aspects of life.

198.   A national report of transgender individuals across the country – the Report of the 2015 U.S. Transgender Survey, issued in December 2016 – found that 30% of respondents who had a job in the prior year reported being fired, denied a promotion, or experiencing some other form of mistreatment related to their gender identity or expression, and more than three-quarters (77%) of respondents who had a job in the prior year took steps to avoid mistreatment in the workplace, such as hiding or delaying their gender transition or quitting their job. Nearly half (46%) of respondents were verbally harassed in the prior year because of being transgender, while nearly one in ten (9%) respondents were physically attacked in the prior year because of their being transgender. Furthermore, nearly half (47%) of respondents were sexually assaulted at some point in their lifetime and one in ten (10%) were sexually assaulted in the prior year. Of the respondents who visited a place of public accommodation where staff or employees

48

thought or knew they were transgender, nearly one-third (31%) experienced at least one type of mistreatment in the prior year in a place of public accommodation, including 14% who were denied equal treatment or service, 24% who were verbally harassed, and 2% who were physically attacked because of their being transgender.

199.   In 2013, it was estimated that there were more than 250,000 LGBT adults in North Carolina, of whom an estimated 15,600 were transgender individuals age 13 to 19 years old. A 2016 report estimated that there are approximately 44,750 transgender adults living in North Carolina. While transgender individuals make up only a small minority of the population, they are disproportionately targeted for hate crimes in the United States.

200.   On Monday, February 22, 2016, by a 7-to-4 vote, the Charlotte City Council approved the Charlotte Ordinance, which, *inter alia*, amended its existing public accommodations protections by adding a ban on discrimination in public accommodations based on "gender identity, gender expression" and "sexual orientation."

201.   The City Council's vote was met with a firestorm of opposition from vocal opponents to the part of the Charlotte Ordinance that would have required certain public accommodations to allow transgender people to use single-sex, multiple-user facilities, such as restrooms and locker rooms that accord with their gender identity.

202.   Opponents of the Charlotte Ordinance distorted the truth of what the Ordinance's non-discrimination requirement would accomplish and formed a vocal campaign decrying a purported attempt to permit "men in women's restrooms."

49

C.    **The Events Leading to H.B. 2, Contemporary Statements by Decision Makers, and Departures From the Normal Legislative Process Revealed a Series of Official Actions Taken for Invidious Purposes.**

203.    The State of North Carolina (the "State") has rarely, if ever, exercised authority to preempt local ordinances providing broader protections than under State law. For example, in 1968 Charlotte adopted an ordinance prohibiting discrimination in public accommodations on the basis of race, color, religion, and national origin. In 1972, the Council amended that ordinance to prohibit discrimination based on sex, which the Council further modified in 1985.

204.    Even though all of these protections extended beyond the reach of the State's public accommodations law, which until H.B. 2 prohibited only public accommodations discrimination based on disability, the State allowed Charlotte's ordinance to stand undisturbed for decades. It was only after Charlotte took steps to protect LGBT people that the State rushed to preempt the ordinance.

205.    Even before the Charlotte City Council had cast its vote on the Charlotte Ordinance, Gov. McCrory informed Charlotte City Council members that the State would likely take immediate action to put a halt to the Charlotte Ordinance—even as Gov. McCrory conceded that was an exceedingly unusual step. In an email to Charlotte City Council members, Gov. McCrory noted that he "made a point as the former 14 year Mayor and current Governor to stay out of specific issues being voted on by the Charlotte City Council." Gov. McCrory nonetheless characterized the Charlotte Ordinance's non-discrimination protections for LGBT people as "changing basic long-established values

and norms" surrounding "public restrooms," and he ominously warned of "possible danger from deviant actions by individuals taking improper advantage of a bad policy." Gov. McCrory said that the Charlotte Ordinance would "most likely cause immediate State legislative intervention which I would support as governor."

206.    On Tuesday, February 23, 2016, Speaker Moore issued a press release announcing that he would work with fellow Republicans to explore a "legislative intervention to correct [Charlotte's] radical course."

207.    In North Carolina, it is the state's Governor who typically calls a special session but, in this case, Gov. McCrory refused to call a special session because he was concerned that the legislature would go beyond addressing the Charlotte Ordinance.

208.    As a result of Gov. McCrory's refusal to call a special session, legislative leaders opted for a rarely used law that allows special sessions when three-fifths of legislators in both chambers support the call. That provision in the state constitution had not been used since 1981, according to Lt. Governor Dan Forest's chief of staff, Hal Weatherman. The special session cost approximately $42,000 to convene.

209.    The text of H.B. 2, which was named the "Public Facilities Privacy and Security Act," was not shared with most legislators until they arrived to debate the bill.

210.    North Carolina House of Representatives Minority Leader Larry Hall ("Minority Leader Hall") stated "We don't know what we're discussing here, we don't know what we're voting on. *What we're doing is a perversion of the process*."

51

211.    Minority Leader Hall said that Democrats were initially told that the special session would take place on Thursday, March 24, 2016, when instead the special session was held on March 23, 2016. Minority Leader Hall stated that, as a result, a number of legislators were "caught off guard" and were "scrambling to try to come back" for the session.

212.    The special session, which lasted a single day, was substantially shorter than previous special sessions. Before H.B. 2 had been filed, Speaker Moore announced that the committee hearing for the bill would begin five minutes after introduction of the bill and adjournment of the morning session. Shortly thereafter, and approximately twelve minutes after the House came to order, H.B. 2 was filed—the first time it was officially made available to the public or most legislators.

213.    Approximately three minutes after H.B. 2 was filed, the chairman of the House Judiciary IV Committee—the committee to which H.B. 2 was assigned—stated, in response to a fellow member's question, that it was his "intention" to permit time for public comment on the bill during the committee hearing. Plaintiffs are informed and believe, and on that basis allege, that no prior public notice of the time and place for public comment on H.B. 2 was provided.

214.    Only forty-five minutes were allotted for public comment, which was insufficient to permit those who had signed up to speak on H.B. 2 to be heard.

215.    In response to complaints during the committee hearing that members had

not been given an opportunity to read the text of H.B. 2, the chairman permitted a five-

minute break to allow members to read the bill.

216.    After a favorable referral from the House Judiciary IV Committee, H.B. 2

received only three hours of debate in the House, after which it was passed and referred

to the Senate.

217.    The roll call for H.B. 2 in the Senate was called after all Democratic

members of the Senate walked out of the chambers in protest, with North Carolina State

Senate Democratic Leader Dan Blue calling the special session an "affront to democracy"

and stating that the Democratic caucus in the Senate "choose[s] not to participate in this

farce." With every Democratic member absent, the Senate passed H.B. 2 unanimously.

218.    Comments made by lawmakers both during the debate, in the press, and

through their social media used vitriolic language to make clear their aim at undoing

Charlotte's protections for LGBT people:

        a.    Descriptions of the legislature's work by North Carolina State

Senate President Pro Tempore Phil Berger ("Sen. Berger") included:

                i.    "Senate unanimously votes to stop radical ordinance allowing

men into public bathrooms with women and young girls."

                ii.    "Lawmakers were forced to come back to session to address

the serious safety concerns created by the dangerous ordinance—which violated existing

state criminal trespass law, indecent exposure law and building codes and created a

53

loophole that any man with nefarious motives could use to prey on women and young children. . . ."

            iii.       "How many fathers are now going to be forced to go to the ladies' room to make sure their little girls aren't molested?"

        b.       North Carolina State Senator Buck Newton said, "The Charlotte City Council should have never passed this unlawful and reckless bathroom and locker room ordinance. Politics have reached a new extreme when a municipality's top priority is allowing men into women's bathrooms and locker rooms. But tens of thousands of our constituents from across the state have called on us to stand up to the political correctness mob, fight for common sense and put a stop to this nonsense once and for all."

