# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

          *Plaintiffs*,

v.

ROY A. COOPER, III, *et al.*,

          *Defendants*,

    and

PHIL BERGER, *et al.*,

          *Intervenor-Defendants*.

No. 1:16-cv-00236-TDS-JEP

## PLAINTIFFS' OPPOSITION TO UNC DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................... 1

FACTUAL BACKGROUND .......................................................................... 2

ARGUMENT ................................................................................................... 8

    I.    Plaintiffs Have Standing to Challenge HB142's Restroom Access
        Preemption Provision. ................................................................... 8

        A.    Plaintiffs Have Standing with Respect to Executive Branch
            Defendants. ...................................................................... 8

            1.    Plaintiffs are Suffering and Will Continue to Suffer
                Injury from the Inability to Use Government
                Restrooms and Reasonable Fear of Prosecution for
                Trespass. ................................................................ 9

            2.    Plaintiffs' Injuries are Traceable to HB142 and Can Be
                Redressed with an Order Invalidating HB142. ..................... 13

        B.    Plaintiffs Have Standing with Respect to UNC. .............................. 14

    II.    Plaintiffs Have Standing to Challenge HB142's Unconstitutional
        Preemption of Local Government Anti-Discrimination Statutes. .............. 17

    III.    Plaintiffs' Claims are Ripe. ...................................................... 19

    IV.    Plaintiffs Adequately Plead All Counts Challenging HB142. ................... 22

        A.    The Court Need Not Resolve Claims Against Executive
            Branch Defendants. ........................................................ 23

        B.    Plaintiffs' Claims Against Defendant Spellings Neither
            Violate Sovereign Immunity Nor Exceed the Bounds of
            § 1983. ......................................................................... 24

        C.    Plaintiffs Plausibly Plead Due Process Claims. ............................... 26

        D.    Plaintiffs Plausibly Plead Title IX and Title VII Claims. ............... 29

            1.    Discrimination Based on a Person's Transgender
                Status is Discrimination "On the Basis of Sex." ................. 30

2.  UNC's and Intervenors' Narrow Interpretation Conflicts with the Plain Text and Settled Statutory Interpretation Principles......................................................................32

3.  UNC's Refusal to Clarify After HB2 Which Public Facilities Transgender Students and Employees May Use Discriminates in Violation of Titles VII and IX. ........... 34

E.  Plaintiffs Plausibly Plead Equal Protection Claims. ........................ 36

1.  HB142 Intentionally Discriminates on the Basis of Gender Identity and Sexual Orientation................................ 36

2.  HB142 Establishes a More Burdensome Political Process for LGBT Individuals. ............................................. 40

F.  Intervenors' Tenth Amendment Arguments are Irrelevant and, Regardless, Plaintiffs' Requested Relief Would Not Commandeer the Legislative Process. ............................................. 41

V.  Plaintiffs Adequately Plead HB2 Claims. ................................................... 42

A.  No Grounds Exist to Dismiss Plaintiffs' Constitutional HB2 Claims at this Stage. ......................................................................... 42

B.  Plaintiffs Plausibly Plead Title IX and Title VII HB2 Claims......... 43

CONCLUSION ................................................................................................................ 47

CERTIFICATE OF WORD COUNT

CERTIFICATE OF SERVICE

ii

# INTRODUCTION

Plaintiffs Joaquín Carcaño, Payton Grey McGarry, Hunter Schafer, Quinton Harper, Angela Gilmore, Madeline Goss, and American Civil Liberties Union of North Carolina (collectively, "Plaintiffs"), respectfully submit this consolidated opposition to UNC Defendants' ("UNC") and Intervenor-Defendants' ("Intervenors") Respective Motions to Dismiss. (ECF Nos. 221, 222).

This case concerns the basic dignity and life functions of transgender North Carolinians and the entire LGBT community. UNC and Intervenors seek to avoid judicial review of sweeping legislative action that codified restrictions on the freedoms of LGBT individuals. But close review of those legislative actions makes clear that the North Carolina General Assembly has passed a series of laws, culminating in North Carolina House Bill 142 ("HB142"), which seek to and effectively do bar transgender individuals from using the restroom safely and which lock LGBT individuals out of the local political process.

Plaintiffs have standing to challenge HB142, and their claims are ripe. HB142 imposes a *de facto* bar on transgender people's access to multiple-occupancy facilities in government buildings ("government restrooms"), and Plaintiffs have suffered and will continue to suffer concrete, particularized harms under HB142. The deliberate vagueness of HB142's language puts Plaintiffs at constant risk of arrest and prosecution for trespass if they use government restrooms, and Plaintiffs have consequently altered their behavior to avoid using them. HB142 also places an unequal barrier in the way of Plaintiffs' and

1

all LGBT North Carolinians' efforts to seek local laws prohibiting anti-LGBT discrimination, locking them out of the political process.

Plaintiffs' allegations against HB142 state valid claims for relief. That HB142 does not expressly regulate Plaintiffs does not alter the fact that HB142's implementation and effect violates Plaintiffs' due process and equal protection rights, as well as their rights under Titles IX and VII.

But even if UNC and Intervenors were to obtain dismissal of Plaintiffs' HB142 claims, Plaintiffs' Title IX and Title VII nominal damages claims against UNC for the period during which North Carolina House Bill 2 ("HB2") was in effect—and to which no party raises serious justiciability arguments—would remain for this Court to adjudicate.

## FACTUAL BACKGROUND

Plaintiffs initially challenged HB2, which mandated that all government restrooms be used only by persons based on their "biological sex," which HB2 defined as the sex stated on a person's birth certificate. HB2 was spurred by a Charlotte City Council Ordinance ("Charlotte Ordinance") that amended the City's public accommodations law to ban discrimination based on "gender identity, gender expression" and "sexual orientation." Fourth Amended Complaint ("FAC") ¶ 200, ECF No. 210. Plaintiffs challenged HB2 on multiple grounds, *e.g.*, Third Am. Compl., ECF No. 183, and this Court granted Plaintiffs' motion for a preliminary injunction in part, enjoining HB2 as violating Title IX, *see* Memorandum Opinion, ECF No. 127 ("Op.").

2

Although HB2 has now been repealed by and replaced with HB142, HB142 can be understood only in light of the General Assembly's prior efforts to regulate transgender people's access to government restrooms—efforts that generated an immense public backlash. FAC ¶¶ 223-225. As part of an apparent deal to secure HB2's repeal, the Charlotte City Council repealed the Charlotte Ordinance in its entirety on the morning of December 21, 2016, just before the General Assembly met in special session to consider repealing HB2. FAC ¶¶ 227-233.

In that special session, a "clean repeal" bill—which would have simply repealed HB2 in its entirety—was introduced but was never considered. FAC ¶ 235. During the 2017 regular session, "clean repeal" bills were again introduced but did not pass. FAC ¶ 240.

On March 30, 2017, in a single day, HB142 was passed and signed by Governor Cooper. General Assembly leaders announced a deal to repeal HB2 at 10:30 p.m. the evening prior, releasing HB142's text about an hour later. FAC ¶ 243. To quickly consider the bill, the Senate used a process referred to as "gut and amend." FAC ¶ 243. Neither the full House nor the full Senate heard public comment before voting on the legislation, and the Governor signed HB142 by late afternoon. FAC ¶¶ 244-245.

HB142 did far more than simply repeal HB2. It simultaneously added a provision to state law withdrawing the authority of state and local entities to regulate access to government restrooms, showers, or changing facilities. Section 2 provides:

> State agencies, boards, offices, departments, institutions, branches of government, including The University of North Carolina and the North Carolina Community College System, and political subdivisions of the State,

3

including local boards of education, are preempted from regulation of access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly.

N.C. Sess. Laws 2017-4, § 2 (Mar. 30, 2017) (codified at N.C. Gen. Stat. § 143-760).

Significantly, no current "act of the General Assembly" regulates access to these government facilities. The lack of any law concerning access is revealing in two ways. First, it shows that the legislature, by passing HB142 and refusing to regulate access, intentionally codified statewide ambiguity about whether transgender individuals can use government facilities consistent with their gender identity, or at all. This intentional ambiguity operates as a *de facto* bar to the use of facilities by stoking the fear and uncertainty surrounding transgender individuals in restrooms.

Second, despite the fact that HB142 expressly bars all "regulation of access" to facilities except by the General Assembly (which has enacted no such regulation), everyone in North Carolina—from the Governor, to the leadership of the General Assembly, to the public at large—understands that the bar on regulation applies only to transgender people, and not to restroom access by anyone else. HB142 would appear to make it unlawful for government restrooms to be restricted to use by men or women, in the absence of any act of the General Assembly authorizing such a regulation. Separating restrooms into men's rooms and women's rooms, after all, constitutes "regulation of access" to these facilities. But no one in the state understands HB142 to bar separation of

4

restrooms by sex.  Instead, HB142's restriction is understood as being only about restroom access by transgender people.[1]

That widespread understanding is not surprising, given both the history of state attempts to regulate transgender individuals' restroom use and state officials' recent statements about HB142.  Several lawmakers have stated in the press and through social media that HB142 retained HB2's ban on transgender individuals using government restrooms in accordance with their gender identity.  FAC ¶ 246.  And lawmakers did more than simply read HB142 as retaining HB2's ban: many emphasized the criminal consequences that would follow if a transgender individual used a government restroom consistent with his or her gender identity.  For example, Intervenor Speaker Moore noted that HB142 "preserve[s] the authority of North Carolina criminal law on trespassing, indecent exposure, and peeping."  *Id.*  State Representative Kevin Corbin stated that because government entities cannot regulate access to multiple occupancy facilities, "[t]his essentially means … that the restroom provision of HB2 remains."  FAC ¶ 14.  And State Senator Britt stated that "[t]here is already a law on the books, if you go into a restroom other than that of your biological gender, it is second-degree trespassing."  FAC ¶ 246.  In effect, lawmakers incorporated the criminal trespass laws as an enforcement

---

[1] Plaintiffs do not seek to prevent any arm of the North Carolina government from maintaining separate men's restrooms and women's restrooms; but the practical reality that all parts of the state's government continue to regulate access in this manner (and others, including policies regarding janitorial access) illustrates that those government entities—including UNC—have control over these facilities and are *choosing* to enforce HB142 in certain ways but not in others.

