IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÍN CARCAÑO, *et al.*,<br><br>    *Plaintiffs*,<br>  v.<br><br>ROY A. COOPER, III, in his official capacity as Governor of North Carolina, *et al.*,<br><br>    *Defendants*. | Case No. 1:16-cv-236 |

**UNC DEFENDANTS' REPLY BRIEF IN SUPPORT OF
MOTION TO DISMISS THE FOURTH AMENDED COMPLAINT**

# ARGUMENT

## I. THE COURT SHOULD DISMISS THE CLAIMS CHALLENGING HB 142

### A. Plaintiffs Fail To Establish Article III Standing To Sue The UNC Defendants Over HB 142

Plaintiffs' claims against the UNC Defendants challenging HB 142 fail for lack of Article III standing.

To establish standing, a plaintiff must show injury-in-fact, traceability, and redressability. Having identified an injury, a plaintiff must base the rest of the standing analysis on that particular injury. He must show that that particular injury is traceable, and that that particular injury is redressable. But Plaintiffs switch from one alleged injury to another as they move from one part of the test to the next. For example, in addressing injury, they emphasize the "operation" rather than the "enforcement" of HB 142 (Opp. 16), arguing that the law's mere existence "instill[s] … confusion in transgender people" (Opp. 10). But then, in addressing traceability, they switch from operation to enforcement, emphasizing the authority of "campus police" to "enforce the state's criminal laws." (Opp. 15.) This is no way to analyze standing.

Applying the Article III test properly, it becomes clear that Plaintiffs lack standing to sue the UNC Defendants over HB 142. Although Plaintiffs

1

identify three potential injuries, none satisfies all three parts of the test for standing.

*First*, Plaintiffs assert standing on the ground that the University maintains "male and female signs on campus restrooms." (Opp. 14.) They claim that these signs "regulate restroom access" in a "discriminatory anti-transgender" way, causing them injury. (*Id.*) This argument fails.

For one, the signs do not "regulate restroom access" in violation of HB 142. One would not normally describe a sign outside a bathroom as a "regulation." That is because a regulation is "an authoritative rule," usually "having the force of law." *Merriam-Webster Online Law Dictionary*. A sign is not "an authoritative rule." Nor does a sign, in itself, have "the force of law."

For another, the signs do not instruct transgender people to stay out of particular restrooms. This Court's preliminary-injunction order explained that, while HB 2 was in effect, "the meaning" of "the words and symbols on … sex-segregated facilities" depended on HB 2. (Op. 26.) "In light of [HB 2]," the Court said, "sex-segregated signs den[ied] permission to those whose birth certificates fail to identify them as a match." (Op. 26.) Now, however, HB 2 has been repealed. There is thus no longer a basis for insisting that the signs refer to the sex listed on one's birth certificate. Indeed, Plaintiffs do not allege

2

that the University has done *anything* to stop them from interpreting the signs to refer to their self-identified gender, rather than to their birth sex.

*Second*, Plaintiffs assert standing on the ground that that the "operation" of HB 142 causes "uncertainty about which restrooms they are permitted to use." (Opp. 16.) But the alleged uncertainty is not traceable to the UNC Defendants, because, as Plaintiffs seemingly accept, they had no role in enacting HB 142. And the UNC Defendants have no power to eliminate the alleged uncertainty, because, as Plaintiffs seemingly accept, they lack the power to adopt authoritative interpretations of state law.

*Third*, Plaintiffs assert standing on the ground that the UNC Defendants allegedly control campus police, "which is authorized to enforce the state's criminal laws." (Opp. 14.) But a defendant's power to enforce a law is a basis for suing it only where there is a "credible threat" of enforcement. *Doe v. Duling*, 782 F.2d 1202, 1206 (4th Cir. 1986). Plaintiffs have not alleged that the UNC Defendants have threatened to call in police officers to enforce any criminal laws against them. Further, Plaintiffs have sued to challenge HB 142, not to challenge the enforcement of the state's criminal laws. Enforcement of the state's criminal laws is thus beside the point. In all events, the UNC Defendants do not exercise ultimate authority over campus law enforcement. The statutes that Plaintiffs cite, N.C. Gen. Stat. §§ 116-

3

40.5(a) and 74G-6(c), simply allow the University to "establish" campus law-enforcement agencies and to "enter into joint agreements" with local governments to allow these agencies to operate outside campus. Neither statute puts the University in charge of the agencies' law-enforcement activities. Quite the contrary, state law independently vests campus law-enforcement officers with "all the powers of law enforcement officers generally" (N.C. Gen. Stat. § 116-40.5), and officers independently take an oath to enforce state law (N.C. Gen. Stat. § 74G-6(b)).

Plaintiffs have failed to identify any single harm that meets all three parts of the test for Article III standing. Plaintiffs' claims accordingly fail.

