IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JOAQUÍN CARCAÑO, PAYTON GREY MCGARRY; HUNTER SCHAFER; MADELINE GOSS; ANGELA GILMORE; QUINTON HARPER; and AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:16cv236 |
| ROY COOPER, in his official capacity as Governor of North Carolina; UNIVERSITY OF NORTH CAROLINA; MARGARET SPELLINGS, in her official capacity as President of the University of North Carolina; JOSHUA STEIN, in his official capacity as Attorney General of North Carolina; MACHELLE SANDERS, in her official capacity as Secretary of the North Carolina Department of Administration; MANDY K. COHEN, in her official capacity as Secretary of the North Carolina Department of Health and Human Services; and JAMES H. TROGDON III, in his official capacity as Secretary of the North Carolina Department of Transportation | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| PHIL BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; and TIM MOORE, in his official capacity as Speaker of the North Carolina House of Representatives, | ) ) ) ) ) ) ) ) | |

Intervenor-Defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This case originated as a challenge to North Carolina's Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, commonly known as House Bill 2 ("HB2"), which required, among other things, that public agencies ensure that multiple occupancy restrooms, showers, and other similar facilities be "designated for and only used by" persons based on the "biological sex" listed on their birth certificate. That law was repealed during the pendency of this action, and Plaintiffs eventually filed a Fourth Amended Complaint (Doc. 210), claiming that the repealing law, 2017 N.C. Sess. Laws 4, commonly known as House Bill 142 ("HB142"), violates their Fourteenth Amendment rights, as well as Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") (id. ¶¶ 1, 35). In short, Plaintiffs, who include persons who identify as transgender, allege two principal forms of injury. First, they contend that they are injured by legal uncertainty as to which restrooms, showers, and changing facilities they are permitted to use. Second, they contend that they are injured both by HB142's preemption of attempts by any local government to "enact or amend

an ordinance regulating private employment practices or regulating public accommodations," HB142 § 3[1] ("Section 3"); and also by HB142's prohibition of attempts by any state agency or political subdivision to "regulat[e] . . . access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly," HB142 § 2 ("Section 2").

Before the court are motions to dismiss by Senator Phil Berger and Speaker Tim Moore ("Intervenor-Defendants"), proceeding in their official capacities as heads of the General Assembly's two chambers (Doc. 221), and by the University of North Carolina ("UNC") and its President, Margaret Spellings (together, the "UNC Defendants") (Doc. 222).[2]  The court held a hearing on the motions on June 25, 2018.

For the reasons set forth below, the court finds that Plaintiffs lack standing as to their substantive due process (Count 1), Title IX (Count 6), and Title VII (Count 7) claims based on alleged legal uncertainty caused by HB142, but do have standing to

---

[1] This provision expires on December 1, 2020.  HB142 § 4.

[2] Separately, Plaintiffs have moved jointly with Governor Cooper and those Defendants associated with his administration for entry of a consent decree that would declare that transgender persons are not prevented from using public facilities in accordance with their gender identity, and permanently enjoining those Defendants and their employees from prohibiting transgender persons from doing so.  (Doc. 216; Doc. 216-1.)  Because Intervenor-Defendants and the UNC Defendants contend that Plaintiffs lack standing to pursue their claims, the court has determined that it must first resolve the issue of its subject matter jurisdiction before entertaining the proposed consent decree.  (Doc. 226 at 2.)

pursue their equal protection (Count 2) claims relating to the preemption provisions of Sections 2 and 3, except as to President Spellings. Further, the court declines to dismiss Plaintiffs' contingent claims involving HB2 (Counts 3, 4, and 5) at this time and reserves ruling on Plaintiffs' nominal damages (Counts 6 and 7) claims for alleged Title VII and IX violations during the time HB2 was in effect. As to Count 2, the court finds that Plaintiffs fail to state a claim based on Section 2, but succeed in stating a claim based on Section 3.

As a result, the UNC Defendants' motion to dismiss will be granted except as to Plaintiffs' contingent claims involving HB2 in Counts 3, 4, and 5, and as to Plaintiffs' claims for nominal damages in Counts 6 and 7 for the alleged Title VII and IX violations that occurred while HB2 was in effect. Intervenor-Defendants' motion to dismiss will be granted except as to Plaintiffs' equal protection claims based on Section 3 in Count 2, and as to Plaintiffs' contingent claims involving HB2 in Counts 3, 4, and 5.

## I.  BACKGROUND

The facts are found in the 403 numbered paragraphs of Plaintiffs' 103-page Fourth Amended Complaint, which is construed in the light most favorable to Plaintiffs, as well as those matters of which the court can take judicial notice. Considered together, they demonstrate the following:

**A.    HB2**

On February 22, 2016, the Charlotte City Council amended, by a vote of seven to four, its existing non-discrimination ordinances, making it unlawful to discriminate on the basis of "marital status, familial status, sexual orientation, gender identity, [and] gender expression."[3]    (Doc. 127 at 12–13 (alteration in original); see also Doc. 210 ¶ 200.)  The amendment also repealed prior rules that exempted "[r]estrooms, shower rooms, bathhouses, and similar facilities which are in their nature distinctly private" from the city's prohibitions against sex discrimination.  (Doc. 127 at 12 (alteration in original).)

The Charlotte ordinance prompted a quick reaction from then-Governor Patrick McCrory and the General Assembly.  Governor McCrory had informed the Charlotte City Council members before passage of the ordinance that the State would likely take immediate action upon the ordinance's passage, since it would "'chang[e] basic long-established values and norms' surrounding 'public restrooms'" and present "possible danger from deviant actions by individuals taking improper advantage of a bad policy."  (Doc. 210 ¶ 205.)  On February 23, 2016, Speaker Moore announced that he and fellow Republicans would seek "a legislative intervention to

---

[3]  Charlotte's existing non-discrimination ordinances prohibited discrimination on the basis of race, gender, religion, national origin, ethnicity, age, disability, and sex.  (Doc. 127 at 12 n.5.)

correct [the Charlotte City Council's] radical course." (Id. ¶ 206.) On March 23, 2016, the General Assembly convened for a special session, during which members of the House Judiciary IV Committee — the committee that first considered HB2 — were allegedly given only minutes to read HB2 before voting on whether to send the bill back to the House for a full debate. (Id. ¶¶ 211-215.) After three hours of debate, the House passed HB2. (Id. ¶ 216.) The bill proceeded to pass unanimously in the Senate, following a walk-out by all Democratic Senators. (Id. ¶ 217.) Governor McCrory signed the bill into law later that day, and it became effective immediately. (Id. ¶ 220.)

HB2 affected North Carolina law in several ways. First, it modified the State's non-discrimination laws. Previously, the State had prohibited discrimination on the basis of race, religion, color, national origin, age, sex, and handicap. See HB2 § 3.1. Part III of HB2 modified this language to prohibit discrimination on the basis of "biological sex," defined as "[t]he physical condition of being male or female, which is stated on a person's birth certificate," rather than simply "sex." HB2 §§ 1.2-1.3, 3.1 (modifying N.C. Gen. Stat. § 143-422.2). It also extended these non-discrimination provisions, which had previously applied only to the State, to private employers and places of public accommodation. See id. §§ 3.1-3.3. Part III also precluded state common-law causes of action for violations of those non-

6

discrimination provisions.  See id. § 3.2.

Second, Parts II and III of HB2 preempted all local ordinances that conflicted with the new non-discrimination standards, including the Charlotte ordinance that prompted HB2's passage. Id. §§ 2.1-3.3.  Third, Part I of HB2 explicitly set new rules for the use of restrooms and changing facilities operated by state agencies.  Specifically, Part I provided that all public agencies, including local boards of public education, must "require" that "every multiple occupancy bathroom or changing facility . . . be designated for and only used by persons based on their biological sex," defined as the "physical condition of being male or female, which is stated on a person's birth certificate."  Id. §§ 1.2-1.3.

Before HB2 was passed, Plaintiffs maintained, transgender individuals used the bathrooms they believed aligned with their gender identity without apparent fear of prosecution under state law.  (See Doc. 103 at 20-21, (noting that "the status quo was working for transgender people in that they could make these judgments [about which bathrooms to use]"), and at 70 (Governor's counsel speculating same).)  Under Part I of HB2, North Carolina law explicitly regulated which bathrooms were available for use by transgender individuals — the bathrooms that matched the gender listed on their birth certificates.  HB2 § 1.

Plaintiffs filed this action on March 28, 2016.  (Doc. 1.)

**B.    Preliminary Injunction**

On May 16, 2016, Plaintiffs moved to preliminarily enjoin Defendants from enforcing Part I of HB2, the so-called "bathroom" provisions.  (Doc. 21.)  After a hearing, the court issued an 83-page decision on August 26, 2016, granting the motion as to three individual Plaintiffs employed by UNC.  (Doc. 127).  In doing so, the court noted that for "transgender individuals who used facilities that did not match the sex listed on their birth certificate[s]," HB2 foreclosed any argument that they believed they had permission to enter facilities that matched their gender identity.  (Id. at 18.)  The court found that the three individual Plaintiffs were likely to succeed on the merits of their Title IX claim because the Department of Education ("DOE") had issued guidance that "sex" under Title IX included gender identity such that covered institutions must treat transgender individuals consistent with their gender identity, which the Fourth Circuit held in G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 723 (4th Cir. 2016), vacated and remanded, 137 S. Ct. 1239 (2017) (mem.) required this court's deference.  (Doc. 127 at 45.) The court also found that Plaintiffs had not shown that they were likely to succeed on their equal protection claim and reserved ruling on their due process claims.  (Doc. 127 at 59–60, 79–81.)

Plaintiffs subsequently filed a Second Amended Complaint on September 21, 2016, (Doc. 151) and a Third Amended Complaint on

November 21, 2016 (Doc. 183).

In 2017, the DOE withdrew its interpretative guidance, which led the Supreme Court to vacate the Fourth Circuit's judgment in G.G. and remand the case for further consideration. See Gloucester Cty. Sch. Bd. v. G.G. ex. rel. Grimm, 137 S. Ct. 1239 (2017) (mem.). The Fourth Circuit subsequently remanded the case to the district court, which dismissed all claims for prospective relief as moot in light of the plaintiff's graduation from high school, but continued to consider claims for nominal damages and retrospective declaratory relief. Grimm v. Gloucester Cty. Sch. Bd., No. 4:15-CV-54, 2017 WL 9882602 (E.D. Va. Dec. 12, 2017).

