# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| JOAQUÌN CARCAÑO, *et al.*, <br>     *Plaintiffs*, <br> v. <br><br> ROY A. COOPER, *et al.*, <br>     *Defendants*, <br> v. <br><br> PHIL BERGER, *et al.*, <br>     *Intervenor-Defendants* | No. 1:16-cv-00236-TDS-JEP <br><br> **INTERVENOR-DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF DISMISSAL OF FOURTH AMENDED COMPLAINT** |

Pursuant to the Court's October 23, 2018 Order (Doc. 253), the Legislative Intervenor-Defendants submit the following supplemental brief on nominal damages in support of their motion to dismiss, and state as follows.

## INTRODUCTION AND FACTUAL SUMMARY[1]

With little explanation, Plaintiffs Carcaño, McGarry, Schafer, and the ACLU of North Carolina ("Plaintiffs") assert that their Title IX and Title VII claims for nominal damages against the University of North Carolina Defendants ("UNC Defendants") for the brief period of time when HB 2 was in effect remain viable despite the statute's repeal by the North Carolina General Assembly.[2] *See* Doc. 233 at 11 n.3; *see also* Fourth

---

[1] Because the factual background of this case has been described at length in several rounds of briefing and Orders, *see* Doc. 221; Doc. 223; Doc. 248, this brief dispenses with a full factual statement. As necessary, relevant facts will be cited as part of the argument.

[2] *See* Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

1

Amended Complaint ("4AC") at ¶¶ 391–98 (alleging violation of Title IX); *id.* ¶¶ 399–403 (Title VII); 102 (prayer for relief seeking "nominal damages in the amount of $1.00 for violation of [Plaintiffs' Carcaño, McGarry, and Schafer's] rights under Title IX and Title VII, as applicable"). As the UNC Defendants have argued, they cannot be held liable for nominal damages because they did not enact HB 2 or enforce it during the time it was in effect. Doc. 223 at 28–29 (UNC Defendants' motion to dismiss). Intervenor-Defendants adopt that showing, which requires dismissal of Plaintiffs' claims for nominal damages as to HB 2.

Plaintiffs' claim for nominal damages must be dismissed for the additional reason that Plaintiffs were never subject to prosecution or other enforcement action under HB 2, nor otherwise compelled to conform to its requirements. On the contrary, the UNC Defendants disclaimed any power to enforce the law and affirmatively declined to do so. Fourth Circuit law is clear that where a plaintiff has not been deprived of any concrete interest under an allegedly unconstitutional law, his or her claim for nominal damages is mooted by the law's repeal. Thus, even if the UNC Defendants could be held liable for HB 2 at all, Plaintiffs' claims for nominal damages are non-justiciable and must be dismissed.

Finally, even if Plaintiffs' claims for nominal damages remain justiciable in light of the repeal of HB 2, they are without merit. Plaintiffs' claims rest on the legal theory that Title IX's and Title VII's prohibitions on discrimination "'because of'" or "'on the basis of . . . sex'" also cover "discrimination on the basis of gender nonconformity,

2

gender identity, transgender status, and gender transition." 4AC ¶¶ 393, 401. But all available indications of meaning — contemporaneous dictionary definitions, legislative history, and other congressional enactments defining and using the term "gender identity" — establish that Congress used the term "sex" in both statutes to mean "biological sex," and *not* "gender identity." Because Plaintiffs fail in the fundamental task of establishing that the statutes apply to gender identity discrimination, their claims for nominal damages (even if justiciable) should be dismissed for failure to state a claim.

## ARGUMENT

### I. PLAINTIFFS FAIL TO STATE A COGNIZABLE NOMINAL DAMAGES CLAIM BECAUSE THEY NEVER SUFFERED A CONCRETE INJURY CAUSED BY ENFORCEMENT OF HB 2.

In the Fourth Circuit, a claim for nominal damages may survive the repeal of challenged legislation — but only when the plaintiff has been deprived of a liberty interest by enforcement of the law. That standard is not easy to meet: Even where plaintiffs have been *prosecuted* under an allegedly unconstitutional statute, their nominal damages claims become moot if the statute is later repealed. In this case, enforcement of HB 2 has never caused Plaintiffs any concrete injury; in fact, the UNC Defendants consistently stated that they would not apply the law to Plaintiffs, making Plaintiffs' alleged injuries — mostly generalized anxiety and fear of prosecution under *other* statutes — entirely speculative. Plaintiffs' claims for nominal damages thus did not survive the repeal of HB 2.

### A. A Claim For Nominal Damages Does Not Survive A Law's Repeal If Enforcement of the Law Never Caused A Concrete Injury to Plaintiff.

