# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

          *Plaintiffs*,

v.

ROY A. COOPER, III, in his official capacity as Governor of North Carolina, *et al.*,

          *Defendants*.

Case No. 1:16-cv-236

## UNC DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' NOMINAL-DAMAGES CLAIMS

## INTRODUCTION

In their Fourth Amended Complaint, Plaintiffs seek nominal damages from the University of North Carolina for House Bill 2 ("HB 2"), even though the University did not enact HB 2, and even though HB 2 has now been repealed. Plaintiffs' nominal-damages claims lack legal merit. *First*, Plaintiffs' claims are not justiciable, because HB 2 has now been repealed and because Plaintiffs do not allege that the University took any enforcement action against them under it. *Second*, Plaintiffs fail to state claims under Title VII and Title IX because the University has not discriminated on the basis of sex or gender identity, and in any event these statutes currently do not prohibit discrimination on the basis of gender identity. *Finally*, Plaintiffs fail to state a claim under Title IX because the implementing regulations establish a safe harbor for the separation of bathrooms by sex—a safe harbor that protects the University here. This Court should therefore dismiss Plaintiffs' nominal-damages claims and allow the University to return to its crucial work of educating the students of North Carolina.

## STATUTORY BACKGROUND

**Title VII.** Congress enacted Title VII, a statute that prohibits discrimination in the workplace, as part of the Civil Rights Act of 1964. Title VII makes it unlawful for an employer "to discriminate against any

1

individual," or "to limit, segregate, or classify his employees … in any way which would deprive or tend to … adversely affect [an individual's] status," because of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Title VII addresses two types of discrimination: "disparate treatment" (explicitly "treat[ing] some people less favorably than others" on the basis of a protected trait) and "disparate impact" ("adopting a practice that is "facially neutral in [its] treatment of different groups but that in fact fall[s] more harshly on one group than another and cannot be justified by business necessity"). *Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Title VII allows damages only in cases involving "intentional discrimination [and] not … disparate impact." 42 U.S.C. § 1981a (a)(1); *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999). Plaintiffs raise only a claim of disparate treatment. (*See* Fourth Am. Compl. Count VII.)

**Title IX.** Congress enacted Title IX, a statute that prohibits sex discrimination in federally funded education programs, in 1972. Title IX provides that "[n]o person in the United States shall, on the basis of sex, … be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX also provides that, "[n]otwithstanding anything to the contrary contained in this chapter, nothing contained herein shall be construed to prohibit any

2

educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Title IX prohibits only intentional discrimination; it does not allow disparate-impact liability. *See Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712, 731–32 (E.D. Va. 2015).

## ARGUMENT

### I. The Court Should Dismiss The Title VII And Title IX Claims Because They Are Not Justiciable

Plaintiffs' nominal-damages claims challenging HB 2 are not justiciable, because HB 2 has been repealed and because Plaintiffs make no allegations that the University ever took action to enforce HB 2 against them while the statute was still in effect.

### A. A claim challenging a repealed statute and seeking nominal damages is justiciable only if the defendant actually enforced that statute against the plaintiff

Article III of the Constitution grants federal courts the power to decide "Cases" and "Controversies." A lawsuit challenging a repealed statute and seeking nominal damages is a justiciable "Case" or "Controversy" only if the defendant actually enforced that statute against the plaintiff while the statute was in effect.

3

For example, in *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 F.
App'x 566 (4th Cir. 2007), a town enacted a zoning ordinance prohibiting
flashing signs; a furniture store that owned such a sign challenged the
ordinance under the First Amendment; and the town repealed the challenged
provision. The Fourth Circuit ruled that "[the store's] assertion of a nominal
damages claim alone is insufficient to preserve a live controversy, … as the
Ordinance was never enforced against it." *Id.* at 571. The court
acknowledged that town officials had (1) "informed [the store] that its [sign]
… violated the ordinance," (2) "sent a letter" directing the store to "remove
the sign," and (3) sent "a second letter" setting a final deadline for the
furniture store "to have [its] sign removed." *Id.* at 567–68. Even so, the
town never took "action to enforce the Ordinance—it never cited, fined, or
charged [the furniture store] with violating the Ordinance, and never
instituted any court proceedings." *Id.* at 568. Because the town "did not fine
or cite [the store]," and did not initiate any "court proceedings," the "claim for
nominal damages fail[ed] to present a case or controversy." *Id.* at 573.

