# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

        *Plaintiffs*,

        v.

ROY A. COOPER, III, *et al.*,

        *Defendants*,

        and

PHIL BERGER, *et al.*,

        *Intervenor-Defendants.*

No. 1:16-cv-00236-TDS-JEP

## PLAINTIFFS' OPPOSITION TO UNC DEFENDANTS' AND INTERVENOR-DEFENDANTS' MOTIONS TO DISMISS NOMINAL-DAMAGES CLAIMS

# INTRODUCTION

UNC's and Legislative-Intervenors' (collectively, "Defendants") motions to dismiss Plaintiffs' nominal damages claims against UNC should be denied. As this Court ruled when granting a preliminary injunction against UNC, Plaintiffs suffered "injuries-in-fact" while HB 2 was in effect—injuries-in-fact that gave Plaintiffs standing to sue UNC. UNC's implementation of HB 2 excluded Plaintiffs from restrooms and other facilities consistent with their gender and exposed Plaintiffs to stigma, physical and psychological harm, the disclosure of private information about their transgender status, and the threat of physical violence. This Court's earlier ruling on justiciability is law of the case. That HB 2 has since been repealed, and that Plaintiffs now seek only nominal damages, does not erase the injuries-in-fact Plaintiffs suffered. And Defendants' mootness arguments are unavailing precisely because of the injuries-in-fact Plaintiffs suffered—which an award of nominal damages would redress.

On the merits, none of Defendants' arguments withstand scrutiny. UNC is simply incorrect that Plaintiffs must show intentional discrimination by UNC under Title VII and Title IX. The law is clear that where a law facially discriminates on the basis of sex as HB 2 did, a showing of intent is not required. Defendants are also incorrect that the broad language of Titles VII and IX does not prohibit discrimination against transgender students and employees. As the Supreme Court has made clear, those statutes' broad language covers the full range of discrimination because of sex, including discrimination based on sex stereotypes. And contrary to Defendants' arguments, Title IX's implementing regulations do not authorize discrimination against transgender individuals

1

in the context of single-sex facilities. Those regulations simply permit the provision of separate restrooms—but cannot trump Title IX's broad language and prohibition on the full range of sex discrimination. Finally, the Spending Clause poses no bar to Plaintiffs' Title IX claim, because the statutory language and courts' interpretations of it put UNC on notice that any and all discrimination on the basis of sex is prohibited.

## ARGUMENT

## I.     Plaintiffs' Nominal Damages Claims Against UNC Are Justiciable.

HB 2 was in effect for five months on UNC's campuses before it was enjoined by this Court as to Plaintiffs. Dkt. 127 at 13-14, 81-82. During those months, UNC inflicted actionable harm on Plaintiffs by excluding them from restrooms and other facilities consistent with their gender identity—and exposing them to stigma, physical and psychological harm, the disclosure of private information about their transgender status, and the threat of physical violence. In issuing a preliminary injunction, this Court agreed, holding that Plaintiffs had suffered "injuries-in-fact" sufficient to give them standing to challenge UNC's implementation of HB 2. Dkt. 127 at 23-28. And the preliminary injunction prevented Plaintiffs from suffering further harm on UNC's campuses because of HB 2.

Advancing many of the same arguments UNC made—and this Court rejected—at the preliminary injunction stage, Defendants now seek to relitigate the harm that Plaintiffs suffered while HB 2 was in effect and claim that Plaintiffs suffered no injury-in-fact before entry of the preliminary injunction. Dkt. 254 at 2-8; Dkt. 255 at 1, 3-10. The law-of-the-case doctrine prevents Defendants from relitigating this issue. And

Case 1:16-cv-00236-TDS-JEP   Document 258   Filed 11/30/18   Page 3 of 39

Defendants' new argument that Plaintiffs' nominal damages claims are moot because HB 2 has been repealed, Dkt. 254 at 3-8; Dkt. 255 at 3-10, is contrary to controlling Fourth Circuit authority, and is likewise premised on an attempt to relitigate the harms that HB 2 imposed on Plaintiffs. Dkt. 254 at 3-8; Dkt. 255 at 3-10.

### A. UNC And Intervenors Are Barred By Law Of The Case From Relitigating Whether Plaintiffs Suffered Injuries-In-Fact While HB 2 Was In Effect.

In seeking dismissal of Plaintiffs' nominal damages claims, Intervenors do not even reference, and UNC references only in passing, this Court's prior ruling that Plaintiffs suffered injuries-in-fact while HB 2 was in effect—injuries sufficient to give Plaintiffs standing to assert HB 2 claims against UNC and obtain a preliminary injunction. Dkt. 127 at 23-28. In violation of the law-of-the-case doctrine, they seek to relitigate Plaintiffs' injuries-in-fact, which the parties actually litigated on Plaintiffs' motion for a preliminary injunction, Dkt. 50 at 8-12; Dkt. 73 at 2-8, and which this Court actually decided in granting Plaintiffs' motion, Dkt. 127 at 23-28.

"Under the law-of-the-case doctrine, 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Cone v. Randolph Cty. Sch. Bd. of Educ.*, 657 F. Supp. 2d 667, 674 (M.D.N.C. 2009) (quoting *United States v. Lentz*, 524 F.3d 501, 528 (4th Cir. 2008)). Once established, the law of the case "must be followed in all subsequent proceedings in the same case in the trial court ... unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work

3

manifest injustice." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quotations omitted); *see also Miller v. City of Cincinnati*, 870 F. Supp. 2d 534, 539 (S.D. Ohio 2012) (applying the law of the case doctrine at motion to dismiss stage to bar relitigation of plaintiffs' standing, which had been decided at preliminary injunction stage).

None of the three exceptions to the law-of-the-case doctrine applies here. Moreover, it is beyond question that the parties actually litigated Plaintiffs' injuries-in-fact, and that the Court ruled in Plaintiffs' favor on this issue. In their supplemental briefs to dismiss Plaintiffs' HB 2 nominal damages claims, Defendants make many of the same injury-in-fact arguments they made in opposing Plaintiffs' preliminary injunction motion. *Compare* Dkt. 50 at 8-23 (UNC arguing that Plaintiffs' HB 2 claims against UNC were not justiciable because the UNC Defendants "have neither enforced nor threatened to enforce [HB 2]," and "have not taken, and do not intend to take, any disciplinary or other action to enforce [HB 2]"), *with* Dkt. 255 at 7-10 (arguing Plaintiffs' nominal damages claims against UNC are not justiciable because Plaintiffs have not alleged UNC "ever took any 'action to enforce' HB 2 against Plaintiffs while the statute was in effect," or "has ever *actually* punished or disciplined [Plaintiffs] in accordance with HB 2"), and *with* Dkt. 254 at 2-3 (Intervenors similarly arguing that "UNC Defendants disclaimed any power to enforce the law and affirmatively declined to do so," and that "HB 2 has never caused Plaintiffs any concrete injury; in fact, the UNC

4

defendants consistently stated they would not apply the law to Plaintiffs, making Plaintiffs alleged injuries … entirely speculative").[1]

