IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

        *Plaintiffs*,

v.

ROY A. COOPER, III, in his official capacity as Governor of North Carolina, *et al.*,

        *Defendants*.

Case No. 1:16-cv-236

**UNC DEFENDANTS' SUPPLEMENTAL REPLY BRIEF
IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' NOMINAL-DAMAGES CLAIMS**

## ARGUMENT

**I.  This Court Should Dismiss The Title VII And Title IX Claims Because They Are Not Justiciable**

The University of North Carolina has shown that Plaintiffs' nominal-damages claims challenging House Bill 2 ("HB 2") are not justiciable.  (*See* Mem. 3–10.)  Plaintiffs' responses lack merit.

**A.  The law-of-the-case doctrine allows the Court to decide whether Plaintiffs' claims are justiciable**

Plaintiffs claim that the law-of-the-case doctrine precludes the Court from deciding whether their nominal-damages claims are justiciable.  (Opp. 3–7.)  That is incorrect.

*First*, the law-of-the-case doctrine "does not and cannot limit the power of a court" to decide whether it has "subject matter jurisdiction"—especially "Article III subject matter jurisdiction."  *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003).  The "very legitimacy of a court's adjudicatory authority" rests on its possession of jurisdiction.  *Id.*  As a result, the "value of correctness in the subject matter jurisdiction context … trump[s] the prudential goals" of the law-of-the-case doctrine (at least in the absence of "bad faith" attempts to "prolong" the lawsuit through "perpetual litigation of subject matter jurisdiction").  *Id.* at 515–16 & n.9.  Since the justiciability of Plaintiffs' nominal-damages claims is a matter of Article III

1

subject-matter jurisdiction, the law-of-the-case doctrine does not preclude the Court from deciding it.

*Second*, "decisions at the preliminary injunction phase do not constitute the law of the case." *Democratic Nat'l Comm. v. Reagan*, 904 F.3d 686, 700 n.4 (9th Cir. 2018). Courts customarily conduct preliminary-injunction proceedings in "haste," "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). For this reason, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding" later in the same litigation. *Id.* This Court made its earlier ruling here at the preliminary-injunction stage, so the ruling is not the law of the case.

*Finally*, the law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the *same issues* in subsequent stages in the same case." *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 715 (4th Cir. 2015). "It does not apply" where a new motion "present[s] different issues." *Id.* The issue before the Court now differs from the issue before the Court at the preliminary-injunction stage in at least three ways:

- The issue at the preliminary-injunction stage was whether Plaintiffs' claims were justiciable when HB 2 was in effect, but the issue now is whether their claims remain justiciable after HB 2 has been repealed.

- The issue at the preliminary-injunction stage was whether Plaintiffs' claim for an injunction was justiciable, but the issue now is whether their claims for nominal damages are justiciable.

- The issue at the preliminary-injunction stage was whether Plaintiffs' evidence established that the case was justiciable, but the issue now is whether the allegations in the later-filed Fourth Amended Complaint establish on their face that the case is justiciable.

Because the University seeks resolution of a different issue, the law-of-the-case doctrine is not applicable.

### B. Plaintiffs' claims are not justiciable

The University has shown that (1) a nominal-damages claim against a repealed statute is not justiciable if the defendant never enforced the statute against the plaintiff, and (2) Plaintiffs fail to allege that the University enforced HB 2 against them while the statute was in effect. (*See* Mem. 3–7.) Plaintiffs lack a persuasive response.

Plaintiffs rely principally on *Covenant Media of South Carolina, LLC v. City of North Charleston*, 493 F.3d 421 (4th Cir. 2007). But in that case, it was not disputed that the defendant *did* apply the challenged statute to the plaintiff: The statute established an unconstitutional procedure for adjudicating applications for sign permits, and it was undisputed that the

3

defendant used that unconstitutional procedure when "processing … [the plaintiff's] application." *Id.* at 428. "The *Covenant Media* situation is readily distinguishable from" a case in which the defendant has *not* taken enforcement action under the statute. *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 F. App'x 566, 573 (4th Cir. 2007).

Plaintiffs also claim that the University enforced HB 2 against them by issuing "pronouncements" about the University's obligation to "comply with State law." (Opp. 5.) That is incorrect. In *Chapin*, the Fourth Circuit ruled that a nominal-damages claim against a repealed town ordinance was nonjusticiable, even though the town had previously "informed [the plaintiff] that its [sign] … violated the Ordinance," "sent a letter" directing the plaintiff to "remove the sign," and sent "a second letter" repeating the demand "to have [the] sign removed. 252 F. App'x at 567–68. Plaintiffs' allegations in this case—that the University issued general guidance about HB 2—fall short of even *Chapin*. If repeated and specific orders to obey an ordinance did not suffice to make the nominal-damages claims in *Chapin* justiciable, general guidance about a statute cannot suffice to make the nominal-damages claims here justiciable.

