# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN CARCAÑO, *et al.*,

    *Plaintiffs*,

  v.

ROY A. COOPER, III, *et al.*,

    *Defendants*,

  and

PHIL BERGER, *et al.*,

    *Intervenor-Defendants.*

No. 1:16-cv-00236-TDS-JEP

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' AND EXECUTIVE BRANCH DEFENDANTS' SUPPLEMENTAL JOINT MOTION FOR ENTRY OF A CONSENT DECREE

Plaintiffs Joaquín Carcaño, Payton Grey McGarry, Hunter Schafer, Quinton Harper, Angela Gilmore, Madeline Goss, and American Civil Liberties Union of North Carolina (collectively, "Plaintiffs"), respectfully submit the following memorandum of law in support of the Supplemental Joint Motion for Entry of a Consent Decree submitted by Plaintiffs and Defendants Roy A. Cooper III, Joshua Stein, Machelle Sanders, Mandy K. Cohen, and James H. Trogdon III (collectively, "Executive Branch Defendants") (collectively referred to herein as "the Parties").

## PERTINENT FACTUAL BACKGROUND

On March 28, 2016, Plaintiffs filed this action initially challenging North Carolina House Bill 2 ("H.B. 2"). H.B. 2, which mandated that school boards and executive branch agencies require that all multiple occupancy restrooms or changing facilities be designated for and used only by persons based on their "biological sex" (defined as the sex stated on a person's birth certificate), was spurred by a Charlotte City Council Ordinance ("Charlotte Ordinance"). The Charlotte Ordinance had amended the City's public accommodations law to ban discrimination based on "gender identity, gender expression," and "sexual orientation." Fourth Amended Complaint ("FAC") ¶ 200, ECF No. 210. Plaintiffs challenged H.B. 2 on multiple grounds and this Court preliminarily enjoined H.B. 2 in part as violating Title IX, *see Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016).

On March 30, 2017, H.B. 2 was repealed by and replaced with North Carolina House Bill 142 ("H.B. 142"). As part of an apparent deal to secure H.B. 2's repeal, on the morning of December 21, 2016, the Charlotte City Council first repealed the Charlotte Ordinance in its entirety just before the North Carolina General Assembly met in special session to consider repealing H.B. 2. *Id.* ¶¶ 227-233. A "clean repeal" bill— which would have simply repealed H.B. 2 in its entirety—was introduced at that special session, but was never considered. *Id.* ¶ 235. "Clean repeal" bills were likewise introduced multiple times during the 2017 regular session, but did not pass. FAC ¶ 240.

Only on March 30, 2017 did the General Assembly pass, and Governor Cooper sign, H.B. 142 as a replacement to H.B. 2. Like H.B. 2, H.B. 142 was passed in

exceedingly unusual circumstances. The law was introduced, passed, and signed in less than twenty-four hours. General Assembly leaders announced a deal to repeal H.B. 2 at 10:30 p.m. the night before its passage, first releasing H.B. 142's text about an hour later. FAC ¶ 243. On March 30, to quickly consider the bill, the Senate used a process referred to as "gut and amend." FAC ¶ 243. That procedure ensured that neither the full House nor the full Senate heard public comment before voting on the legislation. The Governor signed H.B. 142 by late afternoon. FAC ¶¶ 244-245.

Moreover, H.B. 142 was not simply a "clean repeal" of H.B. 2. While it rescinded the provisions of H.B. 2 limiting transgender individuals' use of multiple occupancy restrooms or changing facilities, H.B. 142 simultaneously added a provision to state law withdrawing the authority of state agencies, institutions, branches of government, and political subdivisions to regulate access to multiple occupancy restrooms, showers, or changing facilities (hereinafter referred to as "public facilities"). Specifically, Section 2 of H.B. 142 provides:

> State agencies, boards, offices, departments, institutions, branches of government, including The University of North Carolina and the North Carolina Community College System, and political subdivisions of the State, including local boards of education, are preempted from regulation of access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly.

N.C. Sess. Laws 2017-4, § 2, (March 30, 2017) (codified at N.C. Gen. Stat. § 143-760). Section 3 of H.B. 142 also contained a prohibition against local non-discrimination ordinances. Section 3 provides that: "No local government … may enact or amend an ordinance regulating private employment practices or regulating public

3

accommodations." *Id.* § 3. Thus, H.B. 142 prospectively prohibits the enactment of ordinances like the Charlotte Ordinance that was repealed as a predicate to H.B. 2's repeal. Section 4 of H.B. 142 retains that ban until December 1, 2020. *Id.* § 4.

