IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÌN CARCAÑO, et al.,      *
                             *
        Plaintiffs,          *
                             *  Case No. 1:16CV236
vs.                          *
                             *
ROY A. COOPER, et al.,       *
                             *
        Defendants,          *
                             *
vs.                          *  Winston-Salem, North Carolina
                             *  June 25, 2018
PHIL BERGER, et al.,         *  10 a.m.
                             *
                             *
        Intervenor-Defendants.*
*******************************

**EXPEDITED TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE THOMAS D. SCHROEDER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        CHASE B. STRANGIO, ESQUIRE
                           JAMES D. ESSEKS, ESQUIRE
                           American Civil Liberties Union
                           Foundation
                           125 Broad Street, 18th Floor
                           New York, NY 10004-2400

                           CHRISTOPHER A. BROOK, ESQUIRE
                           American Civil Liberties Union of
                           North Carolina
                           Post Office Box 28004
                           Raleigh, NC 27611-8004

For the Defendants:        OLGA E. VYSOTSKAYA DE BRITO, ESQUIRE
  (State/Cooper)           North Carolina Department of Justice
                           Post Office Box 629
                           Raleigh, NC 27602

```
 1   (UNC Defendants)           VIVEK SURI, ESQUIRE
                                KRISTEN A. LEJNIEKS, ESQUIRE
 2                              Jones Day
                                51 Louisiana Avenue, NW
 3                              Washington, DC 20001

 4                              THOMAS C. SHANAHAN, ESQUIRE
                                CAROLYN C. PRATT, ESQUIRE
 5                              Post Office Box 2688
                                Chapel Hill, NC 27517
 6

 7   (Executive Branch         GENE C. SCHAERR, ESQUIRE
      Defendants)              STEPHEN S. SCHWARTZ, ESQUIRE
 8                              Schaerr Duncan LLP
                                1717 K Street, NW, Suite 900
 9                              Washington, DC 20006

10                              ROBERT D. POTTER, JR., ESQUIRE
                                5821 Fairview Road, Suite 207
11                              Charlotte, NC 28209

12
     Court Reporter:           Lori Russell, RMR, CRR
13                              P.O. Box 20593
                                Winston-Salem, NC 27120
14

15

16

17

18

19

20

21

22

23

24           Proceedings recorded by stenotype reporter.
          Transcript produced by Computer-Aided Transcription.
25
```

1              **P R O C E E D I N G S**

2          **THE COURT:**  All right.  Good morning.  We're here on

3   Carcaño versus Governor Cooper, et al., which is 1:16CV236.

4      Let me ask you all to go ahead and note your appearances

5   for the record, if you would.  Let me start with the

6   Plaintiffs.

7          **MR. STRANGIO:**  Chase Strangio for the ACLU with the

8   Plaintiffs.  With me at counsel table is James Esseks, also

9   from the ACLU, and Chris Brook from the ACLU North Carolina.

10          **THE COURT:**  All right.  Good.

11          **MR. SCHWARTZ:**  Stephen Schwartz with Schaerr Duncan

12   for the Intervenor-Defendants, and with me is Gene Schaerr and

13   Robert Potter.

14          **MR. SURI:**  Vivek Suri from Jones Day for the UNC

15   Defendants and present with me is Kristen Lejnieks, also from

16   Jones Day.  And, sorry, we also have Tom Shanahan and Carolyn

17   Pratt.

18          **MS. VYSOTSKAYA:**  Olga Vysotskaya from the

19   North Carolina Department of Justice on behalf of all the

20   Executive Branch Defendants.

21          **THE COURT:**  Thank you for coming.  I set this for

22   hearing because I wanted to give you an opportunity to speak

23   some more to the issues that are raised.  I read all the

24   materials you've presented as to the motion to dismiss the

25   Fourth Amended Complaint.

1      I also have before me the proposed consent decree entered

2  into between the Plaintiffs and the Governor.  It's not clear

3  to me whether the Defendants had intended to respond to the

4  consent decree and there's been some passage of time.  So I

5  don't know whether anybody intended to address that.  I do have

6  some questions about that as well.

7      But let me start first with the motion to dismiss.  As I've

8  said, I've read all the materials and so you don't necessarily

9  need to go over everything in detail.  You're welcome to put

10  that -- I don't believe the microphone is hooked up, so you're

11  welcome to speak from the table, if you wish.

12          **MR. SCHWARTZ:**  That's fine, Your Honor.  Fine.  Would

13  you prefer I stand?

14          **THE COURT:**  Yes, please.

15          **MR. SCHWARTZ:**  Of course, Your Honor.

16      Your Honor, again, it's Stephen Schwartz for the

17  Intervenor-Defendants.  A few remarks about the -- to hit the

18  highlights from the motion to dismiss.  Obviously, I'm prepared

19  for any questions you have.

20      The original subject of this lawsuit, H.B. 2, was repealed

21  in broad bipartisan compromise more than a year ago.  Since

22  then this is a lawsuit looking for a reason to exist.  H.B. 2's

23  replacement, H.B. 142, is a procedural rule that sets for the

24  North Carolina state government when certain government

25  policies will be made and certain legislation can be enacted.

1  The State's decision to proceed in this way does not give rise
2  to a justiciable claim.
3      To challenge H.B. 142, Plaintiffs need to have standing and
4  they need a ripe injury.  Plaintiffs have only two theories of
5  injury, neither of which are justiciable.  Their first
6  injury -- the first alleged injury is an uncertainty about the
7  applicable legal standard for access to certain public
8  facilities, but uncertainty by itself has never been considered
9  a basis -- a basis for federal jurisdiction.
10      As the Supreme Court held in *National Park Hospitality,*
11  many activities, including most business transactions, would
12  benefit in some way from additional clarity about parties --
13  parties' legal rights and obligations, but that -- but the
14  potential benefits of additional clarity have never been
15  considered to be an edict into federal court.
16      If uncertainty were enough for jurisdiction, every single
17  area where legislature has left the law silent for some reason
18  or where it could add clarity could enable a lawsuit by parties
19  who would prefer to have one of a particular rule, but that
20  simply isn't the law.  Even if uncertainty could point to a
21  legal injury, it wouldn't be traceable to H.B. 142 and wouldn't
22  be addressed -- or redressed, excuse me, by invalidation of
23  H.B. 142.
24      Insofar as Plaintiffs claim that state law facility access
25  is uncertain, it was uncertain before H.B. 2 was passed

1  originally and Plaintiffs concede that they aren't asking this

2  Court to impose a statewide rule.

3      **THE COURT:**  Well, their argument now is that it's

4  become a little more -- I don't know if I want to say

5  "certain."  And they can speak for it.  But they say in light

6  of the -- as I understand the argument, in light of the passage

7  of time and the events of this case, it becomes more apparent

8  now that under current law maybe they're not permitted to enter

9  the restrooms with which they identify.

10     **MR. SCHWARTZ:**  I'm not sure why that would be the

11 case, though, because they haven't challenged any trespass law.

12 They haven't added as a defendant any local law enforcement who

13 enforces trespass law.  They haven't asked this Court to adopt

14 a -- an interpretation of a trespass law.

15     **THE COURT:**  Well, they have the proposed declaration

16 of the mother from Wilmington who says that the school

17 superintendents, for example, are blaming H.B. 142 for their

18 decision.

19     **MR. SCHWARTZ:**  Well, it's a little bit unclear from

20 the declaration what exactly the school board is saying, but at

21 any rate, the -- all that H.B. 142 says is that decisions about

22 facility access have to be based on statewide -- statewide law.

23     The question of what, if anything, the local school board

24 is basing its decision, whatever its decision is, on, that must

25 be a question of some law other than H.B. 142.  If H.B. 142

1  were repealed or enjoined, the local school board would still

2  have that -- that authority.  In fact, it would have even

3  greater authority to make that kind of decision because, unlike

4  now, when certain kinds of local -- of local and agency

5  policymaking are preempted by H.B. 142, repealing or enjoining

6  H.B. 142 would open all of that up.  The outcome of that is

7  uncertain.  It would probably vary from local jurisdiction to

8  local jurisdiction.  Different agencies might adopt

9  different -- different approaches.

10      But the -- but all of that just underscores the fact that

11  to the extent that there is uncertainty, it comes from laws

12  that -- other than H.B. 142.  It comes from uncertainty about

13  the application of laws the Plaintiffs haven't challenged,

14  haven't asked this Court to interpret, couldn't ask this Court

15  to interpret authoritatively because they're state laws and

16  which, in any event, are necessarily very fact driven.

17      So the result is that even if this Court granted the kind

18  of -- granted the kind of relief they've asked for, namely,

19  enjoining H.B. 142, the uncertainty that they -- that allegedly

20  animates their complaint wouldn't go away.  It might even

21  increase the uncertainty results from other laws and from other

22  governments and state -- levels of state government, state

23  actors who aren't before the Court.

24          **THE COURT:**  But does the State of North Carolina have

25  the authority to determine how it's going to interpret the

1   state trespass laws and other laws?  And let me start with the

2   proposition that -- as I recall, H.B. 2 dealt only with state

3   facilities.  Wasn't that right?  It did not deal with

4   private-sector facilities, only with state facilities.

5           **MR. SCHWARTZ:**  I believe it had some aspects having to

6   do with private-sector facilities, but I think it is

7   principally concerned with --

8           **THE COURT:**  I'm sorry.  H.B. 2.

9           **MR. SCHWARTZ:**  Yeah, that's what I mean, H.B. 2.

10          **THE COURT:**  Okay.  So does the Governor, as the chief

11  law enforcement officer, if you will, in the state, have the

12  authority to define who can go into what restrooms, for

13  example, today under current law?

14          **MR. SCHWARTZ:**  I believe that the -- I can't speak

15  for -- I can't speak for the Governor.  My colleague,

16  Ms. Vysotskaya, will be able to speak for the Executive Branch

17  Defendants as far as -- as far as the authority of the state

18  executive to authoritatively govern access into state

19  facilities.

20          **THE COURT:**  I presume the Governor could issue an

21  Executive Order that gives his interpretation.  He may very

22  well already have done that.  We'll get to that, I imagine.  I

23  mean, I'm presented with a proposed consent decree, which seems

24  to accomplish some of that, which suggested to me maybe the

25  Governor has the authority as a -- I would presume to be the

1  chief law enforcement officer, to say how his administration

2  intends to enforce trespass law as it applies to transgender

3  individuals.

4  **MR. SCHWARTZ:**  Well, there are a couple of aspects of

5  that.  One is the Governor's executive power as head of the

6  state government.  There was an Executive Order that was

7  promulgated by -- by the former governor, Governor McCrory,

8  interpreting H.B. -- H.B. 2, but, of course, it wouldn't have

9  the force of law if the underlying statute has been repealed

10  and replaced with H.B. 142.  Presumably, the Governor could

11  still -- could issue another Executive Order.  Again, my

12  colleague would be best situated to answer those questions.

13  **THE COURT:**  All right.

14  **MR. SCHWARTZ:**  The other aspect of your question,

15  though, relates to the Governor's -- relates to the Executive

16  Branch's authority as -- as head of the -- head of law

17  enforcement and there it's worth pointing out -- and I have the

18  citations here -- that the -- that enforcement -- criminal

19  enforcement of trespass law isn't actually housed with the

20  Attorney General.  That's housed in local law enforcement,

21  indeed the local prosecutors.  That's North Carolina

22  Constitution Article IV, Section 18, and North Carolina

23  Statutes 114-2 and 114-11.6.  That means that, to the extent

24  that Plaintiffs are concerned about trespass law, nobody in

25  this case can -- can control how trespass law will be enforced.

1          **THE COURT:**  But doesn't trespass law, though, depend

2   on whether or not somebody has permission to enter?

3          **MR. SCHWARTZ:**  That's exactly right, Your Honor.

4          **THE COURT:**  And so can the Governor define who has

5   permission to enter?

