IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUÍN   CARCAÑO;   PAYTON   GREY )
MCGARRY; HUNTER SCHAFER; MADELINE )
GOSS;   ANGELA   GILMORE;   QUINTON )
HARPER;   and   AMERICAN   CIVIL )
LIBERTIES UNION OF NORTH CAROLINA, )
                                   )
           Plaintiffs,             )
                                   )
       v.                          )
                                   )       1:16cv236
ROY A. COOPER, III, in his official )
capacity   as   Governor   of   North )
Carolina; UNIVERSITY OF NORTH )
CAROLINA; DR. WILLIAM ROPER, in his )
official capacity as President of )
the University of North Carolina; )
JOSHUA   STEIN,   in   his   official )
capacity   as   Attorney   General   of )
North Carolina; MACHELLE SANDERS, )
in   her   official   capacity   as )
Secretary   of   the   North   Carolina )
Department of Administration; MANDY )
K. COHEN, in her official capacity )
as Secretary of the North Carolina )
Department   of   Health   and   Human )
Services;   and   JAMES   H.   TROGDON, )
III, in his official capacity as )
Secretary   of   the   North   Carolina )
Department of Transportation,      )
                                   )
           Defendants,             )
                                   )
       and                         )
                                   )
PHIL   BERGER,   in   his   official )
capacity as President Pro Tempore )
of the North Carolina Senate; and )
TIM   MOORE,   in   his   official )
capacity as Speaker of the North )
Carolina   House   of )
Representatives,                   )
                                   )
     Intervenor-Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

THOMAS D. SCHROEDER, Chief District Judge.

Before the court is the supplemental joint motion of Plaintiffs Joaquín Carcaño, Payton Grey McGarry, Hunter Schafer, Madeline Goss, Angela Gilmore, Quinton Harper, and the American Civil Liberties Union of North Carolina (together, "Plaintiffs"), along with Defendants Governor Roy Cooper, Attorney General Joshua Stein, and Secretaries Machelle Sanders, Mandy Cohen, and James Trogdon (together, "Executive Branch Defendants") for entry of a proposed consent decree to resolve this lawsuit as between them. (Doc. 289.) Intervenor-Defendants Phil Berger, President Pro Tempore of the North Carolina Senate, and Tim Moore, Speaker of the North Carolina House, proceeding in their official capacities as heads of the North Carolina General Assembly's two chambers, oppose the motion.[1] (Doc. 292.) The remaining Defendants, the University of North Carolina ("UNC") and its President, Dr. William Roper[2] (together, "UNC Defendants"), take no position. (Doc. 288 at 3.) For the reasons that follow, the motion will be granted.

---

[1] The legislators have been permitted to intervene to defend their enactments pursuant to N.C. Gen. Stat. § 1-72.2.

[2] Dr. William Roper has been substituted for former President Margaret Spellings as a Defendant pursuant to Federal Rule of Civil Procedure 25(d). (Doc. 281.)

## I.  BACKGROUND

This case has an extensive history that is more completely recounted in the court's earlier decisions.  <u>See, e.g.,</u> (Doc. 248 at 4-14).  The lawsuit originated as a challenge to North Carolina's Public Facilities Privacy & Security Act, 2016 N.C. Sess. Laws 3, known as House Bill 2 ("HB2"), which required, among other things, that public agencies ensure that multiple occupancy restrooms, showers, and other similar facilities be "designated for and only used by" persons based on the "biological sex" listed on their birth certificate.  The court entered a preliminary injunction, granting Plaintiffs' request in part and denying it in part, based on controlling precedent at the time.  (Doc. 127.)

During the pendency of the case and following substantial economic and other pressures brought against the State as a result of HB2, the North Carolina legislature enacted — and the newly-elected Governor, Defendant Cooper, signed — 2017 N.C. Sess. Laws 4, known as House Bill 142 ("HB142").  Section 1 of HB142 repealed HB2, Section 2 bars state agencies from "regulati[ng] . . . access to multiple occupancy restrooms, showers, or changing facilities, except in accordance with an act of the General Assembly," and Section 3 prohibits local governments from "enact[ing] or amend[ing] an ordinance regulating private employment practices or regulating public accommodations."  Section 4 provides that Section 3 "expires on December 1, 2020."