        c.       North Carolina State Senator David Curtis ("Sen. Curtis") said, "This liberal group is trying to redefine everything about our society. Gender and marriage — just the whole liberal agenda." Sen. Curtis added that, while "[w]e generally don't get involved in local politics[,] [w]e need to do what's right." Sen. Curtis said that H.B. 2 was necessary because, "The gays would go into a business, make some outrageous demand that they know the owner cannot comply with and file a lawsuit against that business owner and put him out of business." Sen. Curtis suggested that H.B. 2 was broadly drafted specifically for the purpose of defending its restroom provision in court: "[w]e feel like we can successfully defend the law and the fact that we made the law much broader," explaining that "[i]n addition to the bathroom issue we restricted the

rights of cities and towns to impose a higher minimum wage. The bill has to do with restricting rights of cities and counties. I suspect we will defend it based on that."

d.    North Carolina State Senator Andrew Brock said, "You know, $42,000 is not going to cover the medical expenses when a pervert walks into a bathroom and my little girls are in there."

e.    Speaker Moore said, "They want to protect adults who feel compelled to dress up like the opposite sex. I, on the other hand, oppose the ordinance to protect children, who from the time they've been potty trained, know to go into the bathroom of their god given appropriate gender. Honestly, it's ridiculous we are even having this discussion. I look forward to invalidating this ordinance as soon as possible."

f.    North Carolina State Representative Mark Brody ("Rep. Brody") said Charlotte's ordinance "violates my Christian values and it violates decency values," adding that he "had to stop it." Rep. Brody further stated that "[t]he homosexual community has just stepped too far and that had to stop and that's my basic opinion," noting that "[t]his is driven by the homosexual community and they're emboldened by their victory in the courts on homosexual marriage." Rep. Brody elaborated further that H.B. 2 "sends a message to these municipalities who have been taken over by the liberal, homosexual, prohomosexual ideology that we are going to stick up for traditional values and we'll stick up for them constantly if that's what we have to do."

g.    North Carolina State Representative John Blust opined that he "think[s] it's ridiculous that your anatomy isn't what governs what restroom you use,"

adding that he does not "understand why they have to make way for this .0001 percent of the population."

219. Debate in both chambers of the North Carolina General Assembly focused specifically on reversing the Charlotte Ordinance, with lawmakers in both chambers condemning the anti-discrimination protections for LGBT people, including provisions protecting transgender individuals' right to use facilities in accordance with their gender identity.

220. Fewer than 10 hours after it was introduced, H.B. 2 passed both houses. Gov. McCrory signed the bill that same night, issuing a signing statement making clear once again that H.B. 2 targets transgender people, whose gender identity North Carolina disrespects. His signing statement said, "This radical breach of trust and security under the false argument of equal access not only impacts the citizens of Charlotte but people who come to Charlotte to work, visit or play. This new government regulation defies common sense and basic community norms by allowing, for example, a man to use a woman's bathroom, shower or locker room." H.B. 2 took effect immediately.

221. Following the enactment of H.B. 2, Gov. McCrory issued Executive Order No. 93, dated April 12, 2016. Among other provisions, the order affirmed that "[u]nder current law, every multiple occupancy restroom, locker room, or shower facility located in a cabinet agency must be designated for and only used by persons based on their biological sex," and that "restrooms, locker rooms, and shower facilities in public buildings, including our schools" would be maintained by the State "on the basis of

56

biological sex." In a press release and video statement accompanying Executive Order

No. 93, the governor stated that the Executive Order "[m]aintains . . . gender-specific

restroom and locker room facilities in government buildings and schools."

222.    Executive Order No. 93 also required that N.C. Gen. Stat. § 143-760 (H.B.

2, Section 1.3) be interpreted consistent with the following guidance: "[w]hen a private

entity leases State real property and the property in the lessee's exclusive possession

includes multiple occupancy restrooms, locker rooms or other like facilities, the private

entity will control the signage and use of these facilities."

> **D.**    **H.B. 2 Is Replaced By H.B. 142—Another Law Whose Legislative History Establishes That It Was Enacted For The Same Invidious Purposes.**

223.    H.B. 2's rank discrimination generated an immense public backlash against

the state.

a.    In July 2016, the National Basketball Association announced that it

was withdrawing the February 2017 NBA All-Star Game from Charlotte, in protest over

H.B. 2.

b.    As a result of H.B. 2, the states of California, Connecticut,

Minnesota, New York, Vermont, and Washington, and numerous cities, including

Atlanta, Los Angeles, Baltimore, New York City, Portland (Oregon), Salt Lake City, San

Francisco, Seattle, and, Washington, D.C. barred publicly-funded travel to North

Carolina.

c.    The Associated Press estimated in March 2017 that H.B. 2 cost North Carolina over $3.76 billion in total lost economic activity.

224.    Gov. McCrory lost the November 2016 North Carolina gubernatorial election to Gov. Cooper.

225.    In a victory speech delivered in early December, then-Governor-Elect Cooper announced his intention to secure the repeal of H.B. 2.

226.    Plaintiffs are informed and believe, and on that basis allege, that, even before his inauguration, then-Governor-Elect Cooper attempted to negotiate with members of the North Carolina General Assembly and the Charlotte City Council to effect the repeal of H.B. 2.

227.    On December 19, 2016, without public notice, and as part of an apparent deal to secure the repeal of H.B. 2, the Charlotte City Council repealed the non-discrimination provisions of the Charlotte Ordinance as well as other provisions of city law that had been pre-empted by H.B. 2. In a resolution, the Charlotte City Council noted that H.B. 2 had "preempted the City's authority to enact ordinances th[at] prohibit discrimination and invalidated the City's non-discrimination ordinance."

228.    The Charlotte City Council's perception that the repeal of the Charlotte Ordinance was linked to repeal of H.B. 2 is evident from the face of its December 19, 2016 enactment, which stated that repeal of the Charlotte Ordinance was made conditional on the explicit repeal of H.B. 2: "[S]hould S.L. 2016-3 not be repealed in its entirety by December 31, 2016, this ordinance shall not be valid."

58

229.    Following the Charlotte City Council's vote, then-Governor-Elect Cooper issued a statement outlining his understanding of the proposed arrangement:

> Senate Leader Phil Berger and House Speaker Tim Moore assured me that as a result of Charlotte's vote, a special session will be called for Tuesday to repeal HB 2 in full. I hope they will keep their word to me and with the help of Democrats in the legislature, HB 2 will be repealed in full.

230.    That same day, Sen. Berger and Speaker Moore issued a joint statement that "For months, we've said if Charlotte would repeal its bathroom ordinance that created the problem, we would take up the repeal of HB2."

231.    In response to the Charlotte City Council's repeal bill, Gov. McCrory also promised to call a special session of the legislature to repeal H.B. 2, noting that he had promised to do so if the Charlotte Ordinance were repealed: "I promised months ago if the Charlotte ordinance was repealed I would call our general assembly into special session to reconsider existing state legislation passed earlier this year and I'm doing just that for this Wednesday."

232.    Gov. McCrory called a special session of the legislature, to convene on December 21, 2016, with the sole purpose of repealing H.B. 2.

233.    In the morning before the special session was convened, in response to criticisms that its December 19, 2016 enactment did not sufficiently repeal the Charlotte Ordinance, the Charlotte City Council convened to enact a new law that repealed the Charlotte Ordinance in its entirety.

234.    On December 21, the North Carolina General Assembly convened in a special session with the sole purpose of repealing H.B. 2.

59

235.    During the special session, a bill (S.B. 3) was introduced by North Carolina State Senator Jeff Jackson that would have repealed H.B. 2, without more. The "clean repeal" bill was referred to a committee, where it was never considered.

236.    The legislature subsequently adjourned without repealing H.B. 2.

237.     Gov. Cooper assumed office on January 1, 2017.

238.    The 2017 regular session of the General Assembly began January 11, 2017.

239.    From the time he assumed office until the present, Gov. Cooper has failed to amend or rescind Executive Order No. 93, which was issued by then-Governor McCrory.

240.    During the regular legislative session, "clean repeal" bills (H.B. 82 and S.B. 84) were again introduced. The bills were referred to committees, where they were never considered.

241.    In early 2017, the NCAA began finalizing its selection of venues to host college sports championships through the year 2022. North Carolina had submitted 133 bids for such events. In late March 2017, the NCAA announced that, unless H.B. 2 was repealed by March 30, 2017, North Carolina would be ineligible to host any championships until 2022.

242.    On March 29, 2017, at approximately 10:30 p.m., leadership from the North Carolina General Assembly announced a deal to repeal H.B. 2. About an hour later, the text of H.B. 142 was released.