5

mechanism to HB2 and HB142—creating widespread fear about whether transgender individuals can use government restrooms and other facilities at all.

Since the Fourth Amended Complaint was filed, current and former elected officials have similarly suggested that HB142 did not repeal HB2. Former Governor McCrory, who signed HB2 into law, recently stated that "House Bill 2 was really never repealed," and that "[a]ll of the restrictions that were in place last October are in place this October."[2]

By singling out transgender individuals for discrimination and by effectively barring them from using government restrooms and other facilities, FAC ¶¶ 2, 16, 26, HB142 causes concrete injury. It interferes with Plaintiffs' treatment for gender dysphoria—which includes "living one's life consistent with one's gender identity, including when accessing single-sex spaces such as restrooms and locker rooms"—and "is inconsistent with medical protocols and can cause anxiety and distress to the transgender person and result in harassment of and violence against them." FAC ¶¶ 51-52.

Plaintiffs in this lawsuit include individuals diagnosed with gender dysphoria who, as part of their clinical treatment, have been instructed by medical professionals to live fully in accordance with their gender identity, including by using appropriate restrooms. FAC ¶¶ 56-58, 62, 93-94, 126, 161. Plaintiffs have alleged that HB142 and the public

---

[2] *See* Decl. of Scott Wilkens, Exhibit A (Colin Campbell, *"House Bill 2 was never really repealed," Pat McCrory says*, The News & Observer (Oct. 26, 2017, 9:56 AM), http://www.newsobserver.com/news/politics-government/politics-columns-blogs/under-the-dome/article180861936.html).

6

statements by state officials claiming that transgender individuals will be prosecuted for trespass for using the "wrong" restroom have deterred them from using appropriate restrooms and have caused them "significant anxiety." FAC ¶¶ 67, 70, 75, 76-80. Sometimes this causes Plaintiffs to "take steps to avoid restroom use altogether." FAC ¶¶ 76, 112-118, 149-154, 167-168. Avoiding restroom use comes with its own medical risks, regardless of a person's gender identity. *E.g.*, Decl. of Dr. Lin Fraser ¶ 33, ECF No. 176-2 ("Fraser Decl.").

Separately, Sections 3 and 4 of HB142 retain until December 1, 2020, a ban on local government anti-discrimination ordinances that had been part of HB2. Section 3 provides that no "local government … may enact or amend an ordinance regulating private employment practices or regulating public accommodations." N.C. Sess. Laws 2017-4, § 3 (Mar. 30, 2017). Thus, HB142 prospectively prohibits the enactment of ordinances, like the Charlotte Ordinance that had been repealed as a predicate to HB2's repeal.

As a result, LGBT individuals have been deprived of the opportunity to advocate for local non-discrimination protections. FAC ¶ 26. Plaintiffs allege that if HB142's preemption provisions were overturned, they "would advocate for local ordinances that prohibit discrimination in employment and public accommodations based on sexual orientation and gender identity" in various localities. FAC ¶¶ 83, 121, 156, 170, 180, 192.

On September 7, 2017, Plaintiffs filed their Fourth Amended Complaint against the Governor, Attorney General, and several North Carolina executive officials

7

("Executive Branch Defendants"), the University of North Carolina, and UNC's

President, Margaret Spellings, seeking declaratory and injunctive relief and nominal

damages. Plaintiffs allege that HB142 violates the Due Process and Equal Protection

Clauses of the United States Constitution, as well as Title IX and Title VII.[3] Intervenors

Speaker Moore and President Pro Tempore Berger previously intervened in this litigation

as defendants, but Plaintiffs bring no claims against them. Plaintiffs and Executive

Branch Defendants filed a Joint Motion for Entry of a Consent Decree on October 18,

2017, which would resolve all claims against Executive Branch Defendants. ECF No.

216. On October 23, 2017, UNC and Intervenors filed motions to dismiss. ECF Nos.

221, 222.

## ARGUMENT

## I. Plaintiffs Have Standing to Challenge HB142's Restroom Access Preemption Provision.

### A. Plaintiffs Have Standing with Respect to Executive Branch Defendants.

The primary goal of any standing inquiry is determining whether the plaintiff is

the proper party to bring suit—not whether the plaintiff will ultimately prevail. *White

Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460-61 (4th Cir. 2005). Thus, when evaluating

standing, the Court should assume the merits of Plaintiffs' claims. *Id.* at 460-61. To

---

[3] In the event the Court finds one or more provisions of HB142 unlawful but HB142's repeal of HB2 not severable, Plaintiffs continue to allege that HB2 violates federal constitutional and statutory law. Separately, Plaintiffs Carcaño, McGarry, and Schafer seek nominal damages for violations of their Title IX and Title VII rights, as applicable, for the violations that have occurred under HB142 and also for those that occurred while HB2 was in force.

8

establish standing, a Plaintiff must show: (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized … and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). When standing is raised as a basis to dismiss, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *White Tail Park*, 413 F.3d at 459 (internal quotation marks and citation omitted).

> 1. **Plaintiffs are Suffering and Will Continue to Suffer Injury from the Inability to Use Government Restrooms and Reasonable Fear of Prosecution for Trespass.**

Plaintiffs have suffered and will continue to suffer concrete, particularized harm under HB142, which was intended to and in fact operates as a bar to safe restroom use by transgender individuals. Plaintiffs—like any member of the public—must occasionally use public restrooms. But because of HB142, Plaintiffs have altered their behavior to avoid using government restrooms, to reduce the threat of being arrested for trespass. *E.g.*, FAC ¶¶ 112-118, 149-154, 167-168. Against HB2's backdrop, the legislature's failure to pass a "clean repeal" of HB2, and government officials' express intent to expel transgender individuals from public restrooms, HB142 established a *de facto* bar on transgender individuals' access to government restrooms. Indeed, HB142 was crafted specifically to retain ambiguity about restroom access and to obstruct local government officials from providing any clarity—resulting in direct harm to transgender people.

9

Several state legislators, including Intervenor Speaker Moore, are on-record claiming that under HB142 transgender individuals using a restroom matching their gender identity will be arrested and charged with trespass. FAC ¶¶ 14, 246. Precisely this vagueness in HB142's language, and the ability to cast the law as retaining a ban on restroom use by transgender people, made the bill politically viable.

Where the State sets out to harm transgender people, deliberately crafts a law to instill fear and confusion in transgender people about what facilities they can use, and causes transgender people to alter their use of facilities, the State cannot escape the consequences of these intentional actions. Plaintiffs have identified injury in fact that gives them standing to challenge HB142.[4]

That HB142 has this effect by prohibiting other government agencies and departments from establishing restroom access policies does not lessen the injury or deprive Plaintiffs of standing. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010) (farmers had standing to challenge agency deregulation that would indirectly harm farmers' crops); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375-76 (1982) (plaintiffs can prove "indirect" injury "[a]s long as [they] have alleged distinct and palpable injuries that are 'fairly traceable' to [defendants'] actions"); *Roe v. Wade*, 410

---

[4] *Howe v. Haslam* is of no help to Intervenors. Intervenors Br. at 4 n.3, ECF No. 225. None of the *Howe* plaintiffs alleged harms as concrete as those in the FAC, such as a *de facto* bar on restroom access and potential criminal trespass liability. Furthermore, the *Howe* court acknowledged that injuries such as potential criminal prosecution would be sufficient to establish standing. No. M2013-01790-COA-R3CV, 2014 WL 5698877, at *19 (Tenn. Ct. App. Nov. 4, 2014).

U.S. 113, 124 (1973) (pregnant woman had standing to challenge statute that regulated doctors but nonetheless caused her harm).