### B. Plaintiffs Fail To Show That Their Claims Against The UNC Defendants Challenging HB 142 Are Ripe

To establish ripeness, Plaintiffs must show that the issues are fit for review and that delaying review would cause hardship. Plaintiffs concede that fitness turns on whether state courts have "crystallized" the meaning of the challenged statute. (Opp. 21 n.11.) They also concede that state authorities have not yet crystallized the meaning of HB 142. (*Id.*) They nonetheless insist that the Court hear the case, on the ground that the hardship they face outweighs the lack of fitness. (*Id.*)

4

Plaintiffs understate the degree to which this case it unfit for review. State courts "have the first and last word as to the meaning" of state statutes. *Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237, 247 (1952). When a federal court issues an "anticipatory judgment" striking down a state law, before the state judiciary has said anything about the law's meaning, it undermines "our federalism." *Id.* Here, Plaintiffs have not asked the state courts to interpret HB 142 or to issue a declaratory judgment that nothing in state law bars them from using bathrooms consistent with their gender identity. Indeed, Plaintiffs have not even asked *this Court* to take either of these steps. Instead, Plaintiffs have jumped straight to the argument that HB 142 is unconstitutional. But it would be improper for the Court to review the constitutionality of the statute before "state courts" have had the chance to "provide further definition to [the statute's] operative language." *Renne v. Geary*, 501 U.S. 312, 323 (1991).

Conversely, Plaintiffs overstate the degree to which HB 142 causes hardship. Plaintiffs assert that HB 142 "require[s] [them] to adjust [their] conduct immediately." (Opp. 20–21.) But HB 142 does not require Plaintiffs to do or to refrain from doing anything; once again, it merely regulates the University's powers, not Plaintiffs' conduct.

5

### C. Plaintiffs Fail To Show That Their Constitutional Claims Against President Spellings Comply With Sovereign Immunity, Fit Within § 1983, Or Have Legal Merit

#### 1. Plaintiffs Fail To Show That The Constitutional Claims Comply With Sovereign Immunity

To overcome sovereign immunity, Plaintiffs must show that the defendant both (1) has a "special relation" to the challenged statute and (2) has "personally" "acted or threatened to act" under that statute. *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010). Plaintiffs claim that they have satisfied the first element because President Spellings "is charged with formulating policy regarding restroom access." (Opp. 25.) That is incorrect; the whole point of HB 142 is to *deprive* University officials, such as President Spellings, of the power to regulate restroom access. Plaintiffs also claim that President Spellings administers "trespass and other criminal laws." (Opp. 26.) But the "special relation … requirement" "is not met when an official merely possesses general authority to enforce the laws of the state." *McBurney*, 616 F.3d at 399.

Plaintiffs also overlook the second part of the test. "Even were [a court] to find a special relation," the plaintiff must still show that "the [defendant] has … acted or threatened to act" under the challenged statute. *Id.* at 402. Plaintiffs do not argue that President Spellings has personally taken action

6

or threatened to take action under HB 142. Quite the contrary, they say that she has "*refused* to state which … multi-user restrooms transgender individuals can use." (Opp. 25 (emphasis added).) They therefore fail the test for overcoming sovereign immunity.

### 2. Plaintiffs Fail To Show That The Constitutional Claims Fit Within § 1983

Plaintiffs do not deny that, to maintain their claims under § 1983, they must show that President Spellings' "own individual actions" violated the Constitution. *Doe v. Rosa*, 795 F.3d 429, 439 n.7 (4th Cir. 2015). But President Spellings did not enact the allegedly vague language of HB 142, has not applied that language to bar transgender people from particular restrooms, and has not ordered campus police to arrest transgender people for trespass. In short, she has done none of the things that Plaintiffs claim violate the Constitution.

The best Plaintiffs can muster is the allegation, unsupported by any specific facts, that President Spellings has "refused to state which … multi-user restrooms transgender individuals can use." (Opp. 25 (emphasis added).) But even if that were true, Plaintiffs do not explain how this refusal to act violates the Constitution. Nor could they, since no provision of the

7

Constitution imposes an affirmative duty on university officials to clarify the meaning of laws enacted by state legislatures.

### 3. Plaintiffs Fail To Show That Their Constitutional Claims Have Legal Merit

*Due Process*. Plaintiffs fail to show that their vagueness challenge to HB 142 has legal merit.

To begin, the vagueness doctrine rests on the Due Process Clause, which forbids depriving people of "life, liberty, or property." A law that allocates authority (such as HB 142) may deprive government agencies of power, but it does not directly deprive any individual of "life, liberty, or property." As a result, it is not amenable to a vagueness challenge. Plaintiffs cite no case that says otherwise. Every case they cite involves, instead, a challenge to a law that directly regulates the challenger's own conduct.