## C. HB142

As part of an apparent compromise to secure the repeal of HB2, the Charlotte City Council repealed its non-discrimination ordinance on December 21, 2016,[4] shortly before the General Assembly met in special session to consider the repeal of HB2. (Doc. 210 ¶¶ 227-33.) During this special session, a bill which would have been a "clean repeal" of HB2 — repealing HB2 with no further conditions — was introduced but was referred to a committee and never considered. (Id. ¶ 235.)

On March 30, 2017, HB142 was passed and signed by Governor

_____

[4] A December 19, 2016 repeal was expressly conditioned on the General Assembly's repeal of HB2, but due to criticisms that the City's repeal was not sufficient, it passed the subsequent repeal two days later. (Doc. 210 ¶¶ 227-233.)

Roy Cooper, who had been elected the prior November. (Doc. 210 ¶¶ 224, 244.) In order to pass the bill quickly, the Senate employed a process known as "gut and amend,"[5] and neither the full House nor the full Senate heard public comment before voting on HB142. (Id. ¶¶ 243-44.)

HB142 is set out as follows. Section 1 repeals HB2. HB142 § 1. Section 2 amends Chapter 142 of the North Carolina General Statutes by adding a new article, Article 81A, § 143-760, which reads:

> State agencies, boards, offices, departments, institutions, branches of government, including The University of North Carolina and the North Carolina Community College System, and political subdivisions of the State, including local boards of education, are preempted from regulation of access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly.

Id. § 2. Section 3 provides that "[n]o local government in this State may enact or amend an ordinance regulating private employment practices or regulating public accommodations." Id. § 3. Section 4 states that "[t]his act is effective when it becomes law" and that "Section 3 of this act expires on December 1, 2020." Id. § 4.

---

[5] Specifically, the North Carolina Senate took "an unrelated bill that had already passed the House, removed the existing language and replaced it with the text of what is now H.B. 142." (Doc. 210 ¶ 243.) This permitted the bill to meet a state requirement that every bill pass a crossover deadline from one chamber to the other.

**D. Fourth Amended Complaint, Proposed Consent Decree, and Motion for Leave to File Declaration of Ericka Myers**

On August 29, 2017, in response to the passage of HB142, Plaintiffs moved, with consent, for leave to file a Fourth Amended Complaint. (Doc. 208.) The motion was granted (Doc. 209), and Plaintiffs filed their Fourth Amended Complaint on September 7, 2017. (Doc. 210.) The Fourth Amended Complaint asserts that HB142 "is the culmination of a series of actions by North Carolina lawmakers targeting LGBT individuals, and particularly transgender individuals, for discrimination" and alleges that HB142 "violates fundamental guarantees of equal protection and due process in the U.S. Constitution and statutory prohibitions on discrimination based on sex under Title IX and Title VII." (Id. ¶ 2.)

Specifically, Count 1 brings a substantive due process claim against Governor Cooper, Attorney General Joshua Stein, Department of Administration Secretary Michelle Sanders, Department of Health and Human Services Secretary Mandy K. Cohen, Department of Transportation Secretary James H. Trogdon (each sued in their official capacity; hereinafter the "Executive Branch Defendants") and Spellings, claiming that (1) HB142 is void for vagueness because it does not inform transgender individuals whether they will be subject to prosecution for using the restrooms or facilities that align with their gender identity and (2) that these Defendants have taken no action to clarify whether transgender

individuals will be subject to prosecution for using the restrooms or facilities that align with their gender identity. (Id. ¶¶ 297-312.) Count 2 brings an equal protection claim against the Executive Branch Defendants and Spellings, claiming that the preemption of state agencies regulating access to restrooms or other single-sex, multiple user facilities, as well as the preemption of new or amended local non-discrimination protections, constitute discrimination on the basis of sex because these preemptions deprive transgender individuals of the ability to seek greater protections at the local level on the same basis as other groups, are being applied in a discriminatory manner, and were passed with discriminatory intent. (Id. ¶¶ 313-44.) Counts 3, 4, and 5 challenge HB2, alleging violations of equal protection, the right to privacy, and liberty and autonomy in the right to refuse unwanted medical treatment. (Id. ¶¶ 345-90.) Count 6 brings a Title IX claim against UNC, claiming that UNC is a recipient of federal funds and that it is discriminating on the basis of sex by failing to ensure that transgender individuals may use restrooms and changing facilities consistent with their gender identity without fear of prosecution. (Id. ¶¶ 391-98.) Count 7 brings a Title VII claim against UNC on behalf of Plaintiff Joaquín Carcaño — a transgender man — claiming that UNC employs him and that it is discriminating against him on the basis of sex, as described in Count 6. (Id. ¶¶ 399-403.)

On October 18, 2017, Plaintiffs and Executive Branch Defendants filed a joint motion for the entry of a consent decree. (Doc. 216.)  The proposed consent decree states that "[u]nder H.B. 142, and with respect to public facilities that are subject to Executive Branch Defendants' control or supervision, transgender people are not prevented from the use of public facilities in accordance with their gender identity" and that "Executive Branch Defendants as used in this paragraph shall include their successors, officers, and employees." (Id. at 5.)  Further, the proposed consent decree states the Executive Branch Defendants "are hereby permanently enjoined from enforcing Section 2 of H.B. 142 to bar, prohibit, block, deter, or impede any transgender individuals from using public facilities under any Executive Branch Defendant's control or supervision, in accordance with the transgender individual's gender identity" and that an individual who uses a public facility under the control of the Executive Branch cannot be prosecuted for the otherwise lawful use of the facility that conforms with the individual's gender identity. (Id.)  Lastly, the proposed consent decree states that the parties shall "bear their own fees, expenses, and costs with respect to all claims raised by Plaintiffs against the Executive Branch Defendants" and stipulates to the dismissal of the remaining claims against the Executive Branch Defendants. (Id. at 5–6.)

On October 23, 2017, Intervenor-Defendants[6] and the UNC Defendants filed separate motions to dismiss. (Docs. 221, 222.) These motions predominantly argue that Plaintiffs lack standing to bring their claims and that, even if they do have standing, Plaintiffs have failed to state their claims sufficiently to survive the motions to dismiss. Both motions have been fully briefed and are ready for decision.[7] (Docs. 223, 225, 233, 234, 235.) Lastly, Plaintiffs have moved for leave to file the declaration of Ericka Myers (Doc. 236), a mother of a transgender student; this motion has also been fully briefed and is ready for decision (Docs. 237, 240, 241, 242).[8]

## II. ANALYSIS

The court will first address the motion for leave to file the declaration of Ericka Myers, as Plaintiffs claim that the court should consider that declaration in connection with the motions to dismiss. The court will then turn to the motions to dismiss.

### A. Motion for Leave to File Declaration of Ericka Myers

In her declaration, Myers states that her eight year-old daughter is transgender, in that "she was assigned the sex male at

---

[6] The court granted Intervenor-Defendants' motion to intervene (Doc. 33) on June 6, 2016. (Doc. 44.)

[7] The Executive Branch Defendants take no position with respect to the motions to dismiss.

[8] Consistent with its prior orders (Docs. 226, 228) and the requests of counsel at the June 25, 2018 motions hearing, this order will not address the joint motion for entry of the consent decree.

birth," but "she has known from a young age that she is a girl."
(Doc. 237-1 ¶ 4.)  Myers explains that her daughter has been
diagnosed with gender dysphoria[9] and that her treatment includes
living all aspects of her life as a female. (Id. ¶¶ 5-6.) However,
her daughter's elementary school, in the New Hanover County School
District in North Carolina, bars her daughter from using the girls'
restroom because she is transgender. (Id. ¶¶ 3, 7.) According to
Myers, the school's principal has explained that this is because
she believes that HB142 makes it illegal for a transgender student
to use a restroom that does not match her birth-assigned sex — or
at least that HB142 "permits schools" to deny such use. (Id. ¶ 9.)
While Myers' daughter has been told that she can "use the nurse's
restroom or the restroom in the teacher's lounge," she has declined
to "use either of these restrooms because she feels humiliated and
singled out as different when she is the only student forced to
use them." (Id. ¶ 10.) As a result, and because boys in the boy's
restroom have told her to "get out because she is in the wrong
place," her daughter has "struggled to be recognized as her true
self," "often holds her urine throughout the school day, and uses

---

[9] Gender dysphoria occurs when a transgender individual experiences
emotional, psychological, or social distress because "their deeply felt,
core identification and self-image as a particular gender does not align"
with their birth sex. (See Doc. 22-1 ¶ 19.) For purposes of the present
motion, the court accepts Plaintiffs' earlier unrebutted evidence that
some transgender individuals form their gender identity misalignment at
a young age and exhibit distinct "brain structure, connectivity, and
function that do not match their birth-assigned sex." (Id. ¶¶ 18, 21-
22.)

the restroom as soon as she gets home." (Id. ¶¶ 13-14.)

Plaintiffs argue that the court can consider the Myers declaration in resolving the pending motions to dismiss because "[w]hen standing is raised as a basis to dismiss, the court 'may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" (Doc. 237 at 4 (quoting White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005)).) Plaintiffs note that this court has considered affidavits filed by a plaintiff to demonstrate standing in the past. Nat'l All. for Accessibility, Inc. v. Rite Aid of N.C., Inc., No. 1:10CV932, 2011 WL 4499294, at *5 n.5 (M.D.N.C. Sept. 27, 2011) ("Fourth Circuit authority . . . appears to permit the use of such affidavits . . . ."). Plaintiffs argue that the Myers declaration provides additional evidence that HB142 causes injury. (Doc. 237 at 5-6.) They also point out that no Defendant actually opposes the request for leave to file the declaration, but instead argue only that the court should not consider the declaration when ruling on the motions to dismiss and that the declaration does not support Plaintiffs' standing claims. (Doc. 242 at 1.)

The UNC Defendants "do not oppose the filing of the declaration, but do oppose Plaintiffs' request that the Court consider [the] declaration when ruling" on their motion to dismiss. (Doc. 240 at 1.) They argue that extrinsic evidence, such as that presented in the Myers declaration, is not relevant to their motion

to dismiss, as "[t]he question before the Court is . . . the adequacy of the allegations in the Complaint." (Id. at 3.) This is because the UNC Defendants claim to have brought a facial challenge to standing only, and "[a] court may 'look beyond the complaint' only '[i]n a factual challenge.'" (Id. at 2 (quoting Wikimedia Found. v. NSA, 857 F.3d 193, 208 (4th Cir. 2017)).) They further argue that the Myers declaration is "immaterial because it recounts events that occurred after the filing of the complaint" and otherwise has no connection to the UNC Defendants. (Id. at 3–4.)