*Reyes v. City of Lynchburg*, 300 F.3d 449, 451 (4th Cir. 2002), is directly on point and disposes of the HB 2 nominal damages claims. Reyes was arrested for holding a protest on the grounds of a high school under a local ordinance that required him to apply for a parade permit. Reyes was eventually tried and acquitted, and after his acquittal "was informed . . . that the parade ordinance would not be enforced against him in the future." *Id*. at 455 n.8. Reyes sued in federal court, seeking declaratory and injunctive relief and nominal damages. After suit was filed but before the court could act on Reyes' claims, the parade ordinance was repealed. *Id*. at 452. Reyes nonetheless argued that his claim for nominal damages for the City's past conduct survived.

On appeal, the Fourth Circuit assumed without deciding that the ordinance was constitutionally defective. *Id.* at 455. But it held that Reyes' claim for nominal damages did not survive repeal of the ordinance: Even though he had been forced to endure a trial under a (presumably) unconstitutional ordinance, Reyes had not suffered any concrete injury.

In so holding, the Fourth Circuit looked to *Richardson v. City of South Euclid*, 904 F.2d 1050 (6th Cir. 1990), where a couple had been prosecuted under a city ordinance prohibiting brothels within city limits. The case was eventually dismissed by the state court on grounds that the ordinance was unconstitutionally vague and overbroad as applied to the defendants, who sued for $250,000 in damages for humiliation, emotional distress, physical harm, and loss of earnings under § 1983. *Id.* at 1051. The crux of the

4

Richardsons' claim, the Fourth Circuit noted, was that being prosecuted under an ordinance later deemed unconstitutional "automatically gives rise to a cause of action." *Reyes*, 300 F.3d at 457. But in *Richardson*, the Sixth Circuit had rejected that premise, finding that merely being prosecuted under a statute later deemed unconstitutional does not cause a concrete injury giving rise to a claim for damages. *Richardson*, 904 F.2d at 1053.

The Fourth Circuit adopted *Richardson*'s reasoning in full and held that, without deprivation of a cognizable liberty interest, there is no claim for nominal damages for being prosecuted under an unconstitutional law that is later repealed, even if a defendant is put to the stress and disruption of a trial. Reyes, the Fourth Circuit noted, was eventually acquitted in open court after a trial on the merits, and "his case would seem to be stronger [than the Richardsons'] because only nominal damages are claimed," as opposed to the emotional and other damages claimed by the Richardsons. *Reyes*, 300 F.3d at 457.

### B. Plaintiffs Suffered No Concrete Injury Caused by HB 2.

*Reyes* stands for the proposition that even past unsuccessful enforcement of a statute against a plaintiff does not give rise to a nominal-damages claim that survives the statute's repeal. Because Plaintiffs in this case were never subject to *any* kind of enforcement of HB 2, *Reyes* disposes of Plaintiffs' nominal-damages claims.

Plaintiffs' various amended complaints do not allege that *anyone* — not just Plaintiffs — was ever prosecuted or subjected to adverse action under HB 2 for using a

5

bathroom inconsistent with the person's biological sex. *See generally* Doc. 1 (Complaint); Doc. 9 (Amended Complaint); Doc. 151 (Second Amended Complaint); Doc. 183 (Third Amended Complaint); Doc. 210 (Fourth Amended Complaint).[3] Where the UNC Defendants were concerned, that was evidently deliberate: The UNC Defendants stated throughout the litigation that they had no intention of enforcing HB 2. *See, e.g.*, Doc. 50 at 4 ("the University . . . has no intention to take any steps to enforce [HB 2] against transgender people who use University bathrooms consistent with their gender identity"); 6 (Defendant Spellings stating she has "no intent to exercise [her] authority to promulgate any guidelines or regulations that require that transgender students use the restrooms consistent with their biological sex").

That means that HB 2 never injured anyone in any way sufficient to give rise to a nominal-damages claim that survives the statute's repeal. When an ordinance is "never enforced against" an individual, an "assertion of a nominal damages claim alone is insufficient to preserve a live controversy[.]" *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 F. App'x 566, 571 (4th Cir. 2007). *See also Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 549 (4th Cir. 2010) (nominal damages not available where school "never undertook a 'concrete act' to investigate or sanction the plaintiffs for violation of the [school's] code of conduct") (citing *Reyes*). Indeed, this case — where

---

[3] Even definitionally, "enforcement" under HB 2 was impossible since the statute lacked an enforcement provision and created no civil or criminal penalties for noncompliance. *See* Session Law 2016-3.