Similarly, in *Morrison v. Board of Education*, 521 F.3d 602 (6th Cir.
2008), a school prohibited students from insulting another student's sexual
orientation; a Christian student who considered homosexuality sinful
challenged the school policy under the First Amendment; and the school then

4

revised the policy. The Sixth Circuit ruled that the student's "claim for nominal damages" did not "presen[t] a justiciable controversy." *Id.* at 605. The court acknowledged that the student, "[w]ary of potential punishment," "remained silent" about homosexuality while the school policy was in effect. *Id.* Even so, the school never took "any specific action," and never performed any "concrete act," to enforce its policy. *Id.* at 610. In such circumstances, "[the] case should be over." *Id.* at 611.

A number of district courts have reached similar conclusions. In *Soto v. City of Cambridge*, 193 F. Supp. 3d 61, 71 (D. Mass. 2016), the court ruled that "nominal damages alone [were] insufficient to keep … alive" a challenge to an abandoned leafletting policy, because there was no evidence "that the 'policy' was being enforced in any significant manner"—"no criminal charges were ever brought … , and no fines were ever sought." In *Peterson v. Village of Downers Grove*, 150 F. Supp. 3d 910, 926 (N.D. Ill. 2015), the court ruled that a challenge to a repealed village sign ordinance was not justiciable, notwithstanding the plaintiff's claim for nominal damages, because "the Village never enforced its short-lived ban." And in *CMR D.N. Corp. v. City of Philadelphia*, No. 07-1045, 2011 WL 857296, at *5 (E.D. Pa. Mar. 11, 2011), the court ruled that it lacked Article III jurisdiction over "a claim for damages in connection with … challenges to [a repealed building height ordinance],"

5

because "the height restriction never was enforced as to [the plaintiff's] project." Put simply, "courts … have allowed damages claims to survive [the repeal of the challenged law] only when the ordinance was applied in some way against the plaintiff." *Id.* at \*4, \*6.

These decisions make sense. It is well established that a challenge to a statute usually becomes moot when the "act [is] repealed." *Bd. of Flour Inspectors v. Glover*, 160 U.S. 170, 170 (1895); *see Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 116 (4th Cir. 2000) ("[S]tatutory changes that discontinue a challenged practice are usually enough to render a case moot" (internal quotation marks omitted)). This venerable principle would become meaningless if a plaintiff could always keep a challenge to a repealed statute alive, even while the defendant never enforced the statute against him, simply by asserting a claim for nominal damages.

In addition, the function of the federal courts is to redress concrete, real-world injuries—not to "'satisfy [a plaintiff's] demand for vindication or curiosity about who's in the right and who's in the wrong.'" *Norfolk S. Ry. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010) (quoting *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1250 (10th Cir. 2009) (Gorsuch, J.)). An award of nominal damages does not redress any concrete *future* injury if the challenged statute has already been repealed. And it does not redress any

concrete *past* injury if the challenged statute was never actually enforced against the plaintiff.  In such a situation, "allowing [the case] to proceed to determine the [lawfulness] of an abandoned policy—in the hope of awarding the plaintiff a single dollar—vindicates no interest and trivializes the important business of the federal courts." *Morrison*, 521 F.3d at 611.

**B.    Plaintiffs' claims challenging HB 2 are not justiciable because HB 2 has been repealed and Plaintiffs make no allegations that the University actually enforced it against them**

HB 2 has now been repealed.  Further, there are simply no allegations in Plaintiffs' Fourth Amended Complaint that the University ever took any "action to enforce" HB 2 against Plaintiffs while the statute was in effect. *Chapin*, 252 F. App'x at 568.  Plaintiffs do not claim that the University has ever "cited, fined, or charged [a student] with violating [HB 2]," or that it has ever "instituted any court proceedings" under HB 2. *Id.*  In these circumstances, "[Plaintiffs'] assertion of a nominal damages claim alone is insufficient to preserve a live controversy, … as [HB 2] was never enforced against [them]." *Id.* at 571.