In response, Plaintiffs argued that their HB 2 claims against UNC were justiciable because UNC was subject to HB 2's discriminatory mandate, had taken steps to implement that mandate, and was required to do so not only by UNC's general obligation to comply with state law, but also by HB 2's express terms. Dkt. 73 at 2-8. Specifically, Plaintiffs argued that UNC inflicted actionable harm by excluding Plaintiffs from restrooms and other facilities consistent with their gender identity, exposing Plaintiffs to stigma, physical and psychological harm, the disclosure of private information about their transgender status, and the threat of physical violence. *Id.*

Presented with these arguments, the Court ruled in Plaintiffs' favor, holding that Plaintiffs suffered injuries-in-fact while HB 2 was in effect sufficient to confer standing to sue UNC and obtain a preliminary injunction. Dkt. 127 at 23-28. In relevant part, the Court held:

> Despite the assertion that UNC does not intend to 'enforce' Part I [of HB 2], UNC's pronouncements are sufficient to establish a justiciable case or controversy. The university has repeatedly indicated it will – indeed, it must – comply with State law. Although UNC has not changed the words and

---

[1] UNC also repeats its argument that UNC could not have discriminated because UNC has a non-discrimination policy. *Compare* Dkt. 50 at 18 *with* Dkt. 255 at 13. As Plaintiffs pointed out at the preliminary injunction stage, Dkt. 73 at 4, that is irrelevant for purposes of this litigation, because UNC nowhere asserts that it applied the non-discrimination policy *instead* of HB 2. To the contrary, UNC President Spellings' message that "the University is bound to comply with HB2" makes clear that any internal non-discrimination policy is subservient to state law. That UNC continued to apply its non-discrimination policies in *other contexts* does not render its compliance with HB 2 any less actionable.

symbols on its sex-segregated facilities, the meaning of those words and symbols has changed as a result of Part I [of HB 2], and UNC has no legal authority to tell its students or employees otherwise …. Unless and until UNC openly defies the law, the signs that UNC posts on its bathrooms, showers, and other similar facilities render transgender individuals who use facilities that match their gender identities trespassers, thus exposing them to potential punishment (certainly by other authorities, if not by UNC).[2]

*Id.* at 26-27 (internal citation omitted). Accordingly, the Court's decision established law of the case on that issue.

Without citing *any* authority, UNC asserts that "it makes no difference that this Court previously ruled that Plaintiffs' request for a preliminary injunction against enforcement of HB 2 presented a 'justiciable case or controversy.'" Dkt 255 at 8-9. That is simply incorrect and flies in the face of this Court's prior ruling and the law-of-the-case doctrine.

To be sure, after this Court determined Plaintiffs suffered injuries-in-fact sufficient to provide standing to assert HB 2 claims against UNC and issued a preliminary injunction against UNC, HB 2 was repealed. Plaintiffs now seek only nominal damages from UNC for the period HB 2 was in effect. Nevertheless, the very facts that gave rise to Plaintiffs' injuries-in-fact when this Court issued a preliminary injunction are the same today as they were then. That HB 2 has been repealed and that Plaintiffs now seek only

---

[2] While the Court expressly rejected UNC's argument that President Spelling's statements about HB 2 were insufficient to cause injuries-in-fact and to confer standing, in its supplemental brief UNC impermissibly seeks to revive these very arguments. Dkt. 255 at 14-17.

6

nominal damages does not alter this Court's conclusion that Plaintiffs suffered injuries-in-fact. That conclusion is now law of the case.

### B. The Repeal of HB 2 Did Not Render Moot Plaintiffs' HB 2 Nominal Damages Claims.

Although Defendants largely avoid any reference to the mootness doctrine, the arguments they make and the cases they cite are firmly rooted in mootness. They argue in essence that because HB 2 has been repealed, and because Plaintiffs seek only nominal damages, Plaintiffs' claims are moot. Dkt. 255 at 3-10; Dkt. 254 at 3-8. That argument is manifestly incorrect and contrary to controlling Fourth Circuit authority. Defendants' argument ignores the very purpose of nominal damages, which is to "'vindicat[e]' rights whose deprivation has not caused actual, provable injury." *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 308 n.11 (1986).

"[E]ven if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiffs may be 'entitled to at least nominal damages.'" *Rendelman v. Rouse*, 569 F.3d 182, 187 (4th Cir. 2009) (quoting *Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007)); *see also Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 632 (4th Cir. 2016) (same); *Am. Humanist Ass'n v. Greenville Cty. Sch. Dist.*, 652 F. App'x 224, 228 (4th Cir. 2016) (same). "To be awarded nominal damages, a plaintiff need only show that a constitutional deprivation occurred, not proof of actual injury." *Grimm v. Gloucester Cty. Sch. Bd.*, No. 4:15-cv-54, 2017 WL 9882602, at *3 (E.D. Va. Dec. 12, 2017).

The critical role of nominal damages here cannot be discounted. As the Supreme Court has recognized, "[u]nlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms." *City of Riverside v. Rivera*, 477 U.S. 561, 574 (1986). "By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed." *Carey v. Piphus*, 435 U.S. 247, 266 (1978); *see also Stachura*, 477 U.S. at 308 n.11 (nominal damages are generally "the appropriate means of 'vindicating' rights whose deprivation has not caused actual, provable injury").

Defendants fail to address or even cite the Fourth Circuit case most directly on point, which compels a ruling in Plaintiffs' favor: *Covenant Media of South Carolina, LLC v. City of North Charleston*, 493 F.3d 421 (4th Cir. 2007). In that case, Covenant Media brought a First Amendment suit challenging the City of North Charleston's sign regulation governing the placement of billboards and other signs within city limits. *Id.* at 424-25. Covenant Media had submitted an application to construct a billboard, but when the city failed to act on its application for several months, it filed suit under the First Amendment seeking injunctive relief and nominal damages. *Id.* at 425. During the litigation, North Charleston adopted a revised regulation, mooting Covenant Media's claim for injunctive relief. *Id.* at 425-26.

The Fourth Circuit held that if the city's original sign regulation lacked the procedural safeguards mandated by Supreme Court precedent, Covenant "has suffered an injury by the City's application of an unconstitutional ordinance that is redressable at

8

least by nominal damages." *Id.* at 428. The court continued: "[b]ecause Covenant alleges a personal injury—untimely consideration of its [application]—that was caused by North Charleston's application of the allegedly unconstitutional [ordinance] and that is redressable by nominal damages, we conclude that the district court erred in determining Covenant lacked standing." *Id.* at 429; *see also id.* at 429 n.4.

Under *Covenant Media*, Plaintiffs' nominal damages claims are not moot. Prior to entry of the preliminary injunction, Plaintiffs suffered injuries-in-fact caused by UNC because "the signs that UNC posts on its bathrooms, showers, and other similar facilities render[ed] transgender individuals who use facilities that match their gender identities trespassers." Dkt. 127 at 27. As the Fourth Circuit has made clear, when a challenged law causes a plaintiff to suffer an injury-in-fact—as it did here—that law's repeal does not render the plaintiff's claim moot if the plaintiff seeks nominal damages. 493 F.3d 429 n.4.

Instead of citing *Covenant Media*, UNC relies on an *unpublished* opinion: *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 F. App'x 566 (4th Cir. 2007). But UNC's reliance is misplaced. *Chapin* directly distinguished *Covenant Media* because the ordinance at issue in *Chapin* did not cause the plaintiff any harm while the ordinance was in effect. *Id.* at 573 (noting that Chapin continued to violate the challenged ordinance throughout the litigation and that, as a result, "Chapin is unable to show any constitutional injury caused by the Ordinance"). UNC fails even to mention this fact in discussing *Chapin*. Dkt. 255 at 4, 7-8. And this Court has already held that HB 2 caused Plaintiffs to suffer injuries-in-fact.