In the final analysis, HB 2 has been repealed, and the Fourth Amended Complaint includes no allegations that the University ever enforced HB 2

4

against *anyone*, let alone against Plaintiffs. Accordingly, Plaintiffs' nominal-damages claims are not justiciable.

## II. The Court Should Dismiss The Title VII And Title IX Claims Because Plaintiffs Fail To State A Claim Against The University For Violation Of These Statutes

The University has shown that the University is not liable under Titles VII and IX both because it has not discriminated against transgender people and because, under current precedent, Titles VII and IX do not cover such discrimination. (Mem. 17–24.) Plaintiffs fail to overcome either argument.

### A. Plaintiffs have failed to show that the University has discriminated against transgender people

Plaintiffs accept that a defendant is liable under Titles VII and IX only if (1) the defendant itself engaged in "explicit facial discrimination" on the basis of a protected trait or (2) the defendant itself "intentionally" discriminated on the basis of such a trait. (Opp. 13.) Plaintiffs rely solely on the theory that the University engaged in explicit facial discrimination on the basis of transgender status; they make no effort to argue that the University has ever harbored discriminatory intent. (Opp. 13–15.) The Fourth Amended Complaint, however, does not support the conclusion that the University ever engaged in explicit facial discrimination.

5

Plaintiffs assert that the University engaged in facial discrimination because "HB 2 'prohibited [them] from using the … restrooms'" corresponding to their gender identity, thereby "stigmatizing and marking [them] as different." (Opp. 13 (quoting Fourth Am. Compl. ¶ 67.)  Plaintiffs also assert the University "enforced HB 2 in a manner that facially discriminated against transgender individuals" by maintaining "words and symbols on its sex-segregated facilities" that, in turn, "render[ed] transgender individuals … trespassers." (Mem. 13–14.)  These assertions are incorrect.

First, Plaintiffs' allegations fail to show that *the University* engaged in the conduct about which they complain.  Plaintiffs' allegation that "*HB 2* prohibited" Plaintiffs from using particular restrooms does not show that *the University* engaged in wrongful conduct.  The University did not enact HB 2, and the Fourth Amended Complaint includes no allegation that the University ever took enforcement action under HB 2 while it was in effect.  Plaintiffs' allegation about the signs on the University's bathrooms is likewise legally insufficient.  The University maintained "words and symbols on its sex-segregated facilities" even before the enactment of HB 2.  (*See, e.g.*, Fourth Am. Compl. ¶ 77.)  "UNC has not changed th[ose] words and symbols" since the statute's enactment. (Dkt. 127 at 26.)  Rather, "the meaning of those words and symbols has changed *as a result of Part I [of HB 2]*." (Dkt. 127 at

6

26 (emphasis added).) Plaintiffs cannot show that the University has engaged in discriminatory conduct by alleging that someone else (the General Assembly) came along and changed the meaning of signs on the University's bathrooms.

Second, Plaintiffs' allegations fail to show that the conduct about which they complain amounted to *facial* discrimination. HB 2, on its face, drew a line only between biological men (to whom it allotted one set of bathrooms) and biological women (to whom it allotted another set of bathrooms). The words and symbols on bathrooms, interpreted against the backdrop of HB 2, likewise drew a line only between biological men and biological women. Neither the statute nor the signs drew a line between cisgender and transgender people; indeed, as Plaintiffs acknowledge, the statute did not even "use the words 'gender identity.'" (Opp. 13.) To be sure, Plaintiffs argue that the statute and the signs had the *effect* of precluding transgender people from using bathrooms consistent with their gender identity, and the *effect* of "stigmatizing and marking [them] as different." But a showing that a practice has a disparate effect on a particular group does not establish that the practice discriminates *on its face* against that group. (Mem. 2.)

In sum, Plaintiffs have failed to show that the University engaged in facial discrimination on the basis of transgender status, and they have not

7

even tried to show that it harbored an intent to discriminate on the basis of transgender status. Plaintiffs' claims for nominal damages thus fail even under their own interpretation of Titles VII and IX.

### B. In any event, Plaintiffs fail to show that Titles VII and IX currently prohibit gender-identity discrimination

**1.** The University has explained that, under current law, Titles VII's and IX's prohibitions on "sex" discrimination preclude the unequal treatment of men and women, not the unequal treatment of cisgender and transgender people. Plaintiffs' responses lack legal merit.