Together, Sections 2 and 3 render meaningless any advocacy by Plaintiffs at the local level to establish clear protections with respect to public facility access or to seek local non-discrimination ordinances. First, no current "act of the General Assembly" explicitly regulates access to public facilities, and many lawmakers indicated in public statements that H.B. 142 had retained H.B. 2's ban on transgender individuals using restrooms and multiple occupancy facilities in accordance with their gender identity. *See* FAC ¶ 246. Section 2 nullifies any advocacy to clarify transgender individuals' use of public facilities. Similarly, Section 3 leaves in place protective statutes and ordinances that pre-existed H.B. 142, such as those prohibiting discrimination on the basis of race or sex (and with the exception of the Charlotte Ordinance directly referring to protections based on gender identity and expression, which was repealed). Thus, H.B. 142 deprives Plaintiffs of protections that individuals in other vulnerable groups enjoy.

On September 7, 2017, following H.B. 142's enactment, Plaintiffs filed a Fourth Amended Complaint, seeking declaratory and injunctive relief and nominal damages. As specifically relevant here, Plaintiffs allege that H.B. 142 discriminates against Plaintiffs based on sex and transgender status in violation of the Equal Protection Clause. *See* FAC ¶¶ 313-344. After Plaintiffs filed their Fourth Amended Complaint, the Parties engaged in extensive, good faith discussions concerning a potential settlement of this

4

action.  On October 18, 2017, following those discussions, the Parties proposed a consent decree that would settle all of Plaintiffs' claims against Executive Branch Defendants.

In the interim, the Legislative Intervenors and UNC moved to dismiss the Fourth Amended Complaint.  On September 30, 2018, this Court granted in part and denied in part those motions.  Although this Court dismissed for lack of standing Plaintiffs' substantive due process claim challenging Section 2 of H.B. 142, the Court expressly found that Plaintiffs had established standing against Executive Branch Defendants with respect to their Equal Protection claims concerning *both* Section 2 and Section 3 of H.B. 142.  Memorandum Opinion & Order at 3-4, 31-39, ECF No. 248 ("Mem. Op.").  As the Court explained, "the Fourth Amended Complaint alleges an injury in fact on Plaintiffs' equal protection claim" because "[w]hile HB142 does not prohibit Plaintiffs' efforts at advocacy, it plainly makes them meaningless by prohibiting even the prospect of relief at the local level."  *Id.* at 33-34.  Having found standing, the Court proceeded to consider the merits of Intervenors' motion to dismiss the Equal Protection claims.  With respect to Section 2, the Court held that Plaintiffs had not pled that Section 2 impacts them disproportionately.  In doing so, however, the Court emphasized that, in its view, "[n]othing in the language of Section 2 can be construed to prevent transgender individuals from using the restrooms that align with their gender identity."  *Id.* at 49.

With respect to Section 3, the Court found that the provision disproportionately impacts Plaintiffs because "transgender individuals have a greater need for protective ordinances than other groups" but were denied any opportunity to seek protections at the local level while other preexisting ordinances were left in place.  *Id.* at 51.  And the Court

5

further concluded that Plaintiffs had adequately alleged Section 3 was passed with discriminatory intent, and that H.B. 142 fails rational basis review. *Id.* at 52-60.[1]

Since this Court's decision on the motion to dismiss—and informed by that decision—Plaintiffs and Executive Branch Defendants have again engaged in extensive negotiations concerning the possibility of a consent decree that would settle all of Plaintiffs' claims against Executive Branch Defendants. The proposed consent decree filed with this motion is the culmination of those negotiations.

## TERMS OF THE PROPOSED CONSENT DECREE

The proposed consent decree would order, adjudge, and decree that:

1.      With respect to public facilities that are subject to Executive Branch Defendants' control or supervision, nothing in H.B. 142 can be construed to prevent transgender people from lawfully using public facilities in accordance with their gender identity. The Executive Branch Defendants as used in this paragraph shall include their successors, officers, and employees. This Order does not preclude any of the Parties from challenging or acting in accordance with future legislation.

2.      The Executive Branch Defendants, in their official capacities, and all successors, officers, and employees are hereby permanently enjoined from enforcing Section 2 of H.B. 142 to bar, prohibit, block, deter, or impede any transgender individuals from using public facilities under any Executive Branch Defendant's control or supervision, in accordance with the transgender individual's gender identity. Under the authority granted by the General Statutes existing as of December 21, 2018, and notwithstanding N.C.G.S. § 114-11.6, the Executive Branch Defendants are enjoined from prosecuting an individual who uses public facilities under the control or supervision of the Executive Branch, when such use conforms with the individual's gender identity, and is otherwise lawful.