6          **MR. SCHWARTZ:**  Well --

7          **THE COURT:**  Whether or not the Governor chooses to

8   enforce the law.

9          **MR. SCHWARTZ:**  Well --

10          **THE COURT:**  I mean, if I tell you you have permission

11  to come to my home, then you have permission to enter my home.

12  Presumably at some point if I tell you you need to leave and

13  you don't, then you would be trespassing, but you wouldn't be

14  trespassing if I gave you permission to enter my home.  Now,

15  that may not stop a police officer from suggesting you've

16  trespassed in my house, but you would have consent as a defense

17  to that.  Why wouldn't that be the same situation here?

18          **MR. SCHWARTZ:**  Well, there are a few aspects to that.

19  Point number one is that -- I go back to my justiciability

20  point.  As you said, even if H.B. 142 were repealed, there

21  would still be trespass law and the Governor would still have

22  that authority; meaning that to the extent Plaintiffs are

23  concerned about a trespass law, it all just folds back into the

24  fact that their -- that their trespass law arguments are rooted

25  in trespass law.  They aren't rooted in H.B. 142 and repeal or

1  enjoined -- or an injunction against H.B. 142 wouldn't make a
2  difference.

3      Beyond that -- again, there are still two aspects of the
4  Governor's authority with respect to trespass law.  One is with
5  respect to -- with respect to state property, where -- where
6  the Governor has certain kinds of authority; and the other is
7  with respect to private property, where -- where the Governor
8  obviously wouldn't have that kind of authority.

9      With respect to -- with respect to state property, I think
10  what the -- what the -- what H.B. 142 says is that -- is that
11  access to certain kinds of facilities has to be determined with
12  respect to state law and it would include, you know, again,
13  trespass -- a trespass law.

14          THE COURT:  My question, though, doesn't that beg the
15  question of who's a trespasser and who isn't and can't --
16  wouldn't the Governor have the authority to say, "The following
17  people would not be considered trespassers on state property"?

18          MR. SCHWARTZ:  That's likely the -- the case, but
19  that -- but, again, it's presumably the Attorney General who
20  would be able to answer that question authoritatively.

21      You're absolutely correct, though, Your Honor, that
22  trespass law hinges on notice.  There are two sections to the
23  trespass statute.  One says you're a trespasser if the owner of
24  the property, you know, tells you to leave, he gives you notice
25  that you aren't allowed to be there anymore, and you need to

1  leave.  The other aspect of trespass law is you're a trespasser

2  if there's a notice posted that puts you on notice that you

3  aren't allowed to be there.

4      But application of both of those aspects of trespass law,

5  it depends on the facts and particular circumstances.  It

6  depends on what kind of facility it is, how exactly it's been

7  posted, who owns the property, what a person does to attract

8  the attention of the person who owns the property, all of these

9  are very fact-specific kind of circumstances.

10     And what H.B. 2 says is that, essentially, instead of

11  promulgating at either the state level -- at the local level or

12  an agency level -- instead of promulgating generally

13  applicable, one-size-fits-all regulations, the issue of access

14  to the facilities has to be determined based on -- based on,

15  you know, the circumstances of particular -- particular cases

16  and that's an issue that's not before this Court right now.

17  Plaintiffs haven't raised any particular trespass.  They

18  haven't indicated any particular circumstance of trespass in

19  their pleadings.

20     This Court's preliminary injunction decision addresses the

21  fact that -- I mean, as far as I'm aware, the kind of issue

22  hasn't come up and so that goes to Plaintiffs' standing to --

23  to -- so even if -- even if trespass issues were before this

24  Court at all and under the Fourth Amended Complaint, it still

25  raises serious concerns about justiciability, particularly, you

1    know, standing arguments.

2            **THE COURT:**  All right.

3            **MR. SCHWARTZ:**  Plaintiffs' other claim of injury --

4    unless you have additional questions about the uncertain

5    facility access, Plaintiffs other claim of -- of a justiciable

6    injury rests on the change that H.B. 2 made in North Carolina

7    political processes.  The Plaintiffs cite no case where a

8    party's standing derives from having to pursue their preferred

9    policies in one political forum rather than in another.  If

10   they could, then essentially every preemption provision in

11   state law or federal law would give rise to an Article III

12   injury by people who claim to be injured by having to go to the

13   forum that isn't the forum of their choice.

14       As the Supreme Court held just last week in *Gill versus*

15   *Whitford*, the Wisconsin redistricting case, one's interest in

16   the policymaking of local government bodies is a generalized

17   interest.  It's not an interest that's particularized to

18   particular people, meaning that an abridgment of one's interest

19   in local policymaking is yet another -- it's a generalized

20   grievance that doesn't give rise to Article III standing.

21       That's particularly the case here where the political

22   process set up by H.B. 142 is perfectly equal and evenhanded.

23   Everyone, whatever policy on facility access or discrimination

24   law he or she might prefer, has to seek it in exactly the same

25   way in exactly the same forum.  Thus, having to pursue

1  Plaintiffs' preferred policy -- facility access rules in the

2  General Assembly --

3      **THE COURT:**  But don't the Plaintiffs argue, though,

4  that they're the ones that are being discriminated against;

5  that effectively what the preemption provision is doing is

6  prohibiting them from seeking protection against discrimination

7  at the municipal level; and in light of the need now to have to

8  get the vote of the General Assembly, which is harder to do

9  given the issues and the composition of the General Assembly,

10  that they're being discriminated against because the drafters

11  of the bill should have known that Plaintiffs might have more

12  success at the local level than they would statewide?

13      **MR. SCHWARTZ:**  I believe that is a fair way of stating

14  Plaintiffs' claims, but it's worth bearing in mind that -- that

15  there isn't kind of a one-way ratchet in this case.  There's a

16  wide range of different kinds of policies different people want

17  to pursue.  Remember, H.B. 142 repealed H.B. 2, which had been

18  the law of the state up until just over -- just over a year

19  ago.  The -- the proponents of H.B. 2 are out of luck to

20  exactly the same extent and potentially even a greater extent

21  than the Plaintiffs are because everybody has to -- everybody

22  has to go in to the General Assembly, which has just repealed

23  H.B. 2.

24      Plus, of course, there's the fact that H.B. 2 regulates --

25  I mean, it regulates third parties and the response of third

1  parties, particularly government entities, to a change in law
2  or to a judicial decision.  It's always been considered to
3  be -- the response independent of the parties, especially ones
4  who aren't before the Court, has always been considered to be
5  speculative.  Nobody knows what different entities would do --
6  in a particular locality would do.  All Plaintiffs do in their
7  complaint is indicate that on information and belief certain
8  jurisdictions, conspicuously not including Charlotte, would
9  enact certain kinds of -- of antidiscrimination provisions, but
10 ultimately that's only guesswork.  Plus, of course --

11         **THE COURT:**  What is the test I'm supposed to apply for
12 determining whether the preemption provision is discriminatory?
13 Is it an equal protection analysis?

14         **MR. SCHWARTZ:**  No.  It's a standing analysis at this
15 stage.  Well, we've raised both jurisdictional issues and
16 merits issues as for the -- as for the effect of -- of H.B. 142
17 on the political process.

18     What the Supreme Court said in *Lujan* was that the elements
19 of standing have to be addressed using the same standards that
20 apply at a particular stage of a proceeding where you are.  And
21 at a motion to -- at the motion to dismiss stage, Plaintiffs
22 need to prove -- they need to allege standing sufficient to
23 meet the standard to get past a motion to dismiss.

24         **THE COURT:**  Would it matter if there were allegations
25 and evidence that the preemption provision was adopted for the

1   sole purpose of discriminating against transgender individuals?

2       **MR. SCHWARTZ:**  If there were allegations that it was

3   adopted for the sole purpose -- well, one, it wouldn't -- I

4   don't think that's necessarily a standing issue because with

5   standing you need an injury.  If -- I don't know.  If the

6   General Assembly had held a Special Session to stick pins into

7   a voodoo doll, Plaintiffs wouldn't be injured.  They couldn't

8   go to court over that.  That's just one very extreme example.

9       So for purposes of jurisdiction, even if there were some

10  kind of intent, I don't think the Plaintiffs have cited and I'm

11  not aware of a case where an act that would otherwise not give

12  rise to a justiciable injury suddenly does create a justiciable

13  injury purely because of the intent behind it.

14      The issue of intent does go to the merits.  We think that

15  the justiciability issues in Plaintiffs' Fourth Amended

16  Complaint are fully sufficient to dismiss Plaintiffs'

17  complaint, but even if this Court did wish to address --

18  address merits, we consider Plaintiffs' allegations of intent

19  to be so thin that they don't create a plausible interest that

20  would be necessary.  But at any rate, that goes to the equal

21  protection issue, Your Honor.

22      As a matter of equal protection, too, though, you need --

23  intent alone wouldn't be enough.  You need -- you need a

24  combination of intent and injury; and if there isn't enough

25  injury to give rise to standing and a ripe claim, then *a*

1  *fortiori* you wouldn't have the -- there wouldn't be a -- there

2  wouldn't be the kind of injury that you need to make out an

3  equal protection claim.

4         **THE COURT:**  All right.

5         **MR. SCHWARTZ:**  So for similar reasons -- I've

6  addressed principally the standing arguments that we've raised

7  in our motion to dismiss, but for similar reasons, Plaintiffs'

8  claims aren't ripe.  As I've mentioned, the issues of facility

9  access and the application of trespass law are inherently and

10 unavoidably fact-based, but Plaintiffs haven't alleged the

11 particular facts of any particular trespass.  For that reason,

12 their -- their allegations haven't crystallized to the point

13 that a -- that a judicial process is possible -- is possible

14 under Article III and they haven't alleged the kind of hardship

15 that justifies a needed judicial process.

16     As I mention again, we've moved to dismiss based on both --

17 both justiciability arguments and merits arguments.  Again, we

18 consider our merits argument -- we consider our justiciability

19 arguments to be adequate.  I'm happy to address the merits.

20     But taking a step back more generally and in conclusion,

21 the fact that Plaintiffs target H.B. 142 after H.B. 2's repeal

22 shows that -- what the amended complaint is really all about.

23 This is ultimately an effort to blow up a complex political

24 compromise on a controversial issue and to achieve a political

25 victory that the Plaintiffs could not achieve through the

1    political process.  But without standing and ripeness, this is

2    just a policy dispute that's outside of this Court's Article

3    III jurisdiction.

4         **THE COURT:**  All right.  Thank you.

5         Mr. Suri.

6         **MR. SURI:**  Thank you, Judge Schroeder.

7         Even if you disagree with every single word out of

8    Mr. Schwartz's mouth right now, we submit that you should still

9    dismiss the UNC Defendants from this case.  The UNC Defendants

10   didn't enact H.B. 142.  They didn't, like some members of the

11   legislature, make statements suggesting criminal consequences

12   as a result of H.B. 142.  They have no authority to enforce

13   H.B. 142, all of which shows that any injury is not traceable

14   to the UNC Defendants.

15        In addition, they have no power to issue a clarification of

16   H.B. 142, to repeal the statute or to do anything to alter the

17   operation of the statute.  That shows that the UNC Defendants

18   cannot provide relief.  There's no redressability.

19        **THE COURT:**  Does UNC have the authority to define

20   who's not going to be a trespasser for purposes of the

21   bathrooms and changing facilities, et cetera?