In the wake of the passage of HB142, the court dissolved its preliminary injunction (Doc. 205), and Plaintiffs filed a Fourth Amended Complaint (Doc. 210) claiming that HB142 and its predecessor HB2 violated their rights under the Fourteenth Amendment, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII").[3]  The Fourth Amended Complaint contains over 400 detailed paragraphs recounting the procedural history of the litigation as well as the myriad actions that led to passage of HB142 and the concomitant repeal of HB2.

On October 18, 2017, Plaintiffs and the Executive Branch Defendants moved jointly for entry of a consent decree.  (Doc. 216.)  A few days later, the UNC Defendants filed a motion to dismiss the lawsuit, as did Intervenor-Defendants.  In a September 30, 2018 Memorandum Opinion and Order (Doc. 248), the court dismissed a number of Plaintiffs' claims, leaving only the following: (1) Plaintiffs' Title VII and Title IX nominal-damages claims against UNC for the period in which HB2 was in force, as to

_____

[3] Plaintiffs pleaded two sets of claims involving HB2: (1) nominal damages claims against UNC for alleged Title VII and IX violations committed during the period when HB2 was in force, and (2) constitutional challenges to HB2 pleaded "solely in the event that the Court finds one or more of HB142's provisions unlawful and not severable from HB142's other provisions" (Doc. 233 at 42), in which case Plaintiffs allege that HB142 should be struck down in its entirety, causing HB2 to spring back into effect.

4

which the court reserved ruling pending supplemental briefing; and (2) Plaintiffs' equal protection challenge to HB142 § 3, brought against the Executive Branch Defendants, as to which the court found that Plaintiffs had met their pleading burden.[4]  The court also directed the parties to meet and confer as to the effect of its dismissal ruling on the proposed consent decree.  (Id. at 63–64.)

As directed, the parties filed supplemental briefing regarding the motions to dismiss Plaintiffs' Title VII and Title IX claims.  On December 21, 2018, Plaintiffs and the Executive Branch Defendants filed a second joint motion for entry of consent decree (Doc. 264), again opposed by Intervenor-Defendants.  On April 23, 2019, Intervenor-Defendants filed what the court construed as an unopposed motion to stay the Title VII and Title IX proceedings pending the Supreme Court's review of Bostock v. Clayton County Board of Commissioners, 723 F. App'x 964 (11th Cir. 2018), cert. granted, 139 S. Ct. 1599 (2019) (mem.) (whether Title VII prohibits discrimination against an employee on the basis of sexual orientation); Zarda v. Altitude Express, Inc., 883 F.3d 100 (2d Cir. 2018), cert. granted, 139 S. Ct. 1599 (2019) (mem.) (same); and EEOC v. R.G. & G.R. Harris Funeral Homes, Inc., 884 F.3d 560 (6th Cir. 2018), cert. granted, 139 S. Ct. 1599 (2019)

---

[4] Plaintiffs' contingent challenges to HB2, as referenced in footnote 3, also remain.

(mem.) (whether Title VII prohibits discrimination against an employee on the basis of transgender status). (Doc. 282.)

The court held a hearing on the pending motions on May 17, 2019. During the hearing, the court heard argument by Plaintiffs and the Executive Branch Defendants as to the proposed terms of the consent decree, as well as the objections of Intervenor-Defendants. The court also expressed its concerns as to certain provisions of the proposed consent decree. (Doc. 287.) A few days later, the court stayed all litigation as it pertains to Plaintiffs' remaining Title VII and Title IX claims and ordered the parties to meet and confer in an attempt to resolve the concerns raised at the hearing as to the terms of the proposed consent decree. (Doc. 286.)

On May 31, 2019, Plaintiffs and the Executive Branch Defendants filed the present supplemental joint motion for entry of consent decree (Doc. 289), along with briefing (Docs. 290, 291) and a revised proposed decree (Doc. 289-1). The parties also filed a status report, as directed by the court, setting out the parties' positions. (Doc. 288.) Intervenor-Defendants filed a supplemental brief setting out their continued opposition to the motion. (Doc. 292.) On July 17, 2019, the court held a telephone hearing regarding the revised proposed decree, expressing additional concerns. Two days later, Plaintiffs filed a final version of the proposed consent decree. (Doc. 294-1.) The motion

is now ready for decision.