60

243.    On March 30, 2017, H.B. 142 was introduced. The Senate, using a process sometimes referred to as "gut and amend," took up an unrelated bill that had already passed the House, removed the existing language and replaced it with the text of what is now H.B. 142.

244.    The bill was the subject of limited debate as it progressed rapidly through the General Assembly, and neither the full House nor the full Senate heard public comment before putting the legislation to a vote. H.B. 142 was passed by the Senate at approximately 11:30 a.m., and by the House at approximately 1:30 p.m. The House approved the bill with a concurrence vote, and no amendments were permitted. By late afternoon, the bill was signed by Gov. Cooper.

245.    H.B. 142 was promoted as a repeal of H.B. 2 to attract business back to North Carolina but only passed through the General Assembly because, like H.B. 2, it continued to discriminate against transgender individuals with respect to the use of single-sex, multiple-user facilities, and continued to bar local government protections for LGBT people.

246.    Lawmakers made it clear in the press and through their social media that H.B. 2's ban on transgender individuals using restrooms and other single-sex, multiple-user facilities matching their gender identity remained under H.B. 142:

> a.  North Carolina State Senator Joyce Krawiec said, "My primary concern is protecting the safety and privacy of women and children

in bathrooms, locker rooms and changing facilities. This bill maintains those protections."

b.  North Carolina State Senator Danny Britt said that "[r]epeal of HB2 does not allow transgender people to use the bathroom of their choosing." He further stated that "[t]here is already a law on the books, if you go into a restroom other than that of your biological gender, it is second-degree trespassing."

c.  Speaker Moore said that "House Bill 142 ensures that persons of the opposite sex cannot go into designated multi-occupancy restrooms, showers and changing rooms by preempting local governments to preserve the authority of North Carolina criminal law on trespassing, indecent exposure and peeping." He also stated that H.B. 142 "accomplishes the same goal [as H.B. 2], but the way it is set up it's much more defensible."

d.  North Carolina State Representative Brenden Jones opined that, under H.B. 142, "the restroom provision of HB2 remains and our children will not be forced to share bathrooms with those of the opposite sex."

e.  North Carolina State Representative Chuck McGrady said that, "In the days since the passage of HB 142 what I've been most often asked is whether the bill weakens protections for vulnerable people,

62

like women and children, in bathrooms, locker rooms, and changing rooms. No, it does not. The state's criminal laws are applicable, specially [sic] criminal provisions like second degree trespassing, indecent exposure and/or peeping."

f. North Carolina State Representative Chuck Szoka stated, "I voted 'aye' on 142 because it kept the two most important things from HB2 in law, and in my opinion, even stronger." According to the Fayetteville Observer, Szoka also explained that "[t]he reset law tells municipalities they don't have the authority to pass an ordinance such as Charlotte's . . . and it continues to protect the safety and privacy of women and children in restrooms and changing rooms."

**E.     H.B. 142, Like H.B. 2 Before It, Harms Transgender People.**

247.    H.B. 2 amended North Carolina's General Statutes to mandate that school boards *require* students to use restrooms and other single-sex, multiple-user facilities in accordance with their so-called "biological sex" providing that,

> Local boards of education shall require every multiple occupancy bathroom or changing facility that is designated for student use to be designated for and used only by students based on their biological sex.

248.    H.B. 2 also imposed the same mandate on all executive branch agencies (which are expressly defined to include Defendant University of North Carolina), and all public agencies, providing that they

> shall require every multiple occupancy bathroom or changing facility to be designated for and only used by persons based on their biological sex.

63

249.    Each of those provisions defined "biological sex" as follows,

Biological sex. – The physical condition of being male or female, which is stated on a person's birth certificate.

250.    Changing the gender marker on one's birth certificate is not a viable option for many transgender people, as every jurisdiction has a different set of often onerous and unnecessary requirements for updating the gender listed on a birth certificate, if they permit that to be done at all.

251.    For instance, a person born in North Carolina can only update the gender marker listed on a North Carolina-issued birth certificate with proof of certain surgeries that may not be medically necessary, advisable, or affordable for any given person. Meanwhile, a person born in neighboring Tennessee can never change the gender listed on a Tennessee-issued birth certificate.

252.    Medical treatment such as the surgery required to update a person's North Carolina birth certificate does not alter a person's gender, but rather merely brings a person's body into alignment with their gender identity. Gender identity is what governs how people live and express their gender regardless of the sex they were assigned at birth.

253.    Both the intent and effect of H.B 2 was to target transgender individuals for discrimination. H.B. 2's provisions requiring use of single-sex, multiple-user facilities in accordance with the sex stated on an individual's birth certificate facially targeted transgender people through a definition of "biological sex" meant only to exclude

64

transgender individuals from restrooms and locker rooms. In addition, lawmakers made clear that H.B. 2 was specifically aimed at transgender people. For example, an FAQ released by Gov. McCrory after H.B. 2's enactment states, "Why did North Carolina pass this law in the first place? Answer: The bill was passed after the Charlotte City Council voted to impose a regulation requiring businesses to allow a man into a women's restroom, shower, or locker room if they choose." The Charlotte Ordinance did not do that. It only permitted a transgender woman to use a women's restroom or other multiple-user facility for women and a transgender man to use a men's restroom or other multiple-user facility for men.

254.    Prior to the passage of H.B. 2, it was already illegal for a person to enter a restroom or locker room to assault or injure another. Moreover, protecting transgender people from discrimination in public accommodations, as has been done in numerous states and hundreds of localities, has resulted in no increase in public safety incidents in any jurisdiction anywhere in the United States, and including transgender people in public life in no way impacts the safety or well-being of non-transgender people.

255.    The painful message of stigma sent by H.B. 2 echoes the dehumanizing rhetoric employed by a number of lawmakers, suggesting that transgender people are somehow predatory or dangerous to others. To the contrary, it was H.B. 2 that exposed transgender people to harassment and potential violence. Transgender people are already disproportionately targeted for physical violence and harassment in North Carolina and across the country. When a transgender person is forced to disclose their transgender

status to strangers, such disclosure puts them at a high risk for violence. H.B. 2's requirement that transgender people be shunted into single-sex, multiple-user spaces that do not match their gender identity invaded their privacy and exposed this vulnerable population to harassment and potential violence by others. Numerous legislators stated that H.B. 142 continues that requirement.

256.    Plaintiffs are informed and believe, and on that basis allege, that, after the enactment of H.B. 2, some school officials who had been respecting their students' gender identity without any problem called parents to say that their children would be forced out of the single-sex facilities that match their gender identity.

257.    H.B. 2's broad sweep meant that the same result applied to executive and public agencies, including routine places such as libraries, public health centers, airports, and the Division of Motor Vehicles, as well as places where people may have turned in times of crisis, such as state hospitals, police departments, and courthouses. Transgender individuals working in such agencies may not have been able to safely use any restroom any longer, threatening their ability to keep their job when H.B. 2 was in effect.

258.    Following the enactment of H.B. 2, Defendant Spellings issued a memorandum dated April 5, 2016 to chancellors of constituent UNC schools, including UNC-Chapel Hill, UNC-Greensboro, and UNCSA-HS. The memorandum specifically stated that "University institutions must require every multiple-occupancy bathroom and changing facility to be designated for and used only by persons based on their biological sex." The memorandum included a copy of H.B. 2, which included its definition of

66

"biological sex." The same memo directed constituent schools to "fully meet their obligations under the Act."

259. The following week, Defendant Spellings issued public comments providing unequivocal guidance that "the University is bound to comply with HB2." On May 9, 2016, on the University of North Carolina's behalf, Defendant Spellings further stated to representatives of the United States Department of Justice that "[H.B. 2] remains the law of the State . . . and the University has no independent power to change that legal reality."

260. H.B. 2's restroom ban also deterred transgender people from participating in the state and local democratic process. It banned them from using the restroom consistent with their gender identity when visiting the North Carolina General Assembly, petitioning their legislator, or entering any building operated by the legislative branch. It likewise banned them from using restrooms consistent with their gender identity when visiting the Governor's mansion, the Governor's office, or other offices operated by the executive branch. It further banned them from using the restroom consistent with their gender identity at a city council meeting or at a city council member's or mayor's office.