Intervenors' argument that "injury by uncertainty" does not establish standing, Intervenors Br. at 7, ECF No. 225, mistakes both Plaintiffs' factual allegations and the applicable legal standards. "Even when the plaintiff might be able to reduce or avoid the risk of injury by changing a course of conduct, a threat of future injury can support standing. In some cases, a great price must be paid to avoid the risk." Charles Alan Wright *et al.*, 13A *Federal Practice & Procedure* § 3531.4, at 266-68 (3d ed. 2008). Time and again, the Supreme Court has confirmed that fear, uncertainty, and avoidance are sufficient injuries for standing purposes. *E.g.*, *Monsanto*, 561 U.S. at 153-54; *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979) (finding standing to bring pre-enforcement vagueness challenge, explaining that "when fear of criminal prosecution" is "not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute" (internal quotation marks and citation omitted)).[5]

---

[5] That recognizing injury from uncertainty would "launch standing doctrine into outer space," Intervenors Br. at 8, is disproven by decades of precedent establishing that fear and uncertainty constitute injury-in-fact. Moreover, Intervenors are simply incorrect in claiming that finding standing here would mean that any jurisdiction in the United States that has not yet legislated on gender access policies for public restrooms will be subject to potential litigation. *Id.* Plaintiffs are not challenging the absence of affirmative non-discrimination protections based on gender identity and Plaintiffs do not suggest they would have standing to bring such a challenge. Rather, Plaintiffs have standing to challenge a specific statute—HB142—that deliberately creates uncertainty about whether transgender individuals can use government restrooms and subjects them to possible criminal prosecution.

Cases finding fear and anxiety related to possible prosecution and legal liability insufficient to confer standing turned on factors not present here. *E.g.*, *Laird v. Tatum*, 408 U.S. 1, 13 & n.7 (1972) (plaintiffs lacked standing to challenge army surveillance programs where plaintiffs' counsel *admitted plaintiffs were not chilled by those programs*); *Doe v. Pryor*, 344 F.3d 1282, 1286-87 (11th Cir. 2003) (plaintiffs' fear of prosecution under statute prohibiting consensual sodomy was not objectively reasonable, in part because such statutes had recently been invalided by *Lawrence v. Texas*, 539 U.S. 558 (2003)).

UNC and Intervenors cite *Clapper v. Amnesty International USA*, to bolster their argument that Plaintiffs lack standing. *Clapper*, however, is a unique case that does not undermine Plaintiffs' standing here. First, the Court explained that it has "often found a lack of standing in cases in which the Judiciary has been requested to review *actions of the political branches in the fields of intelligence gathering and foreign affairs*." 568 U.S. 398, 409 (2013) (emphasis added). Unlike in *Clapper*, Plaintiffs currently face known and concrete harms from HB142—not only dignitary and stigmatic harms, but concrete medical impacts from avoiding restroom use, unequal treatment in workplace and educational settings, as well as disruption of work and school caused by searching for safe restrooms. FAC ¶¶ 67, 106, 143; *see* Fraser Decl. ¶ 33 (describing reduced fluid intake and urinary tract infections due to restroom avoidance).

Indeed, *Clapper* recognized that standing can be "based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." 568 U.S. at 414 n.5 (quoting *Monsanto*, 561 U.S. at 180). Ultimately,

12

the purpose of the standing inquiry is to "filter the truly afflicted from the abstractly distressed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000) (en banc). Here, Plaintiffs allege concrete harms caused by HB142.

### 2. Plaintiffs' Injuries are Traceable to HB142 and Can Be Redressed with an Order Invalidating HB142.

Plaintiffs' inability to access government restrooms without fear of exclusion and prosecution is a direct result of HB142, and an order invalidating the statute would redress those injuries. That HB142 causes these injuries indirectly by regulating state and municipal agencies—instead of directly by regulating individuals—makes no difference to the traceability and redressability analysis. *See supra* at 10-11; *Havens Realty*, 455 U.S. at 375-76.

Intervenors do not challenge traceability and redressability with respect to Executive Branch Defendants' enforcement of HB142's restroom access preemption provision, but aim their arguments solely at Plaintiffs' challenge to HB142's preemption of local non-discrimination ordinances. Intervenors Br. at 8-10. This is no doubt because Plaintiffs have sued the Executive Branch officials with control over government facilities (including restrooms), and a judicial order directed to these officials is capable of providing Plaintiffs with effective relief. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 74 (1978). An order invalidating HB142 would remove the fear and uncertainty HB142 was intended to create, would prevent officials—including Defendants—from claiming that transgender individuals are barred from public facilities, and would restore local governments' ability to clarify that transgender people may use

13

government restrooms corresponding to their gender identity. Indeed, UNC's argument that the Executive Branch is primarily responsible for HB142's interpretation and application and for decisions about criminal prosecutions related to restroom use, UNC Br. at 9, ECF No. 223, confirms that Plaintiffs' injuries are traceable to Executive Branch Defendants and that an order directed at them would redress Plaintiffs' injuries.

###    B.    Plaintiffs Have Standing with Respect to UNC.

Plaintiffs' injuries are also fairly traceable to and redressable by UNC. UNC argues it cannot be the cause of Plaintiffs' injuries because it had no role in HB142's drafting or passage, and does not have the legal power to clarify HB142. UNC Br. at 9. This is not the standard for causation, and UNC cites no precedent to support its argument. UNC does regulate restroom access—for example, by posting male and female signs on campus restrooms—and thus apparently does not believe its own assertion that it has no authority to regulate access under HB142. UNC has chosen a limiting construction of HB142 that applies only to restroom access for transgender individuals. This limited enforcement and discriminatory anti-transgender construction contributes directly to the uncertainty and harm transgender individuals face.

While UNC claims that "Plaintiffs have no personal stake in the extent of the University's powers" under HB142, UNC Br. at 8, Plaintiffs have a deeply personal stake in the extent of those powers, implicating profound medical, psychological, and dignitary interests. *See, e.g.*, FAC ¶¶ 51, 52, 58, 62, 93-94, 126, 161 (describing HB142's impact on and inconsistency with Plaintiffs' medical treatment for gender dysphoria). Beyond UNC's plenary powers to regulate the University's affairs and facilities, UNC also directs

14

campus police, which is authorized to enforce the state's criminal laws. N.C. Gen. Stat. §§ 116-40.5(a), 74G-6(b); *see also Guidelines at UNC*, UNC Police, https://police.unc.edu/about/role/guidelines/ (last visited Dec. 1, 2017). It is simply not true that UNC has no responsibility "for enforcing the state's criminal laws." UNC Br. at 11. If UNC were subject to a judicial order not to bar restroom access for transgender people or not to arrest or sanction any transgender person for using the appropriate restroom, such an order would redress Plaintiffs' injuries. *See Duke Power Co.*, 438 U.S. at 74.

UNC argues that Plaintiffs face no significant uncertainty because the Attorney General has opined that HB142 cannot be applied in an unconstitutional manner. First, in evaluating Plaintiffs' standing, the Court must presume Plaintiffs will prevail on the merits of their claims. *See White Tail Park*, 413 F.3d at 460-61. UNC's argument about the lack of uncertainty goes to the merits, and is thus irrelevant to standing. Likewise, the fact that the Attorney General has jointly moved with Plaintiffs to enter a consent decree is irrelevant to standing, which is determined at the time the complaint is filed. *See Lujan*, 504 U.S. at 569 n.4. At that time (and to this day), no state official had entered into an enforceable promise not to apply HB142 in a certain way. Plaintiffs and Executive Branch Defendants have moved for entry of the consent decree precisely because they agree that HB142 raises significant constitutional issues. But even if Executive Branch Defendants had made similar guarantees independent of this litigation, Plaintiffs would still have standing to challenge the law. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988); *Va. Soc'y for Human Life, Inc. v. FEC*, 263

15

F.3d 379, 386-89 (4th Cir. 2001), *overturned on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).

UNC overlooks that standing to challenge a statute does not actually require the specific "enforcement" of that statute per se; rather, standing lies when plaintiffs establish a "realistic danger of sustaining a direct injury as a result of the statute's *operation* or enforcement." *Babbitt*, 442 U.S. at 298 (emphasis added); *see Local 391, Int'l Bhd. of Teamsters v. City of Rocky Mount*, 672 F.2d 376, 379 (4th Cir. 1982). Here, HB142's operation—particularly when viewed in the context of HB2's prohibitions on access, the failure to cleanly repeal HB2 without imposing a statewide moratorium on restroom access policies, and the ongoing public statements by legislators threatening criminal trespass prosecution—is to put transgender people in permanent uncertainty about which restrooms they are permitted to use.

Finally, UNC suggests that Plaintiffs cannot establish standing to challenge HB142 without also challenging the criminal trespass statute. UNC Br. at 10. That is a dodge. There is nothing inherently unconstitutional about the trespass statute. The key concept underpinning the criminal trespass statute is whether a person has permission to be in a place. That depends not on the trespass statute, but on other aspects of state law. HB2 set rules regarding who had permission to enter public restrooms. HB142, instead of cleanly repealing HB2, froze state law in a state of perpetual uncertainty regarding who has that permission. Public officials continue to make statements that under HB142, transgender individuals are subject to prosecution if they use the "wrong" restroom. Plaintiffs did not challenge the trespass statute because the trespass statute is not causing

16

them harm. HB142 is. *See Babbitt*, 442 U.S. at 298 (an injury must be the "result of the statute's *operation* or enforcement." (emphasis added)).[6]

## II. Plaintiffs Have Standing to Challenge HB142's Unconstitutional Preemption of Local Government Anti-Discrimination Statutes.