In any event, HB 142's meaning is clear: The law simply preempts government entities from regulating restroom access. Plaintiffs acknowledge that HB 142 "is clear in its preemptive effect," but fault the UNC Defendants for failing to "tak[e] an affirmative position concerning which restroom transgender individuals … are permitted to use." (Opp. 27.) This complaint is meritless. The UNC Defendants have taken a position on the meaning of the law that Plaintiffs have challenged; they have explained their view that the

8

law simply preempts government agencies from regulating restroom access, nothing more. The UNC Defendants need not take positions on whether different laws that Plaintiffs have not challenged (namely, the trespass laws) would allow transgender people to use bathrooms consistent with their gender identity.

*Equal Protection.* Plaintiffs also fail to show that HB 142 violates the Equal Protection Clause. They first seek to invalidate HB 142 on account of the motivations of the lawmakers who enacted it. (Opp. 36.) Yet they ignore Fourth Circuit precedent—cited in the UNC Defendants' opening brief—that "specifically reject[s] an inquiry into [legislative] motive in an equal protection claim." *South Carolina Educ. Ass'n v. Campbell*, 883 F.3d 1251, 1263 n.14 (4th Cir. 1989). Plaintiffs instead rely on *Sylvia Development Corp. v. Calvert County*, 48 F.3d 810 (4th Cir. 1995). (Opp. 36). But that case ruled only that an executive agency's improper motive can invalidate "administrative action." *Id.* at 820. It does not suggest that a legislature's improper motive can invalidate legislation. Legislatures, unlike executive agencies, consist of hundreds of members; attempting to figure out the motive of a legislature is simply guesswork.

Plaintiffs persist that HB 142 changed the "political process." (Opp. 40.) They rely on a passage in *Schuette v. BAMN*, 134 S. Ct. 1623 (2014)

9

(plurality), under which a plaintiff may bring an equal-protection challenge to a law that "alter[s] the procedures of government to target racial minorities" where the alteration "had the serious risk, if not purpose, of causing specific injuries on account of race." *Id.* at 1633 (plurality). But *Schuette* expressly limited the political-process doctrine to certain cases involving "race" and "racial minorities." This Court should not extend the doctrine beyond those boundaries. *See Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 868 (2017) ("racial bias implicates unique historical, constitutional, and institutional concerns").

> D. **Plaintiffs Fail To Show That Their Statutory Claims Against The University Concerning HB 142 Have Legal Merit**

Finally, Plaintiffs' claims concerning HB 142, brought under Title IX and Title VII, fail because the claims lack legal merit.

>> 1. **Plaintiffs Fail To Show That Titles IX And VII Prohibit Gender-Identity Discrimination**

Titles IX and VII prohibit discrimination on the basis of "sex." 20 U.S.C. § 1681(a); 42 U.S.C. § 2000e-(a). Plaintiffs fail to show that these statutes encompass "gender identity."

Plaintiffs make no effort to argue that, when Congress enacted Titles IX and VII, readers would have understood "sex" discrimination to cover

10

gender-identity discrimination. Plaintiffs instead argue that "our understanding of transgender individuals has grown" since the 1970s. (Opp. 33.) No doubt. But the *statutes* have not "grown" since the 1970s; they still prohibit only sex discrimination, not gender-identity discrimination. Congress certainly may amend Titles IX and VII to cover new forms of discrimination, but courts may not.

Plaintiffs also fail to account for the many statutes enacted since Titles IX and VII that explicitly distinguish between "sex" and "gender identity." They instead dismiss these laws as "post-enactment legislative history." (Opp. 34.) But the statutes that distinguish sex from gender identity are not "legislative history"; they are statutes. "[The] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

Plaintiffs also fail to address the Fourth Circuit's ruling that "Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender and should not be judicially extended." *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 143 (4th Cir. 1996). Plaintiffs cite cases from other circuits that "judicially extend" Titles IX and VII beyond gender to

11

include gender identity, but this Court is bound by the Fourth Circuit's decisions.

Finally, Plaintiffs look for support in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (plurality), which held that an employer's intentional discrimination on the ground that an employee failed to conform to gender stereotypes is sex discrimination prohibited by Title VII. But Plaintiffs have not claimed that the UNC Defendants have engaged in intentional discrimination based on nonconformance with gender stereotypes. They have claimed only that a statute (no longer in effect and never actually enforced by their employer) engaged in intentional discrimination based on gender identity—a distinct form of discrimination that Titles VII and IX do not cover.