Intervenor-Defendants argue that the Myers declaration would not help the court in determining standing because the harm described in the declaration is caused by the officials in the New Hanover School District, rather than by any Defendant in this case. (Doc. 241 at 3.) They also contend that "the mere fact that certain school officials not before the Court may have mistakenly identified HB 142 as a basis for their restroom policy cannot establish that HB 142 legally caused the alleged harms, nor that a favorable decision in this case would redress those harms." (Id. at 4.)

The Fourth Circuit recently explained the distinction between facial and factual challenges to standing as follows:

> In a facial challenge, the defendant contends that the complaint fails to allege facts upon which standing can be based, and the plaintiff is afforded the same

> procedural protection that exists on a motion to
> dismiss. In a factual challenge, the defendant contends
> that the jurisdictional allegations of the complaint are
> not true. In that event, a trial court may look beyond
> the complaint and in an evidentiary hearing determine if
> there are facts to support the jurisdictional
> allegations.

Wikimedia, 857 F.3d at 208 (citations, internal quotation marks,

and alterations omitted). In a facial challenge, accordingly,

where the plaintiff receives the presumption that all facts alleged

in the complaint are true, the sole question before the court is

whether "the complaint alleges sufficient facts to invoke subject

matter jurisdiction." Kerns v. United States, 585 F.3d 187, 192

(4th Cir. 2009) (emphasis added). It is only in an evidentiary

hearing for a factual challenge, where "the presumption of

truthfulness normally accorded a complaint's allegations does not

apply," that "the trial court [has] the discretion to go beyond

the allegations of the complaint . . . [to] determine if there are

facts to support the jurisdictional allegations." Beck v.

McDonald, 848 F.3d 262, 270 (4th Cir. 2017) (citations and internal

quotation marks omitted).

Neither Intervenor-Defendants nor the UNC Defendants base

their arguments for dismissal for lack of standing on the falsity

of any jurisdictional facts alleged by Plaintiffs. Instead, they

argue that the complaint on its face simply lacks allegations

establishing standing. As a result, the present motions to dismiss

for lack of standing are facial challenges to standing, and the

court will not consider the Myers declaration in resolving them.[10]
See N.C. Fisheries Ass'n, Inc. v. Pritzker, No. 4:14-CV-138-D,
2015 WL 4488509, at *3 (E.D.N.C. July 22, 2015) ("[B]ecause this
is a facial challenge, the court will consider only the amended
complaint and its attached materials, and any documents attached
to the motion to dismiss that are integral to the complaint and
authentic.").

### B. Motion to Dismiss HB142 Claims for Lack of Standing

"It is well established that standing is a threshold
jurisdictional issue that must be determined first because
'[w]ithout jurisdiction the court cannot proceed at all in any
cause.'" Covenant Media of N.C., L.L.C. v. City of Monroe, 285 F.
App'x 30, 34 (4th Cir. 2008) (quoting Steel Co. v. Citizens for a
Better Env't, 523 U.S. 83, 94 (1998)).  The basic standing
requirements are that a plaintiff must show that: (1) he or she
has suffered an "injury in fact," (2) the injury is "fairly . . .
trace[able] to the challenged action of the defendant," and (3) it
is "likely" that "the injury will be redressed by a favorable
decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61
(1992) (citations and internal quotation marks omitted)
(alteration and omission in original).

---

[10] Even if the court were to consider it, the Myers declaration does not
provide any appreciable support for Plaintiff's position on standing,
given that it is based on hearsay and indicates only a third party's
interpretation of HB142, rather than evidence as to the actual meaning
of HB142.

The injury in fact "requirement ensures that plaintiffs have a 'personal stake in the outcome of the controversy.'" Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (citing Warth v. Seldin, 422 U.S. 490, 498 (1975)). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1548 (2016) (quoting Lujan, 504 U.S. at 560). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (citation and internal quotation marks omitted). When plaintiffs seek prospective relief, they must establish an ongoing or imminent injury in fact. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974).

At bottom, Plaintiffs allege that they have been injured in two distinct ways: (1) HB142 leaves them uncertain as to which restrooms or related facilities they are permitted to use, and (2) HB142 creates a barrier which prevents them from being able to petition their local governments for protective ordinances, and which causes them to be regulated unequally by state entities such as UNC. The court will address standing as to each claimed injury in turn.

### 1.  Injury by Uncertainty

Plaintiffs' first alleged injury is that they are unable to use public restrooms and accommodations because they are uncertain about which restrooms they are permitted to use and that this uncertainty creates a reasonable fear of prosecution for second-degree trespass.[11]  (See Doc. 210 ¶¶ 302-12.)  Since HB142 has no enforcement mechanism — and indeed does not prohibit any possible course of conduct on the part of Plaintiffs — Plaintiffs rely on a theory of injury wherein HB142's preemption of regulation of restroom access "except in accordance with an act of the General Assembly," along with the fact that there is no applicable act of the General Assembly affirmatively permitting access, "creat[es] a permanent state of legal uncertainty" (id. ¶ 312) that makes it impossible for transgender individuals to determine whether they will be prosecuted under other statutes, such as North Carolina's second-degree trespass law (id. ¶¶ 302-12); see also N.C. Gen. Stat. § 14-159.13.[12]

Intervenor-Defendants argue principally that (1) uncertainty about the law alone does not create an actionable injury; (2)

---

[11] Although Plaintiffs hint vaguely at fear of prosecution under other state laws (see, e.g., Doc. 210 ¶ 307 (alleging fear of "criminal or other penalty")), the only state law they specify as relevant to their due process claim is the second-degree trespass statute (id. ¶ 306).

[12] In addition, under Section 3, local governments are precluded from passing any new or amended ordinances regulating public accommodations or private employment regardless of whether or not such ordinances would be "in accordance with an act of the General Assembly."  HB142 § 3.

Plaintiffs' choice not to use government restrooms is a "self-inflicted injury" that cannot give rise to standing, as Plaintiffs have no credible fear of prosecution; and (3) HB142 is not vague — it repeals HB2, preempts state agencies from regulating access to multiple occupancy restrooms, showers, or changing facilities, and preempts local governments from enacting or amending ordinances regulating public accommodations and private employment practices. (Doc. 234 at 2–7.)

The UNC Defendants similarly argue that (1) Plaintiffs do not actually face uncertainty as a result of HB142; (2) even if they did, uncertainty about the meaning of a law is not an injury in fact; and (3) anxiety about the application of state trespass laws does not establish standing to bring claims against HB142.[13] (Doc. 223 at 8–12.)

In certain circumstances, a plaintiff's allegations of fear of future prosecution may satisfy the injury-in-fact requirements for prospective relief:

> [T]here is a sufficiently imminent injury in fact if plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder. [I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge

---

[13] The UNC Defendants also argue that the court's justiciability analysis in an earlier order dealing with HB2 (Doc. 127) militates against the conclusion that Plaintiffs have standing to bring claims against the UNC Defendants here (Doc. 223 at 13–14).

a statute that he claims deters the exercise of his
constitutional rights.

Kenny, 885 F.3d at 288 (citations and internal quotation marks
omitted) (second and third alterations in original).[14] Whether the
injury is alleged to be sufficiently imminent or an ongoing injury
in fact, Plaintiffs must show that their fear of criminal
prosecution is "not imaginary or wholly speculative" in order for
that fear to give rise to standing. Babbitt v. United Farm Workers
Nat'l Union, 442 U.S. 289, 302 (1979). In all cases of this type,
then, the threat of prosecution must be both "credible" and
"immediate." EQT Prod. Co. v. Wender, 191 F. Supp. 3d 583, 591
(S.D. W. Va. 2016), aff'd, 870 F.3d 322 (4th Cir. 2017) (citations
omitted); see also id. (noting that a plaintiff must "show more
than the fact that state officials stand ready to perform their
general duty to enforce laws" (quoting Doe v. Duling, 782 F.2d
1202, 1206 (4th Cir. 1986))). For the standing analysis, as with
the other bases for Defendants' motions to dismiss, the court
"accept[s] all properly pled factual allegations in the complaint

---

[14] In the same case, the Fourth Circuit noted a second method of
establishing injury in fact: a "sufficient showing of self-censorship,
which occurs when a claimant is chilled from exercising his right to
free expression." Kenny, 885 F.3d at 288 (quoting Cooksey v. Futrell,
721 F.3d 226, 235 (4th Cir. 2013)). As its wording makes clear, this
latter standard for an ongoing (as opposed to imminent) injury in fact
is confined to First Amendment cases, where the "standing requirements
are somewhat relaxed." Cooksey, 721 F.3d at 235. The standard for
ongoing injury in fact in non-First Amendment cases based on a fear of
future government action is explained in Clapper v. Amnesty Int'l USA,
568 U.S. 398 (2013), and is discussed and applied below.

as true and construe[s] all facts in the light most favorable to the plaintiff." Doe v. Va. Dep't of State Police, 713 F.3d 745, 752 (4th Cir. 2013).

Here, Plaintiffs fail to demonstrate that their claims against HB142 based on legal uncertainty meet any of the three bases for standing.

As to the alleged injury in fact, the court first notes that HB142 says nothing about Plaintiffs' ability to use any facility of any kind, nor does it regulate Plaintiffs in any other way. This accords with the statement of Governor Cooper, quoted in the Fourth Amended Complaint, that there is currently "no North Carolina state law barring the use of multiple occupancy bathroom facilities in accordance with gender identity." (Doc. 210 ¶ 15.) Plaintiffs respond by alleging a credible fear of prosecution under other state statutes — namely, the second-degree trespass statute. See N.C. Gen. Stat. § 14-159.13. This argument could certainly have been made during the time that HB2 was in force, since HB2 gave legal import to the gender-specific placards on bathroom doors. (See Doc. 127 at 25-27 ("Although UNC has not changed the words and symbols on its sex-segregated facilities, the meaning of those words and symbols has changed as a result of [HB2]." Id. at 26.).) Under HB2, multiple occupancy bathrooms were required to be designated for use only by persons of the same "biological sex," where that term was defined as "[t]he physical condition of being

24

male or female, which is stated on a person's birth certificate,"
HB2 §§ 1.2–1.3.  But HB2 has been repealed.  Its replacement,
HB142, requires nothing of the kind.