Plaintiffs were not subject to *any* enforcement under HB 2, even an unsuccessful one — presents an even weaker case for jurisdiction than *Reyes* did.

The claims of injury from HB 2 that Plaintiffs Carcaño, McGarry, and Schafer do allege are not concrete enough for continued jurisdiction. Plaintiffs claim two varieties of injuries from HB 2: (1) injury from having changed their restroom use in response to HB 2, and (2) emotional injuries from the fears they allegedly felt when HB 2 was in effect. Plaintiff Carcaño, a UNC employee, alleges that he was "forced to use a separate restroom from his colleagues" by HB 2, causing him to suffer feelings of humiliation. 4AC ¶ 73. Likewise, Plaintiff McGarry, a UNC employee, alleges that because of HB 2, "he often avoided going to the restroom all day." *Id.* ¶¶ 110–11. And Plaintiff Shafer, a student at the UNC School of the Arts High School, does not even allege that she has been forced to use UNC restrooms that do not conform to her gender identity, but only that she "limited or delayed use of restrooms in public buildings," *id.* ¶ 150, and experienced feelings of stigmatization, mental distress, and anxiety at the possibility of being forced to do so. *Id.* ¶¶ 144–47.[4]

Neither of those injuries gives rise to jurisdiction now.[5] As to the first, Plaintiffs' allegations that they were required by HB 2 to use single-user restrooms at UNC are

---

[4] Plaintiffs do not consistently distinguish between fears resulting from HB 2 and fears resulting from HB 142. Needless to say, any fears resulting from HB 142 cannot be attributed to HB 2.

[5] To permit Plaintiffs to pursue their nominal-damages claims under either theory would be to adopt the *dissenting* opinion in *Reyes*. 300 F.3d at 460 (Michael, J., dissenting)
(Continued…)

7

belied by the UNC Defendants' explicit statement that they had no power, and did not intend, to enforce HB 2 to require any person to use any restroom at odds with their gender identity. The Supreme Court has recently explained that plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). And as this Court has stated, "Plaintiffs must show that their fear of criminal prosecution is 'not imaginary or wholly speculative' in order" to have standing to press their claims, including their claim for nominal damages. Doc. 248 at 23 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)).

As to the second, as *Richardson* makes clear, anxiety and other mental distress resulting from a law does not constitute a concrete injury that can sustain a claim for damages after the law's repeal. *See* 904 F.2d at 1053 (rejecting damages claim based on emotional distress and humiliation). That is consistent with *Reyes*: If an unsuccessful prosecution under an allegedly unconstitutional statute does not create an injury sufficient for a nominal-damages claim, it makes no sense that mental distress would.

Absent any concrete injury to Plaintiffs attributable to enforcement of HB 2, their claims for nominal damages are moot, non-justiciable, and must be dismissed.

---

(Continued…)

("[S]ummary judgment for the City was inappropriate because Reyes has adequately alleged a constitutional injury in the form of chilled speech[.]").

8

Case 1:16-cv-00236-TDS-JEP Document 254 Filed 11/16/18 Page 8 of 16

## II. EVEN IF THE NOMINAL DAMAGES CLAIMS SURVIVED REPEAL OF HB 2, THEY FAIL ON THE MERITS.

Even if a claim for nominal damages could survive the repeal of a statute that was never enforced against Plaintiffs — and under *Reyes*, it cannot — Plaintiffs' claims for nominal damages still fail on the merits. Intervenor-Defendants explained in support of their motion to dismiss that HB 142 did not violate either Title IX or Title VII because neither statute applies to discrimination based on transgender status, nor do they prohibit schools and employers from permitting access to private spaces such as restrooms on the basis of physiological characteristics consistent with biological sex. Doc. 225 at 19–20. Plaintiffs' nominal damages claims as to HB 2 involve precisely the same allegations in the same counts of the Fourth Amended Complaint. 4AC ¶¶ 391–403. Therefore, Plaintiffs' HB 2 claims fail as well.

Both Title IX (enacted in 1972) and Title VII (enacted in 1964) make it unlawful to discriminate in education or employment on the basis of "sex." *See* 20 U.S.C. § 1681(a); 42 U.S.C. § 2000e-2(a)(1). Plaintiffs argue that both statutes' prohibitions on "sex" discrimination "include[] discrimination on the basis of gender nonconformity, gender identity, transgender status, and gender transition." 4AC ¶¶ 393 (Title IX), 401 (Title VII). They allege that HB 2, when it was in effect, denied Plaintiffs Carcaño, McGarry, and Shafer (and members of Plaintiff ACLU) use of "restrooms and changing facilities consistent with [their] gender identity without fear of penalty" in violation of Title IX, *id.* ¶¶ 395–98 (Count VI), and also in violation of Title VII as to Carcaño, *id.* ¶ 403 (Count VII).