It makes no difference that Plaintiffs have alleged that President Spellings "issued a memorandum" directing chancellors of constituent schools to "meet their obligations" under HB 2, and that President Spellings "issued

7

public comments providing unequivocal guidance that 'the University is bound to comply with HB 2.'" Fourth Amended Compl. ¶¶ 258–59. In *Chapin*, the Fourth Circuit ruled that a nominal-damages claim against a town's sign ordinance was nonjusticiable because "the Town took no action to enforce the Ordinance"—even though the town had previously "informed [the plaintiff] that its [sign] … violated the Ordinance," "sent a letter" directing the plaintiff to "remove the sign," and sent "a second letter" repeating the demand "to have [the] sign removed." 252 F. App'x at 567–68. Similarly, in *Doe v. Nixon*, No. 4:08-CV-1518, 2010 WL 4363413, at *4 (E.D. Mo. Oct. 27, 2010), the court ruled that a nominal-damages claim against a state statute was non-justiciable because the defendants never took any "concrete" enforcement action—even the defendants made "public announcements … indicating their intention to enforce [the law]" and "sent letters" "notifying [the recipients] of their obligation to comply with the statute." If the letters in *Chapin* and the letters and announcements in *Doe* did not make a claim for nominal damages justiciable, the announcements here—even when read in the light most favorable to Plaintiffs—cannot make a claim for nominal damages justiciable either.

Similarly, it makes no difference that this Court previously ruled that Plaintiffs' request for a preliminary injunction against enforcement of HB 2

8

presented "a justiciable case or controversy." (Dkt. 127 at 26.) This Court made this ruling at a time when HB 2 was still in effect—not a time when HB 2 had already been repealed. A challenge to a statute that is still on the books usually presents a live controversy; a challenge to a statute that has already been repealed does not.

In addition, this Court's previous ruling addressed the justiciability of a claim for a preliminary injunction, not a claim for nominal damages. To establish standing to seek an injunction, a plaintiff need only show a credible "threat of future enforcement." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2345 (2014). In contrast, "[t]o have standing to pursue [a] claim" for "damages," a plaintiff "must show that the [government] has enforced the purportedly [unlawful] policy against him." *Miller v. Jones*, 483 F. App'x 202, 203 (6th Cir. 2012); *see CMR*, 2011 WL 857296, at *4 ("Damages have been awarded ... *only where the ordinance was enforced*") (emphasis in original). In other words, a plaintiff need show only *potential* future enforcement to seek prospective relief, but must show *actual* past enforcement to seek retrospective relief. In its preliminary-injunction ruling, this Court concluded that there *was* a "potential" for "punishment" as a result of HB 2, because students who used facilities inconsistent with their gender identity would be trespassers and would be subject "to discipline under ... student

9

codes of conduct, which generally prohibit students from violating federal, State, or local laws." (Dkt. 127 at 27.) In contrast, Plaintiffs do not allege in the Fourth Amended Complaint that the University has ever *actually* punished or disciplined them in accordance with HB 2. As a result, regardless of whether the potential for enforcement made the claim for a preliminary injunction justiciable, the absence of any actual enforcement means that the claims for nominal damages are not justiciable. The Court should therefore dismiss the claims.

## II. The Court Should Dismiss The Title VII And Title IX Claims Because Plaintiffs Fail To State A Claim Against The University For Violation Of These Statutes

The Court should also dismiss the nominal-damages claims because Plaintiffs fail to state claims against the University for violation of Titles VII and IX.

### A. There is no legal merit to Plaintiffs' theory that the University has made an illegal sex classification

Plaintiffs first contend that the University is liable under Titles VII and IX because "H.B. 2 facially classifies people based on sex." (Fourth Am. Compl. ¶ 352.) This assertion lacks legal merit.