9

UNC's reliance on *Morrison v. Board of Education*, 521 F.3d 602 (6th Cir. 2008), is misplaced for the same reason. In *Morrison*, before addressing the plaintiff's nominal damages claim, the court found that the plaintiff lacked standing because he failed to state an injury-in-fact. *Id.* at 610. The court's holding that "nominal damages will not provide Morrison any redress," therefore is premised on its earlier determination that he failed to state an injury. *Id.* at 611. In contrast, Plaintiffs' injuries-in-fact here are clear and will be redressed by an award of nominal damages.[3]

Intervenors erroneously claim that "*Reyes v. City of Lynchburg*, 300 F.3d 449, 451 (4th Cir. 2002) … disposes of the HB 2 nominal damages claims." Dkt. 254 at 4. Yet, *Reyes*, and the Sixth Circuit case on which it relies, *Richardson v. City of South Euclid*, 904 F.2d 1050 (6th Cir. 1990), are readily distinguishable from this case. Those cases concerned whether prosecution for violating a subsequently repealed statute results in the loss of any liberty interest, and those courts, citing *Baker v. McCollan*, 443 U.S. 137 (1979), simply recognized that prosecution consistent with due process—even pursuant to a statute that is later repealed—does not cause the loss of any liberty interest. *Reyes*, 300 F.3d at 456-57; *Richardson*, 904 F.2d at 1053. *Reyes* and *Richardson* are simply irrelevant here, where prosecution is not at issue.[4]

---

[3] UNC also relies on *Doe v. Nixon*, which held that the plaintiffs' nominal damages claims were moot because "the plaintiffs … do not allege an actual or imminent injury-in-fact." No. 4:08-CV-1518, 2010 WL 4363413, at *4 (E.D. Mo. Oct. 27, 2010). The opposite is true in this case—as this Court ruled in issuing a preliminary injunction.

[4] Another case Intervenors rely on, *Rock for Life—UMBC v. Hrabowski*, 411 F. App'x 541 (4th Cir. 2010), instead supports Plaintiffs. As *Rock for Life* makes clear, "to establish standing to challenge [a statute], the plaintiffs must first demonstrate an injury-in-fact through the application of that [statute]." *Id.* at 549. Yet again, here this Court

10

UNC cites several out-of-circuit district court cases, to no avail. Those cases are readily distinguishable,[5] and are of no moment because the majority of Circuit Courts have held, as the Fourth Circuit has in *Covenant Media*, that a nominal damages claim prevents mootness when the plaintiffs can show injury to their legally protected interests. *See, e.g., Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 748 (5th Cir. 2009); *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 284 (3d Cir. 2008); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 802-03 (8th Cir. 2006); *Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1257-58 (10th Cir. 2004); *Bernhardt v. Cty. of L.A.*, 279 F.3d 862, 872 (9th Cir. 2002); *Van Wie v. Pataki*, 267 F.3d 109, 115 n.4 (2d Cir. 2001); *Murray v. Bd. of Trs.*, 659 F.2d 77, 79 (6th Cir. 1981).

UNC's suggestion that HB 2 caused no "concrete, real-world injuries" to Plaintiffs is plainly untrue, and conflicts with this Court's previous decision in this case. Dkt. 255 at 6. An award of nominal damages will redress the injuries-in-fact that Plaintiffs

---

has already determined that UNC's implementation of HB 2 prior to issuance of the preliminary injunction caused Plaintiffs injury-in-fact.

[5] In *Soto v. City of Cambridge*, 193 F. Supp. 3d 61 (D. Mass. 2016), the court acknowledged that "there are cases in which a valid claim for nominal damages avoids a finding of mootness," but held that the case before it was not one of them, in part because it was unclear whether the city had ever adopted the challenged policy. *Id.* at 70-71. In *Peterson v. Village of Downers Grove*, 150 F. Supp. 3d 910 (N.D. Ill. 2015), the plaintiff's nominal damages claim was held moot because the plaintiff's sign that violated the since-repealed ordinance had remained in place at all times, and plaintiff thus could not show an injury-in-fact. *Id.* at 926. Similarly, in *CMR D.N. Corp. v. City of Philadelphia*, No. Civ. A. 07-1045, 2011 WL 857296 (E.D. Pa. Mar. 11, 2011), a plaintiff's damages claim against a repealed building height ordinance was moot because the plaintiff "never applied for a permit or a variance" under the ordinance and thus could not show any injury-in-fact. *Id.* at *6.

11

suffered at UNC's hands prior to entry of the preliminary injunction—injuries which this Court found "cause[d] [Plaintiffs] substantial hardship each day the policy [was] in effect." Dkt. 127 at 28. Far from "trivializ[ing] the important business of the federal courts," Dkt. 255 at 7 (quotation omitted), Plaintiffs' nominal damages claims seek to vindicate their civil rights, which UNC violated, *see Stachura*, 477 U.S. at 308 n.11.

## II.   Plaintiffs Have Stated Valid Claims Against UNC That HB 2 Constitutes Impermissible Sex Discrimination Under Title IX and Title VII.

By enforcing HB 2, which this Court recognized "explicitly regulate[d] which bathrooms were available for use by transgender individuals," Dkt. 248 at 7, UNC discriminated against transgender people based on their sex in violation of Title IX and Title VII.[6] *See* 20 U.S.C. § 1681, *et seq.*; 42 U.S.C. § 2000e, *et seq.* Defendants argue that Plaintiffs' nominal damages claims cannot proceed because (i) UNC did not intentionally discriminate against transgender individuals; (ii) the statutes do not prohibit discrimination against transgender students and employees; (iii) Title IX's regulations permit discrimination against transgender students; and (iv) including transgender students within the protection of Title IX would violate the Spending Clause. Dkt. 254 at 9-15; Dkt. 255 at 10-27. None of these arguments can be squared with the plain text of the statutes, this Court's prior holdings, or the overwhelming consensus among courts

---

[6] Plaintiffs discuss Title VII and Title IX—and case law interpreting those statutes— interchangeably because courts have long "look[ed] to case law interpreting Title VII … for guidance in evaluating a claim brought under Title IX." *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007).

12

that excluding transgender people from restrooms that accord with their gender identity violates existing prohibitions on sex discrimination.

### A. Plaintiffs Have Sufficiently Alleged That Enforcement of HB 2 Constituted Discrimination Against Transgender Individuals.

UNC argues without merit that it may be held liable under Titles VII and IX only if Plaintiffs show that UNC *intentionally* discriminated against transgender individuals. Dkt. 255 at 12-16. To support its argument, UNC handpicks select allegations from the Fourth Amended Complaint to suggest that Plaintiffs' allegations are grounded in a theory of discriminatory impact alone. UNC's argument misconstrues Plaintiffs' claims and misapplies the relevant law. Plaintiffs have pleaded, and this Court has already found, that HB 2 *facially* discriminates based on sex, and a facially discriminatory law or policy obviates the need to make any showing of intent.