*First*, the University has explained that the ordinary meaning of "sex" supports this interpretation. (Mem. 18.) Plaintiffs answer that some "dictionary definitions at the time of Title IX's enactment … did indeed recognize variance in sex-related characteristics." (Opp. 23.) A court, however, must ordinarily interpret a word in accordance with its "most common meaning," not in accordance with "other usages" that are "acceptable," but "not … common or ordinary." *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 568–69 (2012). Plaintiffs make no effort to show that the ordinary meaning of "sex" discrimination at the time of Title VII's and Title IX's enactment encompassed discrimination on account of cisgender or transgender status.

8

*Second*, the University has shown that numerous later statutes confirm this interpretation by separately prohibiting sex discrimination and gender-identity discrimination, by treating gender-identity discrimination as a distinct form of discrimination (rather than as a subset of sex discrimination), and by amending some statutes restricting sex discrimination (but not Titles VII and IX) to add references to gender identity. (Mem. 20.) Plaintiffs respond only that "later-enacted statutes" are "entitled to little weight" in the interpretation of Titles VII and IX, because "different statutes passed in 2009 and 2013 sa[y] nothing about the meaning of … statutes Congress adopted in 1964 and 1972." (Opp. 28–29.) That response is mistaken.

"[C]ourts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part, including later-enacted statutes." *Branch v. Smith*, 538 U.S. 254, 281 (2003) (plurality). Later statutes matter in statutory interpretation because "[the] classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." *United States v. Fausto*, 484 U.S. 439, 453 (1988). The only way to get earlier statutory references to "sex" to make sense in combination with the later statutory references to both "sex" and "gender identity" is to interpret "sex" and "gender identity" to be

9

separate. Later statutes also matter in statutory interpretation because, "[a]t the time a statute is enacted, it may have a range of plausible meanings"; "[o]ver time, however, subsequent acts can shape or focus those meanings." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000). Regardless of whether the term "sex" in Titles VII and IX was originally ambiguous enough that it could have encompassed gender identity, later statutes enacted by Congress shaped or focused that term, making clear that Congress considers gender identity to be distinct from sex. (Mem. 20–21.)

In all events, Plaintiffs' response fails even on its own terms. Plaintiffs themselves explain that Congress enacted later statutes distinguishing sex discrimination from gender-identity discrimination "in 2009 and 2013," "after a major evolution in how society and Congress have come to understand transgender people." (Opp. 30–31.) It is striking that, even as late as "2009 and 2013," Congress *still* considered gender-identity discrimination to be its own form of discrimination, rather than a subset of sex discrimination. If Congress considered these forms of discrimination to be different even in 2009 and 2013, *after* this "major evolution," it surely considered them to be different in 1964 and 1972, *before* this "major evolution."

10

*Third*, the University has explained that the Fourth Circuit ruled in *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996), that courts should not "judicially exten[d]" a prohibition of "sex discrimination" beyond "discrimination on the basis of gender." (Mem. 21.) Plaintiffs first respond that "*Wrightson*'s statement was dicta." (Opp. 22 n.9.) But that characterization is inaccurate: The Fourth Circuit made this statement in the course of deciding the scope of Title VII's prohibition on sex discrimination, which makes the statement a part of the Court's reasoning rather than a dictum. *See* 99 F.3d at 143. Anyway, the Fourth Circuit and many district courts in the Circuit have followed *Wrightson* in later cases (*see* Mem. 21–22), and *those* decisions are undoubtedly holdings rather than dicta.

Plaintiffs also maintain that *Wrightson* addressed sexual-orientation discrimination rather than gender-identity discrimination. But *Wrightson*'s recognition that the prohibition of "sex discrimination" "applies *only* to discrimination on the basis of gender" forecloses the judicial extension of Titles VII and IX to cover gender identity just as much as it forecloses their judicial extension to cover sexual orientation. 99 F.3d at 143 (emphasis added).

11

**2.** Plaintiffs make three affirmative arguments for interpreting "sex" in Titles VII and IX to include gender identity. These arguments lack legal merit.

*First*, Plaintiffs say that gender-identity discrimination is sex discrimination because it "is grounded in sex stereotypes prohibited by *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989)." (Opp. 15.) That claim is wrong. An employer engages in sex stereotyping when it assumes or insists that all men or all women act in accordance with a trait "associated with their group"—for example, when it "acts on the basis of a belief that" a man can "be aggressive," but "a woman … must not be." 490 U.S. at 250–51. HB 2 engaged in no such stereotyping.