3.      The Executive Branch Defendants, in their official capacities, and their successors, officers, and employees are hereby permanently

---

[1] The parties have separately submitted supplemental briefing concerning Plaintiffs' H.B. 2 nominal damages claims against UNC.

enjoined from enforcing Section 3 of H.B. 142 to restrict any local
government from interpreting other existing laws as protecting against
discrimination on the basis of sexual orientation, gender identity or gender
expression.

*See* Consent Judgment and Decree at 5-6 ¶¶ 1-3.  The consent decree would resolve

Plaintiffs' claims against Executive Branch Defendants concerning Sections 2 and 3 of

H.B. 142 in this action by entering—with the agreement of the Parties and the Court—a

clearly constitutional interpretation of those sections, and avoiding alternative

interpretations that would pose serious constitutional concerns.  Plaintiffs agree to

dismiss, with prejudice, all remaining claims against Executive Branch Defendants, and

to waive any entitlement to damages, costs, and fees, including attorneys' fees.  *Id.*

¶¶ 16-17.

## ARGUMENT

## I.      Legal Standard for Entry of a Consent Decree.

A consent decree "has elements of both judgment and contract" and "is subject to

judicial approval and oversight generally not present in other private settlements."

*Szaller v. Am. Nat'l Red Cross*, 293 F.3d 148, 152 (4th Cir. 2002) (internal quotation

marks omitted).  Thus, before approving entry of a consent decree, the district court has a

duty to "satisfy itself that the agreement 'is fair, adequate, and reasonable' and 'is not

illegal, a product of collusion, or against the public interest.'"  *United States v. North

Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937 F.2d

505, 509 (10th Cir. 1991)).  Put otherwise, "[d]istrict courts should approve consent

decrees so long as they are not unconstitutional, unlawful, unreasonable, or contrary to

7

public policy." *Stovall v. City of Cocoa*, 117 F.3d 1238, 1240 (11th Cir. 1997). "In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged." *North Carolina*, 180 F.3d at 581.

To assess the consent decree's fairness, adequacy, and reasonableness, the Court must consider "the strength of the plaintiff's case." *Id.* Because that determination is made before trial, however, the district court is "not require[d] … to conduct 'a trial or a rehearsal of the trial.'" *Id.* (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975)). Indeed, "it is precisely the desire to avoid a protracted examination of the parties' legal rights that underlies entry of consent decrees." *Bragg v. Robertson*, 83 F. Supp. 2d 713, 717 (S.D.W. Va. 2000), *aff'd sub nom. Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001). As a result, the district court need only "judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). The court can avoid "decid[ing] the merits of the case or resolv[ing] unsettled legal questions." *Id.*; *see Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (affirming entry of consent decree and explaining that "[t]he court's duty … is fundamentally different from its duty in trying a case on the merits"); *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir. 1975) ("Although the court must approve a consent decree, in so doing it does not inquire into the precise legal rights of the respective parties, but only assures itself that there has

8

been valid consent by the concerned parties and that the terms of the decree are not unlawful, unreasonable, or inequitable." (internal citation omitted)).

A court should give significant weight to the public benefits that flow from early settlement. "Both the parties and the general public benefit from the saving of time and money that results from the voluntary settlement of litigation." *Bragg*, 83 F. Supp. 2d at 717. The court also should consider "the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." *North Carolina*, 180 F.3d at 581 (internal quotation marks omitted).

## II. This Court Plainly Has Jurisdiction To Enter The Proposed Consent Decree.

This Court's power to enter a consent decree "depend[s] on its having subject matter jurisdiction over the case." *Bragg*, 248 F.3d at 299; *see also Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("[A] consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction."). Here there is no question that the Court has subject-matter jurisdiction to enter the proposed consent decree.

In resolving Intervenors' and UNC's motions to dismiss, the Court expressly found subject-matter jurisdiction over Plaintiffs' Equal Protection claims challenging both Sections 2 and 3 of H.B. 142. This Court held that Plaintiffs "have standing to pursue their equal protection (Count 2) claims relating to the preemption provisions of Sections 2 and 3." Mem. Op. at 3-4; *see also id.* at 39. As this Court explained, a "denial of equal treatment resulting from the imposition of a barrier that makes it more difficult

9

for a certain class of people to receive a benefit than for those outside that class may create an injury in fact." *Id.* at 32. Based on that theory, the Fourth Amended Complaint "alleges an injury in fact on Plaintiffs' equal protection claim" because, "[w]hile HB142 does not prohibit Plaintiffs' efforts at advocacy, it plainly makes them meaningless by prohibiting even the prospect of relief at the local level." *Id.* at 34. Accordingly, this Court found jurisdiction over Plaintiffs' Equal Protection claims against both Sections 2 and 3 of H.B. 142.