22        **MR. SURI:**  To some extent, yes.  But, firstly, that's

23   the power that's been preempted by H.B. 142.  The very power to

24   regulate who can go into a particular restroom is the thing

25   that H.B. 142 takes away.  I say to some extent, however,

1  because H.B. 142 includes an "except" clause.  It says "except
2  in accordance with an act of the General Assembly."  So to the
3  extent the University replicates some rule already established
4  by the General Assembly, for example, prohibiting a peeping or
5  indecent exposure or any other conduct that's independently
6  criminal, the University would have the authority in that
7  circumstance.
8          THE COURT:  Has there been any interpretation of House
9  Bill 142, this language about Section 2, the regulation of
10  access?  Has that been interpreted by any state court?
11          MR. SURI:  I'm not aware of any interpretation by a
12  state court or any authoritative interpretation by the State.
13  The closest that we have I think is the Governor's statement
14  that people are not subject to prosecution as a result of going
15  into particular restrooms.  But regardless of how that law --
16          THE COURT:  Let me back up.
17          MR. SURI:  Yes.
18          THE COURT:  Except for the Governor's statement what?
19          MR. SURI:  Except for the Governor's statement -- I
20  think this is paragraph 15 of the complaint -- that a
21  transgender person who uses the restroom consistent with his
22  gender identity is not subject to prosecution.
23          THE COURT:  Is that part of an Executive Order or in
24  what capacity was that made?
25          MR. SURI:  I'm not aware that that has any official

1  status.  I'm just noting that that appears to be what the

2  complaint alleges is the Governor's position.

3          **THE COURT:**  All right.  Well, is the Governor bound by

4  that preemption provision?

5          **MR. SURI:**  I don't know the answer to that.  The

6  answer to that would turn on whether the Governor qualifies as

7  an agency or department within the meaning of H.B. 142 and I

8  don't think we've taken a position on whether he would or would

9  not.  But even if you assume --

10         **THE COURT:**  Is he a branch of government?

11         **MR. SURI:**  He may well be.

12         **THE COURT:**  Because that's one of the listed groups

13  that's preempted, right?

14         **MR. SURI:**  Yes.  But even if we accept that the

15  Governor has no authority to clarify the meaning of H.B. 142,

16  that doesn't change the fact that the University certainly

17  doesn't have the power to do anything about what H.B. 142

18  means.

19     There are a few different ways of looking at this

20  redressability issue.  The first is suppose H.B. 142 were

21  enjoined, repealed, removed.  Would that cure the uncertainty

22  that has allegedly led to this lawsuit?  We submit the answer

23  would be no because with or without H.B. 142, the question

24  would still arise of whether the University or an agency of the

25  government prohibited the Plaintiffs from entering a particular

```
 1  bathroom.  Indeed, the repeal or invalidation of this statute
 2  would seem to give the University or the agency more power to
 3  exclude because now they can issue regulations saying "Don't
 4  enter this particular bathroom."  That's one way.
 5          THE COURT:  Is that argument one that applies equally
 6  to all the Defendants?
 7          MR. SURI:  I think that argument would apply to
 8  everyone else.
 9          THE COURT:  Okay.
10          MR. SURI:  One additional point is that the University
11  itself -- putting aside the other defendants, the University
12  itself has no power to issue authoritative interpretations of
13  state law.  We can debate whether the Attorney General or the
14  Governor has some power as part of the executive power to do
15  so, but the University, at the very least, certainly does not.
16  I think that covers --
17          THE COURT:  When there's a trespass on a UNC campus,
18  who responds?
19          MR. SURI:  It would be either the campus police or in
20  campuses where the University has entered into an agreement
21  with the local police, it would ultimately be the local police.
22          THE COURT:  So let's assume it's campus police.  Who
23  do they respond to?  I mean, who would call them?
24          MR. SURI:  It could be the person who witnesses the
25  trespass or it could be someone at the university who says,
```

1  "There's a trespasser.  Please deal with the trespasser."

2      Now, let's posit, for the sake of argument, that the campus

3  police does everything on the instructions of the University

4  and the University tells the campus police exactly what to do.

5  We dispute that, but let's assume it to be true anyway.  Even

6  then there would be no standing in this case because this case

7  is not about a challenge to the trespass laws.  They could have

8  brought an as-applied challenge to the trespass laws.  They

9  haven't done so.

10     They've instead challenged this jurisdictional provision,

11 H.B. 142, that says the power to regulate is vested in the

12 General Assembly rather than in everyone else; and any injuries

13 that flow from that simply are untraceable to the University,

14 aren't redressable by the University.

15     Further, in respect to the trespass laws, I think it's

16 worth emphasizing that one condition for application of the

17 trespass laws is that someone receive notice that he must stay

18 out of the place where he would be a trespasser.  We think that

19 H.B. 142 denies the University the power to impose such an

20 exclusion in the first place.  The University is preempted from

21 saying, "Stay out."  Any command to stay out, if one exists,

22 must come straight from the General Assembly, not from the

23 University.

24     That covers what I have to say on standing.  Unless the

25 Court has further questions, I'll turn to the merits.

1    **THE COURT:**  So if a transgender student wishes to

2   use -- wishes to be housed in a dorm of the sex with which that

3   person identifies and use the showers of that dorm, what does

4   H.B. 142 allow or prohibit in that instance?

5    **MR. SURI:**  H.B. 142 preempts the University's ability

6   to say, "We will discipline you or punish you or do anything to

7   you if you use those particular showers."  It also preempts the

8   University from issuing a regulation that says entry into those

9   particular showers is validated and authorized.

10    That second part of my answer is of no relevance in this

11  case because the Plaintiffs have accepted in response to the

12  Legislative Intervenors' commandeering arguments that that's

13  not what they're asking for.  They're not asking for the

14  Defendants to be ordered to make an affirmative policy saying,

15  "Yes, please go ahead and use these particular restrooms."

16    All they're contesting, it seems to me from that

17  concession, is that they don't want the Defendants imposing a

18  prohibition, but that's what H.B. 142 already prevents us from

19  doing -- already prevents the University from doing.  There's

20  no additional redress that they could get from the University.

21    **THE COURT:**  All right.  Thank you.  Anything further

22  you want to add?

23    **MR. SURI:**  No, that's all I wish to say, unless you

24  have questions on that.

25    **THE COURT:**  All right.  Maybe later.

1     All right.  I'll be glad to hear from the Attorney
2  General's office.
3          **MS. VYSOTSKAYA:**  Yes, Your Honor.  We have not briefed
4  the motion to dismiss because your order has allowed us to have
5  30 days after you decide a motion on our proposed consent
6  order, so we have not briefed the issue of jurisdiction and
7  would like to reserve the right to brief it later, if
8  necessary.
9     However -- and I don't know if Your Honor would like to
10 direct us to answer -- I could address some of the questions
11 that you had to the other side during an argument on the
12 consent decree portion of the proceedings after Plaintiffs have
13 an opportunity to respond to the arguments raised on the motion
14 to dismiss.
15         **THE COURT:**  Okay.  So you don't have any view on the
16 Defendant' positions?
17         **MS. VYSOTSKAYA:**  We do not and would like to reserve
18 the right to do a full briefing, if necessary, if Your Honor
19 does not dismiss us as part of the consent decree proceedings.
20         **THE COURT:**  All right.  All right.  Let me hear from
21 the Plaintiffs then.
22         **MR. STRANGIO:**  Good morning, Your Honor.  Thank you.
23         **THE COURT:**  Good morning.
24         **MR. STRANGIO:**  I want to start by responding a bit to
25 the Defendants' suggestion that H.B. 142 does not injure the

1  individual Plaintiffs and that they don't have standing to

2  bring this case, and I want to do that first in response to the

3  due process argument and also want to make some important

4  clarifications with respect to equal protection and the nature

5  of the injuries alleged there.

6      As to the very concrete injuries to Joaquín Carcaño and

7  Payton McGarry, the individual plaintiffs in this case, those

8  are injuries that are directly traceable to H.B. 142.  Counsel

9  for the Intervenor-Defendants was talking about, for example,

10  trespass being a fact-specific inquiry.  The injury here is

11  that for now over a year UNC will not let Joaquín Carcaño know

12  where he can go to the bathroom.  As a result of that, the

13  injury operates in two ways.

14          **THE COURT:**  Let me pause there for a moment.  When

15  this -- when the action first got filed, the request from the

16  Plaintiffs was for a preliminary injunction.  You asked me to

17  enjoin the enforcement of H.B. 2 and the reason was because

18  H.B. 2 upset the previous status quo ante, we would say in the

19  law, and at the time you told me that you did not dispute or

20  take issue with the labeling of restrooms, for example, as men

21  and women.  I take it that's still your position, as I

22  understood your briefing; is that right?

23          **MR. STRANGIO:**  That's correct, Your Honor.

24          **THE COURT:**  All right.  So before H.B. 2 was passed by

25  the General Assembly, the restrooms were labeled "Men" and

1  "Women."  Then H.B. 2 came along and defined what that meant,

2  and it was that definition that I understood the Plaintiffs to

3  take issue with, and I entered a partial injunction as to three

4  of the Plaintiffs, and the request was to return the Plaintiffs

5  to the position they were in before H.B. 2 was passed --

6          **MR. STRANGIO:**  That's correct.

7          **THE COURT:**  -- which presumably was their

8  constitutionally protected position.  That's what they wanted.

9  So now H.B. 142 -- I hesitate to use the House Bill numbers

10  because these are laws and so they're not really accurate at

11  this point.  But H.B. 142 eliminates the definitional aspects

12  of H.B. 2 that seem to have caused the filing of the original

13  lawsuit and the injury to the Plaintiffs.  So I'm a little bit

14  at a loss as to how returning the Plaintiffs to the position

15  they wanted to be in before now is an injury, whereas before it

16  was the desired state for relief.

17          **MR. STRANGIO:**  Well, Your Honor, I think that it's the

18  same -- the same request.  The Plaintiffs now have been injured

19  by H.B. 142.  We don't believe that an injunction -- we don't

20  believe that H.B. 142 returns us to the status quo ante right

21  now.  The only way that we can do that is through an injunction

22  enjoining H.B. 142 and the reason is --

23          **THE COURT:**  Let's take it piece by piece because

24  they're different pieces of H.B. 142.  Let's talk about the

25  portion of H.B. 142 that repeals H.B. 2.  So that's Section 1,

1  I believe.

2          **MR. STRANGIO:**  That's Section 1, yes.

3          **THE COURT:**  Are you injured by Section 1?

4          **MR. STRANGIO:**  No, Your Honor, we don't take issue

5  with Section 1.  We have the contingent claims if Section 1 is

6  struck down and H.B. 2 springs back to life.  The focus of the

7  challenge is on Section 2 of H.B. 142, which is the provision

8  with respect to the regulation of bathrooms.  So if we focus on

9  that first --

10         **THE COURT:**  All right.  So Section 2, according to the

11 University, is interpreted to mean that they can't say one way

12 or the other.  They're returning people back to however it was

13 without anybody speaking one way or the other about regulating

14 access to bathrooms.

15    Do you agree with that interpretation, that that's what

16 that does?

17         **MR. STRANGIO:**  I don't agree with that interpretation

18 or I certainly -- I at least don't agree with that

19 interpretation as it's been operating in the real world, which

20 is part of why UNC is responsible to the injuries of our

21 Plaintiffs.

22         **THE COURT:**  Well, let's start -- let's stick with the

23 statute right now.

24         **MR. STRANGIO:**  So the statute -- no, I don't agree

25 with that.

1        **THE COURT:**  You've made a facial challenge to the

2  statute, right?

3        **MR. STRANGIO:**  Yes, Your Honor.

4        **THE COURT:**  Okay.  So I need to stick with the statute

5  first.  So tell me why Section 2 causes injury.

6        **MR. STRANGIO:**  Section 2 causes injury to -- focusing

7  on the individual transgender plaintiffs and the members of the

8  ACLU of North Carolina, Section 2 prevents them from having any

9  authorization to enter a restroom.

10        **THE COURT:**  Why is that?

11        **MR. STRANGIO:**  Because they --

12        **THE COURT:**  I -- but before H.B. 2 was passed, were

13  transgender individuals allowed to enter the restroom that they

14  identified with?