## II.  ANALYSIS

Plaintiffs and the Executive Branch Defendants move for entry of a consent decree that would resolve all remaining claims against the Executive Branch Defendants.[5]  (Doc. 289.)  The proposed consent decree has four decretal paragraphs:

(1) With respect to public facilities that are subject to Executive Branch Defendants' control or supervision, the Consent Parties[6] agree that nothing in Section 2 of H.B. 142 can be construed by the Executive Branch Defendants to prevent transgender people from lawfully using public facilities in accordance with their gender identity.  The Executive Branch Defendants as used in this paragraph shall include their successors, officers, and employees.  This Order does not preclude any of the Parties from challenging or acting in accordance with future legislation.

(2) The Executive Branch Defendants, in their official capacities, and all successors, officers, and employees are hereby permanently enjoined from applying Section 2 of H.B. 142 to bar, prohibit, block, deter, or impede any transgender individuals from using public facilities under any Executive Branch Defendant's control or supervision, in accordance with the transgender individual's gender identity.  Under the authority granted by the General Statutes existing as of December 21, 2018, and notwithstanding N.C.G.S. § 114-11.6,[7] the Executive Branch Defendants are enjoined from prosecuting an individual under Section 2 of H.B.

---

[5] The contingent claims against HB2 would be dismissed as well, leaving only Plaintiffs' Title VII and IX claims against the UNC Defendants, which have been stayed.  (Doc. 286.)

[6] The "Consent Parties" are defined as Plaintiffs and the Executive Branch Defendants.  (Doc. 294-1 at 3.)

[7] Section 114-11.6 creates a "Special Prosecution Division" within the North Carolina Attorney General's office.

142 for using public facilities under the control
or supervision of the Executive Branch, when such
otherwise lawful use conforms with the individual's
gender identity.

(3) The Consent Parties shall each bear their own fees,
expenses, and costs with respect to all claims
raised by Plaintiffs against the Executive Branch
Defendants.

(4) All remaining claims filed by Plaintiffs against
the Executive Branch Defendants in this action are
hereby dismissed with prejudice.

(Doc. 294-1.)

"A consent decree is a negotiated agreement that is entered
as a judgment of the court." Bragg v. Robertson, 83 F. Supp. 2d
713, 717 (S.D.W. Va. 2000). Thus, while it is consensual, it
remains a judicial document. Id. ("Approval of a consent decree
is a judicial act, committed to the informed discretion of the
trial court."); United States v. Swift & Co., 286 U.S. 106, 114–
15 (1932). A federal court only has the power to enter a consent
decree that "spring[s] from and serve[s] to resolve a dispute
within the court's subject-matter jurisdiction." Local No. 93,
Int'l Ass'n of Firefighters v. City of Cleveland, 478 U.S. 501,
525 (1986); see also Pac. R.R. v. Ketchum, 101 U.S. 289, 297 (1897)
(requiring that a consent decree "comes within the general scope
of the case made by the pleadings"). Before the court agrees to
enter a consent decree, it must ensure that the proposed decree
"is fair, adequate, and reasonable" as well as "not illegal, a
product of collusion, or against the public interest." United

States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999) (quoting United States v. Colorado, 937 F.2d 505, 509 (10th Cir. 1991)). While a federal district court "should not blindly accept the terms of a proposed settlement," it "should be guided by the general principle that settlements are encouraged." Id.

Intervenor-Defendants argue that the terms of the proposed decree exceed the court's subject-matter jurisdiction and raise "federalism and separation-of-powers concerns." (Doc. 292 at 1–2.) These, and Intervenor-Defendants' related contentions, are addressed in turn.

A.   Subject-Matter Jurisdiction

Because the court must always assure itself of its subject-matter jurisdiction, it must determine whether the proposed consent decree falls within its power to act. In its September 30, 2018 Memorandum Opinion and Order, the court determined that Plaintiffs lacked standing as to their claims that HB142 created uncertainty about which restrooms they were permitted to use, and the court dismissed those claims for that reason.[8] (Doc. 248 at 21–31.) However, the court determined that Plaintiffs did have standing as to their claims against the Executive Branch Defendants challenging HB142 §§ 2 and 3 on the grounds that the preemption provisions of these sections — which allegedly eliminate the

---

[8] Plaintiffs failed to show injury in fact, traceability, and redressability.

ability of transgender individuals to advocate for anti-discrimination protections in the state agency and municipal policy-making process — constitute a violation of the Equal Protection Clause. (Doc. 248 at 31–39.) Intervenor-Defendants argue that the court's dismissal of Plaintiffs' injury-by-uncertainty claims for lack of standing deprives the court of jurisdiction to enter a consent decree that would alleviate alleged uncertainty about bathroom access, leaving the court with authority only to approve consent decree provisions that directly remediate Plaintiffs' alleged barrier-to-access injury.