261. H.B. 2's harms extended even farther, creating conflicts between state law and various federal laws. The conflict with Title IX, for example, put at risk the more than $4.5 billion in federal education funding that North Carolina was expected to receive in 2016. H.B. 2 also led to potential financial penalties under Executive Orders 11246 and 13672, which prohibit federal contractors (such as the University of North Carolina)

67

from barring transgender employees from the restrooms consistent with their gender identity. In addition, to the extent they complied with H.B. 2, public employers subject to Title VII violated the U.S. Equal Employment Opportunity Commission's decree that discriminating against transgender people with respect to restroom use is impermissible sex discrimination under that law. Public hospitals that receive federal funding also violated Section 1557 of the Affordable Care Act if they complied with H.B. 2.

262. The enactment of H.B. 2 followed a history of discrimination by decision-makers against transgender people, including, for example, Gov. McCrory's participation in a Fourth Circuit *amicus curiae* brief arguing that a transgender student's request to access restrooms in accordance with his gender identity is "radical."

263. H.B. 142 provides in part that:

State agencies, boards, offices, departments, institutions, branches of government, including The University of North Carolina and the North Carolina Community College System, and political subdivisions of the State, including local boards of education, are preempted from regulation of access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly.

264. No "act of the General Assembly" currently regulates access to restrooms and other single-sex, multiple-user facilities.

265. The intent and effect of this provision of H.B. 142 is to perpetuate H.B. 2's discrimination against transgender people by creating a regulatory vacuum that serves to deter transgender individuals from using single-sex, multiple-user restrooms that are consistent with their gender identity.

266. Under H.B. 142, public entities that traditionally regulate restroom, shower,

and changing facility use are barred from providing guidance about which facilities transgender people are permitted to use or are prohibited from using.

267. In fact, the plain language of H.B. 142 goes so far as to bar public entities from all "regulation of access to multiple occupancy restrooms, showers, or changing facilities." Under the statute's plain language, even maintaining separate men's and women's rooms or the posting of any signs restricting use of the facilities to "men" or "women" would appear to be unlawful, although, upon information and belief, neither the state government nor any operator of a state government building in North Carolina is currently enforcing H.B. 142 to that effect.

268. When considered in light of existing state and local law, the broad and vague language of H.B. 142 is designed to deter and effectively does deter transgender individuals from restrooms that accord with who they are and indeed from using restrooms in public buildings altogether.

269. The only thing that transgender individuals know with certainty about their right to use restrooms in North Carolina public facilities is that no government official can assure them that they will not face arrest or other penalty for entering a restroom that accords with who they are, and the passage of H.B. 142 was designed to accomplish exactly that result.

270. Even when prompted by Plaintiffs' counsel, the University of North Carolina has refused to state whether under University policy any of the individual transgender Plaintiffs who originally filed this lawsuit are permitted to use restrooms or

69

other single-sex, multiple-user facilities consistent with their gender identity or whether they will face any penalty for using such facilities.

271. The legislative intervenors—despite being the individuals who drafted and passed H.B. 142—have refused to answer questions designed to clarify whether transgender individuals could face any penalty for using restrooms or other single-sex, multiple-user facilities consistent with their gender identity.

272. What is clear is that every state agency, branch of government, or local government, including the University of North Carolina and its constituent institutions, is expressly forbidden by H.B. 142 from regulating access to restrooms or other single-sex, multiple-user facilities, which when combined with the statements of North Carolina officials, has the effect of deterring the Plaintiffs who are transgender and other transgender individuals from restrooms that accord with their gender, and therefore deter them from use of any restrooms in public buildings.

273. Under H.B. 2, gender designations in restrooms in public buildings and other single-sex, multiple-user facilities took on the legal meaning that they permitted only individuals based on their "biological sex," as defined by H.B. 2. That is, under H.B. 2, a sign saying "women's bathroom" meant, in effect, "biological women only"— and "biological sex" was defined for the purpose of excluding transgender individuals from single-sex, multiple-user spaces.

274. The vacuum purposefully created by H.B. 142 in effect maintains the ban of H.B. 2 and encourages discrimination by both government and private entities and

individuals. The law offers no guidance to anyone except by implication and makes it impossible for a reasonable person who is transgender to know which restroom they can legally use.

275. H.B. 142 also threatens the safety of transgender individuals.

276. Even before the enactment of H.B. 2 and H.B. 142, transgender individuals were already disproportionately subject to harassment and violence, particularly in sex-separated settings. By falsely portraying transgender individuals as a threat to others and denying them the safety that comes from a governing legal authority's recognition of their gender identity and right to legal protections, both H.B. 2 and H.B. 142 heighten the risk of violence and harassment against transgender individuals.

277. Comments by state legislators confirm that H.B. 142's provision preempting regulation of restrooms and other multiple-user facilities was, in fact, *intended* to deter transgender individuals from single-sex facilities that match their gender identity. Indeed, as described above, numerous legislators have described H.B. 142 as having the effect of leaving Part I of H.B. 2 in place.

278. The legislative history of H.B. 2 and H.B. 142 demonstrates that the purpose of H.B. 142's provision preempting regulation of restroom and other single-sex, multiple-user facilities was to discriminate against transgender individuals. The General Assembly intended that H.B. 2's discriminatory mandate be replaced with a provision that continued to discriminate against transgender individuals and mark them as a threat

to the safety and privacy of others—as evidenced by the direct statements by legislators and others to that effect, and the fact that the legislature refused to cleanly repeal H.B. 2.

279.   Lawmakers repeatedly made clear that H.B. 2, and now H.B. 142, would be enforced through the criminal trespass statute, N.C. Gen. Stat. § 14-159.13, which provides that a person "commits the offense of second degree trespass if, without authorization, he enters or remains on the premises of another . . . [a]fter he has been notified not to enter or remain there by the owner, by a person in charge of the premises, by a lawful occupant, or by another authorized person." That is, the discrimination that H.B. 2 invited and encouraged can now result in potential criminal consequences for transgender individuals given the permanent legal uncertainty that is created and perpetuated by H.B. 142.

280.   Before H.B. 2 and H.B. 142, transgender individuals were capable of benefitting from, or advocating for, policies or informal practices at state agencies or local governments that protected their rights to use restrooms consistent with their gender identity. H.B. 142 bars such policies or assurances.

281.   Before H.B. 2, an ordinance prohibiting discrimination on the basis of gender identity or gender expression could be interpreted to require that transgender individuals be guaranteed access to restrooms consistent with their gender identity. While, under H.B. 142, state agencies and local governments may enact such anti-discrimination policies with regard to their own employees or students, such policies automatically contain an exclusion under H.B. 142 to the extent that they would apply to

72

restrooms or other single-sex, multiple-user facilities. This undermines the entire concept of anti-discrimination protections based on gender identity or expression, in the same way that it would undermine protections based on sexual orientation to permit discrimination in access to marriage.

282. Plaintiffs' own experiences demonstrate the harm of this perpetual legal uncertainty. Plaintiffs understandably experience fear, anxiety, and physical symptoms when they are unable to safely use the restroom—as when, *e.g.*, Mr. Carcaño is required to travel to other state agencies such as the North Carolina Department of Health and Human Services as part of his job. He cannot ask which restroom to use for fear of being outed as transgender but runs the risk of arrest or other penalty if he is perceived to be transgender and in the "wrong" restroom—which under the current state of the law could be in either restroom. This causes him to delay or even avoid restroom use altogether, which can lead to severe health consequences.

**F.      H.B. 2 and H.B. 142 Harm Lesbian, Gay, and Bisexual Individuals, as well as Transgender Individuals.**

283. H.B. 2 disproportionately burdened lesbian, gay, and bisexual individuals, as well as transgender individuals, by stripping them of or barring them from obtaining anti-discrimination projections under local law. H.B. 2 took aim at the Charlotte Ordinance in a section providing,

> The General Assembly declares that the regulation of discriminatory practices in employment is properly an issue of general, statewide concern, such that this Article and other applicable provisions of the General Statutes supersede and preempt any ordinance, regulation, resolution, or policy adopted or imposed by a unit of local government or other political subdivision of the State that regulates or

73

imposes any requirement upon an employer pertaining to the regulation of discriminatory practices in employment, except such regulations applicable to personnel employed by that body that are not otherwise in conflict with State law.