Plaintiffs have a legally protected interest in their equal right to petition their local governments for non-discrimination protection. "The 'injury in fact' in an equal protection case … is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). HB142 is a barrier to Plaintiffs' advocacy for local non-discrimination laws. With HB142 in place, local advocacy is futile. Nor need Plaintiffs prove that any municipality would actually pass such a local ordinance in order to have standing, just as the contractors in *Northeast Florida* were not required to show that they would have been awarded the contract absent the challenged minority set-aside rules. Encountering the barrier is the injury that confers standing.[7] *See* FAC ¶¶ 83, 121, 156, 170, 180, 192; *see also Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 863-64 (8th Cir. 2006) (finding injury in fact from "diminished

---

[6] There is no merit to UNC's suggestion that under this Court's preliminary injunction order, Plaintiffs lack standing. UNC Br. at 12-13. Plaintiffs' injuries under HB142 are not the same injuries they experienced under HB2.

[7] Even outside equal protection, injury in fact can be shown by denial of an opportunity to compete for or obtain a benefit, even if prevailing on the merits would not guarantee the benefit. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 161 (1981); *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 100 (4th Cir. 2011).

access to the legislative process"), *abrogated on other grounds by Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).

Intervenors cite several cases for the proposition that a prohibition on local ordinances does not injure a "legally protected interest." Intervenors Br. at 5-6. But these cases stand for the much more limited proposition that plaintiffs cannot manufacture standing to vindicate statutory rights that are not actually protected by a statute. Contrary to Intervenors' claims, *Friends for Ferrell Parkway, LLC v. Stasko*, did not "reject[] a theory of standing" that the "Due Process or Equal Protection Clauses compel North Carolina to devolve authority to set these policies to localities," Intervenors Br. at 6. *Friends for Ferrell* mentions neither equal protection nor due process. In that case, plaintiffs challenged a proposed land transfer to the U.S. government because the land would no longer be available for development and, therefore, the transfer "destr[oyed] their opportunity to lobby for construction." 282 F.3d 315, 324 (4th Cir. 2002). Even then, the court recognized that "a litigant may be injured in fact by the threatened destruction of an opportunity," but that "[o]ne cannot complain about having an opportunity taken away when one does not have a real, concrete opportunity in the first place." *Id.* at 324-25. Here, by contrast, Plaintiffs have alleged concrete injury to their fundamental equal protection and due process rights to petition their local governments regarding non-discrimination ordinances. Similarly, *Salt Institute v. Leavitt*, 440 F.3d 156 (4th Cir. 2006) and *Dreher v. Experian Information Solutions Inc.*, 856 F.3d 337 (4th Cir. 2017), involve different statutory rights and neither involved any claimed injury to equal protection or due process.

18

Intervenors also attack Plaintiffs' standing to bring this claim on traceability and redressability grounds, asserting that not "a single North Carolina agency or locality had their preferred policies in force when H.B. 142 was passed." Intervenors Br. at 4.[8] But standing does not depend on whether the laws for which Plaintiffs are prevented from lobbying existed in the past. The injury is the *unequal barrier* to seeking protection. *Ne. Fla. Chapter*, 508 U.S. at 666. Moreover, Intervenors conveniently overlook the fact that Charlotte repealed its ordinance specifically in exchange for a promised "clean repeal" of HB2—which never occurred. FAC ¶¶ 8, 179. Instead, the legislature enacted HB142, which prohibits local non-discrimination ordinances until 2020.

## III. Plaintiffs' Claims are Ripe.

Plaintiffs' claims are ripe because Plaintiffs are currently experiencing hardships under HB142 that would be eliminated by a favorable ruling from this Court. The dispute involves discrete legal questions and would not materially benefit from further factual development.

Ripeness turns on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The "question in each case is whether … there is a

---

[8] The cases Intervenors cite are inapposite. *See Doe v. Obama*, 631 F.3d 157, 162 (4th Cir. 2011) (injury not traceable to stem cell research funding policies where parental decision to donate embryos was an "intervening cause" of the alleged injury); *Mirant Potomac River, LLC v. U.S. EPA*, 577 F.3d 223, 226-30 (4th Cir. 2009) (injury not traceable to challenged regulation where injury independently caused by separate regulation).

substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "However much the courts might prefer to resolve a particular question at another time and place, they should have a very good reason for indulging that preference, if in doing so they are refusing a petitioner's request to be relieved of an onerous legal uncertainty." *Cont'l Air Lines, Inc. v. C.A.B.*, 522 F.2d 107, 128 (D.C. Cir. 1974).

HB142 is presently harming Plaintiffs by deterring them from using government restrooms, sometimes causing them to avoid such use altogether.[9] *See* FAC ¶¶ 67, 70, 75, 76, 77-80, 112-118, 149-154, 167-168. Plaintiffs need not expose themselves to arrest for trespass or experience forcible removal from a restroom or punishment under UNC's honor code before a challenge is ripe. *E.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 n.8 (2007). Rules and regulations that require a plaintiff "to adjust [his] conduct immediately" are "ripe for review at once." *Va. Soc'y for Human Life*, 263 F.3d at 390; *see also Abbott Labs.*, 387 U.S. at 153. A reasonable fear regarding the possible future application of an ambiguous statute is sufficient. *Babbitt*, 442 U.S. at 301-03; *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 587 n.1 (4th Cir. 2010); *S.C. Med. Ass'n v. Thompson*, 327 F.3d 346, 354 n.3 (4th Cir. 2003).

---

[9] HB142's moratorium on local non-discrimination ordinances is presently harming Plaintiffs as well. *See* FAC ¶¶ 83, 121, 156, 170, 180, 192.

When the threat of enforcement persists for an extended period of time, judicial intervention is especially appropriate. *See United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013); *see also Peachlum v. City of York*, 333 F.3d 429, 435 (3d Cir. 2003).

The cases UNC and Intervenors cite do not undermine the ripeness of Plaintiffs' claims. For example, in *National Park Hospitality Ass'n v. Department of Interior*, the Supreme Court only reached its conclusion that "mere uncertainty as to the validity of a legal rule [does not] constitute[] a hardship for purposes of the ripeness analysis" after it concluded that the challenged regulation "could not be said to be felt immediately by those subject to it in conducting their day-to-day affairs" and that petitioners "suffer[ed] no practical harm" from the regulation. 538 U.S. 803, 810-11 (2003).[10] The *only* injury plaintiffs complained of was "mere uncertainty as to the [rule's] validity." *Id.* at 811.[11]

---

[10] The Court's opinion is also distinguishable as arising under the Administrative Procedure Act, where a different ripeness analysis applies. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808.

[11] Likewise, the other cases UNC and Intervenors cite are factually distinct from this case. Although *Regional Management Corp. v. Legal Services Corp.*, acknowledges that a court can consider whether the meaning of a statute has "crystallized," that consideration must be balanced "against the hardship to the plaintiff from withholding court consideration." 186 F.3d 457, 465 (4th Cir. 1999). In that case, the court found that plaintiffs would "suffer little, if any, hardship from delay" in part because they did not "'rely heavily and frequently'" on the challenged policy. *Id.* at 465-66 (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986)). Here, Plaintiffs—like all human beings—must use restrooms on a daily basis, and avoiding restroom use can have serious consequences.

In *Renne v. Geary*, the Court found lack of ripeness in a challenge to a constitutional provision barring political party endorsements from voter pamphlets where there were no "continuing, present adverse effects." 501 U.S. 312, 322-23 (1991). Although the plaintiffs alleged fear of criminal prosecution, they provided "no explanation of what criminal provision [their] conduct might be held to violate." *Id.* at 322. Similarly, in *Telco Communications, Inc. v. Carbaugh*, the court found lack of ripeness where plaintiffs challenged a regulation concerning the process for revoking a

21

Finally, Intervenors argue that at most Plaintiffs are claiming "contingent future injuries." Intervenors Br. at 10-11. Intervenors ignore that Plaintiffs are (1) being harmed right now due to HB142's deliberate ambiguity and public statements by Intervenor Moore and other state officials that transgender people are subject to prosecution for using the "wrong" restroom and (2) at least with respect to restrooms under Executive Branch Defendants' and UNC's control, any future injury would be due to decisions made by the Defendants in this case, not some third party outside the litigation. Throughout their briefs, UNC and Intervenors ignore and dismiss the concrete injuries that Plaintiffs are currently suffering, not through any fault of Plaintiffs, but from Plaintiffs' reasonable reaction to HB142 and the chorus of official statements promising criminal prosecution for any transgender individual using a government restroom consistent with his or her gender identity. Article III does not require Plaintiffs to subject themselves to criminal sanctions in order to determine which restroom they are permitted to use.

## IV. Plaintiffs Adequately Plead All Counts Challenging HB142.

A motion to dismiss should only be granted if, after accepting as true all well-pleaded allegations and drawing all reasonable inferences in a plaintiff's favor, "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *People for the Ethical Treatment of Animals v. U.S. Dep't of*

---

charitable organization's license where plaintiffs pleaded no facts suggesting they had violated or were accused of violating any provisions of the regulation. 885 F.2d 1225, 1234-35 (4th Cir. 1989).

*Agric.*, 861 F.3d 502, 506 (4th Cir. 2017) (internal quotation marks and citations omitted).