### 2. Plaintiffs Fail To Show That The University Has Engaged In Sex Discrimination Or Gender-Identity Discrimination

In any event, Plaintiffs fail to allege facts showing that the University has engaged in discrimination on the basis of sex (or, for that matter, gender identity). Because Plaintiffs have brought a claim for disparate treatment rather than disparate impact, they must show "intentional discrimination." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). They attempt to make this showing by arguing that the University has failed to "make clear which restrooms transgender individuals can use." (Opp. 35.) But Plaintiffs neither

12

allege nor argue that the University has refrained from issuing such guidance as a result of an intent to discriminate against transgender people. They overlook the neutral explanation for the University's actions: The University is doing its best to comply with a state law that preempts its authority to regulate restroom access.

Plaintiffs try to escape the obligation to show intentional discrimination by relying on *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), and *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971). But *Jackson* involved a "retaliation" claim, 544 U.S. at 171, and *Robinson* involved a "[disparate] impact" claim, 444 F.2d at 795. Neither case involved a sex-discrimination disparate-treatment claim, the only kind of claim at issue in this case.

## II. THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS CHALLENGING HB 2

The Court should also dismiss Plaintiffs' claims against the University under Titles IX and VII, seeking nominal damages for harms allegedly caused while HB 2 was in effect.

To begin, Plaintiffs claim damages for "harms caused by H.B. 2's violation of [Titles IX and VII]." (Compl. ¶ 18.) But Plaintiffs cannot show that the University is responsible for harms "caused by H.B. 2," since the

13

University did not enact HB 2. Plaintiffs' opposition therefore concentrates on the harms caused by the University's "maint[enance]" of "separated facilities." (Opp. 44.) But that is simply not the violation alleged in the complaint, which, again, specifically refers to the harms "caused by H.B. 2" rather than to the harms "caused by the University's maintenance of separated facilities."

In any event, Plaintiffs fail to show that adherence to HB 2 violated Title IX. Plaintiffs acknowledge that a federal implementing regulation expressly permits "separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. But they insist that this regulation covers only facilities separated by gender identity, since it "does not … reference the term 'biological.'" (Opp. 44.) Plaintiffs ignore the relevant context: The Department of Education once endorsed Plaintiffs' interpretation (Letter from James A. Ferg-Cadima, Jan. 7, 2015), but later specifically withdrew that endorsement (Dept. of Justice & Dept. of Education, Dear Colleague Letter, Feb. 22, 2017). Plaintiffs' reading would give the withdrawal no effect at all. Plaintiffs also ignore the rule that conditions on spending (such as those contained in Title IX) are permissible only if they are "unambiguous." *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). To the extent the implementing regulations fail to specify whether they refer to

14

biological or self-identified sex, a court must resolve any ambiguity in the University's favor.

Nor do Plaintiffs show that adherence to HB 2 violated Title VII. As pointed in the UNC Defendants' opening brief, the Fourth Circuit and this Court have both held that Title VII allows employers to "distinguish men and women on the basis of physiology." (Op. 55 (citing *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016)).) Plaintiffs try to overcome these cases by arguing that employers and schools may not "use physiological differences" as an excuse for "stigmatizing treatment." (Opp. 49.) Perhaps so, but the Fourth Circuit and this Court have already recognized that "separate public rest rooms for men and women" properly reflect "acknowledged [physiological] differences," rather than a bare desire to stigmatize. (Op. 56 (quoting *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993)).) Plaintiffs' challenges to HB 2, as asserted against the University, therefore legally fail.

## CONCLUSION

The Court should dismiss the claims against the UNC Defendants.

15

Dated: December 15, 2017

                                                Respectfully submitted,

/s/ Thomas C. Shanahan  
Thomas C. Shanahan (NC Bar No. 42381)  
Carolyn C. Pratt (NC Bar No. 38438)  
THE UNIVERSITY OF NORTH CAROLINA  
P.O. Box 2688  
Chapel Hill, NC 27515  
Tel: (919) 962-4588  
Fax: (919) 962-0477  
Email: tcshanahan@northcarolina.edu

/s/ Glen D. Nager  
Glen D. Nager  
Kristen Lejnieks  
JONES DAY  
51 Louisiana Avenue NW  
Washington, DC 20001  
Tel: (202) 879-3939  
Fax: (202) 626-1700  
Email: gdnager@jonesday.com

*Counsel for the University of North Carolina and President Margaret Spellings*

16

Case 1:16-cv-00236-TDS-JEP   Document 235   Filed 12/15/17   Page 17 of 19

# CERTIFICATE OF WORD COUNT

I certify that this brief complies with the word limits of Local Civil Rule 7.3(d) because, excluding the parts exempted by the rule, the brief contains 3,110 words.

Dated: December 15, 2017

/s/ Glen D. Nager
Glen D. Nager
*Counsel for the UNC Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 15, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: December 15, 2017    /s/ Glen D. Nager
　　　　　　　　　　　　　　Glen D. Nager
　　　　　　　　　　　　　　*Counsel for the UNC Defendants*