Indeed, HB142 returns Plaintiffs to the status quo ante — the
very position that, until now, they have consistently asserted to
be their preferred remedy in this case.  (Doc. 103 at 6–8, 20
(stating at preliminary injunction hearing that "[t]here was no
record prior to the passage of [HB2] of problems being caused in
North Carolina . . . by transgender people using restrooms and
changing facilities consistent with their gender identity," that
"the status quo was fine," and that "[t]he status quo was working
for transgender people in that they . . . could use common sense"
about which restrooms to use).)  Plaintiffs' repeated assertions
along these lines also accord with their inability to cite a single
case in North Carolina of a transgender individual being prosecuted
for using the restroom that corresponded to his or her gender
identity, despite the fact that at least "some transgender
individuals have been quietly using bathrooms and other facilities
that match their gender identity" for years.  (Doc. 127 at 3.)
Given that HB142 repealed HB2 and its biological-access language,
the status quo that the Plaintiffs requested — at least insofar as
it relates to state and local interpretation of legal access to
gender-specific restrooms — has been restored.  The relief sought
by Plaintiffs earlier in this litigation cannot now transform into

an injury in fact that gives rise to standing.

In response, Plaintiffs argue that as a result of the series of events giving rise to (and including) this litigation, there is a heightened political animosity towards transgender individuals regarding their access to bathrooms, such that the likelihood of the State's trespass laws being used against them has increased. Along these lines, Plaintiffs point to statements of certain legislators and politicians who have claimed that the State's trespass laws prohibit transgender access to restrooms not matching one's biological sex. (Doc. 210 ¶¶ 74, 246.)

What this argument attempts to do, however, is graft Plaintiffs' fears about the State's enforcement of its trespass laws onto HB142. As an initial matter, it is far from clear that such a threat is sufficiently imminent. As noted above, Governor Cooper has represented the opposite conclusion (id. ¶ 15.), and he, the Attorney General, and the rest of the Executive Branch Defendants are urging the entry of a consent decree in this action that would expressly and permanently preclude their prosecution of a transgender individual for "us[ing] public facilities . . . when such use conforms with the individual's gender identity, and is otherwise lawful." (Doc. 216-1 at 5 (also requesting that it be ordered and adjudged that "[u]nder H.B. 142, and with respect to public facilities that are subject to Executive Branch Defendants' control or supervision, transgender people are not prevented from

the use of public facilities in accordance with their gender identity").)  In addition, and independent of any consent decree request, the Governor has already issued an Executive Order providing — among other protections — that "State agencies, boards, commissions, and departments under the jurisdiction of the Office of the Governor will not adopt policies or regulations barring, prohibiting, blocking, deterring, or impeding any individual who lawfully uses public facilities under their control or supervision, in accordance with that individual's gender identity."[15]  N.C. Exec. Order No. 24 (Oct. 18, 2017) (https://files.nc.gov/governor/documents/files/EO24-Policies%20Prohibiting%20DiscriminationHarassment%26Retaliation%20in%20State%20EmploymentServicesContracts.pdf).

To the extent Plaintiffs attempt to characterize their injury not as imminent (the future prosecution itself) but as ongoing (see, e.g., Doc. 210 ¶ 282 (describing Plaintiffs' current delay and avoidance of restroom use — in fear of future prosecution — and noting the potentially "severe health consequences" of such

---

[15] The Executive Order also states that it "is subject to and does not otherwise conflict with or abrogate existing state law."  The court takes judicial notice of the Executive Order pursuant to Rule 201(b) of the Federal Rules of Evidence.  See Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013) (noting that, on a motion to dismiss, "courts may consider 'relevant facts obtained from the public record,' so long as these facts are construed in the light most favorable to the plaintiff along with the well-pleaded allegations of the complaint" (quoting Papasan v. Allain, 478 U.S. 265, 283 (1986))), abrogated on other grounds by Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015).

measures)), this characterization necessarily "fares no better."
Clapper v. Amnesty Int'l USA, 568 U.S. 398, 415 (2013). The
Supreme Court has been clear that plaintiffs cannot bootstrap their
way to an injury in fact by harming themselves in the present when
the future prosecution they allegedly fear is not sufficiently
imminent. See id. at 416 ("[Plaintiffs] cannot manufacture
standing merely by inflicting harm on themselves based on their
fears of hypothetical future harm that is not certainly
impending.").

Moreover, even if the court were to assume that Plaintiffs
allege a sufficient injury in fact,[16] Plaintiffs fail to

---

[16] It is important to note that Plaintiffs expressly "do not challenge"
the use of gender-specific signs outside of restrooms and other
facilities. (Doc. 210 at 102 n.1.) Nevertheless, they argue that such
signs are sufficient under North Carolina law to provide "notice not to
enter the premises," N.C. Gen. Stat. § 14-159.13, to transgender
individuals attempting to use the restroom corresponding with their
gender identity, thus exposing transgender individuals to prosecution
for trespass. (Doc. 233 at 30-32.) In support of this proposition they
cite In re S.M.S., 675 S.E.2d 44 (N.C. Ct. App. 2009). In that case, a
high school boy "r[a]n through" a girls' locker room, causing
considerable havoc and leading to his subsequent prosecution for second-
degree trespass. Id. at 44-45. The North Carolina Court of Appeals
held that a "sign marked 'Girl's Locker Room,'" in conjunction with the
defendant's "admission that he violated school rules by entering the
girls' locker room" "was reasonably likely to give respondent notice
that he was not authorized to go into the girls' locker room, pursuant
to [the second-degree trespass statute]." Id. at 46. The court need
not speculate on how a North Carolina court would address this issue in
the context of individuals using bathrooms in accordance with their
gender identity, were such an issue to ever arise. Suffice it to say
that the defendant in S.M.S. made no argument that he was attempting to
use a facility aligned with his gender identity (in fact, it does not
appear that he intended to "use" the facility in any ordinary or relevant
sense), and he admitted knowledge that his entry into the girls' locker
room was against school rules. Moreover, at the hearing on the present
motions, the UNC Defendants expressly disclaimed the ability to regulate,

28

sufficiently allege that such an injury is fairly traceable to any act by any Defendant. To meet the traceability requirement, an injury must be "fairly . . . trace[able] to the challenged action of the defendant," as opposed to "result[ing] from the independent action of some third party not before the court." Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976). "The traceability requirement ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant." Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315, 320 (4th Cir. 2002) (emphasis added).

HB142 does not regulate restroom access in any fashion; indeed, it prohibits such regulation "except in accordance with an act of the General Assembly." (Doc. 210 at ¶ 312.) If Plaintiffs fear that some other law will be enforced against them unconstitutionally, their remedy is to challenge that law — either facially or as applied to them.

In addition, as to their constitutional claims, Plaintiffs fail to show that any alleged uncertainty injury — i.e., the potential enforcement of some other law against them — could be redressed by a favorable decision of this court. As it pertains to those claims, the Fourth Amended Complaint simply pleads for

_____

by institutional rule or policy, whether transgender individuals may use restrooms that align with their gender identity, as a result of HB142's prohibition on such regulations.

this court to strike down HB142 and/or find it unenforceable against Plaintiffs. Even if the court granted this relief in full, it would not redress Plaintiffs' stated fears about the application of state trespass laws against them.

For all these reasons, therefore, the court finds that Plaintiffs have failed to plausibly allege an injury in fact fairly traceable to an act of any Defendant that is capable of being redressed by a favorable decision of this court in this case. Plaintiffs' constitutional claims based on a theory of legal uncertainty must therefore be dismissed.

Plaintiffs' Title IX (Count 6) and Title VII (Count 7) claims against UNC are similarly based on the theory that Plaintiffs are harmed by UNC's failure to take action to ensure that Plaintiffs may use restrooms and changing facilities consistent with their gender identity. (Doc. 210 ¶¶ 395-98, 403.) Having found that this alleged uncertainty does not create an injury in fact, the court finds that UNC has not harmed Plaintiffs by refusing to take the affirmative step of informing Plaintiffs that they will not be subject to prosecution for using the restroom that aligns with their gender identity. This conclusion is bolstered by representations by UNC Defendants' counsel at the motion hearing that they consider themselves preempted by HB142 from regulating individuals' access to restrooms consistent with their gender identity. As a result, Plaintiffs' Title IX and Title VII claims

will also be dismissed for lack of standing.

## 2. Injury by Preemption of Non-Discrimination Policies and Ordinances

Plaintiffs' second claim of injury is that they are harmed by HB142's Section 2, which preempts regulation concerning access to restrooms and other facilities by state agencies, departments, and other political subdivisions of the State of North Carolina, as well as by Section 3's preemption of new or amended local government ordinances regulating access to public accommodations and private employment practices. (Id. ¶¶ 313–44.) Plaintiffs argue that these barriers prevent transgender individuals from being able to access the legislative process and petition their local governments, as well as school boards, universities, and other branches of government, for non-discrimination protections. (Doc. 233 at 20–21.) They argue that these barriers are themselves injuries in fact. (Id. at 20 ("Encountering the barrier is the injury that confers standing.").)

Intervenor-Defendants argue that Plaintiffs still have the right to advocate for their preferred policies at the state level under HB142, even if they will not be able to affect policy change at the local level, and that HB142 does not create an unequal barrier for Plaintiffs because anyone trying to enact a policy regulating private employment practices or public accommodations, or attempting to persuade a state agency to regulate access to

restrooms, will face the same barriers Plaintiffs face. (Doc. 234 at 5–6.)