9

Under a proper understanding of these statutes, Plaintiffs' arguments are incorrect. Neither defines "sex." Therefore, in both statutes, "sex" must be "interpreted as taking [its] ordinary, contemporary, common meaning." *Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted). Every indication of meaning from the time these statutes were enacted establishes that Congress intended "sex" to mean "biological sex," and not, as Plaintiffs claim, "gender identity" (or sexual orientation). *See*, *e.g.*, *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 676 (W.D. Pa. 2015) (Congress used the term "sex" in Title IX to mean "male and female, under the traditional binary conception of sex consistent with one's birth or biological sex"). Until recently, that was the holding of every court of appeals to consider the issue. *See also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221–22 (10th Cir. 2007); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982).[6]

First, contemporaneous dictionaries establish that, at the time Congress enacted these statutes, "sex" meant biological sex. *See*, *e.g.*, *MCI Telecomms. Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 225 (1994) (giving an undefined statutory term the meaning reflected in "[v]irtually every dictionary we are aware of"). In these

---

[6] Intervenor-Defendants recognize that there is contrary authority. *See, e.g.*, *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017) (regarding Title IX); *Equal Employment Opportunity Comm'n v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 570 (6th Cir. 2018), *cert. pet. filed* Aug. 23, 2018 (regarding Title VII). But these decisions are contrary to the statutory text. The Fourth Circuit reached a contrary holding as to Title IX as well, but the decision was vacated by the Supreme Court when the U.S. Department of Education rescinded the guidance on which the panel relied. *See G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 722 (4th Cir. 2016), *vacated and remanded*, 137 S. Ct. 1239 (2017).

10

dictionaries, "sex" "refer[red] to [the] physiological distinction[]" between "male and female." *Webster's New International Dictionary* 2296 (2d ed. 1958); *see also id*. ("SEX refers to physiological distinctions; GENDER, to distinctions in grammar."); *American College Dictionary* 1109 (1970) (defining "sex" in terms of physiological differences); *Webster's Third New International Dictionary* 2081 (1971) (defining "sex" based on a combination of "morphological, physiological, and behavioral peculiarities"). In short, there is no linguistic basis for holding that, at the time of enactment, the term "sex" in Titles IX or VII referred to anything other than the objective physiological characteristics distinguishing men from women.

Second, the legislative history of the statutes confirms the dictionary definitions. *See*, *e.g.*, *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 612–13 (1987) (confirming textual meaning through legislative history). Courts have recognized that "the major thrust of the 'sex' amendment" in Title VII "was towards providing equal opportunities *for women*," not the separate issue of gender identity. *Sommers*, 667 F.2d at 750 (emphasis added).

The legislative history of Title IX, moreover, shows that its proponents were principally motivated to end discrimination against women in university admissions and appointments. *See* 117 Cong. Rec. 39250, 39253, 39258; 118 Cong. Rec. 5104–06. The statute's architects consequently focused on prohibiting "sex" discrimination, *see id*. at 5803; 117 Cong. Rep. 39251, but at the same time sought to preserve schools' ability to separate males and females to preserve "personal privacy," *see* 118 Cong. Rec. 5807. To

11

lay to rest any doubt that the statute preserved the ability to condition access to private spaces on the basis of biological sex, proponents of Title IX proposed an amendment to the effect that "nothing contained herein shall preclude any educational institution from maintaining separate living facilities because of sex." 117 Cong. Rec. 39260. The language was adopted by the House without debate, *see id*. at 39263, and became part of the conference committee bill without discussion or dissent. *See* H.R. Conf. Rep. No. 92-1085 at 222. Not a shred of the legislative history of either statute suggests that Congress intended to define "sex" in terms of gender identity or to require schools and employers to permit persons to use restrooms that conform to their gender identity but not their biological sex.

Third, other indications of congressional purpose point in the same direction. For example, the subsequently enacted Violence Against Women Act ("VAWA") prohibits funded programs or activities from discriminating based on either "sex" or "gender identity." 42 U.S.C. § 13925(b)(13)(A). "Sex" and "gender identity" must have meant distinct things to the Congress that enacted VAWA, for equating sex with gender identity would create surplusage. *See, e.g., National Credit Union Admin. v. First Nat'l Bank & Tr. Co*., 522 U.S. 479, 501 (1998) (rejecting agency interpretation for making statutory language surplusage). Other statutes enacted after Titles IX and VII also prohibit discriminatory acts based on "gender" *and* "gender identity," indicating that Congress knows how to distinguish outward manifestations of sexual identity — akin to sex —

12

from inward, perceived ones.[7] Congress has not included similar language in Titles IX or VII as originally enacted or in any amendment since. This use of the term "gender identity" in a specific and defined way strongly suggests that Congress means something different when it fails to use that term — as it did in Titles IX and VIII. *See, e.g.*, *Cardoza-Fonseca v. INS*, 480 U.S. 421 (1987) (when Congress uses a term in one statute, but fails to use it in another related statute, the assumption is that Congress acted intentionally).