Title VII and Title IX prohibit "discrimination" on the basis of sex. *See* 42 U.S.C. § 2000e-2(a); 20 U.S.C. § 1681(a). The Supreme Court has

10

explained that a sex *classification* amounts to sex *discrimination* if it "make[s] overbroad generalizations … which are entirely unrelated to any differences between men and women," but *not* if it "realistically reflects" "physiological differences between men and women." *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 469 (1981) (plurality); *see Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001). Accordingly, in *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016), the Fourth Circuit held that Title VII allows the Federal Bureau of Investigation to use "gender-normed standards" under which male recruits must complete 30 push-ups, but female recruits must complete 14 push-ups, to graduate from the FBI Academy. *Id.* at 342. The Fourth Circuit explained that "some differences between the sexes [are] real, not perceived," that "[m]en and women simply are not physiologically the same for the purposes of physical fitness programs," and that "physical fitness standards suitable for men may not always be suitable for women." *Id.* at 350. *Bauer* thus confirms that the federal civil-rights laws permit sex classifications that "distinguish between the sexes on the basis of their physiological differences." *Id.* at 351.

These principles defeat the claim that the University violated Titles VII and IX simply because HB 2 "facially classifie[d] people based on sex." (Fourth Am. Compl. ¶ 352). The Fourth Circuit has emphasized "society's

11

undisputed approval of separate public rest rooms for men and women," explaining that "the differences between the genders demand a facility for each gender that is different." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). This Court, too, has recognized that "the State's provision of sex-segregated bathrooms, showers, and other similar facilities" reflects "physiological differences between men and women." (Dkt. 127 at 55.) Indeed, previously in this litigation, Plaintiffs themselves stated that they "do not seek to abolish sex-separated facilities." (Dkt. 22 at 18 n.5.) It follows that Plaintiffs cannot establish a Title VII or Title IX violation simply by asserting that HB 2 "facially classifies people" on the basis of sex.

## B. There is no legal merit to Plaintiffs' theory that the University has made an illegal gender-identity classification

Plaintiffs also claim that the University has discriminated on the basis of gender identity—in other words, on the basis of a person's status as cisgender or transgender. But the University has not discriminated on the basis of gender identity. And, in any event, under current law, Titles VII and IX do not prohibit discrimination on that ground.

12

### 1. The University has not discriminated on the basis of gender identity

Plaintiffs have not alleged that the University intentionally discriminated against transgender people, and no such allegation would be plausible. The University prohibits discrimination on the basis of "sex, sexual orientation, [and] gender identity" as a matter of its internal policies. *The Code of the Board of Governors of the University of North Carolina* § 103 (2001). In addition, after the enactment of HB 2, President Spellings issued a guidance memorandum—which the Complaint quotes and relies on (Fourth Am. Compl. ¶ 258)—reaffirming the University's continued commitment to equal treatment of students and employees, confirming that the University's nondiscrimination policies "remain in effect," and directing constituent institutions to "take prompt and appropriate action to prevent and address any instances of harassment and discrimination." (Dkt. No. 38-5 at 1–2); *see E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (holding that a court may consider documents "explicitly relied on in the complaint" at the motion-to-dismiss stage). Further, Plaintiffs do not allege that the University has disciplined students or employees for using bathrooms inconsistent with their gender identity, or that it has otherwise taken any enforcement action under HB 2. Indeed, President Spellings'

13

guidance memorandum explicitly states that HB 2 "does not contain provisions concerning enforcement." (Dkt. No. 38-5 at 2.)

Unable to allege that the University itself intended to discriminate on the basis of gender identity, or that the University ever took steps to enforce HB 2, Plaintiffs seek to hold the University liable on the basis of the University's statements about HB 2. Specifically, Plaintiffs rely on President Spellings' statements that HB 2 was "the law of the state," that "the University ha[d] no independent power to change that legal reality," and that the University was accordingly "bound to comply" with the law. (Fourth Am. Compl. ¶ 259.) They also point to a memorandum issued by President Spellings to the chancellors of the University's constituent institutions that discussed constituent schools' "obligations under the Act.'" (*Id.* ¶ 258.) Plaintiffs insist that these allegations are enough to hold the University liable under Titles VII and IX. But this line of reasoning is incorrect.