Plaintiffs clearly allege that UNC enforced HB 2 in a manner that facially discriminated against transgender individuals. For example, Mr. Carcaño alleged that, "[t]he only restrooms on the floor where he works at UNC-Chapel Hill are designated either for men or for women" and HB 2 "prohibited him … from using the same restrooms that his coworkers typically use … stigmatizing and mark[ing] him as different and lesser than other men." Fourth Am. Compl. ¶ 67. That HB 2 did not use the words "gender identity" is irrelevant. As this Court held, "Part I [of HB 2] facially classifies and discriminates among citizens on the basis of sex," Dkt. 127 at 48, such that even though "UNC has not changed the words and symbols on its sex-segregated facilities, the meaning of those words and symbols has changed as a result of Part I [of HB 2]," and

13

"the signs that UNC posts on its bathrooms, showers, and other similar facilities render transgender individuals who use facilities that match their gender identities trespassers, thus exposing them to potential punishment (certainly by other authorities, if not by UNC)," *id.* at 26-27.  This Court reiterated that conclusion in its order on Defendants' motions to dismiss.  Dkt. 248 at 48.

UNC's arguments regarding its intent are unavailing.  Under Title VII, when a challenged employment policy or practice is facially discriminatory, no further proof of intent is necessary because "[w]hether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."  *Int'l Union v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).  The employer's motives or intentions are irrelevant, since they cannot "alter the intentionally discriminatory character of the policy."  *Id.*  In *City of Los Angeles Department of Water & Power v. Manhart*, all that was required was to show "a practice" that involved "treatment of a person in a manner which but for that person's sex would be different."  435 U.S. 702, 711 (1978) (quotations omitted).  And in *Phillips v. Martin Marietta Corp.*, a policy of refusing to hire women with preschool-age children constituted discrimination even though "no question of bias against women as such was presented."  400 U.S. 542, 543 (1971) (per curiam).

Title IX likewise requires no proof of discriminatory animus.  *E.g.*, *Cmtys. for Equity v. Mich. High Sch. Athletic Ass'n*, 459 F.3d 676, 696 (6th Cir. 2006) (noting in Title IX case that plaintiff need not prove the defendant *intended* to hurt girls by

14

scheduling boys sports during traditional seasons and girls sports during nontraditional

seasons); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275,

293-96 (2d Cir. 2004) (scheduling of boys' soccer teams but not girls' soccer teams in the

regular fall season precluded girls from opportunity to play in regional and state

championships and violated Title IX).

Thus, UNC is simply wrong to assert that "a plaintiff states a claim under Titles

VII and IX only if he has plausibly alleged that *the defendant* intended to discriminate."

Dkt. 255 at 15 (emphasis in original). Plaintiffs' allegations are more than sufficient to

state valid claims.

### B. Discrimination Against Transgender Individuals Is Discrimination "Because Of" And "On the Basis Of" Sex Under Title VII and Title IX.

Singling out individuals because they are transgender is discrimination on the

basis of sex for purposes of Title VII and Title IX. Defendants' claims that "gender,"

"gender identity," and "transgender status" discrimination are wholly distinguishable

from "sex" is a straw man. The relevant question is not what sex means but rather,

whether individuals have been subjected to impermissible discrimination "because of" or

"on the basis of" their sex. 42 U.S.C. § 2000e-2(a); 20 U.S.C. § 1681(a). Discrimination

against transgender people is understood as sex discrimination for at least three reasons.

First, such discrimination is grounded in sex stereotypes prohibited by *Price Waterhouse*

*v. Hopkins*, 490 U.S. 228, 251 (1989). Second, a person's status as transgender is itself a

sex-based characteristic. And third, discrimination based on a person's transition from

one sex to another is necessarily grounded in and related to sex.

15

The overwhelming consensus of federal appeals courts is that discrimination against transgender people constitutes prohibited sex discrimination. Five Circuits, interpreting five different legal guarantees, have found that discrimination against an individual because they are transgender is a form of discrimination on the basis of sex. *See Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017) (Title IX); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (Equal Protection Clause); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005) (Title VII); *Rosa v. Park W. Bank Tr. Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000) (Equal Credit Opportunity Act, which bars "discriminat[ion] … on the basis of … sex," 15 U.S.C. § 1691(a)(1)); *Schwenk v Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (Gender Motivated Violence Act, which "protect[s] the civil rights of victims of gender motivated violence," 34 U.S.C. § 12361(a)).

At least two Circuits have ruled expressly in favor of transgender students seeking access to facilities matching their gender identity under Title IX. *See Whitaker*, 858 F.3d at 1049-54; *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221-22 (6th Cir. 2016); *see also Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 530 (3d Cir. 2018) (rejecting privacy claims concerning sharing single-sex spaces with transgender students, recognizing that courts have found that "requiring transgender students to use .. birth-sex-aligned facilities" violates federal law). Other district courts in this Circuit have uniformly ruled that exclusion of transgender students from single-sex facilities constitutes sex discrimination for purposes of Title IX, *Grimm v. Gloucester Cty. Sch. Bd.*, 302 F. Supp. 3d 730, 741 (E.D. Va. 2018) ("*Grimm II*"); *M.A.B. v. Bd. of Educ.*, 286

16

F. Supp. 3d 704, 711 (D. Md. 2018), as have the vast majority of district courts across the country, *see Grimm II*, 302 F. Supp. 3d at 741 (collecting authorities).[7]

Discrimination against people because they are transgender inherently rests on sex stereotypes and gender-based assumptions. Nearly thirty years ago, the Supreme Court explained that "we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Price Waterhouse*, 490 U.S. at 251. Prohibition against impermissible sex stereotyping necessarily protects transgender people because, "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048. As the Eleventh Circuit has explained,

> A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior. There is thus a congruence between discriminating against transgender … individuals and discrimination on the basis of gender-based behavioral norms.

*Glenn*, 663 F.3d at 1316 (quotation marks and brackets omitted). Courts have overwhelmingly recognized this inherent relationship between discrimination against transgender people and sex stereotyping. *See, e.g.*, *Doe 1 v. Trump*, 275 F. Supp. 3d 167, 210 (D.D.C. 2017) ("The defining characteristic of a transgender individual is that their inward identity, behavior, and possibly their physical characteristics, do not conform to

---

[7] Intervenors acknowledge this abundance of contrary authority in a footnote, Dkt. 254 at 10 n.6, while UNC altogether fails to acknowledge it, Dkt. 255.

stereotypes of how an individual of their assigned sex should feel, act and look.").

Accordingly, a law like HB 2 that allowed the government "to isolate, distinguish, and subject to differential treatment any student who deviated from what the [government] viewed a male or female student *should* be, and from the physiological characteristics the [government] believed that a male or female student *should* have," violates Title IX. *Grimm II*, 302 F. Supp. 3d at 743; *see also Whitaker*, 858 F.3d at 1049-50; *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 577 (6th Cir. 2018).