In addition, *Price Waterhouse* makes clear that the prohibition of sex discrimination does not impose a freestanding bar on "sex stereotyping." Even in a sex-stereotyping case, "the plaintiff must [still] show that the employer actually relied on her gender in making its decision"—in other words, that the employer's use of stereotypes resulted in "disparate treatment of men and women." *Id.* Plaintiffs cannot do so here: They do not allege that, as a result of reliance on sex stereotypes, the University treated men more favorably than women, or women more favorably than men.

12

*Second*, Plaintiffs assert that gender-identity discrimination is sex discrimination because "a person's transgender status is itself a sex-based characteristic." (Opp. 15.) That assertion disregards the text of Titles VII and IX. These statutes prohibit only discrimination on the basis of "sex." They do not prohibit discrimination on the basis of "sex-based" or "sex-linked" characteristics. In addition, Plaintiffs' argument contradicts the Fourth Circuit's treatment of sexual-orientation discrimination in *Wrightson*. Sexual orientation is just as much a "sex-based" characteristic as transgender status, yet the Fourth Circuit ruled that Title VII does not prohibit it. *Wrightson* establishes that the "prohibition of 'sex' discrimination applies *only* to discrimination on the basis of gender," not to discrimination on the basis of other traits that may be related to gender. 99 F.3d at 143.

*Third*, Plaintiffs draw an analogy between sex discrimination and religious discrimination: They claim that, just as discrimination against people who convert religion is discrimination because of religion, so too discrimination against people who change sex is discrimination because of sex. (Opp. 19–20.) The analogy is inapt, because the relevant statutes themselves treat religion and sex differently. Title VII expressly defines "religion" to "includ[e] all aspects of religious observance and practice" (42 U.S.C. § 2000e(j)), and conversion is an "aspect of religious observance and

13

practice." Yet Titles VII and IX include no comparably expansive definition of "sex." They do not say, for example, that "sex" "includes all aspects of sexual identity and behavior."

In sum, under current law, Titles VII and IX prohibit only the unequal treatment of men and women, not the unequal treatment of cisgender and transgender people. Plaintiffs' nominal-damages claims assert only the latter form of unequal treatment. The Court should, accordingly, dismiss them.

## III. The Court Should Dismiss The Title IX Claim Because The University Is Protected By A Regulatory Safe Harbor

The University has demonstrated that a Department of Education regulation implementing Title IX establishes a regulatory safe harbor for schools that separate bathrooms or changing facilities by biological sex. (Mem. 24–27.) Plaintiffs first respond that "a regulation cannot authorize what [the implemented] statute prohibits." (Opp. 32.) The question here, however, is whether Title IX *does* prohibit the separation of bathrooms by biological sex. And in answering that question, this Court owes deference to the Department of Education's reasonable interpretation of ambiguous provisions of Title IX. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43 (1984). Plaintiffs also claim that the regulation itself applies only where a school allows transgender people to use

14

bathrooms corresponding with their gender identity. (Opp. 32.) The Department, however, has expressly rescinded previous guidance embodying that interpretation. (Opp. 32–33.) "It cannot be presumed that any clause in [a legal text] is intended to be without effect." *Marbury v. Madison*, 1 Cranch 137, 174 (1803). Yet, on Plaintiffs' reading, the rescission of the Department's previous interpretation of its regulation would have no effect at all. "Such a construction is inadmissible." *Id.*

## CONCLUSION

The Court should dismiss Plaintiffs' claims against the University of North Carolina seeking nominal damages under Titles VII and IX.

Dated: December 7, 2018

Respectfully submitted,

/s/ Thomas C. Shanahan
Thomas C. Shanahan (NC Bar No. 42381)
Carolyn C. Pratt (NC Bar No. 38438)
THE UNIVERSITY OF NORTH CAROLINA
P.O. Box 2688
Chapel Hill, NC 27515
Tel: (919) 962-4588
Fax: (919) 962-0477
Email: tcshanahan@northcarolina.edu

/s/ Glen D. Nager
Glen D. Nager
Kristen Lejnieks
Vivek Suri
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Tel: (202) 879-3939
Fax: (202) 626-1700
Email: gdnager@jonesday.com


*Counsel for the University of North Carolina and President Margaret Spellings*

# CERTIFICATE OF WORD COUNT

I certify that this brief complies with the word limits of Local Civil Rule 7.3(d) because, excluding the parts exempted by the rule, the brief contains 3073 words.

Dated: December 7, 2018

/s/ Glen D. Nager
Glen D. Nager
*Counsel for the UNC Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 7, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated: December 7, 2018

/s/ Glen D. Nager
Glen D. Nager
*Counsel for the UNC Defendants*