To be sure, the Court went on to consider the merits arguments raised by Intervenors and ruled on the merits that Plaintiffs had not stated an Equal Protection claim with respect to Section 2, dismissing that claim without prejudice. But Intervenors cannot preclude Executive Branch Defendants from settling, rather than litigating, the claims Plaintiffs assert only against those defendants. *See Local No. 93*, 478 U.S. at 528-29 (explaining that "[i]t has never been supposed that one party—whether an original party, a party that was joined later, or an intervenor—could preclude other parties from settling their own disputes and thereby withdrawing from litigation"). And the Court's merits-based determination does not alter its subject-matter jurisdiction over those claims—or its authority to enter a consent decree.

First, and most obviously, arguments that merely go to "the merits of the settled claims" do not deprive the Court of the authority to enter a consent decree over those claims. *Bragg*, 248 F.3d at 299 (declining to consider arguments that would be raised in a Rule 12(b)(6) motion and that were not challenges to the court's jurisdiction). Irrespective of the Court's view as to the plausibility of Plaintiffs' Section 2 claim,

10

having found subject matter jurisdiction over that claim, the Court retains jurisdiction to consider and enter the proposed consent decree. *See Coastal Me. Botanical Gardens v. Town of Boothbay*, No. 2:17-cv-00493-JDL, 2018 WL 1915923, at *4 (D. Me. Apr. 23, 2018) (where "federal question jurisdiction exists" it was "appropriate for [the court] to consider the proposed Consent Decree without separately deciding whether the Complaint fails to state a claim upon which relief may be granted"). It does not matter that, given the Court's order—and absent an appeal—the decree might now provide "broader relief than the court could have awarded after a trial," at least in the current posture. *Local No.* 93, 478 U.S. at 525; *see also Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1538 (3d Cir. 1984) (explaining that parties "have the right to agree to any thing they please in reference to the subject-matter of their litigation" when negotiating a consent decree).

Second, Plaintiffs remain able—and willing—to appeal this Court's dismissal of the Section 2 claim. "Parties can settle claims that they may not succeed in litigating," and there is frequently "some value for settlement purposes even to substantive claims that [a court] ha[s] rejected" because "plaintiffs have preserved their rights of appeal and could persuade the [appellate court] that [the court] was wrong." *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 236 F.R.D. 53, 56 (D. Me. 2006). Recognizing that reality, the choice to settle by way of a consent decree naturally "embodies a compromise" whereby both Plaintiffs and Executive Branch Defendants "in exchange for the saving of cost and elimination of risk, … each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*,

11

402 U.S. 673, 681 (1971).  Indeed, courts repeatedly have acknowledged that parties can include dismissed claims as part of global settlements.[2]

This Court has subject-matter jurisdiction and authority to enter a consent decree that encompasses Plaintiffs' Equal Protection claims against all sections of H.B. 142.

## III.    The Proposed Consent Decree is Fair, Adequate, and Reasonable.

This Court should approve entry of the proposed consent decree.  Weighing the public interest and the form and scope of relief offered in the decree against the strength of Plaintiffs' claims, the proposed consent decree is fair, adequate, reasonable, and in the public interest.  The proposed consent decree is in the public interest because it provides clarity for all people using restrooms, particularly transgender people, and benefits the citizens of North Carolina, generally, by preventing continued and unnecessary use of public resources to litigate this case.  By adopting a constitutional interpretation of H.B. 142, the proposed consent decree also avoids the necessity of this Court striking down an enactment by the state's legislature.  In addition, the narrow scope of those interpretations

---

[2] *See, e.g.*, *Nichamoff v. CitiMortgage, Inc.*, No. H-12-1039, 2012 WL 6727121, at *2 (S.D. Tex. Dec. 27, 2012) (denying motion for entry of partial final judgment for dismissed claims in part because "the parties could settle the remaining breach of contract claim in a global settlement that addresses the dismissed claims as well"); *EEOC v. N. Hills Passavant Hosp.*, No. 75-890, 1977 WL 15465, at *5-6 (W.D. Pa. Dec. 21, 1977) (finding that plaintiff had settled a previously-dismissed Title VII claim in an earlier action where he settled "all claims arising out of the alleged discrimination" and "waived his right to appeal … dismissal of his Title VII claim after final judgment"); *cf. Myers v. AutoZoners, LLC*, No. 16-1312, 2017 WL 6316586, at *10 (W.D. Pa. Dec. 11, 2017) (explaining that a party could refuse to release a dismissed claim as part of a global settlement because that party could separately attempt to "settle any dismissed claims pending appeal").