15        **MR. STRANGIO:**  Certainly they were allowed to

16  negotiate access.  For example, Joaquín Carcaño was using the

17  men's restroom with the permission of UNC.  UNC had a

18  nondiscrimination policy that allowed transgender

19  individuals -- all of our clients have alleged this.  They were

20  using facilities consistent with their gender identity prior to

21  H.B. 2, prior to H.B. 142.

22        **THE COURT:**  I thought at the time of the preliminary

23  injunction hearing the Plaintiffs' position was that they had a

24  right to use the facilities with which they identified and that

25  everything was working out -- I hesitate to use the word

1  "fine."  But that there was no need for H.B. 2 to redefine, if

2  you will, according to the Plaintiffs, access to these

3  facilities; and that if -- if the Court were to strike H.B. 2,

4  Plaintiffs could go back to the way things were.  Even the

5  Governor's lawyer at that point, I believe, told me, "Well,

6  that's kind of the way things were.  Nobody knew and everything

7  seemed to be fine."

8          **MR. STRANGIO:**  Yes.  And that's our position.

9          **THE COURT:**  So what I'm having trouble with -- if

10  that's what we call the status quo ante before H.B. 2, then how

11  is that an injury to the Plaintiffs?

12          **MR. STRANGIO:**  Because the injury is the operation of

13  H.B. 142.  H.B. 142 is the reason we can't return to the status

14  quo ante.

15          **THE COURT:**  Explain that to me because I'm having a

16  hard time following your line of reasoning.

17          **MR. STRANGIO:**  H.B. 142 --

18          **THE COURT:**  H.B. -- let me offer a proposition.  Does

19  H.B. 142 prohibit the various groups listed there from defining

20  access to restrooms?

21          **MR. STRANGIO:**  So read literally, I think H.B. 142

22  prohibits every single aspect of regulation with respect to

23  restrooms.  So it would prohibit, read literally, the

24  separation of men's and women's restrooms.  I don't see how you

25  can read H.B. 142 and regulate access to restrooms at all.

1    I think -- you know, looking at the context, though, and

2  how H.B. 142 actually operates in the state of North Carolina,

3  the bathrooms are being maintained for men and women, and we're

4  not challenging that.  We're just pointing that out for

5  purposes of showing what's really going on here.  What's really

6  going on here is that this is a law that is designed to either

7  bar transgender people from using the restrooms --

8         **THE COURT:**  How does it do that?

9         **MR. STRANGIO:**  It does that, you know, in a number of

10 ways.  By first creating a vacuum where there is --

11        **THE COURT:**  What's the vacuum?

12        **MR. STRANGIO:**  The vacuum is the fact that it refers

13 to an act of the General Assembly when there is no act of the

14 General Assembly, so an individual --

15        **THE COURT:**  Wasn't the vacuum there before H.B. 2?

16        **MR. STRANGIO:**  Well, the vacuum was there before H.B.

17 2, but we have to acknowledge the context of what's going on

18 here.  The status quo ante was transgender individuals -- as

19 former Governor McCrory's counsel admitted, people were going

20 about their lives.  They were navigating access to restroom

21 use.  Our clients had.  Their ability to obtain the

22 authorization -- as Your Honor recognized in the preliminary

23 injunction decision, that H.B. 2 operated in conjunction with

24 the trespass statute to define who has authorization.  That is

25 still true.  Authorization, as Defendants' counsel agreed, is a

1  fact-specific question.

2      Right now UNC is throwing up its hands and saying, "We

3  can't tell you, Joaquín Carcaño, whether you can use the

4  bathroom without facing penalty."  The most they've offered to

5  the Court is that the Court must assume that they won't be

6  disciplined, with no citation to any --

7          **THE COURT:**  I thought the lawyer told me something

8  more than that and that was that we can't prohibit you from

9  using the bathroom of your choice.

10          **MR. STRANGIO:**  They said -- what I --

11          **THE COURT:**  "If you identify as a transgender, then

12  you can use the bathroom that you wish because we can't

13  regulate that.  So we don't" -- as I understood it, "We don't

14  have to tell you which one to use.  You make your choice and we

15  can't do -- we can't send the police out after you, if you

16  will."

17      Did I understand your argument correctly?

18          **MR. SURI:**  Yes, Your Honor.

19          **MR. STRANGIO:**  So if it's UNC's position that

20  transgender individuals are authorized and have University

21  permission to use the restroom, then that's different than

22  what's been happening to our individual clients because this

23  seems like a different representation in court than one that's

24  being made outside of court for purposes of letting individual

25  transgender people know whether or not they have authorization

1  to enter the bathroom for purposes of the trespass statute, and
2  we submit that that is an injury.

3      You know, going –– taking a step back and sort of
4  addressing the question of standing and redressability, the
5  injury is two-fold.  First, it's the fact that our individual
6  clients have altered their behavior as a result of this.  They
7  have sought clarification from the Defendants about whether or
8  not they have authorization to enter the restrooms.  They have
9  not received that.  They have restricted their restroom use.

10      **THE COURT:**  So let's assume for a minute that I grant
11  the relief you ask for.  Let's assume that I strike down that
12  provision in Section 2 and assume that I find that the repeal
13  is not severable from that, so I strike everything down.  So
14  H.B. 2 goes back into effect; is that right?

15      **MR. STRANGIO:**  Yes, Your Honor.

16      **THE COURT:**  Let's assume I strike it down.  Total win.
17  You get everything you ask for.  Then where will your clients
18  be with respect to access to these facilities and how is that
19  different from where they are at the present?

20      **MR. STRANGIO:**  With respect to our individual clients
21  and allegations of the complaint, you know, two things.  First,
22  you know, with respect to Joaquín Carcaño, he was using, with
23  the permission of UNC and pursuant to their nondiscrimination
24  policy, restrooms consistent with his gender identity.  So he
25  would be back to where he was before.

1    **THE COURT:**  Why can't he do that now?

2    **MR. STRANGIO:**  He can't do that now because he -- for

3    two reasons.  One, he has, understandably, in light of H.B. 2

4    and H.B. 142, concerns about whether he has authorization and

5    every time --

6    **THE COURT:**  Wait a minute.  Why did you say

7    "understandably"?  H.B. 2 has been repealed.  The one law that

8    told him that he couldn't is now off the books and it's been

9    replaced by one, as I understand it, that says that the

10   University is not going to get involved in that, it's not going

11   to regulate it.

12   **MR. STRANGIO:**  Well, they are regulating access with

13   respect to everyone but transgender people is what I'm

14   understanding and maybe, perhaps, they're taking a different

15   position.  But they are -- he is seeking authorization and

16   being told he cannot receive authorization to enter the

17   restroom, and because of that he has to fear that there will be

18   consequences, and that's certainly true --

19   **THE COURT:**  Are they -- is the University telling him,

20   "No, you can't use it" or are they saying, "We can't tell you

21   one way or the other"?

22   **MR. STRANGIO:**  The latter.  They're saying that they

23   can't tell you -- we can't tell you one way or another.  You

24   know, for purposes of the due process in this claim, you know,

25   we think that this constitutes an injury.  The concern about

1    redressability, well, are we returning to the status quo ante
2    and at that point were the -- were the client -- were the
3    individual plaintiffs whole?  Were they able to do -- use the
4    restroom consistent with their gender identity?  As our clients
5    have alleged, they were.  I think that --
6              **THE COURT:**  At what point in the status quo ante was
7    your client entitled to have the University respond as to what
8    restrooms he could use?
9              **MR. STRANGIO:**  Well, first I want to say that the
10   injury alleged isn't the fact that they're not responding.  The
11   injury is that as a result of the operation of H.B. 142 and the
12   fact that he has -- this Court has recognized that trespass
13   applies to whether men and women go into the, you know, quote
14   unquote, proper restrooms, that he is understanding -- he, as a
15   result of the actions that have transpired over the last two
16   years, feels differently about the importance of seeking
17   authorization and that's what he's alleging --
18             **THE COURT:**  But you're not challenging the labeling of
19   the facilities as men's and women's, right?
20             **MR. STRANGIO:**  No, we're not, Your Honor.  We think
21   that --
22             **THE COURT:**  And your clients can choose which one they
23   identify with, right?
24             **MR. STRANGIO:**  Well, they can choose for sure, yes.
25             **THE COURT:**  And if they choose which one they identify

1 with under current law and use the facility that is consistent

2 with what they identify with, is there any part of the law that

3 says he can't do that; that there's notice that would be a

4 trespass?

5       **MR. STRANGIO:** We think that -- two things. First is

6 the many statements made by, for example, the

7 Defendant-Intervenors that this maintains H.B. 2 and that

8 representation that the status quo ante was that people of --

9       **THE COURT:** Well, I can't give that legal effect,

10 though. I mean, they're -- these are people making statements

11 to the press. I mean, I apply the law, so I'm looking at the

12 statute. So if various people want to say it means one

13 thing -- I mean, they may say that your clients are barred from

14 using the restroom because of the -- some statute that deals

15 with swimming pools or something. I mean, they would be wrong,

16 but I'm not going to give that much weight or any weight. So

17 let's focus on the statute.

18       **MR. STRANGIO:** Well, focusing -- focusing on the

19 statute and focusing on the context, our individual clients

20 have alleged that they cannot use the restroom and the consent

21 decree -- so if this Court finds standing, the consent decree

22 is an opportunity to --

23       **THE COURT:** Let's get the standing issue resolved

24 first, because if I don't find standing, then there may be an

25 issue about the consent decree.

1    **MR. STRANGIO:**  I think it's also helpful to look at

2  the equal protection claim because that's another part of this,

3  which I don't agree with Defendant -- the

4  Intervenor-Defendants' counsel that this is not a -- in a sense

5  a discrimination.  I think the standard that this Court applies

6  is the standard that the Supreme Court announced in *Arlington*

7  *Heights* looking at whether or not a legislative action is --

8  both has sort of motivating factors to impact a particular

9  group.

10             **THE COURT:**  Are you now talking about Section 3?

11             **MR. STRANGIO:**  Your Honor, I'm talking about both

12  sections, about Section 2 and Section 3, because this is a --

13  you know, it has been alleged by our -- in the Fourth Amended

14  Complaint that the injury to transgender individuals is both

15  the due process injury and the equal protection injury; that

16  transgender individuals have been singled out.  And the

17  motivation behind the law was, you know, the exclusion of or

18  the confusion about transgender individuals using restrooms at

19  all whatsoever.

20        The injury for standing purposes -- so we can look at the

21  merits, *Arlington Heights* test -- about whether or not that

22  test is met, but equal -- a violation of equal protection is an

23  injury in fact for Article III purposes, and that's what's been

24  alleged both with respect to Section 3 of the law and with

25  respect to Section 2.

1    And going to the redressability piece, I think that
2  *Northeast Chapter,* as well as the affirmative action cases that
3  are -- perhaps are instructive here as well.  Those cases stand
4  for the proposition that, yes, there may be other things in the
5  way of whole relief to an individual.  In *Arlington Heights*,
6  for example, the developing -- there were lots of contingencies
7  in place, but it was the local zoning restriction that was the
8  barrier being challenged.  In this case, H.B. 142 is the
9  barrier being challenged.  It is the source of the injury and
10 taking it away --
11         **THE COURT:**  You need to be more specific.  What part
12 of H.B. 142?
13         **MR. STRANGIO:**  Both H.B. -- both Section 2 and
14 Section 3 of H.B. 142 single out LGBT people.
15         **THE COURT:**  How does Section 2 single out LGBT people?
16         **MR. STRANGIO:**  I think, for example, that Section 2 of
17 H.B. 142, the provision about restroom access, and the -- you
18 know, read literally, that it -- it only -- it would prohibit
19 any regulation whatsoever, but we know that that's not
20 happening.
21         **THE COURT:**  Well, that -- does that prohibit the
22 University of North Carolina from applying H.B. 2 locally on
23 its campuses?
24         **MR. STRANGIO:**  Yes, Your Honor, I think read
25 literally, but H.B. 2 isn't the source of the injury challenged

1    here.