The Supreme Court has cautioned that "a federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." Local No. 93, 478 U.S. at 525 (internal quotation marks omitted). "Accordingly, a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction." Id. The provisions of a consent decree must fall within "the general scope of the case made by the pleadings" and "further the objectives of the law upon which the complaint was based." Id. (quoting Ketchum, 101 U.S. at 297). "[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." Id.

Here, the court is not persuaded that the relief requested by

Plaintiffs and the Executive Branch Defendants falls outside its jurisdiction to approve. "[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial." Local No. 93, 478 U.S. at 525. Moreover, courts have found that even claims "not expressly set out in the pleadings" can "fall within the[ pleadings'] general scope," as long as they are sufficiently related to the pleaded claims. United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1090 (1st Cir. 1994).

Intervenor-Defendants point out that the first two paragraphs of the proposed consent decree directly address potential application of HB142 § 2 as a basis for blocking transgender individuals' use of public facilities matching their gender identity, or prosecuting them for such use, as opposed to the inability to meaningfully advocate for non-discrimination protections at the local government and state agency levels. Intervenor-Defendants therefore trace the lineage of these provisions to Plaintiffs' failed attempt to establish an injury in fact based on alleged uncertainty about which restrooms they were able to use.

As noted above, however, it is sufficient if the provisions of a consent decree relate to the pleaded claims; they need not be

tailored to remedy only the pleaded injury in fact.[9]  Here, the
court found that Plaintiffs established standing to challenge
HB142 § 2 on equal protection grounds.  Plaintiffs contended that
the provision created "'one rule for transgender individuals and
another for non-transgender individuals' because the UNC
Defendants are willing to regulate access to restrooms in one sense
[i.e., by labeling restrooms as for 'men' or 'women'], but refuse
to regulate access to restrooms in the sense of clarifying which
restrooms transgender individuals are permitted to use."  (Doc.
248 at 43 (quoting Doc. 233 at 40).)  In dismissing this claim
under Rule 12(b)(6), the court found that Plaintiffs "failed to
plausibly plead that the preemption of regulation of access to
multiple occupancy restrooms, showers, or changing facilities in
Section 2 impacts them disproportionately" in part because
"[n]othing in the language of Section 2 can be construed to prevent

---

[9] Intervenor-Defendants have not offered a single case in which a court
found that it lacked subject-matter jurisdiction to enter a proposed
consent decree because its terms were not precisely tailored to reach
the properly-alleged injury (and only the properly-alleged injury).
Although Intervenor-Defendants quote from League of United Latin Am.
Citizens, Council No. 4434 v. Clements, 999 F.2d 831 (5th Cir. 1993) (en
banc) ("LULAC") to the effect that "any federal decree must be a tailored
remedial response to illegality," see id. at 847, the LULAC court did
not make its statement in a context analogous to this one.  The plaintiffs
in LULAC no longer had any claims left after the legal issues on appeal
were resolved, leading the court to the obvious conclusion that any sort
of "response to illegality" was practically impossible in such a case.
Id. ("We could not . . . remand [for entry of a consent decree] without
correcting the district court's misapprehensions of law . . . and when
[that task] is done, there is no case.").  In the instant case, Plaintiffs
still have live claims that Defendants unconstitutionally discriminated
against them.

transgender individuals from using the restrooms that align with their gender identity." (Id. at 47, 49.) It is this precise observation, arising out of a challenge to HB142 § 2 which Plaintiffs had standing to bring, that Plaintiffs and the Executive Branch Defendants now seek to memorialize in the consent decree.