284.    Following the enactment of H.B. 2, the City Attorney of the City of Charlotte issued a memorandum dated April 1, 2016 to the Mayor and City Council of the City of Charlotte, regarding the effect of H.B. 2 on the Charlotte Ordinance and other city laws or policies. The memorandum noted that H.B. 2 "invalidates . . . the February 22 amendments to the public accommodations ordinance," and concluded that "[d]ue to the preemption described above, the Community Relations Committee can no longer receive, investigate, and conciliate complaints for violations of the public accommodations ordinance."

285.    H.B. 2 stripped lesbian, gay, and bisexual individuals of anti-discrimination protections in Charlotte, because no such sexual orientation anti-discrimination protections exist in state law. The preemptive effect of this section did not fall equally on all North Carolinians, however.

286.    Recognizing that North Carolina law had no statewide public accommodations protection of any kind except for people with disabilities, H.B. 2 actually enacted a new public accommodations statute—so that the other groups whose protections also would have been preempted under the Charlotte Ordinance were spared that result. The new public accommodations statute prohibits discrimination based on "race, religion, color, national origin, or biological sex"—omitting the sexual orientation

74

(as well as the gender identity and gender expression) protections that had been included in the Charlotte Ordinance.

287.    Even prior to H.B. 2, the North Carolina legislature has a history of targeted discrimination toward lesbian, gay, and bisexual people. For example, the legislature approved and referred to voters a constitutional amendment barring access to marriage for same-sex couples. Legislative leaders also intervened in litigation challenging the constitutionality of the exclusion of same-sex couples from marriage pursuant to a statute authorizing them to act on behalf of the General Assembly. In 2015, the legislature also passed a bill that allows county magistrates to recuse themselves from performing civil marriages.

288.    The preemptive effect of H.B. 2 also harmed transgender people. While the Charlotte Ordinance had prohibited discrimination based on sex, gender identity, and gender expression, the new public accommodations statute restricted its protections solely to "biological sex," which is defined in an effort to deliberately exclude transgender people from protection.

289.    Like H.B. 2, H.B. 142 intentionally targets and disproportionately burdens lesbian, gay, and bisexual individuals, as well as transgender individuals, by continuing to strip them of or bar them from obtaining anti-discrimination projections under local law. H.B. 142 does so through its provision stating,

> No local government in this State may enact or amend an ordinance regulating private employment practices or regulating public accommodations.

75

290.    Under the terms of H.B. 142, its provision preempting local non-discrimination ordinances expires "on December 1, 2020."

291.    As with H.B. 2's preemption provision, the preemptive effect of H.B. 142 does not fall equally on all North Carolinians. Rather, the law's intent to burden and stigmatize LGBT individuals for a legal disability is evident not only from the statute's legislative history, but also from the fact that H.B. 142 does not purport to preempt all local non-discrimination ordinances. Rather, H.B. 142 prevents only the passage of *new* non-discrimination ordinances, until December 1, 2020.

292.    Pre-existing local non-discrimination ordinances covering prohibited grounds of discrimination such as race, sex, or religion continue to be valid under H.B. 142. For example, the day that H.B. 142 was passed, the City of Charlotte issued a statement emphasizing that H.B. 142 "reinstates Charlotte's non-discrimination ordinance as it read prior to [the Charlotte Ordinance]," thus once again outlawing discrimination based on "race, color, religion, national origin, or sex."

293.    The effect of H.B. 142 is thus that no protections in public accommodations or private employment based on sexual orientation, gender identity, or gender expression exist in either state or local law in North Carolina, while protections based on other categories (including categories that may not be explicitly protected in state or federal law) are maintained and permitted in many parts of the state.

294.    That the preemption of local non-discrimination ordinances in H.B. 142 is a pretext for discrimination against LGBT individuals is evident from the fact that the state

76

cannot seriously articulate an interest in uniform state-wide application of discrimination law. That is so because (1) with the repeal of H.B. 2, there are no longer any statewide public accommodations protections of any kind except for people with disabilities; (2) as described above, H.B. 142 leaves in place pre-existing local government non-discrimination ordinances; (3) H.B. 142 does not preempt local governments, school boards, universities, or other state agencies or branches of government from enacting non-discrimination rules or regulations with regard to their *own* employees, or with respect to the services that they provide to citizens; (4) H.B. 142's "preemption" is specifically designed to end in December 2020. In addition, there is no greater need for statewide uniformity with respect to antidiscrimination laws than there is with respect to numerous other laws as to which North Carolina does not prohibit local regulation and as to which there are significant differences in regulations of conduct among different parts of the state—such as, for example, local sales tax laws.

G.    **If The Repeal of H.B. 2 Is Found Inseverable From The Unconstitutional Provisions Of H.B. 142, H.B. 2 Will Once Again Harm LGBT Individuals.**

295.    If this Court were to conclude that (1) one or more provisions of H.B. 142 are unconstitutional or violate federal law and (2) the provision of H.B. 142 repealing H.B. 2 is not severable from H.B. 142's unlawful provisions, then the effect of its ruling may be to restore H.B. 2 to legal operation.

296.    If H.B. 2 were restored to legal operation, the discrimination and stigmatization that it inflicted on LGBT individuals through its provisions relating to

77

single-sex, multiple-user facilities and preemption of local non-discrimination ordinances
would again be imposed upon LGBT individuals, including Plaintiffs.

## CLAIMS FOR RELIEF

## COUNT I

### Deprivation of Substantive Due Process
### (Part II of H.B. 142)

### U.S. Const. Amend. XIV

### Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC
### against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon

297.    Plaintiffs incorporate paragraphs 1 through 296 as though fully set forth
herein.

298.    As used in this Count, references to H.B. 142 (or Part II thereof) include
not only H.B 142 (or Part II thereof) standing alone, but also H.B. 142 (or Part II thereof)
acting or operating in conjunction with any other "act of the General Assembly,"
including but not limited to N.C. Gen. Stat. § 14-159.13.

299.    Count I is asserted by Plaintiffs Carcaño, McGarry, Schafer, Goss, and
ACLU of NC against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon.

300.    Plaintiffs state this cause of action against Defendants Cooper, Spellings,
Stein, Sanders, Cohen, and Trogdon in their official capacities for purposes of seeking
declaratory and injunctive relief, and challenge H.B. 142 both facially and as applied to
Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC.

78

301. The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, places limitations on state action that deprives individuals of life, liberty, or property.

### A. Void for Vagueness

302. Substantive protections of the Fourteenth Amendment's Due Process Clause require that civil and criminal statutes must be articulated with sufficient definiteness that (1) ordinary persons may understand what conduct is prohibited, and (2) the statutes do not encourage arbitrary and discriminatory enforcement.

303. H.B. 142 purposefully creates and perpetuates a ban on restroom regulation and use but provides no guidance on what conduct may be subject to criminal or other penalty.

304. Under H.B. 142, local governments, school boards, public universities, and other state agencies or branches of government are forbidden from regulating access to restrooms or other single-sex, multiple-user facilities "except in accordance with an act of the General Assembly."

305. No "act of the General Assembly," however, currently provides clarity regarding whether transgender individuals will be subject to criminal or other penalty if they use restrooms and other single-sex, multiple-user facilities, or currently empowers local governments, school boards, public universities, and other state agencies or branches of government to provide such clarity or to otherwise regulate "access to multiple occupancy restrooms, showers, or changing facilities."

306. North Carolina law, however, does provide that a person "commits the offense of second degree trespass if, without authorization, he enters or remains on the premises of another . . . [a]fter he has been notified not to enter or remain there by the owner, by a person in charge of the premises, by a lawful occupant, or by another authorized person." N.C. Gen. Stat. § 14-159.13.

307. H.B. 142 provides no way for transgender individuals to determine what conduct may be subject to criminal or other penalty. Indeed, H.B. 142's proscription on "regulation of access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly" specifically bars the local governments, school boards, public universities, and other state agencies or branches of government in charge of restrooms or other single-sex, multiple-user facilities—the entities to whom transgender individuals might turn for such clarity—from providing any guidance regarding whether transgender individuals will be penalized for using particular restrooms or other single-sex, multiple-user, facilities in public buildings.