### A. The Court Need Not Resolve Claims Against Executive Branch Defendants.

Plaintiffs and Executive Branch Defendants have filed a Joint Motion for Entry of a Consent Decree, which would resolve all claims against Executive Branch Defendants. *See* ECF No. 216. To enter the Consent Decree, the Court must only "satisfy itself that the agreement is fair, adequate, and reasonable, and is not illegal, a product of collusion, or against the public interest." *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (internal quotation marks and citation omitted). As long as the Court has jurisdiction, it can avoid "decid[ing] the merits of the case or resolv[ing] unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

The Court granted Intervenors permissive intervention, *see* ECF No. 44, and Plaintiffs do not press any claims against Intervenors or the legislature. As the Supreme Court has explained, "[i]t has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation." *Local No. 93 Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528-29 (1986). Thus, Intervenors cannot block entry of a consent decree resolving claims against Executive Branch Defendants, and the Court should decline to entertain Intervenors' arguments for dismissing Plaintiffs' claims against Executive Branch Defendants.

23

**B.    Plaintiffs' Claims Against Defendant Spellings Neither Violate Sovereign Immunity Nor Exceed the Bounds of § 1983.**

Plaintiffs have properly named Defendant Spellings as a defendant under *Ex parte Young* because she has a "special relation" to the alleged federal law violation.[12]  *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008).  That relation need not be *qualitatively* special; rather the test measures the defendant's "*proximity to* and *responsibility for* the challenged state action."  *Id.* at 333.[13]  Nor must the defendant or her agency be "[a]ctually mention[ed]" in the challenged statute; the relation can be "created by other statutes which authorize the defendant's deep involvement in executing the challenged law."  *Summers v. Adams*, 669 F. Supp. 2d 637, 655 (D.S.C. 2009) (brackets, internal quotation marks, and citation omitted).

Defendant Spellings's statutory duties and policy-making authority establish the necessary special relation to Section 2 of HB142.  Defendant Spellings is statutorily enumerated as UNC's "chief administrative officer," N.C. Gen. Stat. § 116-14(a), and UNC concedes that she has direct policy-making authority.  UNC Br. at 2-3.  That

---

[12] UNC's assertion of sovereign immunity applies only to Plaintiffs' constitutional claims.  UNC Br. at 16.  Accordingly, even if this Court concludes that President Spellings is entitled to sovereign immunity, Plaintiffs' Title IX and VII claims cannot be dismissed on this basis.

[13] Although UNC cites *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001), for the proposition that a defendant must have a "specific duty" to *enforce* the challenged state statute, UNC Br. at 16, that test "is inapposite," *Limehouse*, 549 F.3d at 333.  This Court may look to state law, generally, to determine if HB142 imposes any duty upon Defendant Spellings that is "determinative of the existence of the necessary special relation" and that supplies "a sufficient connection to the alleged violation of federal law."  *Id.*

24

authority extends to the UNC campus police.[14]  Thus, Defendant Spellings is charged with formulating policy regarding restroom access and campus administration of trespass and other criminal laws.

Since HB142's passage, UNC has continued to regulate access to and provide signage for separate men's and women's restrooms but has refused to state which, if any, multi-user restrooms transgender individuals can use.  FAC ¶¶ 13, 76, 113, 270.  That refusal directly affects Plaintiffs' place of work or study—disrupting their ability to attend class, forcing them to miss work time, and causing them to limit their restroom use.  FAC ¶¶ 40, 76, 86, 101, 106, 113.

UNC's refusal is particularly problematic because it conflicts with UNC's policies prohibiting discrimination against transgender individuals.  *See, e.g.*, UNC Br. at 3, 23. Indeed, while HB2 was in effect, Defendant Spellings indicated she had authority to reconcile internal policies related to restroom access.  *See* ECF No. 38-1.

As the administrative head charged with implementing policies at UNC, Defendant Spellings is a proper defendant.[15]  *See Limehouse*, 549 F.3d at 333; *Ansley v.*

---

[14] Campus police are subject to University policies.  *See, e.g.*, *Guidelines at UNC*, UNC Police, *supra*.  Although each institution's Chancellor is responsible for campus security, each Chancellor is "subject to the direction of the president."  *See* Code of the Board of Governors of the Univ. of N.C. § 502 A (revised Nov. 3, 2017), http://www.northcarolina.edu/apps/policy/ index.php?pg=dl&id=2&format=pdf&inline=1; *id.* Appendix 1, § XV.

[15] To no avail, UNC relies on *Doe v. Rosa*, in which the Fourth Circuit noted that principles of respondeat superior do not apply in Section 1983 actions.  795 F.3d 429, 439 n.7 (4th Cir. 2015).  Defendant Spellings's *own* actions and direct policymaking authority are at issue here.

*Warren*, No. 16-cv-00054, 2016 WL 5213937, at *7 (W.D.N.C. Sept. 20, 2016).  The *Ex parte Young* doctrine is intended to ensure that injunctive relief would be effective against the defendant sued, *see Limehouse*, 549 F.3d at 333-34, and UNC offers no reason why an injunction against UNC's implementation of HB142 would not redress HB142's harms.

### C.    Plaintiffs Plausibly Plead Due Process Claims.

Plaintiffs plausibly allege that HB142 intentionally creates uncertainty concerning which, if any, government restrooms transgender people can use, thereby exposing transgender people to potential civil and criminal penalties.  Such vagueness violates due process because Plaintiffs cannot know how to conform their conduct to the law.  HB142 is the source of that vagueness, and invalidating the law would remedy the due process violation.

The Constitution "insist[s] that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and an enactment "is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  This constitutional requirement applies to civil and criminal laws alike.  *See A.B. Small Co. v. Am. Sugar Ref. Co.*, 267 U.S. 233, 239 (1925); *Dickson v. Sitterson*, 280 F. Supp. 486, 498 (M.D.N.C. 1968).  A statute that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement" is unconstitutionally vague.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (internal quotation marks and citation omitted).

26

HB142 fails to provide transgender people with fair notice of what is prohibited. HB142 bars any regulation of government restroom use "except in accordance with an act of the General Assembly," but no act of the General Assembly clarifies what restrooms transgender individuals may use. FAC ¶ 264. In short, HB142 intentionally leaves transgender people in limbo about whether they may legally use restrooms in government buildings. That intentional vagueness and the attendant risk of prosecution violates the Constitution.

Notably, while both UNC and Intervenors argue that HB142 is not vague because it is clear in its preemptive effect, *neither* party takes an affirmative position concerning which restroom transgender individuals like Plaintiffs are permitted to use. And as Plaintiffs allege, numerous legislators—including Intervenor Moore—have asserted since HB142's enactment that second degree trespass, indecent exposure, or peeping charges could be brought against transgender individuals who use the "wrong" restroom.[16] FAC ¶ 246. Indeed, the state's criminal laws provide that a person commits second degree trespass "if, without authorization, he enters or remains on the premises of another … [a]fter he has been notified not to enter or remain there by the owner, by a person in charge of the premises, by a lawful occupant, or by another authorized person." N.C. Gen. Stat. § 14-159.13(a). North Carolina courts have applied the statute to existing directives about public restroom and locker room use holding, for example, that a sign

---

[16] While these statements may be of "limited value" when determining the legislature's *intent* in passing HB142, *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 229 (4th Cir. 2016), here Plaintiffs rely on these statements as evidence of the meaning of HB142, and whether HB142 provides fair notice of what is prohibited.

27

demarking the "'Girl's Locker Room' was reasonably likely to give [a male student] notice that he was not authorized to go into the girl's locker room." *In re S.M.S.*, 675 S.E.2d 44, 46 (N.C. Ct. App. 2009). HB142 therefore permanently changes the risk transgender individuals face. Public agencies, including UNC, continue to regulate restroom access in several respects but not regarding transgender individuals. HB142's disparate enforcement sends a clear message to transgender individuals: "Good luck guessing where to use the restroom without consequence."

The state of legal uncertainty carries a risk of arrest and prosecution if transgender individuals use the restroom that accords with their gender identity. FAC ¶¶ 75, 112, 149, 168. The same is true if transgender individuals attempt to use the restroom that *does not* match their gender identity. Because transgender individuals typically are perceived by others as the sex matching their gender identity, their use of a restroom designated for their assigned sex at birth also poses the risk of arrest. FAC ¶¶ 75, 112, 149, 168. Plaintiffs therefore assert a serious claim that the legal vacuum created by HB142 fails to provide transgender individuals "fair notice of what is prohibited" or is "so standardless that it authorizes or encourages seriously discriminatory enforcement."[17] *Fox Television Stations*, 567 U.S. at 253 (internal quotation marks and citation omitted).

---

[17] "A statute can be impermissibly vague for either of [these] two independent reasons." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). While it suffices for Plaintiffs to show that HB142 fails to provide fair notice, Plaintiffs also allege that the law's lack of any clarity fails to provide any guidance for enforcement, rendering it subject to arbitrary and discriminatory enforcement. For this same reason, Plaintiffs also adequately allege a substantive due process claim that the legal uncertainty created by HB142 renders HB142

UNC's and Intervenors' claim that HB142 is not vague in its preemptive effect and does not directly regulate Plaintiffs is beside the point. UNC Br. at 18-19; Intervenors Br. at 11-13. As this Court previously recognized, HB2 essentially "dictate[d] how the trespassing statute applies to transgender individuals' use of bathrooms," and "foreclose[d]" an individual's ability to argue "that they believed they had permission to enter facilities that matched their gender identity." Op. at 18. This history cannot be ignored. While potential criminal penalties follow from enforcement of other laws (in part because HB142 like HB2 before it has no clear enforcement mechanism), the *vagueness* about those laws' reach—*e.g.*, who has "authorization" to be in a restroom—flows directly from HB142's prohibition on any further clarity. HB142 is the direct cause of the unconstitutional vagueness that affects Plaintiffs' conduct.