The UNC Defendants argue that HB142 — and thus the barriers about which Plaintiffs complain — is not traceable to them because the "University and President Spellings neither drafted, proposed, voted on, passed, enacted, signed, nor ratified HB 142. Nor do they have the legal power to 'clarify' it." (Doc. 223 at 10.)[17]

Generally, if a plaintiff can demonstrate that he or she has the intention to take a particular lawful action that "has been thwarted by official action" that was discriminatory, that plaintiff has demonstrated an injury in fact. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264 (1977) (finding that a plaintiff had standing to bring a claim when the "injury [he] assert[ed] [wa]s that his quest for housing nearer his employment ha[d] been thwarted by official action that [wa]s racially discriminatory"). Further, the denial of equal treatment resulting from the imposition of a barrier that makes it more difficult for a certain class of people to receive a benefit than for those outside that class may create an injury in fact. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 666 (1993). It is not necessary for

_____

[17] Although the UNC Defendants argue generally on behalf of both the University and President Spellings, Plaintiffs' equal protection claims (Count 2) are only brought against President Spellings.

a plaintiff to show that he or she would have received a certain benefit in order for that plaintiff to show an injury in fact by way of a government barrier to seeking — or to seeking on "equal footing" with members of other groups — the receipt of that benefit. Id. ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

Viewed in the light most favorable to Plaintiffs, the Fourth Amended Complaint alleges an injury in fact on Plaintiffs' equal protection claim. First, Plaintiffs claim that, if not for HB142's prohibition on local anti-discrimination ordinances and regulations, they "would advocate for local ordinances that prohibit discrimination in employment and public accommodations based on sexual orientation and gender identity." (Doc. 210 ¶¶ 83, 121, 156, 170, 192.) Second — although they need not show this in order to adequately demonstrate standing — Plaintiffs have claimed that at least some of the localities where they reside (specifically, Carrboro, Chapel Hill, and Orange County) would pass ordinances that "prohibit discrimination in employment and public accommodations on the basis of sexual orientation and gender identity" if they were permitted to do so. (Id. ¶¶ 81, 170, 190.)

Finally, Plaintiffs allege that HB142 discriminates against them on the basis of their transgender status. (Id. at 278.) Just as a plaintiff in Arlington Heights demonstrated an injury in fact by asserting that his attempt to find housing closer to his employment was thwarted by discriminatory official action, Plaintiffs here assert that HB142 has thwarted their attempts to lobby for, and receive the benefits of, protective ordinances or regulations. See 429 U.S. at 264. While HB142 does not prohibit Plaintiffs' efforts at advocacy, it plainly makes them meaningless by prohibiting even the prospect of relief at the local level. Thus, HB142's preemption of local regulation of public accommodations and private employment practices, as well as agency regulation of access to bathrooms and other facilities, creates an injury in fact as to Plaintiffs. Northeastern, 508 U.S. at 666 ("The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier.").

Intervenor-Defendants contend that Plaintiffs have no "legally protected interest" in lobbying for local protective ordinances or regulations (Doc. 225 at 6), and they cite the Fourth Circuit's decision in Friends for Ferrell Parkway, LLC v. Stasko, 282 F.3d 315 (4th Cir. 2002) in support of the proposition that "the destruction of [plaintiffs'] opportunities to lobby for" a benefit is not an injury in fact. Id. at 324. But Stasko was not an equal protection case. In Stasko, a proposed acquisition of

land by the U.S. Fish and Wildlife Service — in alleged violation of certain environmental and other statutes — would have precluded the potential construction of a parkway on that land.  Id. at 318-19.  The plaintiffs there argued that the deprivation of the opportunity to lobby for such a parkway, which would bring them economic benefits if constructed, was an injury in fact.  The Fourth Circuit rejected this alleged injury because the likelihood of the parkway being built was too "remote."  Id. at 325.  As the court noted: "[P]laintiffs cannot sidestep the requirements for standing by recharacterizing a wholly speculative injury as a diminished opportunity to prevent that injury when the facts reveal the 'opportunity' itself to be just as tenuous."  Id. at 324.

In the instant case, however — as with equal protection cases of this type — Plaintiffs are not merely "recharacterizing" one injury (here, the lack of anti-discrimination ordinances) as a diminished opportunity to prevent that injury through lobbying. The Supreme Court has made clear that "the imposition of the barrier" is itself the injury in "equal protection case[s] of this variety," not the plaintiff's "ultimate inability to obtain the benefit."  Northeastern, 508 U.S. at 666; see Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 280 n.14 (1978) (finding sufficient injury in fact "in the University's decision not to permit [the plaintiff] to compete for all 100 places in the class" and noting that "even if [the plaintiff] had been unable to prove that he

would have been admitted in the absence of the [barrier], it would not follow that he lacked standing").[18]

Intervenor-Defendants finally contend that HB142 cannot cause Plaintiffs a "particularized" injury, <u>Spokeo</u>, 136 S. Ct. at 1548, since HB142 "also forecloses <u>proponents</u> of [HB2's] now-repealed biological-access policy from seeking to enact it at the agency or local level." (Doc. 225 at 5 n.4). But this argument again ignores those equal protection cases based on facially neutral laws. It is definitionally the case that a facially neutral law will, "on its face," treat all citizens "in an identical manner." <u>Hunter v. Erickson</u>, 393 U.S. 385, 391 (1969). But in the instant case, Plaintiffs allege that "the reality is that the law's impact falls on the minority." <u>Id.</u> It is transgender individuals, not biological-access advocates, who allege denial of the equal protection of the laws. <u>See</u> <u>id.</u> ("The majority needs no protection against discrimination."). To the extent that biological-access advocates may have other complaints about HB142's preemption

---

[18] Even if the court were to look through the imposition of the barrier to Plaintiffs' likelihood of gaining the benefit itself, Intervenor-Defendants' argument fails. Unlike in <u>Stasko</u>, where the plaintiffs' hoped-for achievement of their desired benefit was "pure conjecture" and was based on "numerous, questionable assumptions" that were in opposition to "[s]ubstantial evidence in the record," 282 F.3d at 323, here Plaintiffs point out that Charlotte had previously adopted just the sort of anti-discrimination ordinance Plaintiffs desire; in fact, it was that ordinance that sparked both HB2 and this litigation. Plaintiffs allege in effect that, if not for HB142 (and certainly HB2 before it), the Charlotte ordinance may still be in effect. (Doc. 210 ¶¶ 226–28, 233, 330.)

provisions, those complaints do not preclude transgender individuals from asserting a particularized injury. See id. at 390-91 ("It is true that [the challenged law] draws no distinctions among racial and religious groups. Negroes and whites, Jews and Catholics are all subject to the same requirements if there is housing discrimination against them which they wish to end. But [the challenged law] nevertheless disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations . . . .").

Plaintiffs have also adequately alleged traceability as to the Executive Branch Defendants, although not as to President Spellings. As to the Executive Branch Defendants, traceability is easily met given that (1) HB142 is the sole cause of the prohibition on new or amended local non-discrimination ordinances and agency regulation of restroom access; (2) HB142 was negotiated for and signed by Governor Cooper; and (3) the Executive Branch Defendants are tasked with enforcing and upholding the law. (Doc. 210 ¶¶ 226, 229, 244.) See Mich. Bldg. & Const. Trades Council, AFL-CIO v. Snyder, 846 F. Supp. 2d 766, 777-78 (E.D. Mich. 2012) ("The Court finds that the alleged injuries are fairly traceable to the Defendant. As Governor of Michigan, Defendant signed the Act into law and is responsible for its enforcement. . . . Plaintiffs' alleged injuries are directly traceable to the Act .

. . .").[19]

However, traceability fails with respect to President Spellings because she had and has nothing to do with the drafting, passage, or enforcement of HB142.[20]  The injury relevant to this equal protection claim is Plaintiffs' effective preclusion under HB142 from advocating for certain anti-discrimination protections from entities like UNC, not the actual denial of such protections on the part of UNC.  President Spellings has done nothing to deny Plaintiffs the opportunity to advocate for anti-discrimination protections relating to transgender bathroom access.  Instead, President Spellings has only declined to give Plaintiffs the affirmative permission they request; as discussed above, this is

---

[19] Further, no party has directly argued that Plaintiffs' equal protection claims are not traceable to the Executive Branch Defendants on the ground their connection to the passage of HB142 is too attenuated.  The mere signature of a governor on a bill and his general duty to enforce state laws is not always sufficient for the law's impact to be traceable to the Executive Branch.  See Greater Birmingham Ministries v. Alabama, No. 2:15-CV-02193-LSC, 2017 WL 782776, at *5–7 (N.D. Ala. Mar. 1, 2017) (finding that a challenged statute was not traceable to the governor who signed the bill into law but was not "sufficiently responsible for [its] administration"); NAACP v. California, 511 F. Supp. 1244, 1261–62 (E.D. Cal. 1981), aff'd, 711 F.2d 121 (9th Cir. 1983) (finding that a challenged constitutional amendment was not traceable to the governor who signed the legislation proposing the amendment because the effect of his signature was only to put the amendment on a ballot where voters would decide whether the amendment should go into effect).  In the instant case, however, Governor Cooper signed HB142 directly into law, appears to have been involved in the negotiations that led to its passage, and is presumably authorized to enforce it.  (Doc. 210 ¶¶ 226, 229, 244).  Thus, HB142's prohibitions are sufficiently traceable to him and the other Executive Branch Defendants.

[20] As previously stated, HB142 does not regulate individuals, nor does it empower or require other parties to regulate individuals.  As a result, President Spellings cannot enforce HB142 against Plaintiffs.

not an injury in fact. As a result, since it cannot fairly be said that Plaintiffs' injuries relating to preemption of advocacy for anti-discrimination protections were "caused by" President Spellings' conduct, Stasko, 282 F.3d at 320, the equal protection claim brought in Count 2 against President Spellings should be dismissed.

Finally, the court finds that Plaintiffs have adequately shown redressability. While a merely "speculative" claim of redressability is insufficient, Plaintiffs need only show that that their alleged injury is "likely . . . [to] be redressed by a favorable decision." Lujan, 504 U.S. at 561 (citation and internal quotation marks omitted) (emphasis added). "[N]o explicit guarantee of redress to a plaintiff is required to demonstrate a plaintiff's standing." Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 100 (4th Cir. 2011). Here, in so far as Plaintiffs' alleged injury is the barrier to anti-discrimination advocacy created by HB142, and because the court has the power to enjoin the enforcement of HB142, Plaintiffs have adequately demonstrated that a favorable decision of this court is likely to provide them with the relief they seek.

As a result, the court finds that the Plaintiffs have standing to bring their Count 2 equal protection claim against the Executive Branch Defendants.

**C.  Motion to Dismiss HB2 Claims for Lack of Ripeness**

Counts 3, 4, and 5 of the Fourth Amended Complaint challenge HB2.  Plaintiffs contend that they have "adequately pled plausible claims that HB142 is invalid, leaving open the possibility that the HB2 claims will require resolution" in the event that HB142 § 1 is struck down and HB2 goes back into effect.  (Doc. 233 at 45–46.)