Fourth, Plaintiffs' position is inconsistent with federal regulatory interpretations of Title IX, which allow regulated institutions to provide "separate toilet, locker room, and shower facilities on the basis of sex," *see* 34 C.F.R.§ 106.33, and to "separate[e] . . . students by sex" within physical education classes and certain sports "the purpose or major activity of which involves bodily contact," *see id.* § 106.34. These provisions would be incoherent if "sex" were determined, not by physical characteristics, but by one's "internal sense of belonging to a particular gender." 4AC ¶ 44.

An additional consideration relevant to Title IX is that if that statute *were* suddenly held to cover gender-identity discrimination as well, it would likely be unconstitutional. As a Spending Clause statute, *see Franklin v. Gwinnett Cnty. Pub. Sch.*,

---

[7] *See* 18 U.S.C. § 249 (prohibiting acts or attempts to cause bodily injury to any person "because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person," and defining "gender identity" as "actual or perceived gender-related characteristics"); 42 U.S.C. § 3716(a)(1)(C) (Attorney General authority to assist with State and local investigations and prosecutions); 20 U.S.C. § 1092(f)(1)(F)(ii) (crime reporting by universities).

13

503 U.S. 60, 74 (1992), Title IX must give fair notice of its funding conditions. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The latent possibility that schools would have to treat sex as equivalent to gender identity, on pain of losing federal funding, would offend that clear-notice requirement. This Court should interpret Title IX to avoid that constitutional problem. *See*, *e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 190 (1991).

Plaintiffs have tried to bridge the gap between their claims and the statutory texts by claiming that discrimination linked to transgender status is a form of sex stereotyping prohibited by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *See* Opp. (Doc. 233) at 31. But in an ordinary system of sex-separated facilities, all people with particular physiological characteristics (determinative of "sex" according to the statutes' original meaning) are treated in the same way. No reference is necessary to anyone's "internal sense" of gender identity, 4AC ¶ 44, expressions of sex identification, behavior, or anything else. Plaintiffs' position only makes sense under the assumption that physiological characteristics are *themselves* a stereotype about sex. Opp. at 31 (claiming that "unlike other men, Mr. Carcaño was designated a different sex at birth, and thus does not conform to the stereotypes associated with men"). Under that theory, "sex" is determined exclusively by gender identity. That, in turn, begs the underlying question of what Title IX or Title VII originally meant, and it finds no purchase in the text or history of either.

14

Taken together, these indications of meaning establish that Titles IX and VII do not use the term "sex" to include "gender identity." Accordingly, Plaintiffs' allegations of discrimination under these statutes fail, and their claims for nominal damages — even if justiciable — must be dismissed.

## CONCLUSION

Because Plaintiffs have not suffered any concrete injury attributable to HB 2, their claims for nominal damages were extinguished upon the statute's repeal. Alternatively, Plaintiffs' claims fail because Titles IX and VII use the term "sex" to mean "biological sex," and only prohibit discrimination on that basis. The motion to be dismiss must be affirmed and Plaintiffs' claims for nominal damages dismissed.

Respectfully submitted,

By:  /s/ Stephen S. Schwartz
Gene C. Schaerr* (DC Bar #416638)
Stephen S. Schwartz* (DC Bar #477947)
*Counsel for President Pro Tempore
Phil Berger and Speaker Tim Moore*
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Email: gschaerr@schaerr-jaffe.com
        sschwartz@schaerr-jaffe.com

By:  /s/ Robert D. Potter, Jr.
Robert D. Potter, Jr. (State Bar #17553)
*Counsel for President Pro Tempore
Phil Berger and Speaker Tim Moore*
2820 Selwyn Avenue, #840
Charlotte, NC 28209
Telephone: (704) 552-7742
Email:  rdpotter@rdpotterlaw.com

*appearing pursuant to Local Rule 83.1(d)

*Counsel for Intervenor-Defendants*

Date:  November 16, 2018

# CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who have consented to electronic notification.

/s/ *Stephen S. Schwartz*
Counsel for Intervenor-Defendants