*First*, Plaintiffs suggest that these announcements about HB 2 violated Titles VII and IX because "the intent" of the lawmakers who enacted HB 2 "was to target transgender individuals for discrimination." (*Id.* ¶ 253.) The Supreme Court has ruled, however, that an employer is liable for damages under Title VII only for "its own" intentional discrimination. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998); *see Brzonkala v. Va.*

14

*Polytechnic Inst.*, 169 F.3d 820, 835 (4th Cir. 1999) (*en banc*) ("Title VII …

provides a remedy only for gender discrimination that can be attributed to

the fault of the employer").  Similarly, a recipient of federal funds is "liable in

damages under Title IX only for its own misconduct"—only where "the

recipient itself … subject[s] persons to discrimination." *Davis*, 526 U.S. at

640–41; *see Baynard v. Malone*, 268 F.3d 228, 237 (4th Cir. 2001) ("a school …

may be held liable under Title IX only for its own misconduct."(internal

quotation marks omitted))  As a result, a plaintiff states a claim under Titles

VII and IX only if he has plausibly alleged that *the defendant* intended to

discriminate.  Indeed, even an allegation that *the defendant's own employees*

harbored an intention to discriminate does not suffice, except in certain

limited circumstances where the employees' intention "would be imputed to

the [defendant] under traditional agency principles." *Staub v. Proctor Hosp.*,

562 U.S. 411, 422 & n.4 (2011); *see Smyth-Riding v. Sciences & Eng'g Servs.*,

*LLC*, 699 F. App'x 146, 156 (4th Cir. 2017).

      In this case, Plaintiffs have alleged only that the lawmakers who

enacted HB 2 intended to discriminate—not the University did so.  The

lawmakers, however, are not the University.  Further, the lawmakers are in

no sense agents of the University, and there is no basis in "traditional agency

principles" to impute their intentions to the University.  *Staub*, 562 U.S. at

422 n.4.  Plaintiffs thus may not bring a Title VII or Title IX claim against the University on account of the lawmakers' alleged intentions.

*Second*, Plaintiffs suggest that the announcements about HB 2 violated Titles VII and IX because the effect of HB 2 was to "expose transgender people to harassment and potential violence," because HB 2 "disproportionately burdened … transgender individuals," and because the "effect" of HB 2 "did not fall equally on all North Carolinians" (Fourth Am. Compl. ¶¶ 255, 283, 285).  These allegations, however, are relevant only to a disparate-impact claim, not a disparate-treatment claim: The allegations assert that HB 2, though "facially neutral," "in fact f[ell] more harshly on" transgender people than on others. *Teamsters*, 431 U.S. at 335 n.15.  But Title VII does not allow a plaintiff to seek damages on a disparate-impact claim; Title IX does not allow a plaintiff to bring a disparate-impact claim at all; and Plaintiffs in this case have not brought a disparate-impact claim. *Supra* 2–3.  Allegations about the disproportionate burdens imposed by HB 2 are thus no basis for holding the University liable.

*Finally*, Plaintiffs suggest that the announcements about HB 2 violated Titles VII and IX because HB 2 "facially classifie[d] people based on … gender identity."  (Fourth Am. Compl. ¶ 352.)  But HB 2, on its face, made no reference to gender identity.  It drew no distinction between cisgender and

16

transgender people.  Rather, the statute required that *all* people, regardless of gender identity, use facilities in public buildings consistent with their biological sex.  Compliance with a statute that is facially neutral does not amount to intentional discrimination.

In sum, Plaintiffs have not alleged that the University has engaged in any intentional discrimination on the basis of gender identity.  As a result, Plaintiffs fail to state claims against the University even under their own reading of Titles VII and IX.

### 2. In any event, Titles VII and IX currently do not prohibit gender-identity discrimination

Titles VII and IX prohibit discrimination on the basis of "sex."  Under current law, that term must be read as denoting biological sex, not gender identity.  In other words, Titles VII and IX prohibit the unequal treatment of men and women, not the unequal treatment of cisgender and transgender people.