The Supreme Court has long recognized that protections from sex discrimination are not limited to "[m]yths and purely habitual assumptions," but extend to generalizations that are "unquestionably true." *Manhart*, 435 U.S. at 707. Generalizations that are accurate for most people cannot justify sex discrimination against those who do fall "outside the average description." *United States v. Virginia*, 518 U.S. 515, 550 (1996). Simply because most men are designated male at birth, does not mean men like Mr. Carcaño can be treated as insufficiently masculine or insufficiently male because they were designated a different sex at birth. Titles IX and VII prohibit sex discrimination precisely because "[p]ractices that classify people in terms of ... sex tend to preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals." *Manhart*, 435 U.S. at 709.[8]

---

[8] It is not true that HB 2 created a system where "all people with particular physiological characteristics … are treated in the same way." Dkt. 254 at 14. Instead, it divided them between sex-separated facilities based on the gender marker on their birth certificates. The significant variation among state requirements to correct gender markers on birth certificates means that HB 2 did not separate individuals by anatomy, but instead by circumstance. *Compare, e.g.*, Md. Code Ann., Health-Gen. § 4-211(b) (permitting

18

Even if transgender people were somehow precluded from *Price Waterhouse*'s protection against sex stereotyping, a person's transgender status, properly understood, is an inherently sex-based characteristic. Plaintiffs were treated differently under HB 2 because they are men and women whose gender identity does not match their sex assigned at birth. The incongruence between their gender identity and their sex designated at birth is what makes them transgender. Treating a person differently because of the relationship between those two sex-based characteristics is literally discrimination on the basis of "sex." *See Whitaker*, 858 F.3d at 1051 (the district's "policy cannot be stated without referencing sex," and thus is inherently "based upon a sex-classification" such that "heightened review applies"); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn. 2016) (explaining why discrimination based on sex necessarily includes "discrimination on the basis of gender identity"); *Love v. Johnson*, 146 F. Supp. 3d 848, 850-51 (E.D. Mich. 2015); *Roberts v. Clark Cty. Sch. Dist.*, 215 F. Supp. 3d 1001, 1014 (D. Nev. 2016). Whether described as regulating which gender-specific restrooms Plaintiffs were allowed to use, or defining Plaintiffs' sex for purposes of accessing those facilities, HB 2 was inescapably about sex.

Discrimination based on gender transition is also inextricably linked to sex. Differential treatment because of a change in religion provides an apt analogy: firing an employee because she converts from Christianity to Judaism "would be a clear case of

---

correction of birth certificate if individual has received unspecified "appropriate" transition-related care) *with* Tenn. Code Ann. § 68-3-203(d) (forbidding correction even where individual has received surgical care).

discrimination 'because of religion.'" *Schroer v. Billington*, 577 F. Supp. 2d 293, 306

(D.D.C. 2008). Even if the employer "harbors no bias toward either Christian or Jews

but only 'converts[,]' … [n]o court would take seriously the notion that 'converts' are not

[protected]." *Id.* "By the same token, discrimination 'because of sex' inherently includes

discrimination against employees because of a change in their sex." *Harris Funeral*

*Homes*, 884 F.3d at 575; *see also Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d

931, 949 (W.D. Wis. 2018) (adopting religious analogy to gender transition); *Fabian*, 172

F. Supp. 3d at 527 (same); *Bd. of Educ. v. U.S. Dep't of Educ.*, 208 F. Supp. 3d 850, 868

n.8 (S.D. Ohio 2016) ("*Highland*") (same).

Accordingly, there are multiple ways in which Plaintiffs have stated plausible sex

discrimination claims under Titles VII and IX based on HB 2's exclusion of Plaintiffs

from sex-separated facilities because they are transgender.

### C.     Defendants' Narrow Reading Of "Sex" Cannot Be Squared With The Statutes' Plain Language Or Controlling Case Law.

Title VII's and Title IX's broad language cannot be reduced to the narrow reading

that UNC and Intervenors advance based on what they claim was Congress's

understanding of the term "sex" when the statutes were enacted in 1964 and 1972. The

Supreme Court long ago rejected that approach. As Justice Scalia explained on behalf of

a unanimous Court: "statutory prohibitions often go beyond the principal evil to cover

reasonably comparable evils, and it is ultimately the provisions of our laws rather than

the principal concerns of our legislators by which we are governed." *Oncale v.*

20

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *accord Whitaker*, 858 F.3d at 1048.

The Supreme Court has repeatedly warned "that a statute is not to be confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980) (quotation marks and alterations omitted). "[C]hanges, in law or in the world," may often "require [a statute's] application to new instances," *West v. Gibson*, 527 U.S. 212, 218 (1999), even where legislators "might not have appreciated [that] possibility," *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007). "[I]f Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators." *Barr v. United States*, 324 U.S. 83, 90 (1945).

The legislators who passed Title IX may have been principally motivated "to end discrimination against women in university admissions and appointments," Dkt. 254 at 11, but they wrote a statute that "broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex,'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681(a)). The term discrimination "covers a wide range of intentional unequal treatment; by using such a broad term, Congress gave the statute a broad reach." *Id.* at 175. Discrimination that harms transgender individuals "on the basis of" or "because of" their sex is a "reasonably comparable evil" that falls squarely within the statute's plain text, *Oncale*, 523 U.S. at 79, and courts must give the statute "a sweep as broad as its language," *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982) (quotation marks omitted); *see also Elwell v.*

21

*Oklahoma*, 693 F.3d 1303, 1311 (10th Cir. 2012) ("Title IX does not limit its coverage at all, outlawing discrimination against any 'person,' broad language the Court has interpreted broadly." (Gorsuch, J.) (citations omitted)).

The same principles apply to both Title IX and Title VII. The statutes protect students and employees from sexual harassment even though "the concept of 'sexual harassment' as gender discrimination had not been recognized or considered by the courts" when Congress enacted the statutes. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 664 (1999) (Kennedy, J., dissenting). The statutes also extend to harassment between members of the same sex even though many judges have stated they "cannot believe that Congress … could have intended it to reach such situations." *McWilliams v. Fairfax Cty. Bd. of Supervisors*, 72 F.3d 1191, 1196 (4th Cir. 1996), *abrogated by Oncale*, 523 U.S. 75. "It is quite possible that these interpretations may also have surprised some who served in" Congress when the statute was enacted. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 345 (7th Cir. 2017) (en banc). But courts cannot "rewrite the statute so that it covers only what [they] think is necessary to achieve what [they] think Congress really intended." *Lewis v. City of Chicago*, 560 U.S. 205, 215 (2010).[9]

---

[9] UNC's analogy to sexual orientation discrimination jurisprudence also fails. Dkt. 255 at 21-22. To the extent the Fourth Circuit's statement about sexual orientation discrimination in *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138 (4th Cir. 1996) is good law, that statement does not govern Title VII's and Title IX's application to discrimination against transgender individuals. Indeed, at least four Circuits recognize that discrimination against transgender individuals is sex discrimination, despite having also (erroneously) concluded that sexual orientation discrimination is not. *Compare Glenn*, 663 F.3d at 1316, *with Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979);

In a further effort to advance a narrow reading of the statutes, Defendants argue that the Court should defer to dictionary definitions of "sex" at the time of the statutes' enactment. Dkt. 255 at 17-18; Dkt. 254 at 10-11. However, Defendants' arguments misapprehend contemporaneous definitions of sex and controlling case law.