12

is fair and adequate in light of the strength of Plaintiffs' claims and this Court's resolution of those claims at the motion to dismiss stage.

### A.    The Proposed Consent Decree is in the Public Interest.

The proposed consent decree is in the public interest.  Its terms provide clarity about the meaning of H.B. 142 for people who live in or visit North Carolina, particularly transgender people.  The citizens of North Carolina, generally, also benefit from the consent decree.  Resolving this matter without protracted litigation and by definitively interpreting H.B. 142 avoids the continued and unnecessary use of public resources to litigate this case.  It is "precisely the desire to avoid a protracted examination of the parties' legal rights which underlies consent decrees," and "[n]ot only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation."  *Gorsuch*, 718 F.2d at 1126.  Continued litigation necessarily involves continuing risk to the state.  *See Armour & Co.*, 402 U.S. at 681 (explaining that in entering consent decrees "parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation").

Moreover, Executive Branch Defendants' assessment of these priorities is entitled to a measure of deference from this Court.  *Cf. Bragg*, 83 F. Supp. 2d at 717 ("[W]here a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement, a reviewing court may appropriately accord substantial weight to the agency's expertise and public interest responsibility." (internal quotation marks and citation omitted)).  And by entering a construction of H.B. 142 that

13

resolves Plaintiffs' constitutional claims, the proposed consent decree avoids the necessity of this Court striking down an enactment by the state's legislature—an outcome likewise in the public interest. *See Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 177 (4th Cir. 2010) ("[T]he doctrine of constitutional avoidance attempts to give effect to legislative intent, not to subvert it, since it is premised on the reasonable notion that legislatures do not intend an interpretation which raises serious constitutional doubts." (internal quotation marks and brackets omitted)).

**B.  The Narrow Interpretations Embodied In The Proposed Consent Decree And The Strength Of Plaintiffs' Claims Both Weigh In Favor Of Entering The Consent Decree.**

Both Plaintiffs and Executive Branch Defendants agree that Plaintiffs' claims against Sections 2 and 3 of H.B. 142 have raised "serious federal-law concerns, including concerns over constitutional guarantees of equal protection and due process." Consent Judgment and Decree ¶ 11. The proposed consent decree would remedy these concerns in a narrow way: by endorsing the interpretation of Section 2 that this Court adopted in its order on the motion to dismiss, and by clarifying the reach of Section 3 in a way that both accords with its plain language and avoids constitutional concerns. Given the strength of Plaintiffs' claims, these terms are fair, adequate, and reasonable.[3]

---

[3] This memorandum discusses only the Equal Protection claims asserted against Executive Branch Defendants and related to H.B. 142. The joint motion in no way constitutes a forfeiture of any of Plaintiffs' other arguments or claims against any defendant, including those related to H.B. 2.

14

### 1. Adopting The Interpretations Offered In The Proposed Consent Decree Is A Narrow Remedy.

The "amount and form of the relief offered" in the consent decree when weighed against the strength of Plaintiffs' claims confirms the fairness of the consent decree. *Carson*, 450 U.S. at 88 n.14. The Fourth Amended Complaint seeks an order striking down H.B. 142 as violating the Equal Protection Clause (among other claims). FAC at 101. The Parties' proposed consent decree would instead leave H.B. 142 in place. Indeed, it would give effect to H.B. 142's language while resolving many of Plaintiffs' constitutional concerns. This narrow method of resolving these claims weighs in favor of entering the decree.

With respect to Section 2, the consent decree would merely give binding effect to the interpretation of that section that this Court has found persuasive. The decree would confirm that "nothing in H.B. 142 can be construed to prevent transgender people from lawfully using public facilities in accordance with their gender identity." Consent Judgment and Decree at 5 ¶ 1. This Court has read the statute in the same way, concluding that: "[n]othing in the language of Section 2 can be construed to prevent transgender individuals from using the restrooms that align with their gender identity." Mem. Op. at 49.