2         **THE COURT:**  Well, no, that's not the point.  The point

3    is that -- is to define what it means when it says "are

4    preempted from regulation of access."  So -- I mean, some of

5    the cases you sent me as supplemental authorities, at least one

6    of them, was a group of folks who were interested in privacy in

7    restrooms and so there's more than one side to this issue.

8    There are folks who oppose access to multi-use facilities

9    unless it was anatomical, which raises the H.B. 2 issue I guess

10   again.  So would Section 2 prohibit regulation in accordance

11   with that side of the argument?

12        **MR. STRANGIO:**  Read literally, I think that it

13   would -- it prohibits regulation of access.  In operation, I --

14   I don't understand how we could assume that regulation of

15   access to restrooms only means regulation of access for

16   transgender people.  Right now every state agency, as far as

17   I'm aware, of the University of North Carolina is maintaining

18   men's and women's facilities, which is a regulation of access

19   into those facilities; and the only way that the regulation of

20   access in H.B. 142 is understood is to be about transgender

21   individuals.  That seems like a context that would never have

22   existed before H.B. 2, that you would talk about regulation of

23   access to restrooms and the only thing that we would be

24   referring to would be where transgender individuals can go to

25   the restroom.

1     So I think that it's important to look at cases like *City
2  *of Los Angeles versus Patel* that remind us that the proper
3  inquiry is the people for whom the laws are restriction and
4  that is transgender people.  Everyone else is going about their
5  lives, going to the bathroom as they always have because
6  everyone is regulating restroom access inconsistent with H.B.
7  142, but that is illustrative of the fact H.B. --
8          **THE COURT:**  But how does H.B. 142 restrict the
9  Plaintiffs access to the restrooms of their choice?
10         **MR. STRANGIO:**  Your Honor, the allegations -- so one
11 example is that since -- as we've alleged in the complaint,
12 paragraph 76, that since H.B. 142's passage and the lifting of
13 the preliminary injunction against the enforcement of H.B. 2 --
14 this is with respect to Mr. Carcaño -- the University of North
15 Carolina has refused to state whether Mr. Carcaño is permitted
16 to use the restroom and so he is injured by the fact that he
17 cannot go to the bathroom at work.  He cannot -- that is an
18 injury and the source of that injury is H.B. 142.
19         **THE COURT:**  Why can't he use the restroom of his
20 choice?  What's prohibiting him from doing that?
21         **MR. STRANGIO:**  The risk of adverse consequences.
22         **THE COURT:**  What adverse consequences?
23         **MR. STRANGIO:**  Possible arrest for trespass.
24         **THE COURT:**  For trespass?
25         **MR. STRANGIO:**  For -- you know, for not having

1    authorization.  They will not provide him with authorization
2    and they have the authority to do so.
3         **THE COURT:**  But if they -- if the University can't
4    regulate access, how would it -- how would it charge him with
5    trespass?
6         **MR. STRANGIO:**  Well, the -- they could say that -- you
7    know, that he is not authorized to be in the bathroom in a
8    fact-specific inquiry or someone else could and they haven't
9    given him the ability to have the authorization at his
10   disposal.  The authorization is the source of the injury, the
11   fact that he cannot go about his life without that risk.
12       And if you look at cases like *Babbitt* and *Susan B. Anthony,*
13   for standing purposes an individual need not face arrest in
14   order to determine what the law means.  And he has gone out of
15   his way, as has counsel, to try to just make sure that he has
16   authorization to enter the restrooms so that he doesn't have to
17   fear --
18       **THE COURT:**  Is there any realistic likelihood that
19   Mr. Carcaño is going to face arrest for using the restroom of
20   his choice when the University's position is that they're not
21   going to regulate access to the bathrooms?
22       **MR. STRANGIO:**  Well, they have represented certain
23   things in court today, but the University is regulating access
24   to the restroom insofar as they're maintaining separate
25   restrooms for men and women.

1        **THE COURT:**  But you didn't take any issue with that.

2        **MR. STRANGIO:**  We aren't challenging that, but we

3   think that that's instructive.  They're taking inconsistent

4   positions with respect to their authority under H.B. 142.

5        **THE COURT:**  How can you challenge -- I'm struggling.

6   How do you criticize them for something that you don't

7   challenge?

8        **MR. STRANGIO:**  Because we're not saying it's a source

9   of injury.  We're saying it's evidence that they're not

10  following the law in the way that they are suggesting they are.

11       **THE COURT:**  So they need to take down all the signs?

12       **MR. STRANGIO:**  To be consistent with H.B. 142, read

13  literally.  We're not challenging that, but the fact that they

14  haven't -- the fact that they're -- they cannot regulate access

15  to restrooms if H.B. 142 says what everyone is claiming that it

16  means.  It's unclear to us how they are doing the regulation

17  that they are doing for everyone else but transgender people

18  and that's the source of the injury, is through the operation

19  of the law they're maintaining this -- they're throwing up

20  their hands and saying, "Good luck guessing.  We're not going

21  to tell you which restroom to use.  We are going to regulate

22  access in every single other way."

23     I think actually the City of Charlotte's ordinances are

24  instructive here to sort of point out the way in which the law

25  is operating in a nonsensical manner and is designed

1  exclusively to be about transgender individuals, in violation

2  of both due process and of equal protection.  Charlotte has a

3  prohibition on sex discrimination, so not talking about the

4  pieces of the Charlotte ordinance that were repealed with

5  respect to sexual orientation and gender.  They had a

6  prohibition on sex discrimination of public accommodations.

7  Section 3 of H.B. 142 does not preempt existing

8  nondiscrimination ordinances.  It only prospectively preempts.

9  But it does prohibit regulation of access to restrooms.

10      So here's how Charlotte's ordinance is set up, saying it

11  shall be unlawful to deny a person because of sex the full and

12  equal enjoyment of the goods, services, facilities of public

13  accommodation.  So a straightforward prohibition on the basis

14  of sex.  And then it has a separate section that says that this

15  shall not apply to restrooms, showers, bathhouses, and similar

16  facilities and has -- you know, recognizing that wholesale

17  prohibition on sex discrimination, as this Court recognized,

18  would raise questions about the separation altogether with

19  respect to restrooms.

20      So that piece seems to be preempted by Section 2 of H.B.

21  142, but nobody is interpreting it that way.  Nobody is taking

22  down the signs across the state of North Carolina.  Nor are we

23  suggesting that they should.  We point it out merely to say as

24  a factual matter --

25          **THE COURT:**  But you're criticizing UNC for not doing

1  it, right?

2         **MR. STRANGIO:**  It depends what you mean by criticism,

3  Your Honor.  If you -- if you mean criticizing so that we can

4  highlight the extent to which their arguments are internally

5  inconsistent, then yes.  If you mean criticizing as inform the

6  basis of our constitutional injury or our statutory injury,

7  then no.  It's more that it highlights that.  Read literally,

8  H.B. 142 cannot be squared with how things are operating on the

9  ground, and that is the source of both the injury under due

10  process and the injury under equal protection.

11         **THE COURT:**  So can Section 2 be read consistent with

12  the Constitution?

13         **MR. STRANGIO:**  We think, Your Honor, that the consent

14  decree accomplishes that.

15         **THE COURT:**  No, I'm not interested -- I'm not

16  interested in the consent decree right now.  I'm interested in

17  the statute.  Can the -- I mean, isn't there a proposition that

18  if a statute can be interpreted constitutionally the Court

19  should endeavor to interpret it constitutionally?

20         **MR. STRANGIO:**  Yes, Your Honor.  I think --

21         **THE COURT:**  And so can -- can the statute be

22  interpreted constitutionally?

23         **MR. STRANGIO:**  Not without clarification from -- from

24  the Court.  Otherwise, we're left in the same place we are now,

25  where the injuries are being maintained by the inconsistent

1  operation and enforcement of H.B. 142.  But, yes, consistent

2  with the Constitution, H.B. 142 could be read to prohibit --

3  and enforced in such a way so as to explicitly prohibit H.B.

4  142 itself from being the source of the discrimination and lack

5  of authorization with respect to entry into the restroom and

6  locker room facilities, as well as the removal of the denial of

7  equal protection.  It could.  It is not now in any way being

8  enforced or the operation is not --

9        **THE COURT:**  So your clients want to have the full

10  protections of everyone else, right?

11        **MR. STRANGIO:**  Yes, Your Honor.

12        **THE COURT:**  And they deserve to have that.  And -- so

13  the question is:  If your clients identify as a certain sex, a

14  certain gender and they want to use the restroom, why can't

15  they then have the full protections everybody else would have

16  and use the restroom of their choice under your theory of the

17  case?

18        **MR. STRANGIO:**  The theory of the case is that H.B. 142

19  is a bar to them.

20        **THE COURT:**  Forget H.B. 142.

21        **MR. STRANGIO:**  Oh, forget H.B. 142.

22        **THE COURT:**  So you have a transgender male who wants

23  to use the men's room.  It says "Men's," identifies as a male,

24  wants to use the men's room.  Is there anything in H.B. 142

25  that says he can't go in there?

1          **MR. STRANGIO:** The -- on the -- read literally --

2          **THE COURT:** I'm not asking if they go ask permission

3    and they want an explanation and they want it in writing or

4    they want some other assurance. Is there anything in 142 that

5    says you cannot do that, which was the problem with H.B. 2

6    because it said you cannot do that? Is there anything in 142

7    that says you cannot do that?

8          **MR. STRANGIO:** Read literally, Your Honor, no, I don't

9    think there's anything in H.B. 142 that says you cannot do

10   that.

11         I will just remind the Court that there are the nominal

12   damages claims with respect to H.B. 2 and so we can get to

13   those. There is nothing in the literal language. I do think

14   the reality of what is happening to our clients, the injuries

15   alleged, is that they are being injured by the operation of

16   H.B. 142 in practice; that without an order from this Court

17   that the Defendants are going to go back to doing what they

18   have been doing, which is to prohibit de facto individuals from

19   getting authorization that they need to not be injured insofar

20   as they are --

21         **THE COURT:** But -- but -- you put a lot into that

22   sentence, "de facto" and "authorization that they need." As I

23   understand, they're free to use the restrooms currently for the

24   gender that they identify with.

25         **MR. STRANGIO:** Well, it depends on what you mean by

1   "free," Your Honor.  Going back to the standing question, the

2   injury is that they -- they are not free without injury to use

3   the restrooms that they are -- that they identify with.  They

4   may be free in some sense that they -- you know, I may be free

5   to go walk into the women's room now.

6           **THE COURT:**  So in any state that didn't have the

7   history that North Carolina has with H.B. 2, don't they face

8   this same problem?  That is, if they have restrooms labeled

9   "Men's" and "Women's" and a transgender individual wants to use

10  a restroom, they go to whatever authority and ask for

11  permission, and they say, "I'm not going to, you know, say one

12  way or the other, but I'm not going to regulate you," aren't

13  they in the same position that folks in North Carolina would

14  be?

15          **MR. STRANGIO:**  I don't think they are and I think

16  going to the -- to the legal question about whether or not they

17  have standing to challenge this ban, which is what -- what they

18  brought before this Court, I do -- I want to make one point

19  about the redressability and the nature of the injury.

20          **THE COURT:**  Yeah, but you're not answering my

21  question.  I'm trying to get to the injury question.  Does this

22  mean people across the nation are injured by "Men's" and

23  "Women's" signs unless they get permission?

24          **MR. STRANGIO:**  No, Your Honor, that is not our -- that

25  is not our contention.  Our contention is specific to

1  North Carolina, to the operation of this law; that it's not a

2  generalized injury about not being able to have authorization

3  in every single context.

4      It's that there are individual transgender people, Joaquín

5  and the other plaintiffs, who managed their lives.  They

6  weren't running into court before H.B. 2.  The injury is

7  traceable and a product of H.B. 142.