Intervenor-Defendants' response to this argument is that claims ultimately dismissed for failure to state a claim definitionally cannot fall within "the general scope of the case made by the pleadings," Local No. 93, 478 U.S. at 525 (quoting Ketchum, 101 U.S. at 297). Under this reasoning, no proposed consent decree in this case could address HB142 § 2 at all, given the court's Rule 12(b)(6) dismissal of Plaintiffs' equal protection challenge to that provision. But Intervenor-Defendants cite no case applying such a rule, and courts do not consider "the merits of the settled claims" in the consent decree jurisdiction analysis. Bragg, 248 F.3d at 299; see also id. at 299–300 ("As long as [the plaintiff]'s claims were not clearly frivolous from the face of the complaint, jurisdiction was proper, and a challenge to the consent decree may not be made on a jurisdictional basis."). As one court aptly noted, "there may be some value for settlement purposes even to substantive claims that [this court has] rejected, because" — absent a settlement — the plaintiffs could exercise "their rights of appeal and could persuade the [Court of Appeals] that [this court] was wrong." In re New Motor Vehicles Canadian

13

Export Antitrust Litig., 236 F.R.D. 53, 56 (D. Me. 2006).

As a result, neither the court's jurisdictional rejection of Plaintiffs' injury-by-uncertainty claims nor its Rule 12(b)(6) dismissal of Plaintiffs' equal protection challenge to HB142 § 2 vitiates its jurisdiction to enter the proposed consent decree.

### B. **Propriety of the Proposed Consent Decree**

Plaintiffs and the Executive Branch Defendants contend that the proposed consent decree meets the standard of "fair, adequate, and reasonable" and "not illegal, a product of collusion, or against the public interest." North Carolina, 180 F.3d at 581 (quoting Colorado, 937 F.2d at 509). Intervenor-Defendants disagree.

"In considering the fairness and adequacy of a proposed settlement, the court must assess the strength of the plaintiff's case." Id. "In particular, the court should consider the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." Id. (internal quotation marks omitted). "[P]rior to approving a consent decree a court must satisfy itself of the settlement's overall fairness to beneficiaries and consistency with the public interest." Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (quoting United States v. Trucking Emp'rs, Inc., 561 F.2d 313, 317 (D.C. Cir. 1977)). As noted above: in treating these

factors, the court is "guided by the general principle that settlements are encouraged." North Carolina, 180 F.3d at 581.

Here, Plaintiffs' litigation against the Executive Branch Defendants has persisted for over three years and consumed substantial party and public resources. Despite this, the case has not advanced beyond its pre-answer phase as to the Fourth Amended Complaint. Approval of the proposed consent decree would resolve all claims against the Executive Branch Defendants, "avoid the consumption of a significant [additional] amount of time and expense by the parties, including the public fisc, and . . . allow for the efficient use of judicial resources." W. Va. Highlands Conservancy v. Pocahontas Land Corp., No. 2:13-cv-12500, 2015 WL 7736645, at *2 (S.D.W. Va. Nov. 30, 2015).[10] By providing a vehicle for resolving the claims between the settling parties as to the remnants of a contentious challenge involving a matter that has consumed significant state and judicial resources — and doing so by adopting the plain meaning of HB142 § 2, which was passed by the State legislature — the proposed consent decree is consistent with the public interest. See Gorsuch, 718 F.2d at 1126 ("Not only the parties, but the general public as well, benefit from the

_____

[10] While significant discovery can ensure that the court and parties have properly evaluated the claims at issue, see Pocahontas Land Corp., 2015 WL 7736645, at *2, this case is unique in that, as the Fourth Amended Complaint alleges in detail, most of the important facts on which this case is based played out in the public spotlight. Moreover, having already issued multiple merits rulings in this case, the court is very familiar with its background.

saving of time and money that results from the voluntary settlement of litigation."). The court has carefully tracked the development of the proposed consent decree in its several iterations, required supplemental briefing following dismissal of some of Plaintiffs' claims, and held two hearings to address its propriety. In the court's view, the revised proposed consent decree reflects a genuine effort to address the concerns raised by the prior versions.