308. H.B. 142 encourages arbitrary and discriminatory enforcement against transgender individuals—including discrimination by private individuals. This is particularly so in light of (1) H.B. 2's discriminatory mandate—previously applicable statewide—which required that transgender individuals use facilities consistent with their so-called "biological sex," (2) the statements by lawmakers that H.B. 142 preserves H.B. 2's discriminatory mandate, and (3) the fact that, as a matter of practice, most restrooms in public buildings and other single-sex, multiple-user facilities continue to be

80

designated for a particular gender.

**B.    Substantive Due Process**

309.    Substantive protections of the Fourteenth Amendment's Due Process Clause provide that the state may not deprive individuals of life, liberty, or property in a manner that is arbitrary and capricious or that lacks a rational basis, or through means that are insufficiently related to the ends of the law.

310.    As set forth above, H.B. 142 purposefully creates and perpetuates a permanent state of legal uncertainty regarding whether transgender individuals are subject to criminal or other penalty if they use restrooms and other single-sex, multiple-user facilities, by (1) failing to provide any clarity or guidance under state law, and (2) forbidding local governments, school boards, universities, and other state agencies from providing such clarity or guidance.

311.    H.B. 142 is inherently arbitrary and capricious in that—by creating a permanent state of legal uncertainty regarding whether transgender individuals are subject to criminal or other penalty if they use restrooms and other single-sex, multiple-user facilities—it mandates arbitrary and capricious treatment with respect to access to restrooms and other single-sex, multiple-user facilities.

312.    The creation of a permanent state of legal uncertainty such as the one perpetuated by H.B. 142 cannot be justified by any state interest. H.B. 142 is not narrowly tailored or the least restrictive alternative for promoting a compelling state interest, nor is it even rationally related to any legitimate state interest.

81

# COUNT II

## Deprivation of Equal Protection
## (Parts II, III, and IV of H.B. 142)

### U.S. Const. Amend. XIV

313.    Plaintiffs incorporate paragraphs 1 through 312 as though fully set forth

herein.

314.    Plaintiffs state this cause of action against Defendants Cooper, Spellings,

Stein, Sanders, Cohen, and Trogdon in their official capacities for purposes of seeking

declaratory and injunctive relief, and challenge H.B. 142 both facially and as applied to

Plaintiffs.

315.    The Equal Protection Clause of the Fourteenth Amendment, enforceable

pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its

jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

**A.      Discrimination Based on Sex and Transgender Status in Preemption of
Local Ordinances Regulating Access to Restrooms or Other Single-Sex,
Multiple-User Facilities (Part II of H.B. 142)**

316.    Section A of Count II is asserted by Plaintiffs Carcaño, McGarry, Schafer,

Goss, and ACLU of NC against Defendants Cooper, Spellings, Stein, Sanders, Cohen,

and Trogdon.

317.    Under the Equal Protection Clause of the Fourteenth Amendment,

discrimination based on sex is presumptively unconstitutional and subject to strict or at

least heightened scrutiny.

318. Discrimination on the basis of sex includes, but is not limited to, discrimination based on sexual orientation, gender nonconformity, gender identity, transgender status, and gender transition.

319. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to heightened scrutiny.

320. H.B. 142 was motivated by an intent to treat transgender people differently, and worse, than other people, including by (1) stripping them of the benefits of any policies or practices in place at any local government, school board, public university, and other state agency or branch of government that would guarantee them the right to access restrooms or other single-sex, multiple-user facilities consistent with their gender identity, and by (2) precluding any local government, school board, public university, and other state agency or branch of government from "regulation of access to multiple occupancy restrooms, showers, or changing facilities."

321. H.B. 142 was enacted for the purpose of disadvantaging transgender people and is based on animus against transgender people. H.B. 142 was also enacted because of, and not in spite of, its adverse treatment of transgender people.

322. Any justification for H.B. 142's enactment, including a purported governmental interest in consistent statewide obligations, is pretext for discrimination and did not reflect the actual motivations for H.B. 142. Indeed, bills that would have

83

cleanly repealed H.B. 2 were rejected precisely *because* they were considered insufficiently discriminatory against transgender individuals.

323. By preventing transgender individuals from advocating before local governments, school boards, universities, or other state agencies or branches of government for guaranteed access to restrooms or other single-user, multiple-user facilities, H.B. 142 imposes a different and more burdensome political process on transgender people than on non-transgender people, who (1) benefitted from the discriminatory regime under H.B. 2, (2) continue to benefit from the practical reality that most restrooms and other single-sex, multiple-user facilities are marked with gendered signs, and (3) are not burdened by the permanent state of legal uncertainty created and perpetuated by H.B. 142. H.B. 142 accordingly places a special burden on transgender people within the governmental process with an intent to injure that minority group.

324. H.B. 142 deprives transgender people of their right to equal dignity, liberty, and autonomy by continuing to brand them as second-class citizens.

325. H.B. 142's discrimination against transgender people based on sex and transgender status denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**B. Discrimination Based on Sex, Transgender Status, and Sexual Orientation in Preemption of Local Non-Discrimination Protections (Parts III and IV of H.B. 142)**

326. Section B of Count II is asserted by Plaintiffs Carcaño, McGarry, Schafer, Goss, Gilmore, Harper, and ACLU of NC against Defendants Cooper and Stein.

84

327.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex, discrimination based on sexual orientation, and discrimination based on transgender status are presumptively unconstitutional and subject to strict or at least heightened scrutiny.

328.    H.B. 142 deprives LGBT people of protections against discrimination based on sexual orientation, gender identity, gender expression, and transgender status.

329.    H.B. 142 was motivated by an intent to treat LGBT people differently, and worse, than other people, including by precluding any local government from taking action to protect LGBT people against discrimination in private employment or places of public accommodation.

330.    H.B. 142 was enacted for the purpose of disadvantaging LGBT people and is based on animus against LGBT people. H.B. 142 was also enacted because of, and not in spite of, its adverse treatment of LGBT people. This is underscored by the fact that any deal to repeal H.B. 2 was explicitly premised on a prior repeal of the Charlotte Ordinance—a law specifically designed to protect individuals from discrimination based on sexual orientation and gender identity.

331.    Any justification for H.B. 142's enactment, including a purported governmental interest in consistent statewide obligations, is pretext for discrimination and did not reflect the actual motivations for the bill. Indeed, the government cannot assert an interest in consistent statewide obligations given that (1) H.B. 142 in fact leaves in place local government non-discrimination ordinances that were enacted prior to the

85

passage of H.B. 2 (to the extent not otherwise repealed), and cities have announced their intent to continue enforcing them; (2) H.B. 142 does not preempt local governments, school boards, universities, or other state agencies or branches of government from enacting non-discrimination rules or regulations with regard to their own employees or students, or with respect to the services that they provide to citizens; (3) H.B. 142's "preemption" is specified to end in December 2020. In addition, there is no greater need for statewide uniformity with respect to antidiscrimination laws than there is with respect to numerous other laws as to which North Carolina does not prohibit local regulation and as to which there are significant differences in regulations of conduct among different parts of the state—such as, for example, local sales tax laws.

332. By blocking anti-discrimination protections for LGBT people at the local level, H.B. 142 imposes a different and more burdensome political process on LGBT people than on non-LGBT people who have state protection against identity-based discrimination. H.B. 142 accordingly places a special burden on LGBT people within the governmental process with an intent to injure that minority group.

333. H.B. 142 deprives LGBT people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

334. H.B. 142's discrimination against LGBT people based on sex, sexual orientation, and transgender status denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**C. Discrimination Based on Transgender Status Warrants Strict or At Least Heightened Scrutiny**

335. Transgender people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

336. Transgender people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Transgender people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

337. A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

338. Gender identity is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

339. Gender identity generally is fixed at an early age and highly resistant to change through intervention.

**D. Discrimination Based on Sexual Orientation Warrants Strict or At Least Heightened Scrutiny**

340. Lesbian, gay, and bisexual people have suffered a long history of extreme discrimination in North Carolina and across the country, and continue to suffer such discrimination to this day.

341.     Lesbian, gay, and bisexual people are a discrete and insular group and lack the political power to protect their rights through the legislative process. Lesbian, gay, and bisexual people have largely been unable to secure explicit local, state, and federal protections to protect them against discrimination.