### D. Plaintiffs Plausibly Plead Title IX and Title VII Claims.

Plaintiffs have adequately alleged that by failing to ensure that Plaintiffs Carcaño, McGarry, and Schafer may use restrooms and changing facilities consistent with their respective gender identities without fear of penalty, UNC has "exclude[d] [them] from participation in," "denie[d] [them] the benefits of," and "subject[ed] [them] to discrimination" at school on the basis of sex, in violation of Title IX. 20 U.S.C. § 1681(a). Similarly UNC's failure to ensure that Mr. Carcaño has access to restrooms and changing facilities consistent with his gender identity without fear of penalty violates

---

arbitrary and capricious and results in arbitrary and capricious treatment that is not narrowly tailored or the least restrictive alternative for promoting a compelling state interest, nor even rationally related to any legitimate state interest. *See, e.g.*, *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008).

29

Title VII because it discriminates against him with respect to his "terms, conditions, or privileges of employment," and "limit[s], segregate[s], or classif[ies]" him in a way that "deprive[s] or tend[s] to deprive" him of "employment opportunities or otherwise adversely affect[s] his status as an employee"—both because of his sex. 42 U.S.C. § 2000e-2(a). Title IX's protections extend to employees of educational institutions, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982), and courts in this circuit consider case law interpreting Title VII when evaluating Title IX claims, *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

### 1. Discrimination Based on a Person's Transgender Status is Discrimination "On the Basis of Sex."

By treating Plaintiffs differently because they are transgender, UNC impermissibly discriminates "on the basis of sex." Although the Fourth Circuit has not yet addressed the question, a significant number of circuits have held that differential treatment of transgender persons because they are transgender is discrimination on the basis of sex under federal civil rights statutes and the Equal Protection Clause. *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist.*, 858 F.3d 1034, 1049 (7th Cir. 2017), *petition for cert. filed*, 86 U.S.L.W. 3089 (U.S. Aug. 25, 2017) (No. 17-301); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016); *Glenn v. Brumby*, 663 F.3d 1312, 1316-19 (11th Cir. 2011); *Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v. Hartford*, 204 F.3d 1187, 1201-03 (9th Cir. 2000).

Transgender status is an inherently sex-based characteristic. The incongruence between a person's gender identity and sex designated at birth is what makes that person

transgender. Line drawing based on that characteristic inherently discriminates on the basis of "sex." *See Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016).

Discrimination against transgender individuals also rests on sex stereotypes that constitute discrimination on the basis of sex. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion).[18] Assuming or insisting that men and women match "stereotype[s] associated with their group" is discrimination because of sex. *Id.* A transgender individual, by definition "does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048; *accord, e.g.*, *Glenn*, 663 F.3d at 1316.

For example, unlike other men, Mr. Carcaño was designated a different sex at birth, and thus does not conform to the stereotypes associated with men. To be sure, most men are designated male at birth. The Supreme Court has repeatedly instructed, however, that the proper focus of the inquiry "is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) (internal quotation marks and citation omitted).

Finally, discrimination against people because they have undergone a gender transition is necessarily based on sex, just as discrimination based on religious conversion is necessarily based on religion. *Cf. Hobbie v. Unemployment Appeals Comm'n*, 480

---

[18] Although *Price Waterhouse* was a plurality opinion, two justices concurring in the judgment also concluded that the plaintiff had adequately alleged a violation of Title VII. *See* 490 U.S. at 259 (White, J., concurring); *id.* at 272-73 (O'Connor, J., concurring); *see also Whitaker*, 858 F.3d at 1047 (recognizing same).

31

U.S. 136, 144 (1987). Sex discrimination includes discrimination against men and

women who have undergone a gender transition. *See, e.g.*, *Schroer v. Billington*, 577 F.

Supp. 2d 293 306-07 (D.D.C. 2008).

### 2. UNC's and Intervenors' Narrow Interpretation Conflicts with the Plain Text and Settled Statutory Interpretation Principles.

Consistent with each of these understandings of the term "sex," discrimination

against someone because they are transgender is sex-based discrimination. To argue

otherwise, UNC and Intervenors point to definitions or conceptions of "sex" which refer

to classification on the basis of one's reproductive organs or physical characteristics. *See*

UNC Br. at 22, Intervenors Br. at 19. However, *Price Waterhouse* eviscerated the notion

that "sex" is limited to biology. Citing *Price Waterhouse*, the Fourth Circuit has made

clear that "[b]oth biological and cultural differences give rise to Title VII sex

discrimination." *Bauer v. Lynch*, 812 F.3d 340, 347 n.9 (4th Cir. 2016). Thus,

"discrimination … on the basis of being transgender, or intersex, or sexually

indeterminate, constitutes discrimination on the basis of the properties or characteristics

typically manifested in sum as male and female." *Fabian*, 172 F. Supp. 3d at 527.[19]

---

[19] Intervenors acknowledge the "circuit authority" concluding that discrimination against
transgender individuals is a form of sex discrimination, but urge the Court to follow
outdated cases that rely on the Seventh Circuit's decision in *Ulane v. Eastern Airlines,
Inc.*, 742 F.2d 1081 (7th Cir. 1984). Intervenors Br. at 19-20 & n.6. The Seventh Circuit
recently repudiated *Ulane*'s interpretive methodology, however, *Hively v. Ivy Tech.
Cmty. Coll. of Ind.*, 853 F.3d 339, 341 (7th Cir. 2017) (en banc), and clarified that *Ulane*
"cannot and does not foreclose … transgender students from bringing sex-based
discrimination claims based upon a theory of sex-stereotyping," *Whitaker*, 858 F.3d at
1047.

If UNC and Intervenors intend to imply that Congress's intent in passing Title IX and Title VII was primarily to remedy discrimination against women, such supposed intentions cannot overcome the statute's plain language.  The Supreme Court has long rejected that approach: "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).  The Court has repeatedly instructed courts to construe Title IX to encompass "a wide range of intentional unequal treatment."  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).  Our understanding of transgender individuals has grown since Title IX and Title VII were enacted, and "changes, in law or in the world" may "require [a statute's] application to new instances."  *West v. Gibson*, 527 U.S. 212, 218 (1999).  A broadly written statute "embraces all such persons or things as subsequently fall within its scope."  *De Lima v. Bidwell*, 182 U.S. 1, 197 (1901); *see also, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007).[20]

UNC and Intervenors also argue that gender-identity-based sex discrimination is implicitly excluded from Titles IX and VII because in more recent statutes Congress has

---

Because discrimination against transgender individuals is a form of "sex" discrimination, UNC's argument concerning Title VII's coverage of sexual orientation-based discrimination is irrelevant.  UNC Br. at 23.

[20] These authorities also distinguish *Sommers v. Budget Marketing Inc.*, which based its analysis primarily on the fact that Title VII's "thrust" was to "provide[] equal opportunities for women."  667 F.2d 748, 750 (8th Cir. 1982).

33

explicitly protected individuals based on "gender identity."  *See* UNC Br. at 22-23;

Intervenors Br. at 19.  However, attempts at "[p]ost-enactment legislative history (a

contradiction in terms) [are] not a legitimate tool of statutory interpretation."  *Bruesewitz*

*v. Wyeth LLC*, 562 U.S. 223, 242 (2011); *Bilski v. Kappos*, 561 U.S. 593, 645 (2010)

("When a later statute is offered as an expression of how the Congress interpreted a

statute passed by another Congress a half century before, such interpretation has very

little, if any, significance." (internal quotation marks, citation, and ellipses omitted)).[21]

### 3. UNC's Refusal to Clarify After HB2 Which Public Facilities Transgender Students and Employees May Use Discriminates in Violation of Titles VII and IX.

UNC's application of HB142 subjects individuals to discrimination.  Because

UNC does not specify which public facilities transgender individuals can use, UNC

deters transgender individuals' use of any multiple occupancy facility.  UNC therefore

excludes Plaintiffs from participation in and denies them the benefits of UNC's

educational programs, and adversely affects their status as employees.  *See, e.g.*,

*Whitaker*, 858 F.3d at 1049-50; *Mickens v. Gen. Elec. Co.*, No. 3:16-cv-00603, 2016 WL

7015665, at *3 (W.D. Ky. Nov. 29, 2016) (Title VII).

---

[21] Intervenors wrongly assert that if Title IX were held to cover discrimination based on one's gender identity it would be unconstitutional under the *Pennhurst* doctrine. Intervenors Br. at 19-20.  States have long been on notice of Title IX's broad reach, because the Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson*, 544 U.S. at 183.  Furthermore, the notice problem "does not arise in a case" like this one "in which intentional discrimination is alleged."  *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 61 (1992).

34

"The most obvious example" of conduct violating Title IX is the "overt, physical deprivation of access to school resources." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). The "physical deprivation" of restroom access visibly marks UNC's transgender students and employees as separate, and involuntarily discloses or "outs" them as transgender.