Intervenor-Defendants argue that Plaintiffs' claims against HB2 are not ripe because those claims "depend on the Court answering a whole host of preliminary questions."  (Doc. 234 at 11.)  In order for Plaintiffs' claims against HB2 to be ripe, they argue, the court would first need to decide that "(1) one or more provisions of HB 142 are unlawful and (2) the provision of HB 142 repealing HB 2 is not severable from HB 142's unlawful provisions." (Doc. 225 at 22.)  Plaintiffs argue that while the court need not consider their claims challenging HB2 in Counts 3, 4, and 5 at this time, they remain ripe.

Ripeness is a threshold issue and bids the court consider whether "[a] claim . . . rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).  "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court."

Doe v. Virginia Dep't of State Police, 713 F.3d 745, 758 (4th Cir. 2013) (citation omitted). To determine ripeness, the court "balance[s] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." Id. (citation omitted).

While any challenge to HB2 is currently premature, Defendants have not demonstrated that such claims should be dismissed on ripeness grounds. Contingencies dependent on the future actions of third parties are generally too attenuated to be ripe, but the court itself is not a third party. Should Plaintiffs succeed on their remaining claims against HB142, there is a possibility — however remote — that the court will be required in this action to address Plaintiffs' alternative claims against HB2. Defendants' motion to dismiss on ripeness grounds will therefore be denied at this time.[21] See Dimensional Music Publ'g, LLC v. Kersey ex rel. Estate of Kersey, 448 F. Supp. 2d 643, 653 (E.D. Pa. 2006) ("Simply because the outcome of one claim is contingent upon the outcome of

---

[21] Intervenor-Defendants (Doc. 225 at 10-11) and the UNC Defendants (Doc. 223 at 14-16) also argue that Plaintiffs' HB142 claims should be dismissed on ripeness grounds. Intervenor-Defendants' arguments appear to be directed at Plaintiffs' claims based on legal uncertainty, not their claims based on preemption of non-discrimination policies and ordinances. (Doc. 225 at 10-11 ("Plaintiffs cannot solve this [ripeness] issue by relying on their alleged uncertainty about the applicable law." Id. at 11.).) Because the court has already found that Plaintiffs lack standing to pursue their legal uncertainty claims, Intervenor-Defendants' ripeness arguments as to HB142 need not be reached. Similarly, because all of Plaintiffs' claims against the UNC Defendants based on HB142 are dismissed pursuant to this order, the UNC Defendants' ripeness arguments as to HB142 also need not be reached.

another claim in the case does not mean that the first claim cannot be alleged or that the first claim is not ripe." (citations omitted)).

### D. Motion to Dismiss for Failure to State a Claim

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citation omitted). A complaint that does not contain "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face'" must be dismissed. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citation omitted). "The plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" Giacomelli, 588 F.3d at 193 (quoting Iqbal, 556 U.S. at 678.) In assessing the legal sufficiency of a complaint, the factual allegations must be construed in the light most favorable to the plaintiff. Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009). However, "'[t]he presence [ ] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint' cannot support the legal

conclusion." Gladden v. Winston Salem State Univ., 495 F. Supp. 2d 517, 521 (M.D.N.C. 2007) (quoting Young v. City of Mount Ranier, 238 F.3d 567, 577 (4th Cir. 2001)) (alteration in original).

### 1. Equal Protection Claims

Plaintiffs argue that Section 2 has a disparate impact on transgender individuals because, while it prohibits regulation of restroom access by state agencies and various other entities, the UNC Defendants continue to regulate access to restrooms by labeling restrooms as for "men" and "women."[22] They argue that Section 2 creates "one rule for transgender individuals and another for non-transgender individuals" because the UNC Defendants are willing to regulate access to restrooms in one sense, but refuse to regulate access to restrooms in the sense of clarifying which restrooms transgender individuals are permitted to use. (Doc. 233 at 40, 43.) Plaintiffs argue that Section 3 has a disparate impact on transgender individuals because it prevents the passage of local ordinances that would protect transgender individuals from discrimination. (Doc. 233 at 40–43.) They argue that this preemption has a disparate impact because pre-existing ordinances prohibiting discrimination on the basis of race, color, religion,

---

[22] Plaintiffs also claim that UNC Defendants are regulating access to restrooms by providing maintenance to the restrooms, and "regulating when and how a restroom is cleaned, or whether those with disabilities would have access" to restrooms. (Doc. 233 at 40.) As noted previously, Plaintiffs expressly do not challenge any Defendant's practice of maintaining separate men's and women's restrooms. (Doc. 210 at 102 n.1.).

national origin, sex, or any other ground continue to be valid. (Id. at 40.) As such, Plaintiffs claim, they have a need to seek protective ordinances that most others do not and that they are disproportionately harmed by HB142's barrier to their ability to access the political process for greater protection. (Id. at 43–44.) Plaintiffs then argue that HB142 was passed with discriminatory intent because: (1) it follows, and cannot be considered without reference to, HB2, which was passed in response to Charlotte's adoption of an anti-discrimination ordinance protecting transgender individuals; (2) statements from certain North Carolina legislators demonstrate that HB142 was not intended to repeal HB2's prohibition on transgender individuals' restroom use in accordance with their gender identity; (3) HB142 was introduced, debated, passed, and signed within a single day, which departs from the normal procedural sequence and "signals discriminatory intent;" and (4) it has a disproportionate impact on transgender individuals. (Id. at 41–42.)

Intervenor-Defendants argue that Section 3 does not create a disproportionate impact on transgender individuals because (1) it only "centralizes authority to set certain access and non-discrimination policies;" (2) it is a facially neutral law that does not disproportionately burden transgender individuals, but benefits transgender individuals by repealing HB2; and (3) it does not impose a more burdensome political process on transgender

44

individuals because it "equally forecloses local advocacy for the biological-access policies previously embodied in HB 2." (Doc. 225 at 13–17.) They argue that Section 2 has no enforcement mechanism, so Plaintiffs' concern that it is being enforced disparately is misplaced, and that state agencies have not been "regulating" restroom access in violation of HB142 by providing separate male and female facilities. (Doc. 234 at 7.) Intervenor-Defendants also argue that HB142 was not passed with discriminatory intent, but that it was the result of "a bipartisan political compromise bringing advantages and disadvantages for everyone" that the court should not "second-guess." (Id. at 3 n.1, 8.)

A facially neutral law that has an adverse effect on a minority group violates the equal protection clause only if it can be shown that the law was passed with a discriminatory purpose. See Crawford v. Bd. of Educ. of City of Los Angeles, 458 U.S. 527, 535–38 (1982); Washington v. Davis, 426 U.S. 229, 239–48 (1976); Arlington Heights, 429 U.S. at 265 ("Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). Plaintiffs "need not show that discriminatory purpose was the 'sole[]' or even a 'primary' motive for the legislation, just that it was 'a motivating factor.'" N.C. State Conf. of NAACP v. McCrory, 831 F.3d 204, 220 (4th Cir. 2016) (quoting Arlington Heights, 429 U.S. at 265–66). "When considering whether discriminatory intent motivates a facially neutral law, a

court must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" Id. (quoting Arlington Heights, 429 U.S. at 266). Discriminatory intent "may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one [group] than another." Davis, 426 U.S. at 242. But although the fact that a facially neutral law has disparate impact on a certain group is relevant to the equal protection analysis, Arlington Heights, 429 U.S. at 266 (disparate impact "may provide an important starting point"), disparate impact alone is not sufficient to show discriminatory purpose:

> [W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

Davis, 426 U.S. at 242. "[T]he ultimate question remains: did the legislature enact a law 'because of,' and not 'in spite of,' its discriminatory effect." McCrory, 831 F.3d at 220 (quoting Pers. Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).

If Plaintiffs succeed at making this showing of discriminatory intent, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th

Cir. 2001). "The level of scrutiny depends on the type of classification." Sansotta v. Town of Nags Head, 724 F.3d 533, 542 (4th Cir. 2013).

In conducting the discriminatory intent analysis, the court uses as a guide the (nonexhaustive) factors set forth in Arlington Heights: (1) "the [disparate] impact of the official action," (2) "[t]he historical background of the [challenged] decision," (3) "[t]he specific sequence of events leading up to the challenged decision," (4) "[d]epartures from the normal procedural sequence," and (5) "the legislative or administrative history." 429 U.S. at 266–68.

The first conclusion the court reaches in the discriminatory intent analysis is that Plaintiffs have failed to plausibly plead that the preemption of regulation of access to multiple occupancy restrooms, showers, or changing facilities in Section 2 impacts them disproportionately. Plaintiffs' argument as to Section 2 centers on the theory that providing "separate 'men's' and 'women's' restrooms" by "maintaining or posting [gender-specific] signs" constitutes regulation of bathroom access, and therefore that transgender individuals are being treated unequally when entities like UNC disclaim the ability to regulate bathroom access as to transgender individuals. (Doc. 233 at 8 n.1, 38, 43.) But while Plaintiffs are correct that Section 2 prevents state entities like UNC from regulating access to restrooms, the court is

47

unpersuaded that the mere provision of separate male and female facilities is regulation of restroom access, in the relevant sense. As the UNC Defendants point out, a regulation is an authoritative rule with the force of law, and "[o]ne would not normally describe a [gender-specific] sign outside a bathroom" as meeting this description. (Doc. 235.) Although gender-specific bathroom signs might properly have been considered to have the force of law under HB2, which specifically gave legal import to such signs (see Doc. 127 at 26 ("[T]he meaning of those words and symbols [outside bathrooms] has changed as a result of [HB2].")), HB2 has been repealed in full. Its replacement, HB142, imbues gender-specific bathroom signs with no such legal import. And Plaintiffs do not point to any institutional rule or policy on the part of UNC or any other state entity that purports to assign legal import to gender-specific bathroom signs. Plaintiffs' argument also contradicts Plaintiffs' admission that they do not challenge the historical convention of using "men's" and "women's" labels for such facilities. As a result, despite Plaintiffs' claims to the contrary, it does not appear that state entities like UNC are "regulating" access to restrooms at all, much less regulating that access in a way that impacts Plaintiffs disparately.