*First*, the text of Titles VII and IX supports this reading.  It is a "fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary, contemporary, common meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (some punctuation omitted).  When Congress

17

enacted Title VII in 1964 and Title IX in 1972, "sex" meant "either of two divisions, designated *male* and *female*," "by which organisms are classified according to their reproductive functions." *Sex*, The American Heritage Dictionary of the English Language (1st ed. 1969). As a result, the "ordinary, contemporary, common meaning" of Titles VII and IX is that they prohibit the disparate treatment of "male and female," not the disparate treatment of cisgender and transgender.

*Second*, later statutes confirm this interpretation. It is a "rudimentary rule of statutory construction" that courts must interpret statutes "in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality). Indeed, "[t]his classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988).

Statutes enacted after Titles VII and IX repeatedly distinguish sex (or gender) from gender identity. For example:

- The Matthew Shepherd and James Bird Hate Crime Prevention Act separately criminalizes hate crimes motivated by "gender" and hate crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2)). The Act also separately directs the Attorney General to assist state

18

investigation and prosecution of crimes motivated by "gender" and crimes motivated by "gender identity." 34 U.S.C. § 30503(a)(1).

- The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act separately requires reporting of campus crimes motivated by "gender" and campus crimes motivated by "gender identity." 20 U.S.C. § 1092(f).

- The Hate Crimes Statistics Act separately requires the collection of data about crimes motivated by "gender" and crimes motivated by "gender identity." 34 U.S.C. § 41305.

- The Violence Against Women Reauthorization Act separately prohibits "sex" discrimination and "gender identity" discrimination in certain programs. 34 U.S.C. § 12291(13)(b)(1)(A).

- The Violent Crime Control and Law Enforcement Act of 1994 directed the Sentencing Commission to adopt a sentencing enhancement for hate crimes motivated by "gender." 108 Stat. 1796, 2096 § 280003(a). Congress amended the Act in 2009 to require the adoption of a similar sentencing enhancement for hate crimes motivated by "gender identity." 123 Stat. 2190, 2836 § 4703.

These statutes show that Congress has not prohibited gender-identity discrimination in Titles VII and IX. To start, where Congress uses "different words" in different statutory provisions, courts normally "presume that … Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006) (internal quotation marks omitted). Congress used different words in different civil-rights statutes—just "sex" in Titles VII and IX, but both "sex"

19

(or "gender") and "gender identity" in other statutes.  Courts should respect this congressional choice.

Further, "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally."  *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 174 (2009).  In 2009, Congress amended the Violent Crime Control and Law Enforcement Act, which originally referred only to "gender," to add a reference to "gender identity."  123 Stat. 2736 § 4703.  Yet Congress has never amended Titles VII and IX to insert a reference to "gender identity" in those statutes—even though bills to make such amendments have been introduced in every Congress since 2009.[1]  This Court "cannot ignore Congress' decision to amend [the Violent Crime Control and Law Enforcement Act] but not make similar changes to [Titles VII and IX]."  *Gross*, 557 U.S. at 174.

Last, the above statutes confirm that Congress considers "sex" to be separate from "gender identity."  In each of the cited statutes, Congress listed "sex" or "gender" *in addition* to "gender identity," rather than deeming "sex"

---

[1] *See* Equality Act, S. 1006, 115th Cong. (2017); Equality Act, H.R. 2282, 115th Cong. (2017); Equality Act, S. 1858, 114th Cong. (2015); Equality Act, H.R. 3185, 114th Cong. (2015); Employment Non-Discrimination Act, S. 815, 113th Cong. (2013); Employment Non-Discrimination Act, H.R. 1755, 113th Cong. (2013); Employment Non-Discrimination Act, S. 811, 112th Cong. (2011); Employment Non-Discrimination Act, H.R. 1397, 112th Cong. (2011); Employment Non-Discrimination Act, S. 1584, 111th Cong. (2009); Employment Non-Discrimination Act, H.R. 3017, 111th Cong. (2009).

or "gender" to *include* or *mean* "gender identity." In other antidiscrimination statutes, by contrast, Congress explicitly declared that "on the basis of sex" "*include[s]*" "on the basis of pregnancy" (42 U.S.C. § 2000e(k)), that "religion" "*includes*" "religious observance and practice, as well as belief" (§ 2000e(j)), and that "gender identity" "*means*" "actual or perceived gender-related characteristics" (18 U.S.C. § 249(c)(4)) (all emphases added). This contrast establishes that Congress considers gender-identity discrimination to be a separate category from—not a subset of—sex discrimination. And Titles VII and IX, again, prohibit only "sex" discrimination.