Titles VII and IX do not define sex and, regardless of any dictionary definition now or at the time of enactment, their protections plainly do not reduce to the sum of an individual's reproductive organs. And, in fact, Defendants' assumption that contemporaneous dictionary definitions uniformly adopted an anatomy-based definition is incorrect. In *Grimm*, the Fourth Circuit reviewed dictionary definitions at the time of Title IX's enactment, and found that they did indeed recognize variance in sex-related characteristics—and that they certainly could not foreclose claims by transgender students. *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 721-22 (4th Cir. 2016) (*Grimm I*);[10] *see also, e.g.*, *Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 318

_____

*Rosa*, 214 F.3d at 215-16, *with Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Harris Funeral Homes*, 884 F.3d at 571, 580, *with Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764-65 (6th Cir. 2006); *Schwenk*, 204 F.3d at 1202, *with DeSantis v. Pac. Tel. & Tel. Co.*, 608 F.2d 327, 331-32 (9th Cir. 1979). In any event, *Wrightson*'s statement was dicta. *See Wrightson*, 99 F.3d at 143 ("[W]hile it is true Title VII does not afford a cause of action for discrimination based upon sexual orientation, Wrightson *does not allege* that he was discriminated against because he is heterosexual." (emphasis added) (internal citations omitted)); *see Spencer v. Town of Bedford*, No. 6:18-cv-31, 2018 WL 5983572, at *4 n.2 (W.D. Va. Nov. 2, 2018) ("[T]he Fourth Circuit's pronouncement in *Wrightson* … has all the hallmarks of dicta.").

[10] Although the Supreme Court vacated the Fourth Circuit's judgment in *Grimm I* after the Department of Education rescinded its guidance on this issue, the two district courts in this Circuit to consider Title IX claims since then have both recognized that the remainder of *Grimm I* "remains binding law." *Grimm II*, 302 F. Supp. 3d at 743 n.6; *see also M.A.B.*, 286 F. Supp. 3d at 712 n.5. While UNC claims that *Grimm I*'s vacatur deprives that opinion of any persuasive value, the remainder of the opinion remains

23

F. Supp. 3d 1293, 1321 (M.D. Fla. 2018) (considering *Grimm* and other decisions and explaining that the "Court does not find the plain meaning of the word 'sex' as used in Title IX to be apparent from contemporaneous dictionary definitions"); *Highland*, 208 F. Supp. 3d at 866 (explaining that "dictionaries from that era defined 'sex' in myriad ways" and did not reflect "a uniform and unambiguous meaning of 'sex' as biological sex or sex assigned at birth").

Defendants' attempt to cast the statutes' guarantees as restricted purely to "physical" or "biological" differences between individuals is also dramatically out of step with sex discrimination jurisprudence. Dkt. 255 at 17; Dkt. 254 at 10. Indeed, *Grimm I* has already rejected the notion that these non-discrimination guarantees could be coherently rooted in notions of "biology" or anatomy. 822 F.3d at 720-21 ("It is not clear to us how the regulation [under Title IX permitting separate restrooms] would apply in a number of situations—even under the Board's own 'biological gender' formulation"— *e.g.*, "which restroom would a transgender individual who had undergone sex-reassignment surgery use?" or "[w]hat about an intersex individual?"). And, as explained above, Defendants' cramped view of sex discrimination protections was rejected by the Supreme Court decades ago and defies the Court's long-standing recognition that Title

---

binding where neither an *en banc* panel nor the Supreme Court has issued any superseding opinion—neither of which has occurred here. *See United States v. Giddins*, 858 F.3d 870, 886 n.12 (4th Cir. 2017). Accordingly, this Court, too, should "rely on [*Grimm I*] to the extent it offers guidance for deciding the Motions present." *Grimm II*, 302 F. Supp. 3d at 743 n.6; *see also id.* at 752 (denying motion to dismiss Title IX claim for restroom access in accordance with gender identity); *M.A.B.*, 286 F. Supp. 3d at 727 (same).

Case 1:16-cv-00236-TDS-JEP   Document 258   Filed 11/30/18   Page 25 of 39

VII protects individuals from all forms of sex discrimination. *See Price Waterhouse*, 490 U.S. at 251 ("Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." (quotations omitted)).

To support their arguments, Defendants cite a handful of cases that have been superseded, or are so lacking in persuasive value that courts have almost uniformly disregarded them.[11]  For example, while Intervenors lean heavily on *Johnston v. University of Pittsburgh*, 97 F. Supp. 3d 657, 676 (W.D. Pa. 2015), that decision is an outlier, relying on pre-*Price Waterhouse* case law that has since been abrogated—leaving *Johnston* with "little persuasive value." *Highland*, 208 F. Supp. 3d at 875.  Indeed, *Johnston*'s narrow analysis has been rejected by two different courts *within the same district*, as well as others.  *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 286-87 (W.D. Pa. 2017); *EEOC v. Scott Med. Health Ctr., P.C.*, 217 F. Supp. 3d 834, 841-42 (W.D. Pa. 2016) (holding that Title VII's sex discrimination prohibition extends broadly to sexual orientation).[12]

---

[11] *Compare* Dkt. 254 at 10 (citing *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221-22 (10th Cir. 2007) and *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982)), *with Glenn*, 663 F.3d at 1318 n.5 (finding that *Etsitty* and *Sommers* are out of step with the vast majority of decisions in this area).

[12] *See also A.H. ex. rel. Handling v. Minersville Area Sch. Dist.*, 290 F. Supp. 3d 321, 329 n.2 (M.D. Pa. 2017) (compared to *Johnston*, "the Court finds the analysis in the more recent decisions of *Evancho* and *Whitaker* persuasive"); *Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16-cv-4945, 2016 WL 6134121, at *18 n.19 (N.D. Ill. Dec. 29, 2017) (*Johnston* "is of limited persuasive value"), *report and recommendation adopted* 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017).

None of the other authorities UNC cites endorse its attempt to diminish the protections Titles VII and IX afford. Dkt. 255 at 11-12 (citing *Michael M. v. Super. Ct. of Sonoma Cty.*, 450 U.S. 464 (1981) (plurality); *Nguyen v. INS*, 533 U.S. 53 (2001); *Bauer v. Lynch*, 812 F.3d 340 (4th Cir. 2016); and *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993)). Some of these cases are simply inapposite. But to the extent a theme can be discerned, it is not the one UNC advances. Instead, it is that where the government can provide equal access, it must do so—even if there are physiological differences potentially warranting accommodation to ensure equality.

When faced with arguments similar to those Defendants advance, other courts have rejected the applicability of *Michael M.* and *Nguyen* to claims like Plaintiffs' here. *Adams*, for example, involved a school board policy that barred a transgender plaintiff from using the school restroom matching his male gender identity—just as HB 2 blocked Plaintiffs here from using facilities matching their gender identity. In contrast to *Michael M.* (involving a statutory rape law) and *Nguyen* (involving differential sex-based requirements for proving parenthood), the school restroom policy in *Adams* did "not depend on something innately different between the bodies of boys and girls or what they do in the bathroom." *Adams*, 318 F. Supp. 3d at 1318. Rather, that policy, like HB 2, treated the transgender individuals differently simply because of their "failure to act in conformity with [their] sex assigned at birth." *Id.*

For their part, *Bauer* and *Faulkner* support *Plaintiffs*, not Defendants. *Bauer* involved a Title VII challenge by a male FBI Academy trainee, who argued that the Academy's gender-normed standards—which required fewer push-ups of female trainees

26

than male trainees—constituted sex discrimination. 812 F.3d at 342. The court recognized, however, that the Academy had adopted those standards so that more women, of equivalent fitness to men, could qualify, since women "demonstrate their fitness differently." *Id.* at 351. *Bauer* thus upheld the gender-normed fitness requirements because they *furthered* rather than hindered equal access by women.