Respectfully, Plaintiffs continue to believe that Section 2 creates credible fear of penalty and prosecution and is unconstitutionally vague, particularly when coupled with other criminal and civil laws and statements concerning legislators' contrary interpretations of H.B. 142. However, an interpretation of H.B. 142 that confirms that the

law itself poses no bar to transgender individuals' use of public facilities that align with their gender identities would—to a large extent—remedy Plaintiffs claims, albeit more narrowly than Plaintiffs' desired outcome.

The same is true for Section 3, which the Complaint likewise seeks to strike down as unconstitutional before its anticipated December 2020 sunset date. H.B. 142 prohibits the enactment of new or the amendment of existing non-discrimination laws. The consent decree would leave that prohibition in place. It would merely prevent Executive Branch Defendants from enforcing that section to restrict local governments "from interpreting other existing laws as protecting against discrimination on the basis of sexual orientation, gender identity, or gender expression." Consent Judgment and Decree at 6 ¶ 3. Consistent with H.B. 142, the consent decree would neither allow the enactment of new or the amendment of existing laws. It would simply confirm that the *interpretation* of existing non-discrimination laws—like the interpretation of any law—is not static, and would permit local governments to reasonably interpret the reach of their existing ordinances as they see fit without being subject to enforcement actions by the Executive Branch Defendants.[4]  *See, e.g.*, *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 343

---

[4] As Plaintiffs have elsewhere explained, a clear majority of courts agree that protection against gender-based or sex-based discrimination encompasses discrimination on the basis of gender identity and gender expression, in particular. *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011); *Barnes v. City of Cincinnati*, 401 F.3d 729, 737 (6th Cir. 2005); *Rosa v. Park W. Bank & Tr. Co.*, 214 F.3d 213, 215-16 (1st Cir. 2000); *Schwenk v Hartford*, 204 F.3d 1187, 1201-02 (9th Cir. 2000); *see generally* Pls.' Opp'n to Motions to Dismiss Nominal-Damages Claims at 16-20, ECF No. 258.

(7th Cir. 2017) (explaining that deciding what discrimination on the basis of sex means is "a pure question of statutory interpretation" and not an amendment of Title VII); *cf. Glenn v. Johnson*, 761 F.2d 192, 194-95 (4th Cir. 1985) (recognizing that where an agency revised regulations to conform to opinions of the Attorney General it simply made "a correction in an erroneous interpretation of the law … not a change in the law").

### 2. The Court's Order On The Motion To Dismiss Demonstrates The Strength of Plaintiffs' Equal Protection Claims.

Plaintiffs also press strong arguments that H.B. 142 violates the Equal Protection Clause, weighing in favor of resolution through a consent decree. To allege an Equal Protection violation, a plaintiff must allege that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001). In considering the consent decree, however, the Court is "not require[d] … to conduct a trial or a rehearsal of the trial," *North Carolina*, 180 F.3d at 581 (internal quotation marks omitted), and need not "inquire into the precise legal rights of the respective parties," *City of Jackson*, 519 F.2d at 1151. At this early stage of the litigation—and particularly given the narrow interpretations provided in the consent decree—Plaintiffs have shown strong Equal Protection claims that render the consent decree "fair, adequate, and reasonable." *North Carolina*, 180 F.3d at 581.

First, with respect to Section 3, the Court has already found that Plaintiffs have plausibly pled their Equal Protection claim. Mem. Op. at 50-60. The Court found that Section 3 disproportionately impacts transgender individuals because they "have a greater

17

need for protective ordinances than other groups" and have "depended on success at the local level," but because of Section 3 now "lack the protections that individuals in other vulnerable groups enjoy." Mem. Op. at 51.

The Court also catalogued the numerous allegations that, under the factors set forth in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), plausibly plead that H.B. 142 was enacted with a discriminatory purpose. Those factors include the "impact of the official action," whether the action is felt more heavily by particular groups, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," and any "legislative or administrative history." *Id.* at 266-68. Section 3 disparately impacts transgender individuals by precluding new non-discrimination ordinances, while leaving existing ones in place. Mem. Op. at 51-52. The historical background of the law also suggests discriminatory intent—including that H.B. 2 was passed in response to the Charlotte Ordinance and was repealed conditioned on that ordinance's repeal, that H.B. 142 now precludes similar ordinances from being passed, and that "clean repeals" of H.B.2 were introduced but not considered. Mem. Op. at 52-53. And the sequence of events that led to H.B. 142's passage, including departures from the normal legislative process and the fact that the bill was introduced, debated, passed, and signed within a single day also suggest discriminatory intent. Mem. Op. at 53-54

Finally, as this Court also found, Plaintiffs have sufficiently pled that "HB 142 fails rational basis review," particularly given that the law lacks any policy statement and because Intervenors have not offered "any possible governmental purpose for HB142's

18

preemption provisions" beyond noting that the law "is the result of a complex bipartisan compromise." Mem. Op. at 57-60.