8      No, this is not an injury that every transgender person has

9  across the country when they can't find someone to tell them

10  where they can go to the restroom.  This is an injury that is a

11  product of H.B. 142 and that is redressable by H.B. 142 being

12  struck down.  The fact that there may be other uncertainties in

13  the world -- the Defendants have reframed the nature of the

14  claim.  We're not seeking to eliminate every uncertainty.

15  We're seeking to eliminate the injury caused by H.B. 142.

16      **THE COURT:**  What happens if I strike everything down

17  and Mr. Carcaño wants to use the restroom at UNC?  Is he

18  injured?

19      **MR. STRANGIO:**  Is he injured by wanting to use the

20  restroom, Your Honor?

21      **THE COURT:**  No.  I'm going to strike everything down,

22  complete relief for Plaintiffs.

23      **MR. STRANGIO:**  Complete relief I think --

24      **THE COURT:**  So if I give complete relief and

25  Mr. Carcaño goes back to UNC and says, "I've been here before.

1   You told me you wouldn't tell me one way or the other.  Now I'm

2   asking can I use the men's room" -- all right.  I don't know

3   what the answer would be, but if it's the same answer, that is,

4   "We're not going to regulate it one way or the other," is he

5   now injured?

6           **MR. STRANGIO:**  Well, I think with respect to UNC

7   specifically, that their position has always been their

8   nondiscrimination law in the past had allowed people to use the

9   restrooms, and that was the basis for him having that

10  authorization and him being able to negotiate that.

11      If we sort of eliminate the two years that have passed and

12  take away -- strike down the law, is Mr. Carcaño injured when

13  he can't get permission to use the restroom?  I think that

14  that's an unlikely factual scenario and that his employer would

15  negotiate in the fact-specific context in the way that they had

16  been prior.

17      If it's simply -- if it operates to exclude him from the

18  restroom, if there's -- you know, based on the facts, then,

19  yes, that would be an injury.  I don't think the source of the

20  injury is the uncertainty.  The source of the injury in that

21  context would be the exclusion fact-specific to that.  In

22  the -- as things stand now, the relief that Plaintiffs seek is

23  the removal of H.B. 142.  H.B. 142 is the barrier in New

24  Hanover County.  It's the barrier at UNC.  It's the barrier

25  that --

1    **THE COURT:** Well, it's a barrier in New Hanover County

2  because some administrator says, "I think it's a barrier,"

3  right?

4    **MR. STRANGIO:** But –– you know, then if that's –– if

5  the position of the Defendants is that they can't do that,

6  then, you know, nothing –– nothing is stopping them from doing

7  it because there's –– this law is only being enforced in such a

8  way as to –– as to transgender individuals.  This is a law that

9  everyone understands to be about transgender individuals.

10  Either throwing up your hands, as UNC has done, to say, "We

11  won't tell you, but good luck," or using it as a ban

12  altogether, as New Hanover has done –– and that's the relief

13  that Plaintiffs seek, the removal of H.B. 142.  That is the

14  barrier.  That is the source of the injury.

15    And going back quickly, if I could, just to the equal

16  protection arguments with respect to H.B. 142, I want to

17  clarify again that *Arlington Heights* is the proper standard;

18  and that under *Arlington Heights*, the factors that this Court

19  can look at are the impact of the law, the historical

20  background, the sequence, the departure from normal procedures,

21  all of which have been alleged in the complaint.  And –– and

22  with respect to transgender individuals seeking the restroom

23  and with respect to LGBT individuals seeking nondiscrimination

24  protections, the allegations show that there is an injury.

25    Now, whether or not when you get to the tailoring of the

1  law -- and we contend that in *Arlington Heights* scrutiny is

2  proper.  They can make a claim that there was a purpose behind

3  this law, that it survives heightened scrutiny; but on a motion

4  to dismiss, they've offered none of that.  And heightened

5  scrutiny, it's their burden.

6      And so our position is that the injury flows from both the

7  way in which H.B. 142 has been operating in reality, as we've

8  discussed, as well as from the denial of equal protection,

9  which is itself an Article III injury.  And the Supreme Court

10  and the Fourth Circuit have been clear on that.  We put that

11  into the briefing.

12      And so I -- we can get to the nominal damages.  I don't

13  know if Your Honor wants to talk about that.

14          **THE COURT:**  I want to hear from you about your

15  political process -- what the Defendants call political process

16  claim.  That's the Section 3.

17          **MR. STRANGIO:**  Yeah, with respect -- with respect to

18  the political process claim, which is also an equal protection

19  argument -- and this is -- is a straightforward, you know,

20  restriction, subjecting individuals to a different political

21  process than others and boxing LGBT individuals out of the

22  political process in a particular way.  Now --

23          **THE COURT:**  Does it box everybody out or does it only

24  box one side out?

25          **MR. STRANGIO:**  It -- with respect to Section 3 --

1    **THE COURT:** Yeah.

2    **MR. STRANGIO:** -- with the nondiscrimination?  It is

3 specific to certain classes of people that don't already have a

4 local protection since it's prospective only.  So under *Hunter*

5 *v. Erickson* and *Romer,* I think it is specific to people based

6 on sexual orientation and gender identity; and that by virtue

7 of boxing out people from the political process, that is

8 another injury for purposes of Article III if we're looking at

9 standing and under 12(b)(6), you know, stating a claim as to a

10 violation of equal protection.

11    **THE COURT:** Does the State have the authority to

12 decide what issues it wants to resolve on a statewide basis

13 versus a local basis?

14    **MR. STRANGIO:** The State generally has the authority

15 to do that, but not in a discriminatory manner, not in a manner

16 that violates equal protection.

17    **THE COURT:** So how does Section 3 -- how is that

18 discriminatory?

19    **MR. STRANGIO:** Well, section -- so there's -- there's

20 two parts to the argument.  The one that we were just

21 discussing about *Arlington Heights*, which is separate and apart

22 from the political process equal protection argument, that --

23 the *Arlington Heights* factor is whether or not there's both the

24 motivating impact behind the law and -- the motivating intent,

25 as well as the impact, are targeting a group of people.  So

1  there's two parts to this.  So there's the *Arlington Heights*

2  equal protection violation and then a separate piece about the

3  political process, which is a separate equal protection

4  violation, both of which are sufficient for purposes of

5  standing; and the injury is the denial itself.

6      As to the political process, it is specific to

7  ordinances -- to regulations prospectively.  So it sets back

8  where things are and groups of people that are boxed out

9  include LGBT people who are now subjected to a different level

10  of legislative process in order to get the protections that

11  they -- that they need.  Now, it doesn't -- the law doesn't say

12  that it has to only be one group of people.  So someone else

13  may come in and say that they were denied equal protection.

14      But going back to both -- the *Arlington Heights* piece, the

15  purpose behind this law and the way in which it boxes people

16  out of the political process is very much specific to LGBT

17  people.  The context is that Charlotte passes the ordinance.

18  Everyone rushes in to the Special Session saying that this is a

19  crisis and then that is maintained specifically with H.B. 142,

20  Section 3.  And so it's both the *Arlington Heights*

21  discrimination in violation of equal protection, in violation

22  of equal protection by boxing a specific group of people out of

23  the political process.

24      If I could just add one final thing, Your Honor, with

25  respect to the arguments raised by the Defendants that multiple

1    groups are boxed out of the political process in the same way.
2    I don't think it's –– everyone is because you have lots of
3    ordinances that are currently in place that provide different
4    levels of protection than exist at the state level.  So this
5    isn't a uniformity issue.

6        This is about prospectively stopping people from getting
7    new protections and that is analogous to the situation in
8    *Hunter v. Erickson* where it wasn't just race, for example.
9    That was the City of Akron Housing Ordinance context.  It was
10   race, religion, national origin.  Multiple factors were put on
11   a different process and the court found that that was a
12   violation of equal protection because it subjected people on
13   the basis of race of a different –– to a different process than
14   others.

15       And we think that is plainly analogous here and that both
16   for the discussion as to the operation of H.B. 142 and the
17   injuries flowing from it under due process and then the many
18   allegations of how this is a violation as well of equal
19   protection –– and we haven't discussed the statutory claims.
20   They're analogous both with respect to H.B. 142 and H.B. 2.  We
21   think that there are ample allegations to find both standing
22   and that the Plaintiffs have stated a claim under the various
23   theories.

24           **THE COURT:**  All right.

25           **MR. STRANGIO:**  I'll be happy to turn it over to –– do

1  you have any other questions?

2          **THE COURT:**  I do not.  Thank you very much.

3      Anybody else want to be heard from the Plaintiffs' side?

4      All right.  Yes, Mr. Suri.

5          **MR. SURI:**  Thank you, Judge Schroeder.

6      I just wish to emphasize one point about prohibition versus

7  authorization.  The University has said that under H.B. 142 it

8  is preempted from forbidding transgender people from accessing

9  restrooms consistent with their gender identity.  Now we hear

10 from counsel that that's not enough; the source of the injury

11 is beyond this not forbidding; the University needs to give a

12 kind of permission slip affirmatively authorizing access to the

13 restrooms.

14     I think there are four problems with that theory of injury

15 traceable to the University.  The first is in the response to

16 the anti-commandeering argument they seem to disclaim any

17 request for an affirmative authorization.  All they want is for

18 H.B. 142 to be invalidated.

19     Secondly, the general rule is you don't need affirmative

20 authorization to do what you want to do.  It's up to the

21 government to prohibit you from doing something, and if it

22 doesn't do so, the private citizen doesn't need preclearance

23 from the government to engage in whatever conduct he wishes to

24 engage.

25     Third, the trespass statute works the same way.  The

1  trespass statute doesn't say it's a trespass to go somewhere

2  where you don't have authorization.  It says it's trespass to

3  go somewhere where there's either a notice posted saying "Keep

4  Out" or the owner has said, "Get out."  And the University has

5  made it clear that H.B. 142 preempts it from doing that very

6  thing.

7      The final point is, even if you disagree with me on all of

8  those points, the point still stands that the University is not

9  responsible for the injuries in this case because it didn't

10 enact H.B. 142.  We've heard that there's been a barrier put up

11 that creates a lack of assurance as to whether the Plaintiff

12 can use a particular restroom, but the University did not put

13 up that barrier.  To the contrary, the University has had a

14 longstanding policy prohibiting discrimination against

15 transgender individuals.  The legislature has put up this

16 alleged barrier.  So the injury, if one exists at all, it's

17 traceable to the State, not the University.

18         **THE COURT:**  All right.  Mr. Schwartz.

19         **MR. SCHWARTZ:**  Your Honor, it struck me that

20 Plaintiffs' argument was largely an effort to drag this case

21 out of the world of considering justiciability into the world

22 considering the merits.

23     The Plaintiffs kept on emphasizing the *Arlington Heights*

24 factors.  The Plaintiffs kept on trying to talk about the

25 consent decree, but none of that matters.  The *Arlington*

1    *Heights* factors go purely to the merits; and if you don't have

2    standing, then categorically the Court cannot get to the

3    merits.

4        Similarly with the consent decree.  The consent decree

5    is -- it's an act of this Court's jurisdiction and its exercise

6    of judicial power, which is *ultra vires* if the Court doesn't

7    have jurisdiction in the first place.

8        So we need to talk about what exactly the injuries are the

9    Plaintiffs are alleging.  As for uncertainty, as far as I could

10   tell, the Plaintiffs clarified that the uncertainty that

11   they're complaining about is their inability to get essentially

12   a permission slip in advance.  But as my colleague representing

13   UNC Defendants just pointed out, ordinarily preclearance isn't

14   the standard; and as the Supreme Court has indicated, for

15   example, in the *National Park Hospitality* case, you can always

16   wish for additional clarification from the government about

17   your legal rights, but that doesn't get you into court.