The court also observes that the parties have had the benefit of excellent legal counsel. Plaintiffs are well-represented by several major nonprofit legal organizations (the American Civil Liberties Union of North Carolina and Lambda Legal Defense and Education Fund) and large, sophisticated law firms (Jenner & Block LLP and Wiley Rein LLP). The Executive Branch Defendants are well-represented by the North Carolina Department of Justice. While it may appear that Plaintiffs gain little from the proposed consent decree, which affirms the court's reasoning in dismissing their HB142 § 2 equal protection claim, it is a fact that HB2 was repealed during the pendency of the lawsuit, and Plaintiffs do obtain partial resolution of this long-running lawsuit as well as the Executive Branch Defendants' agreement that the parties will pay their own costs and attorneys' fees. The court cannot say that this resolution fails to reflect the relative merit *vel non* of the claims alleged in the Fourth Amended Complaint.

Intervenor-Defendants contend that Plaintiffs and the Executive Branch Defendants are not in reality opposed to each other and, therefore, that any proposed consent decree is necessarily collusive.  It is certainly true that, unlike their immediate predecessors, the Executive Branch Defendants have shown little interest in litigating this case.  They have not moved to dismiss or attempted to answer the Fourth Amended Complaint in the nearly two years since it was filed, nor did they evince any support for Intervenor-Defendants' attempts to obtain dismissal on their behalf, despite the fact that — as the court's ruling on Intervenor-Defendants' motion to dismiss explains — the majority of Plaintiffs' claims have been found to lack merit.  Where there has been little adversarial activity, a federal court must be especially discerning when presented with a proposal in which elected state officials seek to bind their successors as to a matter about which there is substantial political disagreement.  See Horne v. Flores, 557 U.S. 433, 449 (2009) (noting that "public officials sometimes consent to, or refrain from vigorously opposing, decrees that . . . bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers" (internal quotation marks omitted)).  Along these lines, Intervenor-Defendants also argue that the proposed consent decree unduly circumscribes executive

discretion (Doc. 292 at 2-3 & n.2 (citing Michael W. McConnell, Why Hold Elections? — Using Consent Decrees to Insulate Policies from Political Change, 1987 U. Chi. Legal F. 295, 301)), and thus may result in permanent federal supervision of core state processes by subjecting future North Carolina executive branch officials to "a potentially continual round of court proceedings" on charges that they violated the decree (Doc. 287 at 10).

However, the proposed consent decree dismisses the Executive Branch Defendants from the case having ceded nothing more than an interpretation of HB142 § 2 faithful to its plain terms and agreeable to all parties, including the Intervenor-Defendants. In its first paragraph, the proposed decree provides "that nothing in Section 2 of H.B. 142 can be construed by the Executive Branch Defendants [or their successors] to prevent transgender people from lawfully using public facilities[11] in accordance with their gender identity." (Doc. 294-1 at 5.) In the second paragraph, it provides that — as a natural consequence of the first paragraph — the Executive Branch Defendants will not seek to apply HB142 § 2 to prohibit transgender individuals from using public facilities in accordance with their gender identity or prosecute them for such use, when that use is "otherwise lawful." (Id. at 5-6.)

---

[11] The proposed consent decree defines "public facilities" as "multiple occupancy restrooms, showers, or changing facilities as referenced in N.C.G.S. § 143-760 and sect. 2 of H.B. 142." (Doc. 294-1 at 2.)

These provisions follow directly from the fact that the sole function of HB142 § 2 is to preempt regulation of access to public facilities "except in accordance with an act of the General Assembly." Thus, as the court previously concluded, there is simply no plausible argument that HB142 § 2 itself serves as an independent basis for regulating individuals at all. See (Doc. 248 at 29 ("HB142 does not regulate restroom access in any fashion . . . ."), 38 n.20 (noting that "HB142 does not regulate individuals")). Indeed, at the hearing on the present motion, Intervenor-Defendants conceded they do not disagree with that proposition. (Doc. 287 at 7.) In fact, they have previously characterized any contrary argument as "mistaken." See (Doc. 241 at 4 (rejecting an argument that HB142 could be the basis for barring transgender use of a bathroom, because "as a matter of law HB 142 cannot serve as a 'basis' for any school district's restroom access policy")). It is therefore unpersuasive that legitimate executive discretion will be preempted in any way by the proposed consent decree.