342.     A person's sexual orientation bears no relation to a person's ability to contribute to society.

343.     Sexual orientation is a core, defining trait and is so fundamental to one's identity and conscience that a person cannot be required to abandon it as a condition of equal treatment.

344.     Sexual orientation generally is fixed at an early age and highly resistant to change through intervention.

## COUNT III

### Deprivation of Equal Protection
### (H.B. 2)

### U.S. Const. Amend. XIV

345.     Plaintiffs incorporate paragraphs 1 through 344 as though fully set forth herein.

346.     Plaintiffs plead this Count solely in the event that this Court finds that (1) one or more provisions of H.B. 142 are unlawful and (2) the provision of H.B. 142 repealing H.B. 2 is not severable from H.B. 142's unlawful provisions.

88

347. Plaintiffs state this cause of action against certain Defendants in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge H.B. 2 both facially and as applied to them.

## A. Discrimination Based on Sex and Transgender Status in Single-Sex Restrooms and Facilities (H.B. 2, Part I)

348. Section A of Count III is asserted by Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC against Defendants Cooper, Spellings, Sanders, Cohen, and Trogdon.

349. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

350. H.B. 2 discriminated against transgender people on the basis of sex and would again do so if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142.

351. Discrimination based on sex includes, but is not limited to, discrimination based on gender nonconformity, gender identity, transgender status, and gender transition.

352. H.B. 2 facially classifies people based on sex, gender identity, and transgender status.

353. Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict or at least heightened scrutiny.

89

354. H.B. 2 treated transgender people differently than non-transgender people who are similarly situated and would again do so if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142.

355. Under H.B. 2, non-transgender people were able to access restrooms and other single-sex, multiple-user facilities consistent with their gender identity, but transgender people were banned from restrooms and other single-sex, multiple-user facilities consistent with their gender identity.

356. H.B. 2 discriminated against transgender people based on gender nonconformity and would again do so if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142. For example, although Mr. Carcaño and Mr. McGarry are men, are perceived as men in public, and have had medical treatment to bring their bodies into alignment with their male gender identities, they have birth certificates with female gender markers that do not conform to H.B. 2's expectations for men. Furthermore, if transgender men such as Mr. Carcaño and Mr. McGarry had been assigned male at birth, they would not be banned by H.B. 2 from the restrooms and other single-sex, multiple-user facilities consistent with their gender identity. The same is true for Ms. Schafer, who is a young woman, is perceived as a woman in public, and has had medical treatment to bring her body into alignment with her gender but has a birth certificate that classifies her as male and therefore does not conform to H.B. 2's expectations for women. Had Ms. Schafer been assigned female at birth, she would not

90

be banned by H.B. 2 from restrooms and other single-sex, multiple-user facilities designated for women and girls.

357. No person has any control over the sex that person is assigned at birth. In fact, when a person is born with characteristics associated with both male and female infants, the appropriate course is to assign sex based on likely gender identity and to later re-assign sex based on gender identity once it is known if it conflicts with the original sex assignment.

358. H.B. 2's discrimination against transgender people based on sex and transgender status is not substantially related to any compelling or important government interest. Indeed, it is not even rationally related to any legitimate government interest.

359. H.B. 2 endangers the safety, privacy, security, and well-being of transgender individuals. For example, if a transgender young woman like Ms. Schafer were to use the restroom designated for men and boys, she likely would be harassed and might be assaulted by men or boys who believed that she should not be in that restroom. Similarly, if a transgender man like Mr. Carcaño or Mr. Payton were to use the women's restroom, he likely would be harassed and might be assaulted by women who believe he should not be in the women's restroom.

360. H.B. 2 does not promote the safety, privacy, security, or well-being of non-transgender people.

361. H.B. 2 deprives transgender people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

91

362.    H.B. 2's discrimination against transgender people denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

**B.    Discrimination Based on Sex, Transgender Status, and Sexual Orientation in Preemption of Local Non-Discrimination Protections (H.B. 2, Part II, Sections 2.2 & 2.3; H.B. 2, Part III)**

363.    Section B of Count III is asserted by Plaintiffs Carcaño, McGarry, Schafer, Goss, Gilmore, Harper, and ACLU of NC against Defendants Cooper and Stein.

364.    Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on sex, discrimination based on sexual orientation, and discrimination based on transgender status are presumptively unconstitutional and subject to strict or at least heightened scrutiny.

365.    H.B. 2 deprived LGBT people of protections against discrimination based on sexual orientation, gender identity, and gender expression and—if the repeal of H.B. 2 were to be found inseverable from the other provisions of H.B. 142—would again do so.

366.    H.B. 2 was motivated by an intent to treat LGBT people differently, and worse, than other people, including by stripping them of the protections afforded by the Charlotte Ordinance and precluding any local government from taking action to protect LGBT people against discrimination.

367.    H.B. 2 was enacted for the purpose of disadvantaging LGBT people and is based on animus against LGBT people. H.B. 2 was also enacted because of, and not in spite of, its adverse treatment of LGBT people.

92

368.    The justifications cited in H.B. 2 for its enactment, including a purported governmental interest in consistent statewide obligations, are pretext for discrimination and did not reflect the actual motivations for the bill. For example, proposals to add sexual orientation and gender identity and expression protections to the statewide public accommodations law were rejected.

369.    By blocking anti-discrimination protections for LGBT people at the local level, H.B. 2 imposes a different and more burdensome political process on LGBT people than on non-LGBT people who have state protection against identity-based discrimination. H.B. 2 accordingly places a special burden on LGBT people within the governmental process with an intent to injure that minority group.

370.    H.B. 2 deprives LGBT people of their right to equal dignity, liberty, and autonomy by branding them as second-class citizens.

371.    H.B. 2's discrimination against LGBT people based on sex, transgender status, and sexual orientation denies them the equal protection of the laws, in violation of the Equal Protection Clause of the Fourteenth Amendment.

## COUNT IV

## Violation of Right to Privacy
## (H.B. 2)

## U.S. Const. Amend. XIV

## Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC
## against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon

372.     Plaintiffs incorporate paragraphs 1 through 371 as though fully set forth herein.

373.     Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC plead this Count against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon solely in the event that this Court finds that (1) one or more provisions of H.B. 142 are unconstitutional or violate federal law and (2) that the provisions of H.B. 142—including its provisions purporting to repeal H.B. 2—are not severable.

374.  Plaintiffs state this cause of action against Defendants Cooper, Stein, Spellings, Sanders, Cohen, and Trogdon in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge H.B. 2 both facially and as applied to them.

375.     The Due Process Clause of the Fourteenth Amendment places limitations on state action that deprives individuals of life, liberty, or property.

376.     Substantive protections of the Due Process Clause include the right to avoid disclosure of sensitive, personal information.

377. There is a fundamental right of privacy in preventing the release of, and in deciding in what circumstances to release: (1) personal information of which the release could subject them to bodily harm; and (2) information of a highly personal and intimate nature.

378. H.B. 2 required the disclosure of highly personal information regarding transgender people to each person who sees them using a restroom or other facility inconsistent with their gender identity or gender expression, and—if the repeal of H.B. 2 were to be found inseverable from the other provisions of H.B. 142—would again do so. This disclosure places them at risk of bodily harm.

379. There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest. H.B. 2 is not even rationally related to a legitimate state interest.

380. In addition, the privacy interests of transgender people that are invaded outweigh any purported interest the government could assert.

## COUNT V

**Violation of Liberty and Autonomy in the
Right to Refuse Unwanted Medical Treatment
(H.B. 2)**

**U.S. Const. Amend. XIV**

**Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC
against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon**

381. Plaintiffs incorporate paragraphs 1 through 380 as though fully set forth herein.

95

382. Plaintiffs Carcaño, McGarry, Schafer, Goss, and ACLU of NC re-plead this Count against Defendants Cooper, Spellings, Stein, Sanders, Cohen, and Trogdon solely in the event that this Court finds that (1) one or more provisions of H.B. 142 are unconstitutional or violate federal law and (2) the provision of H.B. 142 repealing H.B. 2 is not severable from H.B. 142's unlawful provisions.

383. Plaintiffs state this cause of action against Defendants Cooper, Stein, Spellings, Sanders, Cohen, and Trogdon in their official capacities for purposes of seeking declaratory and injunctive relief, and challenge H.B. 2 both facially and as applied to them.