Moreover, the considerable uncertainty and fear of penalty that HB142 poses effectively excludes Plaintiffs from participation in and denies them the benefit of UNC's educational programs and activities. HB142 singles out transgender students and employees for differential treatment as the only ones who have to worry about which facilities they can use. To the extent Plaintiffs are deterred from using multiple occupancy facilities entirely and instead seek out gender-neutral single-occupancy facilities—if available—that separate treatment itself is discriminatory. *See, e.g.*, *Whitaker*, 858 F.3d at 1049-50.

UNC claims it has not discriminated because it has "simply complied with its obligations under state law" and declined to regulate access to restrooms. UNC Br. at 24-25. However, nothing indicates that UNC has ceased maintaining or posting signs designating separate men's and women's rooms—practices that regulate restroom access. FAC ¶ 267. UNC's decision to make clear that men and women must use particular restrooms, but not to similarly make clear which restrooms transgender individuals can use is an "intentional act," amounting to discrimination because Plaintiffs are thereby "being subjected to differential treatment." *Jackson*, 544 U.S. at 173-74; *see Robinson v. Lorillard Corp.*, 444 F.2d 791, 796 (4th Cir. 1971) (a Title VII plaintiff need not show a

35

*discriminatory* intent but "only that the defendant meant to do what he did" and that "his employment practice was not accidental" (internal quotation marks and citation omitted)). For this same reason, Intervenors' contention that HB142 itself does not discriminate because it only preempts certain decisions by state agencies is unavailing. Intervenors Br. at 18.

### E. Plaintiffs Plausibly Plead Equal Protection Claims.

Plaintiffs have also plausibly alleged that Sections 2, 3, and 4 of HB142 violate the Equal Protection Clause. To allege an equal protection violation, a plaintiff must allege that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

### 1. HB142 Intentionally Discriminates on the Basis of Gender Identity and Sexual Orientation.

HB142 discriminates against individuals on the basis of gender identity and sexual orientation because that is the law's purpose, design, and effect. Equal protection is implicated whenever a classification is "explicitly stated on the face of a statute or in the reasons given for its administration or enforcement," *or* if facially neutral, "nonetheless intentionally utilize[s]" a classification. *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995).[22] When a statute is facially neutral, the plaintiff must also show that the statute was "motivated, at least in part, by an 'invidiously discriminatory' intent." *Id.*

---

[22] Intervenors are simply wrong that an *explicit* classification is "a necessary condition for an equal protection claim." Intervenors Br. at 13-14.

That intent need not be the "sole," "dominant," or even "primary" purpose, so long as the "discriminatory purpose has been a motivating factor in the decision." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265 (1977).

Here, although Section 2 of HB142 does not expressly refer to "gender identity" or even to "sex," the provision discriminates on the basis of one's gender identity and transgender status. While the statute's plain language purports to prohibit *any* regulation of multiple occupancy restroom usage—including maintenance and posting of signs regarding separate men's and women's rooms, regulating when and how a restroom is cleaned, or whether those with disabilities would have access—neither the state government nor anyone operating a government building is currently enforcing HB142 to this effect. FAC ¶ 13. The law, in operation, creates one rule for transgender individuals and another for non-transgender individuals. *Cf. Patel*, 135 S. Ct. at 2451. HB142 deliberately creates confusion and fear for transgender people concerning their access to single-sex public facilities. All defendants thus treat transgender individuals differently from everyone else.

Sections 3 and 4 of HB142 similarly treat LGBT individuals differently. Section 3 does not preempt any *existing* anti-discrimination or public accommodation laws. It only operates prospectively, prohibiting local governments from amending or enacting *new* laws. FAC ¶ 291. Pre-existing non-discrimination ordinances—including the City of Charlotte's ordinance as applied to discrimination based on race, color, religion, national origin, or sex—continue to be valid. FAC ¶¶ 292-293. But there currently exists no protection for LGBT people at the state or local level. As a result, HB142 hinders the

37

enactment of local public accommodation and private employment protections only for certain groups (like LGBT individuals). FAC ¶ 293. Thus, HB142 does not *neutrally* "centralize[] authority to set certain access and non-discrimination policies" or "affect[] existing anti-discrimination norms." Intervenors Br. at 13-14. Context makes clear that the law was targeted at barring the passage of LGBT protections. HB142's passage (and HB2's repeal), was predicated on the repeal of Charlotte's Ordinance. FAC ¶¶ 227-233.

Plaintiffs also plausibly allege that HB142 was motivated by invidious discrimination. To assess intent, *Arlington Heights* instructs courts to undertake a "sensitive inquiry into such circumstantial and direct evidence … as may be available." 429 U.S. at 266. Relevant factors include "impact of the official action," whether it is felt more heavily by particular groups, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and any "legislative or administrative history." *Id.* at 266-68.

Plaintiffs allege facts satisfying each factor. HB142's impact demonstrates a "clear pattern" impacting particular groups: government buildings continue to regulate restrooms in a number of ways *except* for clarifying whether and which government restrooms transgender individuals can use, and Section 3 insulates from repeal existing local policies protecting groups *other than* LGBT individuals. *Id.* at 267; *cf. Guinn v. United States*, 238 U.S. 347, 363 (1915). Nor can HB142's passage be divorced from the historical background of HB2, which restricted individuals' use of restrooms and which

38

was prompted by the Charlotte Ordinance that sought to provide protections for LGBT individuals. FAC ¶¶ 204-206. HB142's provisions must be understood in that light.

The legislative history of the law—in the form of the statements made by a number of legislators contemporaneously with the law's enactment indicating that HB142 did not, and was not intended to, repeal HB2's prohibition on transgender individuals' restroom use, FAC ¶ 246—also demonstrates discriminatory intent.

The sequence of events leading up to HB142's passage and the departure from normal procedures "shed[s] some light on the decisionmakers' purposes." *Arlington Heights*, 429 U.S. at 267. The legislature referred to committee multiple "clean repeal" bills—which would have repealed HB2, without more—but none were enacted. FAC ¶¶ 235, 240. HB142 only passed once the Charlotte Ordinance was repealed and once HB2's repeal was coupled with provisions limiting government restroom regulation and prohibiting enactment of anti-discrimination and public accommodation laws. This context suggests the law passed only because it continued to discriminate against LGBT individuals. FAC ¶ 245. And there was a departure from the normal procedural sequence: the bill was introduced, debated, passed, and signed within a single day. FAC ¶¶ 241-44. That the legislature rushed the bill signals discriminatory intent—even if the legislature acted within the letter of its procedural rules. *See McCrory*, 831 F.3d at 228.

One must inevitably "draw the obvious inference that this sequence of events" surrounding HB142's passage "signals discriminatory intent." *Id.* at 227.

### 2. HB142 Establishes a More Burdensome Political Process for LGBT Individuals.

Plaintiffs plausibly allege that HB142 subjects LGBT individuals to a more burdensome political process. "[T]he Equal Protection Clause … protects the fundamental right to participate equally in the political process, and … any legislation or state constitutional amendment which infringes on this right by fencing out an independently identifiable class of persons must be subject to strict judicial scrutiny." *Evans v. Romer*, 882 P.2d 1335, 1339 (Colo. 1994), *aff'd on other grounds,* 517 U.S. 620, 633 (1996) (internal quotation marks and citation omitted); *see Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Hunter v. Erickson*, 393 U.S. 385 (1969). As explained by the *Schuette v. Coalition to Defend Affirmative Action* plurality, this case law supports the "unremarkable principle that the State may not alter the procedure of government to target" a vulnerable minority group where that alteration "had a serious risk, if not purpose, of causing specific injuries" to that group. 134 S. Ct. 1623, 1632-33 (2014). Equal protection guards an individual's right "not to be injured by the unlawful exercise of government power." *Id.* at 1636.

Section 2 of HB142 fences out transgender individuals from seeking bathroom access guidance from local governments and state entities, but has not prevented regulation of separate "men's" and "women's" restrooms—perpetuating a permanent state of legal uncertainty. Similarly, Sections 3 and 4 of HB142 prevent LGBT individuals from seeking public accommodation or anti-discrimination laws from local governments, while permitting existing local ordinances to remain in place. Unlike in

40

*Schuette*, HB142 does more than alter the political level at which certain policy decisions—like affirmative action policies—are made. HB142 creates different procedures for only LGBT North Carolinians.[23]

### F. Intervenors' Tenth Amendment Arguments are Irrelevant and, Regardless, Plaintiffs' Requested Relief Would Not Commandeer the Legislative Process.

Focusing on a single item in Plaintiffs' request for relief—that the Court require Defendants "to ensure the ability of individuals, including transgender people, to use single-sex, multiple-user facilities in accordance with their gender identity without fear of arrest or penalty" and "to allow local governments to enact and continue to enforce anti-discrimination protections for LGBT people," FAC at 102—Intervenors claim that such relief would unconstitutionally commandeer state and local governments, requiring dismissal of the Complaint "in its entirety." Intervenors Br. at 21. Intervenors arguments are irrelevant. Arguments concerning "the nature of the relief included in the demand for judgment [are] immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted." *Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 629 (W.D. Va. 2014). It would also be premature

---

[23] Because UNC and Intervenors argue only that Plaintiffs have not stated cognizable Equal Protection Claims in the first instance—and do not address justifications to support any section of HB142—Plaintiffs do not address that issue. Plaintiffs note, however, that because HB142 discriminates on the basis of sex, it triggers heightened scrutiny. *See, e.g.*, *supra* at 30-32; *Hively*, 853 F.3d at 345-49. Separately, Plaintiffs allege that classifications based on transgender status and sexual orientation are suspect and independently warrant strict or at least heightened scrutiny. FAC ¶¶ 319, 327, 335-344. UNC and Intervenors have not argued otherwise, because they claim that HB142 is not a discriminatory classification at all.

for the Court to eliminate a potential remedy at this stage of the litigation. *Id.* at 629-30; *Johnson v. Shasta Cty.*, 83 F. Supp. 3d 918, 933 (E.D. Cal. 2015). And even if successful, Intervenors' argument would not warrant dismissal of the Complaint in its entirety, given Plaintiffs' *other* requests for relief. *Charles*, 21 F. Supp. 3d at 629.