Further, as outlined earlier in this opinion, see supra Part II.B.1., it is not a harm to Plaintiffs that they lack an affirmative statement from the UNC Defendants that Plaintiffs are

48

permitted to use the restrooms and facilities that align with their gender identity. Nothing in the language of Section 2 can be construed to prevent transgender individuals from using the restrooms that align with their gender identity, as Plaintiffs claim some had apparently been doing successfully prior to the passage of HB2. (See Doc. 127 at 3, 11 (noting that the record showed that, prior to the passage of HB2, "transgender individuals ha[d] been quietly using facilities corresponding with their gender identity"); Doc. 103 at 70 (Governor's counsel stating, "my guess is that some transgender individuals will continue to use bathrooms that they always used and nobody will know").) In addition, the UNC Defendants stated at the motion hearing that they are preempted from forbidding transgender individuals from using the restrooms that are consistent with their gender identity. Because Plaintiffs have not shown that Section 2 disparately impacts them, their equal protection claim against Section 2 fails.[23] See Morrison, 239 F.3d at 654 ("To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated.").

---

[23] Because Plaintiffs fail to even show a disparate impact, which is the "important starting point" of their equal protection claim, Arlington Heights, 429 U.S. at 266, there is no need for the court to move on to the other Arlington Heights factors. See Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 825 (4th Cir. 1995) ("[A]n equal protection claim must be rooted in an allegation of unequal treatment for similarly situated individuals.").

However, the court does find that Plaintiffs have plausibly pleaded that the preemption of new or amended local "ordinance[s] regulating private employment practices or regulating public accommodations" in Section 3 impacts them disproportionately. Just like Section 2, Section 3 is facially neutral. Further, as Intervenor-Defendants point out, it appears that the State normally has the authority to centralize its decision-making powers by withholding the power to make certain decisions from local governments. See Town of Boone v. State, 369 N.C. 126, 131 (2016) ("Local political subdivisions are mere instrumentalities of the state for the more convenient administration of local government, whose territory and functions rest in the absolute discretion of the state." (citations and internal quotation marks omitted)); see also id. ("[T]he General Assembly has long enjoyed plenary power to create political subdivisions of local government, establish their jurisdictional boundaries, and invest them with certain powers"). But it is an "unremarkable principle that the State may not alter the procedures of government to target" vulnerable minority groups, even when that alteration might otherwise have an equally unremarkable legal basis. Schuette v. Coalition to Defend Affirmative Action, 572 U.S. 291, 304 (2014) (plurality opinion); see Hunter, 393 U.S. at 392 (noting that, while "insisting that a State may distribute legislative power as it desires . . . may generally be true," it is equally true that

such a "principle[] furnish[es] no justification for a legislative structure which otherwise would violate the Fourteenth Amendment").

Here, while HB142 presents the same barrier to anyone else seeking a protective ordinance as it does to transgender individuals, Plaintiffs observe that transgender individuals have a greater need for protective ordinances than other groups.  This is because protective statutes and ordinances that preexist HB142 — such as Charlotte's ordinance prohibiting discrimination on the basis of race, color, religion, national origin, or sex — continue to be valid.  Thus, Plaintiffs plausibly allege they lack the protections that individuals in other vulnerable groups enjoy.  Further, although Intervenor-Defendants protest that HB142 "equally forecloses local advocacy for the biological-access policies previously embodied in [HB2]" (Doc. 225 at 16–17), it is transgender individuals who have depended on success at the local level (e.g., the Charlotte ordinance) and biological-access proponents who have depended on success at the state level (e.g., HB2).  As a result, Plaintiffs have plausibly alleged that the foreclosure of new or amended local non-discrimination ordinances relating to public accommodations impacts them disparately.  See generally Hunter, 393 U.S. at 391 ("[A]lthough the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority.  The

majority needs no protection against discrimination and if it did, a referendum might be bothersome but no more than that."). As a result, Plaintiffs plausibly allege that the inability to lobby for, and receive, greater protections at the local level disparately impacts them. Cf. Romer v. Evans, 517 U.S. 620, 631–36 (1996) (finding an equal protection violation where state amendment specifically eliminated protective ordinances for homosexuals and prevented the passage of state or local laws protective of such persons in the future).

The court also finds that — at this preliminary stage — Plaintiffs have plausibly *alleged* that Section 3 was passed with discriminatory intent sufficient to permit their equal protection claim against that section to proceed. The first Arlington Heights factor, which is the disparate impact of the government action, has already been shown above. See 429 U.S. at 266. While disparate impact is not itself determinative of discriminatory intent, it is evidence of such intent. Davis, 426 U.S. at 242.

The second Arlington Heights factor is the "historical background" of the challenged law, 429 U.S. at 267, which here involves the passage of HB2. Plaintiffs allege that HB2 was passed in response to the Charlotte ordinance that granted anti-discrimination protections to transgender individuals (Doc. 127 at 13) which is some evidence that it — and now HB142, which similarly precludes Charlotte-style ordinances — was motivated, at least in

52

part, by discriminatory intent.  In addition, they allege that the General Assembly was presented with a "clean repeal" of HB2, but chose instead to enact a law that preempted anti-discrimination provisions.  (Doc. 210 ¶ 235.)

The third <u>Arlington Heights</u> factor is "[d]epartures from the normal procedural sequence."  429 U.S. at 267.  Here, Plaintiffs allege that HB142 was introduced, debated, passed, signed, and went into effect within a single day.  (Doc. 210 ¶¶ 208-20.)  To accomplish this, the legislature used a process known as "gut and amend," where an existing bill that had passed one house was stripped out and used as the vehicle for passing HB142.  (<u>Id.</u> ¶¶ 243-45.)   While   Intervenor-Defendants   argue,   not unpersuasively, that this unusual procedural move was merely the result of a "bipartisan political compromise" (Doc. 234 at 8) in response to the immense time-pressure imposed on the State to pass a legislative repeal of HB2,[24] this argument depends on a factual determination the court cannot make at this pleading stage, when the facts must be viewed in the light most favorable to Plaintiffs.

---

[24]  Public backlash in response to the passage of HB2 was substantial and included the following: the National Basketball Association announced it would withdraw the February 2017 NBA All-Star Game from Charlotte; various cities and states in the United States barred publicly-funded travel to North Carolina; and an estimated $3.76 billion in economic activity was lost.  (Doc. 210 ¶ 223.)  In addition, the National Collegiate Athletic Association announced that "North Carolina would be ineligible to host any championships until 2022" unless HB2 was repealed by March 30, 2017.  (<u>Id.</u> ¶ 241.)  HB142 was passed and went into effect on March 29, 2017.  (<u>Id.</u> ¶ 242.)

El-Amin v. McDonnell, No. 3:12-CV-00538-JAG, 2013 WL 1193357, at *4 (E.D. Va. Mar. 22, 2013) ("In short, [plaintiff] has alleged both discriminatory intent and disparate impact, and . . . has pleaded sufficient facts to state a claim for violation of the Equal Protection Clause.  This conclusion has nothing to do with the claim's ultimate likelihood of success, on which the Court expresses no view.  It instead has to do with the basic reality that the Court may not weigh evidence at the motion to dismiss stage, which is, in effect, what the defendants seek."); Williams v. Hansen, 326 F.3d 569, 587 (4th Cir. 2003) (King, J., dissenting) ("Having made the requisite specific, nonconclusory factual allegations in support of their equal protection claim, the question of motive becomes one for the jury.").

The fourth and final Arlington Heights factor is the relevant legislative history.  429 U.S. at 268.  Although Plaintiffs catalog a variety of statements made by North Carolina legislators "in the press and through their social media" in regard to the purpose and effect of HB142 (Doc. 210 ¶ 246), and proceed to argue that such statements tend to "demonstrate[] discriminatory intent" (Doc. 233 at 42), such statements are not "legislative history."  See Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 819 (4th Cir. 1995) (describing the fourth Arlington Heights factor as referencing "contemporary statements by decisionmakers on the record or in minutes of their meetings" (emphasis added)).  As a result,

Plaintiffs have not alleged any relevant legislative history. Nevertheless, this lack of legislative history may well be the result of the expedited legislative process for HB142, which — as discussed above — is itself relevant to the discriminatory intent analysis. (See Doc. 210 ¶ 244 ("The bill was the subject of limited debate as it progressed rapidly through the General Assembly . . . .").) In any case, Plaintiffs are not required to show all four Arlington Heights factors in order to survive a motion to dismiss. McCrory, 831 F.3d at 204 (noting that Arlington Heights merely provides "a nonexhaustive list of factors to consider in making [the discriminatory intent] inquiry"); see Synovus Bank v. Coleman, 887 F. Supp. 2d 659, 668 (W.D.N.C. 2012) ("[S]urviving a Rule 12(b)(6) motion remains a relatively low bar.")

Given that Plaintiffs have plausibly alleged three of the four Arlington Heights factors, that the fourth factor may be of limited use when an expedited legislative process allows for little debate, and that Plaintiffs need only show that discriminatory intent was one of many motivating factors for the passage of Section 3, the court finds Plaintiffs have plausibly *alleged* that Section 3 was passed with discriminatory intent. See generally Arlington Heights, 429 U.S. at 265–66 ("Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or

even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But [unconstitutional] discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose { "pageset": "Sc1" has been a motivating factor in the decision, this judicial deference is no longer justified.")

Having determined that Plaintiffs have plausibly alleged discriminatory intent, "the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison, 239 F.3d at 654. There has been considerable debate at the district and circuit court levels about the applicable standard of scrutiny for classifications based on transgender status, with the majority of courts to have considered the question in recent years finding that "heightened" or "intermediate" scrutiny applies.[25] See, e.g., Glenn v. Brumby, 663

_____

[25] "Intermediate scrutiny requires the state to show that its justification for the classification is 'exceedingly persuasive.'" M.A.B. v. Bd. of Educ. of Talbot Cty., 286 F. Supp. 3d 704, 718 (D. Md. 2018) (quoting United States v. Virginia, 518 U.S. 515, 533 (1996)). "That is, the state is required to demonstrate that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives. Hypothesized or *post hoc* justifications created in response to litigation are insufficient to meet this burden, as are justifications based on overbroad generalizations about sex." Grimm v. Gloucester Cty.

F.3d 1312, 1315–20 (11th Cir. 2011); M.A.B. v. Bd. of Educ. of Talbot County, 286 F. Supp. 3d 704, 718–22 (D. Md. 2018); Doe 1 v. Trump, 275 F. Supp. 3d 167, 208–09 (D.D.C. 2017); Adkins v. City of New York, 143 F. Supp. 3d 134, 139–40 (S.D.N.Y. 2015); but see, e.g., Johnston v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ., 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (applying rational basis review). The Fourth Circuit has not yet reached the issue. Plaintiffs argue that "strict or at least heightened scrutiny" should apply (Doc. 233 at 44 n.23), and no Defendant has offered an argument in its present briefing regarding the proper standard of scrutiny. Because the court finds at this stage that Plaintiffs have sufficiently pleaded that HB142 fails rational basis review, there is no need to resolve now whether a higher standard of scrutiny should apply.[26]

Rational basis review bids the court determine first "whether the end that the state seeks to achieve is a legitimate governmental purpose." Sylvia, 48 F.3d at 820. In this

_____

Sch. Bd., 302 F. Supp. 3d 730, 749 (E.D. Va. 2018) (citations and internal quotation marks omitted).