*Third*, current precedent establishes that Titles VII and IX prohibit sex discrimination, not gender-identity discrimination. Two decades ago, the Fourth Circuit ruled that "Title VII's prohibition of 'sex' discrimination applies only to discrimination on the basis of gender." *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996). The Fourth Circuit cautioned that courts should not "judicially exten[d]" this prohibition to encompass other conduct such as "discrimination based upon sexual orientation." *Id.* That decision remains good law today. *See Murray v. N.C. Dep't of Pub. Safety*, 611 F. App'x 166, 166 n* (4th Cir. 2015) (*per curiam*) ("Title VII does not protect against sexual orientation discrimination"); *Bennett v. Wilson Senior Care, Inc.*, No. 4:17-CV-02798-RBH, 2018 WL 4443118, at *3 (D.S.C.

Sep. 18, 2018) ("Fourth Circuit precedent does not provide for a plaintiff to bring a cause of action under Title VII due to … discrimination based on … sexual orientation"); *Churchill v. Prince George's County Pub. Sch.*, No. PWG-17-980, 2017 WL 5970718, at *4 (D. Md. Dec. 1, 2017) (same); *Barr v. Va. Alcohol Beverage Control*, No. 3:17-CV-326-HEH, 2017 WL 3222541, at *5 (E.D. Va. July 28, 2017) (same); *Hinton v. Virginia Union Univ.*, 185 F. Supp. 3d 807, 817 (E.D. Va. 2016) (same).

*Wrightson* dealt with sexual orientation, but its reasoning also applies to gender identity. The premise of the decision is that "Title VII's prohibition of 'sex' discrimination applies *only* to discrimination on the basis of gender." *Wrightson*, 99 F.3d at 143 (emphasis added). Just as courts should not "judicially exten[d]" the prohibition to encompass sexual-orientation discrimination (*id.*), so too courts should not judicially extend the prohibition to encompass gender-identity discrimination.

Further, although these cases dealt with Title VII, their reasoning also applies to Title IX. Title IX uses the same key word as Title VII: "sex." And, as already explained, the Fourth Circuit has recognized that "Title IX … should be interpreted in accordance with principles governing Title VII." *Preston*, 31 F.3d at 208. Thus, under the reasoning of the Fourth Circuit's

22

precedents, neither Title VII nor Title IX currently prohibits discrimination on the basis of gender identity.

*Fourth*, principles of federalism also show that Title IX, in particular, addresses sex discrimination, not gender-identity discrimination. It is an elementary principle of federalism that, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). That is so because "legislation enacted pursuant to the spending clause is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* "There can, of course, be no knowing acceptance [of federally imposed conditions] if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* This clear-statement requirement applies to "Title IX," a law enacted "pursuant to Congress' authority under the Spending Clause," this clear-statement requirement applies to Title IX. *Davis v. Monroe County Bd. of Ed.*, 526 U.S. 629, 640 (1999). As a result, "private damages actions [under Title IX] are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." *Id.*

Title IX contains no clear statement prohibiting discrimination on the basis of gender identity, and, as a result, failed to provide recipients of federal

funding "adequate notice that they could be liable for" discriminating because of gender identity. *Id.* In the absence of such notice, a Title IX claim alleging gender-identity discrimination cannot succeed.

*Finally*, while there are unquestionably arguments for amending Titles VII and IX to prohibit discrimination against transgender people, the power to make that change belongs to Congress, not the courts. "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences. Until it exercises that power, the people may rely on the original meaning of the written law." *Wisconsin Cent.*, 138 S. Ct. at 2074.

## III. The Court Should Dismiss The Title IX Claim Because The University Is Protected By A Regulatory Safe Harbor

A Department of Education regulation implementing Title IX and interpreting § 1686 provides: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. This regulation currently protects any recipient that separates bathrooms or changing facilities by (biological) sex.