And while Defendants quote *Faulkner*'s reference to "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns," *Faulkner*, 10 F.3d at 232; *see* Dkt. 255 at 11-12, they ignore the central of holding of that case. That we permit separate restrooms for men and women does not say anything about the permissibility of subjecting a subset of men and women—transgender men and women—to discrimination in the use of those facilities. In requiring South Carolina's military college to admit its first-ever female student to day classes, notwithstanding that it might "be disruptive in the first days" and would "probably shake [its] stability temporarily," *Faulkner*, 10 F.3d 233, the Fourth Circuit emphasized that equality is required where it is achievable. Just as the admission of women did not detract from the college's "primary mission," *id.*, sex-specific facilities still maintain their primary character and reasonable expectations of privacy when transgender people use them.

UNC must surely agree. It is unlikely to believe its restrooms and other facilities maintained their sex-separated nature solely when HB 2 was in effect, but not before HB 2, when Plaintiffs and others were "quietly using bathrooms and other facilities that match their gender identity, without public awareness or incident," Dkt. 127 at 3, or now, when UNC no longer blocks individuals from restrooms that match their gender identity.

27

In sum, the cases Defendants cite do not support their attempt to diminish the protections afforded to Plaintiffs by Titles VII and IX.

### D. Congress's Specific Reference To Gender Identity In Other Statutes Does Not Defeat Plaintiffs' Claims Under Titles VII And IX.

Defendants also argue that congressional prohibitions of gender identity discrimination in federal statutes, such as the Violence Against Women Act ("VAWA"), federal hate crimes legislation, and other contemporary federal statutes, suggest that Congress did not intend to protect transgender people when enacting Titles VII and IX. Dkt. 255 at 18-19; Dkt. 254 at 12-13. While Defendants argue that Titles VII and IX must be interpreted in the context of these later-enacted statues, "[s]ubsequent uses of the terms 'gender' and 'gender identity' *in other statutes*" do not suggest that "the omission of those terms in Title IX [and Title VII] was intentional." *Adams*, 318 F. Supp. 3d at 1322 (emphasis added). Indeed, the notion that Congress understood and used those terms consistently over the course of more than forty years should be entitled to little weight where, as here, Defendants point to "terms used in different statutes passed by different Congresses in different decades." *Id.* (quotations omitted).

VAWA, hate crimes legislation, and the other related statutes UNC cites were enacted in 2009 and 2013. Dkt. 255 at 18-19. When Congress enacted Titles VII and IX in 1964 and 1972, the practice of separately enumerating transgender status protections had not yet emerged. That a particular manifestation of discrimination covered by Titles VII and IX has become so pronounced or well-understood that it now has a separate

designation (such as "sexual harassment,"[13] or "gender identity") does not change

statutory interpretation analysis or require specific, separate statutory enumeration.

*Fabian*, 172 F. Supp. 3d at 527 n.12 (interpreting sex discrimination provision in

Connecticut law to cover discrimination against transgender individuals even before

specific amendment adding "'gender identity or expression' to the list of protected

classes," explaining that the added "language does not require the conclusion that gender

identity was not already protected by the plain language of the statute, because

legislatures may add such language to clarify or to settle a dispute about the statute's

scope rather than solely to expand it").

Thus, Congress's use of the term "gender identity" in different statutes passed in

2009 and 2013 says nothing about the meaning of "because of … sex" or "on the basis of

sex" in statutes Congress adopted in 1964 and 1972. *Cf. Marvin M. Brandt Revocable

Tr. v. United States*, 572 U.S. 93, 109 (2014) ("The statutes the Government cites do not

purport to define (or redefine) the [terms of an earlier statute]."); *accord Almendarez-

Torres v. United States*, 523 U.S. 224, 237 (1998) ("These later enacted laws … do not

[purport to] declare the meaning of earlier law."). Far from creating "surplusage" by

---

[13] Indeed, "sexual harassment" was not in the legal or social lexicon in 1964, and four of
the first five courts to consider whether sexual harassment was discrimination "because
of … sex" answered in the negative. *See Tomkins v. Pub. Serv. Elec. & Gas Co.*, 422 F.
Supp. 553, 556 (D.N.J. 1976) (noting same). And yet, Title VII's coverage of sexual
harassment has been hornbook law for over three decades. Similarly, despite Title VII's
express reference to retaliation, the Supreme Court has held that Title IX's more general
reference to discrimination encompasses retaliation. *See Jackson*, 544 U.S. at 174-75
(holding that Title IX encompasses both "sexual harassment" and "retaliation" despite the
statute's failure to explicitly reference those concepts).

29

using the overlapping terms "sex" and "gender identity" in statutes passed in 2009 and 2013, Dkt. 254 at 12, Congress simply "cho[se] to use both a belt and suspenders to achieve its objectives," *Harris Funeral Homes*, 884 F.3d at 578 (quotations omitted).

The absence of subsequent amendment to Titles VII and IX, including failed proposals to add the term "gender identity" to Title VII, Dkt. 255 at 20, are even less probative. "Congressional inaction cannot amend a duly enacted statute." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 186 (1994) (quotations omitted). Indeed, the Supreme Court has declared that such "[p]ost-enactment legislative history (a contradiction in terms) is not a legitimate tool of statutory interpretation." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011); *cf. Massachusetts*, 549 U.S. at 529-30 ("That subsequent Congresses have eschewed enacting binding emissions limitations to combat global warming tells us nothing about what Congress meant … in 1970 and 1977."). Even if it were permissible to interpret an earlier statute based on subsequent Congresses' legislative intent, "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *United States v. Craft*, 535 U.S. 274, 287 (2002) (internal quotation marks omitted). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001).

For these reasons, UNC's reliance on *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009) is misplaced. Dkt. 255 at 20. *Gross* examined Congress's simultaneous amendment of two statutes (Title VII and the ADEA), finding it significant that Congress declined to make the same changes to each statute through its contemporaneous

30

amendments to them. 557 U.S. at 174. As *Gross* explained, "negative implications raised by disparate provisions [between two different statutes] are strongest when the provisions were considered simultaneously when the language raising the implication was inserted." *Id.* at 175 (quotations omitted). That situation is a world apart from the one here, where Congress amended other unrelated statutes such as VAWA decades later—and after a major evolution in how society and Congress have come to understand transgender people.

> **E.** **Title IX Implementing Regulation's Provision For Sex-Separated Facilities Is Consistent, Not In Tension, With Plaintiffs' Claims.**

Defendants argue that Plaintiffs' claims must be dismissed because Title IX's implementing regulations allow schools to maintain sex-separated facilities and to separate students by sex in certain sports activities in physical education classes. Dkt. 254 at 13 (citing 34 C.F.R. §§ 106.33-34 (together, the "Regulations")); Dkt. 255 at 24 (citing 34 C.F.R. § 106.33). But the Regulations must be construed within the context of the entire statutory scheme and in light of the statute's underlying prohibition on "discrimination." *Cf. United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004) ("When a regulation implements a statute, the regulation must be construed in light of the statute" it implements); *see also Time Warner Entm't Co. v. Everest Midwest Licensee, LLC*, 381 F.3d 1039, 1050 (10th Cir. 2004).

The Regulations permit schools to provide sex-separated restrooms and physical education activities, but do not authorize them to do so in a discriminatory manner. The main provision of the statutory text, 20 U.S.C. §1681(a), broadly prohibits all

31

discrimination. The only exceptions to that broad prohibition are expressly spelled out in the statutory text. For example, 20 U.S.C. § 1681(a) contains a series of subsections enumerating narrow contexts in which that prohibition on discrimination "shall not apply." *See Mercer v. Duke Univ.*, 190 F.3d 643, 647 (4th Cir. 1999) (contrasting broad statutory exemption with narrow regulation). Unlike those statutory exemptions, the Regulations do not state that the statute's ban on sex-based discrimination "shall not apply" to restrooms. The agency would lack authority to create such an exemption because a regulation cannot authorize what its implementing statute prohibits. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 62 (2011); *Time Warner*, 381 F.3d at 1050 ("[A] regulation must be interpreted in such a way as to not conflict with the objective of its organic statute."). For example, UNC certainly could not bar women perceived as "masculine" from using women's facilities, nor men perceived as "feminine" from using men's facilities. The Regulations authorize schools to provide separate restrooms or certain sporting activities for boys and girls—not to *discriminate* against a subset of students on the basis of sex by excluding them from the same restrooms or sporting activities as other boys and girls. Accordingly, the Regulations do not provide any "safe harbor," as UNC claims, for discrimination against transgender students. *See Adams*, 318 F. Supp. 3d at 1322 (rejecting similar arguments about the restroom regulation, which simply "cannot [on their face] be presumed to mean 'biological sex'").

UNC further overreaches by claiming that the Department of Justice's and Department of Education's February 2017 Dear Colleague letter somehow establishes new agency guidance, and strains credulity to the breaking point by arguing that this

32

sudden reversal in agency position is owed any deference under *Auer v. Robbins*, 519

U.S. 452 (1997). Dkt. 255 at 25-26. The 2017 Dear Colleague letter simply "stated it

was withdrawing the earlier guidance." *Adams*, 318 F. Supp. 3d at 1323. Far from

creating a new substantive interpretation, "the rescission of the old guidance without

issuing new guidance does not provide any interpretation of Title IX from the

Department of Education," *id.*, and instead creates an "interpretive vacuum," *Minersville*,

290 F. Supp. 3d at 327 (quotations omitted). There exists no new rule to which deference

could be accorded. And, regardless, the agency would have no authority to violate the

statutory text and no deference is owed to a reversal in agency position. *INS v. Cardoza–*

*Fonseca*, 480 U.S. 421, 446 n.30 (1987).

### F. Title IX, Properly Interpreted To Protect Plaintiffs, Does Not Violate The Spending Clause.

Defendants claim without merit that if Title IX protects transgender people from

discrimination in restrooms and other sex-separated facilities, the statute would likely

offend the Spending Clause's requirement that the statute provide fair notice of its

conditions, and would potentially be unconstitutional under *Pennhurst State School &*

*Hospital v. Halderman*, 451 U.S. 1 (1981). Dkt. 255 at 23-24; Dkt. 254 at 13-14. But

Defendants' assertions that it is *unconstitutional* for the government to bar discrimination

against transgender people in accessing facilities—as both Title IX and laws in numerous

jurisdictions do—are meritless. Recipients of federal funds like UNC have clear notice

that Title IX encompasses all forms of sex discrimination. *Jackson*, 544 U.S. at 175, 182-

83; *Davis*, 526 U.S. at 638-39.

33

By arguing that Title IX must explicitly refer to "gender identity" to provide "adequate notice" under *Davis*, UNC relies on an argument that the Fourth Circuit has already rejected in *West Virginia Department of Health & Human Resources v. Sebelius*, 649 F.3d 217, 223 (4th Cir. 2011). In that case, the court held that West Virginia's "'super-clear statement' [rule] … misreads *Pennhurst* and its progeny." *Id*. *Pennhurst* does not require Congress to "prospectively resolve every possible ambiguity concerning particular applications" of a statute. *Id*. at 224 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985)). Indeed, Congress need not "specifically" identify and prescribe "each condition in the legislation." *Students & Parents for Privacy v. U.S. Dep't of Educ.*, No. 16-CV-4945, 2016 WL 6134121, at *20 (N.D. Ill. Oct. 18, 2016), *report and recommendation adopted*, No. 16-CV-4945, 2017 WL 6629520 (N.D. Ill. Dec. 29, 2017) (quotations omitted); *see also Bennett*, 470 U.S. at 666 (holding that there is no requirement that each particular violation be "specifically identified and proscribed in advance"). "The Supreme Court has explained that so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004); *see also Tovar v. Essentia Health*, No. CV 16-100, 2018 WL 4516949, at *3 (D. Minn. Sept. 20, 2018) (stating that the reasoning and holdings in cases such as *Price Waterhouse* and *Oncale* provide ample notice that Title IX encompasses gender identity discrimination).

This is particularly true in the context of Title IX, which has an implied cause of action and does "not list any specific discriminatory practices" that are prohibited.

34

*Jackson*, 544 U.S. at 175. "[A] State that accepts funds under [a statute with an implied cause of action] does so with the knowledge that the rules for … liability will be subject to judicial determination." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 285 (2d Cir. 2003).

In any event, nothing about this argument could foreclose Plaintiffs' claims at the motion to dismiss stage.

## CONCLUSION

The Court should deny Defendants' motions to dismiss Plaintiffs' nominal damages claims.

Dated: November 30, 2018

Respectfully Submitted,

/s/ Christopher A. Brook
Christopher A. Brook (NC Bar No. 33838)
Irena Como*
AMERICAN CIVIL LIBERTIES UNION OF
    NORTH CAROLINA LEGAL
    FOUNDATION
Post Office Box 28004
Raleigh, North Carolina 27611
Telephone: 919-834-3466
Facsimile:  866-511-1344
cbrook@acluofnc.org
icomo@acluofnc.org

James D. Esseks*
Leslie Cooper*
Elizabeth O. Gill*
Chase B. Strangio*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad St., 18th Fl.
New York, NY 10004
Telephone: 212-549-2627
Facsimile:  212-549-2650
jesseks@aclu.org

Tara L. Borelli*
Peter C. Renn*
LAMBDA LEGAL DEFENSE AND
    EDUCATION FUND, INC.
730 Peachtree Street NE, Suite 1070
Atlanta, GA 30308-1210
Telephone: 404-897-1880
Facsimile:  404-897-1884
tborelli@lambdalegal.org
prenn@lambdalegal.org

Scott B. Wilkens*
Luke C. Platzer*
JENNER & BLOCK LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: 202-639-6000
Facsimile:  202-639-6066
swilkens@jenner.com
lplatzer@jenner.com

35

lcooper@aclu.org
egill@aclunc.org
cstrangio@aclu.org

*Appearing by special appearance pursuant to L.R. 83.1(d)

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

I, Christopher A. Brook, hereby certify that this brief complies with the word limit ordered by this Court because, excluding the parts exempted by Local Civil Rule 7.3(d), this brief contains 9,977 words.

/s/ Christopher A. Brook
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Christopher A. Brook, hereby certify that on November 30, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participating attorneys.

/s/ Christopher A. Brook

*Counsel for Plaintiffs*