With respect to Section 2, admittedly this Court concluded that Plaintiffs had not plausibly pled the threshold requirement to show that the law disproportionally impacts them. Mem. Op. at 47-49. Respectfully, Plaintiffs disagree and continue to believe that, although the statute's language purports to prohibit *any* regulation of public facility usage—including maintenance and posting of signs regarding separate men's and women's rooms, regulating when and how a restroom is cleaned, or whether those with disabilities would have access—in operation, neither the state government nor anyone else is currently enforcing H.B. 142 to this effect. However, it was the Court's embrace of the *very interpretation* the consent decree seeks to adopt, that "[n]othing in the language of Section 2 can be construed to prevent transgender individuals from using the restrooms that align with their gender identity," which led the Court to conclude that there is no disparate treatment. Mem. Op. at 49. The Court's resolution thus depends on that reading. If that reading were not effectuated by the consent decree, Plaintiffs continue to believe that they make strong claims that Section 2 is unconstitutional.

Moreover, and as to the other aspects of the Equal Protection claim, Section 2 is on equal footing with Section 3, despite the fact that the Court did not need to make any explicit findings on those grounds. *See* Mem. Op. at 49 n.23. Section 2 was enacted as part of a single statute along with Section 3, against the same backdrop, and in the same sequence of unusual legislative events—all of which support Plaintiffs' claim that the law was passed with discriminatory intent. *See* Mem. Op. at 52-53. In addition, the Court

19

generally found that Plaintiffs had plausibly alleged that "HB 142 fails rational basis review." *Id.* at 59. The Court's findings on those grounds likewise demonstrate the strength of Plaintiffs' Section 2 claim.

Collectively, the narrow reach of the interpretations the consent decree offers, when weighed against the strength of Plaintiffs' Equal Protection claims, demonstrate that the consent decree is fair, adequate, and reasonable.

### C. The Canon Of Constitutional Avoidance Further Supports The Proposed Consent Decree.

The interpretations that would be entered under the proposed consent decree are also further supported—and informed—by the doctrine of constitutional avoidance. If H.B. 142 were interpreted contrary to the consent decree either (1) to prohibit transgender individuals from using single-sex multi-occupancy facilities consistent with their gender identity, or (2) to prohibit local governments from freely interpreting their existing ordinances (whose validity was not affected by H.B. 142), H.B. 142 would pose considerable constitutional problems. It is a basic and long-standing tenet of statutory construction that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *Jones v. United States*, 529 U.S. 848, 857 (2000) (quoting *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909)).

The application of this principle, in fact, is an act of legislative deference: "the doctrine of constitutional avoidance attempts to give effect to legislative intent, not to

subvert it, since it is premised on the reasonable notion that legislatures do not intend an interpretation which raises serious constitutional doubts." *Ward*, 595 F.3d at 177 (internal quotation marks and brackets omitted). Federal courts apply this canon with equal force to rescue state statutes from constitutional infirmities. *See, e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 482-83 (1988) (applying canon to Wisconsin picketing ordinance); *Ward*, 595 F.3d at 177 (construing South Carolina statute to apply only prospectively, in part to avoid constitutional concerns). The Fourth Circuit has instructed courts to apply to state statutes "the statutory construction rules applied by the state's highest court," including the canon of constitutional avoidance. *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009). And North Carolina has expressly adopted the canon. *See, e.g.*, *Beaufort Cty. Bd. of Educ. v. Beaufort Cty. Bd. of Comm'rs*, 681 S.E.2d 278, 282 (N.C. 2009).

The proposed consent decree would interpret Sections 2 and 3 of H.B. 142 comfortably within the language of those statutes, but in a way that expressly avoids contrary interpretations that would pose serious constitutional concerns. This resolution is fair, adequate, and reasonable. Indeed, as the Fourth Circuit has explained, striking down an entire law as unconstitutional is a far more aggressive act of judicial power than simply applying a saving construction of the law. *Cf. Schleifer ex rel. Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998) (explaining that striking down laws as facially void for vagueness is "a far more aggressive use of judicial power than striking down a discrete and particularized application of it").

21

**IV.    The Proposed Consent Decree Is The Product Of Good-Faith Negotiation.**

The proposed consent decree was the subject of substantial negotiation among the Parties.  The nature and extent of those negotiations provide the Court with additional assurance that the proposed consent decree is fair, adequate, and reasonable.  After Plaintiffs filed the Fourth Amended Complaint, the Parties discussed the possibility of settlement and the terms of the proposed consent decree over the course of twelve weeks. All parties were represented by experienced counsel, and the ultimate proposal is the culmination of good-faith, arms-length negotiation.

Plaintiffs initially proposed a resolution of this case to both Executive Branch Defendants and the Intervenors and UNC defendants, and held an initial telephone conference with all parties on July 28, 2017, and a follow-up telephone conference on August 8, 2017.  Thereafter, Plaintiffs and Executive Branch Defendants engaged in thorough discussions over a period of weeks to come to a mutually agreeable proposal.

On October 3, 2018, after the Court granted in part and denied in part UNC's and the Intervenors' motions to dismiss, Plaintiffs again approached Executive Branch defendants about the possibility of settlement.  Over the following two months, the Parties further negotiated the scope of a revised consent decree in light of the Court's order.  During those discussions, Plaintiffs have agreed, contingent on approval of the consent decree, to dismiss *with prejudice* their remaining challenges to H.B. 142 and H.B. 2 against Executive Branch Defendants, and also to forego seeking damages, costs, expenses, and attorneys' fees against Executive Branch Defendants.

The Parties' positions are based on a realistic assessment of the merits of Plaintiffs' case, informed by the Court's resolution and discussion of the claims in its order on the motions to dismiss. In addition, the prior litigation concerning now-replaced H.B. 2 continues to inform the strength of Plaintiffs' arguments regarding the potential constitutional and federal statutory infirmities of H.B. 142. Given these realities, the Parties believe they have, "after careful negotiation" settled upon a compromise whereby "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *Armour & Co.*, 402 U.S. at 681.

*       *       *

## CONCLUSION

For the reasons stated herein, Plaintiffs respectfully request that the Court enter the proposed consent decree.

Dated: December 21, 2018                    Respectfully submitted,

/s/ Christopher A. Brook

| | |
|---|---|
| Christopher A. Brook (NC Bar No. 33838) | Tara L. Borelli* |
| Irena Como* | Peter C. Renn* |
| AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA LEGAL FOUNDATION | LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. |
| Post Office Box 28004 | 730 Peachtree Street NE, Suite 1070 |
| Raleigh, North Carolina 27611 | Atlanta, GA 30308-1210 |
| Telephone: 919-834-3466 | Telephone: 404-897-1880 |
| Facsimile: 866-511-1344 | Facsimile: 404-897-1884 |
| cbrook@acluofnc.org | tborelli@lambdalegal.org |
| icomo@acluofnc.org | prenn@lambdalegal.org |
| | |
| James D. Esseks* | Scott B. Wilkens* |
| Leslie Cooper* | Luke C. Platzer* |
| Elizabeth O. Gill* | Andrew C. Noll* |
| Chase B. Strangio* | JENNER & BLOCK LLP |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | 1099 New York Avenue, NW Suite 900 |
| 125 Broad St., 18th Fl. | Washington, DC 20001-4412 |
| New York, NY 10004 | Telephone: 202-639-6000 |
| Telephone: 212-549-2627 | Facsimile: 202-639-6066 |
| Facsimile: 212-549-2650 | swilkens@jenner.com |
| jesseks@aclu.org | lplatzer@jenner.com |
| lcooper@aclu.org | anoll@jenner.com |
| egill@aclunc.org | |
| cstrangio@aclu.org | |

*Appearing by special appearance pursuant to L.R. 83.1(d)

*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

This brief complies with Local Rule 7.3(d) because, excluding the parts of the brief exempted by Rule 7.3(d) (cover page, caption, signature lines, and certificates of counsel), this brief contains 6,161 words.


Dated: December 21, 2018                    /s/ Christopher A. Brook

                                            *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Christopher A. Brook, hereby certify that on December 21, 2018, I electronically filed the foregoing PLAINTIFFS' AND EXECUTIVE BRANCH DEFENDANTS' SUPPLEMENTAL JOINT MOTION FOR ENTRY OF A CONSENT DECREE, as well as Plaintiffs' Memorandum of Law in support and the Consent Judgment and Decree, using the CM/ECF system, and have verified that such filing was sent electronically using the CM/ECF system to all parties who have appeared with an email address of record.

/s/ Christopher A. Brook

*Counsel for Plaintiffs*