18       Plaintiffs might want verbal permission.  They might want a

19   written permission slip.  They might want -- they might want a

20   framed -- a framed plaque saying that Mr. Carcaño can go into a

21   restroom, but their -- but their wish for additional --

22   additional steps of clarity, that's not enough to create a

23   justiciable injury.

24       The second thing the Plaintiffs address on -- the second

25   aspect of Plaintiffs' injury -- alleged injury that Plaintiffs

1   addressed just now is the -- has to do with the political

2   process.  The Plaintiffs have conceded now that the State has

3   authority to decide what to do statewide and what to allow to

4   happen locally.  Okay.  If the State has that -- has that

5   authority and the Plaintiffs don't have a legal right to demand

6   that legislation happen at a particular -- and in a particular

7   state forum, that's it.  No justiciable claim on the political

8   process theory.

9       It's also -- I also want to mention the fact that

10  Plaintiffs claim that it's purely certain individuals who are

11  boxed out of the political process.  That is completely false.

12  H.B. 142 repeals H.B. 2.  People who -- who were proponents of

13  H.B. 2, who at one point commanded a majority of the state

14  legislature, cannot pursue their preferred policies in their

15  local jurisdictions.  Everybody -- everybody on a very wide

16  spectrum of potential policy preferences, all the way from

17  Plaintiffs on one hand to H.B. 2 proponents on the other hand,

18  nobody in that range can pursue any of their preferred policies

19  at the local level.  They are all funneled into the General --

20  into the General Assembly.  That means that any -- you know,

21  Plaintiffs emphasize that it's about a particular topic that

22  only operates prospectively, but one way or the other it means

23  that, whatever anybody's policy preferences, everybody has to

24  do it in one place.  That is the essence of the generalized

25  grievance that is categorically inadequate to invoke this

1  Court's jurisdiction.

2      The other thing I point out is the -- is the way the

3  Court -- is the redressability -- or, rather, the issues having

4  to do with the reference to the status quo.  There are two ways

5  to address the status quo.  One of them is retrospectively.

6  The other is prospectively.  Or two ways to address the effect

7  of H.B. 142 rather.  I think, as far as I was hearing the

8  Plaintiffs, try as they might, the only difference between the

9  status quo ante prior to H.B. 2 and today that they can think

10  of is the -- is Mr. Carcaño's alleged inability now to get, you

11  know, his written permission slip from UNC.  But, again, that's

12  not an injury.

13      Then you look at that injury prospectively.  What is the

14  difference between the status quo right now and the status quo

15  if H.B. 142 were repealed and enjoined?  The status quo in the

16  future or the potential -- the future state of affairs is

17  precisely the same as the current state of affairs, with the

18  exception of Plaintiffs' pure speculation about the -- about

19  the decisions of third parties who aren't in front of the Court

20  and in many cases who couldn't be constrained by parties in

21  front of the Court; and, of course, there's no threat of

22  enforcement right now.

23      I should also point out as one final point the Plaintiffs

24  have this odd textual theory that regulation of -- that the

25  preempted field under H.B. 142 includes posting restrooms

1  for -- as men's rooms versus women's rooms, and they say

2  that -- that by posting that, that shows there's -- this is a

3  discriminatory practice.

4      **THE COURT:**  I thought I understood the argument to be

5  that that is a form of regulation that they're not challenging,

6  but it's nevertheless a form of regulation.  Therefore, there

7  is some regulating going on even though the statute says you

8  can't.

9    Am I -- is that accurate?

10      **MR. STRANGIO:**  That's accurate, Your Honor.

11      **MR. SCHWARTZ:**  And that is how I understood their

12  argument.

13    One, that -- I wanted to point out that, one, not only are

14  they not challenging the separation of men's and women's

15  facilities; two, they aren't asking this Court to adopt a rule

16  on -- a categorical rule on access to facilities; three, this

17  Court wouldn't have authority to because that's an issue purely

18  of -- I mean, it's a combination of interpretation of state law

19  and of the meaning that property owners attach to their posting

20  of particular signs on particular rooms; and plus, of course,

21  it's a weirdly atextual view of what the term "regulation"

22  means.

23    I think the UNC Defendants' brief had the sharpest response

24  on that point, which is to say that regulation is a -- you

25  know, it's a generally applicable, publicly posted thing that

1  has some kind of official promulgation process.  Nobody -- I
2  don't think anybody considers as a textual matter posting a
3  sign, for example, for trespass law purposes as being a form of
4  regulation.
5          **THE COURT:**  Well, but what if they change the signs?
6  What if the sign said "Men's Room (Based on Anatomy)"?
7  Wouldn't that be a form of regulation?
8          **MR. SCHWARTZ:**  That's a -- it's a hypothetical.
9  Obviously, it's hard to --
10         **THE COURT:**  But it's responsive to your point and I
11 think is -- I think the issue with the men's and women's room
12 is it's a convention that's been used for decades, if not
13 centuries, and so it is what it is.
14         **MR. SCHWARTZ:**  Uh-huh.  I'm not sure what the answer
15 would be if, for example, UNC wanted to -- wanted to post a --
16 wanted to put up "Men's" and "Women's" based on gender
17 identity.  I think that would probably -- I think that would at
18 least arguably be a form of regulation that would be preempted,
19 but it's difficult to say and we haven't briefed the issue.
20         **THE COURT:**  All right.  Anything further?
21         **MR. SCHWARTZ:**  No, Your Honor.
22         **THE COURT:**  So why -- on the political process claim,
23 their argument is that you say it applies equally to all sides;
24 but as a matter of practice and history would say, they're the
25 ones bearing the brunt of the lack of any protections.  So

1  they're being discriminated against, Plaintiffs are; and

2  therefore the preemption provision kind of locks in place the

3  current discriminatory environment for them; and so it does

4  have the effect of injuring them.  It is designed to affect

5  them more so than anyone else.

6          **MR. SCHWARTZ:**  One, I think that that's -- I don't

7  think that that's possible because, remember, H.B. 142 repeals

8  H.B. 2 and just everybody, on a completely even-handed basis,

9  they're all funneled into the same place.

10         Another thing is, to put kind of the most favorable gloss

11 on their argument, as you've done, Your Honor, it is possible

12 that they're arguing that H.B. 142 is locking in a

13 discriminatory regime, but they -- I mean, it's possible that

14 that's what they're arguing.  I don't concede the point.  But,

15 of course, they aren't challenging the current regime of access

16 to any kind of facility.  They aren't saying that the trespass

17 laws are discriminatory.  They're raising a facial challenge

18 where they aren't challenging any particular -- they aren't

19 challenging any particular circumstances of access to

20 particular facilities.

21         And it's important to -- and it's important to consider --

22 consider the analogy between this case and between *Romer* and

23 *Schuette.*  In *Schuette,* the Michigan affirmative action

24 constitutional amendment case, in that case a -- a-- in that

25 case a -- you know, an important area of public policy, the use

1  of affirmative action was prohibited; and in that case,

2  they're -- and in that case, the Supreme Court said, you know,

3  that's something that's within the authority of -- it's within

4  the authority of people to --

5          **THE COURT:**  Aren't those cases at least

6  distinguishable on the ground that the states were trying to

7  prohibit any discrimination and at the same time prevent any

8  affirmative action, and the courts held that if the Fourteenth

9  Amendment meant anything that equal means equal and therefore

10 you have no right to a preference?  So for that reason, the

11 claim that the plaintiffs were injured because they could no

12 longer get their preferences at the level they wanted them

13 didn't amount to a claim because they don't have a right to a

14 preference.

15         **MR. SCHWARTZ:**  Well, it's similar -- it's similar

16 here.  Plaintiffs aren't arguing that they have a right to

17 access any particular facility.  They aren't asking for this

18 Court to enter such a rule.

19         **THE COURT:**  Well, they are asking for access to

20 facilities that match their gender identity, right?

21         **MR. SCHWARTZ:**  Well, not in -- not in the Fourth

22 Amended Complaint.  In this complaint, all they're asking for

23 is -- is an injunction against H.B. 142.  They aren't asking

24 for a -- they aren't asking for a statewide rule that would

25 allow any particular person access to any particular facility.

1          **THE COURT:**  Hold on just a minute.

2      (Pause in the proceedings.)

3          **MR. SCHWARTZ:**  Your Honor, on that point I can refer

4    to page 11, Note 5, of the Plaintiffs' opposition brief where

5    they say that -- where they waive any argument they can

6    challenge the absence of affirmative nondiscrimination

7    protections based on gender identity.  And then on page 42,

8    they disclaim any intent to seek enactment and administration

9    of nondiscrimination policies that do not currently exist.

10   Plus, of course, they aren't -- they aren't challenging the

11   separation of -- challenging the customary separation of

12   facilities by men and women.

13         **THE COURT:**  Paragraph D of the prayer for relief seeks

14   an injunction requiring Defendants to ensure individuals,

15   including transgender people, to use single sex, multi-user

16   facilities in accordance with their gender identity without

17   fear of arrest or other penalty in all public schools,

18   universities, et cetera, and requiring Defendants in their

19   official capacities to allow local governments to enact and

20   continue to enforce antidiscrimination protections.

21         **MR. SCHWARTZ:**  They did mention that in their

22   complaint, but in their opposition to the motions to -- motions

23   to dismiss, they appear to have waived that.

24         **THE COURT:**  You're saying they've waived it.

25      Is that true?  Is that waived now?

1      **MR. STRANGIO:**  No, Your Honor, I don't think that the
2  footnote that Defendants are pointing to is a waiver of that.
3      But, again, this is -- the relief being sought is an
4  injunction from H.B. 142 being operated to that effect and that
5  ability to go back to the status quo ante, which would include
6  the ability to access those facilities as to the individual
7  Plaintiffs as they all were prior to; and the injunction that
8  we're seeking would strike down H.B. 142, which is itself the
9  barrier to that.  We're not seeking anything broader than that
10  in this case.
11      Although, as the -- as the Title IX claim with respect to
12  H.B. 2, the nominal damages, made clear, we think that it would
13  be unlawful to exclude people from restrooms based on unlawful
14  sex discrimination, but the order that we're seeking is an
15  order striking down H.B. 142 as the source of the bar that's
16  currently in place.
17      **THE COURT:**  So any request that I enjoin on a
18  mandatory basis the Defendants to require them to affirmatively
19  give permission, if you will, to facilities?
20      **MR. STRANGIO:**  No, Your Honor, not under the H.B. 142
21  claims.  With respect to H.B. 2 and the nominal damages claims,
22  that seeks a different form of relief, but going back to the
23  standing --
24      **THE COURT:**  That's only if I strike 142 down.
25      **MR. STRANGIO:**  Well, the nominal damages claims exist

1    regardless, but as to -- in terms of the injunction question --

2         **THE COURT:**  Yes.

3         **MR. STRANGIO:**  -- yes -- no, there's not an

4    affirmative request for something mandatory.  Although at this

5    stage, with respect to the motion to dismiss, I'm not sure it's

6    necessary to figure out every nature of the relief and where

7    would it be proper.  For purposes of standing and the injury,

8    H.B. 142 is the source of injury.

9         If I could just take a moment to respond to something --

10        **THE COURT:**  Let me let him finish and I'll give you

11   just a moment.

12        **MR. SCHWARTZ:**  Your Honor, I think Plaintiffs' counsel

13   just confirmed what I was saying; that all they're asking for

14   is an injunction against -- is an injunction against H.B. 142.

15   Then they -- then all they have -- then all they get is the

16   opportunity to pursue -- pursue political processes in other

17   jurisdictions, which wasn't their right to begin with, and they

18   weren't injured by being deprived of, and all they get

19   supposedly is to -- is to -- is to -- and it wouldn't get them

20   any certainty either because the application of trespass law

21   and the promulgation of facility access policies would be left

22   in the hands of third parties making their own -- making their

23   own unconstrained choices.

24        **THE COURT:**  All right.  Thank you.

25        Anybody else want to be heard?

1    I'll be happy to hear from you briefly as to his points

2  that he mentioned.

3         **MR. STRANGIO:**  Yeah, just briefly, Your Honor.  I want

4  to respond to two things he said.

5    The first concerns this question of regulation of restrooms

6  and UNC's contention that regulation is only, you know,

7  something that is promulgated in a ruling.  In that sense, that

8  would seem to be wholly inconsistent with their position that

9  they can't provide Joaquín Carcaño with permission on a one-off

10 basis, for example, to use the restroom; that they are somehow

11 forbidden even from engaging in the type of dialogue with him

12 about whether or not he is authorized as an individual.  And

13 he's alleged in his complaint that they will not -- they will

14 not do that, so that seems inconsistent with the position that

15 somehow a regulation of restrooms is only a policy rule.

16 They're not -- they're not following that, at least as to the

17 allegations in the complaint, which need to be taken as true.

18    And I think it's important that we note that there's so

19 many inconsistencies here with respect to how the law is

20 actually being applied versus the representations made in

21 court, and that the complaint has to control I think going back

22 to -- and we had this conversation last time with respect to

23 UNC that came in, made the same argument that they weren't

24 doing anything, but again, they are doing something.  They're

25 telling --

1   **THE COURT:**  Is your -- excuse me.  I'm sorry to

2   interrupt you, but if I don't ask when I think of it, I may

3   lose the thought.  Is your challenge a facial challenge?

4   **MR. STRANGIO:**  It's crafted as a facial challenge,

5   yes, because it is -- you know, the law is facially doing this.

6   **THE COURT:**  If that's the case then, how do I consider

7   your arguments about what the University may or may not be

8   saying and your client's statements about, you know, how he's

9   trying to get permission and all of that?  That's inconsistent

10  with a facial challenge, is it not?

11  **MR. STRANGIO:**  No, Your Honor.  I think it just -- it

12  shows that the law can't operate in a way with respect to -- so

13  I guess if Your Honor wants to take it as an as-applied

14  challenge, then that would be possible.

15  **THE COURT:**  I'm asking you what -- what you're doing.

16  **MR. STRANGIO:**  So with respect to Section 3, it's --

17  with respect to the equal protection claims, it's a facial

18  challenge.  You know, it's a law that is facially violative of

19  equal protection.  It's a law that under *Arlington Heights* was

20  motivated for a very particular purpose.  It boxes people out

21  of the political process and in a particular way.

22  With respect to due process, I will -- I will concede that

23  due process is generally considered first in an as-applied

24  basis; and so with respect to the vagueness, if we're looking

25  at the injury, it's as applied -- the H.B. 142 is operating as

1    applied to transgender individuals.  Although it's a little

2    bit -- you know, it's a little bit unusual context because,

3    read literally, the law -- it's just not being followed, except

4    with respect to transgender individuals.  So I would say, as

5    applied to transgender individuals, it's creating a due process

6    violation both with respect to the fair-notice requirement and

7    with respect to -- with respect to discriminatory enforcement.

8        And I want to respond quickly to the idea that the trespass

9    law is the source of the injury, and that somehow Plaintiffs

10   should have come in and challenged that.  The trespass law is

11   not the source of the injury.  H.B. 142 is the source of the

12   injury that the Plaintiffs have alleged.  H.B. 142 is the

13   reason that UNC won't communicate with Joaquín Carcaño about

14   whether he's authorized to enter the bathroom.  It's the source

15   of the denial of equal protection.

16       It's -- you know, it reminds me of the Defense of Marriage

17   Act, for example, where you had a definitional provision in

18   federal law.  It wasn't that the individuals who were harmed by

19   that went and challenged every reference to marriage in federal

20   law.  The source of the injury was DOMA and the operation of

21   DOMA.

22       And just like that, the source of the injury is H.B. 142.

23   That its operating in concert with other laws that are not

24   otherwise problematic does not mean you need to come into court

25   and challenge those laws.  The source of the injury is

1  H.B. 142.  The injury that the Plaintiffs are seeking to
2  redress is -- is the injury that flows from H.B. 142.
3       And if I could just point Your Honor to -- to the
4  North Carolina -- *Northeast Florida* cases and *Arlington Heights*
5  again for two reasons before I sit down and I promise that I
6  will.  They're instructive for two reasons.  The first is that
7  they explain that on an equal protection theory it is the
8  barrier that is the injury, not necessarily the receipt of the
9  benefit in those cases that the people were seeking.
10      But it's also instructive outside of the equal protection
11  context to show that for standing purposes you do not need
12  to -- to point -- you do not need to eliminate every single
13  potential source of the injury.  If there is a bar in place, if
14  there is an injury that is being caused by an operation of law,
15  that that's sufficient for standing purposes.  There may be
16  other sources or other uncertainties, as the Defendants have
17  reframed this.  That's not the question for standing.  And that
18  the standing or injuries that are alleged are traceable to this
19  law and that's what we're challenging here.
20      Thank you.  Do you have any other questions?
21          **THE COURT:**  As to the facial challenge to 142, how is
22  the University of North Carolina at all responsible for any of
23  142?
24          **MR. STRANGIO:**  As to section -- so going back to --
25          **THE COURT:**  Just as to the facial challenge.  They --

1      **MR. STRANGIO:**  So the -- just as to Section 3?

2          **THE COURT:**  Any aspect of 142.  How is UNC responsible

3  for -- on a facial challenge to H.B. 142?

4          **MR. STRANGIO:**  UNC is responsible because they are

5  not -- they are operating their facilities in such a way

6  that --

7          **THE COURT:**  Isn't that an as-applied challenge?

8          **MR. STRANGIO:**  Well, there's two parts to that.

9  There's the regulated access and then with respect to the

10 nondiscrimination provisions as a whole.

11     And let me just look back to -- to the law.  I guess

12 it's -- if they're not considered a local government, then

13 that's not relevant for purposes of Section 3; but in terms of

14 the facially discriminatory character of the law, the

15 motivating -- the motivating impetus behind the law, that is

16 not just those who pass the law that are responsible, but those

17 who are enforcing it, an unconstitutional law, themselves --

18         **THE COURT:**  Isn't that an applied challenge?

19         **MR. STRANGIO:**  Well, no, Your Honor, I don't think so.

20 The only case I can think of off the top of my head is a case

21 that we -- that we litigated in a wholly different context.

22 But where you have a prison -- for example, where prison

23 officials -- there's an unconstitutional law of the legislature

24 and it's facially unconstitutional and prison officials are

25 saying, "Well, we don't like it, but we're following it."  And

```
 1   that following a facial unconstitutional law is depriving
 2   individuals of equal protection; that UNC would still be
 3   responsible for that and would be a proper party before this
 4   Court.  We can do further -- further briefing, Your Honor, on
 5   this question if you have -- if you have further questions
 6   about it.
 7           THE COURT:  All right.  Thank you.
 8       All right.  Give me just a second.
 9       (Pause in the proceedings.)
10           THE COURT:  So let me address this question to the
11   Attorney General's office.  You asked to be able to respond to
12   the Fourth Amended Complaint after I decided whether to enter
13   into the consent decree; is that right?
14           MS. VYSOTSKAYA:  That's correct.
15           THE COURT:  And I said you would have 30 days after
16   whatever decision I made as to the motion to dismiss before you
17   then had an opportunity to respond.
18           MS. VYSOTSKAYA:  So the order stated that we will have
19   30 days after you rule on whether to enter -- whether to
20   approve the consent decree.  We will have 30 days to respond
21   from that date.
22           THE COURT:  All right.
23           MS. VYSOTSKAYA:  And, Your Honor, it's docket entry --
24           THE COURT:  It says 226.
25           MS. VYSOTSKAYA:  -- 226.  Yes, Your Honor.
```

1       **THE COURT:**  All right.  Give me just a minute.

2           (Pause in the proceedings.)

3       **THE COURT:**  So what I said is that I would resolve the

4   motions to dismiss first because I didn't know whether there

5   would be a jurisdictional issue and the arguments were made

6   that I didn't -- if I didn't have jurisdiction, then I couldn't

7   enter into a consent decree, correct?

8       **MS. VYSOTSKAYA:**  My reading -- those were the

9   arguments and my reading of the case law would confirm that the

10  Court has to have subject-matter jurisdiction.

11      **THE COURT:**  The Court what?

12      **MS. VYSOTSKAYA:**  Has to have subject matter

13  jurisdiction.

14      **THE COURT:**  So you agree that I have to determine I

15  have subject-matter jurisdiction before I get to the issue of

16  the consent order?

17      **MS. VYSOTSKAYA:**  That's correct.  Or is a part of the

18  claim -- if the Court retains at least a part of the claim,

19  then, yes, you have to have subject-matter jurisdiction in

20  order to --

21      **THE COURT:**  All right.  So my intention is to resolve

22  the motions to dismiss first.  Then we'll see where we are at

23  that point; and if there are portions that are left, then I

24  will resolve the issue of the consent decree.

25      And I don't believe I have any response from anybody else

1  on the consent decree.  Were you anticipating you'd have an

2  opportunity to address that issue?

3          **MR. SCHWARTZ:**  Your Honor, yes.  Your order reflects

4  November 2nd, 2017, Docket No. 228:  It is hereby ordered that

5  the time for any party to respond to the Joint Motion for Entry

6  of a Consent Decree shall be extended until 30 days following

7  the date of this Court's disposition of the pending motions to

8  dismiss.

9          **THE COURT:**  I just want to make sure we're all on the

10  same page then.  So I'll resolve the current motions and then

11  that will kick in potentially deadlines depending on what I

12  resolve.  All right.

13          **MS. VYSOTSKAYA:**  Yes, Your Honor.

14          **THE COURT:**  All right.  Anybody have anything else

15  they want to add before we --

16          **MS. LEJNIEKS:**  Your Honor, can I just clarify?  Right

17  now discovery is on hold and there are two conflicting orders

18  in place, one that was a motion to dismiss dismissal and the

19  other that relates to the consent decree.  We are under the

20  assumption that discovery is stayed until the later of those

21  issues are resolved.  I just wanted to confirm that.

22          **THE COURT:**  Is there any objection to that?

23          **MR. STRANGIO:**  No, Your Honor.

24          **MS. LEJNIEKS:**  Great.  Thank you.

25          **THE COURT:**  All right.  Those were issued -- at least

1    one by the magistrate judge perhaps?

2            **MS. LEJNIEKS:**  Yeah, the magistrate judge issued an

3    order -- it's Docket No. 212 -- on September 8th, 2017, and I

4    believe that one is tied to after the deadline for responding

5    to the Fourth Amended Complaint.  And then the other order is

6    on November 8th, 2017.  That's Docket 232.  That one is tied to

7    the consent decree.  So while we had your attention, Your

8    Honor, I thought it was worth clarifying so that we're on the

9    same page.

10           **THE COURT:**  All right.  So it would be the later of

11   either of those.

12           **MS. LEJNIEKS:**  Great.  Thank you, Your Honor.

13           **MR. STRANGIO:**  No objection.  Thank you.

14           **THE COURT:**  Okay.  All right.  In the absence of

15   anything else -- and thank you for coming in.  I appreciate

16   your briefing and your work on this.  It was well done.  I'll

17   issue a decision just as soon as I can.

18       Okay.  Please adjourn court until our two o'clock session.

19           (Proceedings concluded at 12:09 p.m.)

20

21

22

23

24

25

1

# C E R T I F I C A T E

2     I, LORI RUSSELL, RMR, CRR, United States District Court
Reporter for the Middle District of North Carolina, DO HEREBY
3 CERTIFY:

4     That the foregoing is a true and correct transcript of the
proceedings had in the within-entitled action; that I reported
5 the same in stenotype to the best of my ability and thereafter
reduced same to typewriting through the use of Computer-Aided
6 Transcription.

7

8

9 Lori Russell, RMR, CRR          Date:  2/20/19
Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25