Intervenor-Defendants' core concern regarding future executive discretion appears to be that the proposed consent decree might be interpreted to go beyond HB142 to govern "how State officers can apply trespass and other laws" in the future. (Doc. 292 at 2.) But such interpretation is foreclosed for several reasons. As noted, the proposed decree does no more than establish

19

an agreement to be bound by the plain language of HB142 § 2, which the court and all parties accept as correct: that HB142 § 2 is only a preemption of regulation of access to certain public facilities "except in accordance with an act of the General Assembly." Because there is no legitimate interpretation of HB142 § 2 that runs afoul of the terms of the consent decree, future North Carolina executive branch officials should not suffer any cabining of their policymaking authority. The proposed decree by its very terms is limited to HB142 and does not extend to the application of state trespass law or any other law of the General Assembly,[12] and Plaintiffs and the Executive Branch Defendants readily acknowledge that the proposed decree could not be read in such a way. See (Doc. 290 at 6 (Plaintiffs stating that the proposed consent decree "does not affect the application of or enforcement of laws other than H.B. 142")); (Doc. 291 at 4 (Executive Branch Defendants stating that the proposed decree "addresses the Legislative Intervenors' concern about hypothetical interaction of the Consent Decree with . . . other penal laws, including that of a criminal trespass," because it only bars prosecution where a transgender individual's bathroom use is "otherwise lawful")). Indeed, the court would lack jurisdiction to enter a consent decree that purported to limit the application

---

[12] Neither does the proposed consent decree extend to the application of federal law.

of laws other than HB142, because no complaint in this case ever challenged any law other than HB142 or its defunct predecessor, HB2.  Cf. (Doc. 248 at 29–30 (noting that the Fourth Amended Complaint did not challenge laws other than HB142, and therefore that relief from potential application of those other laws is unavailable in this case)).  The question whether any North Carolina law other than HB142 could be applied to transgender individuals using public facilities in accordance with their gender identity was never at issue in the Fourth Amended Complaint and, under the proposed consent decree, remains open for another day in another forum.  Thus, nothing in HB142 § 2 or the proposed consent decree can be construed to authorize or prohibit transgender use of public facilities, nor are the Executive Branch Defendants or their successors prohibited from arguing the application of any other law of the General Assembly to such use.

Intervenor-Defendants' final argument is that the proposed consent decree impinges on the North Carolina General Assembly's exclusive prerogative "to establish the permanent requirements of North Carolina law."  (Doc. 292 at 2.)  The court finds this contention unpersuasive in the context of this case, where the North Carolina legislature's representatives have agreed that the plain-text interpretation of HB142 § 2 set out by the court and adopted in the proposed consent decree is the right one.  In fact, they previously argued in favor of such an interpretation in their

motion to dismiss the Fourth Amended Complaint.  See, e.g., (Doc.
225 at 2-4 (arguing that "HB142 does not regulate Plaintiffs"
because it "enacts no access . . . standards, has no enforcement
provision, makes no demands on private conduct, and carries no
penalties")); (Doc. 241 at 4).  Moreover, nothing in the proposed
consent decree purports to limit the North Carolina General
Assembly's ability to amend HB142 or pass any law it wishes,
including any law that — unlike HB142 — does regulate individuals'
access to public facilities.[13]

    Considering all of the above, the court is satisfied that the
proposed consent decree is "fair, adequate, and reasonable" and
not illegal, a product of undue collusion, or against the public
interest.  North Carolina, 180 F.3d at 581 (quoting Colorado, 937
F.2d at 509).  The proposed consent decree, which dismisses all
remaining claims against the Executive Branch Defendants with
prejudice, will be entered pursuant to Federal Rule of Civil
Procedure 54(b), the court finding no just reason for delay.

---

[13] Neither does the court find any issue with "enter[ing] a consent decree
on the effect of State law over the objection of Intervenors" merely
because Intervenor-Defendants "are independent state actors with their
own interest in the integrity of State law."  (Doc. 292 at 3).  In fact,
it is precisely because the Executive Branch Defendants and Intervenor-
Defendants are "independent state actors" that Intervenor-Defendants
cannot "block the decree merely by withholding [their] consent," Local
No. 93, 478 U.S. at 529; see id. at 528-29 ("It has never been supposed
that one party — whether an original party, a party that was joined
later, or an intervenor — could preclude other parties from settling
their own disputes and thereby withdrawing from litigation.").

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Supplemental Joint Motion for Entry of Consent Decree (Doc. 289) is GRANTED. The proposed consent decree will be entered contemporaneously with this order.

/s/ Thomas D. Schroeder<br>
United States District Judge

July 22, 2019