384. The Fourteenth Amendment's Due Process Clause protects individuals' substantive rights to be free to make certain private decisions without unjustified governmental intrusion.

385. The right to make certain private decisions without unjustified governmental intrusion includes the right to refuse unwanted medical treatment.

386. H.B. 2 forced transgender people to undergo medical procedures that may not be medically appropriate or available in order to access facilities consistent with their gender identity and would again do so if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142.

387. Not all transgender individuals undergo gender confirmation surgery. For some, the surgery is not medically necessary, while for others it is medically dangerous or impossible. For example, because medical treatment for gender dysphoria is

96

individualized, hormone treatment may be sufficient to manage the distress associated with gender dysphoria for some individuals. Surgery may be medically necessary for others who do not have health insurance coverage for it and cannot afford to pay for the surgery out-of-pocket.

388.    Some states require proof of surgery before they will allow the gender marker on a birth certificate to be changed. For those born in North Carolina, state law (specifically N.C. Gen. Stat. § 130A-11B) requires proof of "sex reassignment surgery."

389.    For example, Ms. Schafer was not able to amend her New Jersey birth certificate to accurately reflect her gender because surgery has not been medically necessary for her (indeed, such surgery is generally not available to individuals under 18). Accordingly, H.B. 2 banned her from accessing restrooms and other facilities consistent with her gender identity and would again do so if the repeal of H.B. 2 were to be found inseverable from the unlawful provisions of H.B. 142.

390.    There is no compelling state interest that is furthered by H.B. 2, nor is H.B. 2 narrowly tailored or the least restrictive alternative for promoting a state interest. H.B. 2 is not even rationally related to a legitimate state interest.

## COUNT VI

## Violation of Title IX
## (H.B. 142 and H.B. 2)

## 20 U.S.C. § 1681, *et seq.*

## Plaintiffs Carcaño, McGarry, Schafer, and ACLU of NC
## against Defendant University of North Carolina

391.    Plaintiffs incorporate paragraphs 1 through 390 as though fully set forth

herein.

392.    Title IX provides that "[n]o person in the United States shall, on the basis

of sex, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any education program or activity receiving Federal financial

assistance."

393.    Under Title IX, discrimination "on the basis of sex" includes discrimination

on the basis of gender nonconformity, gender identity, transgender status, and gender

transition.

394.    Defendant University of North Carolina is an education program receiving

federal financial assistance.

395.    By failing to ensure that Mr. Carcaño—a transgender man—may use

restrooms and changing facilities consistent with his gender identity without fear of

penalty, Defendant University of North Carolina excludes Mr. Carcaño from participation

in, denies him the benefits of, and subjects him to discrimination in educational programs

and activities at Defendant's constituent campus, UNC-Chapel Hill, "on the basis of sex,"

which violates Mr. Carcaño's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

396.   By failing to ensure that Mr. McGarry—a transgender man—may use restrooms and changing facilities consistent with his gender identity without fear of penalty, Defendant University of North Carolina excludes Mr. McGarry from participation in, denies him the benefits of, and subjects him to discrimination in educational programs and activities at Defendant's constituent campus, UNC-Greensboro, "on the basis of sex," which violates Mr. McGarry's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

397.   By failing to ensure that Ms. Schafer—a transgender woman—may use restrooms and changing facilities consistent with her gender identity without fear of penalty, Defendant University of North Carolina excluded Ms. Schafer from participation in, denied her the benefits of, and subjected her to discrimination in educational programs and activities at Defendant's constituent campus, UNCSA-HS, "on the basis of sex," which violated Ms. Schafer's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

398.   By failing to ensure that transgender members of the ACLU of NC, who attend school or work at constituent campuses of Defendant University of North Carolina, may use restrooms and changing facilities consistent with their gender identity without fear of penalty, Defendant University of North Carolina excludes transgender members of the ACLU of NC from participation in, denies them the benefits of, and

subjects them to discrimination in educational programs and activities "on the basis of sex," which violates ACLU of NC members' rights under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

## COUNT VII

### Violation of Title VII
### (H.B. 142 and H.B. 2)

### 42 U.S.C. § 2000e, *et seq.*

### Plaintiff Carcaño
### against Defendant University of North Carolina

399.    Plaintiffs incorporate paragraphs 1 through 398 as though fully set forth herein.

400.    Title VII provides that it is "an unlawful employment practice for an employer" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex" or to "limit, segregate, or classify [its] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a).

401.    Under Title VII, discrimination "because of . . . sex" includes discrimination on the basis of gender nonconformity, gender identity, transgender status, and gender transition.

402.    Defendant University of North Carolina is an "employer" within the meaning of Title VII.

403.    Defendant University of North Carolina is engaged in sex discrimination against Mr. Carcaño in violation of Title VII. Defendant University of North Carolina has failed to ensure Mr. Carcaño access to restrooms and changing facilities consistent with his gender identity without fear of penalty, which is a term, condition, and privilege of employment. This failure also limits, segregates, or classifies him in a way that deprives or tends to deprive him of employment opportunities or otherwise adversely affects his status as an employee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment:

A.    Declaring that the unlawful provisions of H.B. 142 and/or H.B. 2 discussed above (either independently or acting or operating in conjunction with any other "act of the General Assembly") and their enforcement by Defendants violate Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution;

B.    Declaring that the unlawful provisions of H.B. 142 and/or H.B. 2 discussed above and their enforcement by Defendants violate Plaintiffs' rights under Title IX and Title VII;

C.    Permanently enjoining enforcement by Defendants of the unlawful provisions of H.B. 142 and/or H.B. 2 discussed above;

101

D.      Requiring Defendants in their official capacities to ensure the ability of individuals, including transgender people, to use single-sex, multiple-user facilities in accordance with their gender identity without fear of arrest or other penalty in all public schools and universities, executive branch agencies, and public agencies;[1] and requiring Defendants in their official capacities to allow local governments to enact and to continue to enforce anti-discrimination protections for LGBT people;

E.      Awarding Plaintiffs Carcaño, McGarry, and Schafer nominal damages in the amount of $1.00 for violation of their rights under Title IX and Title VII, as applicable;

F.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, 42 U.S.C. § 2000e-5(k), and other applicable laws; and

G.      Granting such other and further relief as the Court deems just and proper.

H.      The declaratory and injunctive relief requested in this action is sought against each Defendant; against each Defendant's officers, employees, and agents; and against all persons acting in active concert or participation with any Defendant, or under any Defendant's supervision, direction, or control.

---

[1] In order to avoid any doubt, Plaintiffs explicitly clarify that they do not challenge and have never challenged in this case the practice of having single-sex, multiple-user restrooms, showers, or dressing areas in public buildings in North Carolina, and that they do not seek and have never sought relief in this case ending that practice. What they seek is an end to restrictions on the ability of transgender people to use such single-sex, multiple-user facilities in accordance with their gender identity, like all other individuals are able to do.

Dated: September 7, 2017

Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook (NC Bar No. 33838)
Irena Como*
AMERICAN CIVIL LIBERTIES UNION OF
    NORTH CAROLINA LEGAL
    FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile: 866-511-1344
cbrook@acluofnc.org
icomo@acluofnc.org

James D. Esseks*
Leslie Cooper*
Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone: 212-549-2627
Facsimile: 212-549-2650
jesseks@aclu.org
lcooper@aclu.org
egill@aclunc.org
cstrangio@aclu.org

Jon W. Davidson*
Tara L. Borelli*
Peter C. Renn*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile: 404-897-1884
jdavidson@lambdalegal.org
tborelli@lambdalegal.org
prenn@lambdalegal.org

Scott B. Wilkens*
Luke C. Platzer*
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: 202-639-6000
Facsimile: 202-639-6066
swilkens@jenner.com
lplatzer@jenner.com

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

Case 1:16-cv-00236-TDS-JEP   Document 210   Filed 09/07/17   Page 103 of 104

**CERTIFICATE OF SERVICE**

I, Christopher A. Brook, hereby certify that on September 7, 2017, I electronically filed the foregoing FOURTH AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND NOMINAL DAMAGES, using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher A. Brook
Christopher A. Brook