Regardless, Intervenors' commandeering argument fails on its merits. Intervenors incorrectly characterize the requested relief as seeking enactment and administration of non-discrimination polices that do not currently exist. *See* Intervenors Br. at 21. Plaintiffs simply request that HB142 be struck down as violating due process and equal protection. The relief Plaintiffs seek would follow from the invalidation of HB142 on those grounds.

## V.     Plaintiffs Adequately Plead HB2 Claims.

### A.     No Grounds Exist to Dismiss Plaintiffs' Constitutional HB2 Claims at this Stage.

Counts III, IV, and V plead alternative constitutional claims against HB2, solely in the event that the Court finds one or more of HB142's provisions unlawful and not severable from HB142's other provisions. *See* FAC ¶¶ 346, 373, 382. Although the Court need not consider those claims at this time, they remain ripe.

Intervenors are wrong as a matter of law in claiming these counts are unripe because they depend on "a string of unpredictable events and decisions." Intervenors Br. at 22. The predicate questions Intervenors contend must be addressed are all questions presented *in this very case*. Plaintiffs' claims do not depend on "speculative predictions," but on this Court's determination of other aspects of Plaintiffs' claims. That the issues

may not arise at all, depending on this Court's resolution of other issues, is no reason for this Court to dismiss these claims. *See, e.g.*, *Dimensional Music Publ'g, LLC v. Kersey ex rel. Estate of Kersey*, 448 F. Supp. 2d 643, 653 (E.D. Pa. 2006) ("Simply because the outcome of one claim is contingent upon the outcome of another claim … does not mean that the first claim … is not ripe.").

Intervenors also incorrectly argue that Plaintiffs seek an advisory opinion. Intervenors Br. at 22.[24] If Plaintiffs prevail on one or more of their HB142 claims and the Court also finds HB142 non-severable, there would undoubtedly be an Article III case or controversy.

Finally, while UNC argues the Court need not consider the HB2 claims because neither predicate condition for their resolution is yet satisfied, UNC's Br. at 26-27, Plaintiffs have adequately pled plausible claims that HB142 is invalid, leaving open the possibility that the HB2 claims will require resolution. And, until the Court resolves Plaintiffs' HB142 claims, the Court need not consider the severability question.[25]

### B. Plaintiffs Plausibly Plead Title IX and Title VII HB2 Claims.

UNC's arguments for dismissing the HB2 statutory claims are also unsupported. UNC incorrectly argues that Plaintiffs have not suffered harm as a result of UNC's

---

[24] The two cases Intervenors cite, Intervenors Br. at 22, are distinguishable. Neither concerns the facts presented here: a repealed statute that might come back into force if provisions of the superseding statute are held unlawful and non-severable.

[25] UNC argues (as Plaintiffs intend to argue) that Section 1 of HB142 (repealing HB2) is severable from HB142's remaining sections. UNC Br. at 26-27. But the severability question will become relevant only if Plaintiffs succeed on one of their challenges to HB142's other provisions.

43

implementation of HB2. When preliminary enjoining UNC, this Court expressly rejected UNC's arguments, finding that by maintaining separated facilities in accordance with HB2's definition of "biological sex," UNC had caused Plaintiffs cognizable injury. *See* Op. at 23-28. Mr. Carcaño, Mr. McGarry, and Ms. Schafer allege harm during HB2's implementation. FAC ¶¶ 71-73, 110, 143, 150.

Nor does Plaintiffs' Title IX HB2 claim warrant dismissal on account of Title IX's implementing regulations, which permit the provision of "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. UNC incorrectly argues that under this regulation, HB2's "requirement to separate restrooms on the basis of biological sex was consistent with Title IX." UNC Br. at 29. As the Seventh Circuit recently noted in reaching the opposite result, neither Title IX nor its implementing regulations define the term "sex" or reference the term "biological." *Whitaker*, 858 F.3d at 1047. Under Supreme Court precedent, Plaintiffs have stated a valid Title IX claim based on sex stereotyping at a minimum. *See, e.g.*, *Whitaker*, 858 F.3d at 1046-50.

UNC's effort to dismiss Plaintiffs' Title VII claim fares no better. UNC claims that under this Court's equal protection preliminary injunction ruling and two precedents this Court relied on—*Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016) and *Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993)—"adherence to HB 2 did not violate Title VII." UNC Br. at 29. This argument fails in two respects. First, it does not acknowledge the different legal standards applicable to a motion for a preliminary injunction and a motion to dismiss. Here, "[t]he court's task is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of

44

success." *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1032 (5th Cir. 2010); *accord Brown v. Bimbo Foods Bakeries Distrib., LLC*, No. 2:16-cv-476, 2016 WL 9415505, at *5 (E.D. Va., Oct. 04, 2016). The FAC plainly meets this standard, which UNC does not even attempt to dispute.

Second, *Bauer* and *Faulkner* do not support UNC's argument. Instead, they stand for the proposition that when the government can provide equal access, it must do so— even if physiological differences potentially warrant accommodation. *Faulkner* involved a challenge to the male-only policy at The Citadel. 10 F.3d at 228-29. The Court referred to "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns," but the decision's overarching conclusion was that equality is required where it is achievable. *Id.* at 233 (requiring admission of the female plaintiff to day classes, notwithstanding that it might "be disruptive in the first days" and would "probably shake The Citadel's stability temporarily"). Just as "The Citadel could still maintain its primary mission, even if women were added to the classroom," *id.*, sex-specific facilities still maintain their primary character and reasonable expectations of privacy when transgender people use them.

*Bauer*, involving a challenge to the FBI Academy's gender-normed standards requiring fewer pushups of female trainees, merely recognized that the Academy had adopted those standards so that more women, of equivalent fitness to men, could qualify, given that women "demonstrate their fitness differently." 812 F.3d at 351. *Bauer* thus upheld the gender-normed fitness requirements because they *furthered* rather than hindered equal access by women.

45

Nothing in *Faulkner* or *Bauer* supports the idea that schools or employers can use physiological differences as a basis for unequal and stigmatizing treatment. Indeed, more recent case law directly on point has concluded that under federal anti-discrimination statutes, actual or perceived physiological differences cannot justify restroom access policies that discriminate against transgender individuals. *See, e.g.*, *Whitaker*, 858 F.3d at 1049-50.

*  *  *

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny UNC

Defendants' and Intervenor-Defendants' Motions to Dismiss.


Dated: December 1, 2017     Respectfully submitted,

/s/ Christopher A. Brook
Christopher A. Brook (NC Bar No. 33838) Jon W. Davidson*
Irena Como*         Tara L. Borelli*
AMERICAN CIVIL LIBERTIES UNION OF  Peter C. Renn*
 NORTH CAROLINA LEGAL FOUNDATION LAMBDA LEGAL DEFENSE AND
Post Office Box 28004       EDUCATION FUND, INC.
Raleigh, North Carolina 27611    730 Peachtree Street NE, Suite 1070
Telephone: 919-834-3466     Atlanta, GA 30308-1210
Facsimile:  866-511-1344     Telephone: 404-897-1880
cbrook@acluofnc.org      Facsimile:  404-897-1884
icomo@acluofnc.org      jdavidson@lambdalegal.org
            tborelli@lambdalegal.org
James D. Esseks*       prenn@lambdalegal.org
Leslie Cooper*
Elizabeth O. Gill*       Scott B. Wilkens*
Chase B. Strangio*       Luke C. Platzer*
AMERICAN CIVIL LIBERTIES UNION   JENNER & BLOCK LLP
 FOUNDATION        1099 New York Avenue, NW Suite 900
125 Broad St., 18th Fl.      Washington, DC 20001-4412
New York, NY 10004      Telephone: 202-639-6000
Telephone: 212-549-2627     Facsimile:  202-639-6066
Facsimile:  212-549-2650     swilkens@jenner.com
jesseks@aclu.org       lplatzer@jenner.com
lcooper@aclu.org
egill@aclunc.org
cstrangio@aclu.org

*Appearing by special appearance pursuant to L.R. 83.1(d)

*Counsel for Plaintiffs*

**CERTIFICATE OF WORD COUNT**

This brief complies with Local Rule 7.3(d) and this Court's November 8, 2017 Order granting Plaintiffs leave to file a single consolidated brief not to exceed 12,500 words because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains 12,493 words.


Dated: December 1, 2017 /s/ Christopher A. Brook

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Christopher A. Brook, hereby certify that on December 1, 2017, I electronically filed the foregoing PLAINTIFFS' OPPOSITION TO UNC DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher A. Brook

*Counsel for Plaintiffs*