[26] In a prior order (Doc. 127), the court applied intermediate scrutiny to HB2 in light of the fact that HB2 "classifie[d] citizens on the basis of 'biological sex'" on its face (Id. at 48–49). Since HB142 does not facially classify individuals on the basis of sex — and indeed does not facially classify or regulate individuals in any sense — the court's standard of scrutiny analysis from its prior order is of little help here. (See id. at 49 n.30 (expressly "declin[ing] to consider" the questions of "whether transgender individuals qualify as a suspect class for Equal Protection purposes" and "whether Plaintiffs have established a sex stereotyping claim").)

determination, the court accords some deference to stated legislative purposes. See <u>City of New Orleans v. Dukes</u>, 427 U.S. 297, 303 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations.") Next, the court determines whether the challenged "classification utilized by the statute is 'rationally related'" to that legitimate governmental purpose. <u>Sylvia</u>, 48 F.3d at 820 (quoting <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 440 (1985)). While the substantive standard for rational basis review ultimately "requires the government to win if any set of facts reasonably may be conceived to justify its classification," this lenient standard must not be allowed to "defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard" at the motion to dismiss stage. <u>Giarratano v. Johnson</u>, 521 F.3d 298, 303 (4th Cir. 2008) (quoting <u>Wroblewski v. City of Washburn</u>, 965 F.2d 452, 459 (7th Cir. 1992)). Ultimately, "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." <u>Id.</u> at 304 (quoting <u>Wroblewski</u>, 965 F.2d at 460).

On the initial question of whether the stated governmental purpose for HB142 is legitimate, the court is hampered by the fact that the legislation is accompanied by no policy statement. Nor do Intervenor-Defendants offer any possible governmental purpose

58

for HB142's preemption provisions in their briefing, noting only that the law is the result of "a complex bipartisan compromise." (Doc. 234 at 3 n.1.)  It is in fact Plaintiffs who hint at the most plausible purpose for HB142's preemption provisions: that they are intended to prevent an uneven patchwork of anti-discrimination laws across the State, in order to head off the sort of uproar that led to — and followed — the passage of HB2. (See Doc. 210 ¶ 331.)  To this notion, Plaintiffs respond:

> [T]he government cannot assert an interest in consistent statewide obligations given that (1) H.B. 142 in fact leaves in place local government non-discrimination ordinances that were enacted prior to the passage of H.B. 2 . . . and cities have announced their intent to continue enforcing them; (2) H.B. 142 does not preempt local governments, school boards, universities, or other state agencies or branches of government from enacting non-discrimination rules or regulations with regard to their own employees or students, or with respect to the services they provide to citizens; (3) H.B. 142's "preemption" is specified to end in December 2020.  In addition, there is no greater need for statewide uniformity with respect to antidiscrimination laws than there is with respect to numerous other laws as to which North Carolina does not prohibit local regulation and as to which there are significant differences in regulations of conduct among different parts of the state . . . .

(Id.)  As a result, Plaintiffs argue, any governmental purpose for HB142's preemption provisions resting on statewide uniformity can only be a "pretext" for the same sort of discrimination that was more explicit in HB2.  (Id.)  Given the lack of briefing from Defendants on this issue, the lack of any clearly stated purpose for the law, the plausible arguments made by Plaintiffs in

opposition to the conceivable purpose of statewide uniformity, and the standard of review at this early pleading stage, the court finds that — while the question is a close one — Plaintiffs have "allege[d] facts sufficient to overcome the presumption of rationality" as to Section 3 at this time. Giarratano, 521 F.3d at 304 (quoting Wroblewski, 965 F.2d at 460); see Mary's House, Inc. v. North Carolina, 976 F. Supp. 2d 691, 704 (M.D.N.C. 2013) ("Plaintiffs do more than present conclusory assertions . . . . The complaint therefore alleges sufficient facts to overcome the presumption of rationality at this early stage. Whether Plaintiffs can ultimately meet the high bar in proving Defendants lacked any rational basis for the [challenged classification] remains to be seen.").

In conclusion, because Plaintiffs have plausibly pleaded both discriminatory intent and lack of a rational basis for Section 3, their equal protection claim against Section 3 survives the motions to dismiss as to the Executive Branch Defendants.[27]

---

[27] Intervenor-Defendants also argue that Plaintiffs' claims should be dismissed as contrary to the Tenth Amendment to the United States Constitution (Doc. 225 at 21), which forbids the "commandeer[ing]" of state legislatures by Congress "by directly compelling them to enact and enforce a federal regulatory program." New York v. United States, 505 U.S. 144, 161 (1992). Intervenor-Defendants base this argument on the theory that Plaintiffs are asking the court to mandate that "North Carolina officials . . . enact and administer access and non-discrimination policies that do not now exist." (Doc. 225 at 21.) Even to the extent Plaintiffs' requested relief could be characterized in the manner Defendants suggest — which is at odds with Plaintiffs' own assertion that "Plaintiffs simply request that HB142 be struck down" (Doc. 233 at 45) — an improperly-stated request for relief is not

## 2. Nominal Damages Claims

Finally, Plaintiffs allege that, regardless of the outcome of their claims against HB142, they have claims for nominal damages against the UNC Defendants for "violations of their Title IX and Title VII rights . . . that occurred while HB2 was in force." (Doc. 233 at 11 n.3.)  In their brief, Plaintiffs relegate this claim to a footnote and decline to make any argument or cite any cases in support of their position.  (Id.)  The complaint is no more illuminating.  (Doc. 210 ¶¶ 18, 391-403.)

The UNC Defendants contend that under Titles VII and IX, a defendant can be liable only for its own conduct, or the conduct of its agents.  (Doc. 223 at 29.)  They note that, under this principle, Plaintiffs may not "seek damages from the University 'for the harms caused by H.B. 2's violation of'" Titles IX and VII because the UNC Defendants played no part in the enactment of HB2 and because Plaintiffs' Fourth Amended Complaint does "not suggest that the University in fact enforced HB 2 against any of [the

_____

normally grounds for dismissal of a complaint.  Charles v. Front Royal Volunteer Fire and Rescue Dept., Inc., 21 F. Supp. 3d 620, 629 (W.D. Va. 2014) ("[T]he nature of the relief included in the demand for judgment is immaterial to the question of whether a complaint adequately states a claim upon which relief can be granted." (citation omitted)); 5 Charles Alan Wright et al., Federal Practice and Procedure § 1255 (3d ed. 2018) ("[T]he selection of an improper remedy in the Rule 8(a)(3) demand for relief will not be fatal to a party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type."); see also Fed. R. Civ. P. 54(c) ("[A] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").  As a result, the Tenth Amendment does not preclude Plaintiffs' equal protection claim.

Plaintiffs].”  (Id. (quoting Doc. 210 ¶ 18).)  The UNC Defendants also argue that Plaintiffs have not demonstrated that any adherence to HB2 would have violated Titles IX and VII, as both statutes permit the maintenance of separate bathrooms, locker rooms, and shower facilities on the basis of sex.  (Id. at 29–30.)

The briefing on these claims is wholly inadequate for proper resolution.  As such, decision on this issue will be withheld without prejudice to the parties rearguing it upon further request and further briefing.  Fed. R. Civ. P. 12(i).

## III. CONCLUSION

For the reasons stated, the court finds that Plaintiffs have plausibly alleged an equal protection claim against Sections 3 and 4[28] of HB142 as to the Executive Branch Defendants and that Plaintiffs' potential claims against HB2 should not be dismissed on ripeness grounds at this time.  The court defers ruling on Plaintiffs' claims for nominal damages for the alleged Title IX and Title VII violations that occurred while HB2 was in effect against them.  In all other respects, the motions to dismiss are granted.

---

[28] Section 4 only states that “[t]his act is effective when it becomes law” and that “Section 3 of this act expires on December 1, 2020.”  HB142 § 4.  Since the operative language relevant to Plaintiffs' equal protection claim is found in Section 3, the foregoing opinion has treated that section exclusively.  But since Section 4 modifies Section 3, and since Plaintiffs also make their equal protection claim against Section 4, that claim currently survives to the same extent it survives as to Section 3.

IT IS THEREFORE ORDERED as follows:

1.    Plaintiffs' motion for leave to file the declaration of Ericka Myers (Doc. 236) is DENIED.

2.    The motion to dismiss by the UNC Defendants (Doc. 222) is GRANTED IN PART and DENIED IN PART in that the claims in Counts 1 and 2 against them, as well as the claims in Counts 6 and 7 pertaining to HB142, are DISMISSED WITHOUT PREJUDICE, but that the claims against them in Counts 3, 4, and 5 survive.  The court reserves ruling on the nominal damages claims brought against them for the period of time when HB2 was in effect against them as found in Counts 6 and 7.

3.    The motion to dismiss by Intervenor-Defendants (Doc. 221) is GRANTED IN PART and DENIED IN PART, in that the claims in Count 1, along with the equal protection claim in Count 2 as to Section 2 of HB142, are DISMISSED WITHOUT PREJUDICE, but that the equal protection claim in Count 2 as to Sections 3 and 4 of HB142, as well as the claims in Counts 3, 4, and 5, survive.

4.    Any party wishing to submit additional briefing regarding Plaintiffs' nominal damages claims for the period of time when HB2 was in effect against Plaintiffs must do so within 30 days of the issuance of this order.

5.    As per the court's prior order (Doc. 228), any party wishing to submit additional briefing as to the joint motion for entry of a consent decree must do so within 30 days of the issuance

of this order. In light of the court's ruling in the present order, the court directs all parties to meet and confer prior to the filing of such additional briefing to determine whether any agreement can be reached as to the effect of the court's rulings on the joint motion.

6. As per the court's prior order (Doc. 226), the Executive Branch Defendants are not required to serve an answer or other responsive pleading to Plaintiffs' Fourth Amended Complaint until 30 days after the court's disposition of the joint motion for entry of a consent decree.


/s/    Thomas D. Schroeder
United States District Judge

September 30, 2018