24

This result follows from the Department of Education's interpretation of the regulation.  An agency's interpretation of its own regulation is "controlling" (unless it is "plainly erroneous or inconsistent with the regulation").  *Auer v. Robbins*, 519 U.S. 452, 461 (1997).  In January 2015, the Department of Education's Office of Civil Rights issued an opinion letter concluding that, in order to take advantage of this regulatory safe harbor, "a school generally must treat transgender students consistent with their gender identity."  Office for Civil Rights at the Dep't of Education, Letter from James A. Ferg-Cadima to Emily Prince (Jan. 7 2015) ("2015 Opinion Letter"). Then, in February 2017, the Departments of Justice and Education issued a joint opinion letter withdrawing this earlier interpretation.  Dep't of Justice & Dep't of Education, Dear Colleague Letter (Feb. 22, 2017) ("2017 Opinion Letter").  The 2017 Opinion Letter establishes that, under the Department of Education's current understanding of the regulation, an educational institution may take advantage of the regulatory safe harbor even if it treats students in accordance with their biological sex rather than their gender identity.  Because this interpretation is not "plainly erroneous or inconsistent with the regulation," it is "controlling."  *Auer*, 519 U.S. at 461 (internal quotation marks omitted).  And it is "black-letter administrative law" that

25

this "interpretation" is "retroactive." *Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 921 (D.C. Cir. 2013).

The University's alleged conduct—announcing that "the University is bound to comply with HB 2" (Fourth Am. Compl. ¶ 259)—falls within the terms of this regulatory safe harbor, as currently interpreted by the Department of Education. HB 2 required the University (in the regulation's words) to "provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. Further, because nobody alleges that the University provided better facilities for men than for women, or vice versa, "such facilities provided for students of one sex [were] comparable to such facilities provided for students of the other sex." *Id.* The regulation thus forecloses any effort to hold the University liable in this case.

The Fourth Circuit's decision in *G.G. v. Gloucester County School Board*, 822 F.3d 709 (4th Cir. 2016), does not suggest otherwise. In that case—which was decided after the 2015 Opinion Letter, but before the 2017 Opinion Letter—the Fourth Circuit ruled that the regulation, as then interpreted by the Department of Education, provided a safe harbor only where a school treats transgender students in accordance with their gender identity. Subsequently, however, the Departments of Education and Justice issued the 2017 Opinion Letter, and the Supreme Court vacated the Fourth

Circuit's decision in *G.G.* *See* 137 S. Ct. 1239 (2017) (Mem.). The Fourth Circuit's opinion in *G.G.* is not pertinent here, both because the regulatory interpretation on which *G.G.* rested has now been withdrawn, and because a "[Supreme Court] decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect." *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975); *see In re Naranjo*, 768 F.3d 332, 344 n.15 (4th Cir. 2014).

## CONCLUSION

The Court should dismiss Plaintiffs' claims against the University of North Carolina seeking nominal damages under Titles VII and IX.

Dated: November 16, 2018

Respectfully submitted,

/s/ Thomas C. Shanahan
Thomas C. Shanahan (NC Bar No. 42381)
Carolyn C. Pratt (NC Bar No. 38438)
THE UNIVERSITY OF NORTH CAROLINA
P.O. Box 2688
Chapel Hill, NC 27515
Tel: (919) 962-4588
Fax: (919) 962-0477
Email: tcshanahan@northcarolina.edu

/s/ Glen D. Nager
Glen D. Nager
Kristen Lejnieks
Vivek Suri
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: gdnager@jonesday.com

*Counsel for the University of North Carolina and President Margaret Spellings*

28

## CERTIFICATE OF WORD COUNT

I certify that this brief complies with the word limits of Local Civil Rule

7.3(d) because, excluding the parts exempted by the rule, the brief contains

5873 words.

Dated: November 16, 2018        /s/ Glen D. Nager
                                   Glen D. Nager
                                   *Counsel for the UNC Defendants*

## CERTIFICATE OF SERVICE

I certify that on November 16, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: November 16, 2018      /s/ Glen D. Nager
                                                Glen D. Nager
                                                *Counsel